9/13/00

18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jason E. Benson,                      :    CIVIL ACTION NO. 1:CV-00-1229
                    Plaintiff         :
                                      :    (Judge Caldwell)
v.                                    :
                                      :    (Magistrate Judge Blewitt)
                                      :
Thomas Duran, et al.,                 :
                    Defendants        :

AMENDED COMPLAINT

FILED
SCRANTON

SEP 11 2000

PER _____
        DEPUTY CLERK

## PARTIES

1.) The plaintiff, Jason E. Benson, was held at Adams County Prison (hereon A.C.P.) during the events described in this complaint.

2.) Defendant Thomas Duran is the Warden of A.C.P.. He is sued in his individual capacity.

3.) Defendants Bruce Cluck and Debra Hanky are the Deputy Wardens of A.C.P.. They are sued in their individual capacity.

4.) Defendant's John Jennings and William Orth are Lieutenants of the A.C.P.. They are sued in their individual capacity.

5.) Defendant Rae Hientzelman is a Sergeant of the A.C.P.. He is sued in his individual capacity.

6.) Defendant's Briton Shelton and David Vazquez are Correctional Officer's of the A.C.P.. They are sued in their individual capacity.

7.) Doctor William J. Steinour is a physician employed at the Gettysburg Hospital. He is sued in his individual capacity.

8. Dr. Ronald Long, physician, and Dr. William Ellien, psychiatrist, are employed at the State Correctional Institution Smithfield. They are sued in their individual capacities.

Plaintiff retains the right to amend any future Jane/John Doe defendants that becomes available through discovery.

## FACTS

1.) On August 25, 1999, plaintiff, a Pennsylvania State Prisoner, was transferred to the Adams County Prison (hereafter referred to as A.C.P.) for the purpose of attending a Post Conviction Relief Act Hearing. (See Exhibit "A")

2.) On August 27, 1999, upon plaintiff's return to A.C.P. from the aforementioned hearing, he was released from the Sheriff's restrains. However, A.C.P. Intake Officer, defendant Briton Shelton, recuffed the plaintiff behind his back, and shackled him about the ankles. This not being the usual protocol for returning inmates, plaintiff inquired as to why he was being

**FACTS CONTINUED FROM PAGE 2**

recuffed.   Defendant Briton Shelton responded, saying, "Hey, I ain't the one!"   At this time defendant Lt. John Jennings appeared, saying, "Bring Shithead in to get naked."   Indicating a strip search.

3.)  Plaintiff  was led to a small room adjacent to the intake area.  Plaintiff, handcuffed behind his back and shackled about the ankles, was seated in a chair.  Defendant Lt. Jennings exited the room leaving plaintiff alone with defendant Briton Shelton, was docile, and no words were exchanged.  Defendant Lt. John Jennings returned with Warden Thomas Duran, Deputy Wardens Bruce Cluck and Debra Hankey, Sergeant Rae Hientzelman, and John Doe, who was carrying a video camera, filming. (See Exhibit "B" - (1), (2), and (3).

4.)  At this time, Deputy Warden Bruce Cluck ordered plaintiff to strip.  Plaintiff, handcuffed and shackled, unable to comply, refused.  Notwithstanding, plaintiff was handcuffed behind his back, and shackled about his ankles posing no threat to the defendant's, without warning was shot in the face with O.C. Pepper Foam.  Plaintiff, unable to breath or see, attempted to rid himself of the O.C. Pepper Foam, lost his balance, hitting his head against a computer monitor.  At this time, defendant Warden Thomas Duran gave the order to "Takem' down'"  Seriously injuring plaintiff, defendants Bruce Cluck, Debra Hankey, John Jennings, Rea Hientzelman, and Briton Shelton knocked plaintiff to the ground, hammering plaintiff's head into the floor, twisting plaintiff's hands beyond normal range of motion, kicking and kneeing  plaintiff  in  his back and side.  (See Exhibit "C")

5.)  After pleading for several minutes for defendant's to get off of him, defendant's relented, throwing plaintiff into a concrete shower stall, where plaintiff fell unconscious.  Defendant Thomas Duran forcefully yanked plaintiff out of the shower stall, taking him to the floor again, where defendant Thomas Duran stomped his foot into the plaintiff's neck.  After plaintiff was released from defendant Thomas Duran's foot, and removed of the restraints, plaintiff complied to a strip search.  A.C.P. has no medical facilities, thus plaintiff requested to be taken to the Gettysburg Hospital Emergency Room.  (See Exhibit "D")

6.)  Subsequently, the Gettysburg Hospital Emergency Room physician Dr. William J. Steinour, who is familiar with plaintiff's past history of epilepsy, refused to address plaintiff's request for anti-seizure medications, as well as his complaint of losing consciousness, diagnosing the plaintiff with, "Multiple contusions" and released plaintiff to the care of A.C.P..

**FACTS CONTINUED FROM PAGE 3**

7.)   Thereafter, on August 30, 1999, plaintiff was witnessed by defendant's Lt. William Orth and C.O. David Vazquez to be in a state of convulsions, but refused to immediately treat plaintiff until one and one-half (1½) hours later, where they again witnessed plaintiff in a state of serious convulsions, only then calling for the Adams County Sheriff's Department to transport plaintiff to the Gettysburg Hospital.  Once plaintiff arrived at the Gettysburg Hospital Emergency Room, he was witnessed by hospital Medical Staff to be in a life threatening state of severe seizures known as "Status Epilepticus," incontinent, and foaming and bleeding from the mouth.  Plaintiff was immediately admitted to the Gettysburg Hospital Critical Care Unit with "Imminent Death" orders (See Exhibits "E" (1), (2), (3), and (4)

8.)   After further investigation, it was discovered that a series of pharmacological deviations prescribed by defendant's Dr. Ronald Long and Dr. William Ellien of SCI Smithfield precipitated into the aforementioned "Status Epilepticus" attack suffered by plaintiff.  (See Exhibit "F"(4))

9.)   On June 4, 1999, plaintiff was seen by defendant Dr. Ronald Long.  Plaintiff complained that the anti-seizure medication he was on, (a hypantoin derivative called Dilantin) was causing unwanted side effects, and that he wanted to switch back to the anti-seizure medication he was on prior to the Dilantin. Defendant Dr. Ronald Long refused to change the medications, and abruptly discontinued plaintiff's Dilantin, without prescribing any further medications to treat plaintiff's epilepsy disorder. (See Exhibit "G")

10.)  On June 15, 1999, plaintiff sent a request to defendant Dr. Ronald Long, asking him to reconsider prescribing an anti-seizure medications of any kind.  This request was never responded to. (See Exhibit "H")

11.)  On July 24, 1999, plaintiff was seen by defendant Dr. William Ellien, psychiatrist.  At this time, plaintiff inquired as to why he wasn't on anti-seizure medications.  Defendant Dr. William Ellien, said this wasn't his field of expertise and that I should talk to Defendant Dr. Ronald Long.  He then prescribed the anti-depressant drug Imipramine.

12.)  The abrupt discontinuance of Dilantin by defendant Dr. Ronald Long, as well as the prescription anti-depressant Imipramine, in combination with the physical and emotional trauma sustained during the use of excessive force in A.C.P. synergistically caused plaintiff to enter into the aforementioned life threatening "Status Epilepticus" seizures that occurred on August 29, 1999. (See Exhibit "I" (1), (2), and Exhibit "E(4)"

## CLAIMS FOR RELIEF

1.)  The actions of Warden Thomas Duran, Deputy Warden Bruce Cluck, Deputy Warden Debra Hankey, C.O. Briton Shelton, Lt. John Jennings, Sgt. Rea Heintzelman, and Jane/John Doe in using physical force against the plaintiff without need or provocation, and in failing to intervene to prevent the misuse of force was done maliciously and sadistically, and constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

2.)  Defendant's Lt. William Orth, and C.O. Vazquez's failure to provide adequate medical treatment to plaintiff, placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

3.)  Adams County Prisons lack of adequately trained medical staff and medical facilities constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

4.)  Defendant Dr. William J. Stienour's failure to treat plaintiff as a seizure risk even after plaintiff explained to defendant that he was an epileptic, and not currently on medications, constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

5.)  The combined actions of defendant Dr. Ronald Long and Dr. William Ellien in abruptly stopping plaintiff's anti-seizure medication and in prescribing an anti-depressant drug known to lower seizure threshold placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A2:  The actions of Lt. Orth and C.O. David Vazquez in ignoring plaintiff while in seizures and post-ictal state constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A3:  The actions of Dr. William J. Steinour in refusing to treat plaintiff as a seizure risk, despite plaintiff reminding him that he was epileptic and not currently on anti-seizure medication constitutes deliberate indifference in violation of the

- 5 -

CLAIMS FOR RELIEF
CONTINUED FROM PAGE 5


Eighth Amendment of the United States Constitution.

A5:  The actions of Dr. Ronald Long in abruptly discontinu-
ing  plaintiff's anti-seizure medications despite foreknowledge
that such actions would cause severe, life threatening seizures
constitutes deliberate indifference in violation of the Eighth
Amendment of the United States Constitution.

A6:  The actions of defendant Dr. William Ellien in pre-
scribing the drug Tofranil known to decrease the seizure thres-
hold, with foreknowledge that plaintiff was epileptic and had
been abruptly withdrawn from his anti-seizure medications and the
seizure risk associated with the withdrawal of said medications
and the addition of the drug Tofranil he prescribed constitutes
deliberate indifference to the Eighth Amendment of the United
States Constitution.

B-2: $500,000.00 against Dr. Ronald Long and Dr. William
Ellien for abruptly discontinuing plaintiff's anti-seizure medi-
cation and prescribing an anti-depressant seizure antagonist
drug, and causing plaintiff to fall into a life threatening state
of seizures known as "Status Epilepticus," and subsequent hospi-
talization of plaintiff.

- 6 -

# PHYSICIAN'S ORDERS

Exhibit F

Benson Jason
DS6483
9-27-76
SCISM

Drug Allergies:
NKA

Self-Medication Program ☐ Yes    ☐ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|---|
| 0710 4-28-99 | | ① MEJ test |
| 4-28-99 | CIT | |
| | | S. CRAIG HOFFMAN PA – C |
| 6/4/99 0915 | A | ① D/C Dilantin |
| 6-4-99 0930 | | RONALD A LONG, M.D. |
| 6-8-99 1515 c | A | ① Cont on secure clinic          RAY McMULLEN, PA-C WHS |
| 6-8-99 | | |
| 7-23-99 | | Consult ST FPD O.L 2 ID    DR. MIGUEL SALOMON M.D. per V.O. Dr. M. Salomon / Dr. Spectral |
| | | DR. MIGUEL SALOMON M.D. |

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person or party.

PLEASE USE BALL POINT PEN ONLY

# PHYSICIAN'S ORDERS

Exhibit G

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-22-76

Institution: Smithfield C

Drug Allergies: NKA

Self-Medication Program ☐ Yes  ☒ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS | 1 |
|---|---|---|---|
| 7-27-99 1615 hrs | 6 | ① Next appointment in 1 month. ② Ativan 1mg PO q 6 hrs PRN anxiety, attal: · max 2 doses/day · max 6 doses/week for 1 month ③ Begin Imipramine 50mg PO hs daily, through 3 Aug '99 ④ On 4 Aug 99 - increase Imipramine to 75mg PO hs, daily through 10 aug 1999 ⑤ On 11 aug-99-increase Imipramine to 100mg PO hs, daily for 5 months ✓⑥ On/about 19 aug 1999 - obtain Tofranil (Imipramine + desipramine) blood level in AM  William G Oliva MD | |
| | | William Imc 7/27/99 2000 | |
| | | Barb Grove, L.P.N. | |

Received

JUL 27 1999

SCI-Smithfield
Medical Records Department

This information is strictly CONFIDENTIAL and is for the use of only the person or entity to whom it is addressed. These reports are not to be made available to any person

PLEASE USE BALL POINT PEN ONLY

**Parke-Davis—Cont.**

**COLY-MYCIN® S OTIC**    ℞
[cŏ″ly-my′cin s ō′tic]
with Neomycin and Hydrocortisone
(colistin sulfate–neomycin
sulfate–thonzonium
bromide–hydrocortisone acetate
otic suspension)

**DESCRIPTION**
Coly-Mycin S Otic with Neomycin and Hydrocortisone (colistin sulfate-neomycin sulfate-thonzonium bromide-hydrocortisone acetate otic suspension) is a sterile aqueous suspension containing in each ml: Colistin base activity, 3 mg (as the sulfate); Neomycin base activity, 3.3 mg (as the sulfate); Hydrocortisone acetate, 10 mg (1%); Thonzonium bromide, 0.5 mg (0.05%); Polysorbate 80, acetic acid, and sodium acetate in a buffered aqueous vehicle. Thimerosal (mercury derivative), 0.002%, added as a preservative. It is a nonviscous liquid, buffered at pH 5, for instillation into the canal of the external ear or direct application to the affected aural skin.

**CLINICAL PHARMACOLOGY**
1. Colistin sulfate—an antibiotic with bactericidal action against most gram-negative organisms, notably *Pseudomonas aeruginosa, E. coli.,* and *Klebsiella-Aerobacter.*
2. Neomycin sulfate—a broad-spectrum antibiotic, bactericidal to many pathogens, notably *Staph aureus* and *Proteus sp.*
3. Hydrocortisone acetate—a corticosteroid that controls inflammation, edema, pruritus and other dermal reactions.
4. Thonzonium bromide—a surface-active agent that promotes tissue contact by dispersion and penetration of the cellular debris and exudate.

**INDICATIONS AND USAGE**
For the treatment of superficial bacterial infections of the external auditory canal, caused by organisms susceptible to the action of the antibiotics; and for the treatment of infections of mastoidectomy and fenestration cavities, caused by organisms susceptible to the antibiotics.

**CONTRAINDICATIONS**
This product is contraindicated in those individuals who have shown hypersensitivity to any of its components, and in herpes simplex, vaccinia and varicella.

**WARNINGS**
As with other antibiotic preparations, prolonged treatment may result in overgrowth of nonsusceptible organisms and fungi.
If the infection is not improved after one week, cultures and susceptibility tests should be repeated to verify the identity of the organism and to determine whether therapy should be changed.
Patients who prefer to warm the medication before using should be cautioned against heating the solution above body temperature, in order to avoid loss of potency.

**PRECAUTIONS**
**General:** If sensitization or irritation occurs, medication should be discontinued promptly.
This drug should be used with care in cases of perforated eardrum and in longstanding cases of chronic otitis media because of the possibility of ototoxicity caused by neomycin. Treatment should not be continued for longer than ten days. Allergic cross-reactions may occur which could prevent the use of any or all of the following antibiotics for the treatment of future infections: kanamycin, paromomycin, streptomycin, and possibly gentamicin.

**ADVERSE REACTIONS**
Neomycin is not uncommon cutaneous sensitizer. There are articles in the current literature that indicate an increase in the prevalence of persons sensitive to neomycin.

**DOSAGE AND ADMINISTRATION**
The external auditory canal should be thoroughly cleansed and dried with a sterile cotton applicator.
When using the calibrated dropper:
For adults, 5 drops of the suspension should be instilled into the affected ear 3 or 4 times daily. For infants and children, 4 drops are suggested because of the smaller capacity of the ear canal.
This dosage correlates to the 4 drops (for adults) and 3 drops (for children) recommended when using the dropper-bottle container for this product.
The patient should lie with the affected ear upward and then the drops should be instilled. This position should be maintained for 5 minutes to facilitate penetration of the drops into the ear canal. Repeat, if necessary, for the opposite ear.
If preferred, a cotton wick may be inserted into the canal and

4 hours. The wick should be replaced at least once every 24 hours.

**HOW SUPPLIED**
Coly-Mycin S Otic is supplied as:
N 0071-3141-35—5-mL bottle with dropper
N 0071-3141-36—10-mL bottle with dropper
Each ml contains: Colistin sulfate equivalent to 3 mg of colistin base, Neomycin sulfate equivalent to 3.3 mg neomycin base, Hydrocortisone acetate 10 mg (1%), Thonzonium bromide 0.5 mg (0.05%), and Polysorbate 80 in an aqueous vehicle buffered with acetic acid and sodium acetate. Thimerosal (mercury derivative) 0.002% added as a preservative.
**Shake well before using.**
Store at controlled room temperature 15°-30°C (59°-86°F). Stable for 18 months at room temperature; prolonged exposure to higher temperatures should be avoided.
                            3141G033
Caution—Federal law prohibits dispensing without prescription.

**KAPSEALS®**    ℞
**DILANTIN®**
[dĭ-lăn′tĭn″]
(Extended Phenytoin Sodium Capsules, USP)

**DESCRIPTION**
Phenytoin Sodium is an antiepileptic drug. Phenytoin sodium is related to the barbiturates in chemical structure, but has a five-membered ring. The chemical name is sodium 5,5-diphenyl-2,4-imidazolidinedione.
Each Dilantin—*Extended Phenytoin Sodium Capsule USP* contains 30 mg or 100 mg phenytoin sodium USP. Also contains lactose, NF; sucrose, NF; talc, USP; and other ingredients. The capsule shell and band contain colloidal silicon dioxide, NF; FD&C red No. 3; gelatin, NF; glyceryl monooleate; sodium lauryl sulfate, NF. The Dilantin 30-mg capsule shell and band also contain citric acid, USP; FD&C blue No. 1; sodium benzoate, NF; titanium dioxide, USP. The Dilantin 100-mg capsule shell and band also contain FD&C yellow No. 6; hydrogen peroxide 3%; polyethylene glycol 200. Product *in vivo* performance is characterized by a slow and extended rate of absorption with peak blood concentrations expected in 4 to 12 hours as contrasted to *Prompt Phenytoin Sodium Capsules USP* with a rapid rate of absorption with peak blood concentration expected in 1½ to 3 hours.

**CLINICAL PHARMACOLOGY**
Phenytoin is an antiepileptic drug which can be useful in the treatment of epilepsy. The primary site of action appears to be *the motor cortex* where spread of seizure activity is inhibited. Possibly by promoting sodium efflux from neurons, phenytoin tends to *stabilize* the threshold against hyperexcitability caused by excessive stimulation or environmental changes capable of reducing membrane sodium gradient. This includes the reduction of posttetanic potentiation at synapses. Loss of posttetanic potentiation prevents cortical seizure foci from detonating adjacent cortical areas. Phenytoin reduces the maximal activity of brain stem centers responsible for the tonic phase of tonic-clonic (grand mal) seizures.
The plasma half-life in man after oral administration of phenytoin averages 22 hours, with a range of 7 to 42 hours. Steady-state therapeutic levels are achieved 7 to 10 days after initiation of therapy with recommended doses of 300 mg/day.
When serum level determinations are necessary, they should be obtained at least 5-7 half-lives after treatment initiation, dosage change, or addition or subtraction of another drug to the regimen so that equilibrium or steady-state will have been achieved. Trough levels provide information about clinically effective serum level range and confirm the patient compliance and are obtained just prior to the patient's next scheduled dose. Peak levels indicate an individual's threshold for emergence of dose-related side effects and are obtained at the time of expected peak concentration. For Dilantin Kapseals peak serum levels occur 4-12 hours after administration.
Optimum control without clinical signs of toxicity occurs more often with serum levels between 10 and 20 mcg/ml, although some mild cases of tonic-clonic (grand mal) epilepsy may be controlled with lower-serum levels of phenytoin.
In most patients maintained at a steady dosage, stable phenytoin serum levels are achieved. There may be wide interpatient variability in phenytoin serum levels with equivalent dosages. Patients with unusually low levels may be noncompliant or hypermetabolizers of phenytoin. Unusually high levels result from liver disease, congenital enzyme deficiency or drug interactions which result in metabolic interference. The patient with large variations in phenytoin plasma levels, despite standard doses, presents a difficult clinical prob-

free phenytoin levels may be altered in ... tein binding characteristics differ from ...
Most of the drug is excreted in the bile ... lites which are then reabsorbed from the ... excreted in the urine. Urinary excretion ... metabolites occurs partly with glomeru... more importantly, by tubular secretion... is hydroxylated in the liver by an enzy... saturable, small incremental doses may ... stantial increases in serum levels, when ... per range. The steady-state level may be ... increased, with resultant intoxication, fr... dosage of 10% or more.

**INDICATIONS AND USAGE**
Dilantin is indicated for the control of to... chomotor (grand mal and temporal lobe) ... vention and treatment of seizures occurring ... ing neurosurgery.
Phenytoin serum level determinations ... for optimal dosage adjustments (see Dos... istration).

**CONTRAINDICATIONS**
Phenytoin is contraindicated in those pa... persensitive to phenytoin or other hydan...

**WARNINGS**
Abrupt withdrawal of phenytoin in epil... precipitate status epilepticus. When, in th... clinician, the need for dosage reduction, di... substitution of alternative antiepileptic ... this should be done gradually. However, in... allergic or hypersensitivity reaction, rap... alternative therapy may be necessary. In t... tive therapy should be an antiepileptic dru... the hydantoin chemical class.
There have been a number of reports sugg... ship between phenytoin and the developm... nopathy (local or generalized) including be... hyperplasia, pseudolymphoma, lymphom... Disease.
Although a cause and effect relationship ha... lished, the occurrence of lymphadenopath... need to differentiate such a condition from... lymph node pathology. Lymph node involv... with or without symptoms and signs resemb... ness eg, fever, rash and liver involvement... In all cases of lymphadenopathy, follow-up... an extended period is indicated and every ... made to achieve seizure control using alter... tic drugs.
Acute alcoholic intake may increase phenyt... while chronic alcoholic use may decrease se... In view of isolated reports associating phen... erbation of porphyria, caution should be ... this medication in patients suffering fro...
**Usage in Pregnancy:**
A number of reports suggests an associatio... of antiepileptic drugs by women with epile... incidence of birth defects in children born... Data are more extensive with respect to phe... nobarbital, but these are also the most com... antiepileptic drugs; less systematic or anec... gest a possible similar association with the... antiepileptic drugs.
The reports suggesting a higher incidence o... children of drug-treated epileptic women can... as adequate to prove a definite cause and eff... There are intrinsic methodologic problems... quate data on drug teratogenicity in humans... or the epileptic condition itself may be more... drug therapy in leading to birth defects. The... of the mothers on antiepileptic medication... infants. It is important to note that anti... should not be discontinued in patients in w... administered to prevent major seizures... strong possibility of precipitating status ... attendant hypoxia and threat to life. In ... where the severity and frequency of the sei... such that the removal of medication does no... threat to the patient, discontinuation of t... considered prior to and during pregnancy... not be said with any confidence that even m... not pose some hazards to the developing emb... prescribing physician will wish to weigh t... ations in treating and counseling epile... childbearing potential.
In addition to the reports of increased fre... malformation, such as cleft lip/palate and h... tions in children of women receiving phe... antiepileptic drugs, there have more recen... a fetal hydantoin syndrome. This consists ... deficiency, microcephaly and mental defic...

Skin rash, petechiae, urticaria, itching, photosensitive edema (general or of face and tongue); drug fever; activity with desipramine.

Bone marrow depression including agranulocytosis; purpura; thrombocytopenia.

Nausea and vomiting, anorexia, epigastric diarrhea; peculiar taste, stomatitis, abdominal black tongue.

Gynecomastia in the male; breast enlargement galactorrhea in the female; increased or decreased impotence; testicular swelling; elevation or depression in blood sugar levels; inappropriate antidiuretic hormone secretion syndrome.

Jaundice (simulating obstructive); altered liver function; weight gain or loss; perspiration; flushing; urinary frequency, drowsiness, dizziness, weakness and fatigue; parotid swelling; alopecia; proneness to falling.

**Withdrawal Symptoms:** Though not indicative of addiction, abrupt cessation of treatment after prolonged therapy may produce nausea, headache and malaise.

## DOSAGE AND ADMINISTRATION

Up to 100 mg/day intramuscularly in divided doses. Intramuscular administration should be used only for starting therapy in patients unable or unwilling to use oral medication. As oral form should supplant the injectable as soon as possible.

Lower dosages are recommended for elderly patients and adolescents. Lower dosages are also recommended for outpatients as compared to hospitalized patients who will be under closer supervision. Dosage should be initiated at a low level and increased gradually, noting carefully the clinical response and any evidence of intolerance. Following remission, maintenance medication may be required for a longer period of time, at the lowest dose that will maintain remission.

## OVERDOSAGE

Children have been reported to be more sensitive than adults to an acute overdosage of imipramine hydrochloride. An overdose of any amount in infants or young children, especially, must be considered serious and potentially fatal.

**Symptoms:** These may vary in severity depending upon factors such as the amount of drug absorbed, the age of the patient, and the interval between drug ingestion and start of treatment. Blood and urine levels of imipramine may not reflect the severity of poisoning; they have a qualitative rather than quantitative value, and are not reliable indicators in the clinical management of the overdose.

CNS abnormalities may include drowsiness, stupor, coma, restlessness, agitation, hyperactive reflexes, muscle rigidity, athetoid and choreiform movements, and convulsions.

Cardiac abnormalities may include arrhythmia, tachycardia, evidence of impaired conduction, and signs of congestive failure.

Respiratory depression, cyanosis, hypotension, shock, vomiting, hyperpyrexia, mydriasis, and diaphoresis may also be present.

The recommended treatment for overdosage with tricyclic antidepressants may change periodically. It is recommended that the physician contact a poison control center for current information on treatment. Cardiac involvement, respiratory depression and cardiac arrhythmia can occur suddenly, hospitalization and close observation may be necessary, even when the amount thought to be small or the initial degree of intoxication appears slight or moderate. All patients with ECG abnormalities should have continuous cardiac monitoring closely observed until well after cardiac status has returned to normal; relapses may occur after apparent recovery.

If necessary, empty the stomach promptly by lavage. In an unguarded patient, secure the airway with a cuffed endotracheal tube before beginning lavage (do not induce emesis). Use of activated charcoal slurry may help reduce absorption of imipramine.

CNS: If external stimulation to reduce the tendency to convulse. If anticonvulsants are necessary, diazepam and may be useful.

Maintain adequate respiratory exchange. Do not use respiratory stimulants.

Shock should be treated with supportive measures, such as fluids, oxygenation, intravenous fluids, and, if necessary, a vasopressor agent. The use of corticosteroids in shock is controversial and may be contraindicated in cases of overdosage with tricyclic antidepressants. Digitalis may increase conduction abnormalities and further irritate an already sensitized heart. If congestive heart failure necessitates rapid digitalization, particular care must be exercised.

Body temperature should be controlled by whatever external means are available, including ice packs and cooling sponge baths, when necessary.

Peritoneal dialysis, exchange transfusions and forced diuresis have been generally reported as ineffective because of the rapid fixation of imipramine in tissues. Blood and urine levels of imipramine may not correlate with the degree of intoxication, and are unreliable indicators in the clinical management of the patient.

The slow intravenous administration of physostigmine salicylate has been used as a last resort to reverse severe CNS anticholinergic manifestations of overdosage with tricyclic antidepressants; however, it should not be used routinely, since it may induce seizures and cholinergic crises.

## HOW SUPPLIED

Ampuls 2 ml—For intramuscular administration only
25 mg imipramine hydrochloride, 2 mg ascorbic acid, 1 mg sodium bisulfite, 1 mg sodium sulfite

Boxes of 10 .............................................. NDC 0028-0065-23
Store between 59°–86°F (15°–30°C).

Note: Upon storage, minute crystals may form in some ampuls. This has no influence on the therapeutic efficacy of the preparation, and the crystals redissolve when the affected ampuls are immersed in hot tap water for 1 minute.

## ANIMAL PHARMACOLOGY & TOXICOLOGY

A. Acute: Oral $LD_{50}$ ranges are as follows:

| | |
|---|---|
| Rat | 355 to 682 mg/kg |
| Mouse | 100 to 215 mg/kg |

Depending on the dosage in both species, toxic signs proceeded progressively from depression, irregular respiration and ataxia to convulsions and death.

B. Reproduction/Teratogenic: The overall evaluation may be summed up in the following manner:

Oral: Independent studies in three species (rat, mouse and rabbit) revealed that when Tofranil is administered orally in doses up to approximately 2½ times the maximum human dose in the first 2 species and up to 25 times the maximum human dose in the third species, the drug is essentially free from teratogenic potential. In the three species studied, only one instance of fetal abnormality occurred (in the rabbit) and in that study there was likewise an abnormality in the control group. However, evidence does exist from the rat studies that some systemic and embryotoxic potential is demonstrable. This is manifested by reduced litter size, a slight increase in the stillborn rate and a reduction in the mean birth weight.

Parenteral: In contradistinction to the oral data, Tofranil does exhibit a slight but definite teratogenic potential when administered by the subcutaneous route. Drug effects on both the mother and fetus in the rabbit are manifested in higher resorption rates and decrease in mean fetal birth weights, while teratogenic findings occurred at a level of 5 times the maximum human dose. In the mouse, teratogenicity occurred at 1½ and 6½ times the maximum human dose, but no teratogenic effects were seen at levels 3 times the maximum human dose. Thus, in the mouse, the findings are equivocal.

C91-42 (Rev. 2/92)

Dist. by:
Geigy Pharmaceuticals
Ciba-Geigy Corporation
Ardsley, New York 10502

## TOFRANIL®   ℞
[toe-fray'nil]
imipramine hydrochloride USP
Tablets of 10 mg
Tablets of 25 mg
Tablets of 50 mg
For oral administration

## DESCRIPTION

Tofranil, imipramine hydrochloride USP, the original tricyclic antidepressant, is a member of the dibenzazepine group of compounds. It is designated 5-[3-(Dimethylamino)propyl]-10, 11-dihydro-5H-dibenz[b,f ] azepine Monohydrochloride. Imipramine hydrochloride USP is a white to off-white, odorless, or practically odorless crystalline powder. It is freely soluble in water and in alcohol, soluble in acetone, and insoluble in ether and in benzene. Its molecular weight is 316.87.

Inactive Ingredients: Calcium phosphate, cellulose compounds, docusate sodium, iron oxides, magnesium stearate, polyethylene glycol, povidone, sodium starch glycolate, sucrose, talc and titanium dioxide.

## CLINICAL PHARMACOLOGY

The mechanism of action of Tofranil is not definitely known. However, it does not act primarily by stimulation of the central nervous system. The clinical effect is hypothesized as being due to potentiation of adrenergic synapses by blocking uptake of norepinephrine at nerve endings. The mode of action of the drug in controlling childhood enuresis is thought to be apart from its antidepressant action.

## INDICATIONS

Depression: For the relief of symptoms of depression. Endogenous depression is more likely to be alleviated than other depressive states. One to three weeks of treatment may be needed before optimal therapeutic effects are evident.

Childhood Enuresis: May be useful as temporary adjunctive therapy in reducing enuresis in children aged 6 years and older, after possible organic causes have been excluded by appropriate tests. In patients having daytime symptoms of frequency and urgency, examination should include voiding cystourethrography and cystoscopy, as necessary. The effectiveness of treatment may decrease with continued drug administration.

## CONTRAINDICATIONS

The concomitant use of monoamine oxidase inhibiting compounds is contraindicated. Hyperpyretic crises or severe convulsive seizures may occur in patients receiving such combinations. The potentiation of adverse effects can be serious, or even fatal. When it is desired to substitute Tofranil in patients receiving a monoamine oxidase inhibitor, as long an interval should elapse as the clinical situation will allow, with a minimum of 14 days. Initial dosage should be low and increases should be gradual and cautiously prescribed.

The drug is contraindicated during the acute recovery period after a myocardial infarction. Patients with a known hypersensitivity to this compound should not be given the drug. The possibility of cross-sensitivity to other dibenzazepine compounds should be kept in mind.

## WARNINGS

Children: A dose of 2.5 mg/kg/day of Tofranil should not be exceeded in childhood. ECG changes of unknown significance have been reported in pediatric patients with doses twice this amount.

Extreme caution should be used when this drug is given to:
patients with cardiovascular disease because of the possibility of conduction defects, arrhythmias, congestive heart failure, myocardial infarction, strokes and tachycardia. These patients require cardiac surveillance at all dosage levels of the drug;

patients with increased intraocular pressure, history of urinary retention, or history of narrow-angle glaucoma because of the drug's anticholinergic properties;

hyperthyroid patients or those on thyroid medication because of the possibility of cardiovascular toxicity;

patients with a history of seizure disorder because this drug has been shown to lower the seizure threshold;

patients receiving guanethidine, clonidine, or similar agents, since Tofranil may block the pharmacologic effects of these drugs;

patients receiving methylphenidate hydrochloride. Since methylphenidate hydrochloride may inhibit the metabolism of Tofranil, downward dosage adjustment of imipramine hydrochloride may be required when given concomitantly with methylphenidate hydrochloride.

Tofranil may enhance the CNS depressant effects of alcohol. Therefore, it should be borne in mind that the dangers inherent in a suicide attempt or accidental overdosage with the drug may be increased for the patient who uses excessive amounts of alcohol. (See PRECAUTIONS.)

Since Tofranil may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as operating an automobile or machinery, the patient should be cautioned accordingly.

## PRECAUTIONS

An ECG recording should be taken prior to the initiation of larger-than-usual doses of Tofranil and at appropriate intervals thereafter until steady state is achieved. (Patients with any evidence of cardiovascular disease require cardiac surveillance at all dosage levels of the drug. See WARNINGS.)

Elderly patients and patients with cardiac disease or a prior history of cardiac disease are at special risk of developing the cardiac abnormalities associated with the use of Tofranil.

It should be kept in mind that the possibility of suicide in seriously depressed patients is inherent in the illness and may persist until significant remission occurs. Such patients should be carefully supervised during the early phase of treatment with Tofranil, and may require hospitalization. Prescriptions should be written for the smallest amount feasible.

Hypomanic or manic episodes may occur, particularly in patients with cyclic disorders. Such reactions may necessitate discontinuation of the drug. If needed, Tofranil may be resumed in lower dosage when these episodes are relieved. Administration of a tranquilizer may be useful in controlling such episodes.

An activation of the psychosis may occasionally be observed in schizophrenic patients and may require reduction of dosage and the addition of a phenothiazine.

Concurrent administration of Tofranil with electroshock therapy may increase the hazards; such treatment should be

*Continued on next page*

The full prescribing information for each Geigy product is contained herein and is in effect as of September 1, 1993.

Exhibit A

1.   IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA

2                              Criminal

3    Commonwealth

4        vs.                              CC-510-98

5    Jason Eric Benson

6                        **ORDER OF COURT**

7            AND NOW, this 27th day of August, 1999, the

8    Defendant appeared with counsel.  Counsel has indicated that

9    she has filed an amended PCRA petition, which raises one

10   issue which is legal in nature.  The argument is that the

11   Court is without power to impose two separate sentences on

12   count five and six in that there should have been only one

13   conspiracy.

14           IT IS ORDERED that a transcript be prepared of the

15   proceedings that occurred on August 4, 1998 and filed of

16   record.  Copies will be provided counsel at the initial cost

17   of the County of Adams.

18           Argument is scheduled for November 30, 1999 at

19   9:00 a.m.  PCRA counsel shall file her brief by

20   November 9, 1998, and the Commonwealth shall file its brief

21   by November 17, 1999.

22                              By the Court,

23

24                              _____
                                Oscar F. Spicer
25   Michael A. George, Esq., DA   President Judge
     Kristen L. Rice, Esq.





# ADAMS COUNTY PRISON
## GETTYSBURG, PA
### INMATE REQUEST SLIP

*CARBON Copy Please Respond*

**Exhibit B**

INMATE: Jason E Benson

INMATE ID#: _____

BLOCK / CELL#: A-09

DATE: 08.26.99

REQUEST TO SEE: (CIRCLE ONE) **WARDEN** – DEPUTY WARDEN – SHIFT SUPERVISION –
BLOCK OFFICER - MENTAL HEALTH – **DOCTOR** – LAWYER – PAROLE OFFICER –
PENNSYLVANIA PRISON SOCIETY

REASON FOR REQUEST: Last night I was not given my Dilantin an anti-seizure
med that I must take. It is a life sustaining medication. Please order my medication
to be given to all.

DATE RECEIVED: _____    RECEIVED BY: _____

ACTION TAKEN: _____

---

ACPF#0

# ADAMS COUNTY PRISON
## GETTYSBURG, PA
### INMATE REQUEST SLIP

INMATE: Jason E Benson

INMATE ID#: _____

BLOCK / CELL#: A-09

DATE: 08.27.99

REQUEST TO SEE: (CIRCLE ONE) **WARDEN** – DEPUTY WARDEN – SHIFT SUPERVISION –
BLOCK OFFICER - MENTAL HEALTH – DOCTOR – LAWYER – PAROLE OFFICER –
PENNSYLVANIA PRISON SOCIETY

REASON FOR REQUEST: I have not received my Dilantin since I arrived here.
I must have my medication it is an anti-seizure drug. I have been having
auras since early this afternoon since then. I must. PLEASE GET ME MY
MEDS!

DATE RECEIVED: _____    RECEIVED BY: _____

ACTION TAKEN: _____

Exhibit "C, page 1

ACPF #36

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME  _Benson, Jason_          ACP# _99-00740_  DATE _8/27/99_

HOUSING AREA  _A-Block_          LOCATION OF INCIDENT  _Intake_

TIME: _1120_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _On above time & date I, Sgt Heintzel_ was asked to help with Inmate Benson, Jason at intake. Inmate Benson, Jason didn't want to strip after court.

Action and Comments:  _TAKEN TO GETTYSBURG E.R. NO. for EVALUATION AS A RESULT OF THE O.C. AND THIS INMATES REQUEST A.S.P. NOTIFIED & CODE ADAMS CHARTED FOR AGGRAVATED ASSAULT BY A PROVIDER EVERY WAS VIDEO TAPED_

Shift Commander
Signature and I.D. No.: _____  60  Date and Time  _8-27-99  1600_

Print Name  _Lt. Heintz_

Report of Incident: On above time & date I, Sgt Heintzel was asked to help with Inmate Benson, Jason in the Intake area. Inmate Benson was having a problem that he didn't want to be strip after coming back from court. He was asked to strip but he refused to do so. At that time he was sprayed & then he stated to hit his head on the computer screen. After this he wouldn't stop so he was taken to the floor until he had enough & then he was placed in the shower.

(over for continuation)

Staff Signature
and I.D. No:  _Sgt Heintzel  61-4_          Date and Time  _8/27/99  1300_

Print Name  _Heintzelman_

Exhibit C  ACPF #36
page 2

# ADAMS COUNTY PRISON
# EXTRAORDINARY OCCURRENCE REPORT

NAME _Benson, Jason_    ACP# _99-00740_  DATE _8/27/99_

HOUSING AREA _A-Block_    LOCATION OF INCIDENT _Medical Office_

TIME: _1145 hrs_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number)  _Use of force_

Action and Comments: _Inmate showered, transferred to E-Block and transported to ER and_
_examined by the on-duty physician._
_PSP notified to press charges._
_* Incident was video documented_

Shift Commander
Signature and I.D. No.: _B.A. Cluck_    Date and Time _8/27/99  1500 hrs_

Print Name _B.A. Cluck_

Report of Incident: _On the above time and date, I was informed by Lt. Jennings that the_
_aforementioned inmate was refusing to submit to a strip-search upon returning from_
_court. I attempted to speak w/ Inmate Benson about his actions but he only began_
_yelling profanities and making comments like, "Fuck this! This is fucking Bullshit! I'm_
_not stripping!" He was again asked to cooperate and submit to a search and he_
_again refused. At that point, Lt. Jennings sprayed a one second burst of CC spray (Foam)_
_into Benson face. Benson then began calling staff present, "fucking animals," "cock suckers"_

(over for continuation)

Staff Signature
and I.D. No: _B.A. Cluck  2_    Date and Time _8/27/99  1500 hrs_

Print Name _B.A. Cluck_

Exhibit C, page 3
ACPF #36

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _BENSON, JASON_  ACP# _990740_  DATE _8/27/99_

HOUSING AREA _E-2_  LOCATION OF INCIDENT _MEDICAL ROOM_

TIME: _11:10_  a.m. p.m.

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _FORCE USED ON INMATE BENSON, JASON (990740). WARDEN DURAN, DEPUTY WARDENS CLUCK AND HANKEY, LT. JENNINGS, SGT. HEINTZELMAN, OFFICER SHELTON_

Action and Comments: _TAKEN TO E.R. @ 1310 FOR MEDICAL ATTENTION AS A RESULT OF O.C. AND INMATE'S REQUEST. DSP NOTIFIED TO FILE CRIMINAL CHARGES FOR AGGRAVATED ASSAULT BY PRISONER. ENTIRE EVENT WAS VIDEO-TAPED._

Shift Commander
Signature and I.D. No.: _647_  Date and Time _8-27-99 NOON_

Print Name _LT. JEWES_

Report of Incident: _ON THE ABOVE DATE & APP. TIME, LT. JENNINGS INFORMED ME THAT INMATE BENSON, UPON HIS RETURN FROM COURT, WAS REFUSING TO BE STRIP-SEARCHED. I REPORTED TO THE LT'S OFFICE AND MET LT. JENNINGS WHO BRIEFED ME ON WHAT HAD TRANSPIRED THUS FAR. A PLAN WAS DEVISED AND WE REPORTED TO THE MEDICAL ROOM, WHERE DEPUTY WARDEN_

(over for continuation)

Staff Signature
and I.D. No: _#1_  Date and Time _8/27/99  3:10 PM_

Print Name _DURAN_

PENNSYLVANIA STATE POLICE
**PROPERTY RECORD**

SP 7-007 (3-94)

**4. STATUS**
☒ EVIDENCE ☐ FOUND ☐ RECOVERED ☐ RECEIPT ☐ OTHER

**5. OFFENSE**

**6. STATION/DISTRICT OFFICE**

**7. SUBMITTING OFFICER** — BADGE NO.

**8. RECEIVING OFFICER** — BADGE NO.

**9. DATE** / TIME

**10. INVESTIGATING OFFICER** — BADGE NO.

**11. SIGNATURE OF RECEIVING OFFICER**

**12. FOUND OR RECOVERED FROM/SIGNATURE** — ADDRESS — TELEPHONE NO. — LOCATION — **13. DATE** / TIME

**14. CODES:**
STORAGE AREA
1. PROPERTY ROOM    3. EXPLOSIVE MAGAZINE
2. SAFETY DEPOSIT BOX    4. NON-DEPARTMENT

DISPOSITION
1. DESTROYED    4. RELEASED TO OWNER/FINDER
2. ESCHEATABLE    5. DONATED
3. EXPENDED IN LABORATORY

REMOVAL CODE
1. CUSTODY    3. LABORATORY
2. COUNT    4. OTHER

| 15. | 16 PROPERTY OUT | 23. DATE & TIME | 24. ITEM(S) NO. | 25. ITEMS - (ONE ITEM PER LINE) | 16. TYPE PROPERTY | 17. CODE | 18. QUANTITY | 19. VALUE | 20. STORAGE AREA CODE | 21. DISPOSITION CODE |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | X | 03/31/95 | 1 | | 27 | 01 | 1 | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 0 | | | | | | | | | | |

26. CUSTODIAL OFFICERS INIT./BADGE NO.

27. REMOVAL CODE & LOCATION

28. ESTIMATED DATE OF RETURN

29. COMPUTER ENTRY

30. I HEREBY CERTIFY THAT I AM THE OWNER OF PROPERTY OR AUTHORIZED AGENT TO RECEIVE ITEM(S) NO.

31. CLAIMANT'S NAME

32. CLAIMANT'S SIGNATURE

OWNER'S NAME — OWNER'S SIGNATURE — ADDRESS — TELEPHONE NO. — DATE

**PROPERTY RECORD CONTINUATION**

☐ 1.    2. INCIDENT NO.    3. DESIGNATION/DIVISION/UNIT

H4-1925-48    H4-5915

*Exhibit E*

# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

**NAME:**     BENSON, JASON E                      **DATE OF VISIT:** 08/27/1999
**MR:**          177556

**HISTORY:** This 22 year old presents to the Emergency Department in handcuffs and ankle cuffs for evaluation of injuries sustained in a "scuffle" with the prison guards  The patient states that he was "man handled" by the prison guards, was taken down, and felt like he was being kicked, although he was maced at the time and couldn't really see how he was being taken down  He complains of numbness in his knuckles, pain in his back and chest, and in the back of his head  His last tetanus booster was about a month ago

**MEDICATIONS** Ativan once daily  Had a dose earlier this morning  Feels stressed out right now and wants more Ativan

**PHYSICAL:** The patient is awake, alert, appears in no acute or severe distress although he appears apprehensive  He is afebrile  Blood pressure is 132/90, pulse 92, respirations 20 and not labored

| | |
|---|---|
| HEENT | Reveals superficial contusion of the right frontotemporal scalp  No other scalp injury is noted  He has conjunctival injection  Tympanic membranes are normal  Pupils are equal and react normally  EOM's intact  There is no facial asymmetry  Speech is normal  There is no tenderness of his neck  There is no apparent pain with neck motion  He has tenderness to palpation of the paraspinous lumbar muscles  He has point tenderness over the right inferolateral thorax  He has no pain in that area with AP compression of his chest  There is no crepitus noted |
| LUNGS | Clear and equal and he is breathing deeply and ventilating well |
| ABDOMEN | Soft and nontender |
| EXTREMITIES | Lower extremity exam is normal  Exam of the upper extremity reveals a few superficial handcuff type contusions of the skin  His neuro exam to the upper extremities is normal  Capillary refill is intact  Sensation and color is normal |

**TREATMENT/PLAN:** The patient is given 1 mg of Ativan by mouth, released in the care of the prison guards, and is to follow with Dr  Posner  He is to be given Tylenol as needed for discomfort

**IMPRESSION:** Multiple contusions

WJS dh
DD  08/27/1999 DT  08/27/1999 14 17

SIGNED BY   WILLIAM J STEINOUR, MD

MR164 11/91                        EMERGENCY DEPARTMENT REPORT



Exhibit F
Page 1

# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

8-31 D

**NAME:**   BENSON, JASON E
**MR:**        177556

**DATE OF VISIT:** 08/30/1999

CHIEF COMPLAINT   Seizure

**HISTORY:** The sheriff that transported this patient from prison says he was told that this patient had a small seizure about an hour and a half ago and then a larger one more recently that prompted the decision to transport this gentleman to the Emergency Department  He was noted to be bleeding from his mouth following the second seizure  He was apparently transported to the Emergency Department in the police cruiser in a conscious condition but shortly after arriving here, had another seizure which occurred in our parking lot area  This was observed by paramedic staff and was observed to be significant  When I went out to the parking lot area, he was noted to be apparently post ictal with bloody mucous coming from his mouth  His respirations were somewhat labored  He was transported into the Emergency Department for further evaluation

PAST MEDICAL HISTORY   Positive for seizures in the past.  He has been worked up with neurology consults, numerous CT's and I believe EEG  It is believed he has a seizure disorder although he apparently had seizures prompted or precipitated by his multi drug use which includes cocaine, marijuana, and ecstasy  He was seen here a couple of days ago by Dr Stemour for injuries related to a scuffle with prison guards  He apparently was maced at that point but was treated and released with a diagnosis of multiple contusions

MEDICATIONS   Faxed to us from prison are Serzone, Ativan p r n and Imipramine   He apparently is on no anticonvulsants

**PHYSICAL:** On arrival in the Emergency Department the patient is pale, diaphoretic, unresponsive with somewhat snoring respirations.  O2 saturation initially was about 88% range  He was somewhat resistant to maintaining oxygen mask on his face but as he became more lucid he became calmer and his O2 saturation improved into the high 90's  Within the period of 15 minutes or so in our department, he was able to look towards me in response to his name being called and able to follow simple commands such as opening his mouth -

| | |
|---|---|
| HEENT | He has a little minor ecchymosis in his left postauricular area  Pupils are equal  TM's, nares unremarkable  Exam of his mouth I believe shows an abrasion of the right lateral tongue |
| NECK | Appears to be supple |
| LUNGS | Clear anteriorly |
| HEART | Regular rhythm |
| ABDOMEN | Soft . |
| EXTREMITIES | He was initially wearing handcuffs but was switched to leg shackles by the sheriff that brought him in  He seems to have movement in all his arms and legs |

**TREATMENT/PLAN:** Since this seizure witnessed by us in the Emergency Department was his third in a short period of time, he was given a loading dose of Dilantin 1 gram IV  Blood work has been drawn which shows a white count of 17 6 with a normal H&H and platelet count  Chem panel 2 is pending

PAGE 1 OF 2

Exhibit "D"

# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

NAME:    BENSON, JASON E
MR:    177556

I plan to speak to the next doctor up for unassigned admission about this patient  With three seizures in a short period of time, I feel that he should be admitted to the hospital for more close observation

**IMPRESSION:** Multiple seizures

TWH dli
DD  08/30/1999 DT  09/01/1999 11 34

SIGNED BY   TIMOTHY W HOLLAND, MD

9/2/99

MR164 11/91                **EMERGENCY DEPARTMENT REPORT**



# THE GETTYSBURG HOSPITAL

## CONSULTATION REPORT

0300410351   17-75-56

BENSON, JASON E
KAHSLER, DAVIC F MD
[2C7A 09/27/1996 22? M

NAME  JASON  BENSON

DATE AND TIME OF REQUEST  30AUG99   0900

TO DOCTOR  DR MESSER

OPINION ONLY  ☑     TREAT AND FOLLOW  ☑

REASON FOR CONSULTATION:

RECURRENT  SEIZURES

REQUESTING PHYSICIAN:  DR KAHSLER

| DATE | TIME | SIGNATURE | PERSON NOTIFIED OF REQUEST |
|------|------|-----------|----------------------------|
| 30AUG99 | 0910 | | DEB |

REPORT OF CONSULTATION (Findings, Diagnosis, Recommendations)

22 Y.O. WM WITH HX EPILEPSY
SINCE 12 Y.O.  P.H. OF "PETIT MAL" (PROBABLY COMPLEX-PARTIAL
SEIZURES) + GENERALIZED. EEG'S 3/89 4/90 → (L) TEMPORAL
FOCUS   EEG 8/97 ⊖ @ AM FOR SEIZURES 2° TO PT.
DIC OF DILANTIN + DRUG USE.        C/O MIGRANE
Rx SERZONE, ATIVAN, IMIPRAMINE PTA FROM CO PRISON. Rx
IV. DILANTIN 1 GM.   LAB OK BUT ↑WBC ↓CO₂ CW POST-
ICTAL STATE.   HAD III SZ THIS AM   0440 → ONSET
IN SLEEP   DKED DILANTIN x 4 MOS

EXAM: NEUR SUPPLE.   MS. - ALERT + ORIENTED,   NO APHASIA
MEMORY OK   CN - VIS FIELDS ✓ FUNDUS ✓  NO PAPILLED...
PERR, EMS - FROM SM -  ⊕ NYSTAGMUS IN ALL DIRECTIONS
(C/W DILANTIN LOAD.)  HEARS ✓  TONGUE ✓  MOTOR -
NO DRIFT   POWER   R=L   TONE ✓   SENS ✓
DTR'S 1-2+ R=L   TOES ↓
    EEG- TODAY  → (L) DISCHARGE
IMP: ① SEIZURE DISORDER; ② STATUS EPILEPTICUS @ AM
    2° TO DIC OF DILANTIN ± EFFECTS OF OTHER
    DRUGS ON SEIZURE THRESHOLD
SUGGEST - ✓ DILANTIN LEVEL IN AM   IF ⟩10 BUT ⟨20
    Rx 200 MG PO BID. OR PREVIOUS DOSE KNOWN TO BE
    EFFECTIVE

SIGNATURE OF CONSULTANT

CONSULTATION REPORT

*Exhibit F, page 3*

# THE GETTYSBURG HOSPITAL

## CRITICAL CARE UNIT
## BASIC ANTI-ARRHYTHMIA THERAPY

```
0300410351   17-75-56
BENSON,JASON E
KAMSLER,DAVID F MD
E2C7A 09/27/1976 22Y   M
```

Registered Nurses in the Critical Care Unit are authorized to act immediately in the following life threatening situations with the following medications after a reasonable diagnosis has been made and while the physician is being called

**1    Death Imminent** Patient unconscious

a    Ventricular Fibrillation /Pulseless Ventricular Tachycardia
CPR  Defibrillate with 200 watt seconds *  If no conversion call Code Blue, defibrillate with 300 watt seconds  If no conversion, defibrillate with 360 watt seconds  If still no response, give Epinephrine 1 10,000 1mg IV PUSH, defibrillate with 360 watt seconds  Give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 360 watt seconds  Follow with Lidocaine drip of 250 D₅W with Lidocaine 1 gram at 2mg/minute  Follow Code Blue Procedure

b    Ventricular Tachycardia  (with palpable pulse)
Defibrillate with 100 watt seconds  If no response, defibrillate with 200 watt seconds  If no response, call Code Blue, defibrillate with 300 watt seconds  If no response, give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 300 watt seconds  Follow with Lidocaine drip at 250cc D₅W with Lidocaine gram 1 at 2mg/minute  Follow Code Blue Procedure

c    Severe Bradycardia (rate less than 30)
Atropine 1.0mg IV PUSH  May repeat Atropine q. 3 - 5 minutes for total 2mg  Consider CPR  Prepare patient for transcutaneous pacing

d    Asystole
CPR  Call Code Blue  Give Epinephrine 1 10,000 1mg IV PUSH  CPR  Give Atropine 1mg IV PUSH  Follow Code Blue Procedure

**2    Life Threatening.** Patient still conscious but symptomatic  If physician is not immediately available then

a    Ventricular Tachycardia (3 or more PVCs in sequence)
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100mg per bolus)
Lidocaine drip at 2mg/minute

b    PVCs  6 or more a minute, multi-focal in nature, coupling or occurring of T wave
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100 mg per bolus)
Lidocaine drip at 2mg/minute

c    Bradycardia  Rate less than 40 or 50 a minute and patient symptomatic  (Consciousness altered or blood pressure dropped)
Atropine  5mg IV PUSH  If rate further drops, follow immediately with second dose of 5mg IV PUSH  If rate does not significantly increase in 2 to 5 minutes, give additional  5mg IV PUSH  Prepare patient for transcutaneous pacing