ORIGINAL

FILED
HARRISBURG

OCT 1 0 2000

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

**POST & SCHELL, P.C.**
BY:    JOHN R. KANTNER, ESQUIRE
I.D.    # 75741
240 GRANDVIEW AVENUE
CAMP HILL, PA 17011
(717) 731-1970

ATTORNEYS FOR DEFENDANT
WILLIAM J. STEINOUR, M.D.

---

JASON ERIC BENSON,

                                    Plaintiff

                v.

WARDEN THOMAS DURAN,
DEPUTY WARDEN BRUCE CLUCK,
DEPUTY WARDEN DEBRA HANKEY,
LT. JOHN JENNINGS, LT. WILLIAM ORTH,
SGT. RAE HIENTZELMAN,
C.O. BRITON SHELTON,
C.O. DAVID VAZQUEZ,
C.O.s JANE/JOHN DOE,
DR. WILLIAM J. STEINOUR,
ADAMS COUNTY PRISON,

                                    Defendants

IN THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT
OF PENNSYLVANIA

NO. 1:CV-00-1229

(JUDGE CALDWELL)

(MAGISTRATE JUDGE BLEWITT)

---

### MOTION OF DEFENDANT WILLIAM STEINOUR, M.D.
### TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

AND NOW, comes Defendant William Steinour, M.D., by and through his attorneys, Post & Schell, P.C., and for his Motion to Dismiss the Complaint pursuant to F.R.C.P. 12(b)(6), states as follows:

1.    This is an action for violation of civil rights pursuant to 42 U.S.C. §1983. Specifically, Plaintiff alleges violation of his civil rights protected by the Eighth Amendment of the U.S. Constitution, for alleged deliberate indifference to serious medical needs. A copy of the Amended Complaint is attached as Exhibit "A".

2.      As alleged in the Complaint, Defendant Dr. Steinour is a physician employed at the Gettysburg Hospital, being sued in his individual capacity (Exhibit "A", ¶7).

3.      Plaintiff was transported to the Gettysburg Hospital Emergency Department on or about August 27, 1999, following an altercation with correctional officers at the Adams County Prison (Id., ¶¶1-5).

4.      At the Emergency Department, Plaintiff was examined and treated by Defendant Dr. Steinour (Id., ¶6).

5.      As alleged, Defendant Dr. Steinour "refused to address" Plaintiff's request for anti-seizure medications and, similarly, "refused to address" Plaintiff's complaint of losing consciousness. Plaintiff contends that he has a history of epilepsy, of which Dr. Steinour was allegedly aware. Plaintiff was diagnosed and treated for multiple contusions and released to the care of Adams County Prison officials on that same date.

6.      Subsequently, on August 30, 1999, Plaintiff was observed to be in a state of continued convulsions and was transported to Gettysburg Hospital Emergency Room, where he was evaluated and treated by another physician.  He was admitted to Gettysburg Hospital at that time, with a diagnosis of status epilepticus.

7.      Plaintiff contends that Dr. Steinour was "deliberately indifferent to his serious medical needs" in failing to treat Plaintiff as a seizure risk after being told of the epileptic condition, in violation of the Eighth Amendment of the U.S. Constitution (Id., ¶¶4(a3)).  There are no State tort law claims asserted against Dr. Steinour.

-2-

8.    In order to prevail under 42 U.S.C. §1983, a plaintiff must allege and prove that a defendant deprived plaintiff of his Constitutional rights while acting under color of State law. Gomez v. Toledo, 446 U.S. 635, 640 (1980).

9.    Plaintiff has failed to set forth any facts of record that demonstrate that moving Defendant acted under color of State law in providing medical treatment at the Gettysburg Hospital Emergency Department. Plaintiff has, therefore, failed to state a claim under 42 U.S.C. §1983, for which relief can be granted.

10.    In the alternative, and should the Court find that moving Defendant did, in fact, act under color of State law, Plaintiff has failed to set forth facts of record demonstrating that Defendant acted with deliberate indifference to his serious medical needs, as required to sustain a cause of action for denial of care under 42 U.S.C. §1983. Estelle v. Gamble, 429 U.S. 97 (1976).

11.    To establish "deliberate indifference" in support of a claim for violation of civil rights, a plaintiff must establish more than negligence or inadvertent failure to provide medical care. Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976). The Courts have recognized that where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, Federal Courts are generally reluctant to second-guess medical judgments. Sturts v. City of Philadelphia, 529 F.Supp. 434 (E.D. Pa. 1982). Dismissal is appropriate as Plaintiff is unable to prove any set of facts in support of his claims which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

**WHEREFORE**, Defendant William Steinour, M.D. respectfully requests that This Honorable Court grant the within Motion to Dismiss and Order that Plaintiff's claims against him be dismissed with prejudice.

Respectfully submitted,

POST & SCHELL, P.C.

Date: _____    _____

JOHN R. KANTNER, ESQUIRE
ID #75741
Counsel for Defendant William J. Steinour, M.D.

**Exhibit    A**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jason E. Benson,                :    **CIVIL ACTION NO. 1:CV-00-1229**
              Plaintiff         :
                                :    **(Judge Caldwell)**
V.                              :
                                :    **(Magistrate Judge Blewitt)**
                                :
Thomas Duran, et al.,          :
              Defendants        :

*FILED*
*SCRANTON*

AMENDED COMPLAINT

*FILED*
*SCRANTON*

SEP 1 1 2000

PER _____
        DEPUTY CLERK

## PARTIES

1.) The plaintiff, Jason E. Benson, was held at Adams County Prison (hereon A.C.P.) during the events described in this complaint.

2.) Defendant Thomas Duran is the Warden of A.C.P.. He is sued in his individual capacity.

3.) Defendants Bruce Cluck and Debra Hanky are the Deputy Wardens of A.C.P.. They are sued in their individual capacity.

4.) Defendant's John Jennings and William Orth are Lieutenants of the A.C.P.. They are sued in their individual capacity.

5.) Defendant Rae Hientzelman is a Sergeant of the A.C.P.. He is sued in his individual capacity.

6.) Defendant's Briton Shelton and David Vazquez are Correctional Officer's of the A.C.P.. They are sued in their individual capacity.

7.) Doctor William J. Steinour is a physician employed at the Gettysburg Hospital. He is sued in his individual capacity.

8. Dr. Ronald Long, physician, and Dr. William Ellien, psychiatrist, are employed at the State Correctional Institution Smithfield. They are sued in their individual capacities.

Plaintiff retains the right to amend any future Jane/John Doe defendants that becomes available through discovery.

## FACTS

1.) On August 25, 1999, plaintiff, a Pennsylvania State Prisoner, was transferred to the Adams County Prison (hereafter referred to as A.C.P.) for the purpose of attending a Post Conviction Relief Act Hearing. (See Exhibit "A")

2.) On August 27, 1999, upon plaintiff's return to A.C.P. from the aforementioned hearing, he was released from the Sheriff's restrains. However, A.C.P. Intake Officer, defendant Briton Shelton, recuffed the plaintiff behind his back, and shackled him about the ankles. This not being the usual protocol for returning inmates, plaintiff inquired as to why he was being

- 2 -

**FACTS CONTINUED FROM PAGE 2**

recuffed.  Defendant Briton Shelton responded, saying, "Hey, I ain't the one!"  At this time defendant Lt. John Jennings appeared, saying, "Bring Shithead in to get naked."  Indicating a strip search.

3.) Plaintiff was led to a small room adjacent to the intake area.  Plaintiff, handcuffed behind his back and shackled about the ankles, was seated in a chair.  Defendant Lt. Jennings exited the room leaving plaintiff alone with defendant Briton Shelton, was docile, and no words were exchanged.  Defendant Lt. John Jennings returned with Warden Thomas Duran, Deputy Wardens Bruce Cluck and Debra Hankey, Sergeant Rae Hientzelman, and John Doe, who was carrying a video camera, filming. (See Exhibit "B" - (1), (2), and (3).

4.) At this time, Deputy Warden Bruce Cluck ordered plaintiff to strip.  Plaintiff, handcuffed and shackled, unable to comply, refused.  Notwithstanding, plaintiff was handcuffed behind his back, and shackled about his ankles posing no threat to the defendant's, without warning was shot in the face with O.C. Pepper Foam.  Plaintiff, unable to breath or see, attempted to rid himself of the O.C. Pepper Foam, lost his balance, hitting his head against a computer monitor.  At this time, defendant Warden Thomas Duran gave the order to "Takem' down!"  Seriously injuring plaintiff, defendants Bruce Cluck, Debra Hankey, John Jennings, Rea Hientzelman, and Briton Shelton knocked plaintiff to the ground, hammering plaintiff's head into the floor, twisting plaintiff's hands beyond normal range of motion, kicking and kneeing plaintiff in his back and side. (See Exhibit "C")

5.) After pleading for several minutes for defendant's to get off of him, defendant's relented, throwing plaintiff into a concrete shower stall, where plaintiff fell unconscious.  Defendant Thomas Duran forcefully yanked plaintiff out of the shower stall, taking him to the floor again, where defendant Thomas Duran stomped his foot into the plaintiff's neck.  After plaintiff was released from defendant Thomas Duran's foot, and removed of the restraints, plaintiff complied to a strip search.  A.C.P. has no medical facilities, thus plaintiff requested to be taken to the Gettysburg Hospital Emergency Room. (See Exhibit "D")

6.) Subsequently, the Gettysburg Hospital Emergency Room physician Dr. William J. Steinour, who is familiar with plaintiff's past history of epilepsy, refused to address plaintiff's request for anti-seizure medications, as well as his complaint of losing consciousness, diagnosing the plaintiff with, "Multiple contusions" and released plaintiff to the care of A.C.P..

**FACTS CONTINUED FROM PAGE 3**

7.) Thereafter, on August 30, 1999, plaintiff was witnessed by defendant's Lt. William Orth and C.O. David Vazquez to be in a state of convulsions, but refused to immediately treat plaintiff until one and one-half (1½) hours later, where they again witnessed plaintiff in a state of serious convulsions, only then calling for the Adams County Sheriff's Department to transport plaintiff to the Gettysburg Hospital. Once plaintiff arrived at the Gettysburg Hospital Emergency Room, he was witnessed by hospital Medical Staff to be in a life threatening state of severe seizures known as "Status Epilepticus," incontinent, and foaming and bleeding from the mouth. Plaintiff was immediately admitted to the Gettysburg Hospital Critical Care Unit with "Imminent Death" orders (See Exhibits "E" (1), (2), (3), and (4)

8.) After further investigation, it was discovered that a series of pharmacological deviations prescribed by defendant's Dr. Ronald Long and Dr. William Ellien of SCI Smithfield precipitated into the aforementioned "Status Epilepticus" attack suffered by plaintiff. (See Exhibit "F"(4))

9.) On June 4, 1999, plaintiff was seen by defendant Dr. Ronald Long. Plaintiff complained that the anti-seizure medication he was on, (a hypantoin derivative called Dilantin) was causing unwanted side effects, and that he wanted to switch back to the anti-seizure medication he was on prior to the Dilantin. Defendant Dr. Ronald Long refused to change the medications, and abruptly discontinued plaintiff's Dilantin, without prescribing any further medications to treat plaintiff's epilepsy disorder. (See Exhibit "G")

10.) On June 15, 1999, plaintiff sent a request to defendant Dr. Ronald Long, asking him to reconsider prescribing an anti-seizure medications of any kind. This request was never responded to. (See Exhibit "H")

11.) On July 24, 1999, plaintiff was seen by defendant Dr. William Ellien, psychiatrist. At this time, plaintiff inquired as to why he wasn't on anti-seizure medications. Defendant Dr. William Ellien, said this wasn't his field of expertise and that I should talk to Defendant Dr. Ronald Long. He then prescribed the anti-depressant drug Imipramine.

12.) The abrupt discontinuance of Dilantin by defendant Dr. Ronald Long, as well as the prescription anti-depressant Imipramine, in combination with the physical and emotional trauma sustained during the use of excessive force in A.C.P. synergistically caused plaintiff to enter into the aforementioned life threatening "Status Epilepticus" seizures that occurred on August 29, 1999. (See Exhibit "I" (1), (2), and Exhibit "F(4)"

## CLAIMS FOR RELIEF

1.) The actions of Warden Thomas Duran, Deputy Warden Bruce Cluck, Deputy Warden Debra Hankey, C.O. Briton Shelton, Lt. John Jennings, Sgt. Rea Heintzelman, and Jane/John Doe in using physical force against the plaintiff without need or provocation, and in failing to intervene to prevent the misuse of force was done maliciously and sadistically, and constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

2.) Defendant's Lt. William Orth, and C.O. Vazquez's failure to provide adequate medical treatment to plaintiff, placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

3.) Adams County Prisons lack of adequately trained medical staff and medical facilities constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

4.) Defendant Dr. William J. Stienour's failure to treat plaintiff as a seizure risk even after plaintiff explained to defendant that he was an epileptic, and not currently on medications, constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

5.) The combined actions of defendant Dr. Ronald Long and Dr. William Ellien in abruptly stopping plaintiff's anti-seizure medication and in prescribing an anti-depressant drug known to lower seizure threshold placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A2: The actions of Lt. Orth and C.O. David Vazquez in ignoring plaintiff while in seizures and post-ictal state constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A3: The actions of Dr. William J. Steinour in refusing to treat plaintiff as a seizure risk, despite plaintiff reminding him that he was epileptic and not currently on anti-seizure medication constitutes deliberate indifference in violation of the

CLAIMS FOR RELIEF
CONTINUED FROM PAGE 5

Eighth Amendment of the United States Constitution.

A5:  The actions of Dr. Ronald Long in abruptly discontinuing plaintiff's anti-seizure medications despite foreknowledge that such actions would cause severe, life threatening seizures constitutes deliberate indifference in violation of the Eighth Amendment of the United States Constitution.

A6:  The actions of defendant Dr. William Ellien in prescribing the drug Tofranil known to decrease the seizure threshold, with foreknowledge that plaintiff was epileptic and had been abruptly withdrawn from his anti-seizure medications and the seizure risk associated with the withdrawal of said medications and the addition of the drug Tofranil he prescribed constitutes deliberate indifference to the Eighth Amendment of the United States Constitution.

B-2: $500,000.00 against Dr. Ronald Long and Dr. William Ellien for abruptly discontinuing plaintiff's anti-seizure medication and prescribing an anti-depressant seizure antagonist drug, and causing plaintiff to fall into a life threatening state of seizures known as "Status Epilepticus," and subsequent hospitalization of plaintiff.

# PHYSICIAN'S ORDERS

Exhibit F

Benson JASON
DS6483
4-27-76
SCism

Drug Allergies:
NKA

Self-Medication Program ☐ Yes    ☐ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|---|
| 0710 4-28-99 | | ① HIV test |
| 4-28 | | |
| | | |
| | | S. CRAIG HOFFMAN PA - C |
| 6/4/99 0915 | A | ① D/c Dilantin |
| 6-4-99 0920 | | RONALD A LONG, M.D. |
| 6-8-99 1515 C | A | ① Cont on seizure clinic |
| | | RAY McMULLEN, PA-C WHS |
| 7-23-99 | | ① ___ STST FPD O.L.C ID |
| | | ___ fer L.O. Dr. M. Salomon ___ |
| | | DR. MIGUEL SALOMON M.D. |
| | | DR. MIGUEL SALOMON M.D. |

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person or party.

PLEASE USE BALL POINT PEN ONLY

# PHYSICIAN'S ORDER

Exhibit G

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-22-76

Institution: Smithfield    C

Drug Allergies: NKA

Self-Medication Program ☐ Yes  ☒ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS    1 |
|---|---|---|
| 7-27-99 | B | ① Next appointment in 1 month |
| 1615 hrs | | ② Ativan 1mg PO q 6 hrs PRN anxiety, attal: · max 2 doses/day; · max 10 doses/week; for 1 month |
| | | ③ Begin Imipramine 50mg PO hs daily, through 3 Aug '99 |
| | | ④ On 4 Aug 99 - increase Imipramine to 75mg PO hs, daily, through 10 Aug 1999 |
| | | ⑤ On 11 Aug 99 - increase Imipramine to 100 mg PO hs, daily, for 5 months |
| | | ✓ ⑥ On/about 19 Aug 1999 - obtain Tofranil (Imipramine + desipramine) blood level in AM |
| | | a William F. Elion MD |
| Written Imc 7/27/99 2000 | | |

Barb Grove, L.P.N.

Received

JUL 27 1999

SCI-Smithfield
Medical Records Department

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person.

PLEASE USE BALL POINT PEN ONLY

**Parke-Davis—Cont.**

## COLY-MYCIN® S OTIC    ℞

[cō"ly-my´cin s ō´tic]
with Neomycin and Hydrocortisone
(colistin sulfate–neomycin
sulfate–thonzonium
bromide–hydrocortisone acetate
otic suspension)

### DESCRIPTION

Coly-Mycin S Otic with Neomycin and Hydrocortisone (colistin sulfate–neomycin sulfate–thonzonium bromide-hydrocortisone acetate otic suspension) is a sterile aqueous suspension containing in each ml: Colistin base activity, 3 mg (as the sulfate); Neomycin base activity, 3.3 mg (as the sulfate); Hydrocortisone acetate, 10 mg (1%); Thonzonium bromide, 0.5 mg (0.05%); Polysorbate 80, acetic acid, and sodium acetate in a buffered aqueous vehicle. Thimerosal (mercury derivative), 0.002% added as a preservative. It is a nonviscous liquid, buffered at pH 5, for instillation into the canal of the external ear or direct application to the affected aural skin.

### CLINICAL PHARMACOLOGY

1. Colistin sulfate—an antibiotic with bactericidal action against most gram-negative organisms, including *Pseudomonas aeruginosa*, *E. coli.*, and *Klebsiella-Aerobacter*.
2. Neomycin sulfate—a broad-spectrum antibiotic, bactericidal to many pathogens, notably *Staph aureus* and *Proteus* sp.
3. Hydrocortisone acetate—a corticosteroid that controls inflammation, edema, pruritus and other dermal reactions.
4. Thonzonium bromide—a surface-active agent that promotes tissue contact by dispersion and penetration of the cellular debris and exudate.

### INDICATIONS AND USAGE

For the treatment of superficial bacterial infections of the external auditory canal, caused by organisms susceptible to the action of the antibiotics; and for the treatment of infections of mastoidectomy and fenestration cavities, caused by organisms susceptible to the antibiotics.

### CONTRAINDICATIONS

This product is contraindicated in those individuals who have shown hypersensitivity to any of its components, and in herpes simplex, vaccinia and varicella.

### WARNINGS

As with other antibiotic preparations, prolonged treatment may result in overgrowth of nonsusceptible organisms and fungi.

If the infection is not improved after one week, cultures and susceptibility tests should be repeated to verify the identity of the organism and to determine whether therapy should be changed.

Patients who prefer to warm the medication before using should be cautioned against heating the solution above body temperature, in order to avoid loss of potency.

### PRECAUTIONS

**General:** If sensitization or irritation occurs, medication should be discontinued promptly.

This drug should be used with care in cases of perforated eardrum and in longstanding cases of chronic otitis media because of the possibility of ototoxicity caused by neomycin. Treatment should not be continued for longer than ten days.

Allergic cross-reactions may occur which could prevent the use of any or all of the following antibiotics for the treatment of future infections: kanamycin, paromomycin, streptomycin, and possibly gentamicin.

### ADVERSE REACTIONS

Neomycin is a not uncommon cutaneous sensitizer. There are articles in the current literature that indicate an increase in the prevalence of persons sensitive to neomycin.

### DOSAGE AND ADMINISTRATION

The external auditory canal should be thoroughly cleansed and dried with a sterile cotton applicator.

When using the calibrated dropper:
For adults, 5 drops of the suspension should be instilled into the affected ear 3 or 4 times daily. For infants and children, 4 drops are suggested because of the smaller capacity of the ear canal.

This dosage correlates to the 4 drops (for adults) and 3 drops (for children) recommended when using the dropper-bottle container for this product.

The patient should lie with the affected ear upward and then the drops should be instilled. This position should be maintained for 5 minutes to facilitate penetration of the drops into the ear canal. Repeat, if necessary, for the opposite ear. If preferred, a cotton wick may be inserted into the canal and

4 hours. The wick should be replaced at least once every 24 hours.

### HOW SUPPLIED

Coly-Mycin S Otic is supplied as:
N 0071-3141-35—5-mL bottle with dropper
N 0071-3141-36—10-mL bottle with dropper

Each ml contains: Colistin sulfate equivalent to 3 mg of colistin base, Neomycin sulfate equivalent to 3.3 mg neomycin base, Hydrocortisone acetate 10 mg (1%), Thonzonium bromide 0.5 mg (0.05%), and Polysorbate 80 in an aqueous vehicle buffered with acetic acid and sodium acetate. Thimerosal (mercury derivative) 0.002% added as a preservative.

**Shake well before using.**

Store at controlled room temperature 15°-30°C (59°-86°F). Stable for 18 months at room temperature; prolonged exposure to higher temperatures should be avoided.

3141G033

Caution—Federal law prohibits dispensing without prescription.

## KAPSEALS®
## DILANTIN®    ℞

[dī-lăn´tin ]
(Extended Phenytoin Sodium Capsules, USP)

### DESCRIPTION

Phenytoin Sodium is an antiepileptic drug. Phenytoin sodium is related to the barbiturates in chemical structure, but has a five-membered ring. The chemical name is sodium 5,5-diphenyl-2,4-imidazolidinedione.

Each Dilantin—*Extended Phenytoin Sodium Capsule* USP contains 30 mg or 100 mg phenytoin sodium USP. Also contains lactose, NF; sucrose, NF; talc, USP; and other ingredients. The capsule shell and band contain colloidal silicon dioxide, NF; FD&C red No. 3; gelatin, NF; glyceryl monooleate sodium lauryl sulfate, NF. The Dilantin 30-mg capsule shell and band also contain citric acid, USP; FD&C blue No. 1; sodium benzoate, NF; titanium dioxide, USP. The Dilantin 100-mg capsule shell and band also contain FD&C yellow No. 6; hydrogen peroxide 3%; polyethylene glycol 200. Product *in vivo* performance is characterized by a slow and extended rate of absorption with peak blood concentrations expected in 4 to 12 hours as contrasted to *Prompt Phenytoin Sodium Capsules* USP with a rapid rate of absorption with peak blood concentration expected in 1½ to 3 hours.

### CLINICAL PHARMACOLOGY

Phenytoin is an antiepileptic drug which can be useful in the treatment of epilepsy. The primary site of action appears to be *the motor cortex* where spread of seizure activity is inhibited. Possibly by promoting sodium efflux from neurons, phenytoin tends to *stabilize* the threshold against hyperexcitability caused by excessive, stimulation or environmental changes capable of reducing membrane sodium gradient. This includes the reduction of posttetanic potentiation at synapses. Loss of posttetanic potentiation prevents cortical seizure foci from detonating adjacent cortical areas. Phenytoin reduces the maximal activity of brain stem centers responsible for the tonic phase of tonic-clonic (grand mal) seizures.

The plasma half-life in man after oral administration of phenytoin averages 22 hours, with a range of 7 to 42 hours. Steady-state therapeutic levels are achieved 7 to 10 days after initiation of therapy with recommended doses of 300 mg/day.

When serum level determinations are necessary, they should be obtained at least 5-7 half-lives after treatment initiation, dosage change, or addition or subtraction of another drug to the regimen so that equilibrium or steady-state will have been achieved. Trough levels provide information about clinically effective serum level range and confirm patient compliance and are obtained just prior to the patient's next scheduled dose. Peak levels indicate an individual's threshold for emergence of dose-related side effects and are obtained at the time of expected peak concentration. For Dilantin Kapseals peak serum levels occur 4-12 hours after administration.

Optimum control without clinical signs of toxicity occurs more often with serum levels between 10 and 20 mcg/ml, although some mild cases of tonic-clonic (grand mal) epilepsy may be controlled with lower-serum levels of phenytoin.

In most patients maintained at a steady dosage, stable phenytoin serum levels are achieved. There may be wide interpatient variability in phenytoin serum levels with equivalent dosages. Patients with unusually low levels may be noncompliant or hypermetabolizers of phenytoin. Unusually high levels result from liver disease, congenital enzyme deficiency or drug interactions which result in metabolic interference. The patient with large variations in phenytoin plasma levels, despite standard doses, presents a difficult clinical prob-

free phenytoin levels may be altered [text obscured] tein binding characteristics differ [text obscured]
Most of the drug is excreted in the bile [text obscured] lites which are then reabsorbed from the [text obscured] excreted in the urine. Urinary excretion [text obscured] metabolites occurs partly with glomerul[text obscured] more importantly, by tubular secretion. [text obscured] is hydroxylated in the liver by an enzyme [text obscured] saturable, small incremental doses may r[text obscured] stantial increases in serum levels, when t[text obscured] per range. The steady-state level may be [text obscured] increased, with resultant intoxication, fr[text obscured] dosage of 10% or more.

### INDICATIONS AND USAGE

Dilantin is indicated for the control of [text obscured] chomotor (grand mal and temporal lobe) [text obscured] vention and treatment of seizures occurring [text obscured] ing neurosurgery.

Phenytoin serum level determinations [text obscured] for optimal dosage adjustments (see, Dos[text obscured] istration).

### CONTRAINDICATIONS

Phenytoin is contraindicated in those pati[text obscured] persensitive to phenytoin or other hydan[text obscured]

### WARNINGS

Abrupt withdrawal of phenytoin in epilep[text obscured] precipitate status epilepticus. When, in the [text obscured] clinician, the need for dosage reduction, dis[text obscured] substitution of alternative antiepileptic [text obscured] this should be done gradually. However, in [text obscured] allergic or hypersensitivity reaction, rap[text obscured] alternative therapy may be necessary. In [text obscured] tive therapy should be an antiepileptic dru[text obscured] the hydantoin chemical class.

There have been a number of reports sugge[text obscured] ship between phenytoin and the developmen[text obscured] nopathy (local or generalized) including ben[text obscured] hyperplasia, pseudolymphoma, lymphom[text obscured] Disease.

Although a cause and effect relationship ha[text obscured] lished, the occurrence of lymphadenopath[text obscured] need to differentiate such a condition fro[text obscured] lymph node pathology. Lymph node involve[text obscured] with or without symptoms and signs resem[text obscured] ness eg, fever, rash and liver involvement[text obscured] In all cases of lymphadenopathy, follow-up [text obscured] an extended period is indicated and ever[text obscured] made to achieve seizure control using alt[text obscured] tic drugs.

Acute alcoholic intake may increase pheny[text obscured] while chronic alcoholic use may decrease se[text obscured] In view of isolated reports associating phen[text obscured] erbation of porphyria, caution should be ex[text obscured] this medication in patients suffering from [text obscured]

**Usage in Pregnancy:**
A number of reports suggests an associati[text obscured] of antiepileptic drugs by women with epilep[text obscured] incidence of birth defects in children born[text obscured] Data are more extensive with respect to phe[text obscured] nobarbital, but these are also the most com[text obscured] antiepileptic drugs; less systematic or anec[text obscured] gest a possible similar association with the [text obscured] antiepileptic drugs.

The reports suggesting a higher incidence o[text obscured] children of drug-treated epileptic women ca[text obscured] as adequate to prove a definite cause and eff[text obscured] There are intrinsic methodologic problems [text obscured] quate data on drug teratogenicity in human[text obscured] or the epileptic condition itself may be involv[text obscured] drug therapy in leading to birth defects. The[text obscured] of the mothers on antiepileptic medication[text obscured] infants. It is important to note that ant[text obscured] should not be discontinued in patients in w[text obscured] administered to prevent major seizures [text obscured] strong possibility of precipitating status e[text obscured] attendant hypoxia and threat to life. In [text obscured] where the severity and frequency of the seiz[text obscured] such that the removal of medication does no[text obscured] threat to the patient, discontinuation of [text obscured] considered prior to and during pregnancy [text obscured] not be said with any confidence that even int[text obscured] not pose some hazards to the developing emb[text obscured] prescribing physician will wish to weigh [text obscured] ations in treating and counseling epile[text obscured] childbearing potential.

In addition to the reports of increased incid[text obscured] malformation, such as cleft lip/palate and h[text obscured] tions in children of women receiving phen[text obscured] antiepileptic drugs, there have been recent [text obscured] a fetal hydantoin syndrome. This consists of [text obscured] deficiency, microcephaly and mental defici[text obscured]

Skin rash, petechiae, urticaria, itching, photosen-
sitivity; edema (general or of face and tongue); drug fever;
sensitivity with desipramine.

Bone marrow depression including agranulo-
cytosis, eosinophilia; purpura; thrombocytopenia.

Nausea and vomiting, anorexia, epigas-
tric distress; diarrhea; peculiar taste, stomatitis, abdominal
cramps, black tongue.

Gynecomastia in the male; breast enlargement
and galactorrhea in the female; increased or decreased li-
bido, impotence; testicular swelling; elevation or depression
of blood sugar levels; inappropriate antidiuretic hormone
(ADH) secretion syndrome.

Jaundice (simulating obstructive; altered liver
function), weight gain or loss; perspiration; flushing; urinary
frequency, drowsiness, dizziness, weakness and fatigue;
headache, parotid swelling; alopecia; proneness to falling.

Withdrawal Symptoms:  Though not indicative of addiction,
abrupt cessation of treatment after prolonged therapy may
produce nausea, headache and malaise.

DOSE AND ADMINISTRATION

(... up to 100 mg/day intramuscularly in divided doses.
...al administration should be used only for starting
...in patients unable or unwilling to use oral medica-
...e oral form should supplant the injectable as soon as
...ble.)

...dosages are recommended for elderly patients and
...ents. Lower dosages are also recommended for outpa-
...s compared to hospitalized patients who will be under
...supervision. Dosage should be initiated at a low level
...creased gradually, noting carefully the clinical re-
...and any evidence of intolerance. Following remission,
...maintenance medication may be required for a longer
...of time, at the lowest dose that will maintain

...DOSAGE

...have been reported to be more sensitive than adults
...acute overdosage of imipramine hydrochloride. The
...dosage, as reported in infants or young children,
...must be considered serious and potentially fatal.
...al Symptoms:  These may vary in severity depend-
...factors such as the amount of drug absorbed, the
...patient, and the interval between drug ingestion
...start of treatment. Blood and urine levels of impra-
...not reflect the severity of poisoning; they have
...qualitative rather than quantitative value, and are
...indicators in the clinical management of the

...abnormalities may include drowsiness, stupor, coma,
...restlessness, agitation, hyperactive reflexes, mus-
...ity, athetoid and choreiform movements, and
...sions.

...abnormalities may include arrhythmia, tachycar-
...evidence of impaired conduction, and signs of con-
...failure.

...respiratory depression, cyanosis, hypotension, shock, vomit-
...hyperpyrexia, mydriasis, and diaphoresis may also be
...

...The recommended treatment for overdosage
...yclic antidepressants may change periodically.
...it is recommended that the physician contact a
...control center for current information on treatment.
...CNS involvement, respiratory depression and car-
...arrhythmia can occur suddenly, hospitalization and
...observation may be necessary, even when the amount
...thought to be small or the initial degree of intoxi-
...appears slight or moderate. All patients with ECG
...alities should have continuous cardiac monitoring
...closely observed until well after cardiac status has
...ned normal; relapses may occur after apparent re-
...

...patient, empty the stomach promptly by lavage.
...conscious patient, secure the airway with a cuffed en-
...al tube before beginning lavage (do not induce eme-
...) Administration of activated charcoal slurry may help reduce
...ption of imipramine.

...external stimulation to reduce the tendency to
...If anticonvulsants are necessary, diazepam and
...zepam may be useful.
...Adequate respiratory exchange. Do not use respira-
...pressants.

...should be treated with supportive measures, such as
...position, intravenous fluids, and, if necessary, a
...pressor. The use of corticosteroids in shock is con-
...ersial and may be contraindicated in cases of overdosage
...cyclic antidepressants. Digitalis may increase conduc-
...abnormalities and further irritate an already sensitized
...cardium. If congestive heart failure necessitates rapid
...talization particular care must be exercised.
...should be controlled by whatever external
...available, including ice packs and cooling sponge

...Peritoneal dialysis, exchange transfusions
...therate have been generally reported as ineffec-

've because of the rapid fixation of imipramine in tissues.
Blood and urine levels of imipramine may not correlate with
the degree of intoxication, and are unreliable indicators in
the clinical management of the patient.

The slow intravenous administration of physostigmine sal-
icylate has been used as a last resort to reverse severe CNS
anticholinergic manifestations of overdosage with tricyclic
antidepressants; however, it should not be used routinely,
since it may induce seizures and cholinergic crises.

HOW SUPPLIED

Ampuls 2 ml—For intramuscular administration only
  25 mg imipramine hydrochloride, 2 mg ascorbic acid, 1 mg
  sodium bisulfite, 1 mg sodium sulfite
  Boxes of 10 .............................................NDC 0028-0065-23
Store between 59°-86°F (15°-30°C).
Note:  Upon storage, minute crystals may form in some am-
puls. This has no influence on the therapeutic efficacy of the
preparation, and the crystals redissolve when the affected
ampuls are immersed in hot tap water for 1 minute.

ANIMAL PHARMACOLOGY & TOXICOLOGY

A.  Acute:  Oral $LD_{50}$ ranges are as follows:
Rat                                             355 to 682 mg/kg
Dog                                             100 to 215 mg/kg
Depending on the dosage in both species, toxic signs pro-
ceeded progressively from depression, irregular respiration
and ataxia to convulsions and death.

B.  Reproduction/Teratogenic:  The overall evaluation may be
summed up in the following manner:
Oral:  Independent studies in three species (rat, mouse and
rabbit) revealed that when Tofranil is administered orally in
doses up to approximately 2½ times the maximum human
dose in the first 2 species and up to 25 times the maximum
human dose in the third species, the drug is essentially free
from teratogenic potential. In the three species studied, only
in that study there was likewise an abnormality in the con-
trol group. However, evidence does exist from the rat studies
that some systemic and embryotoxic potential is demonstra-
ble. This is manifested by reduced litter size, a slight increase
in the stillborn rate and a reduction in the mean birth
weight.
Parenteral:  In contradistinction to the oral data, Tofranil
does exhibit a slight but definite teratogenic potential when
administered by the subcutaneous route. Drug effects on
both the mother and fetus in the rabbit are manifested in
higher resorption rates and decrease in mean fetal birth
weights, while teratogenic findings occurred at a level of 5
times the maximum human dose. In the mouse, teratogenic-
ity occurred at 1½ and 6½ times the maximum human
dose, but no teratogenic effects were seen at levels 3 times
the maximum human dose. Thus, in the mouse, the findings
are equivocal.

C91-42 (Rev. 2/92)

Dist. by:
Geigy Pharmaceuticals
Ciba-Geigy Corporation
Ardsley, New York 10502

TOFRANIL®                                                       R
[toe-fray´nill ]
imipramine hydrochloride USP
Tablets of 10 mg
Tablets of 25 mg
Tablets of 50 mg
For oral administration

DESCRIPTION

Tofranil, imipramine hydrochloride USP, the original tricy-
clic antidepressant, is a member of the dibenzazepine group
of compounds. It is designated 5-[3-(Dimethylamino)propyl]-
10, 11-dihydro-5H-dibenz[b,f ] azepine Monohydrochloride.
Imipramine hydrochloride USP is a white to off-white, odor-
less, or practically odorless crystalline powder. It is freely
soluble in water and in alcohol, soluble in acetone, and insol-
uble in ether and in benzene. Its molecular weight is 316.87.
Inactive Ingredients.  Calcium phosphate, cellulose com-
pounds, docusate sodium, iron oxides, magnesium stearate,
polyethylene glycol, povidone, sodium starch glycolate, su-
crose, talc and titanium dioxide.

CLINICAL PHARMACOLOGY

The mechanism of action of Tofranil is not definitely known.
However, it does not act primarily by stimulation of the cen-
tral nervous system. The clinical effect is hypothesized as
being due to potentiation of adrenergic synapses by blocking
uptake of norepinephrine at nerve endings. The mode of
action of the drug in controlling childhood enuresis is
thought to be apart from its antidepressant effect.

INDICATIONS

Depression:  For the relief of symptoms of depression. Endog-
enous depression is more likely to be alleviated than other

pressive states. One to three weeks of treatment may be
needed before optimal therapeutic effects are evident.
  Childhood Enuresis:  May be useful as temporary adjunc-
tive therapy in reducing enuresis in children aged 6 years
and older, after possible organic causes have been excluded
by appropriate tests. In patients having daytime symptoms
of frequency and urgency, examination should include void-
ing cystourethrography and cystoscopy, as necessary. The
effectiveness of treatment may decrease with continued drug
administration.

CONTRAINDICATIONS

The concomitant use of monoamine oxidase inhibiting com-
pounds is contraindicated. Hyperpyretic crises or severe
convulsive seizures may occur in patients receiving such
combinations. The potentiation of adverse effects can be seri-
ous, or even fatal. When it is desired to substitute Tofranil in
patients receiving a monoamine oxidase inhibitor, as long an
interval should elapse as the clinical situation will allow,
with a minimum of 14 days. Initial dosage should be low and
increases should be gradual and cautiously prescribed.
The drug is contraindicated during the acute recovery period
after a myocardial infarction. Patients with a known hyper-
sensitivity to this compound should not be given the drug.
The possibility of cross-sensitivity to other dibenzazepine
compounds should be kept in mind.

WARNINGS

Children:  A dose of 2.5 mg/kg/day of Tofranil should not be
exceeded in childhood. ECG changes of unknown signifi-
cance have been reported in pediatric patients with doses
twice this amount.
Extreme caution should be used when this drug is given to:
patients with cardiovascular disease because of the possibil-
ity of conduction defects, arrhythmias, congestive heart fail-
ure, myocardial infarction, strokes and tachycardia. These
patients require cardiac surveillance at all dosage levels of
the drug;
patients with increased intraocular pressure, history of uri-
nary retention, or history of narrow-angle glaucoma because
of the drug's anticholinergic properties;
hyperthyroid patients or those on thyroid medication be-
cause of the possibility of cardiovascular toxicity;
patients with a history of seizure disorder because this drug
has been shown to lower the seizure threshold;
patients receiving guanethidine, clonidine, or similar agents,
since Tofranil may block the pharmacologic effects of these
drugs;
patients receiving methylphenidate hydrochloride. Since
methylphenidate hydrochloride may inhibit the metabolism
of Tofranil, downward dosage adjustment of imipramine
hydrochloride may be required when given concomitantly
with methylphenidate hydrochloride.
Tofranil may enhance the CNS depressant effects of alcohol.
Therefore, it should be borne in mind that the dangers inher-
ent in a suicide attempt or accidental overdosage with the
drug may be increased for the patient who uses excessive
amounts of alcohol. (See PRECAUTIONS.)
Since Tofranil may impair the mental and/or physical abili-
ties required for the performance of potentially hazardous
tasks, such as operating an automobile or machinery, the
patient should be cautioned accordingly.

PRECAUTIONS

An ECG recording should be taken prior to the initiation of
larger-than-usual doses of Tofranil and at appropriate inter-
vals thereafter until steady state is achieved. (Patients with
any evidence of cardiovascular disease require cardiac sur-
veillance at all dosage levels of the drug. See WARNINGS.)
Elderly patients and patients with cardiac disease or a prior
history of cardiac disease are at special risk of developing the
cardiac abnormalities associated with the use of Tofranil.
It should be kept in mind that the possibility of suicide in
seriously depressed patients is inherent in the illness and
may persist until significant remission occurs. Such patients
should be carefully supervised during the early phase of
treatment with Tofranil, and may require hospitalization.
Prescriptions should be written for the smallest amount
feasible.
Hypomanic or manic episodes may occur, particularly in
patients with cyclic disorders. Such reactions may necessi-
tate discontinuation of the drug. If needed, Tofranil may be
resumed in lower dosage when these episodes are relieved.
Administration of a tranquilizer may be useful in controlling
such episodes.
An activation of the psychosis may occasionally be observed
in schizophrenic patients and may require reduction of dos-
age and the addition of a phenothiazine.
Concurrent administration of Tofranil with electroshock
therapy may increase the hazards; such treatment should be

Continued on next page

The full prescribing information for each Geigy product is
contained herein and is that in effect as of September 1,
1993.

Exhibit (A)

1

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA

2                              Criminal

3   Commonwealth

4        vs.                              CC-510-98

5   Jason Eric Benson

6                         **ORDER OF COURT**

7        AND NOW, this 27th day of August, 1999, the

8   Defendant appeared with counsel.  Counsel has indicated that

9   she has filed an amended PCRA petition, which raises one

10  issue which is legal in nature.  The argument is that the

11  Court is without power to impose two separate sentences on

12  count five and six in that there should have been only one

13  conspiracy.

14        IT IS ORDERED that a transcript be prepared of the

15  proceedings that occurred on August 4, 1998 and filed of

16  record.  Copies will be provided counsel at the initial cost

17  of the County of Adams.

18        Argument is scheduled for November 30, 1999 at

19  9:00 a.m.  PCRA counsel shall file her brief by

20  November 9, 1998, and the Commonwealth shall file its brief

21  by November 17, 1999.

22                              By the Court,

23

24

                                _____
                                Oscar F. Spicer
25  Michael A. George, Esq., DA    President Judge
    Kristen L. Rice, Esq.



# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _Benson, Jason_          ACP# _99-00740_ DATE _8/27/99_

HOUSING AREA _A-Block_          LOCATION OF INCIDENT _Intake_

TIME: _1120_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _On above time & date I, Sgt Heintzel was asked to help with Inmate Benson, Jason at intake. Inmate Benson, Jason did want to strip after court._

Action and Comments: _Taken to Gettysburg E.R. 170 for Evaluation as a result of the O.C. and the inmates request. A.S.P. notified to E.O's criminal charges for Aggravated Assault by a prisoner. Event was videotaped._

Shift Commander
Signature and I.D. No.: _____ _60_ Date and Time _8-27-99  1600_

Print Name _Lt. Tracy_

Report of Incident: _On above time & date I, Sgt Heintzel was asked to help with Inmate Benson, Jason in the Intake area. Inmate Benson was being a problem that he didn't want to be strip after coming back from court. He was asked to strip but he refused to do so. At that time he was sprayed & then he started to hit his head on the computer screen. After this he wouldn't stop so he was taken to the floor until he had enough & then he was placed in the shower._

(over for continuation)

Signature
I.D. No: _Sgt Heintzel 61-4_          Date and Time _8/27/99  1300_

Name _Heintzelman_

Exhibit C ACPF
Page 2

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME Benson, Jason                    ACP# 99-00740  DATE 8/27/99

HOUSING AREA A-Block                  LOCATION OF INCIDENT Medical Office

                                      TIME: 1145 hrs

Brief Summary of Incident:
(Include Staff and Inmate Names and Number)  Use of force

Action and Comments: Inmate showered, transferred to E-Block and transported to ER and examined by the on-duty physician.
         PSP notified to press charges.
* Incident was video documented

Shift Commander
Signature and I.D. No.: B.A. Cluck                    Date and Time 8/27/99  1500 hrs

Print Name  B.A. Cluck

Report of Incident: On the above time and date, I was informed by Lt Jennings that the aforementioned inmate was refusing to submit to a strip-search upon returning from court. I attempted to speak w/ Inmate Benson about his actions but he only began yelling profanities and making comments like, "Fuck this! This is fucking Bullshit! I'm not stripping!" He was again asked to cooperate and submit to a search and he again refused. At that point, Lt Jenning sprayed a one second burst of CC spray (Face) into Benson face. Benson then began calling staff present, "fucking animals," "cock suckers"

(over for continue

aff Signature
d I.D. No.: B.A. Cluck C                    Date and Time 8/27/99  1500 hrs

int Name  B.A. Cluck

EXHIBIT C, page
ACPF #:

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _BENSON, JASON_   ACP# _990740_ DATE _8/27/99_

HOUSING AREA _E-2_   LOCATION OF INCIDENT _MEDICAL ROOM_

TIME: _APP. 11:10_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number)  _FORCE USED ON INMATE BENSON JASON (990740). WARDEN DURAN, DEPUTY WARDENS CLUC AND HANKEY, LT. JENNINGS, SGT. HEINTZELMAN, OFFICER SHELTON._

Action and Comments: _TAKEN TO E.R. @ 1310 FOR MEDICAL ATTENTION AS A RESULT OF O.I.C. AND INMATE'S REQUEST. PSP NOTIFIED TO FILE CRIMINAL CHARGES FOR AGGRAVATED ASSAULT BY PRISONER. ENTIRE EVENT WAS VIDEO-TAPED._

Shift Commander
Signature and I.D. No.: _____ 617_   Date and Time _8-27-99 NOW_

Print Name _LT. JONES_

Report of Incident: _ON THE ABOVE DATE & APP. TIME, LT. JENNINGS INFORMED ME THAT INMATE BENSON, UPON HIS RETURN FROM COURT WAS REFUSING TO BE STRIP-SEARCHED. I REPORTED TO THE LT'S OFFICE AND MET LT. JENNINGS WHO BRIEFED ME ON WHAT HAD TRANSPIRED THIS FAR. A PLAN WAS DEVISED AND WE REPORTED TO THE MEDICAL ROOM, WHERE DEPUTY WARDEN_

(over for continuation)

Staff Signature
and I.D. No: _____ #1_   Date and Time _8/27/99_   _3:10/pm_

Print Name _DURAN_

PENNSYLVANIA STATE POLICE
**PROPERTY RECORD**

SP-7-60 (8-94)

**4. STATUS**
☒ EVIDENCE  ☐ FOUND  ☐ RECOVERED  ☐ RECEIPT  ☐ OTHER

**5. OFFENSE** Agg Assault

**6. STATION/DISTRICT OFFICE** Carlisle

**7. SUBMITTING OFFICER** Cpl. T. Mills

**8. RECEIVING OFFICER** BADGE NO. 448

**9. DATE**

**10. INVESTIGATING OFFICER** J.L. Myer   BADGE NO. 6671

**11. SIGNATURE OF RECEIVING OFFICER**

**12. FOUND OR RECOVERED FROM/SIGNATURE**  Thomas Dyland

**ADDRESS**

**LOCATION**

**TELEPHONE NO.**

**13. DATE**   TIME

**14. CODES:**

STORAGE AREA
1. PROPERTY ROOM  3. EXPLOSIVE MAGAZINE
2. SAFETY DEPOSIT BOX  4. NON-DEPARTMENT

DISPOSITION
1. DESTROYED  4. RELEASED TO OWNER/FINDER
2. ESCHEATABLE  5. DONATED
3. EXPENDED IN LABORATORY

REMOVAL CODE
1. CUSTODY  3. LABORATORY
2. COURT  4. OTHER

| 15. | 16. TYPE PROPERTY | 17. CODE | 18. QUANTITY | 19. VALUE | 20. STORAGE AREA CODE | 21. DISPOSITION CODE |
|---|---|---|---|---|---|---|
| 0 | | | | | | |
| 9 | | | | | | |
| 8 | | | | | | |
| 7 | | | | | | |
| 6 | | | | | | |
| 5 | | | | | | |
| 4 | | | | | | |
| 3 | | | | | | |
| 2 | ACP 625 Browning Co Cal Auto Self Loading | 27 | 01 | 1 | | |

**ITEMS - (ONE ITEM PER LINE)**

| 23. DATE & TIME | 24. ITEM(S) NO. | 25. OFFICER'S SIGNATURE - BADGE NO. | 26. CUSTODIAL OFFICERS INIT./BADGE NO. | 27. REMOVAL CODE & LOCATION | 28. ESTIMATED DATE OF RETURN | 29. COMPUTER ENTRY |
|---|---|---|---|---|---|---|
| 12/21/99 | 1 | | | | | |

**PROPERTY RECORD CONTINUATION**  ☐

**1. DESIGNATE OWNER/FINDER, OR:**  2. INCIDENT NO.   3.

I HEREBY CERTIFY THAT I AM THE OWNER OF PROPERTY OR AUTHORIZED AGENT TO RECEIVE ITEM(S) NO. _____

CLAIMANTS SIGNATURE _____   CLAIMANTS NAME _____

OWNER'S NAME _____   OWNER'S SIGNATURE _____   ADDRESS _____   TELEPHONE NO. _____   DATE _____





# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

**NAME:**   BENSON, JASON E                                    **DATE OF VISIT:** 08/27/1999
**MR:**       177556

**HISTORY:** This 22 year old presents to the Emergency Department in handcuffs and ankle cuffs for evaluation of injuries sustained in a "scuffle" with the prison guards. The patient states that he was "man handled" by the prison guards, was taken down, and felt like he was being kicked, although he was maced at the time and couldn't really see how he was being taken down. He complains of numbness in his knuckles, pain in his back and chest, and in the back of his head. His last tetanus booster was about a month ago

**MEDICATIONS** Ativan once daily. Had a dose earlier this morning. Feels stressed out right now and wants more Ativan

**PHYSICAL:** The patient is awake, alert, appears in no acute or severe distress although he appears apprehensive. He is afebrile. Blood pressure is 132/90, pulse 92, respirations 20 and not labored

|  |  |
|---|---|
| HEENT | Reveals superficial contusion of the right frontotemporal scalp. No other scalp injury is noted. He has conjunctival injection. Tympanic membranes are normal. Pupils are equal and react normally. EOM's intact. There is no facial asymmetry. Speech is normal. There is no tenderness of his neck. There is no apparent pain with neck motion. He has tenderness to palpation of the paraspinous lumbar muscles. He has point tenderness over the right inferolateral thorax. He has no pain in that area with AP compression of his chest. There is no crepitus noted |
| LUNGS | Clear and equal and he is breathing deeply and ventilating well |
| ABDOMEN | Soft and nontender |
| EXTREMITIES | Lower extremity exam is normal. Exam of the upper extremity reveals a few superficial handcuff type contusions of the skin. His neuro exam to the upper extremities is normal. Capillary refill is intact. Sensation and color is normal |

**TREATMENT/PLAN:** The patient is given 1 mg of Ativan by mouth, released in the care of the prison guards, and is to follow with Dr Posner. He is to be given Tylenol as needed for discomfort

**IMPRESSION:** Multiple contusions

WJS dh
DD 08/27/1999 DT 08/27/1999 14 17                    SIGNED BY   WILLIAM J STEINOUR, MD

MR164 11/91                    EMERGENCY DEPARTMENT REPORT





Exhibit F
Page 1

# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

NAME:    BENSON, JASON E

MR:    177556

DATE OF VISIT: 08/30/1999

8-31 0

CHIEF COMPLAINT  Seizure

**HISTORY:** The sheriff that transported this patient from prison says he was told that this patient had a small seizure about an hour and a half ago and then a larger one more recently that prompted the decision to transport this gentleman to the Emergency Department  He was noted to be bleeding from his mouth following the second seizure  He was apparently transported to the Emergency Department in the police cruiser in a conscious condition but shortly after arriving here, had another seizure which occurred in our parking lot area  This was observed by paramedic staff and was observed to be significant  When I went out to the parking lot area, he was noted to be apparently post ictal with bloody mucous coming from his mouth  His respirations were somewhat labored  He was transported into the Emergency Department for further evaluation

*PAST MEDICAL HISTORY*  Positive for seizures in the past.  He has been worked up with neurology consults, numerous CT's and I believe EEG  It is believed he has a seizure disorder although he apparently had seizures prompted or precipitated by his multi drug use which includes cocaine, marijuana, and ecstasy  He was seen here a couple of days ago by Dr Steinour for injuries related to a scuffle with prison guards  He apparently was maced at that point but was treated and released with a diagnosis of multiple contusions

*MEDICATIONS*  Faxed to us from prison are Serzone, Ativan p r n  and Imipramine  He apparently is on no anticonvulsants

**PHYSICAL:** On arrival in the Emergency Department the patient is pale, diaphoretic, unresponsive with somewhat snoring respirations. O2 saturation initially was about 88% range  He was somewhat resistant to maintaining oxygen mask on his face but as he became more lucid he became calmer and his O2 saturation improved into the high 90's  Within the period of 15 minutes or so in our department, he was able to look towards me in response to his name being called and able to follow simple commands such as opening his mouth

| | |
|---|---|
| HEENT | He has a little minor ecchymosis in his left postauricular area  Pupils are equal  TM's, nares unremarkable  Exam of his mouth I believe shows an abrasion of the right lateral tongue |
| NECK | Appears to be supple |
| LUNGS | Clear anteriorly |
| HEART | Regular rhythm |
| ABDOMEN | Soft . |
| EXTREMITIES | He was initially wearing handcuffs but was switched to leg shackles by the sheriff that brought him in  He seems to have movement in all his arms and legs |

**TREATMENT/PLAN:** Since this seizure witnessed by us in the Emergency Department was his third in a short period of time, he was given a loading dose of Dilantin 1 gram IV  Blood work has been drawn which shows a white count of 17 6 with a normal H&H and platelet count  Chem panel 2 is pending



# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

NAME:      BENSON, JASON E
MR:          177556

I plan to speak to the next doctor up for unassigned admission about this patient  With three seizures in a short period of time, I feel that he should be admitted to the hospital for more close observation

**IMPRESSION:**  Multiple seizures

TWH dli
DD  08/30/1999 DT  09/01/1999 11 34

SIGNED BY   TIMOTHY W HOLLAND, MD

MR164 11/91                    **EMERGENCY DEPARTMENT REPORT**

# THE GETTYSBURG HOSPITAL

## CONSULTATION REPORT

NAME *Jason Benson*

DATE AND TIME OF REQUEST *3/29/99   0900*

TO DOCTOR *Dr Messer*

REASON FOR CONSULTATION:

*Recurrent Seizures*

```
0300410351   17-75-56
BENSON, JASON E
KANSLER, DAVID F MD
[ZCTA 09/27/1976 22Y  M
```

OPINION ONLY [✓]

TREAT AND FOLLOW [a]

REQUESTING PHYSICIAN: *Dr Kansler*

| DATE | TIME | | PERSON NOTIFIED |
|---|---|---|---|
| 3/29/99 | 0910 | SIGNATURE *D-McCall* | OF REQUEST  *DEB* |

REPORT OF CONSULTATION (Findings, Diagnosis, Recommendations)

*22 Y.O. WM WITH HO EPILEPSY SINCE 12 Y.O. P.H. OF "PETIT MAL" (PROBABLY COMPLEX - PARTIAL SEIZURES) + GENERALIZED. EEG'S 3/89 + 4/90 → L TEMPORAL FOCUS  EEG 8/97 ⊖ @ AM FOR SEIZURE 2° TO PT. DC OF DILANTIN + DRUG USE.  C/O MIGRANE + SERZONE, ATIVAN, IMIPRAMINE PTA FROM GP PRISON.  RC IV. DILANTIN + GM.  LAB OK BUT ↑WBC ↓CO₂ C/W POST-ICTAL STATE.  HAD TII SZ THIS AM 0440 → ONSET IN SLEEP  DC'ED DILANTIN × 4 MOS*

*EXAM: NECK SUPPLE.  MS. - ALERT + ORIENTED.  NO APHASIA MEMORY OK  CN - VIS FIELDS ✓ FUNDUS ✓ NO PAPILLEDEMA PERRL, EMS - FRONTALIS SYM ✓ ⊕ +6 NYSTAGMUS IN ALL DIRECT (C/W DILANTIN LOAD.)  HEARING ✓ TONGUE ✓ MOTOR - NO DRIFT  POWER R=L  TONE ✓ SENS ✓ DTR'S 1-2+ R=L  TOES ↑↑*

*EEG TODAY → L DISCHARGE*

*IMP: ① SEIZURE DISORDER; ② STATUS EPILEPTICUS @ AM 2° TO DC OF DILANTIN ± EFFECTS OF OTHER DRUGS ON SEIZURE THRESHOLD*

*SUGGEST - ✓ DILANTIN LEVEL IN AM  IF >10 BUT <20 RX 200 MG PO BID. OR PREVIOUS DOSE KNOWN TO BE EFFECTIVE*

SIGNATURE OF CONSULTANT

## CONSULTATION REPORT

MB19 1/88

White - Medical Records          Yellow - Consulting Physician

# THE GETTYSBURG HOSPITAL

## CRITICAL CARE UNIT
## BASIC ANTI-ARRHYTHMIA THERAPY

```
0300410351    17-75-56
BENSON, JASON E
KAHSLER, DAVIC F MC
E2C7A 09/27/1976 22Y    M
```

Registered Nurses in the Critical Care Unit are authorized to act immediately in the following life threatening situations with the following medications after a reasonable diagnosis has been made and while the physician is being called

**1    Death Imminent**  Patient unconscious

a    Ventricular Fibrillation /Pulseless Ventricular Tachycardia
CPR  Defibrillate with 200 watt seconds *  If no conversion call Code Blue, defibrillate with 300 watt seconds  If no conversion, defibrillate with 360 watt seconds  If still no response, give Epinephrine 1 10,000 1mg IV PUSH, defibrillate with 360 watt seconds  Give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 360 watt seconds  Follow with Lidocaine drip of 250 D₅W with Lidocaine 1 gram at 2mg/minute  Follow Code Blue Procedure

b    Ventricular Tachycardia  (with palpable pulse)
Defibrillate with 100 watt seconds  If no response, defibrillate with 200 watt seconds  If no response, call Code Blue, defibrillate with 300 watt seconds  If no response, give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 300 watt seconds  Follow with Lidocaine drip at 250cc D₅W with Lidocaine gram 1 at 2mg/minute  Follow Code Blue Procedure

c    Severe Bradycardia (rate less than 30)
Atropine 1.0mg IV PUSH  May repeat Atropine q. 3 - 5 minutes for total 2mg  Consider CPR  Prepare patient for transcutaneous pacing

d    Asystole
CPR  Call Code Blue  Give Epinephrine 1 10,000 1mg IV PUSH  CPR  Give Atropine 1mg IV PUSH  Follow Code Blue Procedure

**2    Life Threatening.**  Patient still conscious but symptomatic  If physician is not immediately available then

a    Ventricular Tachycardia (3 or more PVCs in sequence)
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100mg per bolus)
Lidocaine drip at 2mg/minute

b    PVCs 6 or more a minute, multi-focal in nature, coupling or occurring of T wave
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100 mg per bolus)
Lidocaine drip at 2mg/minute

c    Bradycardia  Rate less than 40 or 50 a minute and patient symptomatic  (Consciousness altered or blood pressure dropped)
Atropine  5mg IV PUSH  If rate further drops, follow immediately with second dose of  5mg IV PUSH  If rate does not significantly increase in 2 to 5 minutes, give additional  5mg IV PUSH  Prepare patient for transcutaneous pacing

MR-53  Rev 4/96

# Exhibit    B

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JARIBU IGWE MUTOPE,

    Plaintiff,           :   CIVIL NO. 3:CV-98-1179

                      :

    v.                :   (Judge Kosik)

RANDALL EDGAR, ET AL.,

    Defendants



**MEMORANDUM AND ORDER**

    Presently pending before the court is defendant Good Samaritan Hospital's (Moving Defendant) motion (Doc. 73) to dismiss the amended complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The motion has been fully briefed and is ripe for disposition. For the reasons set forth below, the motion will be granted.

<u>Background</u>

    The above-captioned civil rights complaint pursuant to 42 U.S.C. § 1983 was filed on July 21, 1998 by Jaribu Igwe Mutope, an inmate presently confined at the State Correctional Institution, Frackville, Pennsylvania (SCI-Frackville).[1] He proceeds <u>pro se</u> and <u>in forma pauperis</u>. On March 11, 1999, plaintiff filed an amended complaint (Doc. 62).[2]

---

1. At the time Mutope filed his complaint he was confined at the Lebanon County Prison.

2. The amended complaint supersedes the original complaint. <u>See Brandon v. Beard</u>, 140 F.R.D. 328, 329 (M.D. Pa. 1991).

Moving Defendant filed a motion to dismiss the amended complaint (Doc. 73) together with a brief in support (Doc. 74) on June 21, 1999.  Plaintiff filed briefs in opposition (Doc. Nos. 77, 78) on June 25, 1999.  No reply brief has been filed.

Named as defendants are:  Randall Edgar; M. Barrett; Lt. Klingler; Officers Spitler and MacNicholas; the Lebanon City Police Department; Raiger, apparently employed at the Lebanon County Correctional Facility; Dr. James Keller;[3] and Good Samaritan Hospital. With respect to Moving Defendant, the amended complaint alleges that during the course of his arrest on April 29, 1997, Mutope was beaten and called racial names by certain members of the Lebanon City Police Department.  As a result of this purported beating, he states that he received serious bodily injuries consisting of broken bones in multiple areas of his body, including injuries to his left and right wrists.  Further, he states that he was denied medical treatment for those injuries by Dr. Keller and by various unnamed staff members at the Good Samaritan Hospital emergency room on the day of the incident as well as during his subsequent nine day stay at that facility.

In the motion to dismiss, Moving Defendant argues that it was not acting under color of state law within the meaning of § 1983 when it treated plaintiff.  Further, Moving Defendant contends that, even assuming there was state action, plaintiff's allegations against it are premised solely on the theory of respondeat superior, which is not a proper basis for imposing § 1983 liability.  Finally, Moving Defendant argues that, assuming

---

3.  The name of this defendant is spelled differently in the complaint and in defendant's response, the court will use the spelling found in defendants' submissions, which is presumed to be the correct one.

2

plaintiff had sufficiently alleged that it acted under color of state law, he has failed to state a claim because he fails to allege any deliberate indifference to his serious medical needs. Conversely, plaintiff argues that Good Samaritan was acting under color of state law because when he was brought to that facility on April 29, 1997 he was in the custody of the Lebanon City Police and in handcuffs. He remained in handcuffs for hours despite complaints to hospital medical personnel that his injuries were being affected by the handcuffs. He also states that he was only released from police custody when they realized how serious his injuries were and, was subsequently discharged by his doctor via the telephone to the police on May 7, 1997. Further, plaintiff argues that by refusing to respond to his complaints of pain due to the handcuffs and the injuries to his hands, the hospital was deliberately indifferent to his serious medical needs.

Based upon a careful review of the pleadings and briefs, the court is of the view that Moving Defendant's motion to dismiss for failure to state a claim can be granted as the complaint against it suffers from a fatal deficiency which can not be cured by amendment.

### Discussion

A court, in rendering a decision on a motion to dismiss, must accept the veracity of the plaintiff's allegations. White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990). In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), the Court of Appeals for the Third Circuit added that when considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims." "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set

3

of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

"The test in reviewing a motion to dismiss for failure to state a claim is whether, under any reasonable reading of the pleadings, plaintiff may be entitled to relief." Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir. 1993) (citation omitted). Additionally, a court must "accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them." Markowitz v. Northeast Land Co., 906 F.2d 100, 103 (3d Cir. 1990); Independent Enters., Inc. v. Pittsburgh Water & Sewer Auth., 103 F.3d 1165, 1168 (3d Cir. 1997). Finally, it is additionally well-settled that pro se complaints should be liberally construed. Haines v. Kerner, 404 U.S. 519, 520 (1972).

In order to assert an actionable civil rights claim, plaintiff must allege that some person has deprived him of a federal right, and that the person who caused the deprivation acted under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988); Gorman v. Township of Manalapan, 47 F.3d 628, 638 (3d Cir. 1995); Barna v. City of Perth Amboy, 42 F.3d 809, 815 (3d Cir. 1994). Since one of the essential elements of a § 1983 action is the requirement that the person acted under color of state law, "... state action is a threshold issue in any section 1983 case." Bonenberger v. Plymounth Township, 132 F.3d 20, 23 (3d Cir. 1997); Gorman, 47 F.3d at 638. Action under color of state law requires "that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" West, 487 U.S. at 49. "A private action is not converted into one under color of state law merely by some tenuous connection to state action. The issue is not whether the state was

4

involved in some way in the relevant events, but whether the action taken can be fairly attributed to the state itself." Gorman, 47 F.3d at 638.  Without state action there can be no § 1983 liability.  Gorman, Id.   The burden of proof on the issue of action under color of state law rests with the plaintiff.  West, 487 U.S. at 48; Gorman, Id.

There are three test for detecting the presence of action under color of state law: (1) "traditional exclusive governmental function," test, which extends to "... only those activities that have been 'traditionally the exclusive prerogative of the State'"; (2) the symbiotic relationship test, which"... examines the relationship between the state and the alleged wrongdoer to discern whether there is a great degree of interdependence between the two;" and (3) the "close nexus test, ... [wherein] the inquiry is 'whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of he State itself.'" Klavan v. Crozer-Chester Medical Center, 60 F. Supp.2d 436, 441-42 (E.D. Pa. 1999); Gorman, 47 F.3d at 639-40.  The court is of the view that plaintiff's allegations as to Good Samaritan Hospital fail to establish that that defendant acted under color of state law in its treatment of him under any of these tests.

The only allegations against the Moving Defendant stem from its treatment of plaintiff at the emergency room on the date of his initial arrest and for the nine days thereafter he contends he was hospitalized.  Courts have held that the provision of hospital services is not a traditional public function exclusively reserved to the state.  Klavan, 60 F. Supp.2d at 441, n.5.  Therefore, something more is required before Good Samaritan's conduct in this case can be said to constitute state action.  However, the fact that plaintiff

5

was initially brought to the hospital by the police, kept in handcuffs for a time, and ultimately

discharged to the police, does not transform otherwise private action into state action.

Instructive on this point is the decision reached in McIlwain v. Prince William Hospital, 774

F. Supp. 986 (E.D. Va. 1991). In McIlwain, a former prison inmate filed a § 1983 civil rights

complaint against the prison and the hospital, where he was brought for emergency care

after lapsing into unconsciousness from a heroin overdose, for failure to inform him that

during his two day hospital stay his blood had been tested for HIV and had come back

positive. He was not informed of the positive test results by prison doctors either and after

his release contended that he transmitted the virus to his wife. In finding that the hospital

was not a state actor within the meaning of § 1983, the court stated:

> ... no contractual relationship existed between the Hospital and
> the Haymarket Correctional Facility. The prison did not routinely
> treat inmates at the Hospital. Rather, McIlwain was rushed to
> the Hospital because he needed emergency care. A hospital's
> mere acceptance of a prison inmate for emergency care does
> not transform the hospital into a state actor. By seeking
> emergency treatment for McIlwain, the prison did not delegate
> its duty to provide him with medical care; the Hospital admitting
> McIlwain to its emergency room, did not accept any such duty.
> The Hospital was not 'fully vested with state authority ... to
> provide essential medical care to those the State had
> incarcerated.' West v. Atkins, 108 S.Ct. at 2260. In short, the
> Hospital was not a state actor.

McIlwain, 774 F. Supp. at 989-90. It also follows that, for the same reasons, the factual

allegations against Good Samaritan fail to demonstrate a close nexus between that

defendant and the conduct of the police, so as to render the conduct of the former state

action.

Moreover, as Moving Defendant correctly contends, if there was state action by

6

Good Samaritan, it cannot be held liable to plaintiff on the basis of respondeat superior.

Claims brought under § 1983 cannot be premised on a theory of respondeat superior.

Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Moving Defendant cannot be

held vicariously liable for the conduct of its employees unless plaintiff alleges a policy,

which he does not.  McIlwain, 774 F. Supp. at 990; Temple v. Albert, 719 F. Supp. 265, 268

(S.D.N.Y. 1989) (finding private hospital not vicariously liable under § 1983 for acts of its

employees).

Consequently, the motion to dismiss filed by Good Samaritan will be granted and

that defendant will be dismissed from this action.  An appropriate order follows.

ACCORDINGLY, THIS  20  DAY OF MARCH, 2000, IT IS HEREBY ORDERED

THAT: the motion to dismiss (Doc. 73) filed on behalf of defendant Good Samaritan

Hospital is GRANTED and that defendant is dismissed from this action.


EDWIN M. KOSIK
United States District Judge


EMK:mcs

## CERTIFICATE OF SERVICE

I, John R. Kantner, Esquire, an employee of the law firm of Post & Schell, P.C., do hereby certify that on the date set forth below, I did serve a true and correct copy of foregoing document upon the following person at the following address indicated below by sending same in the United States mail, first-class, postage prepaid:

Jason Eric Benson
SCI-SM
DS-6483
PO Box 999
1120 Pike Street
Huntingdon, PA  16652

Thomas Duran, Warden
Adams County Prison
Gettysburg, PA  17325

Bruce Cluck, Deputy Warden
417 West Middle Street
Gettysburg, PA  17325

Debra Hankey, Deputy Warden
Adams County Prison
Gettysburg, PA  17325

Lt. John Jennings
73 Fourth Street
PO Box 155
Biglerville, PA  17307

Lt. William Orth
236 West Main Street
Waynesboro, PA  17268

Sgt. Rae Hientzelman
Adams County Prison
Gettysburg, PA  17325

C.O. Briton Shelton
Adams County Prison
Gettysburg, PA  17325

C.O. David Vazquez
670 Quaker Run Road
Aspers, PA  17304

C.O. Jane Doe
Adams County Prison
Gettysburg, PA  17325

C.O. John Doe
Adams County Prison
Gettysburg, PA  17325

Adams County Prison
Adams County Prison
Gettysburg, PA  17325

James D. Young, Esquire
Lavery, Flaherty, Young & Patterson, P.C.
P.O. Box 1245
Harrisburg, PA 17108-1245

Date:  10/10/00

_____

John R. Kantner, Esquire