IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

JASON ERIC BENSON,                :    CIVIL ACTION NO. 1:CV-00-1229
        PLAINTIFF    JUN - 1 2001
                                  :        (Judge Caldwell)
    V.                            :        (Magistrate Judge Blewitt)
                  PER _____   :
THOMAS DURAN, et al.,    DEPUTY CLERK
        DEFENDANTS                :    JURY TRIAL DEMANDED

MOTION FOR ORDER COMPELLING DISCLOSURE
OR DISCOVERY  AND FOR EXPENSES AND SANCTIONS

AND NOW, come the Plaintiff Jason Benson, respectfully
requesting this Honorable Court to issue an order compelling the
def., William Ellien, and/or his attorney's at Monaghan & Gold,
P.C., to disclose discovery and issue an order for sanctions,
pursuant to Federal Rules of Civil Procedure, Rule 37 (a)(b), & (c)
et seq., respectively.

The attorney's for def., Ellien, Mr. Alan Gold, and Mr. Sean
Robins, have been advising him to invariably object to almost all of
plaintiff's interrogatories and admissions[un]justifiably or unlawfully.

Throughout the discovery process, plaintiff has received
unnecessary resistance in the form of: flat out lies; failures to
disclose documents; and for lack of a better phrase, dummied-upped
responses. On April 23, 2001, plaintiff filled out a consent form
for the official release of his medical/mental health records
pursuant to DC-ADM 003, "Release of Information Policy." Plaintiff
sent the document to def., Ellien's attorney Alan Gold. See exhibit
"A". Soon thereafter, plaintiff wrote def., Ellien's attorney Mr.
Sean Robins, and explained in detail that their evasiveness is
inconsistant with the Federal Rules of Civil Procedure.

The plaintiff respectfully requests that this Honorable Court bare with his inability to afford extra copies of the necessary exhibits to prove his point. So will the Court please refer to plaintiff's[Reply To Defendant Ellien's Renewed Motion To Dismiss] submitted on May 25, 2001, plaintiff will refer to them as (5/25/01 exhibits B or B-1).

The letter that plaintiff wrote is herein, at exhibit "B", and to bring the court up to speed, here are a few of irrational responses to ordinary situations in which Ellien, as a matter of law and/or truthfulness should've answered without objecting to or creating a far fetched response:

> [Interrogatories]: at (5/25/01, B & B-1)
>
> At item #11, plaintiff asked: "What effects would Tofranil, Serzone, and Ativan [when mixed together] have on an unmedicated epileptic patient?
>
> Ellien's answer: Objection. Objection. Answering defendant objects to this interrogatory on the grounds that it seeks information which is irrelevant to any claim asserted in plaintiff's complaint against answering defendant. In addition, this interrogatory seeks an expert opinion."

The question is relevant to the claim of deliberate indifference and Ellien's subjective knowledge of the medication that he prescribed for plaintiff. It is evidenced by the Greivance Officer's Initial Review Response to plaintiff's claims in Grievance #SMI-383-00:

> "You claim that Dr. Ellien prescribed a seizure antagonist, Imipramine on 7/27/99. Upon reviewing the documentation, I find that Dr. Ellien noted, 'We reviewed for each medicine its benefits and indications, its **side effects** and precautions and **medicine to medicine interactions**'...'He noted **his understanding and gave consent**.'

The above proves subjective knowledge - and is therefore relevant; As for the ojection, Ellien knows quite well that "Ativan is not to be

taken with 'Tricyclic Antidepressants' and Imipramine is the 'Original
Tricyclic Antidepressant,' see any Physician's Desk Reference. See also
exhibit "C" attached hereto. There are two (2) pertinent subjects that
relate to the deliberate indifference Ellien shown plaintiff; First, is
the "Possible [medicine to medicine] Interactions", and it gives a long
list of medications that must not be taken with "Ativan," Tricyclic
Antidepressants and Anticonvulants; the most important thing it says is
**"Do not take lorazepam/ativan in combination with any of these drugs."**
And the second part is in the "Warning/Precautions:**"Do not abruptly stop
taking lorazepam. Sudden cessation can provoke withdrawal symptoms,
including 'seizures.'"** Id., at exhibit "C". The assertion that that
interrogatory seeks an expert opinion is obsured and is evidenced by the
easily obtained exhibit "C".

        Also in the interrogatories at item #19, plaintiff asked

Ellien to:        "Explain the following statement as if you were
explaining it to a laymen to medical terms:
'Seizure disorder, Status Epilepticus due to the
discontinuation of Dilantin plus the effects of
other drugs on the seizure threshold?'

                  Ellien's answer:  Objection. Answering defendant
objects to this interrogatory on the grounds that it
is vague as to what is being asked, and very confus-
ing as written, and as such cannot be responded to
as stated. In addition, it appears that plaintiff
attempts to seek an expert opinion through this
interrogatory, and it is objected to on that basis
as well. In addition, although vague and confusing,
this interrogatory appears to seek information which
is irrelevant to any claim asserted in plaintiff's
complaint against answering defendant.'"

Here, Ellien, again denies his medical experience and asserts his will
to evade answering. But, Ellien has stated that as "a general matter,
subjects relating to the field of pharmacology are part of all medical
school curriculum...(and) issues relating to the appropriateness of the
use of any particular medication for any particular purpose are addressed

in various ways, including formal training, such as medical school, through experience , through reading of articles and textbooks, and through materials and information supplied by pharmaceutical manufacturers...(and)Prior to the treatment of patients, answering defendant acquires the appropriate familiarity with their medical history and medical records." All of this information is given by Ellien by way of further response without waiving his objection. This is wrong.

Defendant Ellien knows for a fact that what he was asked to explain in item #19, was in essence, the same thing any doctor would be telling a patient in his care that sought answers. In fact, it meant specifically that, **"Plaintiff is diagnosed with a Seizure Disorder, and that he went in an Status Epilepticus as a result of the discontinuation of his Dilantin and in combination with the effects of other drugs [Tofranil & Imipramine] on the seizure threshold."** Ellien, knew that Tofranil has been shown to **lower the seizure threshold,** and it is factually evidenced by the Initial Review Response information to plaintiff's grievance, page 2, supra. Furthermore, Ellien, by way of further response, stated that he read articles, textbooks, and materials supplied by pharmaceutical manufacturers; needless to say, this information about the drug Tofranil, is easily accessible by looking it up in any Physician's Desk Reference, see exhibit "D" attached hereto. Reading that exhibit the Court will find that def., Ellien, not only prescribed harmful drugs but, prescribed two drugs known to have negative interactions and seizure inducing qualities which ultimately lead to the status epilepticus attack on August 30, 1999. See also exhibit "E", which explains why plaintiff was having recurrent seizures; see IMP--or "Impressions".

-4-

Apparently def., Ellien, and Attorney's, do not believe that the Federal Rules of Civil Procedure apply to them and/or this matter or proceeding as plaintiff found out by the prevaricated assertions in the letter he received on March 30, 2001. As a result of that letter plaintiff filed exhibit "A" attached hereto, and I guess, to add insult to injury, defendant Ellien, by and through his attorney's stated: "Answering defendant objects to these Request for Admissions to the extent that they seek information which is beyond the scope of permissible discovery under the Fed.R.Civ.P., seek information which is protected by the attorney-client and work product privileges, and which is otherwise privilege or non-discoverable under the rules." See (5/25/01 exhibit "C" ¶2). Moreover,   althrough the requests for admissions the def.,Ellien, objects and fails to admit to the genuineness of documents and to the truth of matters asserted therein. For example, the request for admission #3:

> "When you saw and treated the plaintiff on 7/27/99, the plaintiff was not on any anti-convulsants for over 52 days.
>
> Response: Answering defendant is without information sufficient to either admit or deny this request."

The response was a lie, and if the Court checks page 4, supra it will find that Ellien specifically stated: "Prior to the treatment of patients, answering defendant acquires the appropriate familiarity with their medical history and medical records." Another example, is the request for admission #5:

> "Imipramine does not bother the seizure threshold, or the effectiveness of anti-convulsants.
>
> Response: Objection. Answering defendant objects to this request on the grounds that it is confusing as written and makes no sense.

> It is unknown what plaintiff means by
> 'seizure threshold', or what 'bothering'
> the 'seizure threshold,' what plaintiff
> means...or what anticonvulsants
> plaintiff is referring to in this request.
> .."

They go on to state somemore bogus stuff which the Court will read. But,

the fact staill remains that Ellien, has to be a misinformed doctor or

he believes that plaintiff and this Court are [un]intelligent!

Nevertheless, plaintiff has shown the Court that it doesn't matter what

the anticonvulsant is, and that Imipramine has been shown to lower the

seizure threshold, see exhibits "C & D" attached hereto. Furthermore,

what type of Doctor in his right mind, doesn't know about the side

effects, precautions, and warnings of drugs he's prescribing to his

patients?--an illiterate Doctor, but, that's not the case here, we have

a Doctor/defendant and attorney's who see no reason why they should

adhere to rules or guard their ethical responsibilities with pride.

Ellien, knows the answer to all of plaintiff's interroga-

tories and refuses to admit to the truth of any matter or circumstance

regardless of the fact that he has the capacity to answer. The defendant

Ellien, also states that plaintiff seeks documents that are protected

by attorney client privilege or work product privilege. These are also

lies and plaintiff only requested that his "medical file/record and a

copy of the contract between Eliien's employer [Magellan Behavioral

Health Services], both are legally permissible see Fed.R.Evid., Rule

411: Liability Insurance: states in relevant part that "This rule does

not require the exclusion of evidence of insurance against liability

when offered for another purpose, such as proof of agency, onwership,

or control, or bias or prejudice of a witness." Specifically, def.,

Ellien, must maintain that he was acting within his/or either the Dept.,

of Corrs., or Magellan Behavioral Health Services' contractual guide-
lines when he treated plaintiff.  Ellien's potential for bias or
prejudice as a def./witness in this matter far exceeds the exclusion
of liability insurance because, there must be ethical control stipulated to
in the contract that the Doctor does not disregard an excessive risk to
inmate's health or safety pursuant to the Eighth Amendment of the United
States Constitution. Therefore, if there is no proof of the onwership/
employer's standards of control, then there is no compliance with our
Constitutions safeguards. Moreover, in any insurance agreement there are
standards that the insuree must live up to, or abide by, especicially
in a multi-patient like the Department of Corrections.

A party claiming privilege in Federal Court must identify
a particular privilege that Federal Court's recognize, the mere assertion
that information is "confidential" establishes no privilege enforcable
in Federal Court. See Martin v. Lamb, 122 F.R.D. 143,146 (W.D.N.Y.1988);
Nguyen Da Yen v. Kissinger, 528 F.2d 1194,1205 (9th Cir.1975); Mackey v.
United States, 351 F.2d 794,795 (D.C.Cir.1965); Likewise, information is
not privileged if it is available to others i.e., prison employees,
their attorney's, insurance companies, etc., see Fed.R.Civ.P. 26 (b)(5);
Because there is no-doubt a certain standard that Ellien must adhere to,
the insurance contract between the D.O.C., and his employer Magellan, is
discoverable. If defendant's and their attorney's are allowed to claim
attorney-client or work product privileges to all of the information
pertaining to any civil matter, there would be no reason to have the
discovery rules. Cf. In re Natta, 48 F.R.D. 319,322 (D.Del.1969); accord
732 F.2d 1302,1314 (7th Cir.1984); Bergman v. Kemp, 97 F.R.D. 413,416 (W.
D.Mich.1983)(A privilege "should not be regarded as a right which can be

disclosed to some and withheld from others); <u>Clark v. Township of Falls</u>, 124 F.R.D. 91, 94 (E.D.1988).

On May 7, 2001, plaintiff again tried to explain his position to Ellien's attorney's to no avail. Counsel seems to be at the least misunderstanding that because Ellien has objected to plaintiff's interrogatories and admissions on the advice of counsel, they cannot rely on the attorney-client privilege to keep the advice secret. <u>Mitzer v. Sobol</u>, 136 F.R.D. 359,361-62 S.D.N.Y.1991); <u>Buford v. Holladay</u>, 133 F.R.D. 487,496(S.D.Miss.1990). This principle cuts both ways; if I sue about an event, I cannot then refuse to answer questions about my own conduct during that event on the grounds of the privilege against self-incrimination. <u>Penn Communications Specialties, Inc. v. Hess</u>, 65 F.R.D. 610 (E.D.Pa.1975); <u>Brown v. Ames</u>, 346 F.Supp. 1176,1177-78 (D.Minn.1972). See exhibit "F". Plaintiff tried to find out if the contract and/or insurance policy was actually privileged by submitting a request to view the the document on 5/14/01, subsequently, my <u>request</u> was <u>merely</u> <u>denied</u>. Also on 5/15/01, I submitted a request to the "Corrections Health Care Administrator (C.H.C.A.) Mr. George Weaver, about the release form for my medical records/files. Mr. Weaver's, reply was: "As of this date, May 16, 2001, I have not received a request from your attorney regarding copies of your medical record. You may want to contact him to see who he sent the release forms to." See exhibit's "G & G-1."

Therefore, the plaintiff needs the Court's acumen to calm this situation into a Civil Proceeding. The plaintiff is respectfully requesting that the Court pursuant to it's own power, issue an order to the Superintendent James Morgan, here at SCI-Smithfield, that plaintiff not be transferred until the matters in [1:00-CV-01229] have been completed. Because, now that plaintiff has figured out what def., Ellien,

is attempting to hind behind, plaintiff will experience the same foul
treatment other litigator's have been subjected to; regardless of whether
or not, their actions had any merit. The plaintiff will been transferred
to another institution and **his property containing his legal material will
be suitably  lost forever**. It has happened many, many times before and
as soon as my legal material disappears I will not have any means to
address any of the defendant's litigation.

CONCLUSION

Because defendant Ellien, and his attorney's chose to
willfully disregard Fed.R.Civ.P., Rules 37(a)(2)(A), 37 (a)(3), and
37 (c)(1)(2), the plaintiff respectfully requests that they be ordered
to turn over the following discovery:

a) The names of all expert witnesses that
they intend on calling to testify on
their client's behalf; and the essence
of the experts' testimony;

b) Reanswer all of plaintiff's admissions
and interrogatories without the inven-
tive falsifications or evasiveness;

c) Turn over all of the documents that
were requested by plaintiff; and

d) In addition to the discovery, plaintiff
respectfully request that the Court
issue an order to all of the defendant's
and counsel, notifying them of the
plaintiff's Demand for a Jury Trial
pursuant to Fed.R.Civ.P. 38 (a)(b);
39 (a).

Furthermore, as a result of def., Ellien, and his attorney's violations
of Fed.R.Civ.P. 37 (a)(4), plaintiff requests that this Honorable Court
order the def.,Ellien, and/or his Attorney's to pay plaintiff $500.00 in
expenses and attorney's fees. The amount stated would serve to pay off
plaintiff's filing fee and enable him to get his inmate account out of

the negative, as well as, having enough left over to actually be able to copy all of the defendants' attorney's at the same time, and be able to produce better quality in his copies.

**WHEREFORE,** the plaintiff Jason E. Benson, respectfully moves this Honorable Court to use it's seasoned acumen and grant the relief requested herein.

Respectfully submitted,

Date: 5/24/01

Jason E. Benson, Plaintiff
DS-6483, SCI-Smithfield
1120 Pike Street, P.O. Box 999
Huntingdon, PA 16652

CERTIFICATE OF SERVICE

I, Jason Benson, Plaintiff, hereby certify that a true and complete copy of the foregoing document was served upon the following[*] by First Class Mail in a prepaid envelope:


Sean S. Robins, Esquire
Monaghan & Gold, P.C.
Attorney's at Law
7838 Old York Road
Elkins Park, PA 19027

By: _____
Jason Benson, Plaintiff
DS-6483, SCI-Smithfield
1120 Pike Street, P.O. Box 999
Huntingdon, Pennsylvania 16652


_____

[*] All other defendant's and attorney's will be served as soon as I can afford to make their copies.

-11-

" A ''

# Monaghan & Gold P.C.
## ATTORNEYS AT LAW

Alan S. Gold
John F. X. Monaghan, Jr.
Alexander R. Ferrante
Robert F. Fortin
Murray R. Glickman
Kenneth W. Taylor
Tanya M. Sweet
Francis D. Hennessy
Sean Robins*
Eric B. Greenberg*
Leslie L. Gallagher*
*Also member of New Jersey bar

MANOR PROFESSIONAL BUILDING
7837 Old York Road
Elkins Park, PA 19027
(215) 782-1800
FAX (215) 782-1010

Of Counsel
Barbara Malett Weitz
Alan L. Butkovitz
Steven M. Zelitch

March 30, 2001

**VIA CERTIFIED MAIL - RETURN
RECEIPT REQUESTED
Z 290 205 464**

Jason E. Benson, #DS-6483
SCI - Smithfield
1120 Pike Street
P.O. Box 999
Huntingdon, PA   16652

     Re:    **Benson v. Ellien, et al.
                U.S.D.C., Middle District of .PA., No. 1:00-CV-1229
                <u>Our File No.:  076-1441</u>**

Dear Mr. Benson:

     Enclosed you will find responses and objections to your Request for Admissions and "Interrogatories and Request for Production of Documents" on behalf of our client, Dr. Ellien, in regard to the above-captioned matter.  Although you termed the Interrogatories as including document requests, with the exception of Interrogatory No. 5, you do not request any documents.

     In regard to your letter of March 23, 2001, you refer to self-executing disclosures pursuant to Rule 26.  First, I would point out, that you have failed to submit any such disclosures as of this time.  Second, pursuant to our reading of the Court's Amended Standing Practice Order, applicable to pro se inmate litigation, it is our position that self-executing disclosures are not applicable to this action.  In any event, our Motion to Dismiss is pending, and such disclosures we believe would not be appropriate prior to the motion's determination.

     In your letter, you request that we provide you with "a complete copy of my medical records."  Please be advised, that our client, Dr. Ellien, is not and has never been the custodian of your medical records and, while he, as any other of your medical providers has access to your records for the purpose of providing treatment, the records are and remain the property of the Department of Corrections.  As such, our client does not have the authority, legal or otherwise,

# Monaghan & Gold P.C.
### Attorneys At Law

Jason E. Benson, #DS-6483
March 30, 2001
Page 2

to produce for you a copy of your medical records file.  Any such request for your medical records file must be made to the Department of Corrections, pursuant to their policies and procedures applicable to the provision of such records to inmates.  We are not able to fulfill this request.

If you have any further questions, please do not hesitate to contact us.

Very truly yours,

ALAN S. GOLD
SEAN ROBINS

ASG/SR:js
Enclosures

"A"

**DC-ADM 003, Release of Information Policy**                    **Attachment**

DC-108                    PENNSYLVANIA DEPARTMENT OF CORRECTIONS
                         AUTHORIZATION FOR RELEASE OF INFORMATION[1]
                  (THE EMPLOYEE/INMATE SHALL CHECK AND INITIAL ALL BOXES THAT APPLY)

| Medical/ Dental Records | | Mental Health Records | ✓ | Drug & Alcohol Treatment Records | ✓ | HIV Information | | Records (General) | ✓ |
|---|---|---|---|---|---|---|---|---|---|

I, the undersigned, hereby give my consent for:
(name and address of facility)

JASON E. BENSON
S.C.I. SMITHFIELD
P.O. BOX 999, 1120 PIKE ST.
HUNTINGDON, PA 16652

To release information to:
(name and address of requester)

ALAN GOLD, ESQ.
7837 OLD YORK RD.
ELKINS PARK, PA 19027

I hereby authorize the above named source to release or disclose information related to the above referenced records/information to the requester during the period beginning 2/2/94 and ending 4/8/01. The information being requested is: ALL MEDICAL FILES, DOCTORS NOTES, PA NOTES, AND NURSING NOTES INCLUDING ALL PSYCHIATRIC ORDERS, NOTES, AND MEDICATION FLOW CHARTS. Authorization for disclosure is being given for the purpose of: CIVIL LITIGATION

Disclosure of medical/dental information may contain all aspects of my treatment and hospitalization, including psychological and psychiatric information, drug and/or alcohol information, as well as information regarding Acquired Immunodeficiency Syndrome (AIDS) and tests or treatment for Human Immunodeficiency Virus (HIV).

Disclosure for mental health records pertains to treatment, hospitalization, and/or outpatient care provided to me for the period listed above. I understand that my record may contain information regarding all aspects of my treatment and hospitalization, including psychological and psychiatric information, drug and/or alcohol information as well as information regarding Acquired Immunodeficiency Syndrome (AIDS) and tests or treatment for Human Immunodeficiency Virus (HIV). **Authorizations for release of mental health records expire in 30 days.**

Disclosure of HIV related information is information about whether the patient has had a test for HIV, an HIV related illness or AIDS. HIV (Human Immunodeficiency Virus) is the virus that may cause or indicate AIDS or HIV infection.

Disclosure of general information is information contained in an inmate's DC-15. Generally, any communications from the inmate to the Department of Corrections and responses thereto, misconducts, and grievances.

In authorizing this disclosure, I explicitly waive any and all rights I may have to the confidential maintenance of these records, including any such rights that exist under local, state, and federal statutory and/or constitutional law, rule or order, including those contained in the Pennsylvania Mental Health Procedures Act, 1976, the Pennsylvania Drug and Alcohol Abuse Control Act, 1972, and the Confidentiality of HIV-Related Information Act, No. 148.

I understand that I have no obligation to permit disclosure of any information from my record and that I may revoke this authorization, except to the extent that action has already been taken, at any time by notifying the Medical Records Technician, Health Care Administrator, or Facility Manager. In any event, this authorization will expire 90 days after the date signed, **with the exception of Mental Health records which have a 30 day expiration date,** unless revoked prior to that time.

I understand that these records are the property of the Department of Corrections and that my authorization for their release does not require the Department of Corrections to release these records. It is understood by the above requesting facility that if the requested information's confidentiality is protected by Federal Regulations that bar secondary dissemination or re-disclosure, the providing facility will provide a statement to that effect.

Furthermore, I will indemnify and hold harmless the Pennsylvania Department of Corrections, and its employees and agents, for any losses, costs, damages, or expenses incurred because of releasing information in accordance with this authorization.

| Employee/Inmate Signature | DSC0483 | 4-23-01 | Signature of Witness |
|---|---|---|---|
| | Employee ID/ Inmate DC Number | Date | |

[1] 2-CO-1E-07

"B"

JAson E. Benson
#DS6483, S.C.I. Smithfield
1120 Pike Stret, P.O. Box 999
Huntingdon, PA, 16652

Sean Robins, Esquire
Monaghan & Gold, P.C.
MAOR PROFESSIONAL BUILDING
7837 Old York Road
Elkins Park, PA 19027

April 24, 2001

Re; Benson V. Duran, et al.
No. 1:00-CV-1229
Your File No. : 076-1441

Dear Counselor Robins:

        I have finally gotten around to reviewing your clients
responses and objections to my Request for Admissions and Inter-
-rogatories, and Request for Production of Documents. Contrary to
your beliefs that I've only requested documents in item No. 5; perhaps
you have not read items 14 & 21. Nonetheless, they will be discussed
within.

Whether or not def. Ellien has access to my medical record for
treatment purposes or otherwise, he still is considering himeself
a "Department of Corrections Official" as is the essence of your
Motion to Dismiss" pursuant to 42 U.S.C. §1997(e)(a). That in and
of itself disclaims his assertion of not having the authority; so,
please find the enclosed proper form necessary to have my complete
medical file reproduced for you, and therein you'll be able to re-
-spect my request. Please allow me to explain a little further why
I want to you to produce my records: If you have a contract with
medical personnel in your firm, I suggest you have my record reviewed
as to some of the interrogatories and admissions that your client
chose to object to, and numerous grounds asserted like "that it is
vague as to what is being asked, and very confusing as written".Maybe
for a lawyer, but not for a supposed doctor.

In addition, Mr. Robins, I'm not sure whether you realize it or not
but ,your advise of objecting to my interrogatories and admissions
are weak to say the least, and they're inconsistant with the Federal
Rules of Civil Procedure, and were not made in good faith. The nec-
-essary review of my medical record will enhance your preparation
for your experts testimony; of course, because your client is a
psychiatrist with diplomas to prove that position, I will cross examine
him and your expert witness(es) to prove every claim in my complaint.

Here are some of the facts as to why Ellien should've answered
my requests:

[Interrogatories[

1) Your objection is baseless and without merit,in that,the length
of time Ellien practiced medicine goes to his experience, know how,
background, skill,knowledge, accomplishments, or qualifications.

2) There is nothing vague or ambiguous when inquiring about trainiing,
it goes to his legal capacity to determine as well as prescribe med-
-ications, and is relevant to the very core of claims in my complaint.
Let him tell the jury or you for that matter, that studying in the
field of pharmacology does not have a direct relation with him/ plaintif
claim that I/def. Ellien, prescribed a harmful drug that should not
have been prescribed.

3 & 4) The objection is meritless. By your way of further response
my interrogatory was answered. However, def., Ellien is quite familiar
with numerous pharmeceutical dictionaries which lucidly explains
what medications should be prescribed to epileptic patients like
plaintiff. He also knows that reading/reviewing any patients medical
file is paramount to prescribing medications. Would it not be nice
if your client tells the jury "I do not check patients medical his-
-tory, or the possibilities of side effects of medications that I
prescribe."

7) Objection, baseless. Let your client tell the jury that "Imipramine
and Ativan should be prescribed to all epileptics, especially if they
aren't on anti-convulsants", and watch what I show and prove to them.

11) Objection, meritless. But I, have an idea: tell your client to
tell the jury that "He does not what the side effects of those drugs
(Ativan, Tofranil, and Serzone)would have on an unmedicated epileptic
patient and harm therefrom isn't my fault" Counselor, as for your
statement: "this interrogatory seeks an expert opinion"; That is
uncorrect and I will have your experts prove it by reading a few
sentences from any Physicians Desk Reference. There are a few specific
sections of the drug Tofranil and Ativan, that will prove def., Ellien
prescribed not only one, but two drugs that have negative interactions
 and seizure inducing qualities on epileptics. More over, def., Ellien
is prevaricating when he states that he does not know what "Vital
Statistics" are in the context of the pharmeceutical field.
Nevertheless, I will share some drug information with you: Vital
Statistics explain the drug class; generic names; warnings, and special
information like poossible interactions or precautions" For example,
has def. Ellien told you that"extreme caution should be used when
Tofranil is prescribed to patients with a history of seizure disorder
because this drug has been shown to lower the seizure threshold."
How about this, did he tell you that "Lorazapam/Ativan, must not be
taken in combination with a a Tricyclic Antidepressant?" and that
Tofranil is the ORIGINAL TRICYCLIC ANTIDEPRESSANT! All of these facts
are easily accessible via any Physicians Desk Rederence and do not
require an expert opinion: on the other, I'll have your experts tell
you and the jury the same.

15) Def. Ellien knows as well as I do, that he has never physically been in the same room with me, therefor, unable to review any of the documents I wished to share with him.

17) Def. Ellien knows as well as I do that any epileptic patient that has been abruptly cut off of Dilantin, status epilepticus is all but inevitable. Not to worry, I will have your experts explain just that to the jury.

19) Def. Ellien, or your experts will explain to you what the state--ment means: "Plaintiff is an epileptic; and had multiple serious convulsions as a result of the abrupt discontinuation of his seizure medication and the side effects of Tofranil and Ativan, which loweered and/or made it more likely for him to have seizures." As far as vague and confusing is concerned, it is not, and goes to the heart of plaintiffs deliberate indifference claim.

21) (First #21) Please have def. Ellien tell the jury that that inter-rogatory makes no sense. I will be a joy showing the jury a doctor who does not know or recognize pharmeceutical terms despite having said terms as part of his medical school curriculum.

22) Contrary to your beliefs or def. Elliens, assertions, interrogatories do not assume the facts not in evidence and it is not assume the existence based upon a false premise! As a matter of fact, interrogatory#9 and def. Ellien's answer made it a fact in evidence. I would love for him to tell the jury that he's never prescribed those drugs to any other epileptic patients, because I will certainly make him explain why he didn't and was it it because the end result would be the same as the diagnosis in item #19 above: "Seizure disorder, Status Epilepticus, due to the discontinuation of Dilantin, plus the effects of other drugs on the seizure threshold."

Let us review some of the admissions

1) Regardless of the fact that def. Ellien is a psychiatrist, it shows deliberate indifference through the ROUTINE, PRACTICE, OR HABIT of incorrectly prescribing medications to patients without care and/or any regard for thier medical histories.

5) PLease have def. Ellien testify that he does not know what Imipramine "bothering" the seizure threshold means, and that it is confusing and makes no sense. I will surely have a representative from the Federal Drug Enforcement Administration there to witness that testimony, and I will have the D.E.A. rep., or your experts reveal the fact that if def. Ellien doesn't understand or know what I've asked, he should not be prescribing medications.

6) Def. Ellien would not admit that Ativan and Tofranil must be taken in combination or together when prescribed for an epileptic. However, by of further response, he denies that request for admission and you do not state why. But, you and I know why--and soon a jury will too. The same thing applies to admissions #'s 7,9,& 10. Specifically, by way of further response, you or def. Ellien proved my case for me by stating "there exists protocols pertinent to the prescription of all medications.

In conclusion, counselor, your client is in a very bad position an it's getting bleaker by the minute. As soon as I recieve my complete medical record all of the beating around the bush and evasiveness will be non-existent. Therefore, the ball is in your court, and I'm sure you know that the Court is not going to grant Ellien, or any other defendant, a Motion to Dismiss, summary judgement, or anything else except a jury trial. Please try to explain to your client and or his idemnifiers that I have an open mind to a sensible and fair propositioning.

Sincerely,

---------------------

Jason E. Benson, DS6483
S.C.I. Smithfield
P.O. Box 999, 1120 Pike Street
Huntingdon, PA 16652



# Ɍ LORAZEPAM

**DRUG CLASS**
Antianxiety Drugs (Benzodiazepines)

**BRAND NAME**
Ativan

**OTHER DRUGS IN THIS SUBCLASS**
alprazolam, clonazepam, diazepam, temazepam, triazolam

**GENERAL DESCRIPTION**
Introduced as an injectable drug in 1963 and as a tablet in 1984, lorazepam is a benzodiazepine prescribed for the treatment of anxiety, severe nervous tension, and insomnia. In injection form, it is also used to relieve presurgery anxiety. For more information, see Benzodiazepines. For visual characteristics of lorazepam and the brand-name drug Ativan, see the Color Guide to Prescription Drugs and Herbs.

## Precautions

☠ **WARNING**
Never combine alcohol with lorazepam; the combination can cause dangerous central nervous system and respiratory depression.

Do not abruptly stop taking lorazepam. Sudden cessation can provoke withdrawal symptoms, including seizures; irritability; insomnia; confusion; mental depression; hypersensitivity to pain, noise, or light; and feelings of suspicion and distrust. Slowly reduce the dosage under your doctor's guidance.

**SPECIAL INFORMATION**
- Lorazepam can impair your alertness, judgment, and coordination. Avoid driving and performing hazardous activities until you know how the drug affects you.
- Let your doctor know if you have narrow-angle glaucoma, a liver or kidney impairment, chronic respiratory disease, myasthenia gravis, depression, sleep apnea, or a history of drug abuse or addiction. Lorazepam may exacerbate these conditions.
- This drug can cause sleep apnea in people with chronic respiratory disease, such as emphysema.
- Lorazepam can cause physical and psychological dependence, sometimes after only one or two weeks, but usually after prolonged use.
- People with a history of drug or alcohol abuse are at a greater risk of psychological dependence on lorazepam.
- Tolerance may increase with prolonged use; as your body adjusts to lorazepam, the drug becomes less effective. Never increase the dose without consulting your doctor, because the risk of lorazepam dependence increases with higher doses.
- Do not take lorazepam if you are pregnant or breast-feeding.

**TARGET AILMENTS**
Anxiety and panic disorders

Insomnia

Presurgery anxiety (an adjunct to anesthesia)

Skin rash, petechiae, urticaria, itching, photosensitivity, edema (peripheral or of face and tongue); drug fever; activity with desipramine.

Bone marrow depression including agranulocytosis; eosinophilia; purpura; thrombocytopenia.

Gastrointestinal: Nausea and vomiting, anorexia, epigastric distress; peculiar taste, stomatitis, abdominal cramps; black tongue.

Gynecomastia in the male; breast enlargement and galactorrhea in the female; increased or decreased libido; impotence; testicular swelling; elevation or depression of blood sugar levels; inappropriate antidiuretic hormone secretion syndrome.

Jaundice (simulating obstructive); altered liver function, weight gain or loss; perspiration; flushing; urinary frequency, drowsiness, dizziness, weakness and fatigue; headache, parotid swelling; alopecia; proneness to falling.

Withdrawal Symptoms: Though not indicative of addiction, abrupt cessation of treatment after prolonged therapy may produce nausea, headache and malaise.

## DOSAGE AND ADMINISTRATION

Use up to 100 mg/day intramuscularly in divided doses. Parenteral administration should be used only for starting therapy in patients unable or unwilling to use oral medication. Oral form should supplant the injectable as soon as possible.

Lower dosages are recommended for elderly patients and adolescents. Lower dosages are also recommended for outpatients as compared to hospitalized patients who will be under close supervision. Dosage should be initiated at a low level and increased gradually, noting carefully the clinical response and any evidence of intolerance. Following remission, maintenance medication may be required for a longer period of time, at the lowest dose that will maintain remission.

## OVERDOSAGE

Deaths have been reported to be more sensitive than adults to an acute overdosage of imipramine hydrochloride. An overdose of any amount in infants or young children, especially, must be considered serious and potentially fatal.

Manifestations: These may vary in severity depending on factors such as the amount of drug absorbed, the age of the patient, and the interval between drug ingestion and start of treatment. Blood and urine levels of imipramine do not reflect the severity of poisoning; they have only a qualitative rather than quantitative value, and are not indicators in the clinical management of the overdose.

CNS abnormalities may include drowsiness, stupor, coma, restlessness, agitation, hyperactive reflexes, muscle rigidity, athetoid and choreiform movements, and convulsions.

Cardiac abnormalities may include arrhythmia, tachycardia, evidence of impaired conduction, and signs of congestive failure.

Respiratory depression, cyanosis, hypotension, shock, vomiting, hyperpyrexia, mydriasis, and diaphoresis may also be present.

The recommended treatment for overdosage of tricyclic antidepressants may change periodically. It is recommended that the physician contact a poison control center for current information on treatment. Because cardiac involvement, respiratory depression and cardiac arrhythmia can occur suddenly, hospitalization and close observation may be necessary, even when the amount thought to be small or the initial degree of intoxication appears slight or moderate. All patients with ECG changes should have continuous cardiac monitoring and closely observed until well after cardiac status has been normal; relapses may occur after apparent recovery.

In the adult patient, empty the stomach promptly by lavage and/or induced patient, secure the airway with a cuffed endotracheal tube before beginning lavage (do not induce emesis). Use of activated charcoal slurry may help reduce absorption of imipramine.

External stimulation to reduce the tendency to convulsions. If anticonvulsants are necessary, diazepam or phenytoin may be useful.

Maintain adequate respiratory exchange. Do not use respiratory stimulants.

Shock should be treated with supportive measures, such as oxygen, intravenous fluids, and, if necessary, a vasopressor agent. The use of corticosteroids in shock is controversial and may be contraindicated in cases of overdosage of tricyclic antidepressants. Digitalis may increase conduction disturbances and further irritate an already sensitized myocardium. If congestive heart failure necessitates rapid digitalization, particular care must be exercised.

Fever should be controlled by whatever external measures are available, including ice packs and cooling sponge baths.

Use of peritoneal dialysis, exchange transfusions, forced diuresis have been generally reported as ineffective because of the rapid fixation of imipramine in tissues. Blood and urine levels of imipramine may not correlate with the degree of intoxication, and are unreliable indicators in the clinical management of the patient.

The slow intravenous administration of physostigmine salicylate has been used as a last resort to reverse severe CNS anticholinergic manifestations of overdosage with tricyclic antidepressants; however, it should not be used routinely, since it may induce seizures and cholinergic crises.

## HOW SUPPLIED

Ampuls 2 ml—For intramuscular administration only

25 mg imipramine hydrochloride, 2 mg ascorbic acid, 1 mg sodium bisulfite, 1 mg sodium sulfite

Boxes of 10 .................................................. NDC 0028-0065-23

Store between 59°–86°F (15°–30°C).

Note: Upon storage, minute crystals may form in some ampuls. This has no influence on the therapeutic efficacy of the preparation, and the crystals redissolve when the affected ampuls are immersed in hot tap water for 1 minute.

## ANIMAL PHARMACOLOGY & TOXICOLOGY

A. Acute: Oral $LD_{50}$ ranges are as follows:

Rat     355 to 682 mg/kg
Dog     100 to 215 mg/kg

Depending on the dosage in both species, toxic signs proceeded progressively from depression, irregular respiration and ataxia to convulsions and death.

B. Reproduction/Teratogenic: The overall evaluation may be summed up in the following manner:

Oral: Independent studies in three species (rat, mouse and rabbit) revealed that when Tofranil is administered orally in doses up to approximately $2\frac{1}{2}$ times the maximum human dose in the first 2 species and up to 25 times the maximum human dose in the third species, the drug is essentially free from teratogenic potential. In the three species studied, only one instance of fetal abnormality occurred (in the rabbit) and in that study there was likewise an abnormality in the control group. However, evidence does exist from the rat studies that some systemic and embryotoxic potential is demonstrable. This is manifested by reduced litter size, a slight increase in the stillborn rate and a reduction in the mean birth weight.

Parenteral: In contradistinction to the oral data, Tofranil does exhibit a slight but definite teratogenic potential when administered by the subcutaneous route. Drug effects on both the mother and fetus in the rabbit are manifested in higher resorption rates and decrease in mean fetal birth weights, while teratogenic findings occurred at a level of 5 times the maximum human dose. In the mouse, teratogenicity occurred at $1\frac{1}{2}$ and $6\frac{1}{2}$ times the maximum human dose, but no teratogenic effects were seen at levels 3 times the maximum human dose. Thus, in the mouse, the findings are equivocal.

C91-42 (Rev. 2/92)

Dist. by:
Geigy Pharmaceuticals
Ciba-Geigy Corporation
Ardsley, New York 10502

---

## TOFRANIL®     R

[toe-fray′nill]

imipramine hydrochloride USP
Tablets of 10 mg
Tablets of 25 mg
Tablets of 50 mg
For oral administration

## DESCRIPTION

Tofranil, imipramine hydrochloride USP, the original tricyclic antidepressant, is a member of the dibenzazepine group of compounds. It is designated 5-[3-(Dimethylamino)propyl]-10,11-dihydro-5H-dibenz[b,f] azepine Monohydrochloride. Imipramine hydrochloride USP is a white to off-white, odorless, or practically odorless crystalline powder. It is freely soluble in water and in alcohol, soluble in acetone, and insoluble in ether and in benzene. Its molecular weight is 316.87.

Inactive Ingredients: Calcium phosphate, cellulose compounds, docusate sodium, iron oxides, magnesium stearate, polyethylene glycol, povidone, sodium starch glycolate, sucrose, talc and titanium dioxide.

## CLINICAL PHARMACOLOGY

The mechanism of action of Tofranil is not definitely known. However, it does not act primarily by stimulation of the central nervous system. The clinical effect is hypothesized as being due to potentiation of adrenergic synapses by blocking uptake of norepinephrine at nerve endings. The mode of action of the drug in controlling childhood enuresis is thought to be apart from its antidepressant effect.

## INDICATIONS

Depression: For the relief of symptoms of depression. Endogenous depression is more likely to be alleviated than other depressive states. One to three weeks of treatment may be needed for optimal therapeutic effects are evident.

Childhood Enuresis: May be useful as temporary adjunctive therapy in reducing enuresis in children aged 6 years and older, after possible organic causes have been excluded by appropriate tests. In patients having daytime symptoms of frequency and urgency, examination should include voiding cystourethrography and cystoscopy, as necessary. The effectiveness of treatment may decrease with continued drug administration.

## CONTRAINDICATIONS

The concomitant use of monoamine oxidase inhibiting compounds is contraindicated. Hyperpyretic crises or severe convulsive seizures may occur in patients receiving such combinations. The potentiation of adverse effects can be serious, or even fatal. When it is desired to substitute Tofranil in patients receiving a monoamine oxidase inhibitor, as long an interval should elapse as the clinical situation will allow, with a minimum of 14 days. Initial dosage should be low and increased gradually and cautiously prescribed.

The drug is contraindicated during the acute recovery period after a myocardial infarction. Patients with a known hypersensitivity to this compound should not be given the drug. The possibility of cross-sensitivity to other dibenzazepine compounds should be kept in mind.

## WARNINGS

Children: A dose of 2.5 mg/kg/day of Tofranil should not be exceeded in childhood. ECG changes of unknown significance have been reported in pediatric patients with doses twice this amount.

Extreme caution should be used when this drug is given to:
patients with cardiovascular disease because of the possibility of conduction defects, arrhythmias, congestive heart failure, myocardial infarction, strokes and tachycardia. These patients require cardiac surveillance at all dosage levels of the drug;
patients with increased intraocular pressure, history of urinary retention, or history of narrow-angle glaucoma because of the drug's anticholinergic properties;
hyperthyroid patients or those on thyroid medication because of the possibility of cardiovascular toxicity;
patients with a history of seizure disorder because this drug has been shown to lower the seizure threshold;
patients receiving guanethidine, clonidine, or similar agents, since Tofranil may block the pharmacologic effects of these drugs;
patients receiving methylphenidate hydrochloride. Since methylphenidate hydrochloride may inhibit the metabolism of Tofranil, downward dosage adjustment of imipramine hydrochloride may be required when given concomitantly with methylphenidate hydrochloride.

Tofranil may enhance the CNS depressant effects of alcohol. Therefore, it should be borne in mind that the dangers inherent in a suicide attempt or accidental overdosage with the drug may be increased for the patient who uses excessive amounts of alcohol. (See PRECAUTIONS.)

Since Tofranil may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as operating an automobile or machinery, the patient should be cautioned accordingly.

## PRECAUTIONS

An ECG recording should be taken prior to the initiation of larger-than-usual doses of Tofranil and at appropriate intervals thereafter until steady state is achieved. (Patients with any evidence of cardiovascular disease require cardiac surveillance at all dosage levels of the drug. See WARNINGS.) Elderly patients and patients with cardiac disease or a prior history of cardiac disease are at special risk of developing the cardiac abnormalities associated with the use of Tofranil.

It should be kept in mind that the possibility of suicide in seriously depressed patients is inherent in the illness and may persist until significant remission occurs. Such patients should be carefully supervised during the early phase of treatment with Tofranil, and may require hospitalization. Prescriptions should be written for the smallest amount feasible.

Hypomanic or manic episodes may occur, particularly in patients with cyclic disorders. Such reactions may necessitate discontinuation of the drug. If needed, Tofranil may be resumed in lower dosage when these episodes are relieved. Administration of a tranquilizer may be useful in controlling such episodes.

An activation of the psychosis may occasionally be observed in schizophrenic patients and may require reduction of dosage and the addition of a phenothiazine.

Concurrent administration of Tofranil with electroshock therapy may increase the hazards; such treatment should be

Continued on next page

The full prescribing information for each Geigy product is contained herein and is that in effect as of September 1, 1993.

"E"

# THE GETTYSBURG HOSPITAL

## CONSULTATION REPORT

0300410351    17-75-56

BENSON,JASON E
KAMSLER,DAVID F MD
EZCIA 09/27/1976 22Y M

NAME  *JASON BENSON*

DATE AND TIME OF REQUEST  *30AUG99    0900*

TO DOCTOR  *DR MESSER*

OPINION ONLY  ☑

TREAT AND FOLLOW  ☒

REASON FOR CONSULTATION:

*RECURRENT SEIZURES*

REQUESTING PHYSICIAN:  *DR KAMSLER*

| DATE | TIME | SIGNATURE | PERSON NOTIFIED OF REQUEST |
|------|------|-----------|----------------------------|
| 30AUG99 | 0910 | *on call* | *DEB* |

REPORT OF CONSULTATION (Findings, Diagnoses, Recommendations)

*22 Y.O WM WITH H/O EPILEPSY*

*SINCE 12 Y.O. P.H. OF "PETIT MAL" (PROBABLY COMPLEX-PARTIAL SEIZURES) + GENERALIZED. EEG'S 3/89 4/90 → (L) TEMPORAL FOCUS EEG 8/97 ⊖ (C) ADM FOR SEIZURES 2° TO PT. D/C OF DILANTIN + DRUG USE. C/O MIGRAINE 1/c SERZONE, ATIVAN, IMIPRAMINE PTA FROM COPRISON. RX I.V. DILANTIN + GM. LAB OK BUT ↑WBC ↓CO₂ C/W POST-ICTAL STATE. HAD TIT SZ THIS AM 0440 → ONSET IN SLEEP DK'ED DILANTIN × 4 MOS*

*EXAM: NEURO SUPPLE. MS. - ALERT + ORIENTED, NO APHASIA MEMORY OK. CN - VIS FIELDS ✓ FUNDUS ✓ NO PHOTOPHOBIA PERRL EUM'S - FULL SZ ✓ ⊕ NYSTAGMUS IN ALL DIRECTIONS (C/W DILANTIN LOAD.) HEARS TONGUE ✓ MOTOR - NO DRIFT POWER R=L TONE ✓ SENS - DTR'S 1-2+ R=L TOES ↑↑*

*EEG TODAY → (L) DISCHARGE*

*IMP: ① SEIZURE DISORDER, ② STATUS EPILEPTICUS @ ADM 2° TO D/C OF DILANTIN ± EFFECTS OF OTHER DRUGS ON SEIZURE THRESHOLD*

*SUGGEST - ✓ DILANTIN LEVEL IN AM. IF >10 BUT <20 RX 200 MG PO BID. OR PREVIOUS DOSE KNOWN TO BE EFFECTIVE*

SIGNATURE OF CONSULTANT

CONSULTATION REPORT

" E "

May 7, 2001

Sean Robins, Esquire
Monaghan & Gold, P.C.
Manor Professional Building
7837 Old York Road
Elkins Park, PA 19027

      Re: Benson V. Duran,et al.
         No. 1:00-CV-1229
         Your File No.: 076-1441

Dear Mr. Robins:

     I am writing because thier is some sort of misunderstanding
that I am expieriancing with defendant Ellien's, responces to my discover
requests. Apparently, defendant Ellien, does not quite understand that
my reasons for instituting these proceedings are because, I believe
and will prove with certaintythat he violated Constitutional provisions.

     To make a long story short, please inform defendant Ellien,
that his, dodging or acting as though he does not understand or know the
meaning of significant medical terms will only make these matters worse.
For example, defendant Ellien, acts as though he does not know what
plaintiff means by [seizure threshold],or objecting because an admission
or interrogatory seeks an expert opinion. The facts of the matter are,
he does know what I am talking about because they are the basics in his
profession.

     In conclusion, please inform Dr. Ellien, that Fed.R.Civ.P.,
33 (c), states: "An interrogatory otherwise proper is not necessarily
objectionable merely because an answer to the interrogatory involves
an opinion or contention that relates to fact or the application of law t
fact,..." The same goes to admissions or Rule 36: "If objection is Made,
the reasons therefor shall be stated. The answer shall specifically deny
the matter or set forth in detail the reasons why the answering party
cannot'truthfully' admit or deny the matter. A denial shall fairlly
meet the substance of the requested admission, and when good faith
requires that a party qualify an answer or deny only part of the matter
of which the admission is requested, the party shall specify so much of i
'as true' and qualify or deny unless the party states that party has
made reasonable inquiry  and that the information is known or readily
obtainable by the party is insufficient to enable the party to admit or
deny. A party who considers that a matter of which an admission ha been
requested presents a genuine issue for trial may not, on that ground
alone, subject the provisions of Rule 37 (c)."

Rule 37 (c) states in relevant part: " If a party fails to admit the
genuineness of any document or the truth of any matter as requested under
Rule 36, and if the party requesting the admissions [thereafter proves
the genuineness of the...truth of the matter], the requesting party may
apply to the court for an order requiring the other party to pay reason-

(1)

" G - "

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|

| 1. To: (Name and Title of Officer)<br>SHARON BURKS | 2. Date:<br>05.14.01 |
|---|---|

| 3. By: (Print Inmate Name and Number)<br>JASON E. BENSON, DS6483<br><br>_Inmate Signature_ | 4. Counselor's Name<br>CRIDER |
|---|---|
|  | 5. Unit Manager's Name<br>BURK |
| 6. Work Assignment | 7. Housing Assignment<br>CA - 08 |

8. Subject: State your request completely but briefly. Give details.

I would like to review the written contract between S.C.I. Smithfield and Wexford Health Sources and Magellan Behavioural Health as soon as possible.

CC:/
file JEB.

9. Response: (This Section for Staff Response Only)

Request denied.

| To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☐ |
|---|---|

Staff Member Name   MRS. BURKS  ,  Mrs. Burks   Date  5/16/01
              _Print_          _Sign_

Revised July 2000

-able attorney's fees." Because defendant Ellien is evading or refusing to answer truthfully the things that I've asked of him, it again only makes things worse for him, whereas I can prove that he knows or should have known the answers to matters I've sent him, and his denials of addmissions of ordinary proceedures and/or terminologies will get him well aquainted with the provisions of Rule 37 (c) (2).

Furthermore, I guess by now you've recieved the Court's ruling on defendant Elliens Motion to Strike. Unfortunately for Ellien, it was denie but, the real essence of that motion was not that he could not respond to it but that, it effectively makes his Motion to Dismiss Plaintiffs Amended Complaint, moot. Thus, a response will enlarge the Docket Entries and/or create more paper work for your office and for me; so, once you've determined that this matter will go to trial, as I know it will, maybe the defendant might want to talk seriously about putting this matter behin us.

Sincerely,

--------------------

Jason E. Benson, DS6483
S.C.I. Smithfield
P.O. Box 999, 1120 Pike Street
Huntingdon, PA 16652

(2)

"G-1"    CA

| DC-135A | |
|---|---|

**INMATE'S REQUEST TO STAFF MEMBER**

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

1. TO: (NAME AND TITLE OF OFFICER)
Mr. George Weaver, C.H.C.A.

2. DATE
May 15, 2001

3. BY: (INSTITUTIONAL NAME AND NUMBER)
Mr. Jason Benson DS-6483

4. COUNSELOR'S NAME

5. WORK ASSIGNMENT

6. QUARTERS ASSIGNMENT
CA-8

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

Mr. Weaver: On April 23, 2001 I submitted a DC-ADM 003, And/or DC-108 for the release of my medical/mental Health Records, to Alan S. Gold, Esquire. It is now my understanding that my records will not be released to him. I do not understand what the problem is, I filled out the correct forms And had a witness' signature. Can you explain to me, Why the Attorney (Mr. Gold) cannot secure a complete copy of my records, especially when I submitted the proper paperwork. I appreciate your time, patience, And consideration in this matter.

Sincerely,

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

As of this date, May 16, 2001, I have not received a request from your attorney regarding copies of your medical record. You may want to contact him to see who he sent the release forms to.

RECEIVED
MAY 16 2001
SCI-SMITHFIELD
MEDICAL RECORD DEPARTMENT

☐ TO DC-14 CAR ONLY          ☐ TO DC-14 CAR AND DC-15 IRS

STAFF MEMBER
K. Kline RHIT          George Weaver, C.H.C.A.  DATE 5/16/01