66

6/19/0

ORIGINAL

$\mathcal{A}_0$ cc

FILED
HARRISBURG, PA

JUN 1 8 2001

MARY E. D'ANDREA, CLE
Per
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASON ERIC BENSON, | : | CIVIL ACTION NO. 1:CV-00-1229 |
| Plaintiff | : | |
| | : | (Judge Caldwell) |
| vs. | : | |
| | : | (Magistrate Judge Blewitt) |
| THOMAS DURAN, et al., | : | |
| Defendants | : | JURY TRIAL DEMANDED |

### APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT, RONALD LONG, M.D.'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE BLEWITT

Exhibit "A"    DC-ADM-804, Consolidated Inmate Grievance Review System, as amended.

Exhibit "B"    Geisler v. Hoffman, 99-1971 (3d Cir. 9/12/00) (unreported).

Exhibit "C"    <u>Curtis v. Horn</u>, Civil Action 3: 00-CV-1149 (Dec. 18, 2000; Judge Conaboy).

Exhibit "D"    <u>Brown v. Dragovich</u>, Civil Action 3: 00-CV-1158 (Nov. 28, 2000; Judge Nealon)

Respectfully submitted,

Lavery, Faherty, Young & Patterson, P.C.

Date: 6/18/2001    By: _____
James D. Young, Esquire
Atty No. 53904
301 Market St., Suite 800
P.O. Box 1245
Harrisburg, PA 17108-1245
(717) 233-6633
Attorney for Defendant,
Ronald Long, M.D.



## POLICY STATEMENT
### Commonwealth of Pennsylvania • Department of Corrections

| Policy Subject: | Policy Number: |
|---|---|
| **Inmate Grievance System** | **DC-ADM 804** |

| Date of Issue | Authority: | Effective Date |
|---|---|---|
| **December 1, 2000** | *[signature]*  **Martin F. Horn** | **January 1, 2001** |

### I.   AUTHORITY

The Authority of the Secretary of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206 and 506 of the Administrative Code of 1929, 71 P.S. §§61, 66 and 186, Act of April 9, 1929, P.L. 177, No. 175, as amended.

### II.   PURPOSE

It is the purpose of this policy to establish procedures for the review of inmate grievances. These procedures ensure that inmates have an avenue through which resolution of specific problems can be sought.

### III.   APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

### IV.   DEFINITIONS

#### A.   Automated Inmate Grievance Tracking System

A computerized system maintained by the Secretary's Office of Inmate Grievances and Appeals designed to store and retrieve data and trends pertaining to the Inmate Grievance System.

**B. Appeal to Facility Manager**

An appeal of a decision rendered at Initial Review.

**C. Appeal to Secretary's Office of Inmate Grievances and Appeals**

The final level of appeal from a grievance.

**D. Chief, Secretary's Office of Inmate Grievances and Appeals**

A management level staff, supervised by the Secretary of Corrections, to oversee the inmate grievance and appeal process, train field staff, and respond to appeals.

**E. Department**

The Pennsylvania Department of Corrections.

**F. Facility Grievance Coordinator**

The Corrections Superintendent's Assistant in a facility, or the designee to the Regional Director in Community Corrections, who is responsible for the overall administration of the Inmate Grievance System in that facility/region. This includes determining whether the grievance was filed in compliance with the policy, as well as the data collection, tracking, and statistical reporting.

**G. Facility Manager**

The Superintendent of a State Correctional Facility, State Regional Correctional Facility, Commander of a Motivational Boot Camp, Regional Director of a Community Correction Center and/or the Director of the Training Academy.

**H. Grievance**

A formal written complaint by an inmate related to a problem encountered during the course of his/her confinement.

**I. Grievance Rejection Form (DC-804, Part 3)**

The form used to return a grievance to an inmate when the grievance cannot be processed. **(See Attachment C)**

**J. Grievance Officer**

An appropriate Department Head or Management Level staff person designated by the Facility Grievance Coordinator, to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g. a Unit Manager would be assigned to provide Initial Review of a grievance regarding a housing unit.

**K. Grievance Restriction**

Inmates who deliberately misuse the grievance system by filing frivolous or fabricated grievances may be restricted to filing no more than one grievance each five (5) working days.

**L. Initial Review**

A review of an inmate's initial grievance conducted by a Grievance Officer. The Facility Manager may direct the Facility Grievance Coordinator to review certain grievances.

**M. Retaliation**

An act of vengeance or threat of action taken against an inmate or staff in response to an inmate complaint of a problem. Examples include unnecessary discipline, intimidation, unnecessary changes in work or program assignments, unjustified transfers or placements, unjustified denials of privileges and services.

**N. Secretary's Office of Inmate Grievances and Appeals**

The office responsible for review and disposition of all appeals of inmate grievances to Central Office.

**O. Working Days**

For the purposes of this policy, working days are Monday through Friday, excluding state holidays.

**V.    POLICY**

It is the policy of the Department that every individual committed to its custody shall have access to a formal procedure through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. For every such issue, there shall be a forum for review and one (1) avenue of appeal. The formal procedure shall be known as the Inmate Grievance System.[1]

**VI.   PROCEDURES**

**A. Initial Grievance**

1.  Inmate Responsibilities

    a.  The Department encourages inmates to express their concerns to staff through respectful, constructive, verbal communication in order that problems are resolved as soon as possible.

b. The Inmate Grievance System is intended to deal with a wide range of issues, procedures, or events that may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with an incident of an urgent or emergency nature, the inmate should contact the nearest staff member for immediate assistance.

c. A grievance must be submitted to the Facility Grievance Coordinator using the **DC-804, Part 1, Grievance Form (See Attachment A).** All grievances must be signed and dated by the inmate. Forms shall be readily available on all housing units. All copies, with the exception of the inmate's copy **(GOLDEN ROD)**, shall be forwarded to the Facility Grievance Coordinator. The **PINK** copy will be returned to the inmate, acknowledging acceptance of the grievance.

d. The inmate shall include a statement of the facts relevant to the claim. **The text of the grievance shall be legible, presented in a courteous manner, and the statement of facts shall not exceed two (2) pages.** The inmate should identify any persons who may have information that could be helpful in resolving the grievance. The inmate should also include information on attempts to resolve the matter informally. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, court orders, or other law. The inmate may include a request for compensation or other legal relief normally available from a court.

e. Grievances must be submitted by the inmate for Initial Review to the Facility Grievance Coordinator within fifteen (15) working days after the events upon which the claims are based. The Grievance Officer may grant the inmate additional time to resolve the grievance informally. In those cases, the inmate shall be granted an additional five (5) working days to re-file the initial grievance.

f. A grievance must be filed with the Facility Grievance Coordinator at the facility where the grievance occurred.

g. All grievances shall be presented individually. Any grievance submitted by a group of inmates **will not** be processed.

h. Grievances and appeals based on different events shall be presented separately, unless it is necessary to combine the issues to support the claim.

i. All grievances and appeals must be presented in good faith and for good cause. No inmate shall be punished, retaliated against, or otherwise harmed for good faith use of this grievance system. Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager/designee.

j. Only an inmate who has been personally affected by a Department or facility action or policy shall be permitted to seek review of a grievance or appeal. The

k.  At any point in the grievance process, the inmate may withdraw the grievance. To withdraw a grievance, an inmate may write on the original grievance "I wish to withdraw this grievance," sign and date the original grievance form or submit a request form to the Facility Grievance Coordinator, identifying the grievance, by number, to be withdrawn.

l.  If a grievance is rejected, when resubmitted, the grievance must be resubmitted under the same grievance number.

## B. Initial Review

1.  Staff Responsibilities

a.  The Facility Grievance Coordinator shall assign a grievance tracking number to all grievances (even rejected grievances) upon receipt and enter all grievances into the Automated Inmate Grievance Tracking System. The Facility Grievance Coordinator is also responsible for entering the facility's disposition of the grievance at each step of the grievance process.

b.  The Facility Grievance Coordinator may combine multiple grievances that relate to the same subject.

c.  The Facility Grievance Coordinator, based on the Grievant's situation, may grant an extension of time for filing the grievance.

d.  If the grievance is determined to be improperly submitted, it shall be returned to the Grievant unprocessed with a **DC-804 Part 3, Grievance Rejection Form** enumerating the reason(s) the grievance was not accepted. **(See Attachment C)** The grievance, if resubmitted, must be resubmitted under the same grievance number within five (5) working days.

e.  If the Facility Grievance Coordinator determines that the issue being grieved is in accordance with **DC-ADM 804**, it will be referred to an appropriate Grievance Officer for review.

f.  The Grievance Officer may submit the grievance for formal resolution or meet with the inmate to suggest ways in which the grievance can be resolved. The Grievance Officer may grant the inmate a maximum of five working days to resolve the grievance informally.

g.  If the Grievance Officer submits the grievance for formal resolution, within ten (10) working days of receipt of the grievance, the Grievance Officer shall provide a written response to the Grievant, using a **DC-804 Part 2 (See Attachment B)** and include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the incident raised in the grievance. A copy of the response shall be sent to the Facility Grievance Coordinator for tracking purposes.

h. The Facility Manager/designee may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is ongoing. If an extension is necessary, the Grievant shall be so advised in writing.

i. Grievances dealing with allegations of abuse shall be handled in accordance with Department policy **1.2.4, "Inmate Abuse Allegation Monitoring Process."**

j. Each Facility Manager/designee shall make provisions for illiterate or non-English speaking inmates to submit grievances, be interviewed, and have translated, any portion of the grievance policy. Extension to the timelines shall be granted in order to secure these services. Facility Managers are authorized to use existing contracts and/or dial-up translation services to provide this service.

## C. Appeal to Facility Manager

### 1. Inmate Responsibilities

a. The Initial Review decision from the Grievance Officer must be received by the inmate before any appeal to the Facility Manager can be sought.

b. Grievant may appeal an Initial Review decision to the Facility Manager in writing, within five (5) working days from the date of receipt by the inmate of the Initial Review decision. Only issues that were raised for initial review may be appealed. Every appeal to the Facility Manager shall be clearly labeled as an appeal at the top of the document with the grievance number included.

c. The text of the appeal shall be legible, presented in a courteous manner, and the statement of facts shall not exceed two (2) pages.

d. The appeal must clearly identify the Initial Review Decision and the basis for the appeal. Only one appeal of any Initial Review Decision will be permitted. Failure to comply may result in the appeal being rejected.

### 2. Staff Responsibilities

a. The Facility Manager may make exceptions to the five (5) working day appeal requirement. An allowance shall be made for delays with mail delivery.

b. The Facility Manager shall notify the inmate of his/her decision within fifteen (15) working days of receiving the appeal. This decision may consist of upholding the decision, modification, reversal, remand, or reassignment for further fact-finding. A brief statement of the reasons for the decision must be included.

c. The Grievance Coordinator shall enter the Facility Manager's decision into the Automated Inmate Grievance Tracking System.

d. When the Facility Manger remands a grievance, the Grievance Officer shall respond within five (5) working days.

### D. Appeal to Secretary's Office of Inmate Grievances and Appeals

1. Inmate Responsibilities

   a. The decision from appeal to the Facility Manager must be received by the inmate before an appeal to the Secretary's Office of Inmate Grievances and Appeals can be sought.

   b. Any Grievant, who is dissatisfied with the disposition of an appeal from the Facility Manager, may submit an appeal to the Secretary's Office of Inmate Grievances and Appeals, within five (5) working days of receiving the decision. An allowance shall be made for delays with mail delivery.  Only issues raised at the Initial Review and appeal to the Facility Manager may be appealed at this level.

   c. An appeal at this level will not be permitted until the Grievant has complied with all procedures established for Initial Review and Appeal to Facility Manager.

   d. The text of the appeal shall be legible, presented in a courteous manner, and the statement of facts shall not exceed two (2) pages.

   e. All appeals to the Secretary's Office of Inmate Grievances and Appeals must be addressed to the following:

      **Chief, Secretary's Office of Inmate Grievances and Appeals**
      **Department of Corrections**
      **2520 Lisburn Road, P. O. Box 598**
      **Camp Hill, PA  17001-0598**

      Failure to properly address the appeal will delay the process.

   f. Inmates appealing to final review are responsible for providing the Secretary's Office of Inmate Grievances and Appeals with all available paperwork relevant to the appeal.  A proper appeal to final review should include photocopies of the initial grievance, Initial Review, and the Appeal to Facility Manager along with the Facility Manager's decision.

   g. Indigent inmates as defined in Department policy **DC-ADM 803, "Inmate Mail and Incoming Publications,"** shall be afforded copy service at no charge in order to submit the required documentation for appeal purposes.  Non-indigent inmates shall incur copying charges in accordance with Department policy **3.4.5, "Photocopying Charges for Inmates."**

2. **Staff Responsibilities**

a. The Secretary's Office of Inmate Grievances and Appeals will ensure that:

   (1) appeals to final review are responded to within thirty (30) working days; and

   (2) appeals and responses are properly maintained in the Automated Inmate Grievance Tracking System.

b. Upon request, the Facility Manager will forward to the Secretary's Office of Inmate Grievances and Appeals a copy of any formal investigation related to a grievance and conducted by the security office.

c. The Secretary's Office of Inmate Grievances and Appeals will review the initial grievance and response, the Appeal to the Facility Manager and response, and any investigative reports and the appeal to final review.

d. The Secretary's Office of Inmate Grievances and Appeals may review appeals with the relevant bureau i.e., health care issues with the Bureau of Health Care Services, education issues with the Bureau of Corrections Education, etc.

e. Upon completion of review, the Secretary's Office of Inmate Grievances and Appeals will respond directly to the inmate in all cases.

f. The Secretary's Office of Inmate Grievances and Appeals will issue a decision within thirty (30) working days after receipt of an appeal. The decision may consist of upholding the decision, modification, reversal, remand, or reassignment for further fact-finding, and must include a brief statement of the reasons for the decision. The Chief, Secretary's Office of Inmate Grievances and Appeals, shall notify the Grievant, Facility Manager, and the appropriate Regional Deputy of the decision and rationale.

g. When the Chief, Secretary's Office of Inmate Grievances and Appeals or designee remands a grievance, the Facility Manager shall respond within ten (10) working days.

h. The Chief, Secretary's Office of Inmate Grievances and Appeals, in consultation with the Secretary of Corrections, shall take any action deemed necessary to ensure the integrity of this policy. This includes:

   (1) prohibiting the transfer of an inmate until the grievance procedure has been completed, including the appeal process; and

   (2) lifting a previously imposed grievance restriction.

i. The Chief, Secretary's Office of Inmate Grievances and Appeals/designee shall notify the Facility Manager in those cases where the suspension of an inmate's transfer is being considered pending the disposition of the appeal process.

j. Any inmate, who is transferred after filing a grievance or an appeal, but prior to completing the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager of the facility in which confined when the grievance was filed. Adjustments shall be made to the various time limitations in order to facilitate review.

## E. Grievance Restriction

1. The Facility Grievance Coordinator will provide the inmate with written notice of the restriction and the reason(s) for it. The Facility Manager shall approve the restriction and a copy of the notice will be forwarded to the Secretary's Office of Inmate Grievances and Appeals.

2. Inmates who deliberately misuse the grievance system by filing frivolous or fabricated grievances may be restricted to filing no more than one grievance each five (5) working days.

3. Upon request of the inmate, the Facility Manager may review the restriction every ninety (90) working days and shall provide notice to the inmate and the Chief, Secretary's Office of Inmate Grievances and Appeals, of the determination to continue or discontinue the restriction and the rationale for the determination.

4. If the inmate continues to abuse the grievance system, the Facility Manager may request a longer period of restriction between grievances through their Regional Deputy Secretary. A copy of the request shall be forwarded to the Secretary's Office of Inmates Grievances and Appeals for tracking purposes.

5. Any grievance restriction may be appealed to the Secretary's Office of Inmate Grievances and Appeals. Appeals must comply with **Section D, 1** above.

## F. Exceptions

1. Initial Review of issues relating to the following Department policies shall be in accordance with procedures outlined therein, and will not be reviewed by a Facility Grievance Coordinator.

   a. **DC-ADM 801, Inmate Discipline;**

   b. **DC-ADM 802, Administrative Custody Procedures; and**

   c. any other Department policy that specifically states that the **DC-ADM 804** is not applicable.

## VII. SUSPENSION DURING AN EMERGENCY

In an emergency or extended disruption of normal facility operation, the Secretary, or designee may suspend any provision or section of this policy, for a specific period.

## VIII. RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility to be consistent with law and to permit the accomplishment of the purpose(s) of the policies of the Department of Corrections.

## IX. RELEASE OF INFORMATION AND DISSEMINATION OF POLICY

### A. Release of Information

#### 1. Policy

This policy document is public information and may be released to members of the public, staff, legislative, judicial, law enforcement and correctional agencies and/or inmates upon request.

#### 2. Procedure Manual (if applicable)

The procedure manual for this policy is not public information and shall not be released in its entirety or in part, without the prior approval of the Secretary of Corrections or designee. This manual or parts thereof, may be released to any Department of Corrections employee on an as needed basis.

### B. Distribution of Policy

#### 1. General Distribution

The Department of Corrections' policy and procedure manuals (when applicable) shall be distributed to the members of the Central Office Executive Staff, all Facility Managers, and Community Corrections Regional Directors on a routine basis. Distribution to other individuals and/or agencies is subject to the approval of the Secretary of Corrections or designee.

#### 2. Distribution to Staff

It is the responsibility of those individuals receiving policies and procedures, as indicated in the "General Distribution" section above, to ensure that each employee expected or required to perform the necessary procedures/duties is issued a copy of the policy and procedures.

## X. SUPERSEDED POLICY AND CROSS REFERENCE

### A. Superseded Policy

#### 1. Department Policy

a. DC-ADM 804 issued July 20, 1994 by former Secretary Joseph D. Lehman.

    b.  DC-ADM 804-1 issued April 2, 1996 by Secretary Martin F. Horn.

    c.  DC-ADM 804-2 issued October 21, 1997 by Secretary Martin F. Horn.

    d.  DC-ADM 804-3 issued October 21, 1997 by Secretary Martin F. Horn.

    e.  DC-ADM 804-4 issued April 29, 1998 by Secretary Martin F. Horn.

    f.  DC-ADM 804-5 issued October 30, 2000 by Secretary Martin F. Horn.

  **2.  Facility Policy and Procedures**

    This document supersedes all facility policy and procedures on this subject.

**B.  Cross Reference(s)**

  **1.  Administrative Manuals**

    a.  DC-ADM 801, Inmate Discipline

    b.  DC-ADM 802, Administrative Custody Procedures

    c.  DC-ADM 803, Inmate Mail and Incoming Publications

    d.  1.2.4, Inmate Abuse Allegation Monitoring Process

    e.  3.4.5, Photocopying Charges for Inmates

  **2.  ACA Standards**

    a.  Administration of Correctional Agencies: 2-CO-3C-01

    b.  Adult Correctional Institutions: 3-4271

    c.  Adult Community Residential Services: 3-ACRS-3D-07

    d.  Adult Correctional Boot Camp Programs: 1-ABC-3D-08

    e.  Correctional Training Academies: None

*DC-ADM 804, Inmate Grievance System*                                    *Attachment A*

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS
P. O. BOX 598
CAMP HILL, PA 17001-0598**

| FOR OFFICIAL USE ONLY |
|---|
| GRIEVANCE NUMBER |

**OFFICIAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: | DATE: |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) | SIGNATURE of INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: | |

**INSTRUCTIONS:**
1. Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner
3. List in Block B any actions you may have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A.  Provide a brief, clear statement of your grievance. Additional paper may be used, maximum two pages.

B.  List actions taken and staff you have contacted, before submitting this grievance.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____                                    _____
Signature of Facility Grievance Coordinator                                    Date

-ADM 804, Inmate Grievance System                                                    *Attachment B*

>-804
rt 2

                                    COMMONWEALTH OF PENNSYLVANIA
                                    DEPARTMENT OF CORRECTIONS
                                           P.O. BOX 598
                                       CAMP HILL, PA 17001

)FFICIAL INMATE GRIEVANCE
NITIAL REVIEW RESPONSE                              GRIEVANCE NO.

| TO: (Inmate Name & DC No.) | FACILITY | HOUSING LOCATION | GRIEVANCE DATE |
|---|---|---|---|
|  |  |  |  |

The following is a summary of my findings regarding your grievance:

*DC-ADM 804. Inmate Grievance System*
DC-804
Part 3

*Attachment C*
**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
*SCI-* _____

DATE: _____

SUBJECT:    Grievance Rejection Form

TO: _____

FROM:    Facility Grievance Coordinator

| FOR OFFICIAL USE ONLY |
| --- |
| GRIEVANCE NUMBER |

The attached grievance is being returned to you because you have failed to comply with the provision(s) of DC-ADM 804, Inmate Grievance System:

1. _____  Grievances related to the following issues shall be handled according to procedures specified in the policies listed and shall not be reviewed by the Facility Grievance Coordinator:

a.  DC-ADM 801-Inmate Disciplinary and Restricted Housing Unit Procedures
b.  DC-ADM 802-Administrative Custody Procedures
c.  other policies not applicable to DC-ADM 804.

2. _____  Block B must be completed, as per the Instruction #3 of the Official Inmate Grievance Form.

3. _____  The grievance does not indicate that you were personally affected by a Department or facility action or policy.

4. _____  Group grievances are prohibited.

5. _____  The grievance was not signed and/or dated.

6. _____  Grievances must be legible and presented in a courteous manner.

7. _____  The grievance exceeded the two (2) page limit.  Description needs to be brief.

8. _____  Grievances based upon different events shall be presented separately.

9. _____  The grievance was not submitted within fifteen (15) working days after the events upon which claims are based.

10. _____  You are currently under grievance restriction. You may not file any grievances until _____
                                                                                              Date

11. _____  Grievance involves matter(s) that occurred at another facility and should be directed by the inmate to the appropriate facility.

12. _____  The issue(s) presented on the attached grievance has been reviewed and addressed previously.

SPK cop

ORINNE



| POLICY STATEMENT | |
| Commonwealth of Pennsylvania • Department of Corrections | |

| Policy Subject: | | Policy Number: |
| **Consolidated Inmate Grievance Review System** | | **DC-ADM 804** |
| Date of Issue: July 20, 1994 | Authority: Joseph D. Lehman Commissioner | Effective Date: Oct. 20, 1994 |

## I.   AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.   PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III.   APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV.   DEFINITIONS

A.   Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B.   Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.

DC-ADM 804

C.  Grievance Officer –

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit.  If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D.  Central Office Review Committee (CORC) –

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E.  Central Office Medical Review Committee (COMRC) –

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff.  The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F.  Initial Review –

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E).  All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G.  Appeal from Initial Review –

The first level of appeal of a decision rendered at Initial Review.  This appeal is directed to the Facility Manager or Community Corrections Regional Director.

**An appeal of the Initial Review decision on a grievance related to a Health Care or Medical Issue shall be submitted directly to the COMRC at Central Office.**

**Only issues raised at Initial Review shall be appealed.**

H.  Final Review –

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (CORC), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

V.  **POLICY**

A.  It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure – the Consolidated Inmate Grievance Review System – through which the resolution of problems or other issues of concern arising

DC-ADM 804

B. Informal Resolution of Problems -  All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review. See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. A Grievance shall be submitted to the Grievance Coordinator in the following manner.

   1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1). See Section V., B.

   2. All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

   3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal.  The inmate grievant must sign the grievance or appeal.

   4. All grievances and appeals must be presented in good faith.  They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review.  Any inmate who

DC-ADM 804

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

   NOTE:    At any point in the grievance process, the inmate has the right to withdraw the grievance.

B. Initial Review

   1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

   2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

   3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

   4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

      The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C. Appeal from Initial Review

   1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

      All other appeals will be submitted as follows.

   2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.

   3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

   4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

DC-ADM 804

### D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

   a. Medical Grievances which will be reviewed by COMRC.

   b. Requests for Final Review of appeals from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further reviews.

The address of the CORC/COMRC is:

> PA DEPARTMENT OF CORRECTIONS
> CENTRAL OFFICE REVIEW COMMITTEE
> PO BOX 598/2520 LISBURN ROAD
> CAMP HILL, PA 17001-0598

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal. The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision. The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

### E. Exceptions

Initial Review and Appeal from Initial Review of issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805 – Policy & Procedures for Obtaining Pre-Release Transfer.

2. DC ADM 801 – Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I

DC-ADM 804

4.   DC-ADM 814 – Incoming Publications

See 814-IIIB. Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F.  Admissions and Review

1.  All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

2.  No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G.  Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII.  SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX.  SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References:  DC-ADM 801, DC-ADM 802

ACA Cross-References:  3-4271

cc:   Executive Deputy Commissioner Reid
      Deputy Commissioner Clymer
      Deputy Commissioner Fulcomer
      Acting Deputy Commissioner Beard
      All Superintendents
      CCC Directors (4)
      File

Joseph D. Lehman,
Commissioner



|  | **Bulletin** |
|---|---|
|  | **Commonwealth of Pennsylvania ● Department of Corrections** |

| To: | Policy Subject: |
|---|---|
| **Superintendents**<br>**Boot Camp Commander**<br>**Regional Directors**<br>**Executive Staff** | **DC-ADM 804**<br>**CONSOLIDATED INMATE GRIEVANCE**<br>**REVIEW SYSTEM** |
|  | Policy Number:  **DC-ADM 804-1** |
|  | Policy Issue Date:  **July 20, 1994** |

| Date of Issue:<br>April 2, 1996 | Authority: | Effective Date:<br>May 20, 1996 |
|---|---|---|

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC).

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued:**

IV.E.:  Definition of COMRC

IV.G.:  "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical Issue shall be submitted directly to the COMRC at Central Office.

V.D.:  "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."



| | Bulletin |
| --- | --- |
| | **Commonwealth of Pennsylvania • Department of Corrections** |

| **To:** Executive Staff Superintendents Regional Directors | **Policy Subject:** Consolidated Inmate Grievance Review System |
| --- | --- |
| | **Policy Number:** DC-ADM 804-2 |
| | **Policy Issue Date:** July 20, 1994 |
| **Date of Issue:** October 1, 1997 | **Authority:** Martin F. Horn | **Effective Date:** November 1, 1997 |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1)    The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2)    In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3)    The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4)    Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5)    In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6)    The Chief Hearing Examiner will be responsible for assuring that:

    (a)    appeals to final review are responded to in a timely fashion;

    (b)    records pertaining to such appeals are maintained properly; and

    (c)    counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the ICU vs Shapp Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of all appeals properly raised to final review. These amendments have been established to ensure timeliness



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| | |
|---|---|
| **To:** Executive Staff<br>Superintendents<br>Regional Directors<br>Boot Camp Commander | **Policy Subject:** Consolidated Inmate Grievance Review System |
| | **Policy Number:** DC-ADM 804-3 |
| | **Policy Issue Date:** July 20, 1994 |

| **Date of Issue:**<br>October 21, 1997 | **Authority:** | **Effective Date:**<br>November 1, 1997 |
|---|---|---|

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner.

> Chief Hearing Examiner
> 1451 S. Market Street
> Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Policy Subject: |
|---|---|
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |
| | Policy Number: DC-ADM 804-4 |
| | Policy Issue Date: July 20, 1994 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read:

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right."

UNREPORTED/NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-1971

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge: The Honorable John R. Padova

Argued: September 12, 2000

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

MEMORANDUM OPINION OF THE COURT

BARRY, Circuit Judge

    Appellant Larry Geisler, a former prisoner at SCI-Graterford, appeals separate orders

of the District Court which granted motions to dismiss his civil rights action against appellees

EXHIBIT

Dr. Stanley Hoffman and Superintendent Donald T. Vaughn. The District Court dismissed

Geisler's action against Dr. Hoffman for failure to exhaust administrative remedies and

dismissed the action against Superintendent Vaughn on the merits.[1] In this appeal, Geisler

seeks reversal of the orders of dismissal and adds a constitutional challenge to 42 U.S.C. §

1997e(a), a challenge he did not raise before the District Court.[2] For the reasons set forth

below, we will affirm.

The facts underlying this case, as sympathetic as they are to Geisler, are well-known

to the parties involved and will not be repeated here. Despite that sympathetic story,

however, we must follow the mandate of Congress in 42 U.S.C. § 1997e(a), as interpreted

---

[1] Superintendent Vaughn argues that because Geisler's brief on appeal fails to address the merits of his claim against him, much less tell this Court why, in his opinion, the District Court erred in dismissing the action as to him, that order of dismissal is not properly before us for review. We agree. "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before t[he] court." Laborers' Int'l Union of No. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) (quoting Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992)); see also Penn. Dept. of Public Welfare v. U.S. Dept. of Health and Human Services, 101 F.3d 939, 944 (3d Cir. 1996). The remainder of this opinion will, therefore, address only Geisler's appeal from the dismissal of Dr. Hoffman and we will affirm as to Superintendent Vaughn without further discussion.

[2] We have consistently refused to consider issues that are raised for the first time on appeal. See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994); Richerson v. Jones, 572 F.2d 89, 97 (3d Cir. 1978) (noting that "refusing to consider on appeal an issue or argument not raised below normally promotes the finality of judgments and conserves judicial resources"). While there is a "manifest injustice" exception to this Court's rule against consideration of new legal issues on appeal, this rarely-applied exception is not triggered here. We, therefore, will not consider Geisler's challenge to § 1997e(a).

by this Court, and affirm the dismissal as to Dr. Hoffman because Geisler simply did not

exhaust his administrative remedies as to the monetary relief he now seeks.

The plain language of 42 U.S.C. § 1997e(a), as amended by the Prison Litigation

Reform Act ("PLRA"), makes clear that: "No action shall be brought with respect to prison

conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or

other correctional facility *until such administrative remedies as are available are exhausted.*"

42 U.S.C. § 1997(e)(a) (emphasis added). As we determined in <u>Nyhuis v. Reno</u>, 204 F.3d

65, 67 (3d Cir. 2000), Congress intended for the PLRA to amend "§ 1997e(a) in such a way

as to make exhaustion of all administrative remedies mandatory--*whether or not they provide*

*the inmate-plaintiff with the relief he says he desires in his federal action.*" The decision in

<u>Nyhuis</u> -- a Bivens action -- to reject a "futility" exception to § 1997e(a) and to regard the

exhaustion requirement as unqualified has been extended to § 1983 claims.  <u>See Booth v.</u>

<u>Churner</u>, 206 F.3d 289, 300 (3d Cir. 2000) ("[T]he rule we announced in <u>Nyhuis</u> has equal

force in the § 1983 context . . . for § 1997e(a) treats Bivens actions and § 1983 actions as

functional equivalents."), <u>petition for cert. filed</u>, 68 U.S.L.W. 3774 (U.S. June 05, 2000) (No.

99-1964).

As the record reveals and Geisler's counsel concedes, Geisler failed to utilize all three

of the tiers of the administrative appeals process provided for by the Pennsylvania

Department of Corrections via the Consolidated Inmate Grievance Review Procedure ("DC-

ADM 804"). While Geisler claims to have filed a grievance to have his J tube reimplanted

and arranged to have an inmate file a second grievance on his behalf, he admittedly never went beyond that initial step within the formal appeals process outlined in DC-ADM 804. Moreover, the failure of the prison officials to formally respond in writing to these grievances did not, contrary to Geisler's argument, relieve him of the obligation of exhausting the requisite administrative remedies. DC-ADM 804 does not prohibit prisoners from appealing the failure of prison officials to act on initial grievances and, therefore, Geisler was statutorily constrained to bring his grievances to the next level within the prison grievance scheme before pursuing relief in the judicial forum. And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court. To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively.

In this connection, Geisler cannot be heard to argue that seeking monetary damages in the administrative setting would have been "futile." First of all, DC-ADM 804 made awards of monetary relief available to inmates as of May 1, 1998 -- well before Geisler filed his federal complaint in July 26, 1999; if the very relief Geisler sought in the judicial forum was first available to him in the administrative forum, a grievance in that forum could not have been "futile." Second, even if administrative remedies had not been available to Geisler via DC-ADM 804, any attempt to invoke a "futility" exception would be denied in light of

Nyhuis and Booth. See Nyhuis, 204 F.3d at 70-77 (explaining that Congress, via the PLRA,

intended for exhaustion to be an unqualified requirement in prisoner civil rights litigation in

an attempt to conserve judicial resources and to give deference to and promote the efficacy

of administrative processes); Booth 206 F.3d at 300 (same).

In sum, Geisler's complaint fits squarely within the dictates of § 1997e(a), as

interpreted by this court in Nyhuis and Booth, that a prisoner exhaust the administrative

remedies available to him or her prior to initiating suit in federal court. Because Geisler

failed to exhaust the three-tiered administrative appeals process with respect to both (1) his

request to have his J tube reimplanted and (2) his current request for monetary damages

attributable to the time he was deprived of the J tube, the District Court properly granted Dr.

Hoffman's motion to dismiss.

We make, however, one observation. While Nyhuis and Booth compel us to uphold

the dismissal of Geisler's complaint for failure to exhaust, we note that exhaustion is a two-

way street with obligations on the part of prison officials as well as on the part of the

prisoner. In Nyhuis, this Court stated that "applying § 1997e(a) without exception promotes

the efficacy of the administrative process itself ..." Nyhuis, 204 F.3d at 76. We anticipated

that under a strict exhaustion requirement "prison grievance procedures will receive

enhanced attention and improved administration." Id. While the state's failure to formally

respond to Geisler's grievances -- and on a motion to dismiss both the filing of the grievances

and the failure to respond must be accepted as true -- does not constitute a ground for

excusing Geisler from exhausting the administrative appeals process, such failure is wholly inconsistent with the "cooperative ethos . . . between inmate and jailer" which this Court envisioned a strict exhaustion requirement would promote. Id. at 77. In response to the inattention in this case, we issue a simple yet stern reminder: federal courts and prisoners alike depend upon prison officials to take seriously their roles within the relevant administrative grievance scheme. Only prompt attention and formal, guided response to timely prisoner grievances will facilitate the overarching policies of the PLRA.

TO THE CLERK OF THE COURT:

Kindly file the foregoing Memorandum Opinion.

/s/ Maryanne Trump Barry
Circuit Judge

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-1971

———————

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge: The Honorable John R. Padova

———————

Argued: September 12, 2000

———————

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

———————

JUDGMENT

———————

This cause came to be heard on the record from the United States District Court for

the Eastern District of Pennsylvania and was argued on September 12, 2000.

After consideration of all contentions raised by the appellant, it is

ADJUDGED and ORDERED that the judgments of the District Court be and are hereby affirmed.

Costs taxed against appellant.

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

Dated: September 29, 2000

sk

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM CURTIS,                       :

      Plaintiff,                     :   CIVIL ACTION NO. 3:00cv1149

      vs.                            :

                                     :   (JUDGE CONABOY)      **FILED**

MARTIN F. HORN, et al.,               :              **SCRANTON**

      Defendants.                    :           **DEC 18 2000**

PER _____ CJC
DEPUTY CLERK

### MEMORANDUM AND ORDER

    William Curtis, an inmate currently incarcerated at the State Correctional Institution at Smithfield ("SCI-Smithfield") initiated the above-captioned civil rights complaint on June 27, 2000, pursuant to 42 U.S.C. § 1983. (Doc. 1). Currently pending before the Court are motions by both parties. Plaintiff filed two motions, one for appointment of counsel (Doc. 10) on October 4, 2000 and one for leave to file an amended complaint (Doc. 23) on December 6, 2000. Defendants filed two motions, one to dismiss the complaint (Doc. 16) on November 3, 2000 and one for a protective order under F.R.Civ.P. 26(c) (Doc. 18) on November 16, 2000. For the reasons outlined below this action will be dismissed, and the other pending motions rendered moot.

### BACKGROUND

    The Plaintiff proceeding pro se, filed the above-captioned

1

EXHIBIT

civil rights action on June 27, 2000.  (Doc. 1).  On August 30,
2000, Plaintiff filed a document entitled "Supplemental Pleadings"
(Doc. 6) pursuant to F.R.Civ.P. 15(d) relating to Supplemental
Pleadings.  On October 2, 2000, the Defendants returned the Waiver
of Service of Summons.  On November 3, 2000, Defendants filed
Motion to Dismiss Plaintiff's Complaint and Supplemental Pleadings.
(Doc. 16).  On November 13, 2000, Defendants filed a brief in
support.  On December 4, 2000, Plaintiff filed a motion in
opposition.  (Doc. 24).

Plaintiff is currently incarcerated at SCI-Smithfield.  At
the time of the events alleged in his complaint (Doc. 1), Plaintiff
was incarcerated at State Correctional Institution in Frackville
("SCI-Frackville").  Plaintiff named twelve defendants.  All of the
Defendants are employed at SCI-Frackville with the exception of
Martin F. Horn, who is the Secretary of the Department of
Corrections.  In addition to Secretary Horn, Plaintiff has named
Joseph W. Chesney, the Superintendent at SCI-Frackville; John W.
Kerestes, the Deputy Superintendent for Facility Management; David
G. White, a dentist; Linda J Nauroth, the Health Care Administrator
at SCI-Frackville; Captain Dennis P. Durant; Lieutenant Derfler;
Sergeant Leonard Poplaski; Donald Betz; Correctional Officer I;
John S. Sanders, Correctional Officer I; Sean R. Resendes,
Correctional Officer I; and James Kane, Institutional Hearing

2

Examiner.

The initial complaint is twenty-seven pages long and includes eighty-eight numbered paragraphs, not including subparagraphs and the Plaintiff's request for relief. The "Supplemental Pleadings" filed by Plaintiff consist of eleven pages and twenty paragraphs, not including subparagraphs and the request for relief, wherein Plaintiff alleges four additional causes of action. (See Docs. 1,6,8).

Plaintiff's complaint (Doc. 1) sets forth four causes of action: The first cause of action claims violations of the Eighth Amendment proscription against cruel and unusual punishment allegedly arising out of the refusal to provide dental care and the overall conditions of confinement in the Restricted Housing Unit ("RHU"); the second cause of action alleges violations of Plaintiff's First Amendment rights as a result of denial of personal family information in the RHU; denial of reading materials and 8 ½ x 11 inch clear paper, and delaying delivery and/or delivering damaged newspapers; the third cause of action claims violations of Plaintiff's Fifth and Fourteenth Amendment rights arising out of misconduct reports, misconduct hearings and punishments; and the fourth cause of action alleges violations of Plaintiff's Fourth Amendment due to unreasonable and excessive cavity and strip searches and use of urinalysis testing. Plaintiff

3

requests declaratory, injunctive and monetary relief including $500.00 in compensatory damages and $1000.00 in punitive damages against each Defendant. (See Doc. 1).

Plaintiff's "Supplemental Pleadings" (Docs. 6,8) filed on August 30, and September 25, 2000, indicate that all Defendants are being sued in their individual and official capacities. Plaintiff claims that he suffered "irreparable injury" on July 26, 2000 and August 1, 2000 as a result of what Plaintiff terms "two false misconduct reports" which resulted in a misconduct hearing on August 1, 2000 at which Plaintiff was denied his "constitutionally protected right to have witnesses testify in his behalf." Plaintiff also complains that on August 21, 2000, an obituary and photograph of his cousin were mailed to him but were confiscated allegedly in violation of Plaintiff's First Amendment right to free exercise of his religion. Plaintiff also complains that on August 23, 2000, his cell was searched in a disruptive manner by Corrections Officer I Fryer and that he had to spend hours putting it back together. Plaintiff sets forth the same four causes of action and demands the same relief as set forth in his initial complaint. (See Docs. 6,8).

## DISCUSSION

The Defendants argue that they are entitled to entry of summary judgment because: (1) the Plaintiff failed to allege that

4

he exhausted all administrative remedies regarding each claim in the complaint; (2) the Plaintiff failed to state a claim upon which relief can be granted.

We are inclined to agree with Defendant's contention that the Plaintiff has in fact failed to properly allege exhaustion[1] with respect to all administrative remedies regarding each claim in the complaint.

Regarding exhaustion, in Plaintiff's initial Complaint (Doc. 1), the only reference to administrative remedies is Plaintiff's use of the word "grievance" in paragraphs 12 and 57. In paragraph 12, Plaintiff claims that he submitted a grievance to Defendant

---

[1]The Prison Litigation Reform Act of 1996 provides, in relevant part, that:

> [n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies are available are exhausted.

42 U.S.C. § 1997e(a)

The Third Circuit recently issued two significant decisions which strictly enforce the exhaustion requirement. In Nyhuis v. Reno, 204 F.3d 65 (3d Cir. 2000), the court held exhaustion applies even though the government's administrative remedies did not provide the relief sought in the lawsuit i.e., there is no futility exception. Until exhaustion is satisfied, the court may not reach the merits of the claim. Id. at 78. In Booth v. Churner, 206 F.3d 289 (3d Cir. 2000); cert granted, 2000 WL 798208, 68 USLW 3774 (U.S. Oct. 30, 2000) the court held that exhaustion applies to use of force claim even though the DOC grievance procedure did not provide monetary relief. Since Booth did not utilize intermediate and final review, the District Court's dismissal of the complaint without prejudice was affirmed.

5

Nauroth, the Health Care Administrator at SCI-Frackville, with respect to his request for a dental bridge.  Plaintiff does not allege that he exhausted the administrative process with regard to this request.  In paragraph 57, Plaintiff references a response by Defendant Lt. Derfler to grievance number 0315-99 in which Defendant Derfler asserted the Plaintiff deliberately made a false claim.  In his "Supplemental Pleadings" (Doc. 8) wherein Plaintiff utilized, in part, the form to be used by prisoners in filing a civil rights complaint in the Middle District, Plaintiff did check the "yes" box with respect to exhaustion of administrative remedies.  However, nowhere in the body of the complaint (Doc. 8) did Plaintiff allege that he in fact exhausted his administrative remedies with respect to each claim.  While the Plaintiff does claim to have exhausted, he does not support this claim with any documentary evidence.[2]  In a document entitled "Affidavit of William Curtis" filed by Plaintiff on December 4, 2000 he declares that he has "exhausted administrative remedies by filing numerous complaints."  (Doc. 22).  The Plaintiff makes this declaration thirteen times with a different claim following each one.  (See Doc. 22).  These are bare allegations with no supporting

---

[2]The DOC utilizes a three-step grievance process set forth in Policy No. DC-ADM 804.  See Booth v. Churner, supra, 206 F.3d at 292 (fn.2).

6

documentation that are insufficient to show requisite exhaustion of all available state remedies.[3]

Therefore, we find that because Plaintiff has failed to identify with particularity that he has in fact exhausted his administrative remedies with respect to each claim, his complaint must be dismissed.  However, it is not for procedural reasons alone we grant the Defendant's motion to dismiss.

The standard of review on a motion to dismiss are well established:

> A complaint may not be dismissed for failure to state a claim upon which relief can be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which could entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).  The court must accept all material allegations in complaint as true and construe them in the light most favorable to the party opposing the motion. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Johnsrud v. Carter, 620 F.2d 29 (3d Cir. 1980);

---

[3]The United States Court of Appeals for the Sixth Circuit has adopted a rule requiring inmates who file suit under Section 1983 to "allege and show that they have exhausted all available state remedies." Brown v. Toombs, 139 F.3d 1102, 1104 (6th Cir. 1998), cert denied, 119 S.Ct. 88 (1998).  The Brown court stated:

> In light of the plain mandatory language of the statute regarding exhaustion of remedies, the legislative purpose underlying the plain language, and the sound policy on which it is based, this Court will henceforth require that prisoners filing Section 1983 cases involving prison conditions must allege and show that they have exhausted all available state remedies.  A prisoner should attach to his Section 1983 complaint the administrative decision, if it is available, showing the administrative disposition of his complaint.

Id. (emphasis added).

7

and <u>Truhe v. Rupell</u>, 641 F.Supp. 57, 58 (M.D.Pa. 1985)(Rambo, J.). Although the complaint is to be liberally construed in favor of the plaintiff (<u>See</u> F.R.C.P. 8(f)), the court does not have to accept every allegation it contains as true. Conclusory allegations of law, unsupported conclusions and unwarranted inferences need not be accepted as true. <u>Conley</u>, <u>supra</u>, 355 U.S. at 45-46, 78 S.Ct. at 102.

<u>Pennsylvania House, Inc. v. Barrett</u>, 760 F.Supp. 439, 449 (M.D.Pa. 1991)(McClure, J.)

The gravamen of the Plaintiff's complaint is his claim of denial of medical care, namely, not receiving a dental bridge. The Plaintiff also makes many other various and sundry claims relating to the conditions of his confinement at SCI-Frackville. The following are a summary of Plaintiff's claims as redacted from his complaint filed June 27, 2000. (Doc. 1).

Paragraph 3-12: That in 1997 and 1998, he went to the former institutional dentist (John Doe) complaining of pain in his gums and difficulty chewing due to four teeth missing on one side of his mouth; that the dentist said that Plaintiff needs a "dental bridge"; that Defendant White replaced dentist John Doe sometime in 1999; that Plaintiff told Defendant White of the pain in his gums and difficulty eating food because of the missing teeth but that Defendant White told Plaintiff that a dental bridge "was absolutely out of the question"; and that Plaintiff filed a grievance with Defendant Nauroth informing her that he has pain in his gums and difficulty eating food properly.

Paragraph 13-19: That in September of 1997, he began to assist inmates in the religious community at SCI-Frackville in a civil rights action filed in the Eastern District of Pennsylvania; that Defendant Kane told Plaintiff he could function much better if he worried about himself and was not involved in jailhouse lawyer activities; that on June 20, 1997, Plaintiff filed a lawsuit in the Court of Common Pleas of Huntingdon County against six defendants from the DOC; that each time Plaintiff is confined in the RHU, he is required to wait for long periods before receiving fundamental hygiene items and legal materials; and that cell searches in the RHU are done in a disruptive manner which leave his legal materials in disarray.

Paragraph 20-21: That while housed in the RHU in 1998, Defendant Sanders held copies of Plaintiff's daily newspaper; and that in 1999 and 2000, Defendant Betz delivered many newspapers to him which were damaged in that the front page was either missing or appeared to have been cut with a razor.

Paragraph 22: That Defendants harassed him by requiring him to submit to six urinalysis tests during a twelve-month period in 1998 and 1999.

Paragraph 23-25: That he had a misconduct hearing on June 16, 1998, as the result of which he received sixty days disciplinary status and non-contact visits for six months which

9

apparently lasted eleven to fourteen days "before administrative reversal."

Paragraph 26: That Defendant Poplaski refused to answer questions during a misconduct hearing on April 30, 1999, the answers to which questions apparently "should have stated there was no evidence of guilt to some charges."

Paragraph 27-31: That on September 14, 1999, he was "assaulted" when Defendant Sanders used extreme force to close the handcuffs on his wrists that were behind his back resulting in abrasions and trauma to his left hand and wrist; that Defendant Sanders began to pull Plaintiff's hand and wrist; that Defendant Sanders began to pull Plaintiff's hand and arm through the door slot with excessive force; that Plaintiff received medical treatment; that at no time did Defendant Sanders attempt to loosen the handcuffs; and that after this "assault," Defendants' Sanders and Henninger searched Plaintiff's cell in a disruptive manner following which Sanders wrote a "fabricated misconduct."

Paragraph 32: That "Defendants" will not allow Plaintiff to receive the publication "Prison Legal News."

Paragraph 33-34: That Defendants violate Plaintiff's First Amendment rights by not allowing Plaintiff to receive family obituaries containing photographs in the RHU which serves no legitimate penological interest.

10

Paragraph 35: That Defendants permanently withheld, damaged and purposely never delivered copies of Plaintiff's "Philadelphia Inquirer"; however, no dates are provided.

Paragraph 36: That he is subjected to "excessive strip searches" going to and coming from the RHU.

Paragraph 37: That Defendant Horn fails to provide adequate clothing to inmates in the RHU during the winter months in the form of a "non-legitimate thin material jumpsuit" and that he has suffered colds and flu symptoms because of the inappropriate clothing.

Paragraph 38: That Defendant Horn subjects Plaintiff to sleep deprivation in the RHU as a result of the count light always being lit.

Paragraph 39: That some of the policies enacted by Defendant Horn are an abuse of discretion and serve a racially discriminatory purpose.

Paragraph 40-43: That in September 1999, Defendant Resendes served Plaintiff numerous breakfast food trays with missing portions of food and that on October 4 and 6, 1999, Defendant Resendes removed the protective wrapping and touched the food with contaminated plastic gloves.

Paragraph 44-46: That on January 4, 2000, while Plaintiff was utilizing the law library, he was moved to a different cell in

11

the RHU, which was filthy and cold; and that Plaintiff's request for cleaning material was denied.

Paragraph 47-48: That on January 31, 2000, Defendant Resendes moved Plaintiff into the last cell of the housing unit which is extremely cold during the winter; and that Defendant Resendes moved a mentally ill inmate next to the Plaintiff who "makes incessant noise during the day and night."

Paragraph 49-50: That on February 14, 2000, Defendant Resendes moved the Plaintiff from cell BC-15 to cell BC-29 which had a leaking wash basin; and that Plaintiff remained in BC-29 for at least five hours until he was moved to cell BC-56.

Paragraph 51-56: That on February 23, 2000, Defendant Resendes subjected Plaintiff to strip searches before and after the exercise yard as a means to harass him; that on April 12, 2000, Resendes moved the Plaintiff into cell BC-43 which was extremely filthy, even though Resendes knew that cell was filthy and that other cells were not occupied; and that Resendes denied Plaintiff's request for cleaning materials which were provided to Plaintiff during the next shift around 3:20 pm.

Paragraph 57-59: That Plaintiff informed Defendant Lt. Derfler, the RHU Lieutenant, about the bad faith conduct of Defendants Sanders and Resendes, which conduct continued.

Paragraph 60-61: That Defendants deny him the use of a

drinking cup in the RHU in order to take his medication.

Paragraph 62: That he has been housed in the RHU since July 4, 1999, and that the ventilation ducts in the unit and in the cell "have not been vacuumed and the level of dust mites has increased causing Plaintiff to become ill."

Paragraph 63: That the Defendants handcuffing policy is hazardous because he is required to place his arms behind his back and if he stumbles and falls his "arms will become dislocated from his shoulder."

Paragraph 64: That there are no concrete sidewalks at certain pathways going to or coming from the RHU annex yard and because Plaintiff's hands are handcuffed behind his back, if he falls his arms will become dislocated from his shoulders.

Paragraph 65: That the cell doors in the RHU annex violate unspecified "federal and state safety code" because the handcuff slots are three inches below the door handle which requires him to bend down to an angle of more than 90 degrees in order to put his hands through the door to be handcuffed, which movement "causes back and shoulder pain."

Paragraph 66: That the Defendants do not provide fingernail or toenail clippers in the RHU and as a result Plaintiff suffers from foot pain due to protruding toenails.

Paragraph 67-68: That Defendant Horn's hygiene policies den

him equal protection of the law because he is a black man and is not permitted to use an electric razor in the RHU necessitating the use of a "Bic type razor" which causes skin irritation.

Paragraph 69: That Defendant Horn's policy regarding the purchasing of inmate television sets violates the Commerce Clause because he is forced to purchase inferior products at inflated prices.

Paragraph 70: That the food trays in the inmate dining area at SCI-Frackville are unsanitary because they are "put on the line soaking wet and as result contain pathogens."

Paragraph 71-72: That inmates are not provided with matches with cigarette purchases and are therefore coerced into buying a cigarette lighter which is "one of the many subtle forms of racketeering that violate Plaintiff's rights under the law"; and that Defendant Horn uses his official capacity to create economic markets through "agency business" which further violate Plaintiff's state and federal constitutional rights.

Paragraph 73-74: That the "acts and omissions of the Defendant" are acts of retaliation and harassment because of Plaintiff's "personal grievance activity and assistance of other prisoners"; and that Defendants attempt to frustrate Plaintiff's legitimate right to seek redress.

Paragraph 75: That his request to purchase 8 ½ x 11 paper

14

was denied.

Paragraph 76-77: That Defendants oral warnings about grievance activity and assisting other inmates are acts of retaliation; and that he has been subjected to a grievance restriction.

Paragraph 78: That his cell was searched on June 6, 2000, in a disruptive manner by Officer Henninger, who is a co-conspirator of Defendant Sanders in a private criminal complaint.

Paragraph 79-80: That his newspapers have been withheld or damaged; and that Defendants' acts and omissions in the RHU "are deliberate acts to inflict slow torture and psychological punishment."

In addition, Plaintiff materially restated many of these grievances in two separate "supplemental pleadings" filed on August 30 and September 25, 2000.  (Docs. 6,8).

Pursuant to the Supreme Court's decision in Estelle v. Gamble, 429 U.S. 97 (1976), an inmate plaintiff must demonstrate that prison officials have breached the standard of medical treatment to which he was entitled.  The government has an "obligation to provide medical care for those whom it is punishing by incarceration.  Id. at 103.  However, a constitutional violation does not arise unless there is a "deliberate indifference to serious medical needs of prisoners" which constitutes "unnecessary

15

and wanton infliction of pain."  Id. at 104 (citation omitted).
The Court of Appeals for the Third Circuit has held that not every
injury or illness enjoys constitutional protection; only serious
medical needs are actionable.  Colburn v. Upper Darby Twp., 946
F.2d 1017, 1023 (3d Cir. 1991); West v. Keve, 571 F.2d 158, 161 (3d
Cir. 1978).

A later decision by the Supreme Court addressed the issue of
what standard should be applied in determining deliberate
indifference in Eighth Amendment cases.  The Court established that
the proper analysis is whether a prison official "acted or failed
to act despite his knowledge of a substantial risk of serious
harm."  Farmer v. Brennan, 511 U.S. 825, 841 (1994).  Furthermore,
a complaint that a physician or a medical department "has been
negligent in diagnosing or treating a medical condition does not
state a valid claim of medical mistreatment under the Eighth
Amendment [as] medical malpractice does not become a constitutional
violation merely because the victim is a prisoner."  Estelle, 429
U.S. at 106.  Where a prisoner has actually been provided with
medical treatment, one cannot always conclude that, if such
treatment was inadequate, it was no more than mere negligence.  See
Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).  It is true
that if inadequate treatment results simply from an error in
medical judgment, there is no constitutional violation.  See id.

16

The Court of Appeals for the Third Circuit in <u>Durmer</u> added that a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. However, where a failure or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. <u>See</u> <u>id.</u>

With regard to Defendants Chesney and Kerestes, although Plaintiff identifies each of these individuals as parties in paragraph 2 of his complaint, none off the paragraphs of Plaintiff's complaint mention these names, nor does Plaintiff allege that they were personally involved in any alleged wrongdoing. Personal involvement is specifically required to state a claim under § 1983. <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988). Even though Chesney and Kerestes are the Superintendent and Deputy Superintendent for Facilities Management respectively, <u>respondeat</u> <u>superior</u> is not a bases for liability under § 1983. <u>See</u> <u>Durmer</u> <u>id.</u> at 69, n.14.

With regard to Defendant Martin Horn, his name is mentioned in paragraphs 7-39, 67-69, and 72. Plaintiff alleges that Horn is responsible for policies that allow him to only have a thin jumpsuit which is not sufficient for the winter, that the count light in the RHU is always on, that Plaintiff is not permitted to

17

purchase an electric razor and that Plaintiff is forced to purchase inferior television sets at an inflated price.  None of these allegations are sufficient when the aforementioned standard is applied.  Furthermore, our constitution "does not mandate comfortable prisons."  Rhodes v. Chapman, 452 U.S.337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981).  In order to state an Eighth Amendment claim, two requirements must be met.  First, the deprivation "must be, objectively, 'sufficiently serious'."  Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994).  Second, because "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment", and the state of mind required is one of "deliberate indifference to inmate health or safety."  Id.  None of these allegations are sufficiently serious to constitute a violation of the constitution and therefore will be dismissed.  Skin irritation and feeling cold during the winter one-hour exercise period, are simply not of constitutional proportions.  To the extent Plaintiff seeks damages for mental or emotional injuries against any Defendant ("psychological torture" due to the constant glow of the count light, see paragraph 82(g)) the claims fail because an inmate may not file a federal cause of action for same "without a prior showing of physical injury" 42 U.S.C. § 1997e(e), and Plaintiff has made no such allegation despite his prolix 27-page initial complaint.

With regard to Defendant David White, DDS, the Plaintiff's claims against him are set forth in paragraphs 9-11 of his complaint wherein he complains that he was denied a dental bridge. A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. <u>Monmouth County Correctional Institution Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), <u>cert denied</u>, 486 U.S. 106 (1988). The seriousness of an inmates medical need may also be determined by reference to the effect of denying treatment. <u>Id.</u> Also, where denial or delay causes an inmate to suffer a lifelong handicap or permanent loss, then the medical need is considered serious. <u>Id.</u> Here, Plaintiff's Complaint itself reveals that he has indeed received medical attention from a dentist with whom he has a differing opinion regarding appropriate treatment. Doctor White saw Plaintiff after dentist John Doe and indicated that Plaintiff did not need a bridge. Plaintiff's Complaint at best states a state medical malpractice action, not a claim for deliberate indifference to a serious medical need.

The only allegation in the complaint (Doc. 1) against Defendant Nauroth is in paragraph 12, wherein Plaintiff indicates that he filed a grievance with Nauroth, the Health Care Administrator at SCI-Frackville, and that he was having pain in his

19

gums and difficulty eating food properly.  For the same reasons set forth above with regard to Defendant White, we must dismiss Plaintiff's complaint.  In addition, Nauroth is not a medical professional.  As such, Nauroth is not required to, and in fact, it would be inappropriate for her to second-guess the diagnosis and treatment as set forth by Defendant Dr. White.  In _Durmer_, the plaintiff alleged that the Warden and the State Commissioner for Corrections ignored letters he wrote to each complaining about his medical care.  The District Court granted summary judgment to each of these individuals and was affirmed.  "Neither of these defendants is a physician, and neither can be considered deliberately indifferent simply because they failed to respond to the medical complaints of a prisoner who was already being treated by the prison doctor."  _Durmer_ _id._ at 69.  The allegation of the complaint establish that Plaintiff is under the care of the prison dentist and that Nauroth is not a physician.  As such, she is not required to counter the judgment of the treating dentist and therefore cannot not be considered deliberately indifferent.

In paragraphs 23-25 of the Complaint (Doc. 1), Plaintiff complains that he was sanctioned to sixty days disciplinary custody status with on non-contact visits for six months when there was "no evidence to support this sanction, for refusing to give signature during urinalysis testing."  These claims are dismissible on three

grounds.  First, Plaintiff admits that through the administrative process the punishment was reversed.  <u>See</u> <u>paragraph 25</u>.  Second, the statute of limitations for suits of this type is two years.  42 Pa.C.S.A. § 5524.  Since § 1983 actions are a species of tort liability and because Plaintiff's complaint was filed on June 27, 2000, more than two years from June 16, 1998, the action is time barred by the statute of limitations.  Third, and most importantly, Plaintiff has failed to state a claim.  It is well established that segregation from general population does not implicate a state-created liberty interest unless it imposes "atypical and significant" hardship on the inmate in "relation to the ordinary incidents of prison life."  <u>Sandin v. Conner</u>, 515 U.S. 472, 484 (1995); <u>Griffin v. Vaughn</u>, 112 F.3d 703, 706 (3d Cir. 1997)(15 months in administrative segregation without a hearing did not deprive prisoner of liberty interest).  Further, even a denial of a hearing prior to administrative custody placement is not a violation of due process.  <u>Griffin</u>, 112 F.3d at 706.

All of Plaintiff's claims wherein he complains about the conditions of confinement in the RHU fail as a matter of law. Therefore, his claims against Defendants Derfler, Poplaski and Resendes fail as a matter of law.

In paragraph 21, Plaintiff claims that Defendant Betz delivered damaged newspapers during 1999 and 2000.  In

21

paragraph 86 of his complaint (Doc. 1) under the third cause of action Plaintiff seeks damages for "negligent destruction of property without compensation." This is clearly a state law claim, not a federal claim, and obviously not a constitutional claim. Accordingly, it is dismissed.

Plaintiff claims in paragraph 20 that at sometime in 1998, Defendant Sanders intentionally withheld copies of Plaintiff's daily newspaper, and in paragraphs 27-31 and 78, he claims Sanders assaulted him on September 14, 1999 when he used "extreme force closing the handcuff on Plaintiff's wrist." This newspaper claim against Sanders, like the claim against Betz is not actionable in federal court and is dismissed. Furthermore, Plaintiff failed to allege what dates this occurred in 1998, and certainly, to the extent that those instances occurred two or more years prior to June 27, 2000, those claims will be time barred by the statute of limitations.

Regarding the handcuff claims, the question of concern to us in a use of force claim is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillan, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000). Handcuffing inmates, particularly those confined to the RHU, is a routine part of prison life. While the

22

Plaintiff may feel a certain amount of indignity and discomfort while being handcuffed, Plaintiff's allegations clearly do not rise to a constitutional level.

Plaintiff's claims he is victim of unreasonable searches of his person and seizures of his property in his cell. These claims also fail. In <u>Bell v. Wolfish</u>, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the court held that unannounced searches, called "shakedowns" and visual body cavity searches, even as applied to pretrial detainees, did not violate the Fourth Amendment. 441 U.S. at 555-559, 99 S.Ct. at 1882-1886. In light of <u>Bell</u>, the Plaintiff has no reasonable expectation to be free from the searches of which he complains.

Finally, with respect to Plaintiff's numerous allegations that his cell was searched in a disruptive manner and his legal materials were left in disarray (<u>see</u> Doc. 1, <u>passim</u>), these claims also fail. Plaintiff has not alleged any "actual injury" as required to state an access to court claim. In <u>Lewis v. Casey</u>, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), the Court held that to pursue a claim of denial of access to the Courts, the inmate must allege actual injury, as opposed to some alleged deficiency in the prison's legal resources. Because Plaintiff has not alleged any injury this claim fails as well.

23

## CONCLUSION

In light of the aforementioned Plaintiff's complaint and supplemental pleadings (Docs. 1,6,8) must be dismissed because Plaintiff failed to state a claim upon which relief can be granted. The dismissal of Plaintiff's complaint and supplemental pleadings (Docs. 1,6,8) and the granting of Defendant's motion to dismiss (Doc. 16) renders Defendant's motion for a protective order (Doc. 18) moot and also renders Plaintiff's two motions, one for appointment of counsel (Doc. 10) and one for leave to file an amended complaint (Doc. 23) moot.[4]

Richard P. Conaboy
United States District Judge

DATE: December __18th__, 2000

---

[4]Note: Plaintiff twice amended his complaint (see Docs. 6, 8).

24

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM CURTIS,                    :
                                   :   CIVIL ACTION NO. 3:00cv1149
        Plaintiff,                 :
                                   :
        vs.                        :
                                   :   (JUDGE CONABOY)
MARTIN F. HORN, et al.,            :
                                   :
        Defendants.                :

ORDER

NOW, this ____18th____ Day of December, 2000, it is hereby

ORDERED that:

1.  Defendant's motion (Doc. 16) to dismiss Plaintiff's

motion and supplemental pleadings is GRANTED.

2.  Plaintiff's complaint and supplemental pleadings (Docs.

1,6,8) are DISMISSED with prejudice.

3.  Plaintiff's motion for appointment of counsel (Doc. 10)

and Plaintiff's motion to file an amended complaint (Doc.

23) as well as Defendant's motion for a protective order

(Doc. 18) are MOOT.

4.  The Clerk of Court is directed to close this case.

FILED
SCRANTON

DEC 18 2000

Richard P. Conaboy
United States District Judge

PER _____CTS_____
        DEPUTY CLERK

25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KIRK RANDLER,                    :
                                 :
          Plaintiff,             :
                                 :      Civil Action No. 3:CV-00-2046
     v.                          :
                                 :
STAN STANISH, et al.,            :
                                 :
          Defendants             :

### CERTIFICATE OF SERVICE

I hereby certify that I am this day depositing in the U.S. mail a true and correct copy of

the foregoing Brief in Support of Defendant Marva Cerullo's Motion to Dismiss Plaintiff's

Complaint upon the person(s) and in the manner indicated below.

Service by first-class mail
addressed as follows:

Kirk Randler, 10003-067          James D. Young, Esquire
FCI-Allenwood                    Lavery, Faherty, Young & Patterson, PC
P.O. Box 2500                    301 Market Street
White Deer, PA 17887             P.O. Box 1245
                                 Harrisburg, PA  17011

Dr. Stan Stanish          Dr. Renato Diaz          Gary Metknowski, P.A.
SCI-Dallas                SCI-Dallas               SCI-Dallas
1000 Follies Road         1000 Follies Road        1000 Follies Road
Dallas, PA  18612-0286    Dallas, PA  18612-0286   Dallas, PA  18612-0286

*Janelle C. Porr*

Janelle C. Porr
Clerk Typist 2

PA Department of Corrections
Office of Chief Counsel
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444

Dated:  March 14, 2001

23
11-28-00
fy

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

GREGORY GARRETT BROWN,            :
                                   :
          Plaintiff,               :
                                   :        CIVIL ACTION NO. 3:00-1158
          vs.                      :
                                   :        (JUDGE NEALON)
MARTIN L. DRAGOVICH, ET AL.,      :                              FILED
                                   :                         SCRANTON
          Defendants               :        ———        NOV 2 8 2000

                          ORDER

DEPUTY CLERK

          Plaintiff, an inmate currently incarcerated at the State Correctional Institute at Camp Hill

(SCI-Camp Hill) in Camp Hill, Pennsylvania, filed the instant civil rights action pursuant to 42

U.S.C. § 1983 on June 28, 2000, alleging poor prison conditions. (Doc 1). A partial filing fee was

paid on July 17, 2000. (Doc.6). Specifically, the complaint alleges threats by prison officials to

murder the Plaintiff in retaliation for exercising his constitutional rights. Plaintiff also filed a motion

for preliminary injunctive relief on July 24, 2000, to which Defendants' filed a brief in opposition on

October 5, 2000. (Docs. 8, 21). Defendants' thereafter filed a motion to dismiss the instant

complaint on September 12, 2000, and Plaintiff filed his response thereto on September 18, 2000.

(Docs. 14, 16).

          On October 27, 2000, United States Magistrate Judge J. Andrew Smyser issued a Report

and Recommendation on this matter. (Doc. 22). Magistrate Judge Smyser recommended that

**EXHIBIT**

**"D"**

Plaintiff's complaint be dismissed, without prejudice, under 42 U.S.C. § 1997 (e)(a), and that

plaintiff's motion for preliminary injunctive relief be denied. While Plaintiff stated that he had

sought redress for his claims through the administrative review, Magistrate Judge Smyser found that

he failed to complete the grievance process available at the prison. He thus determined that

Plaintiff's complaint may also be dismissed for failure to exhaust administrative remedies. Further,

while Plaintiff alleged that he was prohibited from filing grievances, he has not demonstrated an

inability to file an appeal to the Department of Corrections Chief Hearing Examiner for a final

disposition of his claims. Hence, Magistrate Judge Smyser recommended that Plaintiff's request for

preliminary injunctive relief also be denied.

     No objections were filed to the Magistrate Judge's Report and Recommendation. After

careful review and in the exercise of sound judicial discretion, the Court adopts the Magistrate

Judge's Report and Recommendation.


     ACCORDINGLY, THIS 28th DAY OF NOVEMBER, 2000, IT IS HEREBY
ORDERED THAT:

1. The Magistrate Judge's Report and Recommendation (Doc. 22) is adopted;

2. Plaintiff's complaint filed pursuant to 42 U.S.C. § 1983 (Doc.1) is dismissed;

3. The Clerk of Court is directed to close this case; and

4. Any appeal taken from this order will be deemed frivolous, without probable
   cause, and not taken in good faith.

                            United States District Judge

## CERTIFICATE OF SERVICE

I, Linda L. Gustin, an employee with the law firm of Lavery, Faherty, Young & Patterson, P.C., do hereby certify that on this 18th day of June, 2001, I served a true and correct copy of the foregoing APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANT RONALD LONG, M.D.'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE BLEWITT via U.S. First Class mail, postage prepaid, addressed as follows:

Mr. Jason Eric Benson
SCI-SM
#DS-6483
1120 Pike Street
P.O. Box 999
Huntingdon, PA 16652

John R. Kantner, Esquire
Post & Schell, P.C.
240 Grandview Avenue
Camp Hill, PA 17011

David L. Schwalm, Esquire
Thomas, Thomas & Hafer, LLP
305 North Front Street
Harrisburg, PA 17101

Alan Gold, Esquire
Monaghan & Gold
7837 Old York Road
Elkins Park, PA 19027

Linda L. Gustin