ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON E. BENSON                    :        CIVIL ACTION

V.                                 :        NO. 1:CV-00-1229

WILLIAM G. ELLIEN, M.D., et al.    :        (Judge Caldwell)
                                            (Magistrate Judge Blewitt)

FILED
SCRANTON

JUN 2 0 2001

PER _____
DEPUTY CLERK

EXHIBITS OF WILLIAM G. ELLIEN, M.D. IN OPPOSITION TO THE REPORT
AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE BLEWITT

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON E. BENSON,                    :      CIVIL ACTION NO. **1:CV-00-1229**
                                    :
        Plaintiff                   :      (Judge Caldwell)
                                    :
        v.                          :      (Magistrate Judge Blewitt)
                                    :
THOMAS DURAN, et al.,               :
                                    :
        Defendants                  :

**REPORT AND RECOMMENDATION**

FILED
SCRANTON
JUN 4 2001
PER _____
DEPUTY CLERK

    This action is presently proceeding *via* an amended complaint which was filed on

September 11, 2000. (Doc. 18). Named as Defendants are the following: Thomas Duran, Warden;

Bruce Cluck and Debra Hanky, Associate Wardens; John Jennings and William Orth, Lieutenants;

Rae Hientzelman, Sergeant; Briton Shelton and David Vazquez, Correctional Officers; William J.

Steinour, a physician employed at Gettysburg Hospital; Dr. Ronald Long, a physician employed at

the State Correctional Institute at Smithfield; and Dr. William Ellien, a psychiatrist employed at the

State Correctional Institute at Smithfield.   Presently pending are several motions to dismiss the

amended complaint.[1] On October 10, 2000, a motion to dismiss the Plaintiff's amended complaint

was filed on behalf of William Steinour, M.D. **(Doc. 22)**.   Also filed on October 10, 2000, was

a motion to dismiss the Plaintiff's amended complaint which was filed on behalf of Dr. Long.

**(Doc. 21)**. Then, on October 20, 2000, a motion to dismiss the amended complaint was filed on

behalf of William G. Ellien, M.D. **(Doc. 28)**. The motions are ripe for disposition.

_____

1.    An Answer was timely filed on behalf of the Adams County Defendants.

## I. Allegations of the Amended Complaint.

The Plaintiff alleges that on August 25, 1999, he was transferred to the Adams County Prison for the purpose of attending a Post Conviction Relief Act Hearing.   On August 27, 1999, after attending the hearing, he was returned to the Adams County Prison and, upon arrival, was handcuffed behind his back and shackled about the ankles by Defendant Shelton.   Thereafter, the Plaintiff was led into a small room and, in the presence of Defendants Jennings, Duran, Hankey, Hientzelman and John Doe, Defendant Cluck ordered the Plaintiff to strip.   The Plaintiff alleges that he was unable to comply with the order due to the fact that he was handcuffed behind the back and shackled at the ankles.   After refusing the order, the Plaintiff was then, without warning, "shot in the face with O.C. Pepper Foam." (Doc. 18, p. 3).   The Plaintiff was having difficulty breathing and seeing.   He lost his balance and hit his head on a computer monitor.   Defendant Duran then gave the order to take the Plaintiff down.   Plaintiff alleges that Defendants Cluck, Jennings, Hankey, Hientzelman, and Shelton knocked the Plaintiff to the floor, twisted his arms, and kicked and kneed him in his back and side.

The Plaintiff was then thrown into a concrete shower stall, where he was knocked unconscious.   Defendant Duran forcibly removed the Plaintiff from the shower, knocked him to the floor, and stomped his foot into the Plaintiff's neck.   The restraints were then removed and the Plaintiff consented to the strip search.   Thereafter, the Plaintiff requested that he be taken to the Gettsyburg Hospital Emergency Room as there are no medical facilities at the Adams County Prison.

The Plaintiff alleges that Dr. Steinour of the Gettysburg Hospital refused to address the Plaintiff's request for anti-seizure medications as well as his complaint of loss of consciousness.   Dr.

2

Steinour diagnosed the Plaintiff with multiple contusions and released him back to the care of the Adams County Prison.

On or about August 30, 1999, the Plaintiff alleges that Defendants Orth and Vazquez witnessed him in a state of convulsions for 1 ½ hours before transporting him to the Gettsyburg Hospital. Once at Gettysburg, he was immediately admitted to the critical care unit. According to the Plaintiff, the attack was brought on by "a series of pharmacological deviations prescribed by defendant's Dr. Ronald Long and Dr. William Ellien of SCI-Smithfield." (Doc. 18, p. 4). Apparently, in June of 1999, Dr. Long abruptly discontinued the Plaintiff's anti-seizure medication. Subsequently, the Plaintiff questioned both Dr. Long and his psychiatrist, Dr. Ellien, about why the seizure medication was discontinued but was never provided with a satisfactory answer.

It is the Plaintiff's position that "[t]he abrupt discontinuance of Dilantin by defendant Dr. Ronald Long, as well as the prescription anti-depressant Imipramine, in combination with the physical and emotional trauma sustained during the use of excessive force in A.C.P. synergistically caused plaintiff to enter into the aforementioned life threatening "Status Epilepticus" seizures that occurred on August 29, 1999." (Doc. 18, p. 4).

## II. Motions to Dismiss.

### A. Standard.

When evaluating a motion to dismiss, the court must accept all material allegations of the complaint as true and construe all inferences in the light most favorable to the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). A complaint should not be dismissed for failure to state a claim unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim

3

which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 44-46 (1957);  *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988).  A complaint that sets out facts which affirmatively demonstrate that the plaintiff has no right to recover is properly dismissed without leave to amend. *Estelle v. Gamble*, 429 U.S. 97, 107-108 (1976).

      *B.  Motion of Dr. Steinour.*

      In order for the Plaintiff to state a 42 U.S.C. §1983 claim, Plaintiff must first show that this Defendant acted under color of state law.  Action under color of state law requires "that the defendant in a §1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 48 (1988).  The issue is not whether the state was involved in some way in the relevant events, but whether the action taken can be fairly attributed to the state itself.  *Gorman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995).

      "Supreme Court jurisprudence outlines several approaches or discrete tests for detecting the presence of action under color of state law.  The tests have included the exclusive government function approach, the joint participation or symbiotic relationship approach and the nexus approach." *Id*. at 639.  The traditional exclusive governmental function test concerns whether the function performed has been 'traditionally the exclusive prerogative of the State.'" *Klavan v. Crozer-Chester Medical Center*, 60 F. Supp.2d 436, 441, f.n. 5 (E.D. Pa. 1999) *quoting Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982).  "The 'symbiotic relationship' test examines the relationship between the state and the alleged wrongdoer to discern whether there is a great degree of interdependence between the two." *Klavan*, 60 F.Supp.2d at 441.  And, the nexus approach

4

"focuses on the connection between the state and the specific conduct that allegedly violated the plaintiff's civil rights...." *Id*. at 442.

The Plaintiff alleges that on August 27, 1999, "Dr. William J. Steinour, who is familiar with plaintiff's past history of epilepsy, refused to address plaintiff's request for anti-seizure medications, as well as his complaint of losing consciousness, diagnosing the Plaintiff with, 'Multiple contusion' and released plaintiff to the care of A.C.P." (Doc. 18, p. 3 ¶ 6).

The Plaintiff has failed to sustain his burden, in that Defendant, as a physician employed at Gettysburg Hospital, was not acting under color of state authority. "[C]ourts have held that the provision of hospital services is not a traditional public function exclusively reserved to the state." *Klavan*, 60 F. Supp.2d at 441, f.n. 5. There is no indication that 'the State has so far insinuated itself into a position of interdependence with [Dr. Steinour] that it must be recognized as a joint participant in the challenged activity...." Id. at 442. Nor has the Plaintiff demonstrated that there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* Since 42 U.S.C. §1983 provides relief for infringement of civil rights by an individual who acts under color of state law, and does not apply to purely private conduct, Plaintiff is unable to maintain a Section 1983 action against Defendant Steinour. It will therefore be recommended that the motion to dismiss filed on behalf of Defendant Steinour be granted.

C. *Motions to Dismiss of Dr. Long and Dr. Ellien.*

    1.  Failure to exhaust administrative remedies.

Both defendants move to dismiss the complaint, arguing that the Plaintiff has failed to exhaust his administrative remedies.  Prior to initiation of an action such as this, the Plaintiff is required to exhaust his administrative remedies.  42 U.S.C. § 1997e(a).  Section 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).

The Pennsylvania Department of Corrections has a Consolidated Inmate Grievance Review System.  DC-ADM 804 (1994).  After attempted informal resolution of the problem, a written grievance may be submitted to the Grievance Coordinator; an appeal from the Coordinator's decision may be made in writing to the Facility Manager or Community Corrections Regional Director; and a final written appeal may be presented to the Chief Hearing Examiner. DC-ADM 804-2 (1997).

In response to the Defendants' motions to dismiss the complaint, the Plaintiff states that he was initially erroneously informed that it was not necessary to file a grievance.[2]  However, upon

---

2.   The Plaintiff filed two separate responses to the motion to dismiss of Dr. Ellien.  He filed a brief on November 3, 2000 (Doc. 37).  A second brief was filed on January 9, 2001 (Doc. 43). Defendant Ellien then moved to strike the Plaintiff's second response.  That motion was denied by order dated May 1, 2001, (Doc. 52) and Defendant was afforded an opportunity to respond to the Plaintiff's contentions regarding exhaustion of his administrative remedies.  Defendant Ellien availed himself of that opportunity by filing a response to the Plaintiff's second response on May 15, 2001.  (Doc. 54).

becoming aware that it was necessary, he utilized the grievance procedure as required.  For instance, he submits a copy of a grievance that he filed on October 26, 2000, dealing with the issues raised in his complaint, as well as a copy of the grievance officer's summary denying the Plaintiff's grievance. (Doc. 18, Exhibits A and B).  The Plaintiff also represents that he appealed to the Chief Hearing Examiner pursuant to DC-ADM 804 VI. C. 1., but that the Chief Hearing Examiner never responded.   Defendant Ellien takes the position that because the Plaintiff has not submitted proof of his appeals, it should be concluded that the Plaintiff failed to exhaust his administrative remedies and the complaint should be dismissed.  (Doc. 54, p. 3).

In deciding a Motion to Dismiss, the allegations set forth in the Complaint must be accepted as true.  Accordingly, the Plaintiff need only sufficiently allege that he has exhausted his remedies. Defendants' argument is more appropriately considered in the context of a motion for summary judgment.  Since the Plaintiff has sufficiently alleged exhaustion, it will be recommended that the Complaint will not be dismissed for failure to exhaust administrative remedies.

We would note that Dr. Long has only moved to dismiss the complaint on this ground. It will therefore be recommended that the motion filed on behalf of Dr. Long be denied. However, Dr. Ellien has also moved to dismiss the complaint on the grounds that the Plaintiff has failed to allege that he was deliberately indifferent to the serious medical needs of the Plaintiff.  We turn to that issue next.

### 2. Failure to plead deliberate indifference.

"A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825 (1994) *citing Helling v.*

*McKinney*, 509 U.S. 25 (1993); *Wilson v. Seiter*, 501 U.S. 294 (1991); *Estelle v. Gamble*, 429 U.S. 97 (1976).   An inadequate medical care claim, as we have here, requires allegations that the prison official   acted with "deliberate indifference to serious medical needs" of the plaintiff, while a prisoner. *Estelle*, 429 U.S. at 104 (1976); *Unterberg v. Correctional Medical Systems, Inc.*, 799 F. Supp. 490, 494-95 (E.D. Pa. 1992).  The official must know of and disregard an excessive risk to inmate health or safety. *Farmer,* 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*    "The question...is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health.'" *Farmer*, 511 U.S. at 843.

Mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation. *Monmouth County Correctional Institution Inmates v. Lensaro*, 834 F.2d 326 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).  As such, "[a] distinction must be made between a case in which the prisoner claims a complete denial of medical treatment and one where the prisoner has received some medical attention and the dispute is over the adequacy of the treatment." *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988) *citing United States ex. rel. Walker v. Fayette County*, 549 F.2d 573, 575 n.2 (3d Cir. 1979).

As stated above, Dr. Ellien moves to dismiss the complaint on the grounds that the Plaintiff has failed to allege the Dr. Ellien was deliberately indifferent.   However, on page five (5), ¶A6 of the Amended Complaint, the Plaintiff specifically alleges that "[t]he actions of defendant Dr. William Ellien in prescribing the drug Tofranil known to decrease the seizure threshold, with

8

foreknowledge that plaintiff was epileptic and had been abruptly withdrawn from his anti-seizure medications and the seizure risk associated with the withdrawal of said medication and the addition of the drug Tofranil he prescribed constitutes deliberate indifference to the Eighth Amendment of the United States Constitution." Clearly, such allegations are sufficient to state a claim of deliberate indifference to a serious medical need under the Eighth Amendment.  It will therefore be recommended that the motion to dismiss filed on behalf of Dr. Ellien be denied.

## III. Recommendation.

Based on the foregoing, it is respectfully recommended that the Motion to dismiss filed on behalf of Dr. Steinour **(Doc. 22)** be granted.  It is further recommended that the motions to dismiss filed on behalf of Drs. Ellien and Long **(Docs. 21 and 28)** be denied and that the matter be remanded to the undersigned for further proceedings.

**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: June 4, 2001**

9

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON E. BENSON,                         :        CIVIL NO. **1:CV-00-1229**
                                         :
        Plaintiff                        :
                                         :        (Judge Caldwell)
        v.                               :
                                         :        (Magistrate Judge Blewitt)
THOMAS DURAN, et al.,                    :
                                         :
        Defendants                       :

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **June 4, 2001.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within ten (10)
days after being served with a copy thereof.  Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections.  The briefing
requirements set forth in Local Rule 72.2 shall apply.  A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the

magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

**THOMAS M. BLEWITT**
**United States Magistrate Judge**

Dated: June 4, 2001

UNREPORTED/NOT PRECEDENTIAL

## UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

No. 99-1971

---

**LARRY GEISLER,**
Appellant

v.

**STANLEY HOFFMAN, DR.;**
**DONALD T. VAUGHN**

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

---

Argued:  September 12, 2000

---

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed:  September 29, 2000 )

---

MEMORANDUM OPINION OF THE COURT

BARRY, <u>Circuit Judge</u>

Appellant Larry Geisler, a former prisoner at SCI-Graterford, appeals separate orders

of the District Court which granted motions to dismiss his civil rights action against appellees

and arranged to have an inmate file a second grievance on his behalf, he admittedly never went beyond that initial step within the formal appeals process outlined in DC-ADM 804. Moreover, the failure of the prison officials to formally respond in writing to these grievances did not, contrary to Geisler's argument, relieve him of the obligation of exhausting the requisite administrative remedies. DC-ADM 804 does not prohibit prisoners from appealing the failure of prison officials to act on initial grievances and, therefore, Geisler was statutorily constrained to bring his grievances to the next level within the prison grievance scheme before pursuing relief in the judicial forum. And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court. To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively.

In this connection, Geisler cannot be heard to argue that seeking monetary damages in the administrative setting would have been "futile." First of all, DC-ADM 804 made awards of monetary relief available to inmates as of May 1, 1998 – well before Geisler filed his federal complaint in July 26, 1999; if the very relief Geisler sought in the judicial forum was first available to him in the administrative forum, a grievance in that forum could not have been "futile." Second, even if administrative remedies had not been available to Geisler via DC-ADM 804, any attempt to invoke a "futility" exception would be denied in light of

Nyhuis and Booth. See Nyhuis, 204 F.3d at 70-77 (explaining that Congress, via the PLRA, intended for exhaustion to be an unqualified requirement in prisoner civil rights litigation in an attempt to conserve judicial resources and to give deference to and promote the efficacy of administrative processes); Booth 206 F.3d at 300 (same).

In sum, Geisler's complaint fits squarely within the dictates of § 1997e(a), as interpreted by this court in Nyhuis and Booth, that a prisoner exhaust the administrative remedies available to him or her prior to initiating suit in federal court. Because Geisler failed to exhaust the three-tiered administrative appeals process with respect to both (1) his request to have his J tube reimplanted and (2) his current request for monetary damages attributable to the time he was deprived of the J tube, the District Court properly granted Dr. Hoffman's motion to dismiss.

We make, however, one observation. While Nyhuis and Booth compel us to uphold the dismissal of Geisler's complaint for failure to exhaust, we note that exhaustion is a two-way street with obligations on the part of prison officials as well as on the part of the prisoner. In Nyhuis, this Court stated that "applying § 1997e(a) without exception promotes the efficacy of the administrative process itself . . ." Nyhuis, 204 F.3d at 76. We anticipated that under a strict exhaustion requirement "prison grievance procedures will receive enhanced attention and improved administration." Id. While the state's failure to formally respond to Geisler's grievances – and on a motion to dismiss both the filing of the grievances and the failure to respond must be accepted as true – does not constitute a ground for

excusing Geisler from exhausting the administrative appeals process, such failure is wholly inconsistent with the "cooperative ethos . . . between inmate and jailer" which this Court envisioned a strict exhaustion requirement would promote. Id. at 77. In response to the inattention in this case, we issue a simple yet stern reminder: federal courts and prisoners alike depend upon prison officials to take seriously their roles within the relevant administrative grievance scheme. Only prompt attention and formal, guided response to timely prisoner grievances will facilitate the overarching policies of the PLRA.

TO THE CLERK OF THE COURT:

    Kindly file the foregoing Memorandum Opinion.

                                       /s/ Maryanne Trump Barry
                                           Circuit Judge

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

No. 99-1971

---

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

---

Argued: September 12, 2000

---

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

---

JUDGMENT

---

This cause came to be heard on the record from the United States District Court for

the Eastern District of Pennsylvania and was argued on September 12, 2000.

After consideration of all contentions raised by the appellant, it is

ADJUDGED and ORDERED that the judgments of the District Court be and are hereby affirmed.

Costs taxed against appellant.

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

Dated: September 29, 2000

9/13/00

18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jason E. Benson,                    :    CIVIL ACTION NO. 1:CV-00-1229
                Plaintiff           :
                                    :    (Judge Caldwell)
v.                                  :
                                    :    (Magistrate Judge Blewitt)
                                    :
Thomas Duran, et al.,               :                        FILED
                Defendants          :                     SCRANTON

AMENDED COMPLAINT

FILED
SCRANTON

SEP 11 2000

PER _____

DEPUTY CLERK

## PARTIES

1.) The plaintiff, Jason E. Benson, was held at Adams County Prison (hereon A.C.P.) during the events described in this complaint.

2.) Defendant Thomas Duran is the Warden of A.C.P.. He is sued in his individual capacity.

3.) Defendants Bruce Cluck and Debra Hanky are the Deputy Wardens of A.C.P.. They are sued in their individual capacity.

4.) Defendant's John Jennings and William Orth are Lieutenants of the A.C.P.. They are sued in their individual capacity.

5.) Defendant Rae Hientzelman is a Sergeant of the A.C.P.. He is sued in his individual capacity.

6.) Defendant's Briton Shelton and David Vazquez are Correctional Officer's of the A.C.P.. They are sued in their in-dividual capacity.

7.) Doctor William J. Steinour is a physician employed at the Gettysburg Hospital. He is sued in his individual capacity.

8. Dr. Ronald Long, physician, and Dr. William Ellien, psychiatrist, are employed at the State Correctional Institution Smithfield. They are sued in their individual capacities.

Plaintiff retains the right to amend any future Jane/John Doe defendants that becomes available through discovery.

## FACTS

1.) On August 25, 1999, plaintiff, a Pennsylvania State Prisoner, was transferred to the Adams County Prison (hereafter referred to as A.C.P.) for the purpose of attending a Post Con-viction Relief Act Hearing. (See Exhibit "A")

2.) On August 27, 1999, upon plaintiff's return to A.C.P. from the aforementioned hearing, he was released from the Sheriff's restrains. However, A.C.P. Intake Officer, defendant Briton Shelton, recuffed the plaintiff behind his back, and shackled him about the ankles. This not being the usual protocol for returning inmates, plaintiff inquired as to why he was being

**FACTS CONTINUED FROM PAGE 2**

recuffed. Defendant Briton Shelton responded, saying, "Hey, I ain't the one!" At this time defendant Lt. John Jennings appeared, saying, "Bring Shithead in to get naked." Indicating a strip search.

3.) Plaintiff was led to a small room adjacent to the intake area. Plaintiff, handcuffed behind his back and shackled about the ankles, was seated in a chair. Defendant Lt. Jennings exited the room leaving plaintiff alone with defendant Briton Shelton, was docile, and no words were exchanged. Defendant Lt. John Jennings returned with Warden Thomas Duran, Deputy Wardens Bruce Cluck and Debra Hankey, Sergeant Rae Hientzelman, and John Doe, who was carrying a video camera, filming. (See Exhibit "B" - (1), (2), and (3).

4.) At this time, Deputy Warden Bruce Cluck ordered plaintiff to strip. Plaintiff, handcuffed and shackled, unable to comply, refused. Notwithstanding, plaintiff was handcuffed behind his back, and shackled about his ankles posing no threat to the defendant's, without warning was shot in the face with O.C. Pepper Foam. Plaintiff, unable to breath or see, attempted to rid himself of the O.C. Pepper Foam, lost his balance, hitting his head against a computer monitor. At this time, defendant Warden Thomas Duran gave the order to "Takem' down!" Seriously injuring plaintiff, defendants Bruce Cluck, Debra Hankey, John Jennings, Rea Hientzelman, and Briton Shelton knocked plaintiff to the ground, hammering plaintiff's head into the floor, twisting plaintiff's hands beyond normal range of motion, kicking and kneeing plaintiff in his back and side. (See Exhibit "C")

5.) After pleading for several minutes for defendant's to get off of him, defendant's relented, throwing plaintiff into a concrete shower stall, where plaintiff fell unconscious. Defendant Thomas Duran forcefully yanked plaintiff out of the shower stall, taking him to the floor again, where defendant Thomas Duran stomped his foot into the plaintiff's neck. After plaintiff was released from defendant Thomas Duran's foot, and removed of the restraints, plaintiff complied to a strip search. A.C.P. has no medical facilities, thus plaintiff requested to be taken to the Gettysburg Hospital Emergency Room. (See Exhibit "D")

6.) Subsequently, the Gettysburg Hospital Emergency Room physician Dr. William J. Steinour, who is familiar with plaintiff's past history of epilepsy, refused to address plaintiff's request for anti-seizure medications, as well as his complaint of losing consciousness, diagnosing the plaintiff with, "Multiple contusions" and released plaintiff to the care of A.C.P..

- 3 -

**FACTS CONTINUED FROM PAGE 3**

7.) Thereafter, on August 30, 1999, plaintiff was witnessed by defendant's Lt. William Orth and C.O. David Vazquez to be in a state of convulsions, but refused to immediately treat plaintiff until one and one-half (1½) hours later, where they again witnessed plaintiff in a state of serious convulsions, only then calling for the Adams County Sheriff's Department to transport plaintiff to the Gettysburg Hospital. Once plaintiff arrived at the Gettysburg Hospital Emergency Room, he was witnessed by hospital Medical Staff to be in a life threatening state of severe seizures known as "Status Epilepticus," incontinent, and foaming and bleeding from the mouth. Plaintiff was immediately admitted to the Gettysburg Hospital Critical Care Unit with "Imminent Death" orders (See Exhibits "E" (1), (2), (3), and (4)

8.) After further investigation, it was discovered that a series of pharmacological deviations prescribed by defendant's Dr. Ronald Long and Dr. William Ellien of SCI Smithfield precipitated into the aforementioned "Status Epilepticus" attack suffered by plaintiff. (See Exhibit "F"(4))

9.) On June 4, 1999, plaintiff was seen by defendant Dr. Ronald Long. Plaintiff complained that the anti-seizure medication he was on, (a hypantoin derivative called Dilantin) was causing unwanted side effects, and that he wanted to switch back to the anti-seizure medication he was on prior to the Dilantin. Defendant Dr. Ronald Long refused to change the medications, and abruptly discontinued plaintiff's Dilantin, without prescribing any further medications to treat plaintiff's epilepsy disorder. (See Exhibit "G")

10.) On June 15, 1999, plaintiff sent a request to defendant Dr. Ronald Long, asking him to reconsider prescribing an anti-seizure medications of any kind. This request was never responded to. (See Exhibit "H")

11.) On July 24, 1999, plaintiff was seen by defendant Dr. William Ellien, psychiatrist. At this time, plaintiff inquired as to why he wasn't on anti-seizure medications. Defendant Dr. William Ellien, said this wasn't his field of expertise and that I should talk to Defendant Dr. Ronald Long. He then prescribed the anti-depressant drug Imipramine.

12.) The abrupt discontinuance of Dilantin by defendant Dr. Ronald Long, as well as the prescription anti-depressant Imipramine, in combination with the physical and emotional trauma sustained during the use of excessive force in A.C.P. synergistically caused plaintiff to enter into the aforementioned life threatening "Status Epilepticus" seizures that occurred on August 29, 1999. (See Exhibit "I" (1), (2), and Exhibit "F(4)"

## CLAIMS FOR RELIEF

1.) The actions of Warden Thomas Duran, Deputy Warden Bruce Cluck, Deputy Warden Debra Hankey, C.O. Briton Shelton, Lt. John Jennings, Sgt. Rea Heintzelman, and Jane/John Doe in using physical force against the plaintiff without need or provocation, and in failing to intervene to prevent the misuse of force was done maliciously and sadistically, and constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

2.) Defendant's Lt. William Orth, and C.O. Vazquez's failure to provide adequate medical treatment to plaintiff, placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

3.) Adams County Prisons lack of adequately trained medical staff and medical facilities constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

4.) Defendant Dr. William J. Stienour's failure to treat plaintiff as a seizure risk even after plaintiff explained to defendant that he was an epileptic, and not currently on medications, constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

5.) The combined actions of defendant Dr. Ronald Long and Dr. William Ellien in abruptly stopping plaintiff's anti-seizure medication and in prescribing an anti-depressant drug known to lower seizure threshold placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A2: The actions of Lt. Orth and C.O. David Vazquez in ignoring plaintiff while in seizures and post-ictal state constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A3: The actions of Dr. William J. Steinour in refusing to treat plaintiff as a seizure risk, despite plaintiff reminding him that he was epileptic and not currently on anti-seizure medication constitutes deliberate indifference in violation of the

CLAIMS FOR RELIEF
CONTINUED FROM PAGE 5

Eighth Amendment of the United States Constitution.

A5:  The actions of Dr. Ronald Long in abruptly discontinu-
ing plaintiff's anti-seizure medications despite foreknowledge
that such actions would cause severe, life threatening seizures
constitutes deliberate indifference in violation of the Eighth
Amendment of the United States Constitution.

A6:  The actions of defendant Dr. William Ellien in pre-
scribing the drug Tofranil known to decrease the seizure thres-
hold, with foreknowledge that plaintiff was epileptic and had
been abruptly withdrawn from his anti-seizure medications and the
seizure risk associated with the withdrawal of said medications
and the addition of the drug Tofranil he prescribed constitutes
deliberate indifference to the Eighth Amendment of the United
States Constitution.

B-2: $500,000.00 against Dr. Ronald Long and Dr. William
Ellien for abruptly discontinuing plaintiff's anti-seizure medi-
cation and prescribing an anti-depressant seizure antagonist
drug, and causing plaintiff to fall into a life threatening state
of seizures known as "Status Epilepticus," and subsequent hospi-
talization of plaintiff.

# PHYSICIAN'S ORDERS

Exhibit F

Benson JASON

DS6483

9-27-76

SCLSm

Drug Allergies:

NKA

Self-Medication Program ☐ Yes    ☐ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|---|
| 0810 4-28-99 | | ① PPD Test |
| 4-28 | | |
| | | S. CRAIG HOFFMAN PA-C |
| 6/4/99 0915 | A | ① D/c Dilantin |
| 6-4-99 0930 | | RONALD A LONG, M.D. |
| 6-8-99 1515 C | A | ① Cont on seizure clinic |
| | | RAY McMULLEN, PA-C WHS |
| 6-8-99 | | |
| 7-23-99 | | ① ____ PTST FPD O.L.C. 1D    DR. MIGUEL SALOMON M.D. |
| | | per V.O. Dr. M Salomon ____ |
| | | DR. MIGUEL SALOMON M.D. |

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person or party.

PLEASE USE BALL POINT PEN ONLY.

# PHYSICIAN'S ORDERS

Exhibit G

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: Smithfield    C

Drug Allergies:    NKA

Self-Medication Program ☐ Yes    ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS                                    1 |
|---|---|---|
| 7-27-99 | 6 | ① Next appointment in 1 month. |
| 1615 hrs | | ② Ativan 1mg PO q 6 hrs PRN anxiety, attack: |
| | | • max 2 doses/day; • max 10 doses/week; for 1 month |
| | | ③ Begin Imipramine 50mg PO hs daily, through 3 Aug '99 |
| | | ④ On 4 Aug 99 - increase Imipramine to 75mg PO hs, |
| | | daily, through 10 Aug 1999 |
| | | ⑤ On 11 Aug 99 - increase Imipramine to 100mg PO hs, |
| | | daily, for 5 months |
| ✓ | | ⑥ On/about 19 Aug 1999 - obtain Tofranil (Imipramine |
| | | + desipramine) blood level in AM |
| | | a) William G. Oliver MD |
| | | M. Berson Inc 7/27/99 2000 |
| | | Barb Grove, L.P.N. |

Received

JUL 27 1999

SCI-Smithfield
Medical Records Department

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be available to any person

Parke-Davis—Cont.

## COLY-MYCIN® S OTIC

[cŏ″ly-my′cin s ŏ′tĭc]
with Neomycin and Hydrocortisone
(colistin sulfate—neomycin
sulfate—thonzonium
bromide—hydrocortisone acetate
otic suspension)

### DESCRIPTION

Coly-Mycin S Otic with Neomycin and Hydrocortisone (colistin sulfate-neomycin sulfate-thonzonium bromide-hydrocortisone acetate otic suspension) is a sterile aqueous suspension containing in each ml: Colistin base activity, 3 mg (as the sulfate); Neomycin base activity, 3.3 mg (as the sulfate); Hydrocortisone acetate, 10 mg (1%); Thonzonium bromide, 0.5 mg (0.05%); Polysorbate 80, acetic acid, and sodium acetate in a buffered aqueous vehicle. Thimerosal (mercury derivative), 0.002%, added as a preservative. It is a non-viscous liquid, buffered at pH 5, for instillation into the canal of the external ear or direct application to the affected aural skin.

### CLINICAL PHARMACOLOGY

1. Colistin sulfate—an antibiotic with bactericidal action against most gram-negative organisms, notably *Pseudomonas aeruginosa, E. coli.,* and *Klebsiella-Aerobacter.*
2. Neomycin sulfate—a broad-spectrum antibiotic, bactericidal to many pathogens, notably *Staph aureus* and *Proteus sp.*
3. Hydrocortisone acetate—a corticosteroid that controls inflammation, edema, pruritus and other dermal reactions.
4. Thonzonium bromide—a surface-active agent that promotes tissue contact by dispersion and penetration of the cellular debris and exudate.

### INDICATIONS AND USAGE

For the treatment of superficial bacterial infections of the external auditory canal, caused by organisms susceptible to the action of the antibiotics; and for the treatment of infections of mastoidectomy and fenestration cavities, caused by organisms susceptible to the antibiotics.

### CONTRAINDICATIONS

This product is contraindicated in those individuals who have shown hypersensitivity to any of its components, and in herpes simplex, vaccinia and varicella.

### WARNINGS

As with other antibiotic preparations, prolonged treatment may result in overgrowth of nonsusceptible organisms and fungi.

If the infection is not improved after one week, cultures and susceptibility tests should be repeated to verify the identity of the organism and to determine whether therapy should be changed.

Patients who prefer to warm the medication before using should be cautioned against heating the solution above body temperature, in order to avoid loss of potency.

### PRECAUTIONS

**General:** If sensitization or irritation occurs, medication should be discontinued promptly.

This drug should be used with care in cases of perforated eardrum and in longstanding cases of chronic otitis media because of the possibility of ototoxicity caused by neomycin. Treatment should not be continued for longer than ten days.

Allergic cross-reactions may occur which could prevent the use of any or all of the following antibiotics for the treatment of future infections: kanamycin, paromomycin, streptomycin, and possibly gentamicin.

### ADVERSE REACTIONS

Neomycin is a not uncommon cutaneous sensitizer. There are articles in the current literature that indicate an increase in the prevalence of persons sensitive to neomycin.

### DOSAGE AND ADMINISTRATION

The external auditory canal should be thoroughly cleansed and dried with a sterile cotton applicator.

When using the calibrated dropper:

For adults, 5 drops of the suspension should be instilled into the affected ear 3 or 4 times daily. For infants and children, 4 drops are suggested because of the smaller capacity of the ear canal.

This dosage correlates to the 4 drops (for adults) and 3 drops (for children) recommended when using the dropper-bottle container for this product.

The patient should lie with the affected ear upward and then the drops should be instilled. This position should be maintained for 5 minutes to facilitate penetration of the drops into the ear canal. Repeat, if necessary, for the opposite ear.

If preferred, a cotton wick may be inserted into the canal and

4 hours. The wick should be replaced at least once every 24 hours.

### HOW SUPPLIED

Coly-Mycin S Otic is supplied as:
N 0071-3141-31—5-mL bottle with dropper
N 0071-3141-36—10-mL bottle with dropper

Each ml contains: Colistin sulfate equivalent to 3 mg of colistin base, Neomycin sulfate equivalent to 3.3 mg neomycin base, Hydrocortisone acetate 10 mg (1%), Thonzonium bromide 0.5 mg (0.05%), and Polysorbate 80 in an aqueous vehicle buffered with acetic acid and sodium acetate. Thimerosal (mercury derivative) 0.002% added as a preservative.

Shake well before using.

Store at controlled room temperature 15°-30°C (59°-86°F). Stable for 18 months at room temperature; prolonged exposure to higher temperatures should be avoided.

3141G033

Caution—Federal law prohibits dispensing without prescription.

---

## KAPSEALS®
## DILANTIN®

[dĭ-lăn′tĭn″]
(Extended Phenytoin Sodium Capsules, USP)

### DESCRIPTION

Phenytoin Sodium is an antiepileptic drug. Phenytoin sodium is related to the barbiturates in chemical structure, but has a five-membered ring. The chemical name is sodium 5,5-diphenyl-2,4-imidazolidinedione.

Each Dilantin—*Extended Phenytoin Sodium Capsule USP* contains 30 mg or 100 mg phenytoin sodium USP. Also contains lactose, NF; sucrose, NF; talc, USP; and other ingredients. The capsule shell and band contain colloidal silicon dioxide, NF; FD&C red No. 3; gelatin, NF; glyceryl monooleate; sodium lauryl sulfate, NF. The Dilantin 30-mg capsule shell and band also contain citric acid, USP; FD&C blue No. 1; sodium benzoate, NF; titanium dioxide, USP. The Dilantin 100-mg capsule shell and band also contain FD&C yellow No. 6; hydrogen peroxide 3%; polyethylene glycol 200. Product *in vivo* performance is characterized by a slow and extended rate of absorption with peak blood concentrations expected in 4 to 12 hours as contrasted to *Prompt Phenytoin Sodium Capsules* USP with a rapid rate of absorption with peak blood concentration expected in 1½ to 3 hours.

### CLINICAL PHARMACOLOGY

Phenytoin is an antiepileptic drug which can be useful in the treatment of epilepsy. The primary site of action appears to be *the motor cortex* where spread of seizure activity is inhibited. Possibly by promoting sodium efflux from neurons, phenytoin tends to *stabilize* the threshold against hyperexcitability caused by excessive stimulation or environmental changes capable of reducing membrane sodium gradient. This includes the reduction of posttetanic potentiation at synapses. Loss of posttetanic potentiation prevents cortical seizure foci from detonating adjacent cortical areas. Phenytoin reduces the maximal activity of brain stem centers responsible for the tonic phase of tonic-clonic (grand mal) seizures.

The plasma half-life in man after oral administration of phenytoin averages 22 hours, with a range of 7 to 42 hours. Steady-state therapeutic levels are achieved 7 to 10 days after initiation of therapy with recommended doses of 300 mg/day.

When serum level determinations are necessary, they should be obtained at least 5-7 half-lives after treatment initiation, dosage change, or addition or subtraction of another drug to the regimen so that equilibrium or steady-state will have been achieved. Trough levels provide information about clinically effective serum level range and confirm patient compliance and are obtained just prior to the patient's next scheduled dose. Peak levels indicate an individual's threshold for emergence of dose-related side effects and are obtained at the time of expected peak concentration. For Dilantin Kapseals peak serum levels occur 4-12 hours after administration.

Optimum control without clinical signs of toxicity occurs more often with serum levels between 10 and 20 mcg/ml, although some mild cases of tonic-clonic (grand mal) epilepsy may be controlled with lower-serum levels of phenytoin.

In most patients maintained at a steady dosage, stable phenytoin serum levels are achieved. There may be wide interpatient variability in phenytoin serum levels with equivalent dosages. Patients with unusually low levels may be noncompliant or hypermetabolizers of phenytoin. Unusually high levels result from liver disease, congenital enzyme deficiency or drug interactions where result in metabolic interference. The patient with large variations in phenytoin plasma levels, despite standard doses, presents a difficult clinical prob-

free phenytoin levels may be altered in [cut off] tein binding characteristics differ from [cut off] Most of the drug is excreted in the bile [cut off] lites which are then reabsorbed from the [cut off] excreted in the urine. Urinary excretion [cut off] metabolites occurs partly with glomeru[cut off] more importantly, by tubular secretion. [cut off] is hydroxylated in the liver by an enzy[cut off] saturable, small incremental doses may [cut off] stantial increases in serum levels, when d[cut off] per range. The steady-state level may be [cut off] increased, with resultant intoxication, fr[cut off] dosage of 10% or more.

### INDICATIONS AND USAGE

Dilantin is indicated for the control of t[cut off] chomotor (grand mal and temporal lobe) [cut off] vention and treatment of seizures occurring [cut off] ing neurosurgery.

Phenytoin serum level determinations [cut off] for optimal dosage adjustments (see Do[cut off] istration).

### CONTRAINDICATIONS

Phenytoin is contraindicated in those pa[cut off] persensitive to phenytoin or other hydan[cut off]

### WARNINGS

Abrupt withdrawal of phenytoin in epile[cut off] precipitate status epilepticus. When, in the [cut off] clinician, the need for dosage reduction, di[cut off] substitution of alternative antiepileptic me[cut off] this should be done gradually. However, in [cut off] allergic or hypersensitivity reaction, rapi[cut off] alternative therapy may be necessary. In th[cut off] tive therapy should be an antiepileptic dru[cut off] the hydantoin chemical class.

There have been a number of reports sugge[cut off] ship between phenytoin and the developm[cut off] nopathy (local or generalized) including be[cut off] hyperplasia, pseudolymphoma, lymphom[cut off] Disease.

Although a cause and effect relationship ha[cut off] lished, the occurrence of lymphadenopath[cut off] need to differentiate such a condition from [cut off] lymph node pathology. Lymph node involve[cut off] with or without symptoms and signs resembl[cut off] ness eg, fever, rash and liver involvement. [cut off] In all cases of lymphadenopathy, follow-up [cut off] an extended period is indicated and every [cut off] made to achieve seizure control using altern[cut off] tic drugs.

Acute alcoholic intake may increase phenyt[cut off] while chronic alcoholic use may decrease se[cut off] In view of isolated reports associating pheny[cut off] erbation of porphyria, caution should be exe[cut off] this medication in patients suffering from [cut off]

**Usage in Pregnancy:** [cut off]

A number of reports suggests an association [cut off] of antiepileptic drugs by women with epileps[cut off] incidence of birth defects in children born [cut off] Data are more extensive with respect to phe[cut off] nobarbital, but these are also the most comm[cut off] antiepileptic drugs; less systematic or anecd[cut off] gest a possible similar association with the [cut off] antiepileptic drugs.

The reports suggesting a higher incidence of [cut off] children of drug-treated epileptic women cann[cut off] as adequate to prove a definite cause and eff[cut off] There are intrinsic methodologic problems in [cut off] quate data on drug teratogenicity in humans; [cut off] or the epileptic condition itself may be more [cut off] drug therapy in leading to birth defects. The [cut off] of the mothers on antiepileptic medication [cut off] infants. It is important to note that antie[cut off] should not be discontinued in patients in w[cut off] administered to prevent major seizures, bec[cut off] strong possibility of precipitating status ep[cut off] attendant hypoxia and threat to life. In ind[cut off] where the severity and frequency of the seiz[cut off] such that the removal of medication does not [cut off] threat to the patient, discontinuation of the [cut off] considered prior to and during pregnancy, al[cut off] not be said with any confidence that even m[cut off] not pose some hazards to the developing embr[cut off] prescribing physician will wish to weigh [cut off] ations in treating and counseling epilep[cut off] childbearing potential.

In addition to the reports of increased incide[cut off] malformation, such as cleft lip/palate and [cut off] tions in children of women receiving phen[cut off] antiepileptic drugs, there have more recen[cut off] a fetal hydantoin syndrome. This consists of [cut off] deficiency, microcephaly and mental defi[cut off]

Skin rash, petechiae, urticaria, itching, photosensi-... edema (general or of face and tongue); drug fever; ...ivity with desipramine.

...ogic: Bone marrow depression including agranulo-...sinophilia: purpura; thrombocytopenia.

...stinal: Nausea and vomiting, anorexia, epigas-...m, diarrhea; peculiar taste, stomatitis, abdominal ...black tongue.

...ne: Gynecomastia in the male; breast enlargement ...lactorrhea in the female; increased or decreased li-...potence; testicular swelling; elevation or depression ...sugar levels; inappropriate antidiuretic hormone ...cretion syndrome.

...Jaundice (simulating obstructive; altered liver ...weight gain or loss; perspiration; flushing; urinary ...cy; drowsiness, dizziness, weakness and fatigue; ...he; parotid swelling; alopecia; proneness to falling. ...wal Symptoms: Though not indicative of addiction, ...cessation of treatment after prolonged therapy may ...e nausea, headache and malaise.

### ...AND ADMINISTRATION

...up to 100 mg/day intramuscularly in divided doses. ...eral administration should be used only for starting ...in patients unable or unwilling to use oral medica-...e oral form should supplant the injectable as soon as ...

...osages are recommended for elderly patients and ...ts. Lower dosages are also recommended for outpa-...compared to hospitalized patients who will be under ...ervision. Dosage should be initiated at a low level ...reased gradually, noting carefully the clinical re-...d any evidence of intolerance. Following remission, ...ntenance medication may be required for a longer ...of time, at the lowest dose that will maintain ...

### DOSAGE

...have been reported to be more sensitive than adults ...cute overdosage of imipramine hydrochloride. An ...verdose of any amount in infants or young children, ...larly; must be considered serious and potentially fatal. ...cal Symptoms: These may vary in severity depend-...n factors such as the amount of drug absorbed, the ...he patient, and the interval between drug ingestion ...e start of treatment. Blood and urine levels of imipra-...e may not reflect the severity of poisoning; they have ...a qualitative rather than quantitative value, and are ...r indicators in the clinical management of the ...t.

...abnormalities may include drowsiness, stupor, coma, ...restlessness, agitation, hyperactive reflexes, mus-...idity, athetoid and choreiform movements, and ...ns.

...abnormalities may include arrhythmia, tachycar-...evidence of impaired conduction, and signs of con-...failure.

...ory depression, cyanosis, hypotension, shock, vomit-...hyperexia, mydriasis, and diaphoresis may also be ...

... The recommended treatment for overdosage ...cyclic antidepressants may change periodically. ...is it is recommended that the physician contact a ...control center for current information on treatment. ...NS involvement, respiratory depression and car-...arrhythmia can occur suddenly, hospitalization and ...ervation may be necessary, even when the amount ...d is thought to be small or the initial degree of intoxi-...appears slight or moderate. All patients with ECG ...alities should have continuous cardiac monitoring ...ely observed until well after cardiac status has ...ed to normal; relapses may occur after apparent re-...

...scious patient, empty the stomach promptly by lavage. ...conscious patient, secure the airway with a cuffed en-...tube before beginning lavage (do not induce eme-...dmission of activated charcoal slurry may help reduce ...rption of imipramine.

...External stimulation to reduce the tendency to ...re. If anticonvulsants are necessary, diazepam and ...ol may be useful.

...Adequate respiratory exchange. Do not use respira-...imulants.

...should be treated with supportive measures, such as ...asma expansion, intravenous fluids, and, if necessary, a ...nor agent. The use of corticosteroids in shock is con-...versial and may be contraindicated in cases of overdosage ...ic antidepressants. Digitalis may increase conduc-...abnormalities and further irritate an already sensitized ...ium. If congestive heart failure necessitates rapid ...on, particular care must be exercised.

...ion should be controlled by whatever external ...d available, including ice packs and cooling sponge ...ry.

...se of peritoneal dialysis, exchange transfusions ...oresis have been generally reported as ineffec-...

---

... use of the rapid fixation of imipramine in tissues. Blood and urine levels of imipramine may not correlate with the degree of intoxication, and are unreliable indicators in the clinical management of the patient.

The slow intravenous administration of physostigmine salicylate has been used as a last resort to reverse severe CNS anticholinergic manifestations of overdosage with tricyclic antidepressants; however, it should not be used routinely, since it may induce seizures and cholinergic crises.

### HOW SUPPLIED

*Ampuls 2 ml—For intramuscular administration only*
   25 mg imipramine hydrochloride, 2 mg ascorbic acid, 1 mg sodium bisulfite, 1 mg sodium sulfite
   Boxes of 10 ..........................................NDC 0028-0065-23
Store between 59°–86°F (15°–30°C).

*Note:* Upon storage, minute crystals may form in some ampuls. This has no influence on the therapeutic efficacy of the preparation, and the crystals redissolve when the affected ampuls are immersed in hot tap water for 1 minute.

### ANIMAL PHARMACOLOGY & TOXICOLOGY

*A. Acute:* Oral $LD_{50}$ ranges are as follows:
Rat                         355 to 682 mg/kg
Dog                      100 to 215 mg/kg
Depending on the dosage in both species, toxic signs proceeded progressively from depression, irregular respiration and ataxia to convulsions and death.

*B. Reproduction/Teratogenic:* The overall evaluation may be summed up in the following manner:

*Oral:* Independent studies in three species (rat, mouse and rabbit) revealed that when Tofranil is administered orally in doses up to approximately 2½ times the maximum human dose in the first 2 species and up to 25 times the maximum human dose in the third species, the drug is essentially free from teratogenic potential. In the three species studied, only one instance of fetal abnormality occurred (in the rabbit) and in that study there was likewise an abnormality in the control group. However, evidence does exist from the rat studies that some systemic and embryotoxic potential is demonstrable. This is manifested by reduced litter size, a slight increase in the stillborn rate and a reduction in the mean birth weight.

*Parenteral:* In contradistinction to the oral data, Tofranil does exhibit a slight but definite teratogenic potential when administered by the subcutaneous route. Drug effects on both the mother and fetus in the rabbit are manifested in higher resorption rates and decrease in mean fetal birth weights, while teratogenic findings occurred at a level of 5 times the maximum human dose. In the mouse, teratogenicity occurred at 1½ and 6½ times the maximum human dose, but no teratogenic effects were seen at levels 3 times the maximum human dose. Thus, in the mouse, the findings are equivocal.

C91-42 (Rev. 2/92)

Dist. by:
Geigy Pharmaceuticals
Ciba-Geigy Corporation
Ardsley, New York 10502

---

### TOFRANIL®
**[toe-fray'nill]**
imipramine hydrochloride USP
Tablets of 10 mg
Tablets of 25 mg
Tablets of 50 mg
For oral administration

℞

### DESCRIPTION

Tofranil, imipramine hydrochloride USP, the original tricyclic antidepressant, is a member of the dibenzazepine group of compounds. It is designated 5-[3-(Dimethylamino)propyl]-10, 11-dihydro-5H-dibenz[b,f] azepine Monohydrochloride. Imipramine hydrochloride USP is a white to off-white, odorless, or practically odorless crystalline powder. It is freely soluble in water and in alcohol, soluble in acetone, and insoluble in ether and in benzene. Its molecular weight is 316.87.

*Inactive Ingredients.* Calcium phosphate, cellulose compounds, docusate sodium, iron oxides, magnesium stearate, polyethylene glycol, povidone, sodium starch glycolate, sucrose, talc and titanium dioxide.

### CLINICAL PHARMACOLOGY

The mechanism of action of Tofranil is not definitely known. However, it does not act primarily by stimulation of the central nervous system. The clinical effect is hypothesized as being due to potentiation of adrenergic synapses by blocking uptake of norepinephrine at nerve endings. The mode of action of the drug in controlling childhood enuresis is thought to be apart from its antidepressant effect.

### INDICATIONS

*Depression:* For the relief of symptoms of depression. Endogenous depression is more likely to be alleviated than other

---

... states. One to three weeks of treatment may be needed before optimal therapeutic effects are evident.

*Childhood Enuresis:* May be useful as temporary adjunctive therapy in reducing enuresis in children aged 6 years and older, after possible organic causes have been excluded by appropriate tests. In patients having daytime symptoms of frequency and urgency, examination should include voiding cystourethrography and cystoscopy, as necessary. The effectiveness of treatment may decrease with continued drug administration.

### CONTRAINDICATIONS

The concomitant use of monoamine oxidase inhibiting compounds is contraindicated. Hyperpyretic crises or severe convulsive seizures may occur in patients receiving such combinations. The potentiation of adverse effects can be serious, or even fatal. When it is desired to substitute Tofranil in patients receiving a monoamine oxidase inhibitor, as long an interval should elapse as the clinical situation will allow, with a minimum of 14 days. Initial dosage should be low and increases should be gradual and cautiously prescribed.
The drug is contraindicated during the acute recovery period after a myocardial infarction. Patients with a known hypersensitivity to this compound should not be given the drug.
The possibility of cross-sensitivity to other dibenzazepine compounds should be kept in mind.

### WARNINGS

*Children:* A dose of 2.5 mg/kg/day of Tofranil should not be exceeded in childhood. ECG changes of unknown significance have been reported in pediatric patients with doses twice this amount.
Extreme caution should be used when this drug is given to: patients with cardiovascular disease because of the possibility of conduction defects, arrhythmias, congestive heart failure, myocardial infarction, strokes and tachycardia. These patients require cardiac surveillance at all dosage levels of the drug;
patients with increased intraocular pressure, history of urinary retention, or history of narrow-angle glaucoma because of the drug's anticholinergic properties;
hyperthyroid patients or those on thyroid medication because of the possibility of cardiovascular toxicity;
patients with a history of seizure disorder because this drug has been shown to lower the seizure threshold;
patients receiving guanethidine, clonidine, or similar agents, since Tofranil may block the pharmacologic effects of these drugs;
patients receiving methylphenidate hydrochloride. Since methylphenidate hydrochloride may inhibit the metabolism of Tofranil, downward dosage adjustment of imipramine hydrochloride may be required when given concomitantly with methylphenidate hydrochloride.
Tofranil may enhance the CNS depressant effects of alcohol. Therefore, it should be borne in mind that the dangers inherent in a suicide attempt or accidental overdosage with the drug may be increased for the patient who uses excessive amounts of alcohol. (See PRECAUTIONS)
Since Tofranil may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as operating an automobile or machinery, the patient should be cautioned accordingly.

### PRECAUTIONS

An ECG recording should be taken prior to the initiation of larger-than-usual doses of Tofranil and at appropriate intervals thereafter until steady state is achieved. (Patients with any evidence of cardiovascular disease require cardiac surveillance at all dosage levels of the drug. See WARNINGS.)
Elderly patients and patients with cardiac disease or a prior history of cardiac disease are at special risk of developing the cardiac abnormalities associated with the use of Tofranil. It should be kept in mind that the possibility of suicide in seriously depressed patients is inherent in the illness and may persist until significant remission occurs. Such patients should be carefully supervised during the early phase of treatment with Tofranil, and may require hospitalization. Prescriptions should be written for the smallest amount feasible.
Hypomanic or manic episodes may occur, particularly in patients with cyclic disorders. Such reactions may necessitate discontinuation of the drug. If needed, Tofranil may be resumed in lower dosage when these episodes are relieved. Administration of a tranquilizer may be useful in controlling such episodes.
An activation of the psychosis may occasionally be observed in schizophrenic patients and may require reduction of dosage and the addition of a phenothiazine.
Concurrent administration of Tofranil with electroshock therapy may increase the hazards; such treatment should be

*Continued on next page*

The full prescribing information for each Geigy product is contained herein and is that in effect as of September 1, 1993.

Exhibit A
1

1. IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA

2. Criminal

3. Commonwealth

4.     vs.                              CC-510-98

5. Jason Eric Benson

6. **ORDER OF COURT**

7.        AND NOW, this 27th day of August, 1999, the

8. Defendant appeared with counsel.  Counsel has indicated that

9. she has filed an amended PCRA petition, which raises one

10. issue which is legal in nature.  The argument is that the

11. Court is without power to impose two separate sentences on

12. count five and six in that there should have been only one

13. conspiracy.

14.        IT IS ORDERED that a transcript be prepared of the

15. proceedings that occurred on August 4, 1998 and filed of

16. record.  Copies will be provided counsel at the initial cost

17. of the County of Adams.

18.        Argument is scheduled for November 30, 1999 at

19. 9:00 a.m.  PCRA counsel shall file her brief by

20. November 9, 1998, and the Commonwealth shall file its brief

21. by November 17, 1999.

22.                              By the Court,

23.

24.                              _____
                               Oscar F. Spicer
25. Michael A. George, Esq., DA   President Judge
    Kristen L. Rice, Esq.



# ADAMS COUNTY PRISON
## GETTYSBURG, PA
### INMATE REQUEST SLIP

Exhibit B

INMATE: _____
INMATE ID# JASON E BENSON        BLOCK / CELL#: _____
                                 DATE: A 09
                                 08.26.99

REQUEST TO SEE: (CIRCLE ONE) WARDEN – DEPUTY WARDEN – SHIFT SUPERVISION – BLOCK OFFICER - MENTAL HEALTH – DOCTOR – LAWYER – PAROLE OFFICER – PENNSYLVANIA PRISON SOCIETY

REASON FOR REQUEST: _____
Last night I was not given my Delantin, a _____
meds that I must take. It is a life containing medication. Please ____
to be given to all ____

DATE RECEIVED: _____
ACTION TAKEN: _____    RECEIVED BY: _____
_____
_____
_____


# ADAMS COUNTY PRISON
## GETTYSBURG, PA
### INMATE REQUEST SLIP

INMATE: Jason E Benson _____   BLOCK / CELL#: _____
INMATE ID#: _____       DATE: 08-27-99

REQUEST TO SEE: (CIRCLE ONE) WARDEN – DEPUTY WARDEN – SHIFT SUPERVISION – BLOCK OFFICER - MENTAL HEALTH – DOCTOR – LAWYER – PAROLE OFFICER – PENNSYLVANIA PRISON SOCIETY

REASON FOR REQUEST: I have not received my Delantin, and _____ _____
I must have my medication, it is an anti-seizure drug. I have been _____
over since early this afternoon since the meds. PLEASE GET ME MY _____
MEDS!

DATE RECEIVED: _____    RECEIVED BY: _____
ACTION TAKEN: _____
_____
_____
_____

Exhibit "C, page 1

ACPF #36

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _Benson, Jason_     ACP# _99-00740_ DATE _8/27/99_

HOUSING AREA _A-Block_     LOCATION OF INCIDENT _Intake_

TIME: _1120_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) On above time & date I, Sgt Heintzl was asked to help with Inmate Benson, Jason at intake. Inmate Benson, Jason didn't want to strip after court.

Action and Comments: _Taken to Gettysburg E.R. 1120 for evaluation. As a result of the D.L. And the inmates request A.S.P. notified & foss criminal charges for aggravated assult by a prisoner. Event was video tape_

Shift Commander
Signature and I.D. No.: _____ _60_ Date and Time _8-27-99 1600_

Print Name _Lt. Trostle_

Report of Incident: On above time & date I, Sgt Heintzl was asked to help with Inmate Benson, Jason in the Intake area Inmate Benson was being a problem that he didn't want to be strip after coming back from court. He was asked to strip but he refused to do so. At that time he was sprayed & then he stated to hit his head on the computer screen. after this he wouldn't stop so he was taken to the floor until he had enough & then he was placed in the shower.

(over for continuation)

Officer Signature
I.D. No: _Sgt Heintzl 61-4_     Date and Time _8/27/99 1300_

Print Name _Heintzelman_

Exhibit C   ACPF #36
page 2

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME **Benson, Jason**                ACP# **99-00740**  DATE **8/27/99**

HOUSING AREA **A-Block**             LOCATION OF INCIDENT **Medical Office,**

TIME: **1145 hrs**

Brief Summary of Incident:
(Include Staff and Inmate Names and Number)  **Use of force**

Action and Comments: **Inmate showered, transferred to E-Block and transported to ER and examined by the on-duty physician.**
**PSP notified to press charges.**
**\* Incident was video documented**

Shift Commander
Signature and I.D. No.: *B.A. Cluck*                    Date and Time **8/27/99  1500 hrs**

Print Name **B.A. Cluck**

Report of Incident: **On the above time and date I was informed by Lt. Jennings that the aforementioned inmate was refusing to submit to a strip-search upon returning from court. I attempted to speak w/ Inmate Benson about his actions but he only began yelling profanities and making comments like, "Fuck this! This is fucking Bullshit! I'm not stripping!" He was again asked to cooperate and submit to a search and he again refused. At that point, Lt. Jennings sprayed a one second burst of OC spray (Foam) into Benson face. Benson then began calling staff present, "fucking animals," "cock suckers"**

(over for continuation)

Staff Signature
and I.D. No: *B.A. Cluck 2*                    Date and Time **8/27/99  1500 hrs**

Print Name **B.A. Cluck**

SP 7-007 (3-94)

# PENNSYLVANIA STATE POLICE
## PROPERTY RECORD

**4. STATUS** ☒ EVIDENCE ☐ FOUND ☐ RECOVERED ☐ RECEIPT ☐ OTHER

**5. OFFENSE**

**6. STATION / DISTRICT OFFICE**

**7. SUBMITTING OFFICER** / BADGE NO. / **8. RECEIVING OFFICER** / BADGE NO. / **9. DATE** / TIME

**10. INVESTIGATING OFFICER** / BADGE NO.

**11. SIGNATURE OF RECEIVING OFFICER**

**12. FOUND OR RECOVERED FROM/SIGNATURE** / ADDRESS / TELEPHONE NO. / LOCATION / **13. DATE** / TIME

**14. CODES:**

**STORAGE AREA**
1. PROPERTY ROOM
2. SAFETY DEPOSIT BOX
3. EXPLOSIVE MAGAZINE
4. NON-DEPARTMENT

**DISPOSITION**
1. DESTROYED
2. ESCHEATABLE
3. EXPENDED IN LABORATORY
4. RELEASED TO OWNER/FINDER
5. DONATED

**REMOVAL CODE**
1. CUSTODY
2. COURT
3. LABORATORY
4. OTHER

| 15. PROPERTY | 22. IN / OUT | 23. DATE & TIME | 24. ITEM(S) NO. | ITEMS - (ONE ITEM PER LINE) 25. OFFICER'S SIGNATURE - BADGE NO. | 26. CUSTODIAL OFFICERS/INIT./BADGE NO. | 16. TYPE PROPERTY | 17. CODE | 18. QUANTITY | 27. REMOVAL CODE & LOCATION | 19. VALUE | 20. STORAGE AREA CODE | 21. DISPOSITION CODE | 28. ESTIMATED DATE OF RETURN | 29. COMPUTER ENTRY |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | 27 | 01 | 1 | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |

**30.** I HEREBY CERTIFY THAT I AM THE OWNER OF PROPERTY OR AUTHORIZED AGENT TO RECEIVE ITEM(S) NO. _____

**31. CLAIMANT'S NAME**

**32. CLAIMANT'S SIGNATURE**

OWNER'S NAME / OWNER'S SIGNATURE / ADDRESS / TELEPHONE NO.

**3. DESIGNATION/DIVISION/UNIT**

**2. INCIDENT NO.**

☐ PROPERTY RECORD CONTINUATION

Exhibit C, page 3

ACPF #36

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _BENSON, JASON_ ACP# _990740_ DATE _8/27/99_

HOUSING AREA _E-2_ LOCATION OF INCIDENT _MEDICAL ROOM_

TIME: _APP. 11:10_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _FORCE USED ON INMATE BENSON, JASON (990740). WARDEN DURAN, DEPUTY WARDENS CLUCK AND HANKEY, LT. JENNINGS, SGT. HEINTZELMAN, OFFICER SHELTON_

Action and Comments: _TAKEN TO E.R. @ 1310 FOR MEDICAL ATTENTION AS A RESULT OF O.I.C. AND INMATE'S REQUEST. DSP NOTIFIED TO FILE CRIMINAL CHARGES FOR AGGRAVATED ASSAULT BY PRISONER. ENTIRE EVENT WAS VIDEO-TAPED._

Shift Commander
Signature and I.D. No.: _647_ Date and Time _8-27-99 NEW_

Print Name _Lt. Jones_

Report of Incident: _ON THE ABOVE DATE & APP. TIME, LT. JENNINGS INFORMED ME THAT INMATE BENSON UPON HIS RETURN FROM COURT WAS REFUSING TO BE STRIP-SEARCHED. I REPORTED TO THE LT'S OFFICE AND MET LT. JENNINGS WHO BRIEFED ME ON WHAT HAD TRANSPIRED THIS FAR. A PLAN WAS DEVISED AND WE REPORTED TO THE MEDICAL ROOM, WHERE DEPUTY WARDEN_

(over for continuation)

Staff Signature
and I.D. No: _#1_ Date and Time _8/27/99 3:10 PM_

Print Name _DURAN_



*Exhibit 'E'*

# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

**NAME:**  BENSON, JASON E                    **DATE OF VISIT:** 08/27/1999
**MR:**   177556

**HISTORY:** This 22 year old presents to the Emergency Department in handcuffs and ankle cuffs for evaluation of injuries sustained in a "scuffle" with the prison guards  The patient states that he was "man handled" by the prison guards, was taken down, and felt like he was being kicked, although he was maced at the time and couldn't really see how he was being taken down  He complains of numbness in his knuckles, pain in his back and chest, and in the back of his head  His last tetanus booster was about a month ago

**MEDICATIONS** Ativan once daily  Had a dose earlier this morning  Feels stressed out right now and wants more Ativan

**PHYSICAL:** The patient is awake, alert, appears in no acute or severe distress although he appears apprehensive  He is afebrile  Blood pressure is 132/90, pulse 92, respirations 20 and not labored

|   |   |
|---|---|
| HEENT | Reveals superficial contusion of the right frontotemporal scalp  No other scalp injury is noted  He has conjunctival injection  Tympanic membranes are normal  Pupils are equal and react normally  EOM's intact  There is no facial asymmetry  Speech is normal  There is no tenderness of his neck  There is no apparent pain with neck motion  He has tenderness to palpation of the paraspinous lumbar muscles  He has point tenderness over the right inferolateral thorax  He has no pain in that area with AP compression of his chest  There is no crepitus noted |
| LUNGS | Clear and equal and he is breathing deeply and ventilating well |
| ABDOMEN | Soft and nontender |
| EXTREMITIES | Lower extremity exam is normal  Exam of the upper extremity reveals a few superficial handcuff type contusions of the skin  His neuro exam to the upper extremities is normal  Capillary refill is intact  Sensation and color is normal |

**TREATMENT/PLAN:** The patient is given 1 mg of Ativan by mouth, released in the care of the prison guards, and is to follow with Dr Posner  He is to be given Tylenol as needed for discomfort

**IMPRESSION:** Multiple contusions

WJS dh
DD 08/27/1999 DT 08/27/1999 14 17                    SIGNED BY   WILLIAM J STEINOUR, MD

MR164 11/91                    EMERGENCY DEPARTMENT REPORT



Exhibit

# THE GETTYSBURG HOSPITAL

## EMERGENCY DEPARTMENT REPORT

**NAME:**    BENSON, JASON E
**MR:**       177556

I plan to speak to the next doctor up for unassigned admission about this patient   With three seizures in a short period of time, I feel that he should be admitted to the hospital for more close observation

**IMPRESSION:**  Multiple seizures

TWH dli
DD  08/30/1999 DT  09/01/1999 11 34                SIGNED BY   TIMOTHY W HOLLAND, MD

9/2/99





Exhibit F
Page 1

# THE GETTYSBURG HOSPITAL

## EMERGENCY DEPARTMENT REPORT

NAME:     BENSON, JASON E
MR:       177556

DATE OF VISIT: 08/30/1999

8-31 D

CHIEF COMPLAINT  Seizure

**HISTORY:** The sheriff that transported this patient from prison says he was told that this patient had a small seizure about an hour and a half ago and then a larger one more recently that prompted the decision to transport this gentleman to the Emergency Department  He was noted to be bleeding from his mouth following the second seizure  He was apparently transported to the Emergency Department in the police cruiser in a conscious condition but shortly after arriving here, had another seizure which occurred in our parking lot area  This was observed by paramedic staff and was observed to be significant  When I went out to the parking lot area, he was noted to be apparently post ictal with bloody mucous coming from his mouth  His respirations were somewhat labored  He was transported into the Emergency Department for further evaluation

PAST MEDICAL HISTORY  Positive for seizures in the past.  He has been worked up with neurology consults, numerous CT's and I believe EEG  It is believed he has a seizure disorder although he apparently had seizures prompted or precipitated by his multi drug use which includes cocaine, marijuana, and ecstasy  He was seen here a couple of days ago by Dr Steinour for injuries related to a scuffle with prison guards  He apparently was maced at that point but was treated and released with a diagnosis of multiple contusions

MEDICATIONS   Faxed to us from prison are Serzone, Ativan p r n and Imipramine  He apparently is on no anticonvulsants

**PHYSICAL:** On arrival in the Emergency Department the patient is pale, diaphoretic, unresponsive with somewhat snoring respirations.  O2 saturation initially was about 88% range  He was somewhat resistant to maintaining oxygen mask on his face but as he became more lucid he became calmer and his O2 saturation improved into the high 90's  Within the period of 15 minutes or so in our department, he was able to look towards me in response to his name being called and able to follow simple commands such as opening his mouth

| | |
|---|---|
| HEENT | He has a little minor ecchymosis in his left postauricular area  Pupils are equal  TM's, nares unremarkable  Exam of his mouth I believe shows an abrasion of the right lateral tongue |
| NECK | Appears to be supple |
| LUNGS | Clear anteriorly |
| HEART | Regular rhythm |
| ABDOMEN | Soft . |
| EXTREMITIES | He was initially wearing handcuffs but was switched to leg shackles by the sheriff that brought him in  He seems to have movement in all his arms and legs |

**TREATMENT/PLAN:** Since this seizure witnessed by us in the Emergency Department was his third in a short period of time, he was given a loading dose of Dilantin 1 gram IV  Blood work has been drawn which shows a white count of 17 6 with a normal H&H and platelet count  Chem panel 2 is pending

MR164 11/91              EMERGENCY DEPARTMENT REPORT



# THE GETTYSBURG HOSPITAL

## CONSULTATION REPORT

0300410351   17-75-56

NAME   JASON   BENSON

DATE AND TIME OF REQUEST  30AUG99   0900

PERSON, JASON E
KAHSLER, DAVID F MD
C2C7A 09/27/1976 22Y   M

TO DOCTOR   DR MESSER

OPINION ONLY ☑    TREAT AND FOLLOW ☑

mu  09
9/10/99

**REASON FOR CONSULTATION:**

RECURRENT  SEIZURES

REQUESTING PHYSICIAN:  DR KAHSLER

| DATE | TIME | SIGNATURE | PERSON NOTIFIED OF REQUEST |
|------|------|-----------|----------------------------|
| 30AUG99 | 0910 | D——Cree | DEB |

REPORT OF CONSULTATION (Findings, Diagnosis, Recommendations)

22Y.O WM WITH H/O EPILEPSY  30/99
SINCE 12 Y.O. P.H. OF "PETIT MAL" (PROBABLY COMPLEX-PARTIAL
SEIZURES) + GENERALIZED. EEG'S 3/89 + 4/90 → ① TEMPORAL
FOCUS  EEG 8/97 ⊖ ② AM FOR SEIZURES 2° TO PT.
DIC OF DILANTIN + DRUG USE.   C/O MIGRAINE
Rx SERZONE, ATIVAN, IMIPRAMINE PTA FROM CO-PRISON. Rx
(V. DILANTIN + GM.   LAB X BUT ↑WBC ↓CO₂, C/W POST-
ICTAL STATE.  HAD TH SZ THIS AM  0440 → ONSET
IN SLEEP  DKED DILANTIN X 4 MOS

EXAM: NECK SUPPLE.  M.S. - ALERT + ORIENTED, NO APHASIA
MEMORY OK   CN - VIS FLDS ✓ FUNDUS ✓ NO PAPILLEDEMA
PERRL, EOM - FRANK SZ ✓ ⊕ H.S NYSTAGMUS IN ALL DIRECTION
(C/W DILANTIN LOAD.)  HEAR ✓  TONGUE ✓  MOTOR -
NO DRIFT  POWER  R=L   TONE ✓  SENS ✓
DTR'S  1-2+ R=L   TOES ↑↑
EEG TODAY → ① DISCHARGE

IMP ① SEIZURE DISORDER. ② STATUS EPILEPTICUS @ AM
      2° TO DIC OF DILANTIN ± EFFECTS OF OTHER
      DRUGS ON SEIZURE THRESHOLD

SUGGEST — ✓ DILANTIN LEVEL IN AM   IF >10 BUT <20
      Rx 200 MG PO BID.  OR PREVIOUS DOSE KNOWN TO BE
      EFFECTIVE

SIGNATURE OF CONSULTANT

## CONSULTATION REPORT

MR19 1/99



*Exhibit F, page 3*

# THE GETTYSBURG HOSPITAL

## CRITICAL CARE UNIT
## BASIC ANTI-ARRHYTHMIA THERAPY

```
0300410351   17-75-56

BENSON, JASON E
KAMSLER, DAVID F MD
E2C7A 09/27/1976 22Y   M
```

Registered Nurses in the Critical Care Unit are authorized to act immediately in the following life threatening situations with the following medications after a reasonable diagnosis has been made and while the physician is being called

**1**  **Death Imminent**  Patient unconscious

a   Ventricular Fibrillation /Pulseless Ventricular Tachycardia
CPR   Defibrillate with 200 watt seconds *  If no conversion call Code Blue, defibrillate with 300 watt seconds  If no conversion, defibrillate with 360 watt seconds   If still no response, give Epinephrine 1 10,000 1mg IV PUSH, defibrillate with 360 watt seconds   Give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 360 watt seconds  Follow with Lidocaine drip of 250 D₅W with Lidocaine 1 gram at 2mg/minute  Follow Code Blue Procedure

b   Ventricular Tachycardia  (with palpable pulse)
Defibrillate with 100 watt seconds   If no response, defibrillate with 200 watt seconds  If no response, call Code Blue, defibrillate with 300 watt seconds   If no response, give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 300 watt seconds  Follow with Lidocaine drip at 250cc D₅W with Lidocaine gram 1 at 2mg/minute  Follow Code Blue Procedure

c   Severe Bradycardia (rate less than 30)
Atropine 1.0mg IV PUSH   May repeat Atropine q. 3 - 5 minutes for total 2mg   Consider CPR   Prepare patient for transcutaneous pacing

d   Asystole
CPR  Call Code Blue  Give Epinephrine 1 10,000 1mg IV PUSH  CPR  Give Atropine 1mg IV PUSH
Follow Code Blue Procedure

**2**  **Life Threatening.**  Patient still conscious but symptomatic  If physician is not immediately available then

a   Ventricular Tachycardia (3 or more PVCs in sequence)
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100mg per bolus)
Lidocaine drip at 2mg/minute

b   PVCs 6 or more a minute, multi-focal in nature, coupling or occurring of T wave
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100 mg per bolus)
Lidocaine drip at 2mg/minute

c   Bradycardia  Rate less than 40 or 50 a minute and patient symptomatic  (Consciousness altered or blood pressure dropped)
Atropine  5mg IV PUSH   If rate further drops, follow immediately with second dose of 5mg IV PUSH   If rate does not significantly increase in 2 to 5 minutes, give additional  5mg IV PUSH   Prepare patient for transcutaneous pacing

# ⚜️ **Monaghan & Gold** P.C.
### ATTORNEYS AT LAW

Alan S. Gold
John F. X. Monaghan, Jr.
Alexander R. Ferrante
Robert F. Fortin
Murray R. Glickman
Kenneth W. Taylor
Tanya M. Sweet
Francis D. Hennessy
Sean Robins*
Eric B. Greenberg*
Leslie L. Gallagher*
*Also member of New Jersey bar

MANOR PROFESSIONAL BUILDING
7837 Old York Road
Elkins Park, PA 19027
(215) 782-1800
FAX (215) 782-1010

Of Counsel
Barbara Malett Weitz
Alan L. Butkovitz
Steven M. Zelitch

March 28, 2001

RECEIVED
SCRANTON

MAR 2 9 2001

PER _____
DEPUTY CLERK

**VIA UPS - NEXT DAY AIR**

Clerk of Court
United States District Court
Middle District of Pennsylvania
William J. Nealon Federal Building
 & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA   18501

> Re:    **Jason E. Benson v. William G. Ellien, M.D., et al.**
> **U.S.D.C., Middle Dist. of PA, No. 1:CV-00-1229**
> **Our File No.:  076-1441**

Dear Sir/Madam:

Enclosed please find our check in the amount of $10.50 for a copy of Plaintiff's **Amended Complaint** in the above-captioned case.  I have enclosed a UPS - Next Day Air envelope for your convenience.

If you should have any questions, please do not hesitate to contact me.  Your courtesy with regard to the above is appreciated.

Very truly yours,

SEAN ROBINS

SR:js
Enclosures



**POLICY STATEMENT**

**Commonwealth of Pennsylvania ● Department of Corrections**

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Consolidated Inmate Grievance Review System** | | **DC-ADM 804** |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| July 20, 1994 | Joseph D. Lehman, Commissioner | Oct. 20, 1994 |

## I.  AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II.  PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III.  APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV.  DEFINITIONS

A.  Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B.  Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Manager or Community Corrections Regional Director, the Grievance Coordinator may be called upon to provide Initial Review of certain grievances.

DC-ADM 804

C. Grievance Officer -

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit.  If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D. Central Office Review Committee (CORC) -

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E. Central Office Medical Review Committee (COMRC) -

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff.  The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F. Initial Review -

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E). All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G. Appeal from Initial Review -

The first level of appeal of a decision rendered at Initial Review.  This appeal is directed to the Facility Manager or Community Corrections Regional Director.

An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

Only issues raised at Initial Review shall be appealed.

H. Final Review -

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (CORC), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

V. POLICY

A. It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure - the Consolidated Inmate Grievance Review System - through which the resolution of problems or other issues of concern arising during the course of confinement may be sought.  For every such issue there shall be a forum for

DC-ADM 804

B. Informal Resolution of Problems -  All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review. See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. A Grievance shall be submitted to the Grievance Coordinator in the following manner.

1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1). See Section V., B.

2. All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal.   The inmate grievant must sign the grievance or appeal.

4. All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance.  The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review.  Any inmate who submits  a  grievance containing false and malicious information may be subject to

DC-ADM 804

5.  Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

   **NOTE:**   At any point in the grievance process, the inmate has the right to withdraw the grievance.

B.  Initial Review

1.  Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2.  Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3.  The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4.  Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

   The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C.  Appeal from Initial Review

1.  An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

   All other appeals will be submitted as follows.

2.  An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. **The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.**

3.  All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4.  The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

DC-ADM 804

D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

   a. Medical Grievances which will be reviewed by COMRC.

   b. Requests for Final Review of appeals from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further reviews.

The address of the CORC/COMRC is:

> **PA DEPARTMENT OF CORRECTIONS**
> **CENTRAL OFFICE REVIEW COMMITTEE**
> **PO BOX 598/2520 LISBURN ROAD**
> **CAMP HILL, PA  17001-0598**

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal.  The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.  The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

E. Exceptions

Initial Review and Appeal  from Initial Review of  issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805 - Policy & Procedures for Obtaining Pre-Release Transfer.

2. DC ADM 801 - Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I

3. DC ADM 802 - Administrative Custody Procedures. See DC-ADM 802, VI, B, 1,2. Appeal from

DC-ADM 804

4.  DC-ADM 814 - Incoming Publications

See 814-IIIB, Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F.  Admissions and Review

1.  All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

2.  No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G.  Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII.  SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX.  SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References:  DC-ADM 801, DC-ADM 802

ACA Cross-References:  3-4271

cc:  Executive Deputy Commissioner Reid
Deputy Commissioner Clymer
Deputy Commissioner Fulcomer
Acting Deputy Commissioner Beard
All Superintendents
CCC Directors (4)
File

Joseph D. Lehman,
Commissioner



**Bulletin**

**Commonwealth of Pennsylvania ● Department of Corrections**

| To: | Policy Subject: |
|---|---|
| **Superintendents** | **DC-ADM 804** |
| **Boot Camp Commander** | **CONSOLIDATED INMATE GRIEVANCE** |
| **Regional Directors** | **REVIEW SYSTEM** |
| **Executive Staff** | |

**Policy Number:   DC-ADM 804-1**

**Policy Issue Date:   July 20, 1994**

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 2, 1996 | *Martin F. Ho* | May 20, 1996 |

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC). .

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued:**

**IV.E.:**   Definition of COMRC

**IV.G.:**   "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

**V.D.:**   "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."



**Bulletin**
**Commonwealth of Pennsylvania • Department of Corrections**

| | |
|---|---|
| **To:** Executive Staff<br>Superintendents<br>Regional Directors | **Policy Subject:** Consolidated Inmate<br>Grievance Review System |
| | **Policy Number:** DC-ADM 804-2 |
| | **Policy Issue Date:** July 20, 1994 |
| **Date of Issue:**<br>October 1, 1997 | **Authority:** _Martin + AV_ | **Effective Date:**<br>November 1, 1997 |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1)    The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2)    In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3)    The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4)    Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5)    In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6)    The Chief Hearing Examiner will be responsible for assuring that:

(a)    appeals to final review are responded to in a timely fashion;
(b)    records pertaining to such appeals are maintained properly; and
(c)    counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the ICU vs Shapp Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of all appeals properly raised to final review. These amendments have been established to ensure timeliness



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff | Policy Subject: | Consolidated Inmate Grievance Review System |
|---|---|---|---|

Superintendents
Regional Directors
Boot Camp Commander

**Policy Number:** DC-ADM 804-3

**Policy Issue Date:** July 20, 1994

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| October 21, 1997 | *Martin & Horn* | November 1, 1997 |

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner.

> Chief Hearing Examiner
> 1451 S. Market Street
> Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Policy Subject: |
|---|---|
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |
| | **Policy Number:** DC-ADM 804-4 |
| | **Policy Issue Date:** July 20, 1994 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read,

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right."

*opinion footer*

Not Reported in F.Supp.
(Cite as: 1997 WL 43015 (E.D.Pa.))

Page 1

Bilal A. MUHAMM. Plaintiff,
v.
Dr. Arnold SCHWARTZ, Di ..n Roeder and
Dr. Josey Malabranch, Defendants.

Civil Action No. 96-CV-6027.

United States District Court, E.D. Pennsylvania.

Jan. 27, 1997.

Bilal A. Muhammad, Graterford, PA, Pro Se.

Alan S. Gold, Monaghan & Gold, P.C., Elkins Park, PA, for Defendants.

MEMORANDUM AND ORDER

VAN ANTWERPEN, District Judge.

I. INTRODUCTION

*1 On August 29, 1996 Plaintiff Bilal A. Muhammad filed a complaint against Dr. Arnold Schwartz, Dr. John Roeder, and Dr. Josey Malabranch pursuant to 42 U.S.C. § 1983 alleging cruel and unusual punishment via deliberate indifference to his medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution. Mr. Muhammad also asserts a Pennsylvania state law claim of medical malpractice. This court has jurisdiction via § 1983, and through our assertion of pendent jurisdiction over the state law claim per 28 U.S.C. § 1367.

In their instant motion, Dr. Schwartz and Dr. Roeder request that the action against them be dismissed for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dr. Malabranch was never properly served; the complaint against her is therefore dismissed without prejudice. The issue before us consists solely of whether Mr. Muhammad alleged sufficient facts within his complaint to support his § 1983 action against Dr. Schwartz and Dr. Roeder.

II. DISCUSSION
A. Failure to State a Claim

Pursuant to Federal Rule of Civil Procedure 12(b)(6), this court must dismiss a complaint if it fails to state a claim upon which relief can be granted. A complaint should not be dismissed for failure to state a claim unless the plaintiff has alleged no set of facts in support of his claim which would entitle him to relief. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Haines v. Kerner, 404 U.S. 519, 520 (1972). This court's inquiry is essentially limited to the content of the complaint. Biesenbach v. Guenther, 588 F.2d 400, 402 (3d Cir.1978). All allegations in the complaint and all reasonable inferences that can be drawn therefrom must be accepted as true and viewed in the light most favorable to the non-moving party. Nami v. Fauver, 82 F.3d 63, 65 (3d Cir.1996); Holder v. City of Allentown, 987 F.2d 188, 194 (3d Cir.1993). However, "we are not required to accept legal conclusions either alleged or inferred from the pleaded facts." Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir.1993). Further, if "the facts alleged in the complaint, even if true, fail to support the ... claim," we must dismiss the complaint. Id. (citing Ransom v. Marrazzo, 848 F.2d 398, 401 (3d Cir.1988). In a Section 1983 action, a motion to dismiss will be granted if the plaintiff does not sufficiently allege in his complaint the deprivation of any right secured in the Constitution. Nami, 82 F.3d at 65.

B. Factual Allegations

We therefore review Mr. Muhammad's allegations as contained solely within his complaint in the light most favorable to him. Mr. Muhammad is currently incarcerated at S.C.I. Graterford Prison in Graterford, Pennsylvania. He states in his complaint that on December 19, 1994 at approximately 5:00 p.m. he was rushed to the dispensary with complaints of severe stomach and back pains. Complaint at 2. Mr. Muhammad was seen by Defendant Dr. Roeder, and complained to him that was vomiting and thought he had food poisoning. Mr. Muhammad alleges that Dr. Roeder then prescribed Donatol and Maalox to him; however, Dr. Roeder did not take "blood pressure readings and/or a finger stick for blood sugar reading along with temperature readings to determine whether infection was present." Complaint at 3. Mr. Muhammad alleges that his medical records indicated a pre-existing problem with diabetes, hypertension, and kidney stones. Id. In addition, he states that a nurse at the infirmary "attempted to convince

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.                                          **Page 3**
(Cite as: 1997 WL 43015, *3 (E.D.Pa.))

wanton infliction of pain." Estelle, 429 U.S. at 104; Whitley v. Albers, 475 U.S. 312, 319 (1985); Young v. Quinlan, 960 F.2d 351, 359 (3d Cir.1992). In Farmer v. Brennan, 114 S.Ct. 1970 (1994), the Supreme Court discussed "deliberate indifference" in more detail. It is clear that the required state of mind is more than negligence in diagnosing or treating a medical condition, but less than acts or omissions committed for the very purpose of causing harm or with the knowledge that the specific harm will result. Farmer, 114 S.Ct. at 1978. The Farmer court adopted subjective recklessness as the appropriate test, holding that a "prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Id. at 1979; see also, Nami, 82 F.3d at 67. If the official should have perceived a risk, but did not, his acts or omissions cannot establish a constitutional violation. Alleging obviousness or constructive notice is insufficient to state a claim because liability may not be prefaced on these alone, and if a prison official was not aware of even an obvious risk there can be no constitutional violation. Farmer, 114 S.Ct. at 1980, 1982.

In this light, it is clear that to establish his claim, Mr. Muhammad must allege facts that at a minimum show recklessness on the part of Dr. Schwartz and Dr. Roeder. [FN2] It is insufficient to allege that the doctors "misdiagnosed [his] condition, that [the doctors'] method of physical examination and treatment may not have followed community standards, or that [the doctors] disagreed with [his] suggested course of treatment." Bellecourt v. United States, 994 F.2d 427, 431 (8th Cir.1993), cert. denied, 510 U.S. 1109 (1994); see also Estelle, 429 U.S. at 106. Malpractice, while not condoned by this court, is simply not actionable under Section 1983. See Durmer v. O'Carroll, 991 F.2d 64, 67 (3d Cir.1993); Sample v. Diecks, 885 F.2d 1099, 1109 (3d Cir.1989). Malpractice indicates negligence on the part of the physician, and "negligence in the administration of medical treatment is not itself actionable under the Constitution." Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir.1979) (citing

Estelle, 429 U.S. at 105); see also Jordan v. Fox, 20 F.3d 1250, 1277 (3d Cir.1994). Neither, certainly, is a disagreement between the plaintiff and the doctor on the medical diagnosis. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir.1987), cert. denied, 486 U.S. 1006 (1988); Smith v. Marcantonio, 910 F.2d 500, 502 (8th Cir.1990). Because "there may, for example, be several ways to treat an illness," prison doctors have been accorded considerable latitude in the diagnosis and treatment of prisoners. Durmer, 991 F.2d at 67; Inmates of Allegheny County Jail, 612 F.2d at 762; White, 897 F.2d at 110.

> FN2. Some courts have held that because the element of deliberate indifference involves a discussion of intent, this sort of Eighth Amendment claim cannot be resolved at summary judgment; however, the complaint is certainly subject to dismissal for failure to state a claim if no such subjective intent is alleged in the first place. See Young 960 F.2d at 360.

*4 In finding deliberate indifference, courts have generally noted length of time without treatment, the types of complaints made by the prisoner, and the specific responses of the doctor. See Durmer, 991 F.2d at 67 (prisoner went over seven months without treatment, prisoner complained repeatedly of pain over that time, non-medical reasons given for denial); White v. Napoleon, 897 F.2d 103, 109 (3d Cir.1990) (well over ten different instances with several prisoners over many months, repeated complaints, direct comments and actions by doctor which indicate no medical purpose); Lanzaro, 834 F.2d at 347 ("deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates"). The Third Circuit specifically found that allegations that a doctor "intended to inflict pain on prisoners without any medical justification," or a large number of "specific instances in which the doctor insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm to the prisoners" were distinguishing factors of a case that went beyond mere malpractice. White, 897 F.2d at 109.

2. Discussion

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works


Not Reported in F.Supp.                                                    Page 4
(Cite as: 1997 WL 43015, *4 (E.D.Pa.))

For Mr. Muhammad's claims of deliberate indifference, each doctor must be examined separately from the other. See Polk County v. Dodson, 454 U.S. 312, 325 (1981) (holding that because respondeat superior is not a basis for liability under § 1983, one doctor at a prison cannot be held liable for actions of others); Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir.1993). We will therefore examine Mr. Muhammad's allegations with respect to Dr. Roeder first.

Dr. Roeder saw Mr. Muhammad once, when he was first brought to the dispensary on December 19, 1994. Mr. Muhammad complained of stomach and back pains and indicated that he thought it might be food poisoning. Based on this, Dr. Roeder prescribed Donatol and Maalox for treatment of the pain and possible food poisoning, and returned Mr. Muhammad to his cell. Mr. Muhammad does not allege that Dr. Roeder was involved subsequent to this. He does allege that a Nurse, Connie Chubb, told Dr. Roeder about his history of kidney stones.

These allegations are insufficient, even when taken in a light most favorable to Mr. Muhammad, to make out a § 1983 action. Mr. Muhammad does not allege that Dr. Roeder actually knew that the prescriptions issued to Mr. Muhammad would cause further harm. He merely disagrees with the diagnosis, with the ease of twenty-twenty hindsight. He does not allege that Dr. Roeder knew that Mr. Muhammad faced the serious risk of kidney failure, and issued a prescription for Donatol and Maalox in reckless disregard for that risk. He merely states that a history of kidney stones and diabetes was listed in his medical records. This is not deliberate indifference per Farmer v. Brennan. Without alleging actual knowledge, any reference to obviousness via the medical records available, or what the doctor "should have known" is unavailing.

*5 Dr. Schwartz saw Mr. Muhammad twice. The first time was on the morning of December 20, 1996 at a "sick call screening." Mr. Muhammad alleges in his complaint that he had continued stomach and back pains, and vomiting. Dr. Schwartz prescribed Motrin to alleviate his pain, and referred him to the Medical Director,

Dr. Moyer. Mr. Muhammad does not allege any conversation or discussion of his case between Dr. Schwartz and his supervisor, only that the doctor screened him, prescribed him medication for his pain, and referred him to the director.

Dr. Schwartz did not see Mr. Muhammad again until two days later, on December 22, 1994, when Mr. Muhammad signed up for "routine sick call." Dr. Schwartz listened to Mr. Muhammad's complaints, and again prescribed Motrin for his pain. Mr. Muhammad does not state whether or not he took that medication, but it was soon thereafter that he was brought to the dispensary to again be examined by Dr. Moyer. Mr. Muhammad does not allege that Dr. Schwartz had any other contact with him. He does not allege that Dr. Schwartz did or said anything with the knowledge that his actions would cause Mr. Muhammad further harm. Rather, he disagrees with his method of diagnosis, and the diagnosis itself. He does not contest that at any time his complaints were ignored, or that prescriptions were not provided. Mr. Muhammad, simply, has alleged malpractice; in this case, his allegations do not rise to the level required by the deliberate indifferent indifference. See Farmer 114 S.Ct. at 1984; Bellecourt, 994 F.2d at 431.

For both Dr. Schwartz and Dr. Roeder, Mr. Muhammad asserts that their diagnosis was wrong, and that they therefore delayed his admittance at a local hospital. However, Mr. Muhammad first complained of pains in the afternoon of December 19, 1994, and was admitted to the hospital on December 24, 1994 after being in Dr. Moyer's care for two days. While Mr. Muhammad undoubtedly suffered a severe injury, he has not--and, it seems, can not-- alleged that Drs. Schwartz and Roeder both were actually aware of the risks to his health caused by their actions, and that they recklessly disregarded those risks. Mere mention of a medical record listing a history of kidney stones is insufficient to show that the risk to Mr. Muhammad was so obvious it had to have been known. Cf., Farmer, 114 S.Ct. at 1981. The facts reveal instead a pattern of Mr. Muhammad complaining of pain and receiving a responsive prescription, and then within five days of the onset of pain being sent to an outside hospital for further treatment. While the negligent malpractice of medicine upon

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.
(Cite as: 1997 WL 43015, *5 (E.D.Pa.))

prisoners is unfortunate and will certainly not be condoned by this court, the actions of Dr. Schwartz and Dr. Roeder do not rise to "cruel and unusual punishment" prohibited by the Eighth and Fourteenth Amendment. The complaint must therefore be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

D. State Malpractice Claim

**\*6** We had originally exerted jurisdiction over the second count in Mr. Muhammad's complaint, a state malpractice claim, via pendent jurisdiction. However, because we have dismissed the federal Section 1983 claim above, we have no independent basis to hear the state law claim. Ordinarily, when a court dismisses a federal claim early on in the case, it will not use its discretion to retain jurisdiction over any pendent claims, but rather will dismiss the state claims without prejudice to raise the matters in state court. Angst v. Mack Trucks, 969 F.2d 1530, 1534-5 (3d Cir.1989); Panis v. Mission Hills Bank, 60 F.3d 1486 (10th Cir.1995), cert. denied, 116 S.Ct. 1045 (1996); See 28 U.S.C. § 1367(c)(3). We see no reason to do otherwise in this case. We do not express any opinion on the outcome of the malpractice claim in the appropriate state court.

### III. CONCLUSION

Despite an examination of Mr. Muhammad's complaint in a light most favorable to him, we find that he has not alleged facts sufficient to make out a Section 1983 claim.

For the foregoing reasons, we will grant Defendants Dr. Schwartz and Dr. Roeder's motion to dismiss count one of Mr. Muhammad's complaint for failure to state a claim. We will dismiss Mr. Muhammad's pendent state malpractice claim without prejudice to bring the claim in the appropriate state court. We also dismiss without prejudice the complaint against Dr. Malabranch for failure to provide service.

An appropriate order follows.

### ORDER

AND NOW, this 27th day of January, 1997, upon consideration of Defendants Dr. Arnold Schwartz and Dr. John Roeder's Motion to Dismiss filed on January 3, 1997 and Plaintiff Bilal A. Muhammad's response thereto filed on January 13, 1997, it is hereby ordered, consistent with the foregoing opinion as follows:

1. Defendants' Motion to Dismiss is GRANTED as to Count I of the complaint;

2. Plaintiff's Count II is DISMISSED for lack of jurisdiction without prejudice to bring the action in the appropriate state court;

3. Plaintiff's complaint against Defendant Dr. Josey Malabranch is DISMISSED without prejudice for failure to provide service;

4. This case is CLOSED.

**END OF DOCUMENT**

JUN-6-2000   15:47                                                    P.01/09

*Telephone for type*
*keep any unsealar*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BENNIE OUTTERBRIDGE, as Administratrix : 
of the ESTATE OF EDDIE SAMUEL : 
OUTTERBRIDGE and in her own right, : 

                          Plaintiff,       :       CIVIL ACTION
                                           :       NO. 00-1541
               v.                          :

COMMONWEALTH OF PENNSYLVANIA :
DEPARTMENT OF CORRECTIONS, et al. :

                          Defendants.      :

**F I L E D**

JUN - 8 2000

MICHAEL E. KUNZ, Clerk
By_____
                Dep. Clerk

## M E M O R A N D U M

BUCKWALTER, J.                                              June 7, 2000

Presently before the Court is the Medical Defendants' Motion to Dismiss.  For the

reasons stated below, the Motion is Granted.

## I. BACKGROUND

Plaintiff is the alleged Administratix of a decedent prisoner, Eddie Samuel

Outterbridge ("Outterbridge").  She filed the Complaint on March 24, 2000 alleging federal and

state claims against both the moving Medical Defendants[1] and the non-moving Commonwealth

Defendants.   This Court dismissed all claims against the Commonwealth Defendants by an

---

1.  The Medical Defendants will be the term used to refer to the following Defendants who provided medical services at SCI-Mahanoy:  Lazlo Kiraly, M.D. ("Kiraly"), John Hipps, M.D. ("Hipps"); Stanley Hoffman, M.D. ("Hoffman"); John Rush, P.A.C. ("Rush"); Ronald Scott, P.A.C. ("Scott").  All five of these individuals were hired by or contracted with Defendant Correctional Physician Services ("CPS").  During the time period relevant to this suit, CPS entered into a contract to provide medical services to inmates at SCI-Mahanoy.

J*N-08-2000  15:47                                                                   P.02/09

Order dated May 26, 2000.  The federal claims against the Medical Defendants include a

violation of the Eighth Amendment and a conspiracy count.  The state law claims involve

medical negligence, survival and wrongful death.  The Complaint arises from the treatment and

medical care received by decedent Outterbridge that are alleged to have resulted in his death.

According to the Complaint, Outterbridge began his incarceration at SCI-

Mahanoy in October, 1992.  After receiving a positive tuberculin test in October, 1997,

Outterbridge began a prophylactic treatment termed INH.  Although Outterbridge complained

repeatedly to treating physicians that the INH was making him ill, he was forced to continue the

medication.  The Plaintiff alleges that Outterbridge's medical condition was continually

misdiagnosed by the individual Medical Defendants.  He was finally removed from SCI

Mahanoy on April 15, 1998 and died ten days later at Good Samaritan Hospital in Pottsville,

Pennsylvania.

## II.  LEGAL STANDARD

Defendants argue that the case should be dismissed for lack of jurisdiction under

Fed. R. Civ. P. 12(b)(1).  A motion to dismiss on jurisdictional allegations should be judged by

the same standards as a Rule 12(b)(6) motion to dismiss.  See Mortension v. First Federal Sav.

and Loan Ass'n, 549 F.2d 884, 890 (3d Cir. 1977).  When deciding to dismiss a claim pursuant

to Rule 12(b)(6) a court must consider the legal sufficiency of the complaint and dismissal is

appropriate only if it is clear that "beyond a doubt ... the plaintiff can prove no set of facts in

support of his claim which would entitle him to relief." McCann v. Catholic Health Initiative,

1998 WL 575259 at *1 (E.D. Pa. Sep. 8, 1998) (quoting Conley v. Gibson, 355 U.S. 41, 45-46

(1957)).  The court assumes the truth of plaintiff's allegations, and draws all favorable inferences

therefrom.  See, Rocks v. City of Philadelphia, 868 F.2d. 644, 645 (3d. Cir. 1989).  However,

conclusory allegations that fail to give a defendant notice of the material elements of a claim are

insufficient. See Sterling v. SEPTA, 897 F.Supp. 893, 895 (E.D. Pa.1995).  The pleader must

provide sufficient information to outline the elements of the claim, or to permit inferences to be

drawn that these elements exist.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d. Cir. 1993).  A court

must determine whether, under any reasonable reading of the pleadings, the law allows the

plaintiff a remedy.  See, Nami v. Fauver, 82 F.3d 63, 65 (3d. Cir. 1996).

## III.  DISCUSSION

### A.    Count 1:  § 1983 claim for violation of the Eighth Amendment

The Plaintiff has included all of the Medical Defendants in Count 1.  The

Supreme Court has declared that, in accordance with the " 'broad and idealistic, concepts of

dignity, civilized standards, humanity, and decency' " embodied in the Eighth Amendment, the

government is obliged "to provide medical care for those whom it is punishing by incarceration."

Estelle v. Gamble, 429 U.S. 97, 102(1976).  Deliberate indifference to serious medical needs of

prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth

Amendment." Id. at 104.  To be in violation of the Eighth Amendment, there must be both

deliberate indifference on the part of the officials and a serious medical condition.  Monmouth

County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).

The Supreme Court adopted a subjective test for what would constitute an Eighth

Amendment violation in Farmer v. Brennan, 511 U.S. 825, 837 (1994):

> "A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference". Id.

Therefore, the Court continued, "... an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment". Id, at 838. Therefore, to state a § 1983 claim for a denial of medical treatment, the Plaintiff must specifically allege that each defendant was aware of the serious risk Outterbridge faced and that the person disregarded such risk.

After reviewing the Complaint, the Court finds that the Plaintiff has never alleged that any of the Medical Defendants drew inferences that Outterbridge faced a risk of serious harm. The Complaint repeats that each Defendant continued to treat Outterbridge with INH even though he complained of its effects. Plaintiff also alleges that the Medical Defendants "consciously disregarded" abnormal findings resulting from the ingestion of INH. While these facts suggest medical malpractice, they do not sufficiently allege that the Defendants knew of and disregarded the serious risk faced by decedent Outterbridge. Therefore, the Plaintiff's §1983 claims against the Medical Defendants will be dismissed.

Plaintiff has likewise failed to state a cause of action against CPS, as the employer of the individual Medical Defendants. The Third Circuit has repeatedly concluded that no respondeat superior liability exists pursuant to § 1983 under any circumstance. See Robinson v. City of Pittsburgh, 120 F.3d 1285 (3d Cir. 1997). Nevertheless, a private corporation may be held liable for a constitutional violation if it knew of and acquiesced in the deprivation of the

plaintiff's rights. See Miller v. Hoffman, 1998 U.S. Dist. LEXIS 9934. A Plaintiff must state

that the corporation, with deliberate indifference, established and maintained a policy which

directly caused plaintiff's constitutional harm. See Stoneking v. Bradford Area Sch. Dist., 882

F.2d 720, 725 (3d Cir. 1989). The Plaintiff has not alleged any policies of CPS that led to

constitutional harm suffered by Outterbridge.

### B. Count 2: Conspiracy to Violate the Eighth Amendment:

The elements of a conspiracy are a combination of two or more persons to do a

criminal act, or to do a lawful act by unlawful means or for an unlawful purpose. Ammlung v.

City of Chester, 494 F.2d 811, 814 (3rd Cir.1974). The plaintiff must make specific factual

allegations of combination, agreement, or understanding among all or between any of the

defendants to plot, plan, or conspire to carry out the alleged chain of events. See Panayotides v.

Rabenold, 35 F.Supp.2d 411, 419 (E.D. Pa. 1999). Only allegations of conspiracy which are

particularized, such as those addressing the period of the conspiracy, the object of the conspiracy

and certain other actions of the alleged conspirators will be deemed sufficient. See Rose v.

Bartle, 871 F.2d. 331,366 (3d Cir. 1989). Drawing inferences in favor of the Plaintiff, it can be

assumed that the object of the conspiracy was to violate Outterbridge's constitutional rights by

remaining deliberately indifferent to his medical needs. It can also be inferred that the period of

the conspiracy lasted from the time IHN treatment was started until April 15, 1998, the day

Outterbridge was transferred out of SCI-Mahanoy. However, there are no specific allegations

that the Medical Defendant agreed to violate Outterbridge's right to medical treatment. In order

to survive a motion to dismiss, the Plaintiff can not baldy claim that Defendants actions and

omissions constituted a conspiracy without alleging what constituted concerted action. As stated

JUN-08-2000  15:48

above, the Court finds that the Plaintiff did not sufficiently allege a substantive Eighth

Amendment violation.  Plaintiff has also failed to state a claim of conspiracy to violate decedent

Outterbridge's constitutional rights.  Therefore, Count 2 will be dismissed against all of the

Medical Defendants.

## IV.  CONCLUSION

The Plaintiff has failed to allege any claims against the Medical Defendants that

would give this Court jurisdiction under 28 U.S.C. § 1331.  Since the Court no longer has

original jurisdiction over any claim in this case, the Court declines to exercise supplemental

jurisdiction over the remaining state law claims (see 28 U.S.C. § 1367(c)), unless the plaintiff

can successfully replead its alleged § 1983 claim.

An order follows.

JUN-08-2000  15:48                                          P.07/09

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BENNIE OUTTERBRIDGE, as Administratrix          :
of the ESTATE OF EDDIE SAMUEL                    :
OUTTERBRIDGE and in her own right,               :

        Plaintiff,                               :          CIVIL ACTION
                                                      :          NO. 00-1541

           v.                                :

COMMONWEALTH OF PENNSYLVANIA                     :
DEPARTMENT OF CORRECTIONS, et al.                :

        Defendants.                              :

## O R D E R

AND NOW, this 7th day of June, 2000, upon consideration of the Medical

Defendants' Motion to Dismiss (Docket No. 5), and the Plaintiff's Response thereto (Docket No.

10); it is hereby **ORDERED** that the Motion is **GRANTED** as to Counts 1 and 2 with respect to

the Medical Defendants.  It is **FURTHER ORDERED** that plaintiff is granted leave to file an

amended complaint if he can do so in accordance with this opinion.

       If no such amended complaint is filed on or before **June 30, 2000**, the court, on

motion of defendant, will dismiss Counts 1 and 2 and decline to exercise supplemental

jurisdiction over the state claims.

COPIES BY FAX ON: _____

TO: _____

TERED: ___ 6-8-00 ___

BY THE COURT:

_____

RONALD L. BUCKWALTER, J.

CLERK OF COURT

6/8/00

COPIES BY MAIL ON: