*Law Clerk's Copy*

101

FILED

NOV 1 5 2001

PER
HARRISBURG, PA.        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON ERIC BENSON,           :
    Plaintiff                    :        CIVIL ACTION
                       :
      v.                       :        NO. 1:00-CV-01229
                       :
THOMAS DURAN; BRUCE CLUCK;    :
DEBRA HANKEY; JOHN JENNINGS;  :
WILLIAM ORTH; RAE HIENTZELMAN; :        JURY TRIAL DEMANDED
RONALD LONG and WILLIAM ELLIEN; :
BRITON SHELTON; WILLIAM J.    :
STEINOUR AND ADAMS COUNTY     :
PRISON                        :
    Defendants                  :

## BRIEF OF ADAMS COUNTY DEFENDANTS[1] IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    PROCEDURAL HISTORY AND STATEMENT OF FACTS:

       This is a pro se prisoner action arising out of allegations of excessive use of force and lack of proper medical care.   This Brief addresses two specific incidents, the first on August 27, 1999, when pepper spray was used on Mr. Benson and the second, on August 30, 1999, when Mr. Benson allegedly had a seizure while he was being held in E Block of the Adams County Prison.   Mr. Benson has also made medical malpractice claims against non-Adams County Defendants but those claims do not involve the Adams County Defendants.

---

[1] The Adams County Deffendants are the Prison, Thomas Duran, Bruce Cluck, Debra Hankey, John Jennings, William Orth, Ray Heintzelman and Briton Shelton.

A.    The August 27, 1999 Incident.

On August 27, 1999, Mr. Benson returned to the Adams County Prison from a Court appearance and was taken to the intake area which is referred to as "A Block". (Shelton Affidavit ¶ 2)  Before leaving for Court earlier that day, Benson had been charged with a misconduct for inappropriate behavior. (Shelton Affidavit ¶ 3)  When Benson returned to the prison at approximately 11:10 a.m., he was told that he was going to be placed in administrative segregation pending a decision on his misconduct charge.  After being notified of the write-up, Benson became verbally aggressive, profane and loud. (Shelton Affidavit ¶ 5)

Strip searches in the Adams County Prison are routine, but mandatory procedures that all inmates must undergo any time they re-enter the prison from the outside. (Jennings Affidavit ¶ 2)  The purpose of the strip search procedure is to prevent contraband from coming into the prison. (Duran Affidavit ¶ 11)  Mr. Benson has been strip searched on numerous occasions when entering various correctional facilities.  He thinks that the strip search policy is soundly based and reasonable. (Benson Deposition p. 64-65)

After other inmates completed the strip search procedure, Benson was escorted to the medical room so that he could be searched. (Shelton Affidavit ¶ 6)  After the initial request for compliance, Mr. Benson's reply was, "Fuck you, I ain't getting stripped."  Shelton then repeated the request and Benson again replied, "Fuck you."  Lieutenant Jennings then asked Benson if he was going to comply with the strip search procedure and Benson said to him, "Man, fuck you." (Shelton Affidavit ¶ 7)

Up to this point in time, there was no videotaping taking place and neither the Warden nor any of the Deputy Wardens had been informed that there was a problem at the intake area. (Shelton Affidavit ¶ 7)  However, in light of Benson's behavior, Lt. Jennings decided to consult

with Warden Duran and Deputy Wardens Cluck and Hankey. The entire group then moved to the medical room where Benson was again asked on a number of occasions to strip. He refused all requests. (Jennings Affidavit ¶ 5)

When Lieutenant Jennings returned to the intake area with Warden Duran and Deputy Wardens Cluck and Hankey, Warden Duran was operating a video camera. (Shelton Affidavit ¶ 8) The Warden decided to videotape the occurrence to document what appeared to be a situation which may require the use of force. (Duran Affidavit ¶ 12)

When Warden Duran arrived in the medical room, Deputy Wardens Cluck and Hankey were attempting to reason with Benson. All of the prison personnel witnessed requests being made of Benson to comply with the mandatory strip search procedure. (Duran Affidavit ¶ 3; Shelton ¶ 8; Jennings ¶ 6; Cluck ¶ 4; Heintzelman ¶¶ 3-4)

At the time of the events of August 27, 1999, it was Adams County Prison policy to avoid conflict and the application of force whenever possible. (Duran ¶ 5) However, after Benson repeatedly and steadfastly refused to respond first to a verbal request, then to a verbal command and finally to a show of force, the decision was made by the Warden to employ OC pepper foam to obtain compliance. (Duran ¶¶ 5-6) The thought process followed by the Warden was to use the bare minimum of force to obtain compliance with the mandatory strip search procedure without placing any of the officers or the inmate at risk for serious injury. It was Benson's own defiance of prison policy that resulted in him being kept in handcuffs and leg shackles. (Duran ¶ 6)

Pepper spray was developed in the 1980s as a less potentially harmful alternative to traditional tearing agents such as mace. (Traenkle Report p. 9) Pepper spray is derived from a

natural oil resin of chili peppers which is diluted with a carrier propellant such as isopropyl alcohol or water that is then placed in an aerosol or foam form. (Traenkle Report p. 9)

Pepper spray causes almost immediate swelling and burning of the eyes and breathing passages. The effects of the spray deprive the person upon whom it is used of the ability to engage in activities such as fighting. Studies prepared concerning the use of OC spray indicate that the risk of injury or death from the use of the spray is statistically improbable. The effects of the spray generally last from 20 to 45 minutes and leave no residual symptoms. (Traenkle Report p. 9-10)

After being sprayed, Benson rose to his feet and began shouting profanities and threats to the prison staff. He also deliberately banged his head on a computer monitor which was located on a nearby desk. He was then taken to the floor to prevent him from hurting himself or breaking things in the office. The officers held him down on the floor until he agreed to stop resisting at which point he was placed in the shower. (Duran Affidavit ¶ 7)

Other than being verbally abusive to the prison staff after being sprayed, Benson also intentionally spit on or at several of the prison staff members. Benson spit on Officer Shelton's forearm and at others. (Heintzelman Affidavit ¶ 5; Shelton Affidavit ¶ 11; Duran Affidavit ¶ 8) Benson was restrained to stop him from spitting.

After the spit guard was put in place, Lieutenant Jennings and Warden Duran escorted Benson to E Block where he did comply with strip search procedure. He then requested that he be taken to the hospital and his request was honored about 1:10 p.m. Benson returned to the prison later that day. (Duran Affidavit ¶ 9; Shelton Affidavit ¶ 12) At Gettysburg Hospital, Benson was treated for a superficial contusion of the scalp (probably received when Benson

slammed his head on the video monitor) and "a few superficial handcuff-type contusions of the skin." (Traenkle Report p. 12)

The videotape of this occurrence vividly depicts the events immediately leading up to and immediately following the use of the pepper spray.  There can be no doubt from the videotape that Benson: refused to strip without offering explanation or justification; ignored a second request to strip; refers at multiple times during the videotaped portion of the incident, to the "misconduct"  and "write-up" that was assessed against him; was never kicked, punched or beaten by Prison staff; very clearly spits at a Corrections Officer while he is sitting outside the shower (the intentional nature of the spitting at a Corrections Officer is confirmed by the fact that Benson is shown spitting several other times back into the shower).

Mr. Benson acknowledges that he had no lasting effects or injuries from the pepper spray or from being restrained during the incident.  (Benson Deposition 105-109)

**B.      The August 30, 1999 incident.**

On August 30, 1999, sometime between 3:10 a.m. and 3:58 a.m., Lieutenant William Orth was summoned to E Block for a disturbance involving Mr. Benson.  (Orth Affidavit ¶ 3) Officer Sheatler told Lieutenant Orth that Benson was having some kind of a problem.  At that time, Benson appeared to Orth to be physically okay other than the fact that he was having difficulty following directions and answering questions.  Approximately 20 to 25 minutes later, Benson appeared to be having a seizure.  (Orth Affidavit ¶ 4)  As soon as Benson began to have what looked like a seizure, the Sheriff's Department was called to transport him to the hospital.  At approximately 5:35 a.m., Deputy Sheriff Mueller arrived and transported Benson to the Gettysburg Hospital where he was treated.  (Orth Affidavit ¶¶ 5-6)

On the morning of August 30, 1999, after inmate Benson began to show the signs of becoming ill, he was not left alone by the prison staff.  As soon as it became apparent that Benson was having a seizure and needed medical attention, the County Sheriff's Office was called so that Benson could be transported to the hospital for care.  It is the Adams County Sheriff's Office that is responsible for transporting prisoners to and from the prison for security reasons.  (Orth Affidavit ¶¶ 7-8)  In the time period between when the Sheriff's Department was summoned and when they arrived, a member of the prison staff stayed with Benson to make sure that he was okay.  Procedure would have been to summon an ambulance if there had been an emergency.  Benson's condition did not get worse after the Sheriff's Office was called and, in fact, he got better and by the time he left the prison to go to the Gettysburg Hospital, his condition had improved and he was more responsive to questions and verbal directions.  (Orth Affidavit ¶ 9)

II.    **STATEMENT OF ISSUES PRESENTED:**

    A.    **WHETHER ANY MEMBER OF THE PRISON STAFF COMMITTED ANY ACT WHICH ROSE TO THE LEVEL OF CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT?**

    (Suggested answer:  No.)

    B.    **WHETHER THE PRISON STAFF WAS DELIBERATELY INDIFFERENT TO ANY SERIOUS MEDICAL NEED ON THE PART OF THE PLAINTIFF DURING THE EARLY MORNING HOURS OF AUGUST 30, 1999?**

    (Suggested answer:  No.)

6

III.    **ARGUMENT:**

   A.    **There is no basis for an Eighth Amendment cruel and unusual punishment claim against the Prison staff members as a result of the August 27, 1999 incident.**

         1.    **There is no basis for the claims against Deputy Wardens Hankey and Cluck or Sgt. Heintzelman and CO Shelton.**

   In a civil rights case, traditional concepts of respondeat superior do not apply. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Instead, the plaintiff must demonstrate that a supervisory defendant has personal involvement in the alleged wrongs. Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990), citing, Rizzo v. Goode, 423 U.S. 362, 377 (1976). The plaintiff can prove the involvement of the supervisor in two ways. First, the plaintiff can plead and prove personal direction or of actual knowledge and acquiescence. Second, the plaintiff may prove supervisory responsibility due to direct action by the supervisor. Liability may not be premised simply upon negligence. Andrews, 895 F.2d at 1478; Daniels v. Williams, 474 U.S. 327, 328 (1986).

   As for Deputy Wardens Bruce Cluck and Debra Hankey, there is no genuine issue of material fact. Warden Duran was in charge of the staff and he gave the direction to use pepper spray. Neither Mr. Cluck nor Ms. Hankey is seen or heard doing anything improper in regard to Mr. Benson on the videotape. Accordingly, summary judgment should be entered as to the claims against former Deputy Warden Cluck and former Deputy Warden Hankey.

   As for Corrections Officers Heintzelman and Shelton, neither played any role in the decision to use pepper spray, nor are they otherwise shown doing anything on the videotape excessive or improper as to Mr. Benson. They were not otherwise in command of the situation, but instead, were simply part of the staff present at the time. Accordingly, summary judgment should be entered in their favor.

2.    **The force employed by Prison personnel to obtain Mr. Benson's compliance with prison policy was reasonable and not violative of Mr. Benson's constitutionally protected rights.**

The Supreme Court has held that cruel and unusual punishment forbidden by the Eighth Amendment consists of "the unnecessary and wanton infliction of pain." Hudson v. McMillian, 503 U.S. 1, 5 (1992). "Whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is that set out in Whitley: Whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 6-7, quoting, Whitley v. Albers, 475 U.S. 312, 319 (1986). Several factors should be considered in whether or not an inmate is a victim of excessive force: 1) the extent of injuries suffered by the inmate; 2) the need for application of force; 3) the relationship between that need and the amount of force used; 4) and the threat reasonably perceived by the prison officials and any efforts to temper the severity of the force applied against the inmate. Id. The Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from Constitutional recognition diminimus uses of physical force provided that the use of force is not of a sort repugnant to the conscience of mankind. Id., quoting, Whitley, 475 U.S. at 327.

Moreover, prison administrators are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Whitley, 475 U.S. at 321-22. It almost goes without saying that prison officials must have authority to use that amount of force or coercion reasonably necessary to enforce compliance with valid prison rules and to protect themselves and other inmates. Mack v. Thigpen, 1991 U.S. Dist. LEXIS 14803 (S.D. Alabama 1991), quoting, Ort v. White, 813 F.2d 318, 325 (11th Cir. 1987). See, also, Henderson v.

8

<u>Chrans</u>, 1996 U.S. Dist. LEXIS 109 (N.D. Illinois 1996).  The Pennsylvania legislature has enacted a statute making the use of force justifiable where the actor is a Warden or other authorized official of a correctional institution "where the actor believes the force used is necessary for the purpose of enforcing the lawful rules or procedures of the institution . . . ."  18 Pa.C.S.A. § 509(5)(i).

Turning to the facts of the matter, it is clear that the force used here was applied in a good faith effort to maintain discipline and not maliciously or sadistically to cause harm.  The parties agree that Adams County Prison policy is soundly based on the proposition that strip searches for all inmates returning to the prison prevents the entry of contraband and helps to ensure the safety of prisoners, the prison staff and helps to maintain the orderly operation of the prison.  Mr. Benson agrees that this is a reasonable rule and he has complied with strip search procedures in various facilities at various times when he has come back in from the outside.  There is no dispute then that the policy being enforced was reasonable, necessary and just.

There is also no dispute based on the contents of the videotape that the Adams County strip search policy and procedure was explained to Benson and he was asked by Deputy Warden Cluck if he would strip.  He did not respond with any excuse or justification for refusing to comply with the search.  He simply looked at Deputy Warden Cluck and said "no."  He then ignored a further request before the pepper spray was used.

The factors cited in <u>Hudson</u> also support the prison staff's position on this issue.  The first factor is the extent of injuries suffered by the inmate.  According to Gettysburg Hospital records, Benson had a superficial abrasion on his forehead (probably incurred when he slammed his head on the video display monitor) and some bruises inflicted by the handcuffs.  He also suffered from the transient discomfort caused by the pepper spray, which lasted by his

9

estimate a total of 30 minutes.  Accordingly, it is fair to say that whatever injury Mr. Benson suffered as a result of this incident was minimal.

The second factor concerns the need for application of force.  Here, the videotape shows a defiant prisoner refusing a lawful order to comply with a mandatory procedure.  The Warden really had only two alternatives.  First, he could have simply returned Benson to the population without searching him.  Obviously, this was not a realistic option.  Prisoners cannot be allowed to dictate prison policy, nor can they be allowed to come into the prison without being searched for contraband.

The second alternative was to remove Benson's restraints and strip him by force. Clearly, this too was not an attractive option.  Removing the restraints from a defiant prisoner and then attempting to forcefully strip him would have exposed the staff and the inmate to the possibility of serious injury which may have ensued during the subsequent confrontation when the prisoner would have had his arms and legs free to punch and kick the officers.

Under the circumstances, the least invasive form of force was that which was chosen here and the force was limited to gaining the prisoner's compliance – not to sadistically inflict pain.  Immediately after Benson calmed down, he was carried to the shower to rinse off the spray.  Prison staff can also be heard on the videotape attempting to reason with Mr. Benson and not further escalating the situation or antagonizing the prisoner.

The third Hudson factor involved the relationship between the need for the application of force and the amount of force used.  This factor is largely dealt with above.  There was no other force that could have been used in the alternative that would have minimized the potential for injury for both prison staff and inmate.  Under the circumstances, the choice of pepper spray

10

which only produces transient discomfort on the part of the subject was exactly what the circumstances called for.

Factor four concerns the threat reasonably perceived by the prison officials and any efforts to temper the severity of the force applied against the inmate. The threat presented here was to the orderly operation of the prison. Prisoners simply cannot refuse lawful orders. This incident, which was brought about solely due to the lack of cooperation and stubbornness of the inmate, caused the Warden, two Deputy Wardens, a Lieutenant, a Sergeant and a Corrections Officer to all interrupt their normal activities. The situation did not immediately escalate from the refusal to obey an order to the use of pepper spray. Instead, multiple attempts were made to diffuse the situation, first by Officer Shelton, next by Lieutenant Jennings and then by Deputy Warden Cluck. Mr. Benson was then asked again by Lt. Jennings before the spray was used. Ultimately, before the pepper spray was employed, Benson had ignored a detailed request with an explanation of the policy behind it, directions to comply and a show of force by the prison staff.[2] All of this constituted a reasonable escalation of force and showed a sincere effort on the part of the prison to avoid any use of physical force at all. As set forth in Mr. Traenkle's report, the prison's handling of this situation was entirely appropriate and reasonable.

To the extent Mr. Benson may find fault with the way he was treated after he was sprayed, the videotape very clearly demonstrates an appropriate use of physical force to restrain Benson, first when he tried to injure himself and then when he spit on Corrections Officers. The videotape shows no evidence of punching, kicking or other excessive or unreasonable force, but instead, the only force used was that which was necessary to restrain Benson until he calmed down and became compliant.

Under all the circumstances presented, the conduct of the prison staff was fully justified and reasonable under the circumstances.[3] Prison officials must be given some deference to deal with this type of situation where often times it is necessary to take quick and decisive action. see, e.g., Baldwin v. Stalder, 137 F.3d 836 (5th Cir. 1998)(use of pepper mace on shackled prisoners on a bus not a Constitutional deprivation under the circumstances); Lockett v. Cooper, 1997 U.S. Dist. LEXIS 13347 (N.D. Ill.). The force use in this case was not excessive as a matter of law and for the reasons stated above, the Adams County Defendants respectfully request that summary judgment be entered in their favor.

**C.     There is no evidence in the case to support the allegation that the Adams County Prison staff was deliberately indifferent to a serious medical need of Mr. Benson.**

The applicable standard in cases involving alleged failures to provide adequate medical treatment is set forth in Estelle v. Gamble, 429 U.S. 97 (1976). Therein, the Court stated: "In order to state a cognizable claim, a prisoner must allege facts or omissions sufficiently harmful to evidence a deliberate indifference to serious medical needs." 429 U.S. at 105-106. A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person could easily recognize the necessity for a doctor's attention." Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987), cert. denied, 486 U.S. 1006 (1988). Deliberate indifference to serious medical needs occurs when an official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial

---

[2] None of this can be disputed because it is all on videotape.
[3] In this same vein, the prison staff is entitled to qualified immunity since under the circumstances, a reasonable official would have believed that his or her actions were proper under existing law. see, e.g., Anderson v. Creighton, 483 U.S. 635, 640 (1987); Malley v. Briggs, 475 U.S. 335, 341 (1986)(The

risk of harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 114 S.Ct. 1970, 1979 (1994).

Generally speaking, a mere delay in treatment does not involve deliberate indifference. <u>Parker v. Mulderig</u>, 1993 U.S. Dist. LEXIS 2232 (E.D. 1993). In the <u>Parker</u> case, the Court cited an Illinois District Court opinion which addressed a claim for delayed medical care. <u>See</u>, <u>Black v. Lynn</u>, 1989 U.S. Dist. LEXIS 9047 (N.D. Ill. 1989). Therein the Court stated:

> "[Plaintiff] avers he suffered pain in the four or five hours between the time he first sought care from [a guard] and the time he obtained medical attention. . . . This delay, however, is constitutionally negligible. The ability to obtain immediate medical care on demand is a luxury enjoyed by few outside prison walls. Prisoners can expect no more. While delay in access to medical care can amount to cruel and unusual punishment, a few hours wait for medical care for an illness or condition that does not constitute an immediate threat to life or health is not evidence of deliberate indifference to serious medical needs."

<u>Id</u>. at *11.

Cases where District Courts have addressed and dismissed claims for delayed medical care by prisoners are actually quite common. A few of the reported decisions dismissing cases where the delay in medical treatment was much more significant than claimed by Mr. Benson here are summarized below.

<u>Johnson v. Correctional Officer Storm</u>, 1992 U.S. Dist. LEXIS 372 (E.D. Pa.)(Four hour delay in treatment of second degree burns insufficient to support an allegation of reckless indifference); <u>Moore v. Zimmerman</u>, 1985 U.S. Dist. LEXIS 17927 (E.D. Pa.)(Two hour delay in moving inmate to an outside healthcare facility after injury failed to state claim of constitutional dimensions); <u>Brawley v. Philadelphia Sheriff's Department</u>, 1988 U.S. Dist. LEXIS 14654 (E.D.

---

defense of qualified immunity provides "ample protection to all but the plainly incompetent or those who

Pa. 1988), affirmed, 872 F.2d 411 (3d Cir. 1989)(Twelve hour delay in care for a knee injury insufficient to sustain a claim for deliberate indifference).

Turning to the facts of this matter, the record reflects that sometime between 3:10 a.m. and 3:58 a.m., Lieutenant Orth was notified of a disturbance involving Mr. Benson. At that point, Benson was screaming and not responsive to verbal direction. He did not appear to have any physical problems other than the fact that he was having difficulty following directions and answering questions. Within 20 to 25 minutes, Benson appeared to be displaying seizure activity and he also started having convulsions. As soon as this was observed, the Sheriff's Department was called to transport Benson to the hospital. This was completed by 5:35 a.m. when Deputy Sheriff Muller arrived to transport Benson.

Under the circumstances, it is not readily apparent when, if ever, Mr. Benson began to display a serious medical need. However, as soon as Mr. Benson's unusual activity was observed, he was not left alone. Thereafter, when Mr. Benson displayed what appeared to be seizure activity, transportation arrangements were promptly made. At least from Lt. Orth's perspective, this situation did not appear to necessitate the summoning of an ambulance. After the Sheriff's Office was called, Benson's condition did not deteriorate, he actually got better and was more responsive to questions and verbal directions. The contemporaneous logs and reports support this.

Even if Mr. Benson did have a serious medical need and even if Lt. Orth's conduct could be characterized as "negligence," that is not enough to satisfy the deliberate indifference standard which demands knowledge of and a disregard of an excessive risk to inmate health and safety. See, Farmer, supra. Farmer makes it quite clear that the official must be aware of

---

knowingly violate the law.".

14

facts from which an inference could be drawn that a substantial risk of harm exists and the official must also draw the inference. The record does not support such a conclusion.

Without question there was no deliberate indifference on the part of Lt. Orth. After he was notified that an inmate had a problem, the inmate was accompanied and as soon as that problem appeared to become more serious, arrangements were made to transfer the inmate to a medical facility where Mr. Benson got care. At worst, Mr. Benson had to wait an hour or two for the Sheriff's Deputy to arrive. This does not amount to deliberate indifference especially in light of the fact that Benson's condition did not deteriorate, but instead, it improved after he initially began to experience seizures. Mr. Benson's constitutional rights were not infringed in the process. Accordingly, summary judgment should be entered in favor of William Orth.

Likewise, the claim against the Prison for failing to have proper medical facilities or trained personnel in place must also fail. A prison or correctional facility is not a person within the meaning of § 1983. Sponsler v. Berks County Prison, 1995 U.S. Dist. LEXIS (E.D. Pa.). Additionally, there is no dispute but that Mr. Benson got care and that he has not identified any lasting effects or injuries from the alleged delay in treatment. Under the circumstances, there is no basis for any separate claim against the Adams County Prison.

Respectfully submitted,

THOMAS, THOMAS & HAFER, LLP

By: _Kevin C. McNamara_

Kevin C. McNamara, Esquire
I.D.#72668
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108-0999
(717) 237-7132
Attorneys for Defendants

DATE: 11/15/01

## CERTIFICATE OF SERVICE

I, Kevin C. McNamara, Attorney for Thomas, Thomas & Hafer, LLP, hereby certify that a copy of the foregoing document was served upon the following, by enclosing a true and correct copy in an envelope addressed as follows, postage prepaid:

Jason E. Benson
Inmate # DS-6483
SCI Smithfield
P. O. Box 999
1120 Pike Street
Huntingdon, PA 16652

Alan S. Gold, Esquire
7837 Old York Road
Elkins Park, PA 19027

James D. Young, Esquire
Lavery, Faherty Young & Patterson, P.C.
P.O. Box 1245
Harrisburg, PA 17108-1245

**THOMAS, THOMAS & HAFER, LLP**

By: _Kevin C. McNamara_
Kevin C. McNamara

11/15/01

:148853.1

3RD CASE of Level 1 printed in FULL format.

DARRYL K. MACK, Plaintiff, v. MORRIS L. THIGPEN, et al., Defendants

Civil Action No. 88-0041-RV-S

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA, SOUTHERN DIVISION

1991 U.S. Dist. LEXIS 14803

September 3, 1991, Decided
September 4, 1991, Filed

SUBSEQUENT HISTORY: *Adopting Order of October 15, 1991, Reported at 1991 U.S. Dist. LEXIS 14722.*

CORE TERMS: recommendation, disciplinary, inmate, prison, summary judgment, non-moving, dorm, coercive, attachments, written statement, genuine issue, matter of law, Eighth Amendment, disciplinary proceeding, constitutional rights, disciplinary action, unusual punishment, disciplinary board, arresting officer, constitute cruel, assault, Local Rule, entitled to judgment, disciplinary hearing, infliction of pain, present evidence, failed to comply, evidence relied, material fact, moving party

JUDGES: [*1]

William H. Steele, United States Magistrate.

OPINIONBY: STEELE

OPINION: RECOMMENDATION OF MAGISTRATE JUDGE

Plaintiff, Darryl Mack, initiated this action pro se under *42 U.S.C. § 1983.* He names as Defendants Morris L. Thigpen, Commissioner of the Alabama Department of Corrections (hereinafter ADOC); J. O. Davis, Warden of G. K. Fountain Correctional Center; John P. Dawson, Talvin Curry, Luck Chambers, and W. A. White, who are Correctional Officers at G. K. Fountain Correction Center; James H. Wasdin, a Correctional Supervisor at G. K. Fountain Correctional Center; and Duncan Kelly, a Classifications Specialist at G. K. Fountain Correctional Center. n1

n1 Defendant Lt. E. Johnson was voluntarily dismissed from this action by the Plaintiff.

Pending before the Court is the Defendants' Answer, Special Report, and Motion for Summary Judgment (Doc. 24), and Plaintiff's Response to Defendants' Special Report and Motion for Summary Judgment (Doc. 31), which have been referred to the undersigned for recommendation pursuant to *28 U.S.C. §[*2] 636*(b)(1)(B) and Local Rule 26. After consideration and for the reasons set forth below, the undersigned Magistrate Judge recommends that Defendant's Motion for Summary Judgment be granted.

FACTS

On or about October 13, 1987, an incident occurred at the G. K. Fountain Correctional Center between Plaintiff and Defendant Curry, which resulted in Plaintiff being charged with a violation of Administrative Rule 29, assault on a person associated with the ADOC. The record indicates that a copy of the charges was served on Plaintiff and that Defendant White was named as investigating officer. On October 19, 1987, a hearing on this charge was held before a disciplinary panel consisting of Defendants Dawson, Chambers, and Kelly. At the hearing, Plaintiff was allowed to make statements, call witnesses and submit written questions of witnesses who testified. After presentation of the evidence, n2 the board determined that there was sufficient evidence to find Plaintiff guilty of the offense. The board based this finding upon the arresting officer's statement under oath. Upon finding plaintiff guilty, the board imposed punishment of 21 days in disciplinary segregation and referred Plaintiff[*3] to Social Services for possible custody increase. The record reflects that Defendant Davis, as Warden of G. K. Fountain Correctional Center, approved the disciplinary action on October 20, 1987. The record does not reflect whether plaintiff appealed this decision to Defendant Thigpen as Commissioner of ADOC.

n2 Plaintiff was allowed to call six inmates as witnesses. Plaintiff also submitted two written affidavits, one of which was signed by Plaintiff, and three pages of written questions for witnesses and



legal authority. Defendant Curry as the arresting officer was the only witness to testify against Plaintiff.

In his complaint, Plaintiff alleges that the disciplinary proceeding to which he was subjected was constitutionally defective. Initially, Plaintiff contends that the actions of Defendant Curry constitute cruel and unusual punishment in violation of Plaintiff's Eighth Amendment rights. Additionally, Plaintiff claims that his due process rights were violated by the disciplinary proceeding. Finally, Plaintiff argues[*4] that there was insufficient evidence on which to convict him and that the disciplinary board improperly based its decision to find the Plaintiff guilty on the statements of the arresting officer alone.

Defendants have answered Plaintiff's complaint alleging that no violation of Plaintiff's constitutional rights occurred and have moved this Court to grant their motion for summary judgment.

## CONCLUSIONS OF LAW

Summary judgment is proper under Fed.R.Civ.P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed. 2d 265 (1986); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987).* The moving party is entitled to judgment as a matter of law if the non-moving party cannot sufficiently show an essential element of the case to which the non-moving party has the burden of proof. *Id. at 1510.*

The evidence produced, and all factual[*5] inferences arising from it, must be viewed in the light most favorable to plaintiff as the non-moving party. *Barfield v. Brierton, 883 F.2d 923, 934 (11th Cir. 1989).* However, Fed.R.Civ.P. 56(e) requires that when a motion for summary judgment is made and supported according to the rule, the non-moving party's response must set forth specific facts showing a genuine issue for trial. *Id.* If the non-moving party's response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor. *Id.* citing *Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981),* cert. denied, *456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed. 2d 1306 (1982).*

Eighth Amendment Claim

Plaintiff contends that he was physically assaulted by Defendant Curry in violation of his Eighth Amendment rights. Plaintiff states that he was in "C" Dorm at the Temporary Housing Unit (THU) on October 13, 1987. Plaintiff contends that Defendant Curry harassed him and tried to "provoke" him. Plaintiff states that as he turned away from Defendant Curry, Defendant Curry[*6] charged him, hit him and threw him to the floor. Plaintiff also states he was beaten and kicked by Defendant Curry. Plaintiff alleges that Curry's actions constitute cruel and unusual punishment.

According to the ADOC Institutional Report, the incident between Plaintiff and Defendant Curry occurred around 7:20 a.m. as Defendant Curry was attempting to clear the dorm. The Report reflects that Defendant Curry instructed Plaintiff to leave the dorm, but plaintiff became "verbal and loud." (See Doc. 24, attachments) The Report states that Defendant Curry approached Plaintiff and placed his right hand on Plaintiff's left shoulder in an attempt to lead Plaintiff from the dorm. According to the report, Plaintiff leaped at Curry and grabbed him. A struggle took place between Plaintiff and Curry, resulting in Plaintiff clawing and hitting Curry in the face and breaking bones in Curry's hand. The struggle was broken up by other inmates.

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain, or the infliction of pain totally without penological justification." *Ort v. White, 813 F.2d 318, 321 (11th Cir. 1987).* In the context of prison discipline, [*7] the Court must consider:

. . . the distinction between, on the one hand, "punishment" in the strict sense and, on the other, immediately necessary coercive measures undertaken to obtain compliance with a reasonable prison rule or regulation. Punishment in the strict sense involves a penalty which is deliberately administered after reflection and evaluation in response to conduct occurring in the past . . . Punishment in this sense is not designed to bring an ongoing violation to a halt.

*Id. at 322* (footnote omitted). However, "an isolated assault by an individual guard on an inmate is not, within the meaning of the eighth amendment, punishment." *George v. Evans, 633 F.2d 413, 415 (5th Cir. 1980).*

"Even if a physical assault does not constitute cruel and unusual punishment, 'the use of undue force by a prison guard is actionable as a deprivation of fourteenth amendment due process rights.'" *Davis v. Locke, 936 F.2d 1208, 1212 (11th Cir. 1991),* citing *George v. Evans, supra at 416.* A violation of a prisoner's substan-


tive due process rights under the fourteenth amendment occurs "when prison officials [*8] continue to employ force or other coercive measures after the necessity for such coercive action has ceased." *Ort v. White, supra at 327.*

Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights. In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

*Gilmore v. City of Atlanta, Ga., 774 F.2d 1495, 1500-01 (11th Cir. 1985)* (en banc) citing *Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973),* cert. denied, *414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973);* See *Whitley v. Albers, 475 U.S. 312, 320-21, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986).*

Under the facts alleged by the Plaintiff, no constitutional violation[*9] has been demonstrated under either of the standards set out above. The evidence does not show that the action by Defendant Curry was authorized or acquiesced in by prison officials for a penal or disciplinary purpose. Plaintiff has made no showing of wanton conduct on the part of Curry. Consequently, Curry's actions did not constitute "punishment" under the eighth amendment. Likewise, no violation of Plaintiff's substantive due process rights has been shown. Plaintiff has alleged no serious injury nor has he presented any evidence to suggest that he received such an injury from the incident. If Defendant Curry struck Plaintiff, it appears to the Magistrate Judge that the injury to Plaintiff was minimal. In fact, the evidence reflects that it was Curry rather than Plaintiff who sustained serious injuries from the confrontation and required medical attention.

The Magistrate Judge concludes that the amount of force used by Curry was appropriate based on the prison's security interests in maintaining order and in light of the minimal injuries Plaintiff sustained. " Prison officers must . . . have the authority to use that amount of force or those coercive measures reasonably necessary [*10] to enforce an inmate's compliance with valid prison rules and to protect themselves and the other inmates." *Ort v. White, supra at 325.* The Magistrate Judge finds that Plaintiff has failed to demonstrate that Curry's actions were other than a good faith effort to restore order and prevent a disturbance. Thus, the force

used by Curry was reasonable in relation to the threat of harm and disorder apparent at the time. See *id.* Viewing the evidence in a light most favorable to the Plaintiff, no constitutional violation has been shown.

Due Process Violation

Plaintiff asserts that the disciplinary hearing afforded him failed to comply with the requirements of due process. n3 In order to ascertain the validity of this claim by the Plaintiff, the Court must apply the principles found in *Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).*

> n3 Plaintiff makes no specific allegation of a due process violation, but rather makes vague, general statements regarding violations of his due process rights. The Magistrate Judge construes these statements as an allegation that the disciplinary hearing conducted failed to comply with due process requirements.

[*11]

Under the dictates of *Wolff v. McDonnell, supra,* the due process clause requires that an inmate facing disciplinary proceedings must receive (1) advance written notice of the charges; (2) an opportunity for the inmate to call witnesses and present evidence; and (3) a written statement by the factfinders as to the evidence relied upon and the reasons for the disciplinary action. *Wolff v. McDonnell, supra, 418 U.S. at 564-568, 94 S.Ct. at 2978-2980.* The written statement protects the inmate from possible collateral consequences based on a misunderstanding of the nature of the original proceedings and from arbitrary action by prison officials and enables him to "propound his own cause" subsequent to the hearing. *Id. at 565.* "The disciplinary report in and of itself should contain a meaningful statement setting forth the essential facts relied upon." *Hunter v. State, 515 So.2d 114, 115 (Ala.Crim.App. 1987),* citing *Jackson v. State, 485 So.2d 389, 391 (Ala.Crim.App. 1984)* (emphasis in original).

After review of the[*12] evidence, the Magistrate Judge finds that the disciplinary proceedings comply with the requirements as outlined in *Wolff v. McDonnell, supra.* According to the disciplinary report, Plaintiff was served with a copy of the disciplinary report on October 15, 1987 (Doc. 24, attachments). The report reflects that Plaintiff requested six inmates as witnesses on his behalf, and all six were allowed to



testify. The report further reflects that Plaintiff was allowed to submit written questions to be asked of all witnesses, which were answered at the hearing. The report further indicates that Plaintiff was allowed to make a statement and present evidence. Finally, as required by *Wolff, supra,* the report contains a written statement by the factfinders as to the evidence relied on and the reasons for the disciplinary action. Specifically, the board found that on October 13, 1987, Defendant Curry gave a direct order which Plaintiff refused to obey and when Curry attempted to lead Plaintiff from the dorm Plaintiff "did leap at him [Curry] forcing him to grab" Plaintiff with "both falling to the floor." (Doc. [*13] 24, attachments) The board also found that "Inmate Daryl Mack hit him [Curry] in the face." (Doc. 24, attachments) The board determined and stated in its report that Plaintiff was guilty of violating Administrative Rule 29, Assault on a Person Associated with ADOC, based upon the arresting officer's statement under oath.

After review of the facts and evidence as established by the disciplinary report, the Magistrate Judge finds that the dictates of *Wolff, supra* have been met and that Plaintiff was not denied due process. Based on the pleadings and affidavits before the Court, the Magistrate Judge finds, as to this issue, there is no genuine issue as to material fact and that the Defendants are entitled to summary judgment as a matter of law.

Sufficiency of the Evidence

Plaintiff also contends that his constitutional rights were violated whereby the disciplinary board based its finding of guilt solely on the testimony of the arresting officer. The Magistrate Judge interprets this claim as a challenge to the sufficiency of the evidence supporting the board's finding. In evaluating the sufficiency of the evidence in a disciplinary proceeding, [*14] the relevant question is whether there is some evidence in the record that could support the conclusion of the disciplinary committee. *Superintendent v. Hill, 472 U.S. 445, 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985).* "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* (citations omitted). "The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact." *Id., 105 S.Ct. at 2774,* (citations omitted) (emphasis added).

In reviewing the information contained in the disciplinary report, the Magistrate Judge finds that there was some basis in fact for the board's decision to find Plaintiff guilty and to administer punishment. As stated above, the U. S. Supreme Court has determined that it is not necessary to make[*15] an independent assessment of the credibility of Curry or the weight which should have been given to his statement. That same Court has determined that the decisions of prison authorities should be given great deference and that it is not a court's function to decide how best to operate a detention facility, especially where internal security is concerned. *Rhodes v. Chapman, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).* Thus, upon consideration of all matters presented by the parties, the Magistrate Judge finds that Plaintiff's claim that there was insufficient evidence on which to base a finding of guilt is without merit.

CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Defendants' Motion for Summary Judgment be GRANTED and that judgment be entered in favor of the Defendants.

The attached sheet contains important information regarding objections to this recommendation.

DONE this 3rd day of September, 1991.

MAGISTRATE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1. Objection. Any party who objects to this recommendation[*16] or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court. Failure to do so will bar a de novo determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate. See *28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988); Nettles v. Wainwright, 677 F.2d 404 (5th Cir. Unit B, 1982)* (en banc). The procedure for challenging the findings and recommendations of the Magistrate is set out in more detail in Local Rule 26(4)(b), which provides that:

Any party may object to a magistrate's proposed findings, recommendations or report made under *28 U.S.C. § 636(b)(1)(B)* within ten (10) days after being served with a copy thereof. The appellant shall file with the



Clerk, and serve on the magistrate and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. A judge shall make a de novo determination of those portions of the report[*17] or specified proposed findings or recommendation to which objection is made and may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate. The judge, however, need conduct a new hearing only in his discretion or where required by law, and may consider the record developed before the magistrate, making his own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate with instructions.

A Magistrate's recommendation cannot be appealed to a Court of Appeals; only the District Judge's order or judgment can be appealed.

2. Transcript (applicable Where Proceedings Tape Recorded). Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate finds that the tapes and original records in this case are adequate for purposes of review. Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

2ND CASE of Level 1 printed in FULL format.

CURTIS HENDERSON, Plaintiff, v. JAMES A. CHRANS, et al., Defendants.
No. 90 C 6194
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN
DIVISION
1996 U.S. Dist. LEXIS 109

January 5, 1996, Date
January 8, 1996, DOCKETED

CORE TERMS: cell, summary judgment, cuff, prisoner, assault, leg, admit, nurse, excessive force, post-deprivation, discipline, prison, personal responsibility, deliberate indifference, medical treatment, use of force, pro se, destroyed, assaulted, wanton, rigor, entitled to use, kicked, riot, irons, gear, hit, Eighth Amendment, genuine issue of material fact, destruction of property

COUNSEL: [*1] CURTIS HENDERSON, plaintiff, [PRO SE], Dixon, IL.

For JAMES CHRANS, defendant: Richard John Krakowski, Illinois Attorney General's Office, Chicago, IL. For T TOUREA, Captain, defendant: Brian G. Donovan, Mayer, Brown & Platt, Chicago, IL.

JUDGES: James B. Zagel, United State District Judge

OPINIONBY: James B. Zagel

OPINION: MEMORANDUM, OPINION AND ORDER

Curtis Henderson, an inmate at the Dixon Correctional Center proceeding pro se, brings this action alleging violations of his Constitutional rights under the Eighth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983. Henderson alleges that the defendants assaulted him in his cell, denied him proper medical treatment, destroyed his belongings, fabricated disciplinary reports, ignored his complaints and failed to investigate the assault. The defendants now move for summary judgment on all counts.

On October 15, 1990, Henderson was in the segregation building at Sheridan Correctional Center when Captain Tourea asked him to come to the door and cuff up. Henderson alleges that as soon as the order to cuff up was given and before being given an opportunity to comply, officers Dessing, Hagerty, Howell, Komater, Lawson, Smith and Thorsen, [*2] dressed in riot gear, entered his cell and assaulted him. Henderson asserts that the officers pinned him down with a shield and continuously hit and kicked him in the face and sides until Captain Tourea ordered them to stop. Henderson was then handcuffed and placed in leg irons and taken to the dayroom area. Henderson complained that the leg irons were cutting off his circulation and about the pain in his knee that was injured during the altercation in his cell. Henderson then waited approximately twenty minutes to see a nurse who looked at his leg and back and told him to clean his wounds with warm water.

Henderson was then taken to the hospital, but instead of seeing any medical staff, he was taken into a room where Warden Chrans, Assistant Warden Acosta and Lieutenant Akins were present. Henderson alleges that Warden Chrans told him he ordered the officers into his cell.

Henderson then returned to his cell, where he discovered his cell was searched and some of his paintings and family photos had been destroyed.

Discussion

Summary judgment should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. [*3]Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). All reasonable inferences must be drawn in the light most favorable to the non-movant. Anderson v. Stauffer Chemical Co., 965 F.2d 397, 400 (7th Cir. 1992). However, the party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact remaining for trial. Celotex, 477 U.S. at 324 (1986); Schroeder v. Copley Newspaper, 879 F.2d 266, 269 (7th Cir. 1989). A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the non-movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct.

2505 (1986). Pro se litigants are not held to the same stringent standards as formally trained attorneys, thus the technical rigor of summary judgment procedures is inappropriate. *Kincaid v. Vail, 969 F.2d 594, 599 (7th Cir. 1992)*, cert. denied, *Sceifers v. Vail, 506 U.S. 1062, 122 L. Ed. 2d 152, 113 S. Ct. 1002 (1993)*.

(A)

Henderson first alleges that[*4] Officers Dessing, Hagerty, Howell, Komater, Lawson, Smith and Thorsen assaulted him in his cell, that Captain Tourea was present on the scene and ordered the assault, and that Warden Chrans and Assistant Warden Acosta ordered the officers to his cell to conduct the assault. The unnecessary and wanton infliction of pain constitutes cruel and unusual punishment prohibited by the Eighth Amendment. *Whitley v. Albers, 475 U.S. 312, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986)*. When prison officials are accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley, 475 U.S. at 320-21* (citations omitted).

The defendant officers assert that Henderson refused lawful orders to cuff up and exit his cell and thus were entitled to use force against him in accordance with Department of Corrections rules (DOC). While Henderson admits that Captain Tourea ordered him to cuff up, he claims this was not a true order because he was not given an opportunity to comply[*5] with it. Henderson claims that as soon as Captain Tourea ordered him to cuff up, the officers entered his cell in riot gear. He submits that if the order were genuine, Captain Tourea would have given him an opportunity to comply with the order and the other officers would not have been present in riot gear ready to enter his cell before the order to cuff up was even given. If Henderson was not honestly requested to cuff up, the officers cannot claim they used force to compel compliance with a lawful order. Thus, a genuine issue of material fact exists as to whether the officers applied force "in a good faith effort to maintain discipline." Id.

Assuming the officers truly gave Henderson an order to cuff up, they were entitled to use force to gain compliance with the order pursuant to DOC rules which sanction the use of force to "compel compliance with a lawful order given by an employee to ensure the safety and security of the facility." 20 Ill. Admin. Rules § 501.40(a)(1).97 It is clear that prison administrators are accorded "wide-ranging deference in the adoption and

execution of policies and practices that in their judgment are needed to preserve internal order and discipline[*6] and to maintain institutional security." *Whitley, 475 U.S. at 321-22* (citations omitted). However, a refusal to follow orders does not give prison officials the authority to use excessive force. *Whitley, 475 U.S. at 322*. Thus, a second inquiry exists as to whether reasonable force was used. The following factors are relevant to determine whether the use of force was reasonable or wanton and unnecessary: the need for application of force, the relationship between that need and the amount of force used, the threat to the safety of staff and inmates as reasonably perceived by the responsible officials and any efforts made to temper the severity of a forceful response. *Whitley, 475 U.S. at 321*. The extent of injury suffered is one factor, but there is no requirement that the prisoner be severely injured. *Williams v. Boles, 841 F.2d 181, 183 (7th Cir. 1988)*.

Henderson alleges that the officers hit and kicked him in the face and the sides until Captain Tourea ordered them to stop, then put leg irons around his ankles that were so tight they cut off his circulation. The officers do not admit or deny these assertions, they only state that the use of force was justified under[*7] the circumstances. On its face, allegations that Henderson was hit and kicked in the face and sides without any assertion that he was violent or posed a threat to the officers present or that such force was appropriate to achieve cuffing, demonstrates no need for this show of force. There is not enough information to decide whether the extent of force used under the circumstances was justified. Thus, summary judgment is denied with respect to defendant officers Dessing, Hagerty, Howell, Komater, Lawson, Smith and Thorsen.

Defendants also assert that Warden Chrans, Assistant Warden Acosta and Captain Tourea are entitled to summary judgment because they lacked the requisite personal involvement to be held liable for using excessive force. In order for liability to arise under § 1983, the plaintiff must establish a defendant's direct personal responsibility for the claimed deprivation. *Duncan v. Duckworth, 644 F.2d 653, 655 (7th Cir. 1981)*. There is no respondeat superior liability under § 1983. *Polk County v. Dodson 454 U.S. 312, 325, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981)*.

Henderson has alleged that Captain Tourea ordered the officers into his cell when he said "let's do[*8] it now." Henderson also alleged that Warden Chrans told him that he was the one who ordered the officers into his cell. However, Henderson does not present any facts that would indicate that Assistant Warden Acosta ordered

the officers to assault him, and he admits that Acosta denied giving the orders. Henderson's allegations that Tourea and Chrans ordered his assault is enough to establish their personal responsibility in the matter; but, Henderson does not allege facts sufficient to establish Acosta's personal responsibility. Thus, summary judgment is granted only for defendant Acosta.

Defendants finally claim that they are entitled to qualified immunity because the unlawfulness of the conduct was not apparent in light of the pre-existing law at the time. Government officials are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. *Harlow v. Fitzgerald, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982); Rakovich v. Wade, 850 F.2d 1180, 1205 (7th Cir.), cert. denied, 488 U.S. 968, 102 L. Ed. 2d 534, 109 S. Ct. 497 (1988).* The contours[*9] of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Rakovich, 850 F.2d at 1208,* citing *Anderson v. Creighton, 483 U.S. 635, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523 (1987).*

The law at the time of the incident in question was clear that prison guards could only use reasonable force in a good faith effort to maintain or restore discipline and were not entitled to use excessive force. *Whitley, 475 U.S. at 320-21.* Thus, the defendants are not entitled to qualified immunity because a material issue of fact exists as to whether excessive force was used.

(B)

Henderson next alleges he was denied proper medical treatment when he had to wait approximately twenty minutes to see a nurse after he was extracted from his cell and then was taken to the hospital, but was never seen by any medical staff. Henderson claims the nurse refused to treat or acknowledge his injuries, but admits that the nurse looked at his leg and back and told him to clean his wounds with warm water. To state a claim under the Eighth Amendment for failure to provide adequate medical care, a prisoner must allege "more than ordinary lack[*10] of due care for the prisoner's interests or safety," the standard is deliberate indifference. *Del Raine v. Williford, 32 F.3d 1024, 1031 (7th Cir. 1994),* citing *Whitley v. Albers, 475 U.S. 312, 319, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986).* "An inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind.... In order to state a cognizable claim, a prisoner must allege

acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble, 429 U.S. 97, 105-06, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976)* (internal quotations omitted).

Henderson fails to allege deliberate indifference to his medical condition. Henderson claims he had blood on his face and on his leg and that his knee was swollen, but he admits he was attended to by a nurse within a short period of time. Henderson does not claim his injuries were mistreated or even that they were left untreated. As such, Henderson offers no evidence in support of his bare allegation that he was denied proper medical treatment. Thus, summary judgment is granted.

(C) [*11]

Henderson next alleges that defendants trashed his cell and destroyed some of his property in violation of his due process rights. Henderson does not claim that the search was authorized. n1 It is clear that a random unauthorized intentional deprivation of property does not violate the procedural requirements of the due process clause if a meaningful post-deprivation remedy for the loss is available. *Hudson v. Palmer, 468 U.S. 517, 533, 82 L. Ed. 2d 393, 104 S. Ct. 3194 (1984).* The Supreme Court has made it clear that a post-deprivation tort remedy is all the process that is due under these circumstances. *Zinermon v. Burch, 494 U.S. 113, 128, 108 L. Ed. 2d 100, 110 S. Ct. 975 (1990).* In Illinois, a prisoner is entitled to file a tort claim in the Illinois Court of Claims pursuant to 705 ILCS 505/8. *Stewart v. McGinnis, 5 F.3d 1031, 1035 (7th Cir. 1993),* cert. denied, *127 L. Ed. 2d 393, 114 S. Ct. 1075 (1994).* Thus, Henderson has a post-deprivation remedy. *Stewart, 5 F.3d at 1036.* Therefore, the destruction of property does not constitute a due process violation because the State of Illinois provides Henderson with an adequate post-deprivation remedy. Id.

n1 The Seventh Circuit has found similar destruction of property to constitute random, unauthorized action even though the cell "shakedown" constituted authorized conduct. *Stewart v. McGinnis, 5 F.3d 1031, 1035-36 (7th Cir. 1993),* cert. denied, *127 L. Ed. 2d 393, 114 S. Ct. 1075 (1994).*

[*12]

(D)

Finally, Henderson makes allegations in his complaint

that defendants Akins, Chrans, McGinnis and Tourea fabricated disciplinary reports, ignored his verbal and written complaints and failed to investigate the assault. In response to defendants' motion for summary judgment Henderson does not allege a single fact to substantiate these bare allegations. A party may not merely stand on his pleadings to withstand a motion for summary judgment, but must allege specific facts which demonstrate that a genuine issue of triable fact exists. *Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The technical procedural rigors of motions for summary judgment do not apply to prisoners proceeding pro se. *Kincaid v. Vail, 969 F.2d 594, 599 (7th Cir. 1992)*. However, the court still holds pro se prisoner litigants to the same substantive standards as other civil litigants when it decides motions for summary judgment. Bates v. Stevenson, 93 C 1815, *1995 U.S. Dist. LEXIS 1795, 1995 WL 66389, *1 (N.D. Ill.*

Feb. 13, 1995), citing *Kincaid v. Vail, 969 F.2d 594, 600 (7th Cir. 1992)*. Thus, even though Henderson is not held to the same rigors as formally trained attorneys, summary[*13] judgment is granted since he has made no factual allegations to support his claims.

Conclusion

Summary judgment is granted in part and denied in part.

Enter:

James B. Zagel

United State District Judge

Date: JAN - 5 1996

24TH CASE of Level 1 printed in FULL format.

REGINALD LOCKETT, Plaintiff, v. KEITH COOPER, JAMES SCHOMIG, ARTHUR A. GILLEN, GILBERT ROMERO, DOUGLAS REED, RODNEY BAKER, KENNETH BRILEY, RAYMOND MILLER MAURICE LAKE, CYRANO RAYFIELD, KENNETH CATHAN, and LYNN PATTERSON, Defendants.

No. 96 C 6371

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

1997 U.S. Dist. LEXIS 13347

September 2, 1997, Decided

DISPOSITION: [*1] Plaintiff's motion for leave to file in forma pauperis granted. Complaint dismissed as to all claims save plaintiff's excessive use of force claims against Briley.

CORE TERMS: cell, trust fund, clerk, mace, discipline, excessive force, inmate, guard, assault and battery, filing fee, forma pauperis, excessive use, use of force, pro se, correctional, screening, duty, postconviction, audio-visual, confiscation, restrained, partial, assault, sprayed, macing, metal, bunk, constitutional rights, constitutional claim, motion to dismiss

COUNSEL: REGINALD D LOCKETT, plaintiff, Pro se, Joliet, IL.

For KEITH COOPER, JAMES SCHOMIG, ARTHUR A GILLEN, GILBERT ROMERO, DOUGLAS REED, RODNEY BAKER, KENNETH BRILEY, defendants: Susan Takata O'Leary, Illinois Department of Corrections, Chicago, IL.

JUDGES: REBECCA R. PALLMEYER, United States Magistrate Judge.

OPINIONBY: REBECCA R. PALLMEYER

OPINION: MEMORANDUM OPINION AND ORDER

Plaintiff Reginald Lockett has tendered for filing in forma pauperis a pro se complaint seeking damages and other relief under 42 U.S.C. § 1983 for alleged violations of his constitutional rights. Defendants are all state correctional employees who work at the Joliet Correctional Center. Enacted as part of the Prison Litigation Reform Act, Pub.L. No. 104-134, 110 Stat. 1321 (1996) ("PLRA"), 28 U.S.C. § 1915A requires the court to screen substantively an inmate complaint against officers or employees of governmental entities. The screening statute directs the court to dismiss an inmate complaint, or any portion of such a complaint, that fails[*2] to state a claim upon which relief may be granted. Because the screening is to take place "before docketing, if feasible or, in any event, as soon as practicable after docketing," the court understands § 1915A to permit a court to dismiss a case for want of arguable merit before it is "brought" within the meaning of 28 U.S.C. § 1915(b)(1).

The court presumes that the standards applied in addressing an adversarial motion to dismiss under Rule 12(b)(6) apply equally to pre-filing review of an inmate complaint under § 1915A. Under those standards, the court must accept as true the allegations of the complaint and all inferences that may be reasonably drawn from them. McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir. 1995). Moreover, because Lockett is proceeding without counsel, his allegations must be liberally construed. See Antonelli v. Sheahan, 81 F.3d 1422, 1427 (7th Cir. 1996). A motion to dismiss may be granted only if the court concludes that "no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984).

Lockett consented to have[*3] a United States magistrate judge conduct an initial review of his complaint and rule on his motion to proceed in forma pauperis. He appeared and gave testimony in support of his complaint at a hearing held December 13, 1996 at the Stateville Correctional Center. After being fully advised of the PLRA and its possible consequences, Lockett elected to proceed with his case. His testimony at the hearing is considered to explain and, when necessary, supplement the allegations of the complaint in order to determine whether it states a claim. See Eason v. Holt, 73 F.3d 600, 602-03 (5th Cir. 1996).

FACTS

Lockett's complaint arises out of a fracas that

began in the morning of August 13, 1996 when Defendant Kenneth Briley, a correctional officer at Joliet, approached Lockett's segregation cell to implement the decision of an adjustment committee revoking Lockett's "audio-visual privileges"--that is, Briley came to Lockett's cell to remove Lockett's television and radio. (Transcript of Dec. 13, 1996 hearing (hereinafter, "Tr.") at 6.) Lockett objected to the removal of these items from his cell because the summary of the disciplinary proceedings did not mention any such restriction. [*4] (Id.) Briley consulted with Capt. Baker who in turn reviewed the matter with Lt. Miller. (Tr. 7.) Miller made a phone call and returned one more time to tell Lockett he had to relinquish his audio-visual equipment. After Lockett repeatedly refused to comply with demands from Briley, Baker, and Miller that he give up his audio-visual equipment, Baker and Briley warned Lockett that they would spray mace into his cell if he did not come to the door and let them put handcuffs on him. (Tr. 8.) When Lockett continued to resist, Briley came to the cell and sprayed mace through the chuckhole. (Id.)

After Briley sprayed mace into Lockett's cell, the cell "extraction team," consisting of officers Lake, Rayfield, and Cathan, went in and forcibly restrained him. (Tr. 9-10.) Lake first entered the cell and knocked Lockett to the bed. Lake then restrained Lockett in handcuffs while Cathan put leg irons on him. Lockett testified that, while in restraints, he attempted to raise his head up from his metal bunk, but Lake "slammed my head back down on the metal bunk busting it on the side right here." (Tr. 11.) Briley then maced Lockett a second time while asking him whether he had learned his[*5] lesson yet. (Id.) Following the macing, the officers dragged Lockett from the cell and laid him on the floor. (Tr. 12.) Medical Technician Lynn Patterson arrived on the scene and treated Lockett for the mace, but did not immediately attend to the cut on the side of his head. (Tr. 14-15.) Patterson instead allegedly demanded that Lockett sign a form stating that he had refused medical care; when he refused to do so, Lt. Miller allegedly forged his signature. (Tr. 16-17.) About an hour and a half later, Defendants Gilbert Romero and Douglas Reed took Lockett to the health care unit where a doctor treated him for the head wound, a hematoma on the forehead, and abrasions on his wrists and behind an ear. Lockett acknowledged that he did not require stitches for the head injury. (Tr. 21.) The doctor gave Lockett medication and ice packs, but Internal Affairs Officer Reed refused to photograph his injuries, explaining, according to Lockett, that "they don't take pictures anymore . . . . [because] something was wrong with the camera." (Tr. at 20.)

In the afternoon following the alleged assault, Defendants Miller, Rayfield, and Cathan came to Lockett's cell to remove the rest of his[*6] property. (Complaint, P 27.) Among his belongings were legal papers pertaining to Lockett's pending state criminal appeal, a recently filed state postconviction proceeding, and a civil action pending before Judge McDade in the United States District Court for the Central District of Illinois. (Tr. 22-25.) Lockett alleges the taking of his legal material caused him delays that deprived him of his right of access to the courts.

## DISCUSSION

Lockett's complaint asserts four separate causes of action. In his First Cause of Action, Lockett alleges Defendants used constitutionally excessive force in macing and subduing him in his cell on August 13, 1996. In the Second Cause of Action, Lockett maintains defendants violated his right of access to the courts when they took his legal pleadings and law books after they assaulted him. The Third and Fourth Causes of Action are pendent state claims, one for assault and battery and the other for conversion of property. The court addresses these claims in turn.

Excessive Force

Lockett's first claim for relief is that defendants used constitutionally excessive force against him in removing him from his cell. Claims against[*7] correctional officers for excessive use of force are governed by Hudson v. McMillian, 503 U.S. 1, 117 L. Ed. 2d 156, 112 S. Ct. 995 (1992). Recognizing that officials must be given great latitude in maintaining discipline and order in the volatile context of a state prison, Hudson described the "core judicial inquiry" as "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 501 U.S. at 7, citing Whitley v. Albers, 475 U.S. 312, 89 L. Ed. 2d 251, 106 S. Ct. 1078 (1986). Hudson makes clear that "[not] every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9; Lunsford v. Bennett, 17 F.3d 1574, 1582 (7th Cir. 1994). In determining whether a particular use of force is sufficiently grievous to implicate constitutional concerns, the court must look to both motive and a variety of other factors such as the extent of injury, the need for the force, the relationship between the need for force and the amount of force used, and whatever threat the officer reasonably perceived to exist in the situation. 503 U.S. at 7.

In this case, the court notes that Lockett's[*8] testi-

mony reflects that he himself was largely responsible for creating the situation that necessitated the use of force. Lockett objected to the guards' orders because he felt that they had no authority to take his television and radio. The correctness of the guards' orders is, however, irrelevant to Lockett's constitutional claim. As the Court noted in Hudson, prison administrators are entitled to "'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'" Id. at 6 (quoting Whitley, 475 U.S. at 321-22 and Bell v. Wolfish, 441 U.S. 520, 547, 60 L. Ed. 2d 447, 99 S. Ct. 1861 (1979)). Discipline and order could not be preserved if inmates were free to flaunt a correctional officer's order every time they disagreed with it.

Here, in contrast to Lockett's implacable resistance, the guards made several attempts to defuse the situation. According to the facts outlined by Lockett, they made telephone calls to verify the validity of the confiscation order and tried to reason with Lockett before they resorted to force. Lockett was not asked[*9] to put himself in any physical danger to comply with the guards' orders. In short, the facts alleged show that Defendants, with one possible exception, used force in a good-faith effort to maintain or restore discipline rather than maliciously and sadistically to cause Lockett harm.

The first use of mace and entry into Lockett's cell was undertaken in a good faith effort to gain compliance with an order. Even the shove that caused Lockett's head wound is not open to second guessing by the court; Lockett admits that the shove was in response to his trying to rise up from the metal bunk. Any movement on his part could, in the heat of the situation, be legitimately interpreted as continued resistance to the officers' attempts to subdue him.

The potential exception to a conclusion that all of the officers' use of force was justified involves Briley's alleged second macing of Lockett. Prison officials are not free, under the standards announced in Hudson, to use physical force that is wholly lacking in legitimate penological justification. Thus, the fact the initial use of force was legitimate does not give Defendants license to continue to use force after the disturbance came to[*10] an end. Lockett contends Briley sprayed him with mace after the officers had restrained and subdued him. Giving him the benefit of all inferences that could be drawn from the facts, the court cannot conclude beyond doubt that Lockett can prove no set of facts to show that Briley acted with malice. The court therefore will not dismiss at this early stage of the proceedings the excessive force

claims against Briley. The claims against the other defendants, however, are all dismissed. n1

n1 Although Lockett does not set out a specific claim for denial of medical care, he spent some time at his hearing voicing his dissatisfaction with the quality of the medical treatment accorded him in the aftermath of the assault. The facts recounted, however, cannot support a claim for deliberate indifference to serious medical needs. See Estelle v. Gamble, 429 U.S. 97, 106, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976). Thus, to the extent the complaint can be read to allege such a claim, it is dismissed.

Nor is there any basis for a claim of supervisory liability against Defendants Cooper, Schomig, Gillen, Romero, or Reed. Plaintiff acknowledged that these Defendants were not involved in the August 13 incident and that the sole basis for his claims against each of them is their failure to take action in response to his complaints. (Tr. 31-33.) Supervisory officials may be personally liable under § 1983 only if they acted or failed to act with deliberate or reckless disregard of Plaintiff's constitutional rights, or if the constitutional deprivation occurred at their direction or with their knowledge or consent. Black v. Lane, 22 F.3d 1395, 1401 (7th Cir. 1994). Lockett has no constitutional right to require corrective action against the officers involved in the incident after they injured him, and presented no basis for a conclusion that the supervisors had advance notice that Lt. Briley would use unconstitutional force against him.

[*11]

Denial of Access to Courts

Lockett's second constitutional claim pertains to an alleged denial of access to the courts resulting from the confiscation of legal papers from his cell. To prevail on an access to the courts claim, a plaintiff must show that defendants' acts or policies have resulted in actual injury to efforts to pursue nonfrivolous conditions of confinement claims or actions attacking his conviction. Lewis v. Casey, 135 L. Ed. 2d 606, 116 S. Ct. 2174, 2181-82 (1996). Lockett alleges no such injury here. The legal papers taken from Lockett's cell related to the direct appeal of his criminal conviction, a pro se postconviction petition, and a civil action pending in federal court. At the hearing, Lockett acknowledged that his appeal was proceeding, that he was able to file his pro se postcon-

viction petition despite the loss of his papers, and that his civil case was set for trial. (Tr. 23-25.) Consequently, none of Lockett's legal proceedings were so adversely impacted by the taking of his papers as to give rise to a claim of constitutional dimension. The court therefore summarily dismisses the access to the courts claim.

Pendent State [*12] Claims

Lockett also alleges two pendent state claims for conversion and assault and battery. The court retains discretion under 28 U.S.C. § 1367 to dismiss a pendent claim if the underlying federal claim is dismissed before trial. Brazinski v. Amoco Petroleum Additives, 6 F.3d 1176, 1182 (7th Cir. 1993). That discretion is guided by such factors as judicial economy, convenience, fairness, and comity. Timm v. Mead Corp., 32 F.3d 273, 277 (7th Cir. 1994). Applying those factors here, the court declines to exercise supplemental jurisdiction over Lockett's conversion claim as it has no relation to the excessive use of force claim against Briley, the only colorable federal claim that survives preliminary screening under § 1915A. The conversion claim is dismissed without prejudice to filing in state court.

Although Lockett's assault and battery claim is substantially related to his surviving Eighth Amendment excessive use of force claim, it too must be dismissed. Under Illinois law, all claims against the State for damages in cases sounding in tort must be brought in the Illinois Court of Claims. 745 ILCS 5/1 (1996).

An action brought against an employee of the State[*13] is deemed a claim against the State and must be brought in the Court of Claims where: (1) there are no allegations that the employee acted beyond the scope of his authority; (2) the duty alleged to have been breached was not owed to the public generally, independent of State employment; and (3) the complained-of actions involved matters ordinarily within the employee's normal and official functions.

Christiansen v. Masse, 279 Ill.App.3d 162, 166, 664 N.E.2d 314, 318, 215 Ill. Dec. 917 (1st Dist. 1996). Applying these criteria to this case, it is apparent that the Illinois Court of Claims has exclusive jurisdiction over Lockett's assault claim. Defendants were acting well within the scope of their authority and normal duties in attempting to enforce the confiscation order. Moreover, the duty allegedly breached by Defendants was not one owed to the public at large; instead, it arose out of Defendants' custodial relationship to Lockett. Therefore, Lockett's assault and battery claims are ones against the state that must be brought in the Court of Claims.

CONCLUSION

Lockett is granted leave to file in forma pauperis. All claims save Lockett's excessive force[*14] claim against Lt. Briley are dismissed. Dismissal of the state claims is without prejudice. Defendant Briley is given 15 days to waive service of summons as provided under Fed. R. Civ. P. 4(d).

Payment of an initial partial filing fee is waived due to lack of funds. The trust fund officer at plaintiff's current place of incarceration is ordered to collect, when funds exist, the partial filing fee from plaintiff's trust fund account and pay it directly to the clerk of court. After payment of the initial partial filing fee, the trust fund officer at the correctional facility where plaintiff is confined is authorized to collect monthly payments from plaintiff's trust fund account in an amount equal to 20% of the preceding month's income credited to the account. Monthly payments collected from plaintiff's trust fund account shall be forwarded to the clerk of court each time the amount in the account exceeds $ 10 until the full $ 150 filing fee is paid. All payments shall be sent to the Clerk, United States District Court, 219 S. Dearborn St., Chicago, Il. 60604, attn: Fiscal Dept., and shall clearly identify plaintiff's name and the case number assigned to this action. The clerk shall[*15] send a copy of this order to the trust fund officer at the Joliet Correctional Center, P.O. Box 115, Joliet, Illinois 60432.

Plaintiff is instructed to file all papers concerning this action with the clerk of court in care of the prisoner correspondent. In addition, plaintiff must send an exact copy of any filing to defendants or, if represented by counsel, to counsel for defendants. Plaintiff must include on the original filing a certificate of service stating to whom exact copies were mailed and the date of mailing. Any paper that is sent directly to the judge or otherwise fails to comply with these instructions may be disregarded by the court or returned to plaintiff.

The clerk shall send plaintiff Notice of Availability of a Magistrate Judge along with notice of this order.

ENTER

REBECCA R. PALLMEYER

United States Magistrate Judge

Dated: September 2, 1997

3RD CASE of Level 1 printed in FULL format.

ROBERT PARKER v. C/O MULDERIG, et al.
CIVIL ACTION NO. 92-2645
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1993 U.S. Dist. LEXIS 2232

February 17, 1993, Decided
February 19, 1993, Filed

DISPOSITION: [*1] IT IS HEREBY ORDERED that the Defendants' Motions are GRANTED. IT IS FURTHER ORDERED that the Plaintiff's Motion for Appointment of Counsel is DENIED as moot.

CORE TERMS: inmate, summary judgment, cell, prison, deliberate indifference, Eighth Amendment, nonmoving party, risk of harm, dispensary, guard, door, matter of law, deliberately, indifferent, prison official, medical care, whistle, fight, stick, ran, medical attention, infirmary, minutes, reasonable jury, genuine issue, intervene, genuine, cruel and unusual punishment, issues of material fact, altercation

COUNSEL: For ROBERT PARKER, PLAINTIFF: ROBERT PARKER, BI-9732, PRO SE, STATE CORRECTIONAL INSTITUTION, 1120 PIKE STREET P.O. BOX 999, HUNTINGDON, PA 16652, U.S.A.

For MULDERIG, C/O, ERIKSEN, C/O III SGT., DEFENDANTS: SUE ANN UNGER, OFFICE OF ATTORNEY GENERAL, 21 S. 12TH ST., 3RD FL., PHILA, PA 19107-3603, USA.

JUDGES: HUTTON

OPINIONBY: BY THE COURT; HERBERT J. HUTTON

OPINION: MEMORANDUM AND FINAL JUDGMENT

HUTTON, J.

February 17, 1993

Presently before the Court is defendants John Mulderig and Arthur Eriksen's Motion for Summary Judgment, their Supplemental Motion for Summary Judgment and the plaintiff's Motion for Leave to File an Amended Complaint.

FACTUAL BACKGROUND

Plaintiff, an inmate of the State Correctional Institution (SCI) at Smithfield, brought a pro se civil rights claim pursuant to 42 U.S.C. § 1983 claiming an Eighth Amendment violation by two SCI Graterford corrections officials.

On September 30, 1991, defendant, John Mulderig, a corrections officer trainee, was working in the E-Block area escorting[*2] double-lock feed-in status inmates to the medication line at the front of E-Block. (Mulderig Declaration at P 3). Officer Mulderig whose usual shift was in the C-Block area, was unfamiliar with the inmates in the E-Block area. (Mulderig Declaration at P 2). At approximately 8:10 p.m., Officer Mulderig proceeded to escort inmate Shelton, an inmate on double-lock feed-in status, to receive his medication. (Mulderig Declaration at P 3). Upon unlocking Shelton's cell door, Shelton forced open the door and ran past Officer Mulderig. At the same time, Shelton grabbed a broomstick stick which was hidden. (Amended Complaint at P 8). Shelton ran towards the plaintiff standing ten feet away near a radiator where Shelton proceeded to assault the plaintiff with the broomstick. Other inmates were in the area of the fight and began to crowd around to view the altercation. During this time, Officer Mulderig reacting to the situation, shut Shelton's cell door to prevent Shelton's cell mate who was on restricted status from leaving the cell. (Mulderig Declaration at P 7; Eriksen Declaration at P 9). After shutting the cell door, Officer Mulderig then immediately followed the established procedures[*3] for dealing with inmate scuffles by blowing his whistle and waiting for other guards to arrive to assist in restoring order. (Mulderig Declaration at P 8).

In response to Officer Mulderig's alarm, Officer Burns and Sergeant Eriksen hurried to the scene where they assisted Officer Mulderig in stopping the fight. (Amended Complaint at P 13). As Shelton retreated from Officer Mulderig, Officer Burns handcuffed and separated Shelton from the scene. (Burns Declaration at P 5). The plaintiff was escorted to a nearby cell by Sergeant Eriksen where the plaintiff washed blood off of his head. (Eriksen Declaration at P 14). Sergeant

Eriksen subsequently ordered Officer Burns to escort the plaintiff to the dispensary for medical care for the injuries he received in the altercation. Id. (Amended Complaint at P 18). The plaintiff reported to the dispensary at approximately 8:30 p.m. escorted by Officer Burns where he received stitches for a laceration on the top of his head. (Mathis Exhibit 1).

The plaintiff filed this suit under 42 U.S.C. § 1983. The plaintiff is seeking compensatory and punitive damages against Officer Mulderig for the injuries. He argues[*4] that Officer Mulderig did not try to intervene in the fight. (Amended Complaint at P 12). He states that all Officer Mulderig did was to blow his whistle. He further alleges that Officer Mulderig should have sought assistance in escorting Shelton and that Shelton should have been handcuffed. Id. at P 10.

The plaintiff has also named Sergeant Eriksen as a defendant. Although the plaintiff received medical attention subsequent to the incident in the prison infirmary, he claims that he suffered from pain for ten to twenty minutes before Sergeant Eriksen permitted him to go to the infirmary. Id. at P 17. The plaintiff is alleging that the defendants have violated his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the Constitution. (Amended Complaint at P 19). The defendants have moved for summary judgment on the complaint and amended complaint.

DISCUSSION

The purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977). [*5]When considering a motion for summary judgment, this Court shall grant such motion "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When reviewing a motion for summary judgment, this Court will resolve all reasonable doubts and inferences in favor of the non-moving party. Arnold Pontiac--GMC, Inc. v. General Motors Corp., 700 F. Supp. 838, 840 (W.D. Pa. 1988).

The inquiry into whether a "genuine issue" of material fact exists has been defined by the Supreme Court as whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). "As to materiality, the substantive law will identify which facts are material." Id.

The Supreme Court articulated the allocation of burdens between a moving and nonmoving party in a motion for summary judgment in Celotex Corp. v. Catrett, 477 U.S. 317 (1986).[*6] The Court held that the movant had the initial burden of showing the court the absence of a genuine issue of material fact, but that this did not require the movant to support the motion with affidavits or other materials that negated the opponent's claim. Id. at 323. The Court also held that Rule 56(e) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions, on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed.R.Civ.P. 56(e)).

The Supreme Court further elaborated on the type of evidence that the nonmoving party is required to adduce in order to withstand a motion for summary judgment:

We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. Obviously, Rule 56 does not require the nonmoving party to depose her own witnesses. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves, [*7] and it is from this list that one would normally expect the nonmoving party to make the showing to which we have referred [a genuine issue of material fact].

Id.

This Court finds that there are no genuine issues of material fact in this instance. Therefore, the Court must grant the defendants' Motions for Summary Judgment.

A. Eighth Amendment Claim Regarding Risk Of Harm

The Eighth Amendment prohibition of cruel and unusual punishment "prohibits any punishment which violates civilized standards and concepts of humanity and decency." Young v. Quinlan, 960 F.2d 351, 359 (3rd Cir. 1992) (citations omitted). Deficiencies and inadequacies in prison conditions do not necessarily violate the Eighth Amendment. Id. Rather, it is violated only when an inmate is deprived of "the minimal civilized measure of life's necessities." Id. (citations omitted).

In Wilson v. Seiter,    U.S.   , 111 S. Ct. 2321, 115 L.

1993 U.S. Dist. LEXIS 2232, *7

*Ed. 2d 271 (1991)*, the Supreme Court clarified the standard for Eighth Amendment violations suffered during imprisonment. That standard includes two elements: an objective one in which[*8] the individual must demonstrate that the deprivation was sufficiently serious, and a subjective one in which the individual must show that the prison official acted with a sufficiently culpable state of mind. *111 S. Ct. at 2324.*

In the context of suits against guards for failure to protect an inmate from harm caused by other inmates, the Third Circuit has stated that where a prison official is deliberately indifferent to a pervasive risk of harm to an inmate, an inmate may obtain relief in a § 1983 action. *Young v. Quinlan, 960 F.2d 351, 361 (1992)*. In *Young v. Quinlan*, the Third Circuit expressly found that summary judgment against an inmate's claim was inappropriate where prison officials were warned by an inmate that the inmate was concerned about his safety and it was undisputed that the prison officials, aware of the warning, either did nothing or their response, if any, came too late to be of any help to the inmate. *Id. at 363.*

In elaborating on the deliberate indifference standard, the Third Circuit stated that "a prison official is deliberately indifferent when he knows[*9] or should have known of a sufficiently serious danger to an inmate." *Young at 361.* Noting that the phrase "should have known" is a term of art, the *Young* court went on to state that the phrase "should have known" does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk . . ., though something less than subjective appreciation of that risk.

*Id.*, citing *Colburn v. Upper Darby Township, 946 F.2d 1017 (3rd Cir. 1991).*

Furthermore, the "strong likelihood of [harm] must be 'so obvious that a lay person would easily recognize the necessity for' preventive action." *Young, 960 F.2d at 361*, (citing *Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd Cir. 1987)).* There must not only be a great risk of injury, but it must also be so apparent "that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges." *Colburn at 1025.* If the plaintiff has raised genuine issues of material fact [*10]that the alleged deprivations were sufficiently serious and that the prison official was deliberately indifferent to a risk of harm then the plaintiff will survive a motion for summary judgment. *Young, 960 F.2d at 361.*

The plaintiff claims that Officer Mulderig should have intervened to prevent his injuries in his altercation with Shelton. The plaintiff asserts that by allowing Shelton to run past him, Officer Mulderig exhibited deliberate indifference to the risk of harm to the plaintiff. The plaintiff further alleges that Officer Mulderig heard Shelton yell that Shelton "hated faggots" as he opened the door. He states that when Shelton ran past Officer Mulderig, Officer Mulderig saw that Shelton was carrying a stick. (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment at 3).

Officer Mulderig denies seeing the stick or hearing Shelton yell anything. (Mulderig Declaration at PP 5 and 7). Instead, Officer Mulderig asserts that Shelton ran out of the cell past him. At that point Mulderig sensed that "something was not right because of [Shelton's] behavior, but [he] did not know what." (Mulderig Declaration P 5). At that point Mulderig[*11] closed the cell door in order to secure the other inmate who shared Shelton's cell, blew his whistle in order to get assistance, ordered Shelton and the plaintiff to "break it up" and waited for back-up before intervening. Id. at PP 9-15. According to Officer Mulderig, as well as Sergeant Eriksen, the procedure which Officer Mulderig followed in utilizing his whistle to request assistance was in accordance with policies at the facility. n1

n1 The Court is mindful that in situations where prison officials need to act quickly and decisively, "prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson v. McMillian, 112 S. Ct. 295, 999 (1992).*

While these two versions have certain differences, i.e. that the plaintiff states that Shelton was carrying the stick when he left his cell and that Shelton yelled[*12] a reference or threat concerning "faggots", and Mulderig denies that he saw or heard either of these occurrences, these differences are of no import.

Even assuming that the plaintiff is correct in that Officer Mulderig was aware that Shelton was carrying the stick when he ran past Officer Mulderig as he left the cell and that Shelton yelled some sort of reference about homosexuals as Officer Mulderig opened the door, Mulderig's actions still could not as a matter of law rise to the level of deliberate indifference. Officer Mulderig

had no way of knowing prior to the incident that something was about to happen or what method would prevent the risk to the plaintiff. The incident was a single spontaneous occurrence. As the plaintiff concedes, Mulderig was a trainee who was new to the cell block and therefore had no way of knowing who if anyone might be the subject of an attack by Shelton. Nor had the plaintiff ever communicated with the Officer Mulderig or any prison official that Shelton had posed a threat to the plaintiff. (Mathis Declaration at P 4). When Officer Mulderig did sense a risk he immediately followed the protocol of the facility. He immediately secured the other inmate, [*13] whistled for assistance, ordered the inmates to stop, and then waited for other guards before intervening.

Safety concerns of the situation with which Officer Mulderig was presented warranted the action that he took. It was necessary to secure the other inmate who shared Shelton's cell in that cell before taking any other action. In addition, there were other inmates in the immediate area who could have become involved in the disruption had Officer Mulderig not taken the time to call for assistance by utilizing his whistle. Further, immediate intervention into the fighting inmates posed a serious risk to Officer Mulderig given that Shelton was utilizing a weapon until other guards arrived.

This is not a case where a guard, aware of a risk, did nothing, or reacted too late to be of any help to the plaintiff. Officer Mulderig did not ignore the risk with which he was confronted. To the contrary, he reacted to it, in a manner which was consistent with his training. This may have prevented more serious injuries to the plaintiff. Since there is an absence of any prior complaints to any prison authority which would notify Officer Mulderig that the plaintiff was under a risk of harm and [*14] since Officer Mulderig reacted to the spontaneous risk as it occurred, Officer Mulderig could not be found deliberately indifferent by a reasonable jury.

The plaintiff's complaint can only be characterized as a claim that Officer Mulderig did not intervene in a prison fight. In *Arnold v. Jones*, 891 F.2d 1370, 1372 (8th Cir. 1989), the Court of Appeals for the Eighth Circuit held that an unarmed prison guard has no duty as a matter of law to physically intervene in a prison fight which poses a serious risk of harm to the officer. In that case, the Court held it was sufficient for the guard to verbally order the inmates to stop fighting. *Id. at 1374*. Here, Officer Mulderig did more than just order the inmates to stop fighting. He immediately called for help and then intervened when help arrived. At best, the plaintiff has merely alleged a tenable action for negligence against Officer Mulderig. However, negligence is not cogniz-

able under *42 U.S.C. § 1983. Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

Therefore, it is the finding of this Court that there [*15] are no genuine issues of material fact which would require a trial. Under the circumstances as submitted by the plaintiff in his amended complaint, this Court finds as a matter of law that Officer Mulderig was not deliberately indifferent to any risk of harm to the plaintiff. No reasonable jury could find otherwise.

B. Eighth Amendment Claim Regarding Medical Treatment

In *Estelle v. Gamble*, 429 U.S. 97 (1976), the Supreme Court held that the Eighth Amendment is violated when " deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Id. at 104*. As noted earlier in this opinion, the deliberate indifference standard is a high standard, and liability cannot be imposed for "simple negligence" under the Eighth Amendment. Id.

The plaintiff alleges that after the assault by Shelton, he was "bleeding profusely from a head wound." (Plaintiff's Brief at 4). Plaintiff further alleges that defendant Eriksen "refused to respond to plaintiffs [sic] requests for medical attention," and that such refusal constitutes deliberate indifference on the part of Eriksen. [*16] Id.

However, the plaintiff concedes and the Medical Incident/Injury Report notes that the plaintiff did in fact arrive at the dispensary for treatment. He subsequently received four stitches to his head wound and was kept overnight in the infirmary for observation. The incident occurred at approximately 8:10 p.m. and the plaintiff arrived at the dispensary at 8:30 p.m. This is consistent with the reports from both defendants as well as Daniel Burns, the correctional officer who escorted the plaintiff to the infirmary, who all state that the plaintiff was taken to the dispensary within minutes of the incident after Shelton was subdued. Further, the dispensary was a walk of several minutes from where the incident occurred.

It is impossible for this Court to find that twenty minutes amounts to a substantial amount of time considering the injury. Such a minor delay was necessary to secure the immediate area, restrain Shelton, and transport the plaintiff to the dispensary. It cannot be said that Eriksen's conduct rose to the level of deliberate indifference.

It has been held that "mere delay in receiving treatment does not generally involve deliberate indifference." *Felders v. Miller, 776 F. Supp. 424, 427 (N.D. Ind. 1991).* [*17] In *Black v. Lynn, 1989 U.S. Dist. Lexis 9047 (N.D.Ill. 1989),* the Illinois district court was addressing a claim for delayed medical care as a violation of the Eighth Amendment. The court stated:

[Plaintiff] avers he suffered pain in the four or five hours between the time he first sought care from [a guard] and the time he obtained medical attention []. This delay, however, is constitutionally negligible. The ability to obtain immediate medical care on demand is a luxury enjoyed by few outside prison walls. Prisoners can expect no more. While delay in access to medical care can amount to cruel and unusual punishment, a few hours wait for medical care for an illness or condition that does not constitute an immediate threat to life or health is not evidence of a deliberate indifference to serious medical needs.

Id. at *11.

While it is true that the plaintiff required medical attention, it is also true that he received it promptly. Therefore, this Court finds as a matter of law that Sergeant Eriksen was not deliberately indifferent to the medical needs of the plaintiff.

CONCLUSION

For the foregoing reasons, this Court finds that[*18] there are no material issues of fact and that the defendants are entitled to judgment as a matter of law. Therefore, the defendants' Motions for Summary Judgment are GRANTED.

An appropriate Order follows.
FINAL JUDGMENT

AND NOW, this 17th day of February, 1993, upon consideration of Defendants' Motion for Summary Judgment and Plaintiff's Brief in Opposition thereto and the Defendants' Supplemental Motion for Summary Judgment, IT IS HEREBY ORDERED that the Defendants' Motions are GRANTED.

IT IS FURTHER ORDERED that the Plaintiff's Motion for Appointment of Counsel is DENIED as moot.

BY THE COURT:

HERBERT J. HUTTON, J.

3RD CASE of Level 2 printed in FULL format.

RICHARD BLACK, Plaintiff, GORDAN LYNN, RICHARD DE ROBERTIS, and DR. ADJMERE,
Defendants
No. 85 C 8515
UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN
DIVISION
1989 U.S. Dist. LEXIS 9047

July 31, 1989, Decided

CORE TERMS: blood pressure, hypertension, deliberate indifference, medical care, inmate, kidney, summary judgment, infection, diagnosed, medical treatment, genuine issue of material fact, doctor, cellhouse, symptoms, pain, medical attention, deposition, detecting, discovery, clinic, wait, Eighth Amendment, entitled to summary judgment, diagnostic test, medical problem, medical need, pro se, deliberately, indifferent, technician

OPINIONBY: [*1]

ASPEN

OPINION: MEMORANDUM    OPINION    AND
ORDER

MARVIN E. ASPEN, UNITED STATES DISTRICT
JUDGE:

Plaintiff Richard Black brings this pro se civil rights action pursuant to *42 U.S.C. § 1983* seeking damages and declaratory relief against Stateville Correctional Center ("Stateville") Warden Richard DeRobertis, medical technician Gordan Lynn, and Stateville physician Kishor Adjmere. Black asserts three separate violations of his Eighth Amendment right to adequate medical care. Black alleges that defendants refused him emergency treatment for a kidney infection on October 9, 1980. He also alleges that Lynn refused to take his blood pressure on or about June 5, 1980. Finally, he maintains that DeRobertis failed to establish a procedure for detecting hypertension prior to December 1980. Before the court are cross-motions for summary judgment. For the reasons that follow, the court grants summary judgment in favor of defendants.

The facts as set out in the record, read in the light most favorable to Black, are as follows. Black, currently an inmate at the Pontiac Correctional Center, began serving his sentence in 1966. During the years 1971 and 1986, Black was incarcerated at Stateville. During the time [*2] relevant to this complaint, Lynn, as medical technician for the cellhouse where Black was confined, was responsible for monitoring Black's health complaints and referring him for medical treatment when necessary. On or about June 15, 1980, Black went to Lynn's office and

requested to have his blood pressure taken. Black was concerned about his blood pressure because his brother, who at the time was also an inmate at Stateville, had been diagnosed as having hypertension. According to Black, Lynn refused to take his blood pressure because it would involve "too much paperwork".

On October 9, 1980, Black began experiencing pain in his left side and noticed a dark discoloration in his urine. Around eight o'clock in the morning, Black went to see Lynn and, after explaining the symptoms to him, requested a pass to go to the hospital for emergency treatment. Lynn refused to give Black a pass, but told him that he could refer him to Nurse Lewis for an appointment in two weeks. Black thereafter went to the "screeing clinic." The clinic was closed. Black then attempted to receive medical treatment through De Robertis. He went to DeRobertis' office, explained his symptoms, and told DeRobertis [*3] the difficulty he was having in gaining access to the hospital. DeRobertis told Black that he would arrange treatment for him. He ordered Black to return to his cellhouse and wait for a hospital pass. The morning went by and no pass arrived. Black then snuck out of his cellhouse and went to the hospital without permission. At the hospital, Black entered the emergency room and saw Adjmere, who was busy treating another inmate. Black told Adjmere he was in pain. Adjmere ordered Black to leave the room. Black then went to the next room where he encountered Dr. Hutchinson. Agreeing to see Black, Hutchinson took blood and urine tests and prescribed medication for Black before sending him back to his cellhouse. The tests indicated Black had a kidney infection. Black later was disciplined for going to the hospital without written authorization. In November or December 1980, Black was diagnosed as suffering from hypertension. Black was given, and continues to receive, drugs to treat his

1989 U.S. Dist. LEXIS 9047, *3

high blood pressure.

Defendants move for summary judgment as to all claims advanced in the complaint. Summary judgment is proper when no genuine issue of material fact exists. Fed.R.Civ.P. 56(e). A genuine [*4] issue of material fact exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).* The party bearing the burden of proof on an issue may not simply rest on the pleadings; he must affirmatively demonstrate, by specific factual showings, the existence of a genuine issue of material fact requiring trial. n1 *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jamison-Bey v. Thieret, 867 F.2d 1046, 1047 (7th Cir. 1989).* In determining whether nonmovant has successfully shown the existence of a genuine issue of material fact, the court must view the record in the light most favorable to nonmovant and give him the benefit of all inferences permissible from the facts. *Richardson v. Penfold, 839 F.2d 392, 394 (7th Cir. 1988).* Moreover, as pro se litigants are not held to the stringent standards of formally trained lawyers, the court must construe Black's pleadings liberally. See *Haines v. Kerner, 404 U.S. 519, 520 (1972).*

n1 Defendants have not responded to all Black's discovery requests. Black filed a "motion to vacate" setting out five documents that defendants have yet to disclose. The court finds that the documents Black seeks are either not relevant to the claims presented in the complaint or not material to the issues defined by the summary judgment motions. The court therefore concludes Black's lack of access to the requested documents has not prejudiced his ability to respond to defendants' summary judgment motion. In addition, Black has several outstanding requests for admissions. In a prior order, Judge Williams effectively stayed discovery by extending the time for defendants to respond to Black's requests to admit until after ruling on the summary judgment motions. In order not to prejudice Black, the court will deem as admitted each of the statements set out in Black's requests for admissions.

[*5]

A state has an affirmative duty under the eighth amendment "to provide persons in its custody with a medical care system that meets minimal standards of adequacy." *Wellman v. Faulkner, 715 F.2d 269, 271 (7th Cir. 1983),* cert. denied, *469 U.S. 1217 (1984).* To establish an eighth amendment violation for inadequate medical care, a prison inmate must prove a "deliberate indifference to serious medical needs." *Estelle v. Gamble, 429 U.S. 97, 104 (1976).* Deliberate indiffer-

ence is evidenced by acts that are "deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen, 780 F.2d 645, 652-53 (7th Cir. 1985),* cert. denied, *479 U.S. 816 (1986).* "Negligence, gross negligence, or even recklessness as that term is used in tort cases is not enough." *Shockley v. Jones, 823 F.2d 1068, 1072 (7th Cir. 1987).* Factors the court may consider when determining whether challenged acts are deliberately indifferent include, "the severity of the medical problem, the potential for harm if the medical care is denied or delayed and whether any such harm actually resulted from the lack of medical attention." *Burns v. Head Jailor, 576 F.Supp. 618, 620 (N.D.Ill. 1984).*

Black [*6] maintains that DeRobertis was deliberately indifferent to his medical needs because he failed to establish a procedure for detecting hypertension in Stateville inmate prior to December 1980. Defendants have submitted evidence directly contradicting Black's unsupported allegation regarding a lack of screening for hypertension. They show that medical personnel at Stateville did routinely monitor the blood pressure of Stateville inmates in 1980. According to the affidavit of James Heaton, Health Care Administrator at Stateville since 1985, individual inmates were given blood pressure tests during their yearly physicals. Not only does Black fail to controvert this affidavit, his own deposition and affidavit tend to support defendants' claim that procedures existed for detecting hypertension at Stateville. First, Black acknowledged in his deposition that his brother, also an inmate at Stateville, was diagnosed as having hypertension prior to June 1980. Black's affidavit also mentions that Adjmere was "conducting a hypertensive clinic" when Black barged in on the doctor demanding immediate treatment for his kidney ailment. It is therefore apparent that medical staff at Stateville were diagnosing[*7] and treating inmates with hypertension during the time period at issue in this action. The ability to diagnose hypertension and the availability of treatment for the condition rebuts any finding of any systemic and gross deficiencies in medical procedures. Black's bald assertion of such deficiencies in the medical care system at Stateville as it relates to inmates with hypertension is not enough to create a genuine issue of fact requiring trial. See *Benson v. Cady, 761 F.2d 335, 341 (7th Cir. 1985).* As Black has failed to produce any proof or make any offer of proof to support his claim, the court finds that DeRobertis is entitled to summary judgment on Black's challenge to the adequacy of the health care system at Stateville.

Black also alleges that Lynn subjected him to cruel and unusual punishment by denying his request to have his blood pressure taken on or about June 15, 1980.

1989 U.S. Dist. LEXIS 9047, *7

According to Black, Lynn was the gatekeeper for his access to medical treatment. Black therefore maintains Lynn's refusal to take Black's blood pressure because it would involve "too much paperwork" amounted to a deliberate indifference to his serious medical needs.

In order to demonstrate Lynn's deliberate[*8] indifference, Black must establish that his medical needs were serious. "A medical need is serious if it has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Henderson v. Harris, 672 F.Supp. 1054, 1059 (N.D.Ill. 1987)* (citations omitted). According to Black's deposition, he did not inform Lynn of any specific medical complaints or symptoms indicating a medical problem when he asked Lynn to check his blood pressure. He asked Lynn to check his blood pressure only because his brother had been diagnosed as having hypertension. Black therefore was not seeking treatment for a diagnosed condition or presenting symptoms that required immediate medical attention. He merely was asking for a routine diagnostic test. Black asserts that hypertension is a serious condition. It is well accepted that hypertension, if left undetected, may create serious health risks. But Black does not allege that he made any further efforts to have his blood pressure checked or to see a doctor after Lynn rebuffed his request in June 1980. Thus, in essence, he seeks to hold Lynn liable for denying[*9] a single request for a diagnostic test. Lynn may have been negligent in not checking Black's blood pressure, but "[i]solated occurrences of neglect do not amount to deliberate indifference." *Wood v. Sunn, 865 F.2d 982, 989 (9th Cir. 1988); see Murphy v. Lane, 833 F.2d 106, 108 (7th Cir. 1987).* In the circumstances of this case, Lynn's denial of Black's sole request to have his blood pressure checked did not amount to deliberate indifference to a serious medical need. n2

n2 Lynn argues that Black fails to show any injury from the lack of a blood pressure test. Black maintains that his kidney infection resulted from hypertension and could have been treated if detected in June 1980. Lynn retorts that this conclusion is conjectural and that Black submits no evidence to support his claim. Although Lynn may well be right, the court is reluctant to base its decision on this grounds since Black, through discovery, may have been able to develop evidence supportive of his claim. But even if the kidney infection was caused by hypertension, Lynn did not violate Black's constitutional rights in refusing to check his blood pressure on one occasion.

In his final claim, Black alleges [*10] defendants refused him emergency medical treatment for a kidney infection on October 9, 1980. It is undisputed, however, that Black did in fact receive medical treatment for his kidney infection on October 9, 1980. Defendants contend that the treatment rendered to Black defeats his claim of deliberate indifference.

To be actionable under the Eighth Amendment, medical mistreatment must constitute a "wanton infliction of unnecessary pain." *Estelle, 429 U.S. at 104-05.* Because Black's condition was treated promptly, he cannot complain that defendants subjected him to a wanton and unnecessary infliction of pain. Resulting harm is an essential element to a claim of constitutionally inadequate medical care. See *Martin v. Tyson, 845 F.2d 1451, 1458* (7th Cir.), cert. denied, *109 S.Ct. 162 (1988); Gibson v. McEvers, 631 F.2d 95, 98 (7th Cir. 1980); Thomas v. Pate, 493 F.2d 151, 158 (7th Cir. 1974),* cert. denied, *423 U.S. 988 (1975).* Defendants' failure to comply with Black's demands for immediate medical treatment did not cause any significant injury to Black. The fact that Black may have suffered further injury had Hutchinson not treated him is immaterial. See *Green [*11] v. McCaskle, 788 F.2d 1116, 1126-27 (5th Cir. 1986).* "The mere possibility of remote or speculative future injury or invasion of rights will not suffice" for purposes of a § 1983 action. *Reichenberger v. Pritchard, 660 F.2d 280, 285 (7th Cir. 1981).*

Black avers he suffered pain in the four or five hours between the time he first sought care from Lynn and the time he obtained medical attention from Hutchinson. This delay, however, is constitutionally negligible. The ability to obtain immediate medical care on demand is a luxury enjoyed by few outside prison walls. Prisoners can expect no more. While delay in access to medical care can amount to cruel and unusual punishment, a few hours wait for medical care for an illness or condition that does not constitute an immediate threat to life or health is not evidence of a deliberate indifference to serious medical needs. Compare *Duncan v. Duckworth, 644 F.2d 653, 654 (7th Cir. 1981)* (extreme pain caused by twenty-two month delay in scheduling surgery for broken wrist states claim for deliberate indifference) with *Shockley, 823 F.2d at 1068* (two-month delay in providing prescribed medical supplies for paraplegic not deliberate[*12] indifference) and *Benson, 761 F.2d at 341* (medical system requiring two-day wait to see doctor for neck injury not constitutionally deficient). Accordingly, the court finds defendants are entitled to summary judgment on Black's claim regarding the response to his October 1980 request for emergency medical care.

In conclusion, finding that there is no outstanding issue of material fact and that defendants are entitled to

1989 U.S. Dist. LEXIS 9047, *12

judgment as a matter of law, the court grants defendants' motion for summary judgment and denies that of plaintiff. Judgment shall issue dismissing this case in its entirety.

It is so ordered.

DATED: July 31, 1989

5TH CASE of Level 1 printed in FULL format.

JAMES O. JOHNSON v. CORRECTIONAL OFFICER STORM, et al.
CIVIL ACTION NO. 91-1029
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1992 U.S. Dist. LEXIS 372

January 10, 1992, Decided
January 14, 1992, Filed; January 15, 1992, Entered

CORE TERMS: deliberate indifference, medical treatment, deprivation, prisoner, prison, Eighth Amendment, reckless indifference, color of state law, immunities secured, impropriety, inadequacy, cognizable, foot

COUNSEL: [*1] JAMES O. JOHNSON, PLAINTIFF, JAMES O. JOHNSON BJ-1489, [COR LD NTC] [PRO SE], P.O. BOX 999, 1120 PIKE STREET, SMITHFIELD, HUNTINGTON, PA 16652-0244

STORM, CORRECTIONAL OFFICER, SERGEANT OR CENTER CONTROL DELAWARE COUNTY PRISON, THORNTON, PA., IN HIS OFFICIAL CAPACITY AND INDIVIDUALLY, DEFENDANT, ROBERT M. DIORIO, [COR LD NTC], DIORIO & FALZONE, FRONT & PLUM STREETS, P.O. BOX 1789, MEDIA, PA 19063 USA

JUDGES: HUTTON

OPINIONBY: BY THE COURT; HERBERT J. HUTTON

OPINION: MEMORANDUM AND ORDER

HUTTON, J. January 10, 1992

Now before this Court are defendant Sergeant Lance Storm's Motion to Dismiss and plaintiff's response thereto. For the following reasons the defendant's Motion will be GRANTED.

FACTUAL BACKGROUND

Pro se plaintiff, James O. Johnson ("Johnson"), initiated this action pursuant to *42 U.S.C. 1983* claiming violations of his constitutional rights arising out of alleged cruel and unusual punishment while he was incarcerated at the Delaware County Prison. Johnson avers that on September 9, 1989, while an inmate at the Delaware County prison, he spilled boiling water on his right foot. Johnson asserts that at approximately 8:15 p.m., defendant, Sergeant Lance Storm ("Storm"), refused to [*2] allow Johnson access to the medical treatment he required. It is unrefuted, however, that Johnson was treated at approximately 11:00 p.m.

DISCUSSION

Under the Civil Rights Act, *42 U.S.C. 1983,* n1 prisoners may seek redress for the deprivation, under color of state law, of rights guaranteed by the United States Constitution or federal laws. A successful *42 U.S.C. 1983* due process claim must state: "(1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Cohen v. Philadelphia, 736 F.2d 81 (3d Cir. 1984)* cert. denied, *469 U.S. 1019 (1984).* The plaintiff must show the existence of a protected life, liberty, or property interest; the deprivation of that protected interest; and the state action which brought about the deprivation of that interest. *Cohen, 736 F.2d 81; Arnett v. Kennedy, 416 U.S. 134 (1974).*

n1 Title 42 of the United States Code, § 1983 reads in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purpose of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

1992 U.S. Dist. LEXIS 372, *2

*21 U.S.C. § 1983.*

[*3]

In *Estelle v. Gamble, 429 U.S. 97 (1976)*, the Supreme Court stated the standard to be applied in cases involving alleged failures to provide adequate medical treatment during incarceration. The Supreme Court stated:

In order to state a cognizable claim, a prisoner must allege facts or omissions sufficiently harmful to evidence a deliberate indifference to serious medical needs.

*Id.* at 105-06. The Third Circuit has further explained that "only 'unnecessary and wanton infliction of pain' Estelle U.S. 429 at 103, or ' deliberate indifference to the serious medical needs' of prisoners, Id., are sufficiently egregious to rise to the level of a constitutional violation." *White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990).* Accordingly, an alleged inadequacy or impropriety of medical treatment will not support an allegation of reckless indifference. See also *Sturtz v. City of Philadelphia, 520 F.2d at 438;* and *Roach v. Kligman, 421 F.Supp. 338 (E.D. Pa. 1983)* (no Eighth Amendment claim where plaintiff admits that he received some care).

In *Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir. 1979),* [*4]the Third Circuit further stated:

As we noted in *West v. Keve, 571 F.2d 158 (3d Cir. 1978),* the Estelle test is two-pronged. "It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." *Id. at 161.*

*Pierce, 612 F.2d at 762.*

In this case, the complain tails the Estelle test as ex-

plained by the Third Circuit in Keve and Pierce. The complaint does not allege conduct evincing a deliberate indifference on the part of prison officials to the medical needs of the plaintiff. Plaintiff was housed in a maximum security individual cell. There were no witnesses to plaintiff's burn. While escorting plaintiff to Medical, defendant Storm examined plaintiff's foot and it did not appear swollen or blistered. Based upon his observations, defendant Storm concluded that plaintiff was faking the injury. Four hours later, plaintiff's foot was treated for a second degree burn. Mere negligence is insufficient to support a constitutional claim.

Moreover, the plaintiff states that the delay of approximately four hours was a violation of his Eighth Amendment rights. [*5] It is well established that an alleged inadequacy or impropriety of medical treatment will not support an allegation of reckless indifference. *Sturtz 520 F.2d at 438* and *Roach, 421 F.Supp. at 338.* Thus, the complaint fails the first prong of the Estelle test both factually and as a matter of law. Accordingly, the defendants' Motion to Dismiss will be GRANTED.

An appropriate Order follows.

FINAL JUDGMENT - January 14, 1992, Filed

AND NOW, this 10th day of January, 1992, upon consideration of Defendants' Motion to Dismiss and Plaintiff's response thereto, IT IS HEREBY ORDERED that Defendants' Motion is GRANTED.

IT IS FURTHER ORDERED that since Plaintiff has failed to raise any federal law claims, any cognizable state law claims are also dismissed without prejudice.

BY THE COURT:

HERBERT J. HUTTON, J.

11TH CASE of Level 1 printed in FULL format.

ROBERT MOORE v. CHARLES H. ZIMMERMAN, ET AL
No. 85-2010
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1985 U.S. Dist. LEXIS 17927
July 15, 1985

CORE TERMS: corrections, medical staff, medical care, medication, prison, forma pauperis, prescribed, summons, Eighth Amendment, civil rights, intentionally, accompanied, dispensed, unknown, inmate, broken, notify, opposing party, opposing

COUNSEL: [*1]

P.P., F-9544, P.O. Box 244, Graterford, PA 19426 for Plaintiffs

OPINIONBY: NEWCOMER

OPINION: NEWCOMER, J.

MEMORANDUM AND ORDER

Plaintiff has filed a *42 U.S.C. § 1983* civil rights complaint accompanied by a request to proceed in forma pauperis. Since it appears plaintiff is unable to prepay the cost for commencement of this suit, leave to proceed in forma pauperis will be granted.

Plaintiff is currently incarcerated at the State Correctional Institution at Graterford (S.C.I.G.). He states that the window of his cell door was broken, and that, although he brought this to the attention of defendant corrections officer, no action was taken to repair it. Subsequently, plaintiff was injured when he cut himself on the broken glass. When he asked his fellow inmates to notify the cell-block officer, it took one hour for defendant unknown corrections officer to arrive and escort plaintiff to the prison hospital. Plaintiff remained there for another hour until it was determined that outside medical care was needed. Plaintiff was then taken to Montgomery County Hospital where his wound was treated and medication prescribed. Upon return to S.C.I.G., plaintiff states that defendant medical[*2] staff member on one occasion dispensed medication different from that prescribed, and on another occasion mistakenly gave him medication that should have been dispensed to another inmate. Plaintiff alleges that when informed of the mistake, prison authorities did nothing to correct it. Based on these facts, plaintiff contends that his constitutional rights were violated by defendant Zimmerman's policy of failing to properly train corrections staff "to avoid unnecessary violations of prison-residence fundamental constitutional

civil rights." Plaintiff also accuses the two unknown defendants of failing to respond to his medical needs, in violation of his Eighth Amendment rights. *Estelle v. Gamble, 429 U.S. 97, 104 (1976)*.

Read liberally, *Haines v. Kerner, 404 U.S. 519 (1972)*, plaintiff's allegation against defendant Zimmerman for lack of training states a cause of action under § 1983, since plaintiff seeks to impose liability because of this defendant's policy, not merely because of his supervisory capacity. *Rizzo v. Goode, 423 U.S. 362, 371 (1976)*. See also *City of Oklahoma City v. Tuttle, 53 U.S.L.W. 4639* (June 4, 1985). Therefore, this claim may proceed. However, [*3] plaintiff's medical claims will be dismissed.

In order to state a claim under § 1983 for denial of medical care, the plaintiff must demonstrate that the defendant acted with " deliberate indifference to serious medical needs." *Estelle v. Gamble, supra*. Indifference may be "manifested by prison doctors in their response to prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id. at 104-105*. Neither a delay of one hour in defendant corrections officer's response to plaintiff's notification of his injury, nor the fact that plaintiff waited one hour at the prison hospital before being moved to an outside health care facility states a claim of constitutional dimensions under these circumstances. See *Cummings v. Roberts, 628 F.2d 1065 (8th Cir. 1980)* (a 3-day delay in medical treatment); *Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978)*, cert. denied *446 U.S. 928 (1980)* (an 11- hour delay in examination of injury and 22- hour delay in x-raying). Plaintiff's claims relating to defendant medical staff member's dispensation of the incorrect medication similarly fail[*4] to state a claim under § 1983. A complaint directed at the quality of the medical care received from medical personnel will not state an Eighth Amendment violation under § 1983, even if the treatment was so negligent as to amount to malpractice. *Estelle v. Gamble, supra at 107*. See also *West*


*v. Keve, 571 F.2d 151, 161 (3d Cir. 1978); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976); Roach v. Kligman, 412 F.Supp. 521, 525-26 (E.D. Pa. 1976).* Here, plaintiff's claims do not show the intentional conduct needed under either the Eighth or Fourteenth Amendment. *Estelle v. Gamble, supra;* see *Davidson v. O'Lone, 752 F.2d 817 (3d Cir. 1984)* (en banc), cert. granted *53 U.S.L.W. 3852* (June 3, 1985). Therefore, the claims against defendant corrections officer and defendant medical staff member will be dismissed.

Accordingly, this complaint will be dismissed pursuant to *28 U.S.C. § 1915*(d) with respect to defendants corrections officer and medical staff member, and may proceed against defendant Zimmerman. The Court takes note of plaintiff's request for appointment of counsel, but defers its decision until such time as defendant has filed an[*5] answer to the complaint.

ORDER

AND NOW, this 10th day of July , 1985, in accordance with the Memorandum filed this date,

IT IS ORDERED that:

1. Leave to proceed in forma pauperis is GRANTED.

2. The complaint is DISMISSED as frivolous under *28 U.S.C. § 1915*(d) as to defendants Two Unknown State Correctional Institution at Graterford Agents.

3. As against defendant Zimmerman, the complaint is to be filed, the summons is to issue, service is to be made upon defendant, and a copy of this Memorandum and Order is to be directed to plaintiff and defendant.

4. All original pleadings and other papers submitted for consideration to the Court in this case are to be filed with the Clerk of this Court, and shall be accompanied by proof that such documents have been served upon or mailed to counsel for the opposing party (or directly to any party acting pro se). The proof shall show the day and manner of service, i.e.:

"I, (name), do hereby certify that a true and correct copy of the foregoing (name of pleading or other paper) has been served upon the (name(s) of person(s) served) by placing the same in the U.S. Mail, properly addressed, this (date) day of (month), (year). [*6]

(Signature)"

If any pleading or other paper submitted for filing does not include a certificate of service upon the opposing part or counsel for opposing party, it may be disregarded by the Court.

5. Any request for court action shall be set forth in a motion, properly filed and served. The parties shall file copies of all motions and all papers relating to motions with the Clerk of the Court including proof of service upon opposing parties. All other requirements of the Federal Rules of Civil Procedure and Local Rules are to be followed.

6. No direct communcation is to take place with the District Judge or United States Magistrate with regard to this case. All relevant information and papers are to be directed to the Clerk.

7. In the event the summons is returned unexecuted, it is plaintiff's responsibility to ask the Clerk of the Court to issue an alias summons and to provide the Clerk with defendant's correct address, so service can be made.

8. The parties should notify the Clerk's Office when there is an address change. Failure to do so could result in court orders or other information not being timely delivered, which could affect the parties' legal rights.

IT[*7] IS ORDERED.

7TH CASE of Level 1 printed in FULL format.

HOSEA BRAWLEY v. PHILADELPHIA SHERIFF'S DEPARTMENT & DEPUTY SHERIFF JOHN
CANTORAL & DEPUTY SHERIFF KENNETH ROBERTS & DEPUTY SHERIFF JAMES DESHER &
DEPUTY SHERIFF THOMAS CLARK & JOHN DOE, an unknown Deputy Sheriff
Civil Action No. 87-6725
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1988 U.S. Dist. LEXIS 14654

December 22, 1988, Decided

CORE TERMS: deliberate indifference, medical care, bus, pretrial detainee, knee, medical attention,
medical need, prisoner, prison, summary judgment, inmate, constitutional violation, medical treatment,
pretrial detainees, detainee, deputy, suffering, indifference, municipality, seriousness, deliberate,
collision, doctor, prong, pain, Eighth Amendment, constitutional protection, failure to provide, medical
evidence, permanent loss

COUNSEL: [*1]

P.P., Phila., PA., Duane, Morris & Heckscher, Phila.,
PA., Frank E. Noyes, II, Esq.

PHILA. SHERIFFS DEPT & JOHN DOE: DEFTS
CITY OF PHILA.; JOHN CANTORAL; KENNETH
ROBERTS; JAMES DESHER & THOMAS CLARK:
CITY SOLICITOR OFFICE, Patricia V. Sun, Esq.,
Phila., PA

OPINIONBY: KELLY

OPINION: MEMORANDUM

ROBERT F. KELLY, UNITED STATES DISTRICT
JUDGE

The plaintiff, Hosea Brawley, filed this civil rights
action pursuant to *42 U.S.C. § 1983* against the
Philadelphia Sheriff's Department, a department of the
City of Philadelphia, and Deputy Sheriffs John Cantoral,
Kenneth Roberts, James Desher, Thomas Clark and John
Doe, an unknown Deputy Sheriff, alleging that the de-
fendants denied him medical attention. On September
22, 1988, we entered an Order granting the defendants'
motion for summary judgment and entered judgment in
favor of the defendants and against the plaintiff. This
memorandum is in support of that Order.

On December 8, 1986 at about 8:00-9:00 a.m., the
plaintiff, a pretrial detainee at Holmesburg Prison in
Philadelphia, was placed on a sheriff's bus in order to
be transported to City Hall. While the bus was waiting
to exit the prison grounds, a second bus struck the sher-
iff's bus and the plaintiff hit [*2]his knee on the seat in
front of him. In addition, because the plaintiff's right

hand was handcuffed to a prisoner seated next to him,
the collision jarred the plaintiff's back, neck and right
shoulder.

At the time of the collision, the sheriff's bus was
staffed by defendants Kenneth Roberts, John Cantoral,
James Desher and Thomas Clark. After the collision,
the plaintiff requested to see a doctor. The defendants
responded by telling Mr. Brawley to sit down and re-
main calm. Some of the sheriffs exited the bus to inspect
the damage and after about ten minutes, the bus became
dislodged from the second bus and proceeded to City
Hall.

The plaintiff repeated his requests for medical atten-
tion during the bus ride and while waiting in the hold-
ing cell at City Hall. On at least two occasions at City
Hall, the plaintiff was told that he would have to wait
for medical attention. Upon returning to Holmesburg
that evening at about 6:00 p.m., the plaintiff continued
to complain of aches and pains in his knee and back.
Shortly after dinner, the Health Services Physician on
duty at the prison examined the plaintiff and prescribed
a muscle relaxant and aspirin.

In support of their motion for summary [*3] judgment,
the defendants argue that slowness in providing medical
care for a minor injury to a pretrial detainee does not con-
stitute deliberate indifference to a serious medical need
and therefore there is no constitutional violation. The
defendants also argue that the plaintiff's claim against the
Philadelphia Sheriff's Department should be dismissed
because there is absolutely no evidence that the City has
a policy or practice of failing to provide medical care
to prisoners or pretrial detainees. The plaintiff con-
tends that the defendants demonstrated deliberate indif-
ference by not only failing to inquire whether the plain-

tiff needed medical assistance, but by "ignor[ing] the cries and raised voices of the plaintiff and other prisoners." Plaintiff Hosea Brawley's Response to Defendants' Motion for Summary Judgment, p. 5. The plaintiff further contends that the injury to his knee was not minor and constituted a serious medical need. Finally, the plaintiff does not address the defendants' argument regarding the dismissal of the case against the City of Philadelphia.

The entry of summary judgment is required under Rule 56(c) "after adequate time for discovery and upon motion, against [*4] a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986)*. In order to properly evaluate this case against Rule 56(c), it is necessary to discuss the various elements essential to the plaintiff's suit against the City and the deputy sheriffs.

In *Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285 (1976)*, the Supreme Court set forth the standard for reviewing prisoners' claims involving the lack or denial of medical care. In that case, the Court explained that "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id. at 106*. The Third Circuit interprets the Estelle test as requiring a two pronged analysis. *West v. Keve, 571 F. 2d 158, 161 (3d Cir. 1978)*. First, the plaintiff must prove deliberate indifference on the part of prison officials and second, the plaintiff[*5] must show that his medical needs are serious. Id.

The Due Process clause governs when a pretrial detainee makes a claim involving the condition of medical care. *Bell v. Wolfish, 441 U.S. 520, 535, 99 S. Ct. 1861, 1872 (1979)*. In Bell, the Supreme Court declared:

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

Id. (footnotes omitted). The Court went on to describe that "if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment'". *Id. at 539*. In *Hampton v. Holmesburg Prison Officials, 546 F. 2d 1077 (3d Cir. 1976)*, the Third Circuit first addressed the appropriateness of applying the deliberate indifference test of Estelle in a case where a pretrial detainee claimed that he[*6] was denied medical treatment. The Circuit Court stated:

It is questionable whether the Eighth Amendment's prohibition against cruel and unusual punishment is applicable to a pretrial detainee, the most accepted view being that the amendment's proscription applies only after conviction. But this does not mean there is no constitutional protection for a pretrial detainee. It would be anomalous to afford a pretrial detainee less constitutional protection than one who has been convicted.

*Id. at 1079-1080* (citations omitted). The court decided that "[t]o establish a constitutional violation, the indifference must be deliberate and the actions intentional. Moreover, not every injury or illness invokes the constitutional protection-only those that are 'serious' have that effect. Neglect, carelessness or malpractice is more properly the subject of a tort action in the state courts." *Id. at 1081* (footnote omitted).

Although the Supreme Court has not defined the government's due process obligation to pretrial detainees making medical claims, the protection afforded must be "at least as great as the Eighth Amendment protections available to a convicted prisoner." City of Revere [*7] v. Massachusetts *General Hospital, 463 U.S. 239, 244, 103 S. Ct. 2979, 2983 (1983)*. See also *Inmates of Allegheny County Jail v. Pierce, 612 F. 2d 754, 762 (3d Cir. 1979)* ("Thus, at a minimum the 'deliberate indifference' standard of Estelle v. Gamble, must be met."). Despite the Supreme Court's lack of a clear standard, the Third Circuit continues to evaluate medical claims made by pretrial detainees under the deliberate indifference test of Estelle. *Boring v. Kozakiewicz, 833 F. 2d 468, 472 (3d. Cir. 1987)*. The first question, then, is whether the defendant deputy sheriffs acted with deliberate indifference.

In *Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F. 2d 326 (3d Cir. 1987)*, the court, looking to other circuit decisions, described what constitutes deliberate indifference. The court stated:

Where prison authorities deny reasonable requests for medical treatment, however, and such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury,' deliberate indifference is manifest . .

. Deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that 'result[][*8] in interminable delays and outright denials of medical care to suffering inmates.'

*Id. at 346-47* (citations omitted). The second prong of the Estelle test mandates an inquiry into the seriousness of the plaintiff's medical need.

Referring to this second prong, the Third Circuit indicated that the seriousness of a medical need is determined by the effect of denying the particular treatment. *Monmouth, 834 F. 2d at 347.* Furthermore, "where denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious." Id. (citation omitted).

The defendant cites *Martin v. Gentile, 849 F. 2d 863 (4th Cir. 1988)* and *Tyler v. Rapone, 603 F. Supp. 268 (E.D. Pa. 1985)* in support of the argument that the plaintiff has failed to satisfy either prong of the Estelle test. In Tyler, an inmate claimed that the prison warden violated his right to due process by failing to provide him with dental care until two weeks after he complained of a toothache and by not promptly treating a cut suffered during a fight with another inmate. On the warden's motion for summary judgment, Judge Bechtle held that there is no constitutional[*9] violation where the plaintiff "merely claims that prison officials were slow to provide medical and dental care while the plaintiff suffered from minor medical conditions." *603 F. Supp. at 272.* In Martin, the plaintiff, a pretrial detainee, suffered multiple injuries during his arrest. These injuries included a cut above one eye, a puncture wound in his palm and scrapes and bruises on his shoulders and back. After the arrest the plaintiff was taken directly to an interrogation room and interrogated for about 14 hours. Although the officers permitted the plaintiff to wash off his wounds, the defendants refused to take him immediately to a doctor despite the detainee's continued requests for medical attention. Following the interrogation and an admission of guilt from the plaintiff, the officers took the plaintiff to a hospital for medical treatment. The court found that the "delay in taking Martin to the hospital, even if deliberate, did not amount to a constitutional violation under the Estelle standard." *849 F. 2d at 871.* The court relied on the absence of evidence regarding the seriousness of the plaintiff's injuries in support of its finding. The court points out that the[*10] plaintiff presented no medical evidence that these injuries were serious and should have been attended to sooner. In addition, there was no evidence that the delay in taking the plaintiff to the hospital aggravated his injuries.

In this circuit, it is clear that the failure to provide prompt medical attention is not tantamount to a constitutional violation. See *Hampton 546 F. 2d at 1081-82.* Even though Brawley's complaint alleges that he was denied medical treatment, this case is really about the failure to provide prompt medical attention since the plaintiff eventually did receive medical care. Regardless of how this case is characterized, the plaintiff must still satisfy the deliberate indifference test of Estelle.

There is no question that approximately 12 hours elapsed from the time the plaintiff hit his knee until he received medical care from the Health Services physician. There is also evidence that the plaintiff made several requests for medical attention. Although the defendants never inquired as to the nature of the plaintiff's condition, the deputy sheriffs did, on a number of occasions, explain to the plaintiff that he would just have to wait. Nothing in the record [*11]suggests that the actions of the defendants were arbitrary and burdensome or exposed Brawley "'to undue suffering or the threat of tangible residual injury.'" *Monmouth. 834 F. 2d at 346-47.*

Moreover, there is insufficient evidence to support the plaintiff's claim of a serious medical need. Certainly the plaintiff suffered some pain, but pain alone does not constitute a serious medical need. In its brief, the plaintiff concluded that since Mr. Brawley was scheduled to undergo arthoscopic surgery on his knee at the time of the accident, the injury to his knee must have been serious. But the plaintiff submitted no medical evidence that the knee injury was serious enough to require medical care any sooner than Brawley received it. See *Martin, 849 F. 2d at 871.* See also *Boring, 833 F. at 473-74* (expert testimony required to show that injury to pretrial detainee's knee, which had been scheduled for exploratory surgery, constituted a serious condition). Furthermore, nothing in the record reveals that the delay in treatment aggravated the plaintiff's injury or caused him to suffer any "life-long handicap or permanent loss." *Monmouth, 834 F. 2d at 347.* Finally, when Mr. [*12] Brawley received treatment the doctor prescribed a muscle relaxant and aspirin. Based on the above, we are more than satisfied that Mr. Brawley has not made a showing sufficient to establish either deliberate indifference on behalf of the sheriffs or that the injury to his knee presented a serious medical condition.

The plaintiff has also made a claim against the Philadelphia Sheriff's Department. In *Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978),* the Supreme Court stated:

Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.

Id. The record is devoid of any evidence that the Sheriff's Department, "as a matter of policy and prac-

tice, routinely fails to provide medical care to prisoners and/or pretrial detainees in accordance with their constitutional rights." Defendants' Motion for Summary Judgment, [*13] p. 5. Furthermore, the plaintiff does not even contest this argument in its response to the summary judgment motion. Since the plaintiff has not made a showing sufficient to establish an unconstitutional policy or custom on the part of the Department, we shall also dismiss the plaintiff's cause of action against the city of Philadelphia.

1ST CASE of Level 1 printed in FULL format.

JEFFREY L. SPONSLER v. BERKS COUNTY PRISON
CIVIL ACTION NO. 95-1136
UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA
1995 U.S. Dist. LEXIS 2737

February 28, 1995, Decided

CORE TERMS:  prison, correctional, forma pauperis, memorandum, frivolous, harassed, leave to
proceed, length of time

COUNSEL: [*1] JEFFREY L. SPONSLER, [PRO SE], PLAINTIFF, BERKS COUNTY PRISON, LEESPORT, PA.

JUDGES: Assigned to: JUDGE WILLIAM H. YOHN, JR.

OPINIONBY: WILLIAM H. YOHN, JR.

OPINION: MEMORANDUM

YOHN, J.

Plaintiff has filed a pro se *42 U.S.C. § 1983* civil rights action against the Berks County prison. He is alleging, in essence, that he has been harassed by several correctional officers at the prison.

With his complaint, plaintiff filed a request for leave to proceed in forma pauperis.  As it appears he is unable to pay the cost of commencing this action, leave to proceed in forma pauperis is granted.

Plaintiff is suing the Berks County prison because he has allegedly been harassed by correctional officers. In order to bring suit under *42 U.S.C. § 1983*, plaintiff must allege that a person acting under color of state law deprived plaintiff of his constitutional rights.  *West v. Atkins, 487 U.S. 42, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988)*.  A prison is not a "person" subject to suit under the civil rights laws. *Mitchell v. Chester County Farms Prison, 426 F. Supp. 271 (E.D. Pa. 1976)*; [*2] see also *Brooks v. Pembroke City Jail, 722 F. Supp. 1294, 1301 (E.D. N.C. 1989)*.

Plaintiff may also be attempting to sue several correctional officers at Berks County prison. However, he has failed to comply with Rule 10(a) of the Federal Rules of Civil Procedure which provides that the caption of the complaint must contain the names of all of the parties. Furthermore, the form that plaintiff was provided,

by this court, to file his complaint requests plaintiff to state, "as briefly as possible the facts of your case." Additionally, it instructs plaintiff if he intends to allege a number of related claims to number and set forth each claim in a separate paragraph.  Since plaintiff has failed to do so, the complaint will be dismissed without prejudice as frivolous. *28 U.S.C. § 1915(d)*.

If plaintiff chooses to file a new complaint, he shall provide "a short and plain statement of the claim" sufficient to show facts entitling him to relief.  Fed. R. Civ. P. 8(a)(2). He shall set forth, in paragraphs, each individual by name and discuss how each person is involved in his case. In addition, he should fully describe 1) the[*3] length of time that he was required to sleep on the floor in a double-cell, 2) the length of time that he was denied more than one set of underwear, and 3) any response that he received from a correctional officer or any other prison official regarding his cell conditions or his change of clothing.

For the foregoing reasons and in accordance with this memorandum, the complaint is dismissed without prejudice.

ORDER

AND NOW, this 28th day of Feb, 1995, for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that:

1.  Leave to proceed in forma pauperis is GRANTED; and

2.  The complaint is DISMISSED WITHOUT PREJUDICE as frivolous pursuant to *28 U.S.C. § 1915(d)*.

AND IT IS SO ORDERED.

WILLIAM H. YOHN, JR., J.


```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
      JASON E. BENSON,               :
 3           PLAINTIFF              :
                                    :
 4              VS                  :  NO. 1:CV-00-1229
                                    :
 5     WILLIAM G. ELLIEN, M.D.,      :
      et al.,                        :
 6           DEFENDANTS             :
 7
 8
               DEPOSITION OF:  JASON E. BENSON
 9
               TAKEN BY:      DEFENDANT - DR. ELLIEN
10
               BEFORE:        TERESA K. BEAR, REPORTER
11                            NOTARY PUBLIC
12             DATE:          AUGUST 30, 2001, 12:22 P.M.
13             PLACE:         SCI SMITHFIELD
                              1220 PIKE STREET
14                            HUNTINGDON, PENNSYLVANIA
15
16    APPEARANCES:
17        JASON E. BENSON, PRO SE
18        MONAGHAN & GOLD, P.C.
          BY:  ALAN L. BUTKOVITZ, ESQUIRE
19
                   FOR - DEFENDANT - DR. ELLIEN
20
          LAVERY, FAHERTY, YOUNG & PATTERSON
21        BY:  JAMES D. YOUNG, ESQUIRE
22                 FOR - DEFENDANT - DR. LONG
23        THOMAS, THOMAS & HAFER
          BY:  KEVIN C. McNAMARA, ESQUIRE
24
                   FOR - ADAMS COUNTY DEFENDANTS
25
```



**62**

1    A    When I left and I would come back, they would
2    buzz you into the intake area and then you would sit on the
3    bench and they'd cuff you to the bench.  Then when it was
4    your time to be stripped, they'd uncuff you and you'd go
5    into what they call the medical room and conduct a strip
6    search and you go back to your block.
7    Q    Now, each of the times between May 23rd, 1998
8    and August of 1998 when you had been in and out of the jail,
9    whenever you came in did they follow that same procedure?
10   A    Yes.
11   Q    And when you said they would cuff you to the
12   bench, that meant you would have one part of the cuff hooked
13   to the bench and the other one hooked to your hand?
14   A    Yeah, you would be like this.  There's a ring
15   on the wall.
16   Q    So would you have cuffs on both wrists or
17   would you have a cuff --
18   A    Just on one wrist hanging to the wall.
19   Q    And then there's a pole there that they can
20   cuff you to?
21   A    Yes.
22   Q    Were you wearing shackles on your legs during
23   those two or three times that you'd been in and out?
24   A    No, they take those off.  The sheriffs take
25   them with them.  They're the sheriff's cuffs.  They just

**63**

1    switch your handcuffs over.
2    Q    Whenever you needed to be moved from the jail,
3    from the Adams County Prison to court or wherever you had to
4    be outside, was it always the sheriff that did the
5    transporting?
6    A    Yes.
7    Q    Now, in these two or three times that you'd
8    been through a strip search prior to August 1998, when they
9    uncuffed you from the pole in the intake area and took you
10   into the medical area, did they recuff you after you were
11   unhooked from the pole?
12   A    No.
13   Q    Did they remove the cuffs entirely?
14   A    Yeah.
15   Q    So when you went in to be strip searched, you
16   would go into the nurse's area or the medical area with no
17   restraints on you at all?
18   A    That's right.
19   Q    And other than the very first time that you
20   came in, were you wearing the orange prison outfit that they
21   put on you there?
22   A    Yes.
23   Q    And when you did the strip search, did you
24   strip yourself or were you assisted?
25   A    I stripped myself.

**64**

1    Q    And then did a corrections officer examine you
2    at that time?
3    A    Yes.
4    Q    And do you understand why it is that they were
5    doing a strip search?
6    A    Sure I do.
7    Q    Why?
8    A    Well, they don't want you bringing back any
9    sort of contraband.
10   Q    And contraband could include weapons --
11   A    Weapons, drugs, cigarettes, whatever.
12   Q    And would you agree with me that the prison
13   has a -- there's a reasonable reason why they do that?
14   A    Yes.
15   Q    And had you ever refused to submit to a strip
16   search up until August of 1998?
17   A    Never.
18   Q    Now, when you were at Camp Hill, do they also
19   have a strip search procedure there?
20   A    Yes, they do.
21   Q    And without exception, every time you came
22   into the Camp Hill Prison from outside did you have to
23   submit to a strip search?
24   A    Yes, you did.
25   Q    They followed basically the same procedure

**65**

1    that they had had at Adams County Prison for strip searching
2    at Camp Hill?
3    A    Yes, they did.
4    Q    And there were absolutely no exceptions, every
5    time you came in you got strip searched?
6    A    That's correct.
7    Q    Now, at Smithfield, do they have a strip
8    search procedure here?
9    A    Yes, they do.
10   Q    And every single time you come into Smithfield
11   from the outside are you strip searched here?
12   A    Yes.
13   Q    And is the procedure basically the same as
14   what it was at Adams County?
15   A    Yes.
16   Q    And do you understand that at Camp Hill and
17   Smithfield they have the same interest in not wanting people
18   coming in from the outside to bring in contraband?
19   A    That's correct.
20   Q    Do you think that's a good reason for having a
21   strip search?
22   A    Yes, I do.
23   Q    Whatever number of times there were that you
24   came into Camp Hill and to Smithfield, did you ever refuse a
25   strip search?

66

1    A    No.
2    Q    Did anybody ever have to apply force to you up
3    until this incident in Adams County in August of 1999 to get
4    you to comply with the strip search?
5    A    No.
6    Q    You always did it voluntarily?
7    A    Yes.
8    Q    I think you mentioned somewhere during your
9    responses to Mr. Butkovitz's questions that you had kind of
10    an anxiety situation over returning to Adams County for
11    trial on something else.
12    A    It was a subsequent visit after the events
13    that took place on my complaint. I had to go down there to
14    answer to a charge.
15    Q    A charge that arose as a result of that
16    incident with the pepper spray?
17    A    That's correct.
18    Q    You were charged with a separate crime for
19    that incident?
20    A    Yes, I was.
21    Q    Were you convicted on that?
22    A    I pled on that. Nolo contendere.
23    Q    No contest to what charge?
24    A    To aggravated harassment by a prisoner.
25    Q    How much time did you get for that?

67

1    A    One to two years.
2    Q    Is that on top of your three to six?
3    A    Concurrent.
4    Q    Do you have any expectation of when you're
5    going to be released here?
6    A    I imagine I'll max out.
7    Q    Is that because you've been a discipline
8    problem while you've been in the system?
9    A    No, because of the charge that I've had I've
10    already gotten a two-year hit on a three to six and I really
11    don't want to give them a year on the street, understand.
12    Q    I don't understand what that means.
13    A    I got a two-year hit, meaning I can't see the
14    board again for two years.
15    Q    Is that because of the incident in Adams
16    County?
17    A    Yeah. So that's five years. I got three to
18    six. I really don't want to do a year on parole, you know,
19    because, I mean, the recidivism rate is so high. I have my
20    own anxieties as to, you know what I mean, how successful
21    I'll be. Not that I'm going to go out there with criminal
22    intent, but that I'll be able to get a job and do everything
23    as smoothly as perhaps the parole board would like me to.
24    So I just feel as though probably May 23rd, 2004 I'll be
25    walking out the gates.

68

1    Q    And other than those two charges, you don't
2    have anything else -- there's no other reason why you're in
3    prison?
4    A    No.
5    Q    There aren't additional charges, nothing in
6    other jurisdictions or other states?
7    A    That's everything.
8    Q    You mentioned that when you went into Adams
9    County Prison I believe in May of 1998 that your anxiety
10    feelings increased and that you had additional anxiety
11    attacks?
12    A    Not until later on during that day, you know,
13    that things happened. Not immediately when I first got
14    there. I adjusted well.
15    Q    I'm not talking about the day you went back
16    for your post conviction relief act hearing. I'm talking
17    about the original commitment. I understand --
18    A    Oh, my original commitment, I'm sorry.
19    Q    I understood you to answer Mr. Butkovitz's
20    questions that you -- that upon your initial arrest you had
21    some increased anxiety and problems with anxiety attacks.
22    A    Yes, but it really wasn't being addressed at
23    the time.
24    Q    That doesn't form the basis for any of the
25    claims you have in this case, does it?

69

1    A    No.
2    Q    So I'm not going to ask you questions about
3    that because it doesn't have anything to do with this
4    lawsuit.
5    A    Okay.
6    Q    I don't know much about seizure disorders.
7    You talked about grand mal seizures, petit mal seizures --
8    A    Um-hum.
9    Q    -- breakthrough seizures. Let's try and deal
10    with them one by one. A petit mal seizure, what is that for
11    you?
12    A    I'll lose my bearings. I almost -- I
13    literally lose vision. It's like I've fallen asleep and
14    I've gone into a dream for perhaps a few minutes, you know,
15    but in reality it's only been a few seconds. You just
16    completely lose your bearings. That's what a petit mal
17    seizure is.
18    Q    How long have you been having those kind of
19    seizures?
20    A    Since I was about 12, 13 years old.
21    Q    And all the medications that you've taken over
22    the years, none of them have done away completely with that
23    type of seizure?
24    A    No.
25    Q    Is it something that you still have once in a


102

1  car. They had my -- the camera on me when I went to see
2  Steinour when I came back out.
3  Q      You say they had the camera on you.  Do you
4  know the camera was rolling this whole time?
5  A      I assume so, given that they had it on me.
6  Q      The camera was there, but do you know if it
7  was turned on, if it was recording information?
8  A      No, I don't know if it was or if it wasn't.
9  Q      Do you believe there's additional videotape
10  above and beyond what you have in your possession?
11  A      Most definitely.
12  Q      Have you ever seen that videotape?
13  A      No.
14  Q      Do you know if somebody changed tapes at some
15  point in time, if they took the first tape out and put
16  another one in later?
17  A      I don't know what circumstances led to that
18  first 30 seconds or so being missing off the front of the
19  tape.  To me it seems a little suspicious, but I don't know
20  what circumstances led to that.  And I know that there is
21  more to that video than there is available.
22  Q      And you say they actually videotaped your
23  stripping and they videotaped you naked?
24  A      Um-hum.
25  Q      Yes or no?

103

1  A      Yes.
2  Q      And they got on the video your request for
3  transport to the hospital?
4  A      Yes.
5  Q      And Lieutenant Jennings saying that you didn't
6  need any?
7  A      Yes.
8  Q      How long after all this happened did you
9  actually go to the hospital?
10  A      Within the hour.
11  Q      At some point in time somebody decided to send
12  you.  Who made the decision?
13  A      I don't know.  It's not in any of the reports,
14  who made the decision.
15  Q      Who transported you to the hospital?  Was it
16  the sheriff's office again?
17  A      It was the sheriff's office with Lieutenant
18  Jennings.
19  Q      And who was operating the video camera?
20  A      Lieutenant Jennings.
21  Q      Who was operating it during your strip search?
22  A      I really don't know who that was.  The whole
23  -- they changed so many guards since I was there last.
24  Q      Lieutenant Jennings, when he was filming you,
25  was he using his right hand or his left hand?

104

1  A      I couldn't tell if he was using maybe both.  I
2  really wasn't sure.
3  Q      Did he ride in the front or the back seat of
4  the car?
5  A      He was in the front, passenger seat.
6  Q      And this filming continued in the parking lot
7  of the hospital and --
8  A      Into the hospital.
9  Q      And into the hospital?
10  A      Um-hum.
11  Q      Did he videotape the doctor's examination at
12  the hospital?
13  A      Yes.  Yes, he did.
14  Q      When did the videotape stop?
15  A      When we got back to the prison and I was
16  locked in the cell.
17  Q      How much time total would you say was captured
18  on videotape?
19  A      From beginning to end?
20  Q      Yes.
21  A      Probably about an hour and 45 minutes.
22  Q      Was there any other abuse that was captured on
23  the videotape?
24  A      Other than what -- not other than what's on
25  there.

105

1  Q      Abuse was the wrong term.  Was there any other
2  application of physical force on the videotape?
3  A      No.
4  Q      Was there anything else other than Lieutenant
5  Jennings saying you didn't need medical care --
6  A      Um-hum.
7  Q      Was there anything else from your perspective
8  bad that happened in that period of time?
9  A      Not during that -- the day of the 27th, no.
10  Q      You believe there was additional videotaping
11  and in that additional videotaping, if we had it today, it
12  wouldn't show anybody hitting you or applying force to you?
13  A      Not in those missing moments, no.
14  Q      How long did the effects of the pepper spray
15  last on you?
16  A      Half an hour.
17  Q      And did they do anything at the hospital to
18  make it stop burning?
19  A      No.
20  Q      Did it stop burning before you left the
21  prison?
22  A      No.
23  Q      Did it stop burning before you got to the
24  hospital?
25  A      No.  By the time I left, it felt like I just



106

1 had a lot of sand in my eyes.
2    Q    Did you get any treatment at the hospital for
3 the pepper spray?
4    A    No.
5    Q    Did you get any treatment for the -- you said
6 you got some knees and the boot on the back of your neck?
7 Did you get any treatment for that?
8    A    They gave me some pain medicine.
9    Q    And did any of the kneeing or the foot on the
10 back of the neck or -- did any of that leave a mark?
11   A    Yes.
12   Q    Where?
13   A    I had a very clear imprint of a boot here on
14 the side.
15   Q    You're indicating underneath your right arm
16 and your rib area?
17   A    Correct.
18   Q    You had a whole boot?
19   A    A whole boot.
20   Q    Impression on your side?
21   A    Yes.
22   Q    Do you know who left that?
23   A    No.
24   Q    Okay.
25   A    I had a bruise underneath -- I guess that

107

1 would be C-1, C-2.
2    Q    Don't get medical.
3    A    On my neck.
4    Q    High in the back of your neck?
5    A    Correct.
6    Q    And how did you see you had a bruise there?
7    A    The doctor.
8    Q    The doctor said you had a bruise there?
9    A    Yes. And I had bruises I think up here on my
10 temple.
11   Q    You're indicating your left temple area?
12   A    Correct.
13   Q    Was that from when your head hit the computer?
14   A    I would imagine.
15   Q    You say you would imagine. Did it happen from
16 anything else?
17   A    It could have been from me hitting the floor.
18   Q    Do you know?
19   A    No.
20   Q    The period of so called missing videotape,
21 would that have showed you were using additional foul
22 language to the corrections officers?
23   A    Yeah, I believe I was pretty explicative about
24 it during that.
25   Q    And that period of missing videotape, would

108

1 that also have shown your threatening to sue the corrections
2 officers and the staff there?
3    A    Well, I think I did that on camera.
4    Q    Well, I'm asking about the period of missing
5 videotape. I know you did it on the period that we have
6 it. I'm talking about the period when you think that there
7 was videotape being made.
8    A    The time that there wasn't, no. There wasn't
9 anything like that said.
10   Q    What other conversations would have occurred
11 in that period of missing video that you believe exists?
12   A    I recall when I was being -- when they were
13 actually searching me, you know, I said all you had to do
14 was uncuff me, but no one was responding. All you had to do
15 was uncuff me, you know, but nobody was really saying
16 anything so it didn't matter.
17   Q    Do you have any understanding of why the Adams
18 County Prison staff is -- has a heightened sensitivity to
19 prisoners who spit, especially prisoners who attempt to spit
20 on corrections officers, other than the fact that it's
21 disrespectful?
22   A    You mean if you have the spread of a disease.
23 I'm not sure.
24   Q    And they did put a special device on your face
25 at the end of this confrontation to prevent you from

109

1 spitting?
2    A    Yes, they did.
3    Q    Did you have any injuries in this incident
4 other than the superficial bruises that you mentioned?
5    A    With the seizure incident. That's not
6 counting the 30th.
7    Q    I'm talking only about the incident with the
8 pepper spray.
9    A    Only the incident -- no.
10   Q    Only the superficial bruises?
11   A    Just the bruises.
12   Q    And the temporary burning of your eyes and
13 your mouth?
14   A    Sure. That's an injury and a half.
15   Q    But their use of the paper spray on your face,
16 did it leave any marks?
17   A    Not that I'm aware of.
18   Q    Did it make your eyes red?
19   A    Yes.
20   Q    How long did that last?
21   A    When I got back from the hospital and was able
22 to look in the mirror, it was still there. So you figure an
23 hour and 45 minutes, two hours.
24   Q    Was it gone the same day?
25   A    Yes.



BENSON, JASON
08/30/01

BENSON VS
ELLIEN

126

1  Depakene?
2  A    Yes, I was.
3  Q    What was that prescribed for?
4  A    Petit mal seizures.
5  Q    When were you prescribed that?
6  A    I don't recall the date exactly.
7  Q    Did you ever refuse to take the Depakene?
8  A    Oh, yeah.
9  Q    And why did you refuse that?
10  A    I had to see the doctor because they had a
11  younger doctor come in — I wasn't seeing Long, understand,
12  after September — or a little after September, maybe
13  October. I wasn't seeing him. And so they had other
14  doctors come in to see me every once in a while and it was
15  this other younger fellow who prescribed the Depakene. I
16  had a bad reaction to it. I was wobbly and nauseous and —
17  he said you've got to be taken off of it. So they took me
18  off of it.
19        And in respect to the phenobarbital, I had
20  asked to be seen about these petit mal seizures because they
21  had got worse once I got back from Adams County. I had
22  asked to be seen over and over again. The only reliable way
23  to actually get in here was to stop taking the med so I
24  stopped taking it.
25  Q    And that was in October of 2000?

127

1  A    Like I said, I think the refusal was in this
2  year, but I may be wrong. I may be wrong. I'm not entirely
3  sure, to be honest.
4        MR. YOUNG: That's all I have.
5        (The deposition was concluded at 2:58 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

128

1
2  COUNTY OF DAUPHIN          :
                             : SS
  COMMONWEALTH OF PENNSYLVANIA   :
3
4        I, Teresa K. Bear, Reporter-Notary Public,
5  authorized to administer oaths within and for the
6  Commonwealth of Pennsylvania and take depositions in the
7  trial of causes, do hereby certify that the foregoing is the
8  testimony of JASON E. BENSON.
9        I further certify that before the taking of
10  said deposition, the witness was duly sworn; that the
11  questions and answers were taken down stenographically by
12  the said Teresa K. Bear, a Reporter-Notary Public, approved
13  and agreed to, and afterwards reduced to typewriting under
14  the direction of the said Reporter.
15        I further certify that the proceedings and
16  evidence are contained fully and accurately to the best of
17  my ability in the notes taken by me on the within
18  deposition, and that this copy is a correct transcript of
19  the same.
20        In testimony whereof, I have hereunto
21  subscribed my hand this 11th day of September,, 2001.
22
23
          Teresa K. Bear, Reporter
24            Notary Public
          My commission expires
25            on April 13, 2003