Law Clerk's Copy

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
NOV 15 2001
PER _____
HARRISBURG, PA.    DEPUTY CLERK

JASON ERIC BENSON,
    Plaintiff

v.

THOMAS DURAN; BRUCE CLUCK;
DEBRA HANKEY; JOHN JENNINGS;
WILLIAM ORTH; RAE HIENTZELMAN;
RONALD LONG and WILLIAM ELLIEN;
BRITON SHELTON; ADAMS COUNTY
PRISON
    Defendants

CIVIL ACTION

NO. 1:00-CV-01229

JUDGE CALDWELL

### STATEMENT OF MATERIAL FACTS SUBMITTED BY DEFENDANTS DURAN, CLUCK, HANKEY, JENNINGS, ORTH, HEINTZELMAN, SHELTON AND ADAMS COUNTY PRISON IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1.    On August 25, 1999, Jason Benson was temporarily transferred to the Adams County Prison for the purpose of attending a Post Conviction Relief Act Hearing. (Complaint ¶ 1)

2.    On August 27, 1999, Corrections Officer Shelton was on duty at the intake area of A Block of the Adams County Prison when Jason Benson returned from court. (Shelton Affidavit ¶ 2)

3.    Prior to leaving for court that day, Mr. Benson had earned himself a misconduct charge for inappropriate behavior. (Shelton Affidavit ¶ 3)

4.    When Benson returned to the prison at approximately at 11:10 a.m., he was told that he was going to be placed in administrative segregation pending a decision on his

misconduct. Mr. Benson responded by asking why he was going to lock down and an explanation of the reason for this action was given. (Shelton Affidavit ¶ 4)

5. Upon being notified that he was being placed in administrative segregation, Benson became verbally aggressive and loud, saying things such as "Ahh fuck all of you mother fuckers" and "this is fucking bullshit." He then directed the same type of comments to Lieutenant Jennings who was nearby. Benson then sat quietly for about three minutes until other inmates that had returned from court were strip searched. (Shelton Affidavit ¶ 5)

6. After the other inmates had completed the strip search procedure, Benson was escorted back to the medical room so that he could be strip searched. (Shelton Affidavit ¶ 6)

7. On August 27, 1999, and long before, the strip searching of prisoners returning to the Adams County Prison was a mandatory procedure and strip searches were conducted without exception. The purpose of the strip search procedure is to prevent contraband from coming into the prison and helps to ensure safety of the prisoners, the prison staff and helps maintain the orderly operation of the prison. (Duran Affidavit ¶ 11)

8. Mr. Benson agrees that the strip searching of prisoners is a sound and reasonable policy. (Benson Deposition pp. 64-65)

9. On the way to the medical room, Benson again asked CO Shelton why he was getting locked down and it was again explained to him that it was because of his actions and comments prior to the time that he left for court that morning. Benson then said to Shelton "I know you're not going to be a bitch and let that get to you. You bust my balls, why can't I bust yours?" At this point, CO Shelton told Benson that he needed to go into the medical room so that he could be strip searched and Mr. Benson's reply was "fuck you, I ain't getting stripped." The request was repeated and Benson again replied "fuck you." Lieutenant Jennings, who was

2

also present, then asked Benson if he was going to comply with the strip search procedure and Benson said to him "man, fuck you." Up to this point, there was no videotaping taking place and neither the Warden nor any of the Deputy Wardens had even been informed that there was a problem at the intake area. (Shelton Affidavit ¶ 7)

10. After Mr. Benson refused three requests to comply with the strip search procedure, Lieutenant Jennings left and returned with Warden Duran and Deputy Wardens Cluck and Hankey. At this point, a video camera was being operated by Warden Duran. Mr. Benson was again asked, this time by Deputy Warden Cluck, to comply with the strip search procedure, but he again refused. Mr. Benson was then asked a final time by Lieutenant Jennings if he was going to comply with the strip search procedure and yet again he refused. (Shelton Affidavit ¶ 8)

11. The situation with Mr. Benson posed a potential threat to Corrections Officers and the inmates. (Duran Affidavit ¶ 2)

12. Before any force at all was applied to Mr. Benson, Lieutenant Jennings, Sergeant Heintzelman, Corrections Officer Shelton and Deputy Warden Cluck were all brought into the room. The presence of so many members of the staff was intended to demonstrate a show of force to the inmate and to make it clear that he would not be allowed to avoid strip search procedure. (Duran Affidavit ¶ 4)

13. At the time of this occurrence, it was Adams County Prison policy and procedure to avoid conflict and actual application of force whenever possible. However, Mr. Benson repeatedly and steadfastly refused to respond first to a verbal request, second, to a verbal command and third, to a show of physical force. (Duran Affidavit ¶ 5)

3

14. After repeated refusals to comply with the strip search procedure, and at the direction of the Warden, Lieutenant Jennings sprayed Benson with OC foam. The purpose for the use of the foam was to obtain compliance with a minimal use of force and without placing any of the officers or the inmate at risk for personal injury. Because of Benson's steadfast refusal to comply with the strip search procedure, he was deliberately kept in restraint (handcuffs and leg shackles) until he voluntarily agreed to comply with this procedure. (Duran Affidavit ¶ 6; Jennings Affidavit ¶ 6)

15. After being sprayed, Benson rose to his feet, began shouting profanities and threats and then began to intentionally bang his head on a computer monitor which was on a nearby desk. He was then taken to the floor to prevent him from hurting himself or breaking things in the office. He was held down on the floor until he agreed to stop resisting, at which point he was placed in the shower. (Duran Affidavit ¶ 7)

16. After a few minutes in the shower, Benson sat up and began to again use profane language and also began to spit on several of those present, including CO Shelton. He was again taken to the floor to prevent further spitting. The prison warden, is particularly sensitive to the health risks associated with spitting and the possibility of disease transmission that can occur from spitting. Because Benson continued to spit on and at the staff members present, he was forcefully restrained on the floor and eventually a "Spit Guard" was applied to keep him from spitting on or at those present. (Duran Affidavit ¶ 8)

17. After the "Spit Guard" was put in place, Lieutenant Jennings and Warden Duran escorted Benson to E Block where he did comply with strip search procedure. Following this, Benson requested to be taken to the hospital and his request was honored at about 1:10 p.m. Mr. Benson returned to prison later that day. (Duran Affidavit ¶ 9)

4

18. Warden Duran personally videotaped much of the pepper spray incident with Mr. Benson. The incident was videotaped to document the use of reasonable force. There was no other video tape made of the incident and the attached tape shows all of the events that were taped that day. (Duran Affidavit ¶ 12)

19. The videotape shows Mr. Benson receiving an explanation of Prison Policy in regard to strip searches. The videotape also shows Mr. Benson refusing one request to comply with the mandatory strip search procedure and ignoring another. (Duran Affidavit Exhibit)

20. The videotape shows Mr. Benson discussing his misconduct citation with the Prison staff. (Duran Affidavit Exhibit)

21. The videotape shows Mr. Benson spitting on or at Prison staff members at least three times. (Duran Affidavit Exhibit)

22. The videotape shows Mr. Benson intentionally banging his head on a computer monitor and then being taken to the ground by members of the Prison staff. (Duran Affidavit Exhibit)

23. The videotape captures a discussion between Benson and a member of the Prison staff in which Mr. Benson is asked why he decided at this particular time to refuse to obey strip search policy and Benson replies by referring to his "write-up." (Duran Affidavit Exhibit)

24. Pepper spray is the natural oil resin of chili peppers diluted with a carrier propellant such as isopropyl alcohol or water which is placed in an aerosol or foam form. (Report of R.H. Traenkle p. 9)

25. Pepper spray causes burning of the eyes and inflammation of the respiratory tract. Use of pepper spray severely restricts the subject's ability to engage in resistance or fighting behaviors. (Report of R.H. Traenkle pp. 9-10)

26. The impact of pepper spray is transient, lasting 20-45 minutes and leaving no residual effects. (Report of R.H. Traenkle p. 9)

27. After the incident of August 27, 1999, Mr. Benson was transported to Gettysburg Hospital within an hour of the incident where he received treatment for superficial contusions only. (Benson Deposition p. 103; Report of R.H. Traenkle p. 7)

28. Mr. Benson testified that the burning sensation from the pepper spray lasted one-half hour and made his eyes red for approximately an hour and 45 minutes or 2 hours. Other than that, and superficial bruises which resulted partially from Mr. Benson striking his head on the computer monitor, Mr. Benson had no other injuries from the August 27, 1999 incident. Mr. Benson required no specific treatment for injuries related to the pepper spray. (Benson Deposition pp. 105-109)

29. As a result of Mr. Benson's conduct on August 27, 1999, he pleaded nolo contendere to charges of "Aggravated Harassment by a Prisoner." (Traenkle Report p. 7)

30. On August 30, 1999, sometime between 3:10 a.m. and 3:58 a.m., Lt. William Orth was summoned by Corrections Officer Sheatler to E-Block for a disturbance involving Inmate Jason Benson. (Orth Affidavit ¶ 3)

31. Corrections Officer Sheatler told Lt. Orth that Inmate Benson was having some kind of problem. Benson was screaming and not responding to verbal directions. At the time, Inmate Benson appeared to be physically okay other than the fact that he was having difficulty following directions and answering questions. Approximately 20-25 minutes later, Inmate

Benson appeared to be having a seizure and began to scream and suffer what appeared to be convulsions. (Orth Affidavit ¶ 4)

32. When Inmate Benson began to have what appeared to be a seizure, the Sheriff's Department was called to transport him to the hospital. (Orth Affidavit ¶ 5)

33. At approximately 5:35 a.m., Deputy Sheriff Muller arrived and transported Inmate Benson to Gettysburg Hospital where he received treatment. (Orth Affidavit ¶ 6)

34. On the morning of August 30, 1999, after Inmate Benson began to show the signs of becoming ill he was not left alone. As soon as it became apparent that Inmate Benson was having a seizure and needed medical attention, the County Sheriff's Office was called so that Benson could be transported to the hospital for care. (Orth Affidavit ¶ 7)

35. The Adams County Sherriff's Office is responsible for transporting prisoners to and from the Prison for security reasons. (Orth Affidavit ¶ 8)

36. After the Sheriff's Office was summoned, a member of the prison staff stayed with inmate Benson to make sure that he was okay. An ambulance would have been called if this had been an emergency. He did not get worse after the Sheriff's office was called. Instead, he got better and in fact, at the time Inmate Benson left the prison on August 30, 1999, to go to Gettysburg Hospital, his condition had improved and he was more responsive to questions and verbal directions. (Orth Affidavit ¶ 9)

37. Mr. Benson has no memory of the sequence of events, dates, times or any other details of the events which occurred on August 30, 1999. The basis for the allegations in his Complaint made in reference to the August 30, 1999 incident came entirely from the Prison's documentation of the incident. (Benson Deposition pp. 74-75)

38. After Mr. Benson was transported to the Hospital on August 30, 1999, he received appropriate care, his condition was stabilized and he was released within a day or so. (Benson Deposition p. 78)

Respectfully submitted,

**THOMAS, THOMAS & HAFER, LLP**

By: *Kevin C. McNamara*
Kevin C. McNamara, Esquire
I.D.#72668
305 North Front Street
P.O. Box 999
Harrisburg, PA 17108-0999
(717) 237-7132
Attorneys for Defendants Duran, Cluck, Hankey, Jennings, Orth, Heintzelman, Shelton and Adams County Prison

DATE: 11/15/01

8

## CERTIFICATE OF SERVICE

I, Kevin C. McNamara, Attorney for Thomas, Thomas & Hafer, LLP, hereby certify that a copy of the foregoing document was served upon the following, by enclosing a true and correct copy in an envelope addressed as follows, postage prepaid:

Jason E. Benson
Inmate # DS-6483
SCI Smithfield
P. O. Box 999
1120 Pike Street
Huntingdon, PA 16652

Alan S. Gold, Esquire
7837 Old York Road
Elkins Park, PA 19027

James D. Young, Esquire
Lavery, Faherty Young & Patterson, P.C.
P.O. Box 1245
Harrisburg, PA 17108-1245

THOMAS, THOMAS & HAFER, LLP

By: *Kevin C. McNamara* (signature)
Kevin C. McNamara

:148876.1