

Law Clerk's Copy

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

FILED
NOV 1 5 2001
PER ___
HARRISBURG, PA.    DEPUTY CLERK

| | |
|---|---|
| JASON ERIC BENSON,<br>Plaintiff | CIVIL ACTION |
| v. | NO. 1:00-CV-01229 |
| THOMAS DURAN; BRUCE CLUCK;<br>DEBRA HANKEY; JOHN JENNINGS;<br>WILLIAM ORTH; RAE HIENTZELMAN;<br>RONALD LONG and WILLIAM ELLIEN;<br>BRITON SHELTON; ADAMS COUNTY<br>PRISON<br><br>Defendants | JUDGE CALDWELL |

## AFFIDAVIT OF RONALD H. TRAENKLE

1. My name is Ronald H. Traenkle and I have been retained by the Defendants in the above captioned matter for a review of the appropriateness of the use of force and procedures employed by the Adams County Prison staff during the August 27, 1999 incident involving former inmate Jason Benson.

2. In the past, I have been qualified to testify as an expert in both the Eastern and Middle District Courts of Pennsylvania in cases dealing with use of force issues. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

3. Following my review of the pertinent documentation and the video tape of the August 27, 1999 incident involving Jason Benson, I prepared a written report of my findings and opinions which are stated in the report with a reasonable degree of professional certainty. A true and correct copy of my report is attached hereto and marked Exhibit B.

I declare under penalty of perjury that the foregoing is true and correct. Executed on _November 8,_ , 2001.

*Ronald H. Traenkle*
Ronald H. Traenkle

:143894.1

# RONALD H. TRAENKLE

3605 Cloverdale Road
Bensalem, PA 19020
215-639-0741 (home)
727-943-2377 (Florida)

## EDUCATION:

1990  *Northwestern University Traffic Institute* - Graduate level work
1967  *State University of New York* - Degree in Metallurgy

*Northwestern University*: School of Police Staff and Command
*Pennsylvania State University*: Police Executive Development, Polex Legal Forum
*Indiana University of Pennsylvania*: Municipal Police Driver Training Programs
*University of Delaware*: Internal Affairs

Numerous other police management courses, liability training programs, and specialized schools including canine handler and hostage negotiations taught by the Federal Bureau of Investigations, Pennsylvania State Police, Americans for Effective Law Enforcement, The National Sheriff's Association and the Municipal Police Officers Education and Training Commission.

## PROFESSIONAL EXPERIENCE:

TEMPLE UNIVERSITY POLICE ACADEMY

**Director/Commanding Officer**   1998 - present
This position is responsible for administering all phases of basic recruit police training for Temple University in accordance with the regulations set forth by the Municipal Police Officers Education and Training Commission and the Commonwealth of Pennsylvania in Act 120. Duties include the development and implementation of all program policies, rules and regulations related to all academy activities.
*curriculum vitae of Ronald H. Traenkle*

BENSALEM TOWNSHIP POLICE DEPARTMENT

**Captain - Commander Professional Services Division**   1987 - 1998
Highest sworn rank in the department (population 70,000)
The Professional Services Division is responsible for grant preparation, internal affairs, training, criminalistics, Crime Prevention, budget, purchasing, accreditation and risk management. It is also the liaison to the executive and legal branches of Township government. The municipality utilizes line object budgetary procedures with some program budgeting.


DEFENDANT'S EXHIBIT A

*curriculum vitae of Ronald ⬤ Fraenkle*

**Captain - Commander Patrol Division**   1981 - 1987
The Patrol Division provides police patrol, animal control and crossing guard services to the community. The division consisted of three lieutenants, five sergeants and fifty uniform officers assigned to squads, accident investigation and canine functions. It also included over forty civilians in animal control and auxiliary services.

**Lieutenant - Watch Commander**   1978 - 1981
Commanded two or more police shifts consisting of sergeants, patrol officers and detectives. Responsible to investigate complaints and disciplinary problems, evaluate performance of squad supervisors as well as individual officers; in overall command of the Police Department in the absence of higher authority.

**Sergeant - Squad Supervisor**   1977 - 1978
Responsible for supervision, motivation, discipline, and performance of a team of ten police officers who provided patrol services to the community.

**Patrolman - Canine Unit**   1972 - 1977
Responsible for all phases of police work: radio calls, traffic enforcement, accident investigation, as well as canine handler obligations.


**SUMMARY OF QUALIFICATIONS:**

Over twenty-five years of comprehensive law enforcement experience ranging from patrol/K-9 officer to divisional commander. Successful management record of improving employee productivity, morale and organizational professionalism, development of statewide accepted training and nationally recognized "Risk Management" programs, development of policies and procedures, coordination of the Accreditation Program, formulation of the initial Bensalem "Town Watch" program.

**PROFESSIONAL BACKGROUND:**

Experience as an adjunct college instructor and lecturer for: Villanova (Graduate and Undergraduate), North Carolina State University, Temple University, Pennsylvania State University, Bucks County Community College, City of Pittsburgh Police Academy, Philadelphia Police Department Advanced Training Unit, Allegheny County Police Academy, North Carolina POST Academy, Bucks County Police Academy, Washington DC Police Academy, Pennsylvania State Police Academy and the Pennsylvania League of Cities.

Conducted seminars at the 1988, 1989, and 1992 Pennsylvania Chiefs of Police Conference. Conducted training seminars for officers from over fifteen hundred different federal, state and local law enforcement agencies serving in thirty- two states, two foreign countries and the Tohono O'dom Nation Tribal Police. Topics include: Negligent Supervision, Discipline, Driver Training, Police Policy Development, Use of Force, Canine, Police Pursuit, Police Procedures, Domestic Violence and Training.

*curriculum vitae of Ronald ⬤ raenkle*

Faculty member of the Pennsylvania State University Police Executive Development and Advanced Police Executive Development and High Impact Supervision training programs and The Commonwealth of Kentucky Justice Cabinet on "Police Management and Civil Liability."

Assisted in the drafting of Senate Bills (PA) numbers 93-313 and 93-314 regarding Police Pursuit Policy and Training in the Commonwealth of Pennsylvania. Signed into law by Governor Robert Casey in January 1995.

Member of the Municipal Police Officers Education and Training Commission Course Development Committee for the 1998 mandatory in-service training program related to "*Emergency Vehicle Operations*" and the 2000 Development Committee on "*Case Preparation and Testifying in Court*". Lectured on behalf of the Commonwealth of Pennsylvania at the 1999 National Highway Traffic Safety Association "*Train the Trainers*" Program on "*Pursuit Management and Liability*". Co-authored and delivered curriculum "*Critical Policy Development*" for the Pennsylvania Commission on Crime and Delinquency, training presented to Sheriff's Departments throughout the Commonwealth of Pennsylvania 2000-2001. Assisted in writing and delivery of curriculum "*The Ethical and Accountable Leader*" presented to all management level employees of the Pennsylvania Department of Corrections, 2000-2001. Assisted in the development of the new Act 120 curriculum, "*Use of Force in Law Enforcement*" mandated by the Commonwealth of Pennsylvania to be taught all entry-level law enforcement officers, delivered course to Commonwealth certified instructors at the Pennsylvania State Police Academy in 2001.

Commonwealth of Pennsylvania Certified Instructor for the MPOETC in both the Act 120 and Act 180 training programs. Certified Instructor for the American Society of Law Enforcement Trainers.

Fifteen years of experience as a law enforcement/security consultant working more than 350 Federal Civil Rights and State Tort cases. Accepted as an expert witness in both the Federal and State Courts.

## MEMBERSHIPS:
Vidocq Society
Fraternal Order of Police
International Association Chiefs of Police
The American Society of Law Enforcement Trainers
Pennsylvania Chiefs of Police Association (two term member Traffic Committee)

# Report In The Matter Of

## *Jason E. Benson*

### vs.

## *Adams County Prison et al.*
## No. 1: CV-00-1229

Prepared by: 

Ronald H. Traenkle
November 6, 2001

DEFENDANT'S EXHIBIT B

## *Materials Reviewed*

1. Deposition transcript of Jason E. Benson; August 30, 2001

2. Affidavit of Deputy Warden Bruce A. Cluck; dated October 15, 2001

3. Affidavit of Deputy Warden Debra Hankey; dated September 28, 2001

4. Affidavit of Warden Thomas Duran; dated September 27, 2001

5. Affidavit of Sergeant Ray Heintzelman; dated September 28, 2001

6. Affidavit of Lieutenant John Jennings: dated October 29, 2001

7. Affidavit of Corrections Officer Briton L. Shelton; dated November 6, 2001

8. Adams County Prison Extraordinary Occurrence Report prepared by Warden Thomas Duran on August 27, 1999

9. Adams County Prison Extraordinary Occurrence Report prepared by Bruce A. Cluck on August 27, 1999

10. Adams County Prison Extraordinary Occurrence Report prepared by Sergeant Ray Heintzelman on August 27, 1999

11. Adams County Prison Extraordinary Occurrence Report prepared by Briton L. Shelton on August 27, 1999

12. Adams County Prison Extraordinary Occurrence Report prepared by Lieutenant John Jennings on August 27, 1999

13. The Gettysburg Hospital Emergency Department Report relative to Jason Benson's treatment on August 27, 1999 prepared by William J. Steinour, M.D.

14. Adams County Prison *Inmate Handbook*

15. Adams County Prison Policy and Procedure Manual Policy # 300-6 *Use of Force*

16. Oleoresin Capsicum Aerosol Training Manual copyright R.E.B. Training International, Inc.

17. Civil Action No. 1:00-CV-01229 *Jason E. Benson vs. Thomas Duran, et al.*

18. Plaintiff's Response to the Defendant's Request for Production of Documents

2

19. Videotape of the incident occurring August 27, 1999

20. Adams County Prison Recommendation and Report of Administrative Action

21. Adams County Prison Notice of Infraction prepared by Lieutenant Jennings dated August 27, 1999

22. Adams County Prison Notice of Administrative Segregation prepared by Lieutenant Jennings dated August 27, 1999

23. Adams County Prison Misconduct Hearing Committee Report number 1468 prepared by Deputy Warden Cluck dated August 30, 1999

24. Temporary Transfer Sheets relative to Jason Benson

## *Summary of the Incident*

In August of 1999, Jason Benson was incarcerated in the State Correctional Institution in Smithfield. On the 25th of that month, he was transferred to Adams County Prison for a Post-Conviction Relief Act Hearing.

Just before departing for court on August 27, 1999, Mr. Benson was assessed a misconduct by Corrections Officer Briton Shelton. Upon Benson's return from court, the restraints applied by the transporting Adams County Sheriffs were removed. Corrections Officer Shelton then re-secured inmate Benson in leg irons and handcuffed him behind his back.

Corrections Officer Shelton states that when Benson was returned to the prison, he was informed of the misconduct violation and told that he was going to be placed in Administrative Segregation. Corrections Officer Shelton reported:

> *"I told Mr. Benson again why he was going. Mr. Benson then became verbally aggressive and loud. He started saying things such as "Ahh, fuck all of you mother fuckers." "This is fucking bullshit." He then looked at Lt. Jennings and said, "Man fuck you." He then turned his head and looked at me and stated, "Fuck you, too."*
> (Corrections Officer Shelton's report; dated August 27, 1999)
> [Emphasis Added]

Mr. Benson was moved into the Intake Area medical room for his strip search. Here, according to the all the reports and affidavits, Benson, rather than complying with the long-standing and mandatory Adams County Prison search procedure, chose to be hostile and profane.

Anticipating a potential need to use force, Lieutenant Jennings followed established procedure and went to summon assistance. He returned with Deputy Wardens Cluck and Hankey who unsuccessfully attempted to reason with the prisoner. Warden Thomas Duran also responded. His efforts to obtain voluntary compliance from Benson were equally futile.

Once conflict resolution, verbal request, verbal command, and the show of force had proven ineffective in resolving the standoff, corrections personnel prepared to advance to the next step in the force policy. A video camera was brought to the room to record the incident.

Adams County Prison personnel aver inmate Benson was told his complaint regarding the assessed misconduct was irrelevant. Once more, he was asked if he would conform to institutional policy. Once more, the prisoner refused. When asked again, he remained silent. At this point, on the direction and authority of the prison warden, Lieutenant Jennings applied a short burst of oleo capsicum foam to the inmate's face. The corrections officers report that Benson was initially quiet. However, they state when he got up from his chair he became more aggressive, threatening and abusive. He spit at them, then violently

4

struck his head on the desk. They assert Benson's conduct compelled them to put him onto the floor and restrain him.

> "...(Benson) *began to slam his head on the desk and computer screen, to stop the inmate from hurting himself further Inmate Benson was taken to the floor..."*
> (Jennings Report; August 27, 1999) [Emphasis Added]

According to corrections officers, the inmate stopped his violent behavior and was then placed into a running shower in order to flush the pepper foam from his face. Once the capsicum washed away, Benson again became unruly, hostile, loud, threatening, and vulgar. He escalated his aggressiveness by repeatedly spitting on corrections officers hitting both Officer Shelton and Lieutenant Jennings with his saliva. When the prisoner refused to stop, he was taken to the floor where he again spit at Lt. Jennings before being controlled. This time the officers placed a "spit shield" on the prisoner's face. After this Benson became compliant and stopped his aggressive, defiant behavior.

Inmate Benson eventually complied with the Adams County Prison strip search procedures. Subsequently, he was transported to Gettysburg Hospital where he received treatment for superficial contusions.

5

## *Observations*

1. On August 27, 1999, Thomas Duran, Bruce Cluck, Debra Hankey, Briton Shelton, John Jennings, and Ray Heintzelman were employed by the Corrections Department of Adams County. All were members of the staff at the Adams County Prison.

2. All were collectively and individually charged with the responsibility of securing the residents, maintaining order within the facility, and enforcing the policies of the Adams County Prison.

3. In Section 2006 of the Adams County Prison Inmate Handbook can be found:

    *"You may be frisked when moving from one area of the prison to another area, and are subject to a strip search at any time. Inmates leaving and returning to the prison will be strip searched."*
    [Emphasis Added]

4. In his deposition Jason Benson acknowledged that he was aware of this policy and felt it was reasonable.

5. **On the video, the Deputy Warden is heard discussing the misconduct with Inmate Benson.** In response, Benson looks away and shakes his head.

6. **On the video, corrections personnel can be heard asking Benson to comply with the strip search procedure and explaining the reason why.**

7. **On the video, Benson emphatically refuses the first request and ignores a second request.**

8. Adams County **Prison Policy 300-6,** *Use of Force,* **authorizes** the use of force **for inmate control** and **"to conduct a 'frisk' or strip search of any unruly inmate".**

9. Lieutenant **Jennings was directed to administer oleo capsicum** foam.

10. The **video shows** that Jason **Benson intentionally struck his head twice** on the hard surface in front of him.

11. In his complaint, Jason **Benson alleges his head was hammered into the floor. The tape disproves this allegation.**

12. In his complaint, Jason **Benson charges that while on the floor he was kicked and kneed in his back and side. The tape disproves this.**

6

13. In his Plaintiff's Response To The Defendant's Request For Production Of Documents, Jason Benson averred,
    > *"I was...forced into a prone position on the ground, while the weight of the defendant's bodies in my back compressed my chest to the point of rendering my (me) unconscious from respitory difficulty..."*
    (Page 3, Response to Question 7) [Emphasis Added]

    **The videotape disproves this.**

14. In Civil Action No. 1:00-CV-01229, Jason **Benson alleges he was thrown into a concrete shower stall where he fell unconscious. The videotape rebuts this.**

15. **On the videotape, Jason Benson is seen repeatedly spitting at corrections personnel**
    - Before striking his head,
    - After being placed in the shower, and
    - Upon his removal from the shower.

    In response, corrections personnel ask him to stop, place him on the floor and employ a "spit shield".

16. In his deposition, Jason **Benson alleged he was unaware of his misconduct.** However, **on the videotape, he is heard to complain about his "write up" and** seen to **spit on corrections personnel.**

17. As a result of his actions on August 27, 1999, Jason **Benson was charged with, pled Nolo Contendere to, and convicted of "Aggravated Harassment by a Prisoner"**.

18. The Gettysburg Hospital Emergency Department **medical records reveal Jason Benson sustained only "superficial contusions".**

7

## *Conclusions and Opinions*

Based upon the facts and focal issues in the incident of August 27, 1999 and using the contemporary professional literature on police policies, procedures, and practices relevant to this incident and my own training and experience as a frame of reference, I have formed the following opinions. These opinions are accurate within all reasonable limits of professional certainty and reflect the current professional standards taught nationally. They are subject to change based upon the discovery of new information either before or during trial.

I. The purpose of any written directive is to establish guidelines for agency personnel on how to perform a certain task. The directive must allow officers to do their jobs but within those limits established by the Constitution, the Supreme Court, case law, and the particular community's environmental needs and resources.

Administrators are taught that directives must be:

- **Constitutional**: The prescribed guidelines must not violate the United States or Pennsylvania Constitutions.

- **Current**: The prescribed guidelines must not violate clearly established case law. It must conform to generally accepted custom and practice and, where applicable, reflect technological changes.

- **Clear**: The prescribed guidelines must be easily understood and provide directions on how to perform the relevant tasks.

A. The guidelines established by the Adams County Prison relative to Use of Force:

- Define what should be considered force
- Define various levels of force
- Establish when force may be employed
- Dictate factors which an officer is to consider before the application of physical force
- Create a logical progressive confrontational force continuum
- Establish subsequent medical examination and reporting procedures and
- Mandate training for agency personnel

It is my opinion to an extremely high degree of professional certainty that Adams County Prison, from at least June 24, 1998 through the present day, has demonstrated a reasonable effort to develop, update, and maintain a Use of Force Policy. That policy is constitutionally sound, current in content, and easily understood by agency members.

8

II. The Adams County Prison <u>Use of Force</u> Policy also reflects current technological advancements such as oleo capsicum.

The application of chemical agents in the context of human conflict is as old as organized warfare. However, in the late 1980's the National Institute of Justice and the U.S. Attorney General's Conference on Less Than Lethal Weapons became concerned with injuries caused by the application of "traditional" tearing agents, such as the man-made CN and CS (mace) chemical compounds.

Pepper spray (OC) is the natural oil resin of capsicums (chili peppers) diluted with a carrier propellant such as isopropyl alcohol or water and placed in an aerosol or foam form.

> *"Oleoresin Capsicum is an organically based inflammatory agent derived from the essence of cayenne peppers. Its ingredients are generally 90 to 95 percent inert, making it safe for use at very close range."*
> (Federal Bureau of Investigations Law Enforcement Bulletin, May 1994, page 25)

> *"The Federal Bureau of Investigation Firearms Training Unit (FTU) conducted research to determine the most effective chemical agent product to be carried by the Special Agents. Based on that information provided by the U.S. Army Chemical Research and Development Center, FTU approved the use of Oleoresin Capsicum. FBI chemists who were consulted during the study did not foresee any long term health risks associated with the use of OC."*
> (National Institute of Justice, Technology Assessment Program, March 1994, page 5)

> *"OC caused almost immediate swelling and burning of the eyes and breathing passages. When the agent is inhaled, the respiratory tract is inflamed, and breathing is restricted. Effects do not support high levels of activity such as fighting with the police. ...studies indicate that the risk of injury or death is statistically improbable."*
> (International Association of Chiefs of Police, Executive Brief Pepper Spray and In Custody Deaths, March 1994, page 1)

> *"Pepper spray results in considerable tearing of the eyes, as well as temporary paralysis of the larynx which causes subjects to lose their breath. Contact with the face causes a strong burning sensation. After being exposed to the spray, subject's reactions become reflexive in nature. They immediately cover their eyes and bend over into a defensive posture to avoid further contact. This reactive behavior allows officers to gain control and restrain disorderly subjects more*

9

*effectively. The effects of the spray generally last about 20 to 45 minutes and leave no residual effects."*
(Federal Bureau of Investigations Law Enforcement Bulletin, May 1994) [Emphasis Added]

It is my professional opinion **Oleoresin Capsicum** is a non-hazardous inflammatory agent, which gives officers a degree of flexibility at two critical points in the force continuum. It is an intermediate step, which **may be employed before they make physical contact** with subjects **or after initial physical contact** but before the introduction of hard open hand techniques or hand-held weapons such as the baton.

It is also my professional opinion the guidelines established for its use by correctional officers and the introductions of OC spray into a correctional facility are reasonable and prudent decisions by Adams County Prison administrators. These decisions reflect a desire by prison administrators to reduce the threat of assault or injuries to corrections officers and inmates alike.

III. It is my opinion to an extremely high degree of professional certainty that an objective review of the videotape and written record established in this case clearly shows what occurred on August 27, 1999.

1. Upon his returning from court, Jason **Benson was told he had been issued a "Misconduct" and** that he **was being placed in "Administrative Segregation".**

2. The videotape reveals Jason **Benson decided to become uncooperative and commit a serious breech of prison policy and discipline.**

3. Jason **Benson refused** the requests of Lieutenant Jennings and Officer Shelton **to submit to a strip search.**

4. Lieutenant **Jennings summoned Deputy Wardens Cluck and Hankey**.

5. Jason **Benson repeatedly defied both the prison's policy and** the Adams County **Prison officials** who were charged with the responsibility to maintain order and discipline within the facility.

6. Deputy Warden **Cluck and Jason Benson discussed Inmate Benson's issued misconduct.**

7. **Despite repeated attempts by prison officials to peacefully resolve the incident** through verbal communication and a show of force, **the inmate persisted in controlling the standoff.**

10

8. Warden Thomas **Duran entered the room with** additional corrections personnel and **a video camera.**

9. Benson **refused two videotaped requests** to adhere to the long-standing Adams County Prison policy. His **compliance at any time would have prevented the need for an escalation of force**

10. Rather than engage in a physical confrontation with an unsecured prisoner in a small room containing office furniture and equipment, **corrections administrators authorized a brief application of oleo capsicum foam** to Mr. Benson's face.

11. For reasons known only to Inmate **Benson**, he twice **intentionally banged his head onto a computer** monitor, which caused a "superficial contusion on the front temporal scalp". He also became **more hostile, abusive, and vulgar.**

12. In order to prevent **Benson** from seriously injuring himself, he **was placed on the floor** and held there by corrections officers.

13. Once Jason **Benson calmed down**, he **was carried to the shower** since he claimed he was unable to move his legs. (It must be noted that Benson is seen moving his legs later on the videotape.)

14. Jason **Benson was** lowered into the shower stall and **placed under the water stream.** (Flushing with large quantities or fresh water is the preferred de-escalation technique after oleo capsicum application.)

15. Inmate **Benson** ignored attempts to calm him down but rather **remained threatening, abusive, vulgar, and profane.**

16. Inmate **Benson deliberately spit** his saliva **on corrections personnel and refused** several requests **to stop** his aggressive behavior.

17. Inmate **Benson stated he refused to comply with the strip search policy because of the "write up" and**, once again, assaults corrections personnel by deliberately **spitting on them.**

18. Inmate **Benson was** removed from the shower, carried into the outer office, and **placed on the floor.**

19. Jason **Benson again** intentionally **spit on a corrections officer.**

20. **Benson was restrained** and held down until **a "spit shield"** could be obtained and **put in place.**

21. Jason **Benson finally decided to stop** assaulting prison officials **and agreed to follow institutional regulations.**

11

22. Jason **Benson was taken to Gettysburg Hospital** where he was **treated for a superficial contusion** of the scalp and "a few superficial handcuff-type contusions of the skin".

IV. It is my opinion to an extremely high degree of professional certainty that those **corrections officers present on August 27, 1999 had specific and articuable facts that would lead a reasonable, prudent, and properly trained officer to believe:**

- Mr. **Benson was angry and non-compliant,**
- That **force was necessary to enforce the rules and regulations of the prison**, and
- That **hands-on force would result in a physical confrontation** placing corrections personnel and Jason Benson at risk of serious injury.

A. It is my opinion to an extremely high degree of professional certainty **the actions of the Adams County Prison Staff in their efforts to obtain Mr. Benson's voluntary compliance with prison rules on August 27, 1999 were tolerant, reasonable, proper, and exhausted all less-intrusive means of obtaining control of the situation.**

B. It is also my opinion to an extremely high degree of professional certainty **the decision to employ oleo capsicum was an appropriate response to Inmate Benson's defiant behavior** on August 27, 1999. **It was the least intrusive control option left to them by Inmate Benson.**

C. It is further my opinion to an extremely high degree of professional certainty **the use of the "swarm and take down" technique employed by corrections officers** on August 27, 1999 **was reasonable, proper, and necessary** to both prevent Inmate Benson from intentionally injuring himself and to prevent the prisoner's repeated assaults on corrections personnel.

D. Furthermore, it is my opinion to an extremely high degree of professional certainty **there is not an iota of evidence to indicate the force options selected rose to an Eighth Amendment standard** *"cruel and unusual punishment so outrageous as to shock the conscience."*

E. Lastly, it is my opinion to an extremely high degree of professional certainty the **conduct of the involved Adams County Prison personnel** on August 27, 1999 **was proper.** It was **well within the legal and ethical standards established by the courts, taught by the profession, and mandated by the United States and Pennsylvania Constitutions.** Their conduct was **not malicious, unnecessary, unwarranted, or excessive. Any reasonably trained officer** confronted with like circumstances **would respond in a like manner and no reasonably trained corrections officer would believe that response was unlawful.**

12