

FILED
HARRISBURG   11·28·01
                    sc

NOV 2 7 2001

MARY E. D'ANDREA, CLERK
Per_____
        DEPUTY CLERK

117

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON ERIC BENSON,            :
    Plaintiff            :            CIVIL ACTION
                   :
        v.            :            NO. 1:00-CV-01229   *Judge Caldwell*
                   :            *Mag. Judge Blewitt*
THOMAS DURAN; BRUCE CLUCK;    :
DEBRA HANKEY; JOHN JENNINGS;  :
WILLIAM ORTH; RAE HIENTZELMAN; :            JURY TRIAL DEMANDED
RONALD LONG and WILLIAM ELLIEN; :
BRITON SHELTON; AND ADAMS     :
COUNTY PRISON                 :
    Defendants            :


**MEMORANDUM OF DEFENDANTS DURAN, CLUCK, HANKEY, JENNINGS, ORTH, HEINTZELMAN, SHELTON AND ADAMS COUNTY PRISON IN OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE EXPERT TESTIMONY AND FOR SANCTIONS "FOR BLATANT DISCOVERY VIOLATIONS"**


**I.    PROCEDURAL HISTORY:**

    This is a pro se prisoner suit against two doctors, the Adams County Prison and seven past and present members of the prison staff.

    On or about November 14, 2001, Mr. Benson prepared and served a Motion to Preclude Expert Testimony and for discovery sanctions. As to the Adams County Prison Defendants, the Motion asserts that the Court should preclude the presentation of any expert testimony and that the Court should enter a monetary sanction in the amount of $750,000 for what Mr. Benson represents to be shortcomings in the responses of the Adams County Defendants to their discovery obligations. This Brief is in opposition to the Plaintiff's Motion.

II.   **STATEMENT OF ISSUES PRESENTED:**

A.   **WHETHER IN THE ABSENCE OF ANY EXPERT DISCOVERY DEADLINE OR PREJUDICE TO THE PLAINTIFF, THE ADAMS COUNTY DEFENDANTS SHOULD BE PRECLUDED FROM PRESENTING EXPERT TESTIMONY AT TRIAL?**

(Suggested answer: No.)

B.   **WHETHER THE ADAMS COUNTY DEFENDANTS HAVE IN ANY WAY FAILED TO FULLY DISCHARGE THEIR DISCOVERY OBLIGATIONS IN THIS CASE?**

(Suggested answer: No.)

III.   **ARGUMENT:**

A.   **In the absence of an expert discovery deadline or prejudice to the Plaintiff, the Defendants should not be precluded from presenting expert testimony at trial.**

The Plaintiff first seeks to preclude all of the Defendants from presenting expert testimony. The asserted basis for the request is due to the Defendants' "blatant failure" to provide identifying information for expert witnesses and a summary of their anticipated testimony.

In this case, the Court has not imposed a deadline for expert discovery. While it is true that in cases where the Court has not imposed a discovery deadline, discovery for a particular party closes six months after the last pleading filed by that party pursuant to Local Rule of Court 26.4, discovery in this case has continued through mid-October, 2001. The Plaintiff was deposed on August 30, 2001 and as late as October 16, 2001, the Court granted in part and

denied in part a separate discovery motion (dealing with issues not involving the Adams County Prison Defendants) which was filed by the Plaintiff.

Pursuant to F.R.C.P. 26(a)(2), disclosure of information pertaining to expert witnesses must be made at least 90 days prior to trial absent other directions from the Court. In this case, no trial date has yet been set. The Court has, however, imposed a dispositive motion deadline of November 15, 2001. In conjunction with the filing of the Motion for Summary Judgment on behalf of the Adams County Prison Defendants, an expert report with a summary of the expert's qualifications was provided to Plaintiff. A copy of the report and *Curriculum Vitae* for the expert are attached hereto as Exhibit "A".

The Adams County Prison Defendants have not disobeyed any Order of this Court nor have they been untimely under Federal Rule 26 in regard to expert disclosures. Under the circumstances, there is no basis for the Plaintiff's request to preclude the Adams County Defendants from presenting expert testimony at trial and, at this early date, there is no prejudice to the Plaintiff which would justify a preclusion of expert testimony. Accordingly, the Plaintiff's first request for relief should be denied.

**B.    The Adams County Defendants have not failed to complete their discovery obligations as required by the Federal Rules of Civil Procedure.**

The Plaintiff's second point raised with regard to the Adams County Defendants is somewhat vague, but appears to allege that certain "Extraordinary Occurrence Reports" were not produced in response to a discovery request. The particular discovery in question is a set of "Admissions and Request for Production of Documents" bearing a date of May 7, 2001. A copy of this discovery request is attached to Plaintiff's Motion as Exhibit "D."

3

The Plaintiff's Motion appears to concede that timely objections to the Request for Admissions were made (the Objections are attached as part of Exhibit "D" to the Plaintiff's Motion). The Admissions were the third set of requests for admissions that the Plaintiff had served in the case and were in excess of the total number of requests for admissions which are permitted pursuant to Middle District Rule 36.1. The Plaintiff's Motion does not argue that the Request for Admissions should be answered. Instead, the Plaintiff argues that the Adams County Defendants did not produce certain Extraordinary Occurrence Reports in response to the Plaintiff's Request for Production of Documents which is included with the third set of Admissions.

The Plaintiff fails to note that in response to his first Request for Production of Documents in the case, dated September 25, 2000, and attached hereto as Exhibit "B", the Plaintiff made the following request: "7) All complete Adams County Prison "Extraordinary Occurrance (sic) Reports prepared by everyone involved in the incident of 8/27/99." To this request, the Adams County Defendants served a written response on March 29, 2001. The reply stated: "See Extraordinary Occurrence Reports attached hereto." A copy of the response of Adams County Defendants to Plaintiff's Request for Production of Documents, Certificate of Service and the Extraordinary Occurrence Reports attached thereto are all attached hereto and marked Exhibit "C". So, although it is true that the Adams County Defendants did not produce Extraordinary Occurrence Reports in response to the Plaintiff's May 9, 2001 Admissions and Request for Production of Documents, all of these documents were produced in response to a prior, duplicative discovery request.[1] No information has been withheld from the Plaintiff.

---

[1] The May 9 Request for Admissions and for Production of Documents seeks Extraordinary Occurrence Reports from Defendants Hankey, Jennings and Shelton. The reports prepared by Jennings, Shelton,

4

It is clear from the foregoing that the Adams County Defendants have not violated any discovery rule, nor have they failed in any way to comply with their discovery obligations. Accordingly, the Plaintiff's Motion to Preclude Expert Testimony and for Sanctions should be denied.

IV.    **CONCLUSION:**

For the reasons stated above, the Adams County Prison Defendants respectfully request that the Plaintiff's Motion to Preclude Expert Testimony and for Sanctions be denied.

Respectfully submitted,

**THOMAS, THOMAS & HAFER, LLP**

By: _Kevin C. McNamara_
       Kevin C. McNamara, Esquire
       I.D.#72668
       305 North Front Street
       P.O. Box 999
       Harrisburg, PA 17108-0999
       (717) 237-7132
       Attorneys for Adams County Defendants

DATE: 11/27/00

---

Duran, Heintzelman and Cluck were all produced on March 29, 2001. Deputy Warden Hankey's involvement in the August 27, 1999 incident was so minimal that she did not prepare an Extraordinary Occurrence Report.

# Report In The Matter Of

*Jason E. Benson*

*vs.*

## *Adams County Prison et al.*
## No. 1: CV-00-1229

Prepared by: *[signature]*

Ronald H. Traenkle
November 6, 2001



# *Materials Reviewed*

1. Deposition transcript of Jason E. Benson; August 30, 2001

2. Affidavit of Deputy Warden Bruce A. Cluck; dated October 15, 2001

3. Affidavit of Deputy Warden Debra Hankey; dated September 28, 2001

4. Affidavit of Warden Thomas Duran; dated September 27, 2001

5. Affidavit of Sergeant Ray Heintzelman; dated September 28, 2001

6. Affidavit of Lieutenant John Jennings: dated October 29, 2001

7. Affidavit of Corrections Officer Briton L. Shelton; dated November 6, 2001

8. Adams County Prison Extraordinary Occurrence Report prepared by Warden Thomas Duran on August 27, 1999

9. Adams County Prison Extraordinary Occurrence Report prepared by Bruce A. Cluck on August 27, 1999

10. Adams County Prison Extraordinary Occurrence Report prepared by Sergeant Ray Heintzelman on August 27, 1999

11. Adams County Prison Extraordinary Occurrence Report prepared by Briton L. Shelton on August 27, 1999

12. Adams County Prison Extraordinary Occurrence Report prepared by Lieutenant John Jennings on August 27, 1999

13. The Gettysburg Hospital Emergency Department Report relative to Jason Benson's treatment on August 27, 1999 prepared by William J. Steinour, M.D.

14. Adams County Prison *Inmate Handbook*

15. Adams County Prison Policy and Procedure Manual Policy # 300-6 *Use of Force*

16. Oleoresin Capsicum Aerosol Training Manual copyright R.E.B. Training International, Inc.

17. Civil Action No. 1:00-CV-01229 *Jason E. Benson vs. Thomas Duran, et al.*

18. Plaintiff's Response to the Defendant's Request for Production of Documents

19. Videotape of the incident occurring August 27, 1999

20. Adams County Prison Recommendation and Report of Administrative Action

21. Adams County Prison Notice of Infraction prepared by Lieutenant Jennings dated August 27, 1999

22. Adams County Prison Notice of Administrative Segregation prepared by Lieutenant Jennings dated August 27, 1999

23. Adams County Prison Misconduct Hearing Committee Report number 1468 prepared by Deputy Warden Cluck dated August 30, 1999

24. Temporary Transfer Sheets relative to Jason Benson

## *Summary of the Incident*

In August of 1999, Jason Benson was incarcerated in the State Correctional Institution in Smithfield. On the 25th of that month, he was transferred to Adams County Prison for a Post-Conviction Relief Act Hearing.

Just before departing for court on August 27, 1999, Mr. Benson was assessed a misconduct by Corrections Officer Briton Shelton. Upon Benson's return from court, the restraints applied by the transporting Adams County Sheriffs were removed. Corrections Officer Shelton then re-secured inmate Benson in leg irons and handcuffed him behind his back.

Corrections Officer Shelton states that when Benson was returned to the prison, he was informed of the misconduct violation and told that he was going to be placed in Administrative Segregation. Corrections Officer Shelton reported:

> *"I told Mr. Benson again why he was going. Mr. Benson then became verbally aggressive and loud. He started saying things such as "Ahh, fuck all of you mother fuckers." 'This is fucking bullshit." He then looked at Lt. Jennings and said, "Man fuck you." He then turned his head and looked at me and stated, "Fuck you, too."*
> (Corrections Officer Shelton's report; dated August 27, 1999)
> [Emphasis Added]

Mr. Benson was moved into the Intake Area medical room for his strip search. Here, according to the all the reports and affidavits, Benson, rather than complying with the long-standing and mandatory Adams County Prison search procedure, chose to be hostile and profane.

Anticipating a potential need to use force, Lieutenant Jennings followed established procedure and went to summon assistance. He returned with Deputy Wardens Cluck and Hankey who unsuccessfully attempted to reason with the prisoner. Warden Thomas Duran also responded. His efforts to obtain voluntary compliance from Benson were equally futile.

Once conflict resolution, verbal request, verbal command, and the show of force had proven ineffective in resolving the standoff, corrections personnel prepared to advance to the next step in the force policy. A video camera was brought to the room to record the incident.

Adams County Prison personnel aver inmate Benson was told his complaint regarding the assessed misconduct was irrelevant. Once more, he was asked if he would conform to institutional policy. Once more, the prisoner refused. When asked again, he remained silent. At this point, on the direction and authority of the prison warden, Lieutenant Jennings applied a short burst of oleo capsicum foam to the inmate's face. The corrections officers report that Benson was initially quiet. However, they state when he got up from his chair he became more aggressive, threatening and abusive. He spit at them, then violently

4

struck his head on the desk.  They assert Benson's conduct compelled them to put him onto the floor and restrain him.

> "…(Benson) *began to slam his head on the desk and computer screen, to stop the inmate from hurting himself further Inmate Benson was taken to the floor…"*
> (Jennings Report; August 27, 1999) [Emphasis Added]

According to corrections officers, the inmate stopped his violent behavior and was then placed into a running shower in order to flush the pepper foam from his face.  Once the capsicum washed away, Benson again became unruly, hostile, loud, threatening, and vulgar.  He escalated his aggressiveness by repeatedly spitting on corrections officers hitting both Officer Shelton and Lieutenant Jennings with his saliva.  When the prisoner refused to stop, he was taken to the floor where he again spit at Lt. Jennings before being controlled.  This time the officers placed a "spit shield" on the prisoner's face.  After this Benson became compliant and stopped his aggressive, defiant behavior.

Inmate Benson eventually complied with the Adams County Prison strip search procedures.  Subsequently, he was transported to Gettysburg Hospital where he received treatment for superficial contusions.

## *Observations*

1. On August 27, 1999, Thomas Duran, Bruce Cluck, Debra Hankey, Briton Shelton, John Jennings, and Ray Heintzelman were employed by the Corrections Department of Adams County. All were members of the staff at the Adams County Prison.

2. All were collectively and individually charged with the responsibility of securing the residents, maintaining order within the facility, and enforcing the policies of the Adams County Prison.

3. In Section 2006 of the Adams County Prison Inmate Handbook can be found:

   > *"You may be frisked when moving from one area of the prison to another area, and are subject to a strip search at any time. Inmates leaving and returning to the prison will be strip searched."*
   > [Emphasis Added]

4. In his deposition Jason Benson acknowledged that he was aware of this policy and felt it was reasonable.

5. **On the video, the Deputy Warden is heard discussing the misconduct with Inmate Benson.** In response, Benson looks away and shakes his head.

6. **On the video, corrections personnel can be heard asking Benson to comply with the strip search procedure and explaining the reason why.**

7. **On the video, Benson emphatically refuses the first request and ignores a second request.**

8. Adams County **Prison Policy** 300-6, *Use of Force,* **authorizes** the use of force **for inmate control** and **"to conduct a 'frisk' or strip search of any unruly inmate"**.

9. Lieutenant **Jennings was directed to administer oleo capsicum** foam.

10. The **video shows** that Jason **Benson intentionally struck his head twice** on the hard surface in front of him.

11. In his complaint, Jason **Benson alleges his head was hammered into the floor. The tape disproves this allegation.**

12. In his complaint, Jason **Benson charges that while on the floor he was kicked and kneed in his back and side. The tape disproves this.**

6

13. In his Plaintiff's Response To The Defendant's Request For Production Of Documents, Jason Benson averred,

> *"I was...forced into a prone position on the ground, while the weight of the defendant's bodies in my back compressed my chest to the point of rendering my* (me) *unconscious from respitory difficulty..."*
> (Page 3, Response to Question 7) [Emphasis Added]

**The videotape disproves this.**

14. In Civil Action No. 1:00-CV-01229, Jason **Benson alleges he was thrown into a concrete shower stall where he fell unconscious. The videotape rebuts this.**

15. **On the videotape**, Jason **Benson** is **seen repeatedly spitting at corrections personnel**
    - Before striking his head,
    - After being placed in the shower, and
    - Upon his removal from the shower.

    In response, corrections personnel ask him to stop, place him on the floor and employ a "spit shield".

16. In his deposition, Jason **Benson alleged he was unaware of his misconduct.** However, **on the videotape, he is heard to complain about his "write up" and** seen to **spit on corrections personnel.**

17. As a result of his actions on August 27, 1999, Jason **Benson was charged with, pled Nolo Contendere to, and convicted of "Aggravated Harassment by a Prisoner".**

18. The Gettysburg Hospital Emergency Department **medical records reveal Jason Benson sustained only "superficial contusions".**

## *Conclusions and Opinions*

Based upon the facts and focal issues in the incident of August 27, 1999 and using the contemporary professional literature on police policies, procedures, and practices relevant to this incident and my own training and experience as a frame of reference, I have formed the following opinions. These opinions are accurate within all reasonable limits of professional certainty and reflect the current professional standards taught nationally. They are subject to change based upon the discovery of new information either before or during trial.

I.  The purpose of any written directive is to establish guidelines for agency personnel on how to perform a certain task. The directive must allow officers to do their jobs but within those limits established by the Constitution, the Supreme Court, case law, and the particular community's environmental needs and resources.

   Administrators are taught that directives must be:

- **Constitutional**:  The prescribed guidelines must not violate the United States or Pennsylvania Constitutions.

- **Current**:  The prescribed guidelines must not violate clearly established case law. It must conform to generally accepted custom and practice and, where applicable, reflect technological changes.

- **Clear**: The prescribed guidelines must be easily understood and provide directions on how to perform the relevant tasks.

A.  The guidelines established by the Adams County Prison relative to <u>Use of Force</u>:

- Define what should be considered force
- Define various levels of force
- Establish when force may be employed
- Dictate factors which an officer is to consider before the application of physical force
- Create a logical progressive confrontational force continuum
- Establish subsequent medical examination and reporting procedures and
- Mandate training for agency personnel

   It is my opinion to an extremely high degree of professional certainty that Adams County Prison, from at least June 24, 1998 through the present day, has demonstrated a reasonable effort to develop, update, and maintain a Use of Force Policy. That policy is constitutionally sound, current in content, and easily understood by agency members.

II. The Adams County Prison <u>Use of Force</u> Policy also reflects current technological advancements such as oleo capsicum.

The application of chemical agents in the context of human conflict is as old as organized warfare. However, in the late 1980's the National Institute of Justice and the U.S. Attorney General's Conference on Less Than Lethal Weapons became concerned with injuries caused by the application of "traditional" tearing agents, such as the man-made CN and CS (mace) chemical compounds.

Pepper spray (OC) is the natural oil resin of capsicums (chili peppers) diluted with a carrier propellant such as isopropyl alcohol or water and placed in an aerosol or foam form.

> *"Oleoresin Capsicum is an organically based inflammatory agent derived from the essence of cayenne peppers. Its ingredients are generally 90 to 95 percent inert, making it safe for use at very close range."*
> (Federal Bureau of Investigations Law Enforcement Bulletin, May 1994, page 25)

> *"The Federal Bureau of Investigation Firearms Training Unit (FTU) conducted research to determine the most effective chemical agent product to be carried by the Special Agents. Based on that information provided by the U.S. Army Chemical Research and Development Center, FTU approved the use of Oleoresin Capsicum. FBI chemists who were consulted during the study did not foresee any long term health risks associated with the use of OC."*
> (National Institute of Justice, Technology Assessment Program, March 1994, page 5)

> *"OC caused almost immediate swelling and burning of the eyes and breathing passages. When the agent is inhaled, the respiratory tract is inflamed, and breathing is restricted. Effects do not support high levels of activity such as fighting with the police. ...studies indicate that the risk of injury or death is statistically improbable."*
> (International Association of Chiefs of Police, Executive Brief Pepper Spray and In Custody Deaths, March 1994, page 1)

> *"Pepper spray results in considerable tearing of the eyes, as well as temporary paralysis of the larynx which causes subjects to lose their breath. Contact with the face causes a strong burning sensation. After being exposed to the spray, subject's reactions become reflexive in nature. They immediately cover their eyes and bend over into a defensive posture to avoid further contact. This reactive behavior allows officers to gain control and restrain disorderly subjects more*

> *effectively. The effects of the spray generally last about 20 to 45 minutes and leave no residual effects."*
> (Federal Bureau of Investigations Law Enforcement Bulletin, May 1994) [Emphasis Added]

It is my professional opinion **Oleoresin Capsicum** is a non-hazardous inflammatory agent, which gives officers a degree of flexibility at two critical points in the force continuum.  It is an intermediate step, which **may be employed before they make physical contact** with subjects **or after initial physical contact** but before the introduction of hard open hand techniques or hand-held weapons such as the baton.

It is also my professional opinion the guidelines established for its use by correctional officers and the introductions of OC spray into a correctional facility are reasonable and prudent decisions by Adams County Prison administrators.  These decisions reflect a desire by prison administrators to reduce the threat of assault or injuries to corrections officers and inmates alike.

III. It is my opinion to an extremely high degree of professional certainty that an objective review of the videotape and written record established in this case clearly shows what occurred on August 27, 1999.

1. Upon his returning from court, Jason **Benson was told he had been issued a "Misconduct" and** that he **was being placed in "Administrative Segregation".**

2. The videotape reveals Jason **Benson decided to become uncooperative and commit a serious breech of prison policy and discipline.**

3. Jason **Benson refused** the requests of Lieutenant Jennings and Officer Shelton **to submit to a strip search.**

4. Lieutenant **Jennings summoned Deputy Wardens Cluck and Hankey**.

5. Jason **Benson repeatedly defied both the prison's policy and** the Adams County **Prison officials** who were charged with the responsibility to maintain order and discipline within the facility.

6. Deputy Warden **Cluck and Jason Benson discussed Inmate Benson's issued misconduct.**

7. **Despite repeated attempts by prison officials to peacefully resolve the incident** through verbal communication and a show of force, **the inmate persisted in controlling the standoff.**

10

8. Warden Thomas **Duran entered the room with** additional corrections personnel and **a video camera.**

9. Benson **refused two videotaped requests** to adhere to the long-standing Adams County Prison policy. His **compliance at any time would have prevented the need for an escalation of force**

10. Rather than engage in a physical confrontation with an unsecured prisoner in a small room containing office furniture and equipment, **corrections administrators authorized a brief application of oleo capsicum foam** to Mr. Benson's face.

11. For reasons known only to Inmate **Benson**, he twice **intentionally banged his head onto a computer** monitor, which caused a "superficial contusion on the front temporal scalp". He also became **more hostile, abusive, and vulgar**.

12. In order to prevent **Benson** from seriously injuring himself, he **was placed on the floor** and held there by corrections officers.

13. Once Jason **Benson calmed down**, he **was carried to the shower** since he claimed he was unable to move his legs. (It must be noted that Benson is seen moving his legs later on the videotape.)

14. Jason **Benson was** lowered into the shower stall and **placed under the water stream**. (Flushing with large quantities or fresh water is the preferred de-escalation technique after oleo capsicum application.)

15. Inmate **Benson** ignored attempts to calm him down but rather **remained threatening, abusive, vulgar, and profane.**

16. Inmate **Benson deliberately spit** his saliva **on corrections personnel and refused** several requests **to stop** his aggressive behavior.

17. Inmate **Benson stated he refused to comply with the strip search policy because of the "write up" and**, once again, assaults corrections personnel by deliberately **spitting on them.**

18. Inmate **Benson was** removed from the shower, carried into the outer office, and **placed on the floor**.

19. Jason **Benson again** intentionally **spit on a corrections officer**.

20. **Benson was restrained** and held down until **a "spit shield"** could be obtained and **put in place**.

21. Jason **Benson finally decided to stop** assaulting prison officials **and agreed to follow institutional regulations.**

22. Jason **Benson was taken to Gettysburg Hospital** where he was **treated for a superficial contusion** of the scalp and "a few superficial handcuff-type contusions of the skin".

IV.  It is my opinion to an extremely high degree of professional certainty that those **corrections officers present on August 27, 1999 had specific and articuable facts that would lead a reasonable, prudent, and properly trained officer to believe**:

- Mr. **Benson was angry and non-compliant,**
- That **force was necessary to enforce the rules and regulations of the prison**, and
- That **hands-on force would result in a physical confrontation** placing corrections personnel and Jason Benson at risk of serious injury.

A.  It is my opinion to an extremely high degree of professional certainty **the actions of the Adams County Prison Staff in their efforts to obtain Mr. Benson's voluntary compliance with prison rules on August 27, 1999 were tolerant, reasonable, proper, and exhausted all less-intrusive means of obtaining control of the situation.**

B.  It is also my opinion to an extremely high degree of professional certainty **the decision to employ oleo capsicum was an appropriate response to Inmate Benson's defiant behavior** on August 27, 1999. **It was the least intrusive control option left to them by Inmate Benson.**

C.  It is further my opinion to an extremely high degree of professional certainty **the use of the "swarm and take down" technique employed by corrections officers** on August 27, 1999 **was reasonable, proper, and necessary** to both prevent Inmate Benson from intentionally injuring himself and to prevent the prisoner's repeated assaults on corrections personnel.

D.  Furthermore, it is my opinion to an extremely high degree of professional certainty **there is not an iota of evidence to indicate the force options selected rose to an Eighth Amendment standard** *"cruel and unusual punishment so outrageous as to shock the conscience."*

E.  Lastly, it is my opinion to an extremely high degree of professional certainty the **conduct of the involved Adams County Prison personnel** on August 27, 1999 **was proper**. It was **well within the legal and ethical standards established by the courts, taught by the profession, and mandated by the United States and Pennsylvania Constitutions**. Their conduct was **not malicious, unnecessary, unwarranted, or excessive. Any reasonably trained officer** confronted with like circumstances **would respond in a like manner** and **no reasonably trained corrections officer would believe that response was unlawful.**

12

# RONALD H. TRAENKLE

3605 Cloverdale Road
Bensalem, PA 19020
215-639-0741 (home)
727-943-2377 (Florida)

## EDUCATION:

1990  *Northwestern University Traffic Institute* - Graduate level work
1967  *State University of New York* - Degree in Metallurgy

*Northwestern University:*  School of Police Staff and Command
*Pennsylvania State University:*  Police Executive Development, Polex Legal Forum
*Indiana University of Pennsylvania:*  Municipal Police Driver Training Programs
*University of Delaware:*  Internal Affairs

Numerous other police management courses, liability training programs, and specialized schools
including canine handler and hostage negotiations taught by the Federal Bureau of
Investigations, Pennsylvania State Police, Americans for Effective Law Enforcement, The
National Sheriff's Association and the Municipal Police Officers Education and Training
Commission.

## PROFESSIONAL EXPERIENCE:

TEMPLE UNIVERSITY POLICE ACADEMY

**Director/Commanding Officer**  1998 - present
This position is responsible for administering all phases of basic recruit police training for
Temple University in accordance with the regulations set forth by the Municipal Police Officers
Education and Training Commission and the Commonwealth of Pennsylvania in Act 120.
Duties include the development and implementation of all program policies, rules and
regulations related to all academy activities.
*curriculum vitae of Ronald H. Traenkle*

BENSALEM TOWNSHIP POLICE DEPARTMENT

**Captain - Commander Professional Services Division**  1987 - 1998
Highest sworn rank in the department (population 70,000)
The Professional Services Division is responsible for grant preparation, internal affairs, training,
criminalistics, Crime Prevention, budget, purchasing, accreditation and risk management.  It is
also the liaison to the executive and legal branches of Township government.  The municipality
utilizes line object budgetary procedures with some program budgeting.

*curriculum vitae of Ronald H. Traenkle*

**Captain - Commander Patrol Division**   1981 - 1987
The Patrol Division provides police patrol, animal control and crossing guard services to the community.  The division consisted of three lieutenants, five sergeants and fifty uniform officers assigned to squads, accident investigation and canine functions.  It also included over forty civilians in animal control and auxiliary services.

**Lieutenant - Watch Commander**   1978 - 1981
Commanded two or more police shifts consisting of sergeants, patrol officers and detectives. Responsible to investigate complaints and disciplinary problems, evaluate performance of squad supervisors as well as individual officers; in overall command of the Police Department in the absence of higher authority.

**Sergeant - Squad Supervisor**   1977 - 1978
Responsible for supervision, motivation, discipline, and performance of a team of ten police officers who provided patrol services to the community.

**Patrolman - Canine Unit**   1972 - 1977
Responsible for all phases of police work:  radio calls, traffic enforcement, accident investigation, as well as canine handler obligations.


**SUMMARY OF QUALIFICATIONS:**

Over twenty-five years of comprehensive law enforcement experience ranging from patrol/K-9 officer to divisional commander.  Successful management record of improving employee productivity, morale and organizational professionalism, development of statewide accepted training and nationally recognized "Risk Management" programs, development of policies and procedures, coordination of the Accreditation Program, formulation of the initial Bensalem "Town Watch" program.

**PROFESSIONAL BACKGROUND:**

Experience as an adjunct college instructor and lecturer for:  Villanova (Graduate and Undergraduate), North Carolina State University, Temple University, Pennsylvania State University, Bucks County Community College, City of Pittsburgh Police Academy, Philadelphia Police Department Advanced Training Unit, Allegheny County Police Academy, North Carolina POST Academy, Bucks County Police Academy, Washington DC Police Academy, Pennsylvania State Police Academy and the Pennsylvania League of Cities.

Conducted seminars at the 1988, 1989, and 1992 Pennsylvania Chiefs of Police Conference. Conducted training seminars for officers from over fifteen hundred different federal, state and local law enforcement agencies serving in thirty- two states, two foreign countries and the Tohono O'dom Nation Tribal Police.  Topics include:  Negligent Supervision, Discipline, Driver Training, Police Policy Development, Use of Force, Canine, Police Pursuit, Police Procedures, Domestic Violence and Training.

*curriculum vitae of Ronald H. Traenkle*

Faculty member of the Pennsylvania State University Police Executive Development and Advanced Police Executive Development and High Impact Supervision training programs and The Commonwealth of Kentucky Justice Cabinet on "Police Management and Civil Liability."

Assisted in the drafting of Senate Bills (PA) numbers 93-313 and 93-314 regarding Police Pursuit Policy and Training in the Commonwealth of Pennsylvania.  Signed into law by Governor Robert Casey in January 1995.

Member of the Municipal Police Officers Education and Training Commission Course Development Committee for the 1998 mandatory in-service training program related to *"Emergency Vehicle Operations"* and the 2000 Development Committee on *"Case Preparation and Testifying in Court"*. Lectured on behalf of the Commonwealth of Pennsylvania at the 1999 National Highway Traffic Safety Association *"Train the Trainers"* Program on *"Pursuit Management and Liability"*. Co-authored and delivered curriculum *"Critical Policy Development"* for the Pennsylvania Commission on Crime and Delinquency, training presented to Sheriff's Departments throughout the Commonwealth of Pennsylvania 2000-2001. Assisted in writing and delivery of curriculum " *The Ethical and Accountable Leader"* presented to all management level employees of the Pennsylvania Department of Corrections, 2000-2001. Assisted in the development of the new Act 120 curriculum, *"Use of Force in Law Enforcement"* mandated by the Commonwealth of Pennsylvania to be taught all entry- level law enforcement officers, delivered course to Commonwealth certified instructors at the Pennsylvania State Police Academy in 2001.

Commonwealth of Pennsylvania Certified Instructor for the MPOETC in both the Act 120 and Act 180 training programs. Certified Instructor for the American Society of Law Enforcement Trainers.

Fifteen years of experience as a law enforcement/security consultant working more than 350 Federal Civil Rights and State Tort cases. Accepted as an expert witness in both the Federal and State Courts.

## MEMBERSHIPS:
Vidocq Society
Fraternal Order of Police
International Association Chiefs of Police
The American Society of Law Enforcement Trainers
Pennsylvania Chiefs of Police Association (two term member Traffic Committee)

9-27-0

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON E. BENSON,                           : CIVIL ACTION NO. 1:CV-00-1229
      Plaintiff                        :
      V.                               :  (JUDGE CALDWELL)
THOMAS DURAN, et al.,                      :
      Defendants                       :  (MAGISTRATE JUDGE BLEWITT)

## PLAINTIFF'S FIRST REQUEST FOR
## PRODUCTION OF DOCUMENTS

Pursuant to Fed.R.Civ.P., Rule 34, the plaintiff Jason Benson, requests that the defendants produce the documents listed herein within (30) days, either by providing copies or by making them available for inspection and copying.

1) All grievances, complaints, or other document pertaining to the mistreatment or use of force on any inmates that were in the Adams County Prison form 8/98 until 8/99, that were filed against defendants Duran, Cluck, Hankey, jennings, shelton, Heintzelman, Orth, or Vazquez; as well as all invsetigative reports and actions taking as a result of any of the documents stated above.

2) All policies, directives, or instructions to staff concerning the application of use of force.

3) All policies, directives, or instructions to staff concerning the use of tear gas, O.C. Pepper Foam, or other chemical agents used by Adams County Prison staff.

4) All policies or memoranda that describes the application of chemical agents as in request #3, the effects of the chemical agents, and especially policies, directives, and memoranda concerning individuals the said chemical agents should not be applied on.

5) The plaintiff's medical records from Gettysburg Hospital, from 1/90 until 9/99.

6) Any and all policies, directives, or instructions that are given to the Adams County Prison staff about inmates in their custody for court, whom are state prisoners by SCI-Smithfield, and/or Wexford Health Systems concerning the treatment of "Epileptic" patients.

7) All complete Adams County Prison "Extraordinary Occurrence Reports" prepared by everyone involved in the incident on 8/27/99.

8) A copy of the "Use of Force Log" and All statements from witnesses involved from 8/98 until 8/31/99.

DEFENDANT'S
EXHIBIT

# CERTIFICATE OF SERVICE

I, Jasson Eric Benson, plaintiff, do hereby certify that on the date set forth below, I did serve a true and correct copy of the foregoing document upon the defendant's attorney(s) at the following address indicated below by sending same in the United States mail, first class, postage prepaid:

David Schwalm, Esq.
305 North Front St.
P.O. Box 999
Harrisburg, PA. 17108

Date: 9/25/00

Mr. Jason E. Benson, Plaintiff
DS-6483, SCI-Smithfield
P.O. Box 999, 1120 Pike Street
Huntingdon, PA 16652

David L. Schwalm, Esquire
**Thomas, Thomas & Hafer, LLP**
Attorney I.D. # 32574
305 North Front Street
P. O. Box 999
Harrisburg, PA 17108-0999
(717) 255-7643
Attorneys for  Defendants Thomas Duran; Bruce Cluck; Debra Hankey;
John Jennings; William Orth; Rae Hientzelman; David Vazquez; and Briton Shelton

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON ERIC BENSON,          :
    Plaintiff               :          CIVIL ACTION
                            :
       v.                 :          NO. 1:00-CV-01229
                            :
THOMAS DURAN; BRUCE CLUCK;   :
DEBRA HANKEY; JOHN JENNINGS; :
WILLIAM ORTH; RAE HIENTZELMAN; :
RONALD LONG and WILLIAM ELLIEN; :
BRITON SHELTON; DAVID VAZQUEZ; :
WILLIAM J. STEINOUR;         :
    Defendants              :

## RESPONSE OF ADAMS COUNTY DEFENDANTS TO
## PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS

    AND NOW, Defendants, Thomas Duran, Bruce Cluck, Debra Hankey, John Jennings, William Orth, Rae Hientzelman, David Vazquez and Briton Shelton, by their attorneys, Thomas, Thomas & Hafer, LLP, file this Response and Objections to the Plaintiff's First Request for Production of Documents as follows:

    1.    The Adams County Defendants object to Request No. 1 in that the said Request is overly broad, relates to confidential information and seeks discovery of information that is not reasonably calculated to lead to the discovery of admissible evidence.

DEFENDANT'S
EXHIBIT

2.      See copies of Adams County Prison Inmate Handbook, Adams County Prison Use of Force Policy and Procedure, and the training manuals used by Adams County Prison staff in the use of oleoresin capsicum attached hereto.

3.      See documents attached in response to Request No. 2.

4.      See documents attached in response to Request No. 2.

5.      See copies of Plaintiff's medical records maintained at the Adams County Prison for the period of incarceration in 1999.  The Adams County Defendants do not have Plaintiff's medical records from Gettysburg Hospital from January of 1990 to the present.

6.      See documents attached hereto.

7.      See Extraordinary Occurrence Reports attached hereto.

8.      Defendants object to Request No. 8 in that the said Request is overly broad, relates to confidential information and seeks discovery of information that is not reasonably calculated to lead to the discovery of admissible evidence.

Respectfully submitted,

**THOMAS, THOMAS & HAFER, LLP**

David L. Schwalm, Esquire
Attorney I.D. # 32574
305 North Front Street
P. O. Box 999
Harrisburg, PA  17108-0999
(717) 255-7643

Date: 3/28/01

Attorneys for Adams County Defendants

## CERTIFICATE OF SERVICE

I, David L. Schwalm, Attorney for Thomas, Thomas & Hafer, LLP, hereby certify

that a copy of the foregoing document was served upon the following, by enclosing a true

and correct copy in an envelope addressed as follows, postage prepaid:

Jason E. Benson
Inmate # DS-6483
SCI Smithfield
P. O. Box 999
1120 Pike Street
Huntingdon, PA  16652

Jason Kantner
Post & Schell, PC
240 Grandview Avenue
Camp Hill, PA  12011

James D. Young
Lavery, Faherty, Young & Patterson, P.C.
P.O. Box 1245
Harrisburg, PA  17108-1245

THOMAS, THOMAS & HAFER, LLP

David L. Schwalm, Esquire
Attorney I.D. # 32574
305 North Front Street
P. O. Box 999
Harrisburg, PA  17108-0999
(717) 255-7643

Date: 3/29/01

Attorneys for Adams County Defendants

:111593.1

ACPF #3

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _BENSON, JASON_   ACP# _990740_   DATE _8/27/99_

HOUSING AREA _E-2_   LOCATION OF INCIDENT _MEDICAL ROOM_

APP.
TIME: _11:10_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _FORCE USED ON INMATE BENSON,_
_JASON (990740). WARDEN DURAN, DEPUTY WARDENS CLUC_
_AND HANKEY, LT. JENNINGS, SGT. HEINTZELMAN,_
_OFFICER SHELTON_

Action and Comments: _TAKEN TO E.R. @ 1310 FOR MEDICAL ATTENTI_
_AS A RESULT OF O.C. AND INMATE'S REQUEST._
_PSP NOTIFIED TO FILE CRIMINAL CHARGES_
_FOR AGGRAVATED ASSAULT BY PRISONER._
_ENTIRE EVENT WAS VIDEO-TAPED._

Shift Commander
Signature and I.D. No.: _____ 647   Date and Time _8-27-99 1800_

Print Name _Lt. Jenn_

Report of Incident: _ON THE ABOVE DATE & APP. TIME, LT. JENNING_
_INFORMED ME THAT INMATE BENSON, UPON HIS RETURN_
_FROM COURT, WAS REFUSING TO BE STRIP-SEARCHED._
_I REPORTED TO THE LT'S OFFICE AND MET LT._
_JENNINGS WHO BRIEFED ME ON WHAT HAD TRANSPIR_
_THIS FAR. A PLAN WAS DEVISED AND WE REPORTED_
_TO THE MEDICAL ROOM, WHERE DEPUTY WARDEN_

(over for continua

Staff Signature
a    D. No: _____ #1   Date and Time _8/27/99_   _3:10/PM._

Print Name _DURAN_

ACP

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME Benson, Jason                    ACP# 99-00740  DATE 8/27/99

HOUSING AREA A-Block                  LOCATION OF INCIDENT Medical Office

                                      TIME: 1145 hrs

Brief Summary of Incident:
(Include Staff and Inmate Names and Number)  Use of force

Action and Comments: Inmate showered, transferred to E-Block and transported to ER and
examined by the on-duty physician.
PSP notified to press charges.
Incident was video documented

Shift Commander
Signature and I.D. No.: _B.A.Cluck_                    Date and Time 8/27/99  1500 hrs

Print Name  B.A.Cluck

Report of Incident: On the above time and date, I was informed by Lt. Jennings that the
aforementioned inmate was refusing to submit to a strip-search upon returning from
court. I attempted to speak w/ Inmate Benson about his actions but he only began
yelling profanities and making comments like, "Fuck this! This is fucking Bullshit! I'm
not stripping!" He was again asked to cooperate and submit to a search and he
again refused. At that point, Lt Jennings sprayed a one second burst of OC spray (Freeze)
into Benson face. Benson then began calling staff present, "fucking animals," "cock suckers"
(over for continu)

Staff Signature
and I.D. No: _B.A.Cluck_  2               Date and Time 8/27/99  1500 hrs

Print Name  B.A.Cluck

ACPF#

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _Benson, Jason_    ACP# _99-00740_ DATE _8/27/99_

HOUSING AREA _A-Block_    LOCATION OF INCIDENT _Intake_

TIME: _1120_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _On above time & date I, Sgt Heintzl— was asked to help with Inmate Benson, Jason at intake. Inmate Benson, Jason di— want to strip after court._

Action and Comments: _Taken to Gettysburg E.R. 710 for evaluation as a result of the O.C. and the injuries received A.S.P. notified & case command center for aggravated assault by a prisoner Event was video taped_

Shift Commander
Signature and I.D. No.: _____ 60° Date and Time _8-27-99 1600_

Print Name _H. Tewb_

Report of Incident: _On above time & date I, Sgt Heintzl— was asked to help with Inmate Benson, Jason in the Intake area. Inmate Benson was having a problem that he didn't want to be strip after coming back from court. He was asked to strip but he refused to do so. At that time he was sprayed & then he stated to hit his head on the computer screen. After this he wouldn't stop so he was taken to the floor until he had enough & then he was placed in the shower._

(over for continua—)

Staff Signature
and I.D. No: _Sgt Hntzl 61-4_    Date and Time _8/27/99 1300_

Print Name _Heintzelman_

**CERTIFICATE OF SERVICE**

I, Kevin C. McNamara, Attorney for Thomas, Thomas & Hafer, LLP, hereby certify that a copy of the foregoing document was served upon the following, by enclosing a true and correct copy in an envelope addressed as follows, postage prepaid:

Jason E. Benson
Inmate # DS-6483
SCI Smithfield
P. O. Box 999
1120 Pike Street
Huntingdon, PA  16652

Alan S. Gold, Esquire
7837 Old York Road
Elkins Park, PA  19027

James D. Young, Esquire
Lavery, Faherty Young & Patterson, P.C.
P.O. Box 1245
Harrisburg, PA 17108-1245

THOMAS, THOMAS & HAFER, LLP

By: _Ki C McNamara_
Kevin C. McNamara

:149908.1        11/27/01