IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON ERIC BENSON,                                          CIVIL ACTION NO. 1:CV-01229
           Plaintiff **FILED SCRANTON**
    v.                 :      JUDGE CALDWELL
               DEC - 4 2001   MAGISTRATE JUDGE BLEWITT
THOMAS DURAN, et al.,        :
         Defendants     :    JURY TRIAL DEMANDED
         PER                 
           DEPUTY CLERK

PLAINTIFF'S RESPONSE TO THE ADAMS COUNTY DEFENDANT'S
AS WELL AS DEFENDANT'S RONALD LONG'S AND WILLIAM ELLIEN'S
MOTIONS FOR SUMMARY JUDGMENT

     AND NOW, come the plaintiff Jason E. Benson, pro se, responding
to the Adams County Prison defendant's as well as, defendant's Ronald
Long, and William Ellien's Motions for Summary Judgment. The plaintiff
will address them collectively and moves for the denial of each based on
the following:

1.       The crux of plaintiff's case, primarily depends on the use
of expert testimony on the issue of a serious medical need. Epilepsy is
common knowledge among society but, the intricacies will need to be
brought/explained in laymens terms especially, before a jury. It was
evident to petitioner upon the filing of his complaint that expert
testimony would be needed hence, his Motion for Appointment of Counsel
in June, 2000. Unfortunately the motion was denied on August 22, 2000.
Furthermore, it's a common misconception that applying for counsel is
synonymous with applying for expert testimony.

2.       Naturally, defendant's Long, and Ellien, would benefit from
plaintiff's inability to afford counsel/expert testimony and is manifestly
apparent in their pleadings and citation of authority; Boring v.
Kozakiewicz, 833 F.2d 468 (3d Cir.1987).

3.          Likewise, the Adams County Prison defendant's have without citing case law, effectively shown the Court their intentions by way of an Affidavit of Mr. Ronald H. Traenkle, a Law Enforcement Professional. See Adams County Prison defendant's Affidavits.  Interestingly, there are a host of rulings on the above issue but, one in particular comes to mind: Parham v. Johnson, 126 F.3d 454 (3d Cir.1997). In Parham, our Court of Appeal dealt with a situation similar to the case at bar, "Holding that expert testimony is necessary when the seriousness of injury or [illness] would not be apparent to a lay person." Thus, according to the District Court, Parham, had to produce an expert witness and because he did not, the Court ruled in favor of the defendant's for summary judgment. The Court went on stating that "This finding by the District Court is especially startling because when the District Court denied Parham's, Motion for Court Appointed Counsel, the District Court stated that it did not seem likely that expert testimony would be needed in the case." Id.

4.          Indeed, the case at bar, will depended on a jury's belief in either plaintiff's expert witness or the defendant's. For the reasons stated above, the Court isn't without sufficient information and the correct standard(set by the Third Circuit Court of Appeals)to appoint an expert witness on it's own behalf or for the plaintiff.

5.          Contrary to defendant Long's, denial of ever being deliberately indifferent to plaintiff's serious medical needs, defendant Long, is attempting to persuade the Court into believing that all of plaintiff's prior seizures occurred when he was intoxicated and giving what appears to be expert testimony by stating "that Phenobarbitol is an addictive barbituate; that Phenobarbitol is not a good seizure medication

for the long term; and given the fact that Mr. Benson's seizures usually occurred when intoxicated--an unlikely condition while incarcerated, in the exercise of Dr. Long's professional judgment he believed that it would be more appropriate to prescribe Dilantin for plaintiff's seizure disorder." (Dr.Long's Declaration ¶ 9; Exhibit "C" pp.3,11)  From the way it's explained to the Court, one would be led to believe that plaintiff's last seizure occurred while he was intoxicated. Nothing is further from the truth; yes, the plaintiff's last seizure at the time of Long's examination of plaintiff on February 24, 1999, was prior to Christmas, 1998. But, Long, isn't relating to the Court the fact that when plaintiff had the seizure prior to Christmas, 1998, the plaintiff was incarcerated since May 22, 1998, and the seizure occurred while plaintiff was taken from SCI-Camphill, to Court and back to Camphill. The plaintiff never had a chance to get intoxicated.

6.        More importantly, defendant Long's professional judgment about Phenobarbitol being an addictive barbituate and not good seizure medication for the long term, is a ruse to state the least. The plaintiff directs the Court's attention to [Dr.Long's Declaration; Exhibit "C" pp. 16,17,18,19] where it's clear that from February 1, 1999, until May 31, 1999, defendant Long, prescribed according to his "Professional Judgment" Phenobarbitol and Dilantin. Was this some sort of testing going on at the plaintiff's expense, if so, it's Unconstitutional. Regardless, of whether the plaintiff stated that the medication made him jittery, it's a known fact that if an epileptic refuses his anti-convulsive medication, he will be locked in the infirmary until he complies with medication requirement.

7.          On September 5, 2001, defendant Long, issued a subpoena to
the records custodian here at SCI-Smithfield, requesting "any and all
medical records  and any and all documents pertaining to inmate grievances
filed by inmate Jason Benson (DS-6483)." See (Plaintiff's Motion to
Preclude Expert Testimony...; Exhibits "A,B, & C")  Every time the
plaintiff requests a copy of his medical records, the defendant's come
up with more excuses not to turn them over; starting in March, 2001, and
the latest request was on September 13, 2001; see exhibits "A, 1 & 2,"
attached hereto. The plaintiff cannot simply listen to defendant Long,
assert all sorts of "Professional Judgments" [or better yet, expert
testimony] and use plaintiff's medical file to support his opinion when,
Long, and his attorney's have clearly engaged in discovery violations.
Hence, plaintiff's Motion to Preclude Expert Testimony and Motion for
Sanctions for Blatent Discovery Violations. Likewise, the Adams County
Prison defendant's and defendant Ellien's attorney's have previously been
notified by request for the production of documents, that plaintiff sought
a true and correct copy of the medical records and all other information
secured by them. However, because none of the defendant's fancied to honor
the request, the plaintiff also sought the preclusion of expert testimony
and precluding all of the defendant's [**collectively**] from using any
information in the plaintiff's medical records/files. See (Plaintiff's
Motion to Preclude Expert Testimony...; Exhibits "D & E"; and Exhibits "B,
1 & 2" attached hereto.

8.          The plaintiff has suffered the insidious tactics of all of the
defendant's attorney's and attempted to put a stop to the defendant's
receiving his medical records pursuant to the Department of Corrections

Administrative Directives and Memorandums, (DC-ADM 003, Release of
Information Policy). Pursuant to that policy, a prisoner must fill out
and sign a DC-108, Authorization For Release of Information, if he
chooses to have his personal information released; see Exibit "E" of
Plaintiff's Motion to Preclude Expert Testimony. In the case sub judice,
the plaintiff filed an Official Inmate Grievance, the same day he
received the Adams County Prison defendant's request for his medical
files. The purpose of plaintiff filing the grievance was to keep the
defendant's from receiving any records or files because, the plaintiff
cannot be sure whether any of the records/files that have already been
released are true and correct. Apparently, the Adams County Prison
defendant's as well as Long's and Ellien's attorney's have compensated
this "Facilities Grievance Coordinator and the Records Custodian" very
luxuriantly to produce records that **only the Defendant's and their Attorney's**
**have seen**.

9.        The plaintiff has indicated various questionable absurdities
in the medical records submitted by defendant Long. Not one iota of the
information in those records/exhibits is believable by the plaintiff and
he respectfully requests that the Court draw an adverse inference to the
records/exhibits due to all of the defendant's failure to turn them over
to the plaintiff. It is aparent to plaintiff that there is a [**hidden**]
factor eveloping their austere refusal to turn over the documents  the
plaintiff needed to review in assurance of their authenticity. Their
secretive acts are quite perplexing, in that, plaintiff would not have
opposed the release of the records if they were turned over; perhaps
the defendant's think that plaintiff's medical documentation is not
protected from disclosure to them but, protected from plaintiff.

10.      The facts of the matter is that the defendant's have
received medical documentation that is protected Constitutionally and
can only be released if the plaintiff waives any and all rights to
confidentiality. See  DC-ADM 003; and Heicklen v. D.O.C., 769 A.2d 1239
(Pa.Cmwlth.2001); Times Publishing Company v. Michel, 633 A.2d 1233 (1993),
petition for certiorari denied, 645 A.2d 1321 (1994).

11.      Did the Adams County Prison defendant's follow it's Policy and
Procedure as set forth in A.C.P. Policy 300-6, et seq., and the Oleoresin
Capiscum Aerosal Training Manual in use on August 27, 1999?  Suggested
answer: No.  First of all, the Court needs to review the videotape or
documentation of the Adams County Prison defendant's Use of Force; because,
there are too many different versions being told and none of them actually
come anywhere near the truth; according to defendant Duran, a "true and
correct copy" is supposed to be attached to his affidavit. See Affidavit
of Warden Thomas Duran, at ¶ 12.

11.      The plaintiff asserts to the Court that this response, in it's
entirety is a "Statement of Disputable Facts" and calls into question every-
thing the defendant's, their attorney's, and the Law Enforcement Professional
Nor, will the plaintiff waist this Court's time with another version of a
Procedural History that's adding to the confusion created by the defendant's.

12.      The defendant's first argument seeks summary judgment for
defendant's Cluck, and Hankey, because "Neither Mr. Cluck nor Ms. Hankey,
is seen or heard doing anything improper in regard to Mr. Benson on the
videotape." (Brief in Support for Mtn for Summary Judgment pg. 7, ¶ 2.)
Naturally this argument must fail; according to Adams County Prison Policy
and  Procedure Manual for the Use of Force, § II. B. 5. it states:

"The Shift Commander/Administrator
conducts an investigation of the incident
to determine whether proper procedures
were followed in using physical force
according to existing policies and
procedures. This investigation is included
as part of the original report **and
forwarded to the Deputy Warden for review.**"

According to their policy the deputy warden reviewed whether or not the
proper procedures were followed. Hence, their involvement is evident by
their refusal to notify the other staff members that were involved in the
incident, of their **inappropriate disregards for the proper procedures.**
Furthermore, defendant Cluck, physically mauled plaintiff, thereby
causing some of the injuries incurred; and defendant Hankey, at all times
relevant had the power and/or the authority to stop the assult on the
plaintiff because she is charged with knowing the proper procedures and
policies. See § I. C. 2., which states:

"The **Deputy Warden is hereby Charged** with
the enforcement of appropriate regulations
governing the use of prison weapons."

Attached hereto is a copy of the relevant policy as it's been reproduced
by the defendant's for the plaintiff. See Exhibit "C, 1 thru 8" In addition,
the defendant's argue that Heintzelman, and Shelton, were not in command
of the situation, just following orders and part of the staff present at the
time. Well, the plaintiff has alleged and has shown that the defendant's
assulted him because of the maleficenceness of Duran's order. Nor, is
Duran, immune under the traditional concepts of respondeat superior; as he
is evidenced on film stompping plaintiff in his neck.

13.     It is beyond the understanding of the plaintiff as to why the defendant's are prevaricating/fabricating their actions through their attorney's and/or in the affidavits submitted to the Court. When it's been quite clear for some time know that Duran, Cluck, Jennings, Orth, and Shelton, were all suspended from their positions pending the outcome of an investigation. The investigation centered around charges of " ASSULTS, RAPE, ABUSE OF AUTHORITY, SEXUAL HARASSMENT, ET CETERA ET CETERA," and each of these defendant's were eventually fired.

14.     The force employed by the defendant's to allegedly obtain the plaintiff's compliance with prison policy was unreasonable and undertaken to implement the unnecessary and wanton infliction of pain for the purpose of corporal punishment; see Hudson v. McMillian, 503 U.S. 1,5,6-7 (1992). Strip searches are necessary; however, there must be a policy and procedure that's adhered to. In the case at bar, the defendant's blatently chose to disregard the proper procedure which was necessary under the circumstances. Obviously, plaintiff would not be addressing the Court had they been right. Again, the plaintiff must draw the Court's attention to exhibit "C-6; § II. B. 10." which states:

> "The following options constitute the Force continuum, **beginning with the least amount** of force that can be reasonably expected to control the inmate or the situation:
>
> a. Show of Force *
> b. Control Techniques *
> c. Oleoresin Capsicum Aerosol *
> d. Electronic Body Immobilizing Device *
> e. Active Counter measures
> f. Chemical munitions other than O.C.
> g. Firearms
>
> * These options are equivalent methods of control, subject to availability under the circumstances.

The steps that must be taken when using force is clear and must begin

with the least amount of force and progress accordingly. All throughtout
the defendant's pleadings there are assertions of them following the
proper procedures, a curious review of some of them is in order. In the
defendant Shelton's affidavit, he stated: "Mr. Benson had been asked or
directed at least five or six times to comply with routine procedure...
It was my understanding and belief that he was simply refusing to cooperate
because he was disgusted...Lieutenant Jennings sprayed pepper foam in Mr.
Benson's face...For his own protection and the protection of others, Mr.
Benson was taken to floor by Sergeant Heintzelman, Lieutenant Jennings,
Deputy Warden Cluck and me." (Affidavit of Defendant Shelton, at ¶¶ 9,10)
15.        The defendant Jennings, stated "...I believed it was necessary
to consult with the Warden and both Deputy Wardens. We all proceeded to
the medical room where Benson was...The next thing to occur was...Cluck
giving Benson an order to strip, but Benson continue to refuse. On the
orders of the Warden, i sprayed Benson with OC pepper foam..." (Affidavit
of Defendant Jennings, at ¶¶ 5,6.); (Affidavit of Defendant Cluck, at ¶¶
3,4.): "The Warden was notified and he and several other staff members
came to the intake area...After repeated refusals on Benson's part, Lt.,
Jennings sprayed Benson with OC pepper spray..."  (Affidavit of Defendant
Duran, at ¶¶ 5,6.): "However, Mr. Benson repeatedly and steadfastly refused
to respond 'first to verbal request, second, to a verbal command and third,
to a show of physical force!..Because of Benson's steadfast refusal to
comply with the strip search procedure, 'he was [deliberately] kept in
restraint (handcuffs and leg shackles)' until he voluntarily agreed to
comply with this procedure."  Last, but not the least, it's necessary to
review relevant portions of the defendant's "Retained Professional's"
affidavit; Mr. Ronald H. Traenkle, who has an extended knowledge of Law
Enforcement, and his "Report" in this matter is quite off the mark.

16.        The first thing the plaintiff noticed, is that the "Materials

Reviewed" by Mr. Traenkle, e.g.,(#1. Deposition transcript of Jason E.

Benson; August 30,2001; #11. Adams County Prison Extraordinary Occurrence

Report prepared by Briton L. Shelton on August 27,1999; #12. Adams

County Prison Extraordinary Occurrence Report prepared by Lt. John

Jennings on August 27,1999;) were never submitted to the plaintiff per

his request for production of documents.

17.        The plaintiff then noticed in "the Summary of the Incident"

at ¶¶ 2,4,6, & 7, there are interesting notables; but, the one that stands

out states: "Once conflict resolution, verbal request, verbal command, and

a show of force had proven ineffective in resolving the standoff,

corrections personnel prepared to advance to the next step in the force

policy. A video camera was brought to the room to record the incident."

Mr. Traenkle, states that"it is his opinion to an extremely high degree

of professional certainty the **conduct of the involved Adams County Prison**

**personnel** on August 27,1999 was **proper.**" (Traenkle's Affidavit; Exhibit

"B" § IV.E; and see also § IV.C.) The latter section is important for one

reason and that being "...the use of the **'swarm and take down' technique...**

**was reasonable, proper, and necessary'**..."

18.        All of the above goes straight back to the A.C.P. Policy and

Procedure: 300-6; II. B. 10; the Force continuum. Where it clearly states

that it begins with the least amount of force and continues through the

steps as needed. Also stated above, all of the defendant's seem to agree

that the plaintiff refused to strip and that it only took one guard to

cuff the plaintiff with his hands behind his back and shackle him at the

ankles. The defendant's also agree that there were Five (5) males in the

room, excluding plaintiff and that is what was called a show of force.

19.      The show of force was the first step in the continuum and
the very next step was the "Control Techniques;" which is basically the
"Swarm and Take Down" technique their professional law enforcement
party spoke of. The swarm and take down technique works in the following
manner: #1. there must be five personnel; #2. four personnel are assigned
an individual limb of the target i.e.,(1-has the right leg; 2-has the left
leg; 3-has the right arm; and 4-has the left arm); #3. the four personnel
are told to take the inmate down by grabbing their assigned --limb; #4.
once the inmate is on the ground/floor, the fifth person has handcuffs
and shackles that he puts on the inmate.

20.      The defendant's willfully bypassed the second step in the use
of force continuum and went straight to the third step. The plaintiff
never once threatened any of the prison personnel with bodily harm; never
made any aggressive or physically threatening postures, for one, because
he couldn't, he was restrained. Without spraying plaintiff with the chemical
weapon OC pepper foam, the defendant's could have easily stripped him of
his clothing enough to ensure that plaintiff was not hiding any foreign
objects. Furthermore, the defendant's force continuum states that OC pepper
foam, and Electronic body immobilizing devices are equivalent control
techniques. That just isn't true and if it were it means that their policy
is overbroad; it is. According to their policy the defendant's are allowed
to use deadly force, for "self defense; serious offenses against persons;
and escape. See exhibit "C-1" attached hereto.  However, under their use
of physical force, § II.A.1 & 2: has restrictions that state: "Only the
minimal amount of force necessary is used to control an inmate or
situation in the prison;" (see #s 1,2, & 8) exhibit "C-4") Number 8, states
that the defendant's should have used minimal force to "conduct a frisk or
strip search of an unruly inmate;" According to this policy the defendant's

could have used a firearm to make the plaintiff strip.

21.        Nor, is OC pepper foams use the same as a control technique,
as a matter of fact, OC is considered an additional use of force option
and is not intended to replace a **firearm, PR-24 baton, straight baton,**
**expandable baton or any other authorized piece of equipment, nor, is it**
**intended to replace defense and control techniques** that are used within
the levels of force. See exhibit "D-2; D-3; D-4; D-5"  More recently,
another district Court Judge in Washington State barred the use of pepper
spray in a state juvenile facility. "[I]t should be used, he ruled, only
if there is a threat of equal or grater harm to others or to a substantial
amount of valuable property than the pain and danger of harm that the
pepper spray presents. Pat Arthur, plaintiff's attorney in the case,
emphasized a lack of training. If staff **aren't** trained in other intervention
methods, they resort to pepper spray. Calling it a chemical weapon, she said,
I have seen videotapes of kids who are being sprayed. The pain is so intense
the kid immediately falls to the floor, screaming. There is no question of
an injury being suffered." See exhibit "E-1 thru **6**" attached hereto.

22.        The defendant's state that plaintiff's actions caused the
interruption of their normal activities, and that their attack only produced
transient discomfort; this is also untrue. See exhibit "F" attached hereto.
This document is from the Gettysburg Hospitals emergency ward right after
plaintiff was beat-up by the defendant's and it states that: "Patient
states this afternoon he was beaten by the prison guards. He c/o(complains
of) thorasic and lumbar back pain. He also complains of right rib pain and
left thumb numbness.Abrasion noted over thorasic back. Tenderness over
right ribs. Negative heart palpations," and plaintiff was given 2mg of
Ativan, as a precaution or anticonvulsant.

23.        In Brooks v. Kyler, 204 F.3d 102 (3rd Cir.2000), the Court
reasoned that Hudson, primarily stands for the proposition that a showing
of "significant" or "serious" injury is not necessary to make an Eighth
Amendment claim. The Court further concluded that "Three correctional
officers allegedly assulted Brooks by repeatedly punching him in the head,
stomping on his back and neck, slamming him into a wall, choking him
unconscious--all while he was handcuffed to a waist restraint belt and,
at some points, even restrained by leg shackles--simply because he did not
promptly respond to an order...If a jury believes Brooks's version of the
facts, there is no question that the defendant's use of force was excessive
in light of the circumstances confronting them." Id. at, 107. Certainly,
the defendant's in the case at bar, use of force exceeded the circumstances
confronting; as they had a fully restrained, and passive inmate that did
not need to be assulted under the condition he was in.

24.        The defendant Orth, states in his affidavit that an officer
told him at 3:10am on August 30,1999, that the plaintiff was having some
kind of problem; he was screaming and not responding to verbal directions;
"At the time, inmate Benson appeared to be physically okay other than the
fact that he was having difficulty following directions and answering
questions." That is not a fact nor, the truth. The officer told defendant
Orth, that the plaintiff was "found lying on the floor of his cell - he
was **bleeding a little from the mouth.**" Defendant Orth, goes on to state
that approximately 20-25 minutes later, (3:30-3:35am) the plaintiff appeared
to be having a seizure and began to scream and suffer what appeared to be
convulsions. And that "an ambulance would have been called if this was an
emergency. He did not get worse after the Sheriff's office was called.
Instead, he got better and in fact...his condition had improved..." See
(Defendant Orth's Affidavit at ¶¶ 4,9; and the Extraordinary Occurrence

Report attached thereto;and the Log documenting the Times).

25.        However, defendant Orth's actions and comments in the extra-ordinary  occurrence report, tell a different version; "inmate transported to the hospital because of the frequency of seizures and the fact that the seizures became more intense also because the inmate was unresponsive had trouble breathing and was vomitting some blood."  The incident was stated to occurred at 3:10am but was only documented at 3:58am; which is 48 minutes later and the plaintiff left out of the prison with the sheriff's at 5:35am; that means that the plaintiff did not leave the prison until an 2:15 minutes after his first seizure and that's due to defendant Orth's professional certainty; that plaintiff's seizures were not an emergency. The plaintiff was having a "Status epilepticus, the most serious seizure disorder, the seizure doesn't stop. Status epilepticus is a medical emergency because the person has convulsions with intense muscle contractions, is unable to breathe properly, and has widespread(diffuse)electrical discharges in the brain. **Without rapid treatment**, the heart and brain can become over-taxed and permanently damaged, **and the person can die.**" See Exhibits "G-1,2, 3;" attached hereto. Clearly, deliberate indifference is present.

26.        The Adams County Prison defendant's are not entitled to nor, should they be granted qualified immunity. Plaintiff illuminates above that they did not follow their own policy and procedures. See also, <u>Howard v. Adkison</u>, 887 F.2d 134,140 (8th Cir.1989)(defendants who acted in violation of prison policies were not immune); <u>Deorle v. Rutherford</u>, 263 F.3d 1106 (9th Cir.2001). Accordingly, the Adams County Prison defendant's Motion for Summary Judgment should be denied respectively.

27.        The plaintiff respectfully requests that this Honorable Court,
look past the defendant Long's ruse about his "Professional Judgment" making
him come to the conclusion that plaintiff should not be on Phenobarbitol
for a long term and that plaintiff had been non-compliant [with] his
medication. Defendant Long, also stated that it was not medically necessary
to continue the plaintiff on Dilantin because, the plaintiff had effectively
taken himself off of the anti-convulsive medication, and that everything
was documented in plaintiff's medical documentation that he supplied to
the Court. Counsel for defendant Long, seem to believe that the record is
devoid of any evidence establishing that Long, exhibited deliberate indiff-
erence to [any] serious medical need to plaintiff with respect to the
treatment provided at SCI-Smithfield. That is not the truth.

28.        Had the plaintiff actually taken himself off of his anti-
convulsive medication; defendant Long, would have ordered the plaintiff to
sign a "Release from Responsibility for Medical Treatment." in that form
it states: I understand the nature of the treatment is:(Attending physician:
Give brief description of the medical treatment required, and the possible
consequences of this inmate not receiving it.) By refusing this medication
(Phenobarbitol), I understand that my condition may become much worse and
lead to possible deterioration of my health; and possibly **even death**...I
hereby release the attending physician, and the institution from **all legal
responsibility** for any ill effects which may result from my refusal to
accept medical treatment..." See Exhibit "H" attached hereto.

29.        Not one of the defendant's/(collectively) are entitled to
summary judgment in the favor for the reasons **stated** above. However, the
plaintiff is entitled to "Expert Testimony" according to the Court in
Parham supra. Defendant Long's, statement of material facts are objected to
because, if what he states is true, he would've produced exhibit "H".

30.        The plaintiff filed with the Court, a motion entitled
Plaintiff's Statement of Disputed Factual issues and Brief in Opposition
to Defendant's Request for Judgment in Their Favor; and plaintiff also
filed an affidavit against or in support of the above titled pleading.
The Adams County Prison Defendant's did not bother to response to either
pleading. As far as their statement of material facts is concerned ¶¶ 1,
thru 10, are agreed to in part; plaintiff objects to the allegation that
he initially refused to strip and that he used such vulgar language; ¶ 10,
is objected to. The plaintiff was restrained by his hand being cuffed
behind him and his feet were shackled; ¶¶ 12 thru 23, are all lies. See
the videotape and plaintiff's proof above; ¶¶ 23 28, are objected to see
above; ¶¶ 30-38, are all lies, see above pleadings.

        **WHEREFORE**, the plaintiff respectfully requests that all of
the Defendnat's Motions for Summary Judgment or Qualified Immunity be denied
for the clearly disputable issue of material facts presented, and that
this Honorable court review the videotape of August 27,1999, as well as,
appoint a Medical Expert for the plaintiff or so the Court can see that the
truth is what the plaintiff' been pleading to the Court.

                                    Respectfully submitted,


November 23, 2001                   Mr. Jason Benson, PLaintiff

-16-

## CERTIFICATE OF SERVICE

I, Jason E. Benson, plaintiff, hereby certify that a true and correct copy of the foregoing document was served upon the following via first class mail:

Jason Kantor, Esquire
Post & Schell, P.C.
240 Grandview Avenue
Camp Hill, PA 17011

Lavery, Faherty, Young &
Patterson, P.C.  *
James D. Young, Esquire
301 Market St., Suite 800
Harrisburg, PA 17108

David L. Schwalm, Esquire  *
Thomas, Thomas & Hafer
305 North Front Street
P.O.Box 999
Harrisburg, PA 17101

Alan Gold, Esquire  *
7837 Old York Road
Elkins Park, PA 19027

Date:

By: _____
Mr. Jason E. Benson, Plaintiff
SCI-Smithfield, #DS-6483
P.O.Box 999, 1120 Pike Street
Huntingdon, PA 16652

* The plaintiff must send the Defendant's attorney's copies when he can afford to, which will be the first week of December, 2001.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON BENSON,                      :     CIVIL ACTION NO.1:CV-00-1229
          Plaintiff               :
     v.                            :     (Judge Caldwell)
                                   :     (Magistrate Judge Blewitt)
THOMAS LUFAR, et al.,              :
          Defendants               :     JURY TRIAL DEMANDED

REQUEST FOR PRODUCTION
OF DOCUMENTS RECEIVED
PURSUANT TO THE SUBPOENA

     On September 5, 2001, the defendant Ronald Long, issued a

subpoena to the records custodian here at SCI-Smithfield, and requested

the following information:

> "Any and all medical records and any and all
> documents pertaining to inmate grievances
> filed by inmate Jason Benson (DS-6483);
>
> And that they receive them by September 20,
> 2001, at 9:00 a.m.."

     The plaintiff respectfully requests a legible copy, front

and back in some instances, of any and all of the medical records and

the documentation pertaining to inmate grievances filed by plaintiff

which includes (the requests to staff members).

     This request is pursuant to Fed.R.Civ.P. Rule 34, and is

expected to be honored within (30) days.

                                   Respectfully,

Date: 9/13/01

                                   Jason Benson, Plaintiff
                                   DS-6483, SCI-Smithfield
                                   1120 Pike St.,P.O.Box999
                                   Huntingdon, PA 16652

cc: David Schwalm,Esquire
    Alan Gold,Esquire

A-1

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS

Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. **To: (Name and Title of Officer)** Mr Siegel
RECORDS DEPT. / CUSTODIAN OF RECORDS

2. **Date:** 9/25/01

3. **By: (Print Inmate Name and Number)**
Jason E. Benson, DS6483
Inmate Signature

4. **Counselor's Name** CRIDER

5. **Unit Manager's Name** BURK

6. **Work Assignment**

7. **Housing Assignment** CA/08

8. **Subject: State your request completely but briefly. Give details.**

Mr. Siegel,
Did you, pursuant to a Notice of Records deposition, take to the law offices of Lavery, Faherty, Young & Patterson, P.C., in Harrisburg, PA. any and all records described on a supena? Or did you, by mail, send any and all records to the above law office, along with a signed affidavit in lieu of appearing in person to a deposition?
(Note: The records spoke about above are pertaining to Jason Benson, #DS6483)

Thank you kindly for your attention to this matter.

9. **Response: (This Section for Staff Response Only)**

Yes

To DC-14 CAR only ☐        To DC-14 CAR and DC-15 IRS ☐

Staff Member Name _____ Print _____ Sign _____ Date 9-26-01

Revised July 2000

A-2

reject #3

DC-804
Part 1    Legal of Courts

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001-0598**

FOR OFFICIAL USE ONLY

Smi - 7736 - 01

GRIEVANCE NUMBER

**OFFICAL INMATE GRIEVANCE**

| TO: FACILITY GRIEVANCE COORDINATOR | FACILITY: S.C.I.S. | DATE: Oct. 8, 2001 |
|---|---|---|
| FROM: (INMATE NAME & NUMBER) JASON BENSON, DS6483 | SIGNATURE of INMATE: | |
| WORK ASSIGNMENT: | HOUSING ASSIGNMENT: CA/08 | |

INSTRUCTIONS:
1  Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2.  State your grievance in Block A in a brief and understandable manner.
3.  List in Block B the specific actions you have taken to resolve this matter informally.  Be sure to include the identity of staff members you have contacted.

**A.** Provide a brief, clear statement of your grievance.  Additional paper may be used, maximum two pages. ON OCTOBER 5th 2001, I RECEIVED A U.S. DISTRICT COURT SUBPOENA ADDRESSED TO THE CUSTODIAN OF RECORDS OF THIS FACILITY. THIS SUBPOENA IS FOR MY "COMPLETE PRISON FILE" (i.e. medical RECORDS, DISCIPLINARY RECORDS, ETC.) PLEASE BE ADVISED: UNDER D.O.C. POLICY DC-ADM 003 (RELEASE OF INFORMATION POLICY), YOU ARE REQUIRED TO HAVE A DC-108 "AUTHORIZATION FOR RELEASE OF INFORMATION", SIGNED BY MY SELF, TO RELEASE ANY INFORMATION OF THIS NATURE TO ANY OUTSIDE PARTY. I DO NOT CONSENT FOR ANY OF THIS INFORMATION TO BE RELEASED TO ANY BODY.
SHOULD THIS INFORMATION BE RELEASED OUTSIDE OF THE ESTABLISHED D.O.C. PARAMETERS SET FORTH IN DC-ADM 003, I WILL BE FORCED TO CONSTRUE SUCH ACTIONS AS DELIBERATE AND WILLFUL VIOLATIONS OF MY CONSTITUTIONAL RIGHTS, AND WILL PURSUE THEM AS SUCH IN THE APPROPRIATE JUDICIAL VENUE.
PLEASE TAKE INTO CONSIDERATION PARAGRAPHS FIVE, SEVEN AND EIGHT OF THE D.C 108 FORM. I WILL NOT AND DO NOT ENDORSE THESE DISCLAIMERS, AGAINST ADAMS COUNTY PRISON, DEFENDANTS, THE D.O.C., AND THE RECORDS CUSTODIAN - S.C.I.S.

**B.** List actions taken and staff you have contacted, before submitting this grievance.  Attach the copy of the **DC-135A** with the staff member's response of your informal resolution attempt.

THIS ISSUE HAS ALSO BEEN FORWARDED TO THE S.C.I.S. CUSTODIAN OF RECORDS, AS WELL AS THE CLERK OF COURTS. IT IS APPARENT THAT THE DEFENDANTS ARE RECIEVING MY RECORDS, BUT I DO NOT KNOW IF THEY ARE TRUE AND ACCURATE COPIES, AS I HAVE NOT SEEN THEM!

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Signature of Facility Grievance Coordinator

11/16/01

Date

**WHITE** - Facility Grievance Coordinator Copy    **CANARY** - File Copy    **PINK** - Action Return Copy    **GOLDENROD** - Inmate Copy

**DC-ADM 804, Inmate Grievance System**
**DC-804**
**Part 3**

<div align="right">

**Attachment C**
**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**

</div>

**DATE:**       November 16, 2001

**SUBJECT:**   Grievance Rejection Form

| For Official Use Only |
| --- |
| **SMI-7736-01** |
| Grievance Number |

**TO:**        J. Benson DS6483 C/A/8

**FROM:**      Sharon M. Burks
               Facility Grievance Coordinator

The attached grievance is being returned to you because you have failed to comply with the provision(s) of DC-ADM 804, Inmate Grievance System:

1.    Grievances related to the following issues shall be handled according to procedures specified in the policies listed and shall not be reviewed by the Facility Grievance Coordinator.

    a.  DC-ADM 801 – Inmate Disciplinary and Restricted Housing Unit Procedures.
    b.  DC-ADM 802 – Administrative Custody Procedures.
    c.  Other policies not applicable to DC-ADM 804.

2.    Block B must be completed, as per the Instruction of #3 of the Official Inmate Grievance Form.

3.  **X**  The grievance does not indicate that you were personally affected by a Department or facility action or policy.

4.    Group grievances are prohibited.

5.    The grievance was not signed and/or dated.

6.    Grievances must be legible and presented in a courteous manner.

7.    The grievance exceeded the two (2) page limit.  Descriptions need to be brief.

8.    Grievances based upon different events shall be presented separately.

9.    The grievance was not submitted within fifteen (15) working days after the events upon which claims are based.

10.   You are currently under grievance restriction.  You may not file any grievance until

11.   Grievance involves matter(s) that occurred at another facility and should be directed by the inmate to the appropriate facility.

12.   The issue(s) presented on the attached grievance has been reviewed and addressed previously.

Cc:  Major Norris
     DC-15
     File

B-2

ADAMS COUNTY PRISON
POLICY AND PROCEDURE MANUAL

Policy and Procedure:  300-6
Subject: Use of Force

Approved by:                    Effective Date: June 24, 1998

POLICY:    The responsibility of personnel engaged in security
           duties normally extends to the protection of persons
           and property, to the apprehension of individuals
           believed to have committed felonious offenses, such as
           escape, and to the security and custody of prisoners.
           Persons engaged in security activities will avoid the
           use of force where the assigned responsibilities can be
           discharged without force.  If security responsibilities
           cannot be discharged without resorting to force,
           personnel shall use the minimum amount of force
           necessary to discharge their assigned
           responsibilities.

I.         USE OF DEADLY FORCE:
           A.  Definition and Restrictions:
               Deadly force is that force which a person uses with
               the purpose of causing--or which he/she knows, or
               should know, would create a substantial risk of
               causing--death or serious bodily harm.  Its use is
               justified only under conditions of extreme
               necessity as a last resort, when all lesser means
               have failed or cannot reasonably be employed.
               Deadly force is only used under one or more of the
               following circumstances:
               1.  Self Defense:
                   When deadly force reasonably appears necessary
                   to protect personnel who reasonably believe
                   themselves to be in imminent danger of death or
                   serious bodily harm, the application of deadly
                   force is justified.
               2.  Serious Offenses Against Persons:
                   When deadly force reasonably appears necessary
                   to prevent the commission of an offense
                   involving physical violence, in which a person
                   (staff, visitor, inmate, etc.) is in imminent
                   danger of death or serious bodily harm.
               3.  Escape:
                   The use of deadly force in escape situations is
                   limited to the same "self-defense" and "serious
                   offenses against persons" situations above.
                   Deadly force may be utilized only if there is
                   reasonable cause to believe that the escapee
                   is likely to commit a crime involving inflic-

Page 2                          Policy and Procedure:300-6
                                                Use of Force
                                 Effective Date: 06/24/98

tion of serious bodily harm upon Correctional
Officers or others unless immediately
apprehended.  In escape situations where there
is no reasonable cause to believe the escapee
poses a threat of serious physical harm to
either Correctional Officers or others,
deadly force will not be used.  However, if
the escapee threatens an officer with a
dangerous weapon or there is probable cause to
believe the escapee will commit a crime
involving the infliction of threatened
infliction of serious physical harm, deadly
force may be used if necessary to prevent an
escape.  Deadly force is justified to prevent an
escape where the Correctional Officer, who is
considering the employment of that level of
force, is aware of one or more of the
following facts and the escapee has cleared the
last line of security:

a.   The escapee has threatened a Correctional
     Officer with a dangerous weapon during the
     escape.

b.   The escapee is armed and considered
     dangerous or is assisted from outside the
     perimeter by armed accomplices;

c.   The escapee has threatened to commit violent
     acts (such as the taking of hostages or the
     extraction of revenge upon informants or
     witnesses) once he/she has effected his/her
     escape;

d.   The escapee has employed exceptional force
     to penetrate security barriers, such as the
     use of explosives;

e.   The escapee is incarcerated following
     conviction for an offense involving the
     infliction or threatened infliction of
     serious physical harm to another person
     (limited to the offenses of homicide, armed
     robbery, rape, and aggravated assault with
     a deadly weapon);

f.   The escapee has not yet been convicted, but
     there is probable cause to believe that the
     escapee has committed a crime involving the
     infliction or threatened infliction of such
     serious physical harm to another person;

g.   The escapee has committed a crime within the
     prison involving the infliction of serious
     bodily harm upon another person;

h.   The attempt involves the simultaneous
     escape of numerous inmates who are believed
     to pose a heightened degree of danger to
     the public if acting in concert; or

Page 3               Policy and Procedure: 300-6
                     Use of Force
                     Effective Date: 06/24/98

    i.  The escape is attempted during or in
conjunction with a riot, general
disturbance, or potential mass breakout,
such that the necessity to maintain control
and discipline over large numbers of inmates
requires the selective application of deadly
force to prevent escape.

B.  Use of Firearms:
If, in any of the circumstances set forth in Section
I-A of this Policy and Procedure, it becomes
necessary to use a firearm, the following guide-
lines must be observed:

1.  An order to halt will be given before a shot is
fired.

2.  Shots will not be fired if they are likely to
endanger the safety of innocent bystanders.

3.  Shots will be aimed to disable. However, if
circumstances render it difficult to direct
fire with sufficient precision to assure that
the person is disabled rather than killed, such
circumstances do not preclude the use of a fire-
arm, provided such use is otherwise authorized
by this Policy and Procedure.

4.  Warning shots are <u>not</u> fired under any circum-
stances.

5.  Firearms are only used by authorized personnel
outside the secure area of the prison or on the
roof.

6.  Only firearms issued by and authorized by the
prison are used by staff.

C.  Instruction:

1.  No individual is permitted to perform security
duties until he/she has received instruction on
the applicable regulations relating to the use
of force in the performance of such duties. In
addition, instruction is given periodically to
all personnel assigned to these duties to ensure
their familiarity with all restrictions on the
use of force.

2.  The Deputy Warden is hereby charged with the
enforcement of appropriate regulations govern-
ing the use of prison weapons. These regula-
tions encompass the cleanliness, use and safety
aspects of these weapons.

D.  Procedure to be followed when firearm is discharged:
All personnel shall, except while engaging in target
practice, submit a written report to the Warden on
all intended or accidental discharges of a depart-
mental firearm.

Page 4                        Policy and Procedure: 300-6
                              Use of Force
                              Effective Date:  6/24/98

E.   Summary:
     The policies contained herein have been formulated
     to assist prison personnel in determining whether or
     not to use deadly force.  It is the policy of the
     prison that all personnel will resort to whatever
     means are necessary to protect themselves, their
     fellow officers, and inmates from attack where it
     is obvious that serious injury and/or death could
     result.  However, it is also prison policy that
     personnel will exhaust every other reasonable means
     before resorting to the use of deadly force.

II.    USE OF PHYSICAL FORCE:
A.   Restrictions:
     Only the minimal amount of force necessary is used
     to control an inmate or situation in the prison.
     The use of force for inmate control is limited to
     the following conditions:

*I.A.1,2.,B-E*
*I.A.3,B-E*

     1.   In self-defense and/or to prevent an assault;
     2.   To prevent escape;
     3.   To prevent destruction of property;
     4.   To prevent commission of a felony;
     5.   To restrain a physically violent inmate;
     6.   To restrain an intoxicated inmate;
     7.   To move an inmate who refuses to cooperate;
     8.   To conduct a "frisk" or strip search of an
          unruly inmate; and
     9.   To prevent an inmate from self-injury.
B.   Procedures:
     The following guidelines must be strictly followed
     whenever it becomes necessary to use physical force
     on an inmate:
     1.   Except in cases of extreme emergency, ONLY the
          Shift Commander/Administrator will authorize the
          use of physical force to either move or restrain
          an unruly or uncooperative inmate.  Whenever an
          officer believes that the use of physical force
          may be necessary, he/she must immediately
          contact
          the Shift Commander/Administrator.
     2.   Upon notification that the use of force may be
          necessary, the Shift Commander/Administrator
          immediately responds to the area.  Once at the
          scene, he/she makes certain that sufficient man-
          power, adequate security, and restraint
          equipment are available.  In addition, the Shift
          Commander/Administrator instructs the officers
          present and then personally directs their
          efforts.  The Shift Commander/Administrator does
          not get physically involved in the incident
          unless absolutely necessary.  The Shift
          Commander/Administrator also designates an

According to these, the defendant's could have used Deadly Force.

Page 5                       Policy and Procedure: 300-6
                             Use of Force
                             Effective Date:  6/24/98

observer to videotape the incident especially
when several officers are involved and use of
force can reasonably be expected.  At no time,
with the exception of an extreme emergency, is
force used without officers first being properly
briefed on how to handle the situation with
minimal chance for injury.

3.  Physical force is used only after all other
    means
    to handle the situation have been exhausted.
    When at all possible, inmates should be
    persuaded to carry out instructions.  Often
    times the show of sufficient manpower in itself
    is enough to persuade an individual to comply
    with given orders and instructions.

4.  In any situation where physical force is used,
    the Shift Commander/Administrator makes certain
    that the incident is properly documented.  Each
    officer who is involved in the incident must
    submit a written report detailing both why the
    use of force was necessary and the amount of
    force that was used to accomplish the assigned
    task.  The officer's written report must be
    submitted before the end of his/her tour of
    duty.

5.  The Shift Commander/Administrator conducts an
    investigation of the incident to determine
    whether proper procedures were followed in
    using physical force according to existing
    policies and procedures.  This investigation
    is included as part of the original report and
    forwarded to the Deputy Warden for review.

B. 6.  In the event that an officer is injured while
       using physical force on an inmate, the Shift
       Commander/Administrator must investigate the
       extent of this injury and then complete an
       "Employer's First Report of Injury".

7.  Whenever an inmate is injured in an incident
    where physical force is used, the Shift
    Commander/Administrator makes certain that the
    inmate is seen by the Medical Department to
    receive appropriate medical attention.

8.  Whenever physical force is used, the inmate(s)
    involved must be placed in an Administrative
    Segregation status pending an investigation of
    the incident and given notice thereof.

9.  The Duty Officer is notified of any incident in
    which physical force is used on an inmate.

10. The use of force should be applied in accordance
    with the established force continuum unless the

Page 6                    Policy and Procedure: 300-6
                                     Use of Force
                          Effective Date: 6/24/98

Shift Commander/Administrator reasonably
believes the situation requires immediate
escalation to a greater degree of force to
accomplish any of the objectives identified in
this policy.

The following options constitute the Force
continuum, beginning with the least amount of
force that can be reasonably expected to control
the inmate or the situation:
   a.  Show of Force
   b.  Control techniques*
   c.  Oleoresin Capsicum Aerosol*
   d.  Electronic Body Immobilizing Device
       (E.B.I.D.)*
   e.  Active counter measures (strikes against
       the inmate)
   f.  Chemical munitions other than oleoresin
       capsicum
   g.  Firearms
*These options are equivalent methods of control,
subject to availability under the circumstances.

III.    USE OF RESTRAINT EQUIPMENT:
   A.  Whenever an inmate becomes disruptive and/or unruly
       and needs to be restrained, the Shift Commander/
       Administrator is immediately notified.  Except in
       extreme emergencies, only the Shift Commander/
       Administrator or higher authority may authorize the
       use of restraining equipment for the following
       circumstances:
       1.  As a precaution against escape during transfer;
       2.  To move an unruly and/or uncooperative inmate.
       3.  To prevent injury to others or property damage
           by an inmate.
   B.  The Medical Director or designee may authorize the
       use of restraining equipment on an inmate for
       medical reasons (e.g., to prevent self-injury,
       etc.)
       The correctional staff will assist and comply with
       the medical order whenever restraint equipment is
       used for medical reasons.
   C.  Restraining equipment will not be used as a form of
       punishment against an inmate nor will an inmate be
       left in restraints for more time than is absolutely
       necessary.  At the discretion of the Shift
       Commander/Administrator, all restraint equipment is
       removed when it is felt that the inmate no longer
       poses a threat or danger to him/herself or others.
   D.  Whenever possible an inmate is restrained with
       leather restraint devices to prevent injury.  This
       is particularly necessary when handling a mentally

Page 7                          Policy and Procedure:300-6
                                Use of Force
                                Effective Date: 6/24/98

disturbed individual.

E.  Any inmate placed in restraints must be seen by
    Medical personnel as soon as reasonably possible
    to determine if the inmate has suffered any injury
    while he/she was being subdued.  This action is
    documented in the inmate's medical file.

F.  Inmates left in restraints are observed by an
    officer at least once every fifteen (15)minutes and
    seen by Medical staff daily.  A Chronological
    History Form is used to record these observations.

G.  Medical guidelines regarding the application of
    restraint equipment include the following:

    1.  As a general rule, the inmate's head should
        never be restrained.  No binding should be
        anchored to the neck, nor should any form of
        mouth gag be used.  A helmet may be used to
        prevent injury from persistent head banging.

    2.  Whenever security considerations permit, the
        inmate's hands should be restrained in front
        of the body rather than behind.

    3.  An inmate should never be restrained on his/
        her back to the point that he/she cannot turn.
        Restraining the inmate face down or while on
        the side are preferable alternatives.

    4.  Individuals in restraints should be offered
        liquids each hour.  If security permits, at
        least some of the restraints should be removed
        so that the inmate may take nourishment.

    5.  No inmate should be restrained for more than
        2 hours without changing positions.

    6.  The inmate's level of consciousness and circu-
        lation of restrained extremities should be
        monitored.

    7.  No inmate should ever be denied nourishment
        or prescribed medications as part of the
        restraint process.  Inmates should also be
        allowed to use toilet facilities as needed.

    8.  In most cases, the duration of the restraint
        process should not exceed 48 hours. Exceptions
        to this should be fully documented by both
        security and Medical personnel.

I.  The Shift Commander/Administrator and all officers
    involved are responsible for forwarding reports to
    the Deputy Warden on any incident in which restraint
    equipment is used on an inmate.

IV.   USE OF CHEMICAL AGENTS:

      A.  The Shift Commander/Administrator limits the use of
          force against an inmate to that necessary to insure
          security and control.  Only the Shift Commander/
          Administrator or higher ranking correctional

Page 8                          Policy and Procedure:300-6
                                Use of Force
                                Effective Date:  6/24/98

   authority can authorize the issuance and use of
   chemical agents to control or break up assaultive
   actions by inmates.

B.  A chemical agent is used when, in the judgment of
   the Shift Commander/Administrator, its use is in the
   best interest of the inmates and Correctional
   Officers,i.e., minimizing the necessity for physical
   force. It is not to be used against inmates offering
   only passive resistance.  Chemical agents are not
   sprayed at close range (2 to 3 feet) directly into a
   person's eyes.  The inmate is given the opportunity
   to wash the spray off as soon as he/she is under
   control.

C.  After an inmate is sprayed with a chemical agent,
   he/she will be seen by Medical personnel for
   evaluation.  Hospital treatment is to be made
   available if complaints of adverse chemical
   reaction persist.

D.  Chemical agents are available in the Control Center
   for use in case of emergency.  Whenever a chemical
   agent is used, a log entry is made and a written
   report is submitted by the Shift
   Commander/Administrator. This report details why
   he/she ordered its use, who
   ordered its use, who it was used against, the name
   of the officer that was ordered to use it, distance
   it was sprayed from, area of inmate's body sprayed,
   and when it was washed off by the inmate.  Only
   authorized chemical agents are used by staff.

# WHEN TO USE

## Use of Force

Oleoresin Capsicum may be introduced into the Use of Force much earlier then CS or CN gases, which may cause temporary or permanent injury. The Levels of Force is a concept designed to interpret the use of force by officers. Before officers can understand where OC fits into their arsenal of defensive tools, they must have an understanding of the Levels of Force.

Understanding the importance of after-care for subjects who have been subdued with batons, chemical agents, OC aerosols, approved stunning techniques, or electronic stun guns may be as important as the initial use of these weapons.

## Force Options

Sometimes we put too much emphasis on <u>how</u> to apply force and not enough training into <u>when</u> to apply force. Any policies established should be brief, concise and straight forward. Under stress, a policy must be easily recalled by the officer.

Note: OC is considered an additional use of force option and is not intended to replace a firearm, PR-24 baton, straight baton, expandable baton or any other authorized piece of equipment, nor is it intended to replace defense and control techniques that are used within the levels of force.

Copyright®    R.E.B.® Training International, Inc.

# *RECOGNIZING THE THREAT*

Generally attacks are prefaced by signals of aggression and ritualized combat. Although assault generally does not happen during this period, assault is possible. When threats and counter threats have failed to settle a dispute then physical action takes place.

Listed below are some early behavior warning signals (ritual combat). Assault is usually not imminent, but is possible.

## *EARLY BEHAVIOR SIGNALS  (Assault is Possible)*
• Head back - shoulders back and squared to you
• Face turns red on light skin individuals
• Lips pushed forward bearing the teeth
• Excessive salivation such as spitting
• Breathing is quicker and deeper
• Sweating
• Looking through you stare, eyes glazed, or empty stare
• Direct, uninterrupted eye contact
• Belligerent, challenging, yelling, cursing, etc.
• Exaggerated movements - pacing, turning, pointing, fist threatening with arm
  bent and held sideways, hands on hips
• Standing as tall as possible
• Redirects activity because the aggressor stimulating the attack is too frightened
  to directly assault the officer.  Aggression is released on less intimidating
  objects, such as bystanders or objects (i.e. kick a chair)

A common misconception is that an officer must be assaulted before use of an aerosol is justified.  If the officer can show through "experience and training" that an assault was imminent then the use of "OC" is justified.  Listed below are some signals indicating an imminent physical assault.  The more signals observed by the officer, the greater the threat.

## *ASSAULT IS IMMINENT (Signals)*
• Face goes from red to white
• Lips tighten over the teeth
• Breathing is rapid and deep
• Stance changes - bladed position, shifts forward or back
• Verbalization - stops

- 20 -

(Copyright®)   R.E.B.® Training International, Inc.

D-3

# INSTRUCTIONS

## WARNING - FOR LAW ENFORCEMENT AND CORRECTIONS USE ONLY.

### CAUTION: STRONG IRRITANT - CONTENTS UNDER PRESSURE

AEROSOL IRRITANT PROJECTORS ARE WEAPONS. CONTENTS MAY CAUSE SEVERE INJURY UNLESS USED IN ACCORDANCE WITH THESE INSTRUCTIONS. ALTHOUGH WHEN PROPERLY USED, IT IS LESS LIKELY TO CAUSE INJURY THAN CONVENTIONAL WEAPONS, IT SHOULD BE USED ONLY IN SITUATIONS WHERE A WEAPON IS JUSTIFIED AND NECESSARY. KEEP OUT OF REACH OF CHILDREN.

1. AEROSOL IRRITANT PROJECTORS MUST ALWAYS BE USED IN AN UPRIGHT POSITION. USE IN SHORT ONE SECOND BURSTS.

2. NEVER DISCHARGE UNIT INTO WIND.

3. NEVER USE IN CONFINED AREAS. USE ONLY WITH ADEQUATE AIR SUPPLY.

4. FOR BALLISTIC STREAM (NON-FOGGING) UNITS, THE SPRAY SHOULD BE DIRECTED TO THE EYES, NOSE AND MOUTH. FOR FOGGING UNITS, THE SPRAY SHOULD BE DIRECTED AT THE FACIAL AREA FROM A DISTANCE OF NOT LESS THAN 15 FEET.

5. EXTREME CAUTION MUST BE EXERCISED IN DANGEROUS SITUATIONS WHERE OFFICER IS UNDER ATTACK OR THREAT OF ATTACK WITH FIREARMS, KNIVES, FISTS, OR OTHER MEANS OF VIOLENCE. IN SUCH SITUATIONS THE AEROSOL IRRITANT PROJECTOR MAY NOT STOP THE ATTACK OR THREAT OF ATTACK AND THE OFFICER IS CAUTIONED TO USE OTHER AVAILABLE WEAPONS OR RETREAT TO A POINT OF SAFETY.

6. EXTREME CAUTION SHOULD BE EXERCISED WHEN USING AN AEROSOL IRRITANT PROJECTOR AGAINST PERSONS WHO HAVE REDUCED SENSITIVITY TO PAIN. IF SUCH PERSONS ARE NOT DISABLED WITH AN AEROSOL IRRITANT PROJECTOR, THEY MAY REACT WITH VIOLENCE.

7. OFFICERS SHOULD ROUTINELY PRACTICE USE AND HANDLING OF THE AEROSOL IRRITANT PROJECTOR TO DEVELOP PROFICIENCY IN ITS USE IN ORDER TO PREPARE FOR CIRCUMSTANCES WHICH ARE DANGEROUS OR WHICH REQUIRE RAPID HANDLING AND USE OF THE AEROSOL IRRITANT PROJECTOR. OFFICERS SHOULD ROUTINELY TEST FIRE THEIR AEROSOL IRRITANT PROJECTOR EVERY 3 MONTHS (OUTDOORS IN AN APPROPRIATE AND SAFE AREA) TO CHECK PRESSURIZATION AND SPRAY PATTERN.

8. THIS AEROSOL IRRITANT PROJECTOR IS NOT INTENDED FOR AND SHOULD NOT BE USED BY CIVILIANS. CIVILIANS ARE WARNED THAT POSSESSION AND/OR USE BY UNAUTHORIZED PERSONS IS PROHIBITED OR REGULATED BY LAW IN MANY JURISDICTIONS.

9. SPECIAL CARE SHOULD BE USED IN HANDLING AND CARRYING AN AEROSOL IRRITANT PROJECTOR TO AVOID RELEASING THE FORMULATION FROM THE CANISTER. SHOULD THE FORMULATION BE INADVERTENTLY RELEASED FROM THE CANISTER, FIRST AID PRECAUTIONS SHOULD BE FOLLOWED IMMEDIATELY IN FULL DETAIL.

### FIRST AID

1. REMOVE CONTACT LENSES AND CONTAMINATED CLOTHING.

2. FLUSH CONTAMINATED AREAS WITH LARGE QUANTITIES OF COOL WATER OR DILUTED BAKING SODA SOLUTION AND EXPOSE TO FRESH AIR AS SOON AS POSSIBLE AFTER ARREST IS EFFECTED. CAUTION: FAILURE TO FOLLOW THIS INSTRUCTION MAY RESULT IN SEVERE SKIN IRRITATION, SKIN DEPIGMENTATION OR OTHER SKIN INJURY.

3. DO NOT APPLY SALVES, CREAMS, OILS OR LOTIONS WHICH CAN TRAP THE IRRITANT AGENT CAUSING SKIN BLISTERS.

4. SEE PHYSICIAN IF IRRITATION PERSISTS.

### CARE AND MAINTENANCE

THE USE OF INERT PLASTICS AND NON-CORROSIVE METALS MAKES MAINTENANCE, OTHER THAN THE OCCASIONAL BLOWING AWAY OF DUST OR LINT, UNNECESSARY.

IMPORTANT: NEVER TAMPER WITH OR REMOVE THE ACTUATOR.

DO NOT PUNCTURE CARTRIDGE OR PLACE WHERE TEMPERATURE MAY EXCEED 120°F.; CONTENTS UNDER PRESSURE.

THE SHELF LIFE IS FOUR YEARS FROM THE DATE OF MANUFACTURE.

Federal Laboratories Inc.
An Armor Holdings, Inc. Company
MADE IN U.S.A.     1855 S. Loop, Casper, WY 82601          F105086

# USE OF FORCE

Use of Force generally holds the following options:

| | |
|---|---|
| IX. | **Lethal Force** |
| | • Firearm |
| VIII. | **Intermediate Force** |
| | • Stun-Gun, Taser |
| | • PR-24 Baton or Other Impact Weapon |
| VII. | **Aerosol Chemical Agents:  CN & CS** |
| | • CN Tear Agent |
| | • CS Irritant |
| VI. | **Empty Hand Impact** |
| | • Stunning Techniques |
| V. | **Decentralization** |
| | • Pain Compliance Holds |
| | • Pressure Point Control Tactics |
| | • Heavy Techniques of Subject Control |
| | • Defensive Tactics |
| | • Above could be with or without PR-24 or Other Impact Weapon |
| IV. | **Oleoresin Capsicum Aerosol Sprays** |
| | • OC products |
| III. | **Passive Control** |
| | • Escort Techniques |
| | • Light Subject Control |
| | • Above could be with or without PR-24 or Other Impact Weapon |
| II. | **Verbal Commands** |
| | **Verbal Communication** |
| | **Non-Verbal Communication** |
| I. | **Officers Presence in Uniform** |

*( Figure 1 )*

- 14 -

Copyright)    R.E.B.® Training International, Inc.

D-5

Pepper Spray Madness

http://www.caq.com/CAQ56pepper.html





by
**Lynne Wilson**

Involved in at least US deaths, pepperspray can be used to punish "unruly" criminal suspects, mete out street justice, and quell civil unrest. Above, locked out Staley Co. workers are targeted.

Involved in at least 60 US deaths, pepper spray can be used to punish unruly criminal suspects, mete out street justice, and quell civil unrest.

Above, locked out Staley Co. workers are targeted. Imagine that someone has sprayed a substance 600 times hotter than cayenne pepper into your face, eyes and nostrils. Imagine that while this is happening, your hands are cuffed behind your back. Or you have asthma or bronchitis. Or a heart condition. Or you're drunk or just plain upset. Chances are, the pain will be intense, breathing will become difficult, your eyes will swell into blindness, you will become disoriented and fall to the ground. Fear and panic will set in. If you are unlucky enough to be in an altercation with the police and you are in restraints on your stomach, you may die. Last summer, Javier Trejo didn't have to imagine. After his wife, Maria, called police to report that he was drunk and abusive, Orange County,

California, sheriff's deputies subdued him with pepper gas and threw him in a holding cell. About an hour later, he was pronounced dead. I asked the police for help, cried Maria. I didn't say kill him. Trejo became one of the 60 in-custody deaths since 1990 in which pepper spray was a contributing factor.

Derived from the cayenne pepper plant, oleoresin capsicum (OC) or pepper spray, was officially introduced into the US in the 1980s by the Postal Service as a dog repellent. In 1987, claiming that it produced no long-term health risks, the FBI adopted it as an official chemical agent. Ever since, in liquid and foam form, OC has gained popularity among police searching for a non-lethal method of subduing people in street encounters. They claim that it avoids the major drawbacks of other chemical agents: It doesn't blow back on those using it and can be washed off with relative ease. It has the further advantage of not leaving the kinds of injuries that generate brutality complaints.

Echoing advertising by the 200 pepper spray manufacturers, police managers also report that it is 95 percent effective in stopping suspects almost immediately compared to tear gas or Mace at 60 percent.

The International Association of Chiefs of Police asserts not only that OC is better on violent, intoxicated/drugged and mentally ill individuals, but also that it has not caused any deaths, even among persons with pre-existing conditions. With this kind of propaganda, it is no surprise that pepper spray has replaced and surpassed police use of Mace on the streets. Virtually every state authorizes it.

## CRIME OF PUNISHMENT

While there is no question that pepper spray aerosol is less lethal than a gun and that when used correctly, it causes considerably less physical injury than a baton or an attack dog,

it is neither as effective nor as benign as claimed. According to Andrea Pritchett of Copwatch, a citizens group in Berkeley, California, It's used in addition to other forms of force such as guns, batons and mechanical restraints, not in their place. ...

And when you add it to other force methods, pepper spray tends to make a person actually more difficult to control. Nor, she claims, is it likely to reduce excessive force lawsuits against police, since many of California's 28 in-custody deaths involving OC have resulted in wrongful death suits.

As for its being benign, the pain, which can last up to 45 minutes, is so intense that the National Coalition on Police Accountability (N-COPA) has called for monitoring pepper spray as a form of torture as defined by the United Nations Convention on Torture and Other Cruel, Inhuman and Degrading Treatment signed by the US last year.

**The pain from pepper spray, which can last up to 45 minutes, is so intense it has been called a form of torture.**

After police chiefs in Britain and Australia tried to add OC to their arsenals, activists argued that it would violate the Chemical Weapons Convention. They cited instances in Israel and Guatemala, as well as in the US, where OC is used not only to control civil unrest and subdue dangerous suspects, but to mete out extrajudicial punishment as a kind of street justice. In a Washington state case, a young black man who had mouthed off to the cops was pepper sprayed after being handcuffed. He was then left in a patrol car with the heat on high for half an hour.

The ACLU has raised additional concerns that the number of deaths in which OC has been a contributing factor may be much higher than the 60 so far documented.

For example, although none of the autopsy reports for 26 post-spray deaths studied by its Southern California branch listed pepper spray as a cause of death, the group concluded that documents recovered ... establish that [California] state scientists have warned for more than two years that so little is known about residual effects of pepper spray that medical examiners may not know what to look for during an autopsy.

It was only in July 1993 that a North Carolina coroner issued the first US autopsy report directly connecting pepper spray to an in-custody death.



It noted that Angelo Robinson, a 24-year-old black parolee stopped for disorderly conduct, had bronchitis at the time of his death.

Officers reportedly sprayed Robinson 10-15 times and then placed him in a prone position on the ground while he was handcuffed, a position that has been known to cause death from positional asphyxia, in which the weight of the body compresses the chest and causes respiratory failure.

As the danger becomes better known, more medical researchers are recognizing OC-related deaths and reporting an alarming nationwide increase: from two in 1992 to 26 in 1993. In addition to better documentation, these figures indicate the exponential increase in pepper spray use by law enforcement agents.

In one particularly gruesome incident reported by the National Institute of Justice, police sprayed a youth with so much pepper spray that his clothes were soaked. When he was later shot with an electric stun gun by police, his clothing caught on fire.

## PEPPERING PRISONS

If misuse is a problem on the street, it is a disaster in US prisons. The Department of Justice (DoJ) and every federal court that has looked at its use in correctional facilities has found abuses. This fall, after more than 100 inmates rioted at the privately-run West Tennessee Detention Facility, prison guards pumped pepper gas into two dormitories seized by the prisoners.

In late 1994, the DoJ Civil Rights Division investigated a county jail in Syracuse, New York, and reported an unacceptably high and improper use of pepper spray...

Nearly every inmate interviewed told ... of excessive and improper use ... particularly when inmates are not resistant and after the inmate has been restrained and presents no danger.

One suicidal inmate in Syracuse was restrained with three cans of pepper spray. The prisoner reportedly died shortly afterward from positional asphyxia.

More recently, a federal district court judge in Washington State barred the use of pepper spray in a state juvenile facility. [I]t should be used, he ruled, only if there is a threat of equal or greater harm to others or to a substantial amount of valuable property than the pain and danger of harm that the pepper spray presents. Pat Arthur, plaintiffs' attorney in the case, emphasized a lack of training: If staff aren't trained in other intervention methods, they resort to pepper spray. Calling it a chemical weapon, she said, I have seen videotapes of kids who are being sprayed. The pain is so intense:

**Police soaked his clothes with**

## so much pepper spray that when they shot him with an electric stun gun, his clothing caught on fire.

the kid immediately falls to the floor, screaming. There is no question of an injury being suffered.

## WEAPON OF CHOICE

Local community groups, outraged by the startling increase in pepper spray use, are now calling for accountability. Copwatch demanded an outright ban after 37-year-old Aaron Williams, arrested for disorderly conduct, died after being beaten, kicked, and repeatedly pepper-sprayed by San Francisco police officers, probably while in a handcuffed, horizontal position.

Following that incident, police commanders conceded that officers had violated official policy against transporting handcuffed prisoners lying face down (raising the danger of positional asphyxia) and had disregarded the warning to pay special attention to suspects acting in bizarre ways. In this, as in other cases, regulations even when they exist are often ignored by cops who see pepper spray as a very low level use of force, well below the baton.

According to Allan Parachini of the ACLU, which helped draft the San Francisco policy,

Williams died because of a failure of procedure. ... Pepper spray never alone causes death but when it is combined with other restraints, there is a definite risk of fatality. [It] can be a valuable tool in many different situations.

The challenge is to set clear standards regarding how to use it, in what circumstances. ... [I]t doesn't serve anyone's purposes ... when it is used on people in psychiatric distress or on drugs. When used on these people and combined with a hogtie restraint, you are just asking for a fatality.

Regardless of injuries and even death resulting from its use, there is not a single federal agency currently responsible for regulation.

Because pepper spray is probably not a food or a drug within the meaning of FDA legislation, the Consumer Product Safety Commission may be the only federal agency with authority in this field.

As manufacturers increase their efforts to push the use of pepper spray in prisons, to disperse crowds, and to facilitate cell extraction, federal regulation is needed now more than ever. But given the current state of the federal budget, such regulation is unlikely.

Equally unlikely is that police will voluntarily restrict use. Pepper spray, despite the risk of death, and precisely because of the instant punishment and torture it inflicts, is a weapon of choice.

**THE GETTYSBURG HOSPITAL**
147 Gettys Street • PO Box 3786
Gettysburg, PA 17325-0786
717-334-2121

**Emergency Department**
**Initial Assessment**

093481

| | | | Account No. | MR # |
|---|---|---|---|---|
| | | | 0300410016 | 17-75-56 |

| SCREENED FOR DOMESTIC VIOLENCE | | TRIAGE TIME 1333 | WT(KG)/HT | LAST TD | VITAL SIGNS T 97.5 BP 132/90 P R |
|---|---|---|---|---|---|
| ☐ YES | ☐ PATIENT ACKNOWLEDGES | | | | |
| ☐ NO | ☐ PATIENT STATES NO | PREDISPOSING FACTORS | PHYSICIAN NOTIFICATION TIME | LMP _____ | FAMILY HISTORY |
| ☐ SEE NURSES' NOTES | ☐ PATIENT DOES NOT ACKNOWLEDGE | | | G _____ | HBP |

CHIEF COMPLAINT/HPI

Pt states this afternoon he was
beaten by the prison guards
He c/o thoracic & lumbar back pain
He also c/o (R) rib pain & (L) thumb
numbness. Abrasion noted over
thoracic Back. Tenderness over
(R) ribs c palpation.

TOBACCO Y/N AMT
SUBSTANCE Y/N AMT
ETOH Y/N AMT

ADMITTING
CONSULTING

P _____
AB _____
FETAL HEART RATE > 12 WKS

DIABETES
CANCER
MI          AGE
OTHER

| VISUAL ACUITY | TILT TEST | PMH | |
|---|---|---|---|
| CORRECTED   N/A | N/A | DIABETES | CVA |
| OD _____ | | HBP | CANCER |
| OS _____ | | SEIZURE | COPD |
| OU _____ | | CARDIAC | ULCER |
| UNCORRECTED | | SURGERY | |
| OD _____ | | OTHER | |
| OS _____ | | | |
| OU _____ | | | |

PAIN HISTORY

| PROVOKES | QUALITY | | RADIATE | TIME |
|---|---|---|---|---|
| NOTHING | SHARP | PERSISTENT | NONE | START _____ |
| BETTER | DULL | CONSTANT | RADIATES TO | DURATION _____ |
| WORSE | ACHE | INTERMITTENT | SIM EPISODES |
| | HEAVY | PRESSURE | SEVERITY |
| | CRAMPING | BURNING | |
| | TIGHT | OTHER | SCALE 1-10 |

TRIAGE NURSE/EMT-P    EMT-P

ALLERGIES                    REACTION
X NKDA       1 RASH      5 SWELLING      9 DIZZINESS
☒ LATEX      2 FEVER     6 DIARRHEA     10 ANAPHYLAXIS
             3 STOMACH   7 RESPIRATORY  11 FLUSH
             4 HIVES     8 OTHER
                         SPECIFY

| MEDS | REACTION #(s) | MEDS | REACTION #(s) |
|---|---|---|---|

PATIENT PROBLEM

___ AIRWAY CLEARANCE INEFFECTIVE
___ POTENTIAL FOR INFECTION
___ THOUGHT PROCESS ALTERED
___ KNOWLEDGE DEFICIT
___ ANXIETY
___ PAIN
___ BREATHING PATTERN INEFFECTIVE

___ POTENTIAL FOR INJURY
___ SWALLOWING IMPAIRED
___ SELF CARE DEFICIT
___ NONCOMPLIANCE
___ OTHER
___ URINARY ELIMINATION ALTERED
___ POTENTIAL FOR VIOLENCE
___ SKIN INTEGRITY IMPAIRED

___ FLUID VOLUME DEFICIT
___ FEAR
___ PHYSICAL MOBILITY IMPAIRED
___ COMMUNICATION IMPAIRED
___ TISSUE PERFUSION ALTERED
___ POISONING
___ CONSTIPATION

CURRENT MEDICATIONS

NAME / DOSE / FREQUENCY
Ativan 2mg qd

| PT PROBLEM | GOALS | | EVAL | INIT |
|---|---|---|---|---|

KEY     M = MET       N = NOT MET       * = N N       + = SEE D/C INST

| Vision | No Problem | Glasses | Contact Len(s) | Artificial Eye |
|---|---|---|---|---|

Cognitive limitations    Yes No Describe
Communication
  Hearing deficit        Yes No Describe
  Speech deficit         Yes No Describe
  Language Barrier       Yes No Describe
Learning Deficits        Yes No Describe
Religious or Cultural practices
  that impact care       Yes No Describe

MR 198  11/96

ORIGINAL

## of Seizures Vary by Site

| Symptoms |
| --- |
| Twitches in a specific muscle |
| Numbness or tingling in a specific body part |
| Hallucinations of flashes of light |
| Hallucinations of images and complicated repetitive behavior, for instance, walking in circles |
| Chewing movements, lip smacking |
| Intense hallucination of a small, either pleasant or unpleasant |

bends the arms, bends the neck and upper body forward, and straightens the legs. Attacks last for only a few seconds but may recur many times a day. They generally occur in children under age 3; they typically evolve into other forms of seizure later in life. Most children with infantile spasms have associated intellectual impairment or neurodevelopmental delays; mental retardation usually continues into adulthood. The seizures are difficult to stop with antiepileptic drugs.

**Febrile seizures** result from fever in children from 3 months to 5 years old. They occur in about 4 percent of all children and tend to run in families. Most children who have a febrile seizure have only one, and most seizures last for less than 15 minutes. Children who have a febrile seizure are slightly more likely to develop epilepsy later in life.

## Epilepsy

*Epilepsy is a disorder characterized by the tendency to have recurring seizures.*

Overall, 2 percent of the adult population has a seizure at some time. One third of that group has recurring seizures (epilepsy). In about 25 percent of adults with epilepsy, the cause is found when tests such as an electroencephalogram (EEG) recording and magnetic resonance imaging (MRI) reveals scarring in small areas of the brain. In some cases, these defects may be microscopic scars resulting from brain injury at birth or later. A few specific types of seizure disorders (such as juvenile myoclonic epilepsy) are inherited. In the remaining people with epilepsy, the disease is labeled *idiopathic*—that is, no evidence of damage is found in the brain, and the cause isn't known.

People with idiopathic epilepsy usually have their first seizure between the ages of 2 and 14. Seizures before age 2 are generally caused by brain defects, chemical imbalances, or high fevers. Seizures that begin after age 25 are more likely to result from brain trauma, a stroke, or a tumor or other disease.

Epileptic seizures may be triggered by repetitive sounds, flashing lights, video games, or even touching certain parts of the body. Even minor stimuli can trigger a seizure in people with epilepsy. Very strong stimuli—such as certain drugs, low levels of oxygen in the blood, or very low

## Symptoms

Epileptic seizures are sometimes classified by their characteristics. **Simple partial seizures** begin with electrical discharges in a small area of the brain, and the discharges remain confined to that area. The person experiences abnormal sensations, movements, or psychic aberrations, depending on the part of the brain affected. For example, if an electrical discharge occurs in the part of the brain that controls the right arm's muscle movements, the right arm may begin to shake and jerk; if it occurs in the anterior deep temporal lobe (the part of the brain that senses smells), ▲ the person may sense an intensely pleasant or unpleasant smell. A person who has a psychic aberration may experience, for example, a sense of déjà vu, in which unfamiliar surroundings inexplicably seem familiar.

In **Jacksonian seizures**, symptoms begin in one isolated part of the body, such as the hand or foot, and then "march up" the limb as the electrical activity spreads in the brain. **Complex partial (psychomotor) seizures** begin with a 1-to 2-minute period during which the person loses touch with surroundings. The person may stagger, move the arms and legs in strange and purposeless ways, utter meaningless sounds, fail to understand what others say, and resist help. Confusion lasts for several more minutes, followed by full recovery.

**Convulsive seizures (grand mal or tonic-clonic seizures)** usually begin with an abnormal electrical discharge in a small area of the brain. The discharge quickly spreads to adjoining parts of the brain, causing the entire area to malfunction. In **primary generalized epilepsy**, abnormal discharges over a large area of the brain cause widespread malfunction from the beginning. In either case, a convulsion is the body's reaction to the abnormal discharges. In these convulsive seizures, a person experiences a temporary loss of consciousness, severe muscle spasms and jerking throughout the body, intense turning of the head to one side, clenching of teeth, and loss of bladder control. Afterward, the person may have a headache, be temporarily confused, and feel extremely tired. Usually, the person doesn't remember what happened during the seizure.

**Petit mal (absence) seizures** begin in childhood, usually before age 5. They don't produce the con-

vulsions and other dramatic symptoms of grand mal seizures. Instead, a person has episodes of staring, fluttering eyelids, or twitching facial muscles that last 10 to 30 seconds. The person is unresponsive but doesn't fall down, collapse, or move jerkily.

In **status epilepticus**, the most serious seizure disorder, the seizure doesn't stop. *Status epilepticus is a medical emergency* because the person has convulsions with intense muscle contractions, is unable to breathe properly, and has widespread (diffuse) electrical discharges in the brain. Without rapid treatment, the heart and brain can become overtaxed and permanently damaged, and the person can die.

## Diagnosis

A person who loses consciousness, has muscle spasms that shake the body, loses bladder control, or suddenly becomes confused and inattentive may be having a seizure. Yet true seizures are much less common than most people think—most episodes of brief unconsciousness or abnormal behavior aren't caused by abnormal electrical discharges in the brain.

An eyewitness report of the episode can be very helpful to doctors. The witness can describe exactly what happened, while the person who had the seizure usually can't. An accurate description of the circumstances surrounding the episode is needed: How fast it started; whether it involved abnormal muscle movements, such as spasms of the head, neck, or facial muscles; tongue biting, or loss of bladder control; how long it lasted; and how quickly the person recovered. The doctor also needs to know what the person experienced. Did the person have a premonition or warning that something unusual was about to happen? Did anything happen that seemed to precipitate the episode, such as certain sounds or flashing lights?

Aside from noting a description of the episode, a doctor diagnoses a seizure disorder or epilepsy using an electroencephalogram (EEG), which measures electrical activity in the brain. The test is painless and poses no risk. Electrodes are

▲ see box, page 279

Status epilepticus affects about 195,000 people each year in the United States and results in about 42,000 deaths. While people with epilepsy are at an increased risk for status epilepticus, about 60 percent of people who develop this condition have no previous seizure history. These cases often result from tumors, trauma, or other problems that affect the brain and may themselves be life-threatening.

While most seizures do not require emergency medical treatment, someone with a prolonged seizure lasting more than 5 minutes may be in status epilepticus and should be taken to an emergency room immediately. It is important to treat a person with status epilepticus as soon as possible. One study showed that 80 percent of people in status epilepticus who received medication within 30 minutes of seizure onset eventually stopped having seizures, whereas only 40 percent recovered if 2 hours had passed before they received medication. Doctors in a hospital setting can treat status epilepticus with several different drugs and can undertake emergency life-saving measures, such as administering oxygen, if necessary.

People in status epilepticus do not always have severe convulsive seizures. Instead, they may have repeated or prolonged nonconvulsive seizures. This type of status epilepticus may appear as a sustained episode of confusion or agitation in someone who does not ordinarily have that kind of mental impairment. While this type of episode may not seem as severe as convulsive status epilepticus, it should still be treated as an emergency.

## Sudden Unexplained Death

For reasons that are poorly understood, people with epilepsy have an increased risk of dying suddenly for no discernible reason. This condition, called *sudden unexplained death*, can occur in people without epilepsy, but epilepsy increases the risk about two-fold. Researchers are still unsure why sudden unexplained death occurs. One study suggested that use of more than two anticonvulsant drugs may be a risk factor. However, it is not clear whether the use of multiple drugs causes the sudden death, or whether people who use multiple anticonvulsants have a greater risk of death because they have more severe types of epilepsy.

# What Research Is Being Done on Epilepsy?

While research has led to many advances in understanding and treating epilepsy, there are many unanswered questions about how and why seizures develop, how they can best be treated or prevented, and how they influence other brain activity and brain development. Researchers, many of whom are supported by the National Institute of Neurological Disorders and Stroke (NINDS), are studying all of these questions. They also are working to identify and



This drawing shows what a surgeon does during a procedure called a subpial transection. A series of cuts are made in the brain and may prevent seizures from spreading. About 70 percent of patients who receive this

G-2

**Citizens United for Research in Epilepsy (CURE)**
8110 Woodside Lane
Burr Ridge, Illinois 60525
(630) 734-9957
www.CUREepilepsy.org

CURE is a global grassroots organization dedicated to finding a cure for pediatric intractable epilepsy. CURE works to stimulate inovative research through private funding sources and by publicizing the long overlooked need for a cure for this disease.

**Epilepsy Foundation**
4351 Garden City Drive
Suite 406
Landover, Maryland 20785
(301) 459-3700
(800) 332-1000
www.epilepsyfoundation.org

The Epilepsy Foundation is the national voluntary health agency that works for people affected by seizures through research, education, advocacy, and service. Its goals are the prevention and cure of seizure disorders, the alleviation of their effects, and the promotion of independence and optimal quality of life for people who have these disorders. Epilepsy Foundation affiliates serve people with epilepsy and their families in more than 100 communities throughout the United States.

**National Association of Epilepsy Centers**
5775 Wayzata Boulevard
Suite 200
Minneapolis, Minnesota 55416
(612) 525-4511

The goals of this Association, which includes the majority of specialized epilepsy centers in the United States, are to provide information about the care of patients with epilepsy to the appropriate government and industry officials; to exchange information among its members; and to participate in developing standards for programs providing services.

**National Organization for Rare Disorders (NORD)**
P.O. Box 8923
New Fairfield, Connecticut 06812-8923
(203) 746-6518
(800) 999-NORD (6673)
www.rarediseases.org

The National Organization for Rare Disorders (NORD), a federation of voluntary health organizations dedicated to helping people with rare "orphan" diseases, is committed to the identification, treatment, and cure of rare disorders through programs of education, advocacy, research, and service.

*For information on prescription medicines, contact:*

**National Council on Patient Information and Education**
4915 St. Elmo Avenue
Suite 505
Bethesda, Maryland 20814
(301) 656-8565
www.talkaboutrx.org

The National Council on Patient Information and Education is a coalition of organizations committed to providing patients, consumers, and caregivers with useful and appropriate medicine information.

*Pregnant women with epilepsy can help researchers learn how epilepsy drugs affect unborn children by participating in the following program:*

**Antiepileptic Drug Pregnancy Registry**
**Genetics and Teratology Unit**
149 CNY-MGH East
Room 5022A
Charlestown, Massachusetts 02129
(617) 726-7739
(888) 233-2334
Fax: (617) 724-8307
http://neuro-www2.mgh.harvard.edu/aed/registry.nclk

G-3

 

# RELEASE FROM RESPONSIBILITY FOR MEDICAL TREATMENT

I, _Jason Bensen_ , an inmate at S.C.I. _– Smithfield_ ,
   (Inmate's name)                                         (Institution)

have been advised by the physician named below that I am in need of medical treatment for:

_Seizures_

I understand the nature of the treatment is: (Attending physician: Give brief description of the medical treatment required, and the possible consequences of this inmate not receiving it.)

By refusing this medication ( _Phenobarbital_ ), I understand that my condition may become much worse and lead to possible deterioration of my health, and possibly even death.

I hereby refuse this treatment. I have been fully advised of the nature of my ailment or injury and fully realize the effects that may result from my refusal to accept the prescribed treatment. I hereby release the attending physician, and the institution from all legal responsibility for any ill effects which may result from my refusal to accept medical treatment.

In signing this, I certify that the above has been read and fully explained to me.

| | | | |
|---|---|---|---|
| Inmate Signature | Date | Physician Signature | Date |
| Witness Signature | Date | Attending Health Care Provider Signature | Date |

| | |
|---|---|
| Release from Responsibility for Medical Treatment Commonwealth of Pennsylvania Department of Corrections DC-462 Revised 9-2000 | Inmate Name: _Bensen, Jason_ <br><br> Inmate Number: _D S 6483_ <br><br> DOB: _09-27-76_ <br><br> Facility: _S C I S_ |

The Honorable Thomas Blewitt       Mr. Jason Benson
U. S. Magistrate Judge              DS-6483, SCI-Smthfld
United States District Court      1120 Pike Street
235 North Washington, Avenue     Huntingdon, PA 16652
Scranton,  PA 18501-1148         P.O. Box 999

FILED
SCRANTON

DEC 0 4 2001

DEPUTY CLERK

November 28, 2001

Re:     Plaintiff's Response to the Defendant's
Motions for Summary judgment and
Statements of Material Facts; CV-01229

Dear Judge Blewitt:

      The plaintiff Jason Benson, filed or submitted his response to the defendant's Motions for Summary Judgment and Statements of Material Facts with the official's here at SCI-Smithfield to be  copied and mailed to this Court, on 11/23/01. Yesterday, 11/27/01, the plaintiff found out that his petitions/motions had not been copied of mailed because he needed four (4) copies of each and the total came to more than $3.20. Nonetheless. I'm sending the Court the original of my Response.

      Four copies of plaintiff's response totals $16.00 and that doesn't include the statement of material facts in dispute. Clearly, this is a problem that could potentially cost the plaintiff considerable hardship, i.e., the dismissal of his complaint. Plaintiff also filed an Official Grievance about the fact that he is limited to funds that can't cover the necessity of copying his pleadings.

      In light of the above, the plaintiff respectfully requests that this Honorable Court make a ruling on his Motion to Preclude Expert Testimony and Sanctions for Blatent Discovery Violations; thereby ordering the Defendant's to resubmit their Dispositive Motions accordingly.

Sincerely,

Mr. Jason Benson, Plaintiff

Note: See Cash Slip & my copy of the Grievance.



**S.C.I. SMITHFIELD**
**INMATE PASS**

Name: _Benson_ . Date: _11-28-01_

Number _DS8483_

TO: FROM: ( )

( ) BLOCK..........................( )
( ) SHOP...........................( )
( ) FACTORY.......................( )
( ) TREATMENT....................( )
( ) DOCTOR/MEDICAL DEPT.......( )
( ) DENTIST.......................( )
( ) PROT. OR CATH. CHAPLAIN...( )
( ) EDUCATION BLDG..............( )
(✓) OTHER _L.L._

TIME DEPARTED _1341 / A. Smith_ Official
TIME ARRIVED _1350 /_ Official
TIME DEPARTED _1400 /_ Official

PASS RETURNED TO ISSUING AUTHORITY

---

**C-138A**

**CASH SLIP**

COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF CORRECTIONS

**1. REQUISITIONING INMATE**

| INSTITUTIONAL NUMBER | LOCATION | DATE |
|---|---|---|
| DS8483 | CA/DS | 11/23/01 |

**2. RECEIVING INMATE**

| INSTITUTIONAL NUMBER | LOCATION | DATE |
|---|---|---|
| | | |

**3. ITEMS TO BE CHARGED TO MY ACCOUNT**

Please deduct postage for this LEGAL MAIL, addressed to:

The Honorable Thomas Blewitt
U.S. Magistrate Judge
United States Dist. Court
235 N Washington Ave
Scranton, PA 18501-1148

INMATE'S SIGNATURE
_Joe Benson_

**5. OFFICIAL APPROVAL**
_C.I. Guller_

**6. BUSINESS OFFICE'S SPACE**

| CHARGE ENTERED | DATE | BOOKKEEPER |
|---|---|---|
| | | |

[redacted]

Please deduct postage for this
LEGAL MAIL, addressed to:

The Honorable Thomas Blewitt
U.S. Magistrate Judge
United States Dist. Court
235 N. Washington Ave
Scranton, PA 18501-1148

DZ4183 CA108 11/22/01

[signature]

DC-804
Part 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA 17001-0598

| FOR OFFICIAL USE ONLY |
| --- |
| |
| GRIEVANCE NUMBER |

OFFICIAL INMATE GRIEVANCE

| TO: FACILITY GRIEVANCE COORDINATOR<br>**Sharon M. Burks** | FACILITY: | DATE:<br>**November 27,2001** |
| --- | --- | --- |
| FROM: (INMATE NAME & NUMBER)<br>**Mr. Jason Benson DS-6483** | SIGNATURE of INMATE: | |
| WORK ASSIGNMENT:<br>**None** | HOUSING ASSIGNMENT:<br>**CA/08** | |

INSTRUCTIONS:
1  Refer to the DC-ADM 804 for procedures on the inmate grievance system.
2.  State your grievance in Block A in a brief and understandable manner.
3.  List in Block B any actions you may have taken to resolve this matter.  Be sure to include the identity of staff members you have contacted.

A. Provide a brief, clear statement of your grievance.  Additional paper may be used, maximum two pages.

**Since November 23, 2001, I have been trying to have my Civil Matter Motion copied four (4) times. But, I've been notified that I cannot go over/exceed $3.20.**
**My Motion will cost $4.00 and some change each, totaling at least $10.00 and a maximum of $17.60 and that's not including postage.**
**This restriction can cost/cause me to lose my civil matter. Being as though I asked for damages from the defendant's in my matter, I believe it will only be fair to all that I be reimbursed the amount I can/will lose should my case be dismissed because of the fact that I can't get copies;and make certain deadlines; i.e., one million dollars $1,000,000. In addition, I may need to add whomever's responsible as a defendant in my civil matter as a precaution, and I must notify the Court's about this situation.**

B. List actions taken and staff you have contacted, before submitting this grievance.
**The only people I could speak with about this matter is one of the librarian's.**

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____
Signature of Facility Grievance Coordinator

_____
Date

**WHITE** - Facility Grievance Coordinator Copy   **CANARY** - File Copy   **PINK** - Action Return Copy   **GOLDENROD** - Inmate Copy