IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON E. BENSON,           :     CIVIL ACTION
                              NO. 1:CV-00-1229

      Plaintiff,       :

                          (Judge Caldwell)
   vs.            :     (Magistrate Judge Blewitt)

WILLIAM G. ELLIEN, M.D., et al.,  :

      Defendants     :

**FILED**
**SCRANTON**

JAN 1 6 2002

PER _____
DEPUTY CLERK

DEFENDANT'S, WILLIAM G. ELLIEN, M.D.,
STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

     Defendant, William G. Ellien, M.D. ("Ellien"), by and through his attorneys, Gold, Butkovitz &

Robins, P.C., hereby provides the following Statement of Undisputed Facts, in support of his Motion for

Summary Judgment directed against Plaintiff, Jason E. Benson ("Benson").

     1.     Dr. Ellien is a Psychiatrist, and at all times relevant to Benson's claims, provided

psychiatric services to inmates at SCI-Smithfield. (See Verification of William G. Ellien, M.D., attached

hereto as Ex. "C", at ¶2.)

     2.     Benson's first appointment with Dr. Ellien was on July 27, 1999. (See Benson's medical

records, July 27, 1999, attached hereto as Ex. "B"; Ex. "C", at ¶4; Ex. "D", p. 19)

     3.     Prior to July 27, 1999, Dr. Ellien had no professional contact with Benson, or connection

with his treatment whatsoever. (Ex. "C", at ¶4)

     4.     Dr. Ellien provided solely psychiatric-related services and medication to Benson. Ellien

was not responsible for, nor involved in, the treatment of Benson's epilepsy or any other medical

condition. (Ex. "C", at ¶3)

     5.     Benson's medication for epilepsy, Dilantin, was discontinued on June 4, 1999, by

Ronald A. Long, M.D. (Ex. "B", June 4, 1999; Ex. "D", pp. 18 & 38) This was more than seven (7)

weeks prior to Dr. Ellien's involvement in Benson's psychiatric care, and prior to Benson's having

sought psychiatric treatment of any kind at SCI-Smithfield. (Ex. "B", at July 27, 1999; Ex. "C", at ¶¶4-5)

6.      According to Dr. Long, Benson told him that he had stopped taking his Dilantin ten (10) days prior to June 4, 1999, because taking it made him feel jittery. At that time, also according to Dr. Long, Benson had been seizure free for six months and it was not medically necessary to continue the Dilantin. (See Unsworn declaration of Dr. Ronald Long, attached to Motion for Summary Judgment of Dr. Long, at ¶14; Ex. "D", p. 41 & 44)

7.      Benson first sought psychiatric treatment at SCI-Smithfield on July 22, 1999, for panic attacks, anxiousness, and trouble sleeping. At this time he was referred for psychiatric treatment. (Ex. "B", July 22, 1999)

8.      All decisions regarding the selection, use and prescription of any psychiatric medications, or medications used in the psychiatric treatment of Benson, were made with the express knowledge, understanding and informed consent of Benson. Prior to the prescription of any such medication for Benson, Dr. Ellien or the prescribing physician explained to Benson the uses, indications, contraindications, side effects and adverse effects of the medication, and prior to any prescription, Benson was required to indicate that he understood the information provided, and that he consented to the use of the medication. No medication used in Benson's psychiatric treatment was provided without having first obtained Benson's informed consent for its use. (Ex. "C", ¶¶23-24)

9.      At his first appointment with Dr. Ellien, Benson reported that he had been adjusting well overall to SCI-Smithfield, but described experiencing dizziness, confusion, tightness in his chest, and sweating, and problems sleeping. Benson denied having any suicidal thoughts or psychotic symptoms. (Ex. "B", July 27, 1999; Ex. "C", ¶6)

10.     As of July 27, 1999, Benson was on no medications whatsoever. (Ex. "B", July 27, 1999; Ex. "C", ¶6)

11.     At this time, Dr. Ellien diagnosed Benson as suffering from panic disorder without agoraphobia. (Ex. "B", July 27, 1999; Ex. "C", ¶6)

12.    On July 27, 1999, Dr. Ellien discussed with Benson his treatment options regarding the use of Ativan and Tofranil, reviewed their respective benefits and indications, their side effects, precautions, and their medicine interactions.  Benson stated that he understood this, and gave his consent to their prescription.  (Ex. "B", July 27, 1999; Ex. "C", ¶6)

13.    With Benson's understanding and consent, Dr. Ellien prescribed for his use Tofranil, 50 mg, for one week, increasing to 75 mg for the next week, and then to 100 mg daily thereafter.  He also prescribed Ativan 1mg every 6 hours as needed for anxiety, with a maximum of 2 doses/day and 6 doses/week.  (Ex. "B", July 27, 1999; Ex. "C", ¶6) These medications were prescribed to Benson with his knowledge, understanding and consent.

14.    Benson was under no obligation or compulsion to take any psychotropic medication which he did not wish to take.

15.    On August 3, 1999, Benson sent an Inmate Request form to the Warden, in which expressed his "concern" about the Department of Correction's "Y2K" policy, about "security measures" being taken by the military, police, the F.B.I., and about "F.E.M.A. encampments" in "preparation of martial law."  He also expressed concerns about United Nations policy with regard to the treatment of the country's inmate population.  (Ex. "B", Inmate Request to Staff Member, July 27, 1999)

16.    Benson's "concerns" were further documented in his cumulative adjustment record on August 3, 1999, at which time he explained that in 1962 President Kennedy "signed an executive order ... allowing all inmates to be killed in the event of martial law," and that "after the Y2K disaster, martial law will be imposed."  Benson stated that the government was conducting mass inoculations that were making people violently ill; that the government was secretly implanting "biological computer chips into people's bloodstreams"; and that "crop circles" and UFO sightings were involved in the "Y2K scenario."  At this time, Benson "was adamant that he is not crazy and that this is all rational and legitimate thinking which deserves an appropriate answer."  (Ex. "B", August 3, 1999)

17.    Benson was next seen on August 19, 1999, by Jin Ha Yun, M.D., another psychiatrist,

earlier that his scheduled 1 month followup of his initial psychiatric session. At that time Benson

indicated that he had stopped taking the Tofranil prescribed on July 27, 1999, after taking it for only

three days, because he felt nauseated. Benson, however, also acknowledged that nausea was a symptom

of panic disorder, which he suffered from. (Ex. "B", August 19, 1999; Ex. "C", ¶7)

18.     After a discussion of his medication options with Dr. Yun, Benson agreed to try a course

of Serzone, which Dr. Yun prescribed at 100 mg for the first three days, increasing then to 200 mg per

day for 30 days. The Tofranil (Imipramine) was discontinued. (Ex. "B", August 19, 1999; Ex. "C", ¶7)

19.     Benson was next seen psychiatrically on September 1, 1999, by Eugene Polmueller,

M.D. Benson stated that he had been transferred to a county prison for a few days for legal matters, and

while there he suffered a grand mal seizure, and was admitted to the ICU. (Ex. "B", September 1, 1999;

Ex. "C", ¶8) Benson admits that he has no recollection whatsoever of having had this seizure. (Ex. "D",

p. 45)

20.     Benson told Dr. Polmueller that he had been off Dilantin since some time in August.

(Ex. "B", September 1, 1999) This is incorrect, however, as the medical records indicate that Benson's

Dilantin had been actually been discontinued on June 4, 1999, by Dr. Long. (Ex. "B", June 4, 1999; Ex.

"C", ¶5; Unsworn declaration of Dr. Ronald Long, attached to Motion for Summary Judgment of Dr.

Long, at ¶14)

21.     Dr. Polmueller diagnosed Benson at that time as suffering from panic attacks with

agoraphobia and a mixed personality disorder. He discontinued the Serzone, and prescribed Klonopin

0.5 mg mornings, and 1.0 mg evenings, to reduce anxiety. (Ex. "B", September 1, 1999; Ex. "C", ¶8)

22.     Benson was seen by Dr. Ellien for the second time on September 23, 1999, at which time

Benson stated that he was sleeping poorly, and experiencing worsened anxiety. At this time, Benson

denied experiencing full panic attacks, and believed that if he solved his sleeping problem, his anxiety

would be under control. (Ex. "B", September 23, 1999; Ex. "C", ¶9)

23.     Dr. Ellien and Benson discussed medication alternatives, and Benson stated that he had

done well in the past on the medication Ambien, 10 mg. Ellien prescribed Ambien, 10 mg daily for

Benson, and continued him on Klonopin. (Ex. "B", September 23, 1999; Ex. "C", ¶9)

24.    Dr. Ellien next saw Benson on October 19, 1999, in the prison's infirmary, where

Benson was recovering from an intentional overdose of Dilantin. At that time, Benson stated that since

he survived the overdose, "God must intend for him to live," and denied any current suicidal ideation.

Additional medication alternatives were discussed, but deferred until the Dilantin overdose cleared

Benson's system, and he was released from the infirmary. The prescription for Ambien was cancelled,

and the Klonopin continued. (Ex. "B", October 19, 1999; Ex. "C", ¶10; Ex. "D", p. 24)

25.    Benson was seen by Dr. Ellien for the fourth time on November 8, 1999, at which time

he had recovered from his Dilantin overdose and had been released from the infirmary. At this time,

Benson admitted that he had taken the Dilantin overdose "to get high" and that he had not been and was

not suicidal. Benson also admitted that he was having more problems sleeping, which he did not have

when previously on the Ambien. Dr. Ellien restarted Benson on the Ambien, and continued him on

Klonopin. (Ex. "B", November 8, 1999; Ex. "C", ¶11)

26.    On December 8, 1999, Benson was seen by Dr. Ellien for the fifth time, at which time

Benson was confined to the Restrictive Housing Unit (RHU) for "losing his temper and punching a

door." Benson reported increased panic attacks and anxiety. Further medication alternatives were

discussed, and Benson decided to continue with his present medications. (Ex. "B", December 8, 1999;

Ex. "C", ¶12)

27.    Benson was seen again by Dr. Ellien on January 13, 2000, at which time his medications

were discussed, including the possible use of Tofranil, Pamelor, Elavil and Paxil. A trial of Paxil was

agreed upon , after discussing its indications, benefits, side and adverse effects, and precautions, and

Benson consented. (Ex. "B", January 13, 2000; Ex. "C", ¶13)

28.    Benson was seen for the seventh time by Dr. Ellien on January 27, 2000, at which time

he complained that he was not sleeping at night, and felt anxious due to his ongoing court cases.

Benson's current medications and their continued use were discussed, as was the addition of Sinequan to help with sleep and anxiety. Its indications, benefits, side and adverse effects were discussed, and Benson stated his understanding and consent. Benson's diagnosis continued to be panic disorder with agoraphobia. (Ex. "B", January 27, 2000; Ex. "C", ¶14)

29.      On February 12, 2000, Benson sent a three-page handwritten letter to Dr. Ellien, in which he discussed his current thoughts. In the letter, Benson stated that he believed he had begun to experience "lucid petit -mal seizures," in which his head felt light, and "my body hummed as if electrified," his vision became cloudy, and he heard a voice that stated "you are a data processing machine." Benson stated that he did not lose consciousness during this. He also described at times experiencing "fleeting paranoia," and at other times his :senses seem to excelerate, to come alive as if they were never in use." He further stated that "at time I cannot differentiate between dreams and reality - I lose the ability to recognize my consciousness." (Ex. "B", February 12, 2000; Ex. "C", ¶15; Ex. "D", pp. 32-33)

30.      Benson further wrote to Dr. Ellien: " Listen, I've done an awful lot of LSD in my time, an awful lot of mescaline and DMT - virtually every sort of hallucinogenic I've done in huge amounts. My last trip was 3 days before I was busted, I took 22 hits of white blotter. The drug was extremely potent, as I had initially bought a gram of crystalline LSD, which when extenuated can dose about 3500 hits, we sprayed only about 2000." Benson continued: "My point is that with such a massive quantity of LSD (well over 700 hits in my life time, that I've consumed) is it possible that I've caused some sort of neurodegeneration? Am I losing my damned mind?" (Ex. "B", February 12, 2000)

31.      Dr. Ellien saw Benson again on February 17, 2000, at which time they discussed the three-page letter Benson had written, and the fact that the Sinequan was helping him to sleep. Dr. Ellien noted in their discussion that Benson's fear that he was suffering from "petit-mal seizures" has been ruled out the previously day by Dr. Long, who noted that Benson's Dilantin blood level was at a therapeutic level. Dr. Ellien gave Benson his opinion that what he was experiencing was most likely

symptoms of worsening panic attacks, and that an increase in his Sinequan would help to prevent them. Benson consented to this.  (Ex. "B", February 17, 2000; Ex. "C", ¶15)

32.     Dr. Ellien next saw Benson on March 23, 2000, at which time Benson expressed his belief that the prison staff held grudges against him.  Ellien noted that Benson had refused to continue to take the Paxil which had been prescribed for his depression since late February, 2000, and noted Benson's desire to have his dose of Klonopin doubled.  Dr. Ellien deemed this inappropriate because of Benson's past history of abuse and the high risk of Benson's building up a "tolerance" to the medication. They discussed the continued use of Klonopin at a slightly elevated dose, the dicontinuance of Paxil due to the side effects, and an increase in the Sinequan dose.  Benson stated his understanding and gave his consent to this.  Benson's diagnosis was given at this time as panic disorder without agoraphobia.  (Ex. "B", March 23, 2000; Ex. "C", ¶16)

33.     Benson was next seen by Dr. Ellien, for the tenth time, on April 11, 2000, at which time Benson stated that the Klonopin was helping him with his anxiety, and that he was having no further panic attacks.  At this time Benson stated that he no longer wanted to take Sinequan, and requested that he be prescribed "only a sleeping medicine, not something that is used for something else."  Dr. Ellien discussed with Benson his pattern of rejecting medications "which stand the best chance of helping him, while seeking out addictive, antianxiety medicines."  Benson then stated that he wanted to stop talking all medications whatsoever.  Dr. Ellien then "attempted, repeatedly, to inform him of the risks for seizures if he abruptly stopped either or both Dilantin and Klonopin, which he was now threatening."  Dr. Ellien explained to Benson that because of this risk, he would not discontinue the prescription of Klonopin, and told Benson that he had to see Dr. Long regarding his desire to stop taking Dilantin.  Ellien further explained that "in light of seizure history, I strongly advised he not stop Dilantin."  Benson continued to state that he would stop taking the medications, and Dr. Ellien informed him that "due to the high risk of life-threatening status epilepticus if he abruptly came off either or both medicines" (Dilantin and Klonopin) that "I would place him on the 'must take' list for both."  Benson indicated his understanding.

At this time, Dr. Ellien cancelled the Paxil due to Benson's non-compliance; ordered that the Klonopin dosage be gradually tapered over the next six weeks to eventually discontinue; cancelled the Sinequan order due to Benson's refusal; and referred Benson to Dr. Long concerning Benson's desire to stop taking his anti-epilepsy medication, Dilantin. In the interim, Dr. Ellien ordered that Benson be placed on the "must take" list for Dilantin and Klonopin. (Ex. "B", April 11, 2000; Ex. "C", ¶17)

34.    Benson was next seen by Dr. Ellien on May 17, 2000, at which time Benson expressed his concerns that he would not be given his Dilantin while he was away from SCI-Smithfield, on trial in Gettysburg. Dr. Ellien noted that the process by which information about his medications was provided to the receiving institution on the transfer sheet was explained to him, as well as the fact that a supply of the medication would be sent along with him. They further discussed Benson's continuing refusal to accept an antidepressant medication, which was most appropriate for the treatment of his anxiety. Benson agreed to be placed back on Ambien, which had previously been used with some success in helping him sleep. This was also the last time that Dr. Ellien treated Mr. Benson. (Ex. "B", May 17, 2000; Ex. "C", ¶18)

35.    Between July 27, 1999 and May 17, 2000, Benson was seen, evaluated and treated by Dr. Ellien on eleven (11) separate occasions, in addition to being psychiatrically evaluated and treated on several other occasions by other psychiatrists at SCI-Smithfield. On each occasion, Dr. Ellien and Benson discussed in detail Benson's ongoing psychiatric symptoms, and discussed in depth a wide variety of medication alternatives, as well as the use and indications of these medications, their side effects and adverse effects, and their applicability to the treatment of Benson's various symptoms.

36.    During the entire time Benson was under Dr. Ellien's psychiatric care, Dr. Ellien (or another psychiatrist) met with and evaluated Benson on a regular basis, at least once every 30 days, or as the situation warranted. The use and effects of each of the psychiatric medications provided to Benson were monitored, therapeutic levels were tested as appropriate, and modifications to the medications provided were made as the situation warranted, and as Benson made known the success and/or lack of

success of each in managing his conditions and symptoms. All such medication and treatment decisions was made with the knowledge, consultation and informed consent of Benson.

37.     Benson was prescribed Tofranil by Dr. Ellien on one occasion, on July 27, 1999, at a very low dosage. Mr. Benson took this low dosage of Tofranil for a very short period of time before he self-discontinued taking the medication. When the order for Tofranil was discontinued at his next psychiatric evaluation on August 19, 1999, Benson had been off the medication for almost three (3) weeks. (Ex. "B", July 27, 1999 and August 19, 1999; Ex. "C", ¶¶19-20)

38.     The dosage of Tofranil prescribed for Mr. Benson by Dr. Ellien on July 27, 1999, was a very low dosage (50 mg per day), with orders to gradually increase the dosage over a month's time to 100 mg per day, which was also a very low dosage, along with monitoring of his blood levels for the drug. (Ex. "C", ¶20)

39.     The choice of Tofranil at this low dosage for Mr. Benson's psychiatric symptoms in July, 1999, was medically appropriate. (Ex. "C", ¶20)

40.     The incidence of adverse seizure reactions from among **all types** of antidepressants is between one-half percent (1/2 %) and one-and-a-half percent (1-1/2 %). (Ex. "C", ¶21)

41.     There is no medical evidence which specifically attributes the use of Tofranil, particularly in such low doses, as the cause of seizures. (Ex. "C", ¶21)

42.     Certain other antidepressants, notable Wellbutrin, have been linked to seizures, but only when prescribed in very high doses, generally exceeding 600 mg per day. (Ex. "C", ¶21)

43.     There exists no medical evidence whatsoever that the grand mal seizure which Mr. Benson states he suffered in late-August, 1999 while housed in the county prison was in any way causally related to the brief course of a low dosage prescription of Tofranil (Imipramine) which Benson took in late-July, 1999 or early-August, 1999. The seizure which Benson states he suffered took place three to four weeks after he stopped taking the Tofranil. (Ex. "C", ¶22)

44.     Even if Mr. Benson had still been taking the Tofranil at the low dosages prescribed at the

time of the seizure he states he suffered in late-August, 1999, there exists no medical evidence which would attribute such a seizure to the use of the Tofranil in question. (Ex. "C", ¶22)

45.    In Dr. Ellien's medical opinion, to a high degree of medical certainty, the seizure which Mr. Benson states he suffered in late-August, 1999 while in the county prison, was in no way related to his having taken the Tofranil (Imipramine) prescribed for him on July 27, 1999. (Ex. "C", 22)

46.    There is no dispute in this matter that Mr. Benson received psychiatric treatment during the period of time at issue in this matter, and no dispute that he received continuous treatment for his psychiatric conditions from July, 1999 through May, 2000, when he was seen by Dr. Ellien for the last time.

47.    There is no dispute in this matter the Mr. Benson received medications for his psychiatric conditions throughout the July, 1999 through May, 2000 time period. There is no dispute, and the evidence clearly demonstrates, that Mr. Benson received medications for his psychiatric conditions throughout this time period, and that his progress on each medication was closely monitored, and he was regularly evaluated throughout as to his progress on each medication, and the effect of each medication.

48.    There is no dispute that Mr. Benson, throughout the July, 1999 to May, 2000 time period, when Dr. Ellien last evaluated him, that Benson was seen and evaluated psychiatrically on a regular basis, at least once a month, and at times at shorter intervals. In addition to several other psychiatrists, Benson was seen and evaluated by Dr. Ellien himself eleven (11) times during the course of this ten (10) month period.

49.    There exists no evidence that would support a determination that Dr. Ellien's treatment of Mr. Benson constituted deliberate indifference. Dr. Ellien continuously provided Mr. Benson with psychiatric treatment for his psychiatric conditions during the July, 1999 through May, 2000 time period. Dr. Ellien continuously advised and informed Mr. Benson about a wide variety of medication options available to him, and prescribed numerous medications during this time period based upon their

discussions and Mr. Benson's informed consent thereto. Benson was continuously prescribed and provided a variety of psychiatric medications throughout this time period, in a continuing effort to address his psychiatric symptomology which the medications which proved to be most efficacious.

50.    There is no evidence from which it could be concluded that Dr. Ellien ever provided Mr. Benson with any treatment or medications for his psychiatric conditions which Dr. Ellien did not believe was psychiatrically indicated and appropriate at the time. There is no evidence that Dr. Ellien provided any treatment or medication to Mr. Benson which Dr. Ellien believed was inappropriate, or which Dr. Ellien believed presented a substantial risk of harm to Mr. Benson. Benson admits that Dr. Ellien believed that Tofranil (Imipramine) was an appropriate choice of medication. (Ex. "D", p. 21)

51.    There is no dispute in this matter that Mr. Benson, pursuant to the applicable Pennsylvania Department of Corrections administrative regulations (DC-ADM 804), failed to properly and completely exhaust his available administrative remedies by failing to seek monetary relief as provided for therein.