IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JASON E. BENSON | : | CIVIL ACTION |
| V. | : | NO. 1:CV-00-1229 |
| WILLIAM G. ELLIEN, M.D., et al. | : | (Judge Caldwell)<br>(Magistrate Judge Blewitt) |



FILED
SCRANTON

JAN 1 6 2002

## EXHIBITS OF
## DEFENDANT, WILLIAM G. ELLIEN, M.D.,
## IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

9/13/00

18

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Jason E. Benson,
           Plaintiff

v.

Thomas Duran, et al.,
           Defendants

:   CIVIL ACTION NO. 1:CV-00-1229
:
:   (Judge Caldwell)
:
:   (Magistrate Judge Blewitt)
:
:
:

<u>AMENDED COMPLAINT</u>

FILED
SCRANTON

SEP 1 1 2000

PER _____
DEPUTY CLERK



## PARTIES

1.) The plaintiff, Jason E. Benson, was held at Adams County Prison (hereon A.C.P.) during the events described in this complaint.

2.) Defendant Thomas Duran is the Warden of A.C.P.. He is sued in his individual capacity.

3.) Defendants Bruce Cluck and Debra Hanky are the Deputy Wardens of A.C.P.. They are sued in their individual capacity.

4.) Defendant's John Jennings and William Orth are Lieutenants of the A.C.P.. They are sued in their individual capacity.

5.) Defendant Pae Hientzelman is a Sergeant of the A.C.P.. He is sued in his individual capacity.

6.) Defendant's Briton Shelton and David Vazquez are Correctional Officer's of the A.C.P.. They are sued in their individual capacity.

7.) Doctor William J. Steinour is a physician employed at the Gettysburg Hospital. He is sued in his individual capacity.

8. Dr. Ronald Long, physician, and Dr. William Ellien, psychiatrist, are employed at the State Correctional Institution Smithfield. They are sued in their individual capacities.

Plaintiff retains the right to amend any future Jane/John Doe defendants that becomes available through discovery.

## FACTS

1.) On August 25, 1999, plaintiff, a Pennsylvania State Prisoner, was transferred to the Adams County Prison (hereafter referred to as A.C.P.) for the purpose of attending a Post Conviction Relief Act Hearing. (See Exhibit "A")

2.) On August 27, 1999, upon plaintiff's return to A.C.P. from the aforementioned hearing, he was released from the Sheriff's restrains. However, A.C.P. Intake Officer, defendant Briton Shelton, recuffed the plaintiff behind his back, and shackled him about the ankles. This not being the usual protocol for returning inmates, plaintiff inquired as to why he was being

- 2 -

**FACTS CONTINUED FROM PAGE 2**

recuffed.  Defendant Briton Shelton responded, saying, "Hey, I ain't the one!"  At this time defendant Lt. John Jennings appeared, saying, "Bring Shithead in to get naked."  Indicating a strip search.

3.) Plaintiff was led to a small room adjacent to the intake area.  Plaintiff, handcuffed behind his back and shackled about the ankles, was seated in a chair.  Defendant Lt. Jennings exited the room leaving plaintiff alone with defendant Briton Shelton, was docile, and no words were exchanged.  Defendant Lt. John Jennings returned with Warden Thomas Duran, Deputy Wardens Bruce Cluck and Debra Hankey, Sergeant Rae Hientzelman, and John Doe, who was carrying a video camera, filming. (See Exhibit "B" - (1), (2), and (3).

4.) At this time, Deputy Warden Bruce Cluck ordered plaintiff to strip.  Plaintiff, handcuffed and shackled, unable to comply, refused.  Notwithstanding, plaintiff was handcuffed behind his back, and shackled about his ankles posing no threat to the defendant's, without warning was shot in the face with O.C. Pepper Foam.  Plaintiff, unable to breath or see, attempted to rid himself of the O.C. Pepper Foam, lost his balance, hitting his head against a computer monitor.  At this time, defendant Warden Thomas Duran gave the order to "Takem' down!"  Seriously injuring plaintiff, defendants Bruce Cluck, Debra Hankey, John Jennings, Rea Hientzelman, and Briton Shelton knocked plaintiff to the ground, hammering plaintiff's head into the floor, twisting plaintiff's hands beyond normal range of motion, kicking and kneeing plaintiff in his back and side. (See Exhibit "C")

5.) After pleading for several minutes for defendant's to get off of him, defendant's relented, throwing plaintiff into a concrete shower stall, where plaintiff fell unconscious.  Defendant Thomas Duran forcefully yanked plaintiff out of the shower stall, taking him to the floor again, where defendant Thomas Duran stomped his foot into the plaintiff's neck.  After plaintiff was released from defendant Thomas Duran's foot, and removed of the restraints, plaintiff complied to a strip search.  A.C.P. has no medical facilities, thus plaintiff requested to be taken to the Gettysburg Hospital Emergency Room. (See Exhibit "D")

6.) Subsequently, the Gettysburg Hospital Emergency Room physician Dr. William J. Steinour, who is familiar with plaintiff's past history of epilepsy, refused to address plaintiff's request for anti-seizure medications, as well as his complaint of losing consciousness, diagnosing the plaintiff with, "Multiple contusions" and released plaintiff to the care of A.C.P..

- 3 -

FACTS CONTINUED FROM PAGE 3

7.) Thereafter, on August 30, 1999, plaintiff was witnessed by defendant's Lt. William Orth and C.O. David Vazquez to be in a state of convulsions, but refused to immediately treat plaintiff until one and one-half (1½) hours later, where they again witnessed plaintiff in a state of serious convulsions, only then calling for the Adams County Sheriff's Department to transport plaintiff to the Gettysburg Hospital. Once plaintiff arrived at the Gettysburg Hospital Emergency Room, he was witnessed by hospital Medical Staff to be in a life threatening state of severe seizures known as "Status Epilepticus," incontinent, and foaming and bleeding from the mouth. Plaintiff was immediately admitted to the Gettysburg Hospital Critical Care Unit with "Imminent Death" orders (See Exhibits "E" (1), (2), (3), and (4)

8.) After further investigation, it was discovered that a series of pharmacological deviations prescribed by defendant's Dr. Ronald Long and Dr. William Ellien of SCI Smithfield precipitated into the aforementioned "Status Epilepticus" attack suffered by plaintiff. (See Exhibit "F"(4))

9.) On June 4, 1999, plaintiff was seen by defendant Dr. Ronald Long. Plaintiff complained that the anti-seizure medication he was on, (a hypantoin derivative called Dilantin) was causing unwanted side effects, and that he wanted to switch back to the anti-seizure medication he was on prior to the Dilantin. Defendant Dr. Ronald Long refused to change the medications, and abruptly discontinued plaintiff's Dilantin, without prescribing any further medications to treat plaintiff's epilepsy disorder. (See Exhibit "G")

10.) On June 15, 1999, plaintiff sent a request to defendant Dr. Ronald Long, asking him to reconsider prescribing an anti-seizure medications of any kind. This request was never responded to. (See Exhibit "H")

11.) On July 24, 1999, plaintiff was seen by defendant Dr. William Ellien, psychiatrist. At this time, plaintiff inquired as to why he wasn't on anti-seizure medications. Defendant Dr. William Ellien, said this wasn't his field of expertise and that I should talk to Defendant Dr. Ronald Long. He then prescribed the anti-depressant drug Imipramine.

12.) The abrupt discontinuance of Dilantin by defendant Dr. Ronald Long, as well as the prescription anti-depressant Imipramine, in combination with the physical and emotional trauma sustained during the use of excessive force in A.C.P. synergistically caused plaintiff to enter into the aforementioned life threatening "Status Epilepticus" seizures that occurred on August 29, 1999. (See Exhibit "I" (1), (2), and Exhibit "F(4)"

- 4 -

## CLAIMS FOR RELIEF

1.) The actions of Warden Thomas Duran, Deputy Warden Bruce Cluck, Deputy Warden Debra Hankey, C.O. Briton Shelton, Lt. John Jennings, Sgt. Rea Heintzelman, and Jane/John Doe in using phys-ical force against the plaintiff without need or provocation, and in failing to intervene to prevent the misuse of force was done maliciously and sadistically, and constituted cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution.

2.) Defendant's Lt. William Orth, and C.O. Vazquez's fail-ure to provide adequate medical treatment to plaintiff, placed plaintiff in direct risk of serious injury, disease, and death constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

3.) Adams County Prisons lack of adequately trained medical staff and medical facilities constitutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

4.) Defendant Dr. William J. Stienour's failure to treat plaintiff as a seizure risk even after plaintiff explained to defendant that he was an epileptic, and not currently on medi-cations, constitutes deliberate indifference to plaintiff's seri-ous medical needs in violation of the Eighth Amendment of the United States Constitution.

5.) The combined actions of defendant Dr. Ronald Long and Dr. William Ellien in abruptly stopping plaintiff's anti-seizure medication and in prescribing an anti-depressant drug known to lower seizure threshold placed plaintiff in direct risk of seri-ous injury, disease, and death constitutes deliberate indiffer-ence to plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A2: The actions of Lt. Orth and C.O. David Vazquez in ig-noring plaintiff while in seizures and post-ictal state consti-tutes deliberate indifference to the plaintiff's serious medical needs in violation of the Eighth Amendment of the United States Constitution.

A3: The actions of Dr. William J. Steinour in refusing to treat plaintiff as a seizure risk, despite plaintiff reminding him that he was epileptic and not currently on anti-seizure medi-cation constitutes deliberate indifference in violation of the

CLAIMS FOR RELIEF
CONTINUED FROM PAGE 5


Eighth Amendment of the United States Constitution.

A5:  The actions of Dr. Ronald Long in abruptly discontinuing plaintiff's anti-seizure medications despite foreknowledge that such actions would cause severe, life threatening seizures constitutes deliberate indifference in violation of the Eighth Amendment of the United States Constitution.

A6:  The actions of defendant Dr. William Ellien in prescribing the drug Tofranil known to decrease the seizure threshold, with foreknowledge that plaintiff was epileptic and had been abruptly withdrawn from his anti-seizure medications and the seizure risk associated with the withdrawal of said medications and the addition of the drug Tofranil he prescribed constitutes deliberate indifference to the Eighth Amendment of the United States Constitution.

B-2: $500,000.00 against Dr. Ronald Long and Dr. William Ellien for abruptly discontinuing plaintiff's anti-seizure medication and prescribing an anti-depressant seizure antagonist drug, and causing plaintiff to fall into a life threatening state of seizures known as "Status Epilepticus," and subsequent hospitalization of plaintiff.

# PHYSICIAN'S ORDERS

Exhibit F

Benson Jason
DS6483
4-27-76
SCISm

Drug Allergies:
NKA

Self-Medication Program ☐ Yes    ☐ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|---|
| 0710 4-28-99 | | ① Neu test |
| | | |
| | | **S. CRAIG HOFFMAN PA - C** |
| 6/4/89 0915 | | A ① D/c Dilantin |
| 6-4-99 0920 | | **RONALD A LONG, M.D.** |
| 6-8-99 1515 C | | A ① Cont on seizure clinic |
| | | **RAY McMULLEN, PA-C** WHS |
| | | **DR. MIGUEL SALOMON M.D.** |
| 7-23-99 | | Cancel QTST  FPD O.L C ID |
| | | **DR. MIGUEL SALOMON M.D.** |

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person or party.

PLEASE USE BALL POINT PEN ONLY

# PHYSICIAN'S ORDERS

Exhibit G

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☒ No

Inmate Name: Jason Beison

Inmate Number: DS 6483

DOB: 9-27-76

Institution: Smithfield C

| Date/Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|---|
| 7-27-99 6 | | ① Next appointment in 1 month. |
| 1615 hrs | | ② Ativan 1mg PO q 6 hrs PRN unrest, attach: |
| | | • max 2 doses/day • max 6 doses/week, for 1 month |
| | | ③ Begin Imipramine 50 mg PO hs daily, through 3 Aug '99 |
| | | ④ On 4 Aug 99 - increase Imipramine to 75 mg PO hs, daily, through 10 aug 1999 |
| | | ⑤ On 11 aug 99 - increase Imipramine to 100 mg PO hs, daily for 5 months |
| | | ✓ ⑥ On/about 19 Aug 1999 - obtain Tofranil (Imipramine + desipramine) Blood level in AM |
| | | a. William ? Fleire MD |
| Noted Inc 7/27/99 2000 | | |
| | | Barb Grove, L.P.N. |

Received
JUL 27 1999
SCI-Smithfield
Medical Records Department

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person.

FILED
JUL 28 1999
SCI-SMITHFIELD
Medical Records Dept.

PLEASE USE BALL POINT PEN ONLY

1

H(1)

**Parke-Davis—Cont.**

**COLY-MYCIN® S OTIC**    ℞
[cō′′ly-my′cĭn s ō′tĭc]
with Neomycin and Hydrocortisone
(colistin sulfate–neomycin
sulfate–thonzonium
bromide–hydrocortisone acetate
otic suspension)

**DESCRIPTION**
Coly-Mycin S Otic with Neomycin and Hydrocortisone (colistin sulfate-neomycin sulfate-thonzonium bromide-hydrocortisone acetate otic suspension) is a sterile aqueous suspension containing in each ml: Colistin base activity, 3 mg (as the sulfate); Neomycin base activity, 3.3 mg (as the sulfate); Hydrocortisone acetate, 10 mg (1%); Thonzonium bromide, 0.5 mg (0.05%); Polysorbate 80, acetic acid, and sodium acetate in a buffered aqueous vehicle. Thimerosal (mercury derivative), 0.002%, added as a preservative. It is a non-viscous liquid, buffered at pH 5, for instillation into the canal of the external ear or direct application to the affected aural skin.

**CLINICAL PHARMACOLOGY**
1. Colistin sulfate—an antibiotic with bactericidal action against most gram-negative organisms, notably *Pseudomonas aeruginosa, E. coli,* and *Klebsiella-Aerobacter.*
2. Neomycin sulfate—a broad-spectrum antibiotic, bactericidal to many pathogens, notably *Staph aureus* and *Proteus* sp.
3. Hydrocortisone acetate—a corticosteroid that controls inflammation, edema, pruritus and other dermal reactions.
4. Thonzonium bromide—a surface-active agent that promotes tissue contact by dispersion and penetration of the cellular debris and exudate.

**INDICATIONS AND USAGE**
For the treatment of superficial bacterial infections of the external auditory canal, caused by organisms susceptible to the action of the antibiotics; and for the treatment of infections of mastoidectomy and fenestration cavities, caused by organisms susceptible to the antibiotics.

**CONTRAINDICATIONS**
This product is contraindicated in those individuals who have shown hypersensitivity to any of its components, and in herpes simplex, vaccinia and varicella.

**WARNINGS**
As with other antibiotic preparations, prolonged treatment may result in overgrowth of nonsusceptible organisms and fungi.
If the infection is not improved after one week, cultures and susceptibility tests should be repeated to verify the identity of the organism and to determine whether therapy should be changed.
Patients who prefer to warm the medication before using should be cautioned against heating the solution above body temperature, in order to avoid loss of potency.

**PRECAUTIONS**
**General:** If sensitization or irritation occurs, medication should be discontinued promptly.
This drug should be used with care in cases of perforated eardrum and in longstanding cases of chronic otitis media because of the possibility of ototoxicity caused by neomycin. Treatment should not be continued for longer than ten days. Allergic cross-reactions may occur which could prevent the use of any or all of the following antibiotics for the treatment of future infections: kanamycin, paromomycin, streptomycin, and possibly gentamicin.

**ADVERSE REACTIONS**
Neomycin is a not uncommon cutaneous sensitizer. There are articles in the current literature that indicate an increase in the prevalence of persons sensitive to neomycin.

**DOSAGE AND ADMINISTRATION**
The external auditory canal should be thoroughly cleansed and dried with a sterile cotton applicator.
When using the calibrated dropper:
For adults, 5 drops of the suspension should be instilled into the affected ear 3 or 4 times daily. For infants and children, 4 drops are suggested because of the smaller capacity of the ear canal.
This dosage correlates to the 4 drops (for adults) and 3 drops (for children) recommended when using the dropper-bottle container for this product.
The patient should lie with the affected ear upward and then the drops should be instilled. This position should be maintained for 5 minutes to facilitate penetration of the drops into the ear canal. Repeat, if necessary, for the opposite ear. If preferred, a cotton wick may be inserted into the canal and then the cotton may be saturated with the solution. The

4 hours. The wick should be replaced at least once every 24 hours.

**HOW SUPPLIED**
Coly-Mycin S Otic is supplied as:
N 0071-3141-35—5-mL bottle with dropper
N 0071-3141-36—10-mL bottle with dropper
Each ml contains: Colistin sulfate equivalent to 3 mg of colistin base, Neomycin sulfate equivalent to 3.3 mg neomycin base, Hydrocortisone acetate 10 mg (1%), Thonzonium bromide 0.5 mg (0.05%), and Polysorbate 80 in an aqueous vehicle buffered with acetic acid and sodium acetate. Thimerosal (mercury derivative) 0.002% added as a preservative.
**Shake well before using.**
Store at controlled room temperature 15°-30°C (59°-86°F). Stable for 18 months at room temperature; prolonged exposure to higher temperatures should be avoided.
3141G033
Caution—Federal law prohibits dispensing without prescription.

**KAPSEALS®**
**DILANTIN®**    ℞
[dī-lăn′tĭn ″]
(Extended Phenytoin Sodium Capsules, USP)

**DESCRIPTION**
Phenytoin Sodium is an antiepileptic drug. Phenytoin sodium is related to the barbiturates in chemical structure, but has a five-membered ring. The chemical name is sodium 5,5-diphenyl-2,4-imidazolidinedione.
Each Dilantin—*Extended Phenytoin Sodium Capsule* USP contains 30 mg or 100 mg phenytoin sodium USP. Also contains lactose, NF; sucrose, NF; talc, USP; and other ingredients. The capsule shell and band contain colloidal silicon dioxide, NF; FD&C red No. 3; gelatin, NF; glyceryl monoleate; sodium lauryl sulfate, NF. The Dilantin 30-mg capsule shell and band also contain citric acid, USP; FD&C blue No. 1; sodium benzoate, NF; titanium dioxide, USP. The Dilantin 100-mg capsule shell and band also contain FD&C yellow No. 6; hydrogen peroxide 3%; polyethylene glycol 200. Product *in vivo* performance is characterized by a slow and extended rate of absorption with peak blood concentrations expected in 4 to 12 hours as contrasted to *Prompt Phenytoin Sodium Capsules* USP with a rapid rate of absorption with peak blood concentration expected in 1½ to 3 hours.

**CLINICAL PHARMACOLOGY**
Phenytoin is an antiepileptic drug which can be useful in the treatment of epilepsy. The primary site of action appears to be the *motor cortex* where spread of seizure activity is inhibited. Possibly by promoting sodium efflux from neurons, phenytoin tends to *stabilize* the threshold against hyperexcitability caused by excessive stimulation or environmental changes capable of reducing membrane sodium gradient. This includes the reduction of posttetanic potentiation at synapses. Loss of posttetanic potentiation prevents cortical seizure foci from detonating adjacent cortical areas. Phenytoin reduces the maximal activity of brain stem centers responsible for the tonic phase of tonic-clonic (grand mal) seizures.
The plasma half-life in man after oral administration of phenytoin averages 22 hours, with a range of 7 to 42 hours. Steady-state therapeutic levels are achieved 7 to 10 days after initiation of therapy with recommended doses of 300 mg/day.
When serum level determinations are necessary, they should be obtained at least 5-7 half-lives after treatment initiation, dosage change, or addition or subtraction of another drug to the regimen so that equilibrium or steady-state will have been achieved. Trough levels provide information about clinically effective serum level range and confirm patient compliance and are obtained just prior to the patient's next scheduled dose. Peak levels indicate an individual's threshold for emergence of dose-related side effects and are obtained at the time of expected peak concentration. For Dilantin Kapseals peak serum levels occur 4-12 hours after administration.
Optimum control without clinical signs of toxicity occurs more often with serum levels between 10 and 20 mcg/ml, although some mild cases of tonic-clonic (grand mal) epilepsy may be controlled with lower-serum levels of phenytoin.
In most patients maintained at a steady dosage, stable phenytoin serum levels are achieved. There may be wide interpatient variability in phenytoin serum levels with equivalent dosages. Patients with unusually low levels may be noncompliant or hypermetabolizers of phenytoin. Unusually high levels result from liver disease, congenital enzyme deficiency or drug interactions which result in metabolic interference. The patient with large variations in phenytoin plasma levels, despite standard doses, presents a difficult clinical problem. Serum level determinations in such patients may be

free phenytoin levels may be altered in [...] tein binding characteristics differ from [...]
Most of the drug is excreted in the bile [...] lites which are then reabsorbed from the [...] excreted in the urine. Urinary excretion [...] metabolites occurs partly with gluconera [...] more importantly, by tubular secretion, [...] is hydroxylated in the liver by an enzym [...] saturable, small incremental doses may [...] stantial increases in serum levels, with a [...] per range. The steady-state level may be [...] increased, with resultant intoxication, fro [...] dosage of 10% or more.

**INDICATIONS AND USAGE**
Dilantin is indicated for the control of [...] chomotor (grand mal and temporal lobe) [...] vention and treatment of seizures occurring [...] ing neurosurgery.
Phenytoin serum level determinations [...] for optimal dosage adjustments (see, Dosa[...] istration).

**CONTRAINDICATIONS**
Phenytoin is contraindicated in those pat[...] persensitive to phenytoin or other hydant[...]

**WARNINGS**
Abrupt withdrawal of phenytoin in epilep[...] precipitate status epilepticus. When, in the [...] clinician, the need for dosage reduction, [...] substitution of alternative antiepileptic med[...] this should be done gradually. However, in [...] allergic or hypersensitivity reaction, rapid [...] alternative therapy may be necessary. In th[...] tive therapy should be an antiepileptic drug [...] the hydantoin chemical class.
There have been a number of reports sugges[...] ship between phenytoin and the developmen[...] nopathy (local or generalized) including be[...] hyperplasia, pseudolymphoma, lymphoma[...] Disease.
Although a cause and effect relationship has[...] lished, the occurrence of lymphadenopath[...] need to differentiate such a condition from [...] lymph node pathology. Lymph node involve[...] with or without symptoms and signs resembl[...] ness eg, fever, rash and liver involvement[...]
In all cases of lymphadenopathy, follow-up [...] an extended period is indicated and every [...] made to achieve seizure control using altern[...] tic drugs.
Acute alcoholic intake may increase phen[...] while chronic alcoholic use may decrease ser[...] In view of isolated reports associating phen[...] erbation of porphyria, caution should be exer[...] this medication in patients suffering from t[...]
**Usage in Pregnancy:**
A number of reports suggests an associat[...] of antiepileptic drugs by women with epileps[...] incidence of birth defects in children born t[...] Data are more extensive with respect to phe[...] nobarbital, but these are also the most comm[...] antiepileptic drugs; less systematic or anecdo[...] gest a possible similar association with the [...] antiepileptic drugs.
The reports suggesting a higher incidence o[...] children of drug-treated epileptic women cann[...] as adequate to prove a definite cause and eff[...]
There are intrinsic methodologic problems inc[...] quate data on drug teratogenicity in human [...] or the epileptic condition itself may be more [...] drug therapy in leading to birth defects. The [...] of the mothers on antiepileptic medication [...] infants. It is important to note that antiep[...] should not be discontinued in patients in wh[...] administered to prevent major seizures bec[...] strong possibility of precipitating status e[...] attendant hypoxia and threat to life. In th[...] where the severity and frequency of the seizu[...] such that the removal of medication does not[...] threat to the patient, discontinuation of the [...] considered prior to and during pregnancy [...] not be said with any confidence that even th[...] not pose some hazards to the developing emb[...] prescribing physician will wish to weigh [...] ations in treating and counseling epilep[...] childbearing potential.
In addition to the reports of increased incide[...] malformation, such as cleft lip/palate and [...] tions in children of women receiving phen[...] antiepileptic drugs, there have more recentl[...] reports of a fetal hydantoin syndrome. This consists of [...] deficiency, microcephaly and mental defic[...] born to mothers who have received phenyt[...]

Exhibit H(2)

## 1594 Supplements for revisions

Skin rash, petechiae, urticaria, itching, photosensitive edema (general or of face and tongue; drug fever; [activity with desipramine.

[Hema]logic: Bone marrow depression including agranulocytosis; eosinophilia: purpura; thrombocytopenia.

[Gastroin]testinal: Nausea and vomiting, anorexia, epigastric distress, diarrhea; peculiar taste, stomatitis, abdominal cramps, black tongue.

[Endocrine:] Gynecomastia in the male; breast enlargement and galactorrhea in the female; increased or decreased libido, impotence; testicular swelling; elevation or depression of blood sugar levels; inappropriate antidiuretic hormone secretion syndrome.

[Other:] Jaundice (simulating obstructive; altered liver function; weight gain or loss; perspiration; flushing; urinary frequency; drowsiness, dizziness, weakness and fatigue; headache; parotid swelling; alopecia; proneness to falling.

Withdrawal Symptoms:  Though not indicative of addiction, abrupt cessation of treatment after prolonged therapy may produce nausea, headache and malaise.

## [DOSAGE AND ADMINISTRATION]

[Initially,] up to 100 mg/day intramuscularly in divided doses. [Intram]uscular administration should be used only for starting therapy in patients unable or unwilling to use oral medication. Oral form should supplant the injectable as soon as possible.

[Lower d]osages are recommended for elderly patients and adolescents. Lower dosages are also recommended for outpatients as opposed to hospitalized patients who will be under [close sup]ervision. Dosage should be initiated at a low level and increased gradually, noting carefully the clinical response and any evidence of intolerance. Following remission, maintenance medication may be required for a longer period of time, at the lowest dose that will maintain remission.

### DOSAGE

[Children] have been reported to be more sensitive than adults [to an ac]ute overdosage of imipramine hydrochloride. An [over]dose of any amount in infants or young children, [especia]lly, must be considered serious and potentially fatal.

Acute Symptoms:  These may vary in severity depending on [fac]tors such as the amount of drug absorbed, the [age of] the patient, and the interval between drug ingestion [and star]t of treatment. Blood and urine levels of imipramine may not reflect the severity of poisoning; they have [value] qualitative rather than quantitative value, and are [reliable] indicators in the clinical management of the [patient.]

[CNS abn]ormalities may include drowsiness, stupor, coma, [ataxia, r]estlessness, agitation, hyperactive reflexes, muscle [rigidity], athetoid and choreiform movements, and [convulsions.]

[Cardiac ab]normalities may include arrhythmia, tachycar[dia, evi]dence of impaired conduction, and signs of con[gestive f]ailure.

[Respirato]ry depression, cyanosis, hypotension, shock, vomit[ing, hyp]erpyrexia, mydriasis, and diaphoresis may also be [present.]

[Treatment:]  The recommended treatment for overdosage [with tri]cyclic antidepressants may change periodically. [Because i]t is recommended that the physician contact a [poison co]ntrol center for current information on treatment. [Because] CNS involvement, respiratory depression and car[diac arr]hythmia can occur suddenly, hospitalization and [observa]tion may be necessary, even when the amount [ingested is] thought to be small or the initial degree of intoxi[cation app]ears slight or moderate. All patients with ECG [abnorma]lities should have continuous cardiac monitoring [and be cl]osely observed until well after cardiac status has [returned to] normal; relapses may occur after apparent re[covery.]

[In the alert] patient, empty the stomach promptly by lavage. [In the obtu]nded patient, secure the airway with a cuffed en[dotrach]eal tube before beginning lavage (do not induce eme[sis). Admin]istration of activated charcoal slurry may help reduce [absorptio]n of imipramine.

[CNS] external stimulation to reduce the tendency to [convulse]. If anticonvulsants are necessary, diazepam and [paraldeh]yde may be useful.

[Maintain a]dequate respiratory exchange. Do not use respira[tory stim]ulants.

[Shock sh]ould be treated with supportive measures, such as [body pos]ition, intravenous fluids, and, if necessary, a [vasopress]or agent. The use of corticosteroids in shock is con[troversia]l and may be contraindicated in cases of overdosage [of tricycl]ic antidepressants. Digitalis may increase conduc[tion abno]rmalities and further irritate an already sensitized [myocard]ium. If congestive heart failure necessitates rapid [digitaliz]ation, particular care must be exercised.

[Fever sh]ould be controlled by whatever external [means are] available, including ice packs and cooling sponge [treatment.]

[Although] peritoneal dialysis, exchange transfusions [and hemod]ialysis have been generally reported as ineffec-

[tive, the] use of the rapid fixation of imipramine in tissues. Blood and urine levels of imipramine may not correlate with the degree of intoxication, and are unreliable indicators in the clinical management of the patient.

The slow intravenous administration of physostigmine salicylate has been used as a last resort to reverse severe CNS anticholinergic manifestations of overdosage with tricyclic antidepressants; however, it should not be used routinely, since it may induce seizures and cholinergic crises.

### HOW SUPPLIED

**Ampuls 2 ml—For intramuscular administration only**
  25 mg imipramine hydrochloride, 2 mg ascorbic acid, 1 mg sodium bisulfite, 1 mg sodium sulfite
  Boxes of 10 ..............................NDC 0028-0065-23
Store between 59°–86°F (15°–30°C).
Note:  Upon storage, minute crystals may form in some ampuls. This has no influence on the therapeutic efficacy of the preparation, and the crystals redissolve when the affected ampuls are immersed in hot tap water for 1 minute.

### ANIMAL PHARMACOLOGY & TOXICOLOGY

A. Acute:  Oral $LD_{50}$ ranges were as follows:
Rat                           355 to 682 mg/kg
Dog                           100 to 215 mg/kg
Depending on the dosage in both species, toxic signs proceeded progressively from depression, irregular respiration and ataxia to convulsions and death.

B. Reproduction-Teratogenic:  The overall evaluation may be summed up in the following manner:

Oral:  Independent studies in three species (rat, mouse and rabbit) revealed that when Tofranil is administered orally in doses up to approximately $2\frac{1}{4}$ times the maximum human dose in the first 2 species and up to 25 times the maximum human dose in the third species, the drug is essentially free from teratogenic potential. In the three species studied, only one instance of fetal abnormality occurred (in the rabbit) and in that study there was likewise an abnormality in the control group. However, evidence does exist from the rat studies that some systemic and embryotoxic potential is demonstrable. This is manifested by reduced litter size, a slight increase in the stillborn rate and a reduction in the mean birth weight.

Parenteral:  In contradistinction to the oral data, Tofranil does exhibit a slight but definite teratogenic potential when administered by the subcutaneous route. Drug effects on both the mother and fetus in the rabbit are manifested in higher resorption rates and decrease in mean fetal birth weights, while teratogenic findings occurred at a level of 5 times the maximum human dose. In the mouse, teratogenicity occurred at $1\frac{1}{2}$ and $1\frac{1}{2}$ times the maximum human dose, but no teratogenic effects were seen at levels 3 times the maximum human dose. Thus, in the mouse, the findings are equivocal.

C91-42 (Rev. 2/92)

Dist. by:
Geigy Pharmaceuticals
Ciba-Geigy Corporation
Ardsley, New York 10502

## TOFRANIL®                                                  ℞
[toe-fray´nill ]
imipramine hydrochloride USP
Tablets of 10 mg
Tablets of 25 mg
Tablets of 50 mg
For oral administration

### DESCRIPTION

Tofranil, imipramine hydrochloride USP, the original tricyclic antidepressant, is a member of the dibenzazepine group of compounds. It is designated 5-[3-(Dimethylamino)propyl] -10, 11-dihydro-5H-dibenz[b,f] azepine Monohydrochloride. Imipramine hydrochloride USP is a white to off-white, odorless, or practically odorless crystalline powder. It is freely soluble in water and in alcohol, soluble in acetone, and insoluble in ether and in benzene. Its molecular weight is 316.87.
Inactive Ingredients.  Calcium phosphate, cellulose compounds, docusate sodium, iron oxides, magnesium stearate, polyethylene glycol, povidone, sodium starch glycolate, sucrose, talc and titanium dioxide.

### CLINICAL PHARMACOLOGY

The mechanism of action of Tofranil is not definitely known. However, it does not act primarily by stimulation of the central nervous system. The clinical effect is hypothesized as being due to potentiation of adrenergic synapses by blocking uptake of norepinephrine at nerve endings. The mode of action of the drug in controlling childhood enuresis is thought to be apart from its antidepressant effect.

### INDICATIONS

Depression:  For the relief of symptoms of depression. Endogenous depression is more likely to be alleviated than other

[excited] states. One to three weeks of treatment may be needed before optimal therapeutic effects are evident.

Childhood Enuresis:  May be useful as temporary adjunctive therapy in reducing enuresis in children aged 6 years and older, after possible organic causes have been excluded by appropriate tests. In patients having daytime symptoms of frequency and urgency, examination should include voiding cystourethrography and cystoscopy, as necessary. The effectiveness of treatment may decrease with continued drug administration.

### CONTRAINDICATIONS

The concomitant use of monoamine oxidase inhibiting compounds is contraindicated. Hyperpyretic crises or severe convulsive seizures may occur in patients receiving such combinations. The potentiation of adverse effects can be serious, or even fatal. When it is desired to substitute Tofranil in patients receiving a monoamine oxidase inhibitor, as long an interval should elapse as the clinical situation will allow, with a minimum of 14 days. Initial dosage should be low and increases should be gradual and cautiously prescribed.

The drug is contraindicated during the acute recovery period after a myocardial infarction. Patients with a known hypersensitivity to this compound should not be given the drug. The possibility of cross-sensitivity to other dibenzazepine compounds should be kept in mind.

### WARNINGS

Children:  A dose of 2.5 mg/kg/day of Tofranil should not be exceeded in childhood. ECG changes of unknown significance have been reported in pediatric patients with doses twice this amount.

Extreme caution should be used when this drug is given to: patients with cardiovascular disease because of the possibility of conduction defects, arrhythmias, congestive heart failure, myocardial infarction, strokes and tachycardia. These patients require cardiac surveillance at all dosage levels of the drug:

patients with increased intraocular pressure, history of urinary retention, or history of narrow-angle glaucoma because of the drug's anticholinergic properties;

hyperthyroid patients or those on thyroid medication because of the possibility of cardiovascular toxicity;

patients with a history of seizure disorder because this drug has been shown to lower the seizure threshold;

patients receiving guanethidine, clonidine, or similar agents, since Tofranil may block the pharmacologic effects of these drugs;

patients receiving methylphenidate hydrochloride. Since methylphenidate hydrochloride may inhibit the metabolism of Tofranil, downward dosage adjustment of imipramine hydrochloride may be required when given concomitantly with methylphenidate hydrochloride.

Tofranil may enhance the CNS depressant effects of alcohol. Therefore, it should be borne in mind that the dangers inherent in a suicide attempt or accidental overdosage with the drug may be increased for the patient who uses excessive amounts of alcohol. (See PRECAUTIONS.)

Since Tofranil may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as operating an automobile or machinery, the patient should be cautioned accordingly.

### PRECAUTIONS

An ECG recording should be taken prior to the initiation of larger-than-usual doses of Tofranil and at appropriate intervals thereafter until steady state is achieved. (Patients with any evidence of cardiovascular disease require cardiac surveillance at all dosage levels of the drug. See WARNINGS.)

Elderly patients and patients with cardiac disease or a prior history of cardiac disease are at special risk of developing the cardiac abnormalities associated with the use of Tofranil.

It should be kept in mind that the possibility of suicide in seriously depressed patients is inherent in the illness and may persist until significant remission occurs. Such patients should be carefully supervised during the early phase of treatment with Tofranil, and may require hospitalization. Prescriptions should be written for the smallest amount feasible.

Hypomanic or manic episodes may occur, particularly in patients with cyclic disorders. Such reactions may necessitate discontinuation of the drug. If needed, Tofranil may be resumed in lower dosage when these episodes are resolved. Administration of a tranquilizer may be useful in controlling such episodes.

An activation of the psychosis may occasionally be observed in schizophrenic patients and may require reduction of dosage and the addition of a phenothiazine.

Concurrent administration of Tofranil with electroshock therapy may increase the hazards; such treatment should be

Continued on next page

The full prescribing information for each Geigy product is contained herein and is that in effect as of September 1, 1993.

2.6

Exhibit A 

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA

Criminal

Commonwealth

   vs.                                    CC-510-98

Jason Eric Benson

### ORDER OF COURT

         AND NOW, this 27th day of August, 1999, the Defendant appeared with counsel.  Counsel has indicated that she has filed an amended PCRA petition, which raises one issue which is legal in nature.  The argument is that the Court is without power to impose two separate sentences on count five and six in that there should have been only one conspiracy.

         IT IS ORDERED that a transcript be prepared of the proceedings that occurred on August 4, 1998 and filed of record.  Copies will be provided counsel at the initial cost of the County of Adams.

         Argument is scheduled for November 30, 1999 at 9:00 a.m.  PCRA counsel shall file her brief by November 9, 1998, and the Commonwealth shall file its brief by November 17, 1999.

                                    By the Court,


                                    _____
                                    Oscar F. Spicer
Michael A. George, Esq., DA         President Judge
Kristen L. Rice, Esq.



# ADAMS COUNTY PRISON
## GETTYSBURG, PA
### INMATE REQUEST SLIP

Exhibit B

INMATE:

INMATE ID#: Jason E Beard

BLOCK / CELL#: A-99

DATE: 08.26.99

REQUEST TO SEE: (CIRCLE ONE)  WARDEN – DEPUTY WARDEN – SHIFT SUPERVISION – BLOCK OFFICER - MENTAL HEALTH – DOCTOR – LAWYER – PAROLE OFFICER – PENNSYLVANIA PRISON SOCIETY

REASON FOR REQUEST: med that I must take Last night I was not given my Dilantin ... it is a life containing medication. Please ... medication to be given to all

DATE RECEIVED: _____

ACTION TAKEN: _____    RECEIVED BY: _____

---

# ADAMS COUNTY PRISON
## GETTYSBURG, PA
### INMATE REQUEST SLIP

INMATE: Jason E Beard

INMATE ID#: _____

BLOCK / CELL#: _____

DATE: 08.27.99

REQUEST TO SEE: (CIRCLE ONE)  WARDEN – DEPUTY WARDEN – SHIFT SUPERVISION – BLOCK OFFICER - MENTAL HEALTH – DOCTOR – LAWYER – PAROLE OFFICER – PENNSYLVANIA PRISON SOCIETY

REASON FOR REQUEST: I have not ... I must have my medication ... afternoon since the ... PLEASE GET ME MY MEDS

DATE RECEIVED: _____    RECEIVED BY: _____

ACTION TAKEN: _____

Exhibit C, page 1.

ACPF #36

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _Benson, Jason_    ACP# _99-00740_ DATE _8/27/99_

HOUSING AREA _A-Block_    LOCATION OF INCIDENT _Intake_

TIME: _1120_    a.m.
p.m.

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _On above time & date I, Sgt Heintzelman was asked to help with Inmate Benson, Jason at intake. Inmate Benson, Jason didn't want to strip after court._

Action and Comments: _TAKEN TO GETTYSBURG E.R. 710 FOR EVALUATION AS A RESULT OF THE O.C. AND THE INMATES REQUEST. A.S.L. NOTIFIED & C.O.'s ASSURED CUSTODY. Ea. ALLEGATIONS ASSAULT BY A MEDICAL EVENT WAS UNDER TRIAL_

Shift Commander
Signature and I.D. No.: _____    60    Date and Time _8-27-99  1600_

Print Name _M. Tracey_

Report of Incident: _On above time & date I, Sgt Heintzelman was asked to help with Inmate Benson, Jason in the Intake area. Inmate Benson was having a problem that he didn't want to be strip after coming back from court. He was asked to strip but he refused to do so. At that time he was sprayed & then he started to hit his head on the computer screen. After this he wouldn't stop so he was taken to the floor until he had enough & then he was placed in the shower._

(over for continuation)

Staff Signature
and I.D. No: _Sgt Heintzelman  61-4_    Date and Time _8/27/99  1300_

Print Name _Heintzelman_



Exhibit C    ACPF #3C
page 2

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME Benson, Jason                    ACP# 99-00740   DATE 8/27/99

HOUSING AREA A-Block                  LOCATION OF INCIDENT Medical Office

                                      TIME: 1145 hrs

Brief Summary of Incident:
(Include Staff and Inmate Names and Number)   Use of force

Action and Comments: Inmate showered, transferred to E-Block and transferred to ER and examined by the on-duty physician.

PSP notified to press charges.

*Incident was video documented

Shift Commander
Signature and I.D. No.: _B.A. Cluck_                Date and Time 8/27/99  1500 hrs

Print Name  B.A.Cluck

Report of Incident: On the above time and date, I was informed by Lt. Jennings that the aforementioned inmate was refusing to submit to a strip-search upon returning from court. I attempted to speak w/ Inmate Benson about his actions but he only began yelling profanities and making comments like, "Fuck this! This is fucking Bullshit! I'm not striping!" He was again asked to cooperate and submit to a search and he again refused. At that point, Lt. Jenning sprayed a one second burst of OC spray (Foam) into Benson face. Benson then began calling staff present, "fucking animals," "cock suckers"

(over for continuation)

Staff Signature
and I.D. No: _B.A. Cluck_  2              Date and Time 8/27/99  1500 hrs

Print Name  B.A.Cluck

EXHIBIT

**PENNSYLVANIA STATE POLICE**
**PROPERTY RECORD**

SP 7-007 (3-94)

**4. STATUS**
☒ EVIDENCE ☐ FOUND ☐ RECOVERED ☐ RECEIPT ☐ OTHER

7. SUBMITTING OFFICER

10. INVESTIGATING OFFICER

12. FOUND OR RECOVERED FROM/SIGNATURE

14. CODES:

**STORAGE AREA**
1. PROPERTY ROOM    3. EXPLOSIVE MAGAZINE
2. SAFETY DEPOSIT BOX    4. NON-DEPARTMENT

**ITEMS - (ONE ITEM PER LINE)**

**DISPOSITION**
1. DESTROYED    4. RELEASED TO OWNER/FINDER
2. ESCHEATABLE    5. DONATED
3. EXPENDED IN LABORATORY

**REMOVAL CODE**
1. CUSTODY    3. LABORATORY
2. COURT    4. OFFICE

5. OFFENSE

8. RECEIVING OFFICER

11. SIGNATURE OF RECEIVING OFFICER

6. STATION / DISTRICT OFFICE

| 23 DATE & TIME | 24. ITEM(S) NO. | 25. OFFICER'S SIGNATURE - BADGE NO. | 16. TYPE PROPERTY | 17. CODE | 18. QUANTITY | 19. VALUE | 20. STORAGE AREA CODE | 21. DISPOSITION CODE |
|---|---|---|---|---|---|---|---|---|
| | 1 | | 27 | 01 | 1 | | | |

26. CUSTODIAL OFFICERS INIT./BADGE NO.

27. REMOVAL CODE & LOCATION

28. ESTIMATED DATE OF RETURN

29. COMPUTER ENTRY

30. I HEREBY CERTIFY THAT I AM THE OWNER OF PROPERTY OR AUTHORIZED AGENT TO RECEIVE ITEM(S)

31. CLAIMANT'S NAME

32. CLAIMANT'S SIGNATURE

OWNER'S NAME    OWNER'S SIGNATURE    ADDRESS    DATE    TELEPHONE NO.

PROPERTY RECORD CONTINUATION ☐

2. INCIDENT NO.    3. DESIGNATION/INVEN. OR

*Exhibit E, page 3*
ACPF #36

# ADAMS COUNTY PRISON
## EXTRAORDINARY OCCURRENCE REPORT

NAME _BENSON, JASON_    ACP# _990740_  DATE _8/27/99_

HOUSING AREA _E-2_    LOCATION OF INCIDENT _MEDICAL ROOM_

APP. TIME: _11:10_

Brief Summary of Incident:
(Include Staff and Inmate Names and Number) _FORCE USED ON INMATE BENSON_
_JASON (990740). WARDEN DURAN DEPUTY WARDENS CLUCK_
_AND HANKEY, LT. JENNINGS, SGT. HEINTZELMAN,_
_OFFICER SHELTON_

Action and Comments: _TAKEN TO E.R. @ 1310 FOR MEDICAL ATTENTION_
_AS A RESULT OF O.I.C. AND INMATE'S REQUEST._
_PSP NOTIFIED TO FILE CRIMINAL CHARGES_
_FOR AGGRAVATED ASSAULT BY PRISONER._
_ENTIRE EVENT WAS VIDEO-TAPED._

Shift Commander
Signature and I.D. No.: _____ 617    Date and Time _8-27-99 NOW_

Print Name _Lt. Jenns_

Report of Incident: _ON THE ABOVE DATE & APP. TIME, LT. JENNINGS_
_INFORMED ME THAT INMATE BENSON, UPON HIS RETURN_
_FROM COURT WAS REFUSING TO BE STRIP-SEARCHED._
_I REPORTED TO THE LT'S OFFICE AND MET LT._
_JENNINGS WHO BRIEFED ME ON WHAT HAD TRANSPIRED_
_THIS FAR. A PLAN WAS DEVISED AND WE REPORTED_
_TO THE MEDICAL ROOM, WHERE DEPUTY WARDEN_

(over for continuation)

Staff Signature
and I.D. No: _____ #1    Date and Time _8/27/99  3:10 PM_

Print Name _DURAN_

Exhibit 'E'



# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

**NAME:** BENSON, JASON E
**MR:** 177556

**DATE OF VISIT:** 08/27/1999

**HISTORY:** This 22 year old presents to the Emergency Department in handcuffs and ankle cuffs for evaluation of injuries sustained in a "scuffle" with the prison guards  The patient states that he was "man handled" by the prison guards, was taken down, and felt like he was being kicked, although he was maced at the time and couldn't really see how he was being taken down  He complains of numbness in his knuckles, pain in his back and chest, and in the back of his head  His last tetanus booster was about a month ago

**MEDICATIONS** Ativan once daily  Had a dose earlier this morning  Feels stressed out right now and wants more Ativan

**PHYSICAL:** The patient is awake, alert, appears in no acute or severe distress although he appears apprehensive  He is afebrile  Blood pressure is 132/90, pulse 92, respirations 20 and not labored

| | |
|---|---|
| HEENT | Reveals superficial contusion of the right frontotemporal scalp  No other scalp injury is noted  He has conjunctival injection  Tympanic membranes are normal  Pupils are equal and react normally  EOM's intact  There is no facial asymmetry  Speech is normal  There is no tenderness of his neck  There is no apparent pain with neck motion  He has tenderness to palpation of the paraspinous lumbar muscles  He has point tenderness over the right inferolateral thorax  He has no pain in that area with AP compression of his chest  There is no crepitus noted |
| LUNGS | Clear and equal and he is breathing deeply and ventilating well |
| ABDOMEN | Soft and nontender |
| EXTREMITIES | Lower extremity exam is normal  Exam of the upper extremity reveals a few superficial handcuff type contusions of the skin  His neuro exam to the upper extremities is normal  Capillary refill is intact  Sensation and color is normal |

**TREATMENT/PLAN:** The patient is given 1 mg of Ativan by mouth, released in the care of the prison guards, and is to follow with Dr Posner  He is to be given Tylenol as needed for discomfort

**IMPRESSION:** Multiple contusions

WJS dh
DD  08/27/1999 DT  08/27/1999 14 17

SIGNED BY   WILLIAM J STEINOUR, MD

Exhibit



# THE GETTYSBURG HOSPITAL

## EMERGENCY DEPARTMENT REPORT

NAME:     BENSON, JASON E
MR:         177556

I plan to speak to the next doctor up for unassigned admission about this patient  With three seizures in a short period of time, I feel that he should be admitted to the hospital for more close observation

IMPRESSION:  Multiple seizures

TWH dli
DD  08/30/1999 DT  09/01/1999 11 34

SIGNED BY   TIMOTHY W HOLLAND, MD   9/2/99

MR164 11/91          EMERGENCY DEPARTMENT REPORT          PAGE 2 OF 2





*Exhibit F*
*page 1*

# THE GETTYSBURG HOSPITAL

### EMERGENCY DEPARTMENT REPORT

**NAME:**  BENSON, JASON E

**MR:**  177556

**DATE OF VISIT:** 8-31 D  08/30/1999

**CHIEF COMPLAINT**  Seizure

**HISTORY:** The sheriff that transported this patient from prison says he was told that this patient had a small seizure about an hour and a half ago and then a larger one more recently that prompted the decision to transport this gentleman to the Emergency Department  He was noted to be bleeding from his mouth following the second seizure  He was apparently transported to the Emergency Department in the police cruiser in a conscious condition but shortly after arriving here, had another seizure which occurred in our parking lot area  This was observed by paramedic staff and was observed to be significant  When I went out to the parking lot area, he was noted to be apparently post ictal with bloody mucous coming from his mouth  His respirations were somewhat labored  He was transported into the Emergency Department for further evaluation

**PAST MEDICAL HISTORY**  Positive for seizures in the past.  He has been worked up with neurology consults, numerous CT's and I believe EEG  It is believed he has a seizure disorder although he apparently had seizures prompted or precipitated by his multi drug use which includes cocaine, marijuana, and ecstasy  He was seen here a couple of days ago by Dr Steinour for injuries related to a scuffle with prison guards  He apparently was maced at that point but was treated and released with a diagnosis of multiple contusions

**MEDICATIONS**  Faxed to us from prison are Serzone, Ativan p r n and Imipramine  He apparently is on no anticonvulsants

**PHYSICAL:** On arrival in the Emergency Department the patient is pale, diaphoretic, unresponsive with somewhat snoring respirations. O2 saturation initially was about 88% range  He was somewhat resistant to maintaining oxygen mask on his face but as he became more lucid he became calmer and his O2 saturation improved into the high 90's  Within the period of 15 minutes or so in our department, he was able to look towards me in response to his name being called and able to follow simple commands such as opening his mouth –

| | |
|---|---|
| HEENT | He has a little minor ecchymosis in his left postauricular area  Pupils are equal  TM's, nares unremarkable  Exam of his mouth I believe shows an abrasion of the right lateral tongue |
| NECK | Appears to be supple |
| LUNGS | Clear anteriorly |
| HEART | Regular rhythm |
| ABDOMEN | Soft |
| EXTREMITIES | He was initially wearing handcuffs but was switched to leg shackles by the sheriff that brought him in  He seems to have movement in all his arms and legs |

**TREATMENT/PLAN:** Since this seizure witnessed by us in the Emergency Department was his third in a short period of time, he was given a loading dose of Dilantin 1 gram IV  Blood work has been drawn which shows a white count of 17 6 with a normal H&H and platelet count  Chem panel 2 is pending



# THE GETTYSBURG HOSPITAL

## CONSULTATION REPORT

0300410351    17-75-56

NAME   JASON BENSON

FENSON, JASON E
KANSLER, DAVIC F MD
[ZC7A 09/27/1976 22Y M

DATE AND TIME OF REQUEST  30AUG99   0900

TO DOCTOR   DR MESSER

OPINION ONLY  [ Y ]    TREAT AND FOLLOW  [ a ]

REASON FOR CONSULTATION:

RECURRENT SEIZURES

REQUESTING PHYSICIAN:   DR KANSLER

| DATE | TIME | SIGNATURE | PERSON NOTIFIED OF REQUEST |
|------|------|-----------|----------------------------|
| 30AUG99 | 0910 | | DEB |

REPORT OF CONSULTATION (Findings, Diagnosis, Recommendations)

22Y.O. WM WITH H/O EPILEPSY SINCE 12 Y.O. P.H. OF "PETIT MAL" (PROBABLY COMPLEX-PARTIAL SEIZURES) + GENERALIZED. EEG'S 3/89 + 4/90 → L TEMPORAL FOCUS  EEG 8/97 ⊖ ⓐ A.M. FOR SEIZURE 2° TO PT. D/C OF DILANTIN + DRUG USE.   CLO MG RANE SERZONE, ATIVAN, IMIPRAMINE PTA FROM COPRISON. R/C IV. DILANTIN + GM.   LAB OK BUT ↑ WBC ↓ CO₂ C/W POST-ICTAL STATE.  HAD TI SZ THIS AM 0440 → ONSET IN SLEEP   D/C'ED DILANTIN × 4 MOS

EXAM:  NECK SUPPLE.   M.S. — ALERT + ORIENTED, NO APHASIA. MEMORY OK   CN — VIS FIELDS ✓  FUNDUS ✓   NO PAPILLEDEMA PRESENT, EOM'S — FEW BEATS ⊕ NYSTAGMUS IN ALL DIRECTIONS (C/W DILANTIN LOAD.)  HEARS ✓  TONGUE ✓   MOTOR — NO DRIFT  POWER  R=L   TONE ✓  SENS — DTR'S 1-2+ R=L   TOES ↑↑
EEG TODAY → L DISCHARGE
IMP  ① SEIZURE DISORDER; ② STATUS EPILEPTICUS @ AM 2° TO D/C OF DILANTIN ± EFFECTS OF OTHER DRUGS ON SEIZURE THRESHOLD
SUGGEST — ✓ DILANTIN LEVEL IN AM  IF >10 BUT <20 R/C 200 MG PO BID. OR PREVIOUS DOSE KNOWN TO BE EFFECTIVE

SIGNATURE OF CONSULTANT

## CONSULTATION REPORT

White - Medical Records          Yellow - Consulting Physician



*Exhibit F, page 3*

# THE GETTYSBURG HOSPITAL

## CRITICAL CARE UNIT
## BASIC ANTI-ARRHYTHMIA THERAPY



```
0300410351   17-75-56
FENSON, JASON E
KAHSLER, DAVID F  MC
E2C7A 09/27/1976  22Y  M
```

Registered Nurses in the Critical Care Unit are authorized to act immediately in the following life threatening situations with the following medications after a reasonable diagnosis has been made and while the physician is being called

**1**    **Death Imminent**  Patient unconscious

a    Ventricular Fibrillation /Pulseless Ventricular Tachycardia
CPR   Defibrillate with 200 watt seconds *  If no conversion call Code Blue, defibrillate with 300 watt seconds  If no conversion, defibrillate with 360 watt seconds  If still no response, give Epinephrine 1 10,000 1mg IV PUSH, defibrillate with 360 watt seconds  Give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 360 watt seconds  Follow with Lidocaine drip of 250 D₆W with Lidocaine 1 gram at 2mg/minute  Follow Code Blue Procedure

b    Ventricular Tachycardia  (with palpable pulse)
Defibrillate with 100 watt seconds  If no response, defibrillate with 200 watt seconds  If no response, call Code Blue, defibrillate with 300 watt seconds  If no response, give Lidocaine 1mg/kg IV PUSH (not to exceed 100mg per bolus) and repeat defibrillation with 300 watt seconds  Follow with Lidocaine drip at 250cc D₅W with Lidocaine gram 1 at 2mg/minute  Follow Code Blue Procedure

c    Severe Bradycardia (rate less than 30)
Atropine 1.0mg IV PUSH  May repeat Atropine q. 3 - 5 minutes for total 2mg  Consider CPR  Prepare patient for transcutaneous pacing

d    Asystole
CPR  Call Code Blue  Give Epinephrine 1 10,000 1mg IV PUSH  CPR  Give Atropine 1mg IV PUSH  Follow Code Blue Procedure

**2**    **Life Threatening.**  Patient still conscious but symptomatic  If physician is not immediately available then

a    Ventricular Tachycardia (3 or more PVCs in sequence)
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100mg per bolus)
Lidocaine drip at 2mg/minute

b    PVCs 6 or more a minute, multi-focal in nature, coupling or occurring of T wave
Lidocaine bolus 1mg/kg IV PUSH (not to exceed 100 mg per bolus)
Lidocaine drip at 2mg/minute

c    Bradycardia  Rate less than 40 or 50 a minute and patient symptomatic  (Consciousness altered or blood pressure dropped)
Atropine  5mg IV PUSH  If rate further drops, follow immediately with second dose of 5mg IV PUSH  If rate does not significantly increase in 2 to 5 minutes, give additional  5mg IV PUSH  Prepare patient for transcutaneous pacing



# Monaghan & Gold P.C.
## ATTORNEYS AT LAW

Alan S. Gold
John F. X. Monaghan, Jr.
Alexander R. Ferrante
Robert F. Fortin
Murray R. Glickman
Kenneth W. Taylor
Tanya M. Sweet
Francis D. Hennessy
Sean Robins*
Eric B. Greenberg*
Leslie L. Gallagher*
*Also member of New Jersey bar

MANOR PROFESSIONAL BUILDING
7837 Old York Road
Elkins Park, PA 19027
(215) 782-1800
FAX (215) 782-1010

Of Counsel
Barbara Malett Weitz
Alan L. Butkovitz
Steven M. Zelitch

March 28, 2001

RECEIVED
SCRANTON

MAR 2 9 2001

PER _____
            DEPUTY CLERK

**VIA UPS - NEXT DAY AIR**

Clerk of Court
United States District Court
Middle District of Pennsylvania
William J. Nealon Federal Building
  & U.S. Courthouse
235 N. Washington Avenue
Scranton, PA  18501

Re:    **Jason E. Benson v. William G. Ellien, M.D., et al.**
       **U.S.D.C., Middle Dist. of PA, No. 1:CV-00-1229**
       **Our File No.:  076-1441** _____

Dear Sir/Madam:

Enclosed please find our check in the amount of $10.50 for a copy of Plaintiff's **Amended Complaint** in the above-captioned case. I have enclosed a UPS - Next Day Air envelope for your convenience.

If you should have any questions, please do not hesitate to contact me. Your courtesy with regard to the above is appreciated.

Very truly yours,

SEAN ROBINS

SR:js
Enclosures

Sep 26 00 02:49p

# Chart



p.55

# PHYSICIAN'S ORDERS

Exhibit F

Benson JASON
DS6483
9-27-76
SCISM

Drug Allergies:
NKA

Self-Medication Program ☐ Yes ☐ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS |
|---|---|---|
| 0910 4-28-99 | | ① MRI |
| | | S. CRAIG HOFFMAN PA - C |
| 6/4/99 0915 | A | ① D/C Dilantin |
| 6-4-99 0920 | | RONALD A LONG, M.D. |
| 6-8-99 1515 | A | ① Cont on surgery clinic |
| | | RAY McMULLEN, PA-C WHS |
| 7-23-99 | | DR. MIGUEL SALOMON M.D. |
| | | DR. MIGUEL SALOMON M.D. |

This information is strictly CONFIDENTIAL and is for the use of only the person or agency to whom it is addressed. These reports are not to be made available to any person

DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

INSTRUCTIONS

RCVD JUL 27 99

Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.

1. TO: (NAME AND TITLE OF OFFICER)
WARDEN

2. DATE
7.27-99

3. BY: (INSTITUTIONAL NAME AND NUMBER)
DSO485 JASON E. BENSON

4. COUNSELOR'S NAME
BUTLER

5. WORK ASSIGNMENT

6. QUARTERS ASSIGNMENT
GG-15

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

Due to recent information, I have a major concern as to the Pennsylvania D.O.C.'s policy on the upcoming Y2K event horizon. I have been informed that there have been serious security leases filed on the outside, all military and police and F.B.I. leaves have been cancelled, as well as urban assault training scenarios from coast to coast. Over 80 F.E.M.A. encampments have been built all of which indicate preperation of martial law, what does D.O.C. policy indicate to the treatment of inmates? I am aware of a document that was introduced to the United Nations born of 1994 called The Global Biological Basement (www.UnitedNations.org). This 896 page document describes this current chain of events as if it were protocol. Does this document contain any protocol to the treatment of our nations inmate population? I would appreciate an expedited response. Thank you very much for your time.

~JB

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                           ☐ TO DC-14 CAR AND DC-15 IRS

STAFF MEMBER                                                              DATE

07/28/99    15:51    LMS → 814 533 3913                        NO.834    P02

| DC-14 | |
|---|---|
| **CUMULATIVE ADJUSTMENT RECORD** <br> <u>SCI-S</u> <br> Institution | **COMMONWEALTH OF PENNSYLVANIA** <br> **DEPARTMENT OF CORRECTIONS** |

| INSTITUTIONAL NUMBER | PBP NUMBER | NAME |
|---|---|---|
| D56483 | | Benson Jason |

**OBSERVATION**

| DATE | |
|---|---|
| 7/22/79 | Mr. Benson was seen in psychology due to a request slip. He indicated he is having panic attacks, feels very anxious and usually can not fall asleep until dawn. He alleges he has felt like this in the past and was sent to a hospital in Hanover on the psychiatric unit. <br><br> He indicates he will take meds. if necessary but indicated last time he was trying to go natural. He has not seen a psychiatrist here yet. ~~There~~ ~~cause~~ A referral has been sent to psychiatry. <br><br> S. Trautman <br> MES <br> PSS |
| 8/3/79 | Inmate seen due to request slip sent to Supt. Morgan regarding the Y2K situation. Inmate claims that President Kennedy signed an executive order in 1962 allowing all inmates to be killed in the event of martial law being imposed on the country. Based on recent events, Benson |

(OVER)

Jason Benson
27 July 1999
1615 hours
Problem #B

**Smithfield -- Progress Note for Psychiatry:**
The patient was clinically evaluated, today, for
psychiatric needs.  First appointment here.
S.  The patient reported that he has been adjusting
well at Smithfield overall.  He has begun to have
periodic periods of feeling dizzy, confused, tightness
in his chest, sweating and feels that the "whole world
stops".  He has also had problems with sleep but he
denies any energy, appetite or mood problems and he
has had no suicide thoughts or psychotic symptoms.
He has been hospitalized for this in the past.  We
discussed "temporary" use of Ativan and "preven-
tive" treatment with Tofranil.  We reviewed for each
medicine its benefits and indications, its side effects
and precautions and medicine--medicine interactions.
He noted his understanding and gave consent.
O.  Current Medication:  no medicines at present.
**Affect:** anxious, irritable;      **mood:** anxious
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
Diagnosis:  Panic Disorder without agoraphobia
    ICD-9 CM:  300.01
    Axis 5:  GAF = 52
P.  1.  Next appointment in 1 month.
    2.  Begin Tofranil 50mg hs for 1 week, then
        increase to 75mg for 1 week, then increase to
        100mg hs, daily.
    3.  Check Tofranil blood level in 3 weeks.
    4.  Ativan 1mg q6hrs PRN anxiety attack:  max of
        2 doses/day; 6 doses/week.

_William G. Ellien MD_
William G. Ellien, M.D.

Progress Notes
Commonwealth of PA
Dept. of Corrections
DC-472

Inmate Name:  Jason Benson
Inmate Number:  DS 6483
DOB:  9-27-76
Institution:  Smithfield

# PHYSICIAN'S ORDERS

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: Smithfield

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS | 1 |
|---|---|---|---|
| 7-27-99 1615hrs | 6 | ① Next appointment in 1 month. | |
| | | ② Ativan 1mg PO q 6 hrs PRN anxiety attack: • max 2 doses/day; • max 6 doses/week; for 1 month | |
| | | ③ Begin Imipramine 50mg PO hs, daily, through 3 Aug '99 | |
| | | ④ On 4 Aug 99 - increase Imipramine to 75mg PO hs, daily, through 10 Aug 1999 | |
| | | ⑤ On 11 Aug 99 - increase Imipramine to 100 mg PO hs, daily, for 5 months | |
| | | ⑥ On/about 19 Aug 1999 - obtain Tofranil (Imipramine + desipramine) blood level in AM | |
| | | William G. Fleming MD | |

Sep 26 00 02:34p                                                                p. 7

07/28/99    15:51    CMS  814 5JJ 991J                        NO.834    503

| DATE | CUMULATIVE ADJUSTMENT RECORD (Cont.) |
|------|--------------------------------------|
|      | OBSERVATION                          |

8/3/99
(cont.)

believes that after the "Y2K" disaster, martial
law will be imposed. He indicated that 60
F.E.M.A. (federal emergency management agency) internment
camps have been opened across the country
and that all military, F.B.I. and police leaves
have been cancelled in preparation for the
impending Y2K disaster. Benson indicated that the
government is secretly conducting mass inocu-
lations of the public which is causing people to
become violently ill. He also alluded that the
government is secretly implanting biological
computer chips into people's bloodstreams. He
stated that Connie Chung was fired from her t.v.
news reporter job because she began to uncover
government secrets. He discussed the incorporation
of crop circles and UFO sightings into the Y2K
scenario. Benson was adamant that he is
not crazy and that this is all rational and
legitimate thinking which deserves an appropriate
answer. Denies feeling paranoid. Claims he wants
to be prepared for what will happen to him.
Says he is spiritually ready to die but absolutely
denies any suicidal/homicidal ideation. States
he feels bad for the children who will be
raised after the impending Y2K disaster and
feels sad for his family members who will

Sep 26 00 02:34p                                                                      p.6

07/26/99    15:51    CMS + 914 533 9913                              NO.034    P04

| DC-14 | CUMULATIVE ADJUSTMENT RECORD | COMMONWEALTH OF PENNSYLVANIA DEPARTMENT OF CORRECTIONS |
|---|---|---|

SCIS
Institution

| INSTITUTIONAL NUMBER | FBP NUMBER | NAME |
|---|---|---|
| DS6483 | | Jason Benson |

| DATE | OBSERVATION |
|---|---|
| 8/3/99 (cont.) | be left behind. During the entire conversation, Mr. Benson spoke as if we were discussing any routine event. He remained very calm and spoke in a normal tone. States that he and his cell mate talk about this often. He suggested that I do whatever is necessary to prepare for this event. He offered to name several websites from the Internet where this information could be accessed. Cell to Ms. Troutman, B.S.S. Benson is scheduled to see the psychiatrist and this information will be made available to the doctor also |

(OVER)

**CONFIDENTIAL**

**PSYCHIATRIC EVALUATION**

**INMATE NAME: BENSON, JASON**                    **DOC NUMBER: DS6483**

**DATE OF EVALUATION: 8/19/99**

**INSTITUTION: SCI-Smithfield**

**Patient Evaluation:** The patient is seen today, earlier than his scheduled appointment as he stopped Tofranil 50 mg hs after taking it for three days. It was started on July 27, 1999, however, he stopped it for feeling nauseated and sick. He acknowledges that nausea is one of the symptoms of panic disorder. However, he claims that the medication aggravated nausea "twice as much."

Since his first panic attack in 1996, the combination of Xanax or Ativan and Ambien was most successful to control panic attacks. However, due to the high cost of medications and some other reasons, he has been tried on many other different medications with no great success. He has been tried on different antidepressants, tricyclics, SSRI, or a typical antidepressant and nothing seems to work.

Typically, he would go to bed around 9:30 or 10:00 p.m. and try to read to induce sleep. However, he is not able to sleep until 5:00 a.m. and can sleep only a couple hours to start the day.

His anxiety attacks typically would last one or two minutes before he would snap out of it. Recently, he has experienced anxiety attacks approximately once a day, seven or eight times a week. He claims that if he is able to sleep well at night, the next day would be easier and he would not have problems going through the day.

He reports that previously he was tried on Desyrel up to 300 mg hs with no benefit. He says, so far, he has not tried Serzone. After discussion, he is agreeable to trial of it.

**Diagnosis:** No change.

**Recommendation:**
1. Discontinue imipramine.
2. Start Serzone 100 mg p.o. hs for 3 days, then 200 mg p.o. hs for 30 days.
3. Review with Dr. Ellien as previously scheduled that is one month from July 7, 1999.

_____
Jin Ha Yun, M.D.
Psychiatrist

Received

AUG 2 7 1999
SCI-Smithfield
Medical Records Department

Filed
AUG 2 7 1999
SCI-Smithfield
Medical Records Dep.

R6

**CONFIDENTIAL**

**PSYCHIATRIC EVALUATION**

**INMATE NAME: BENSON, JASON**                    **DOC NUMBER: DS6483**

**DATE OF EVALUATION: 9/1/99**

**INSTITUTION: SCI-Smithfield**

**S:** Mr. Benson informs me that he was just down at the county prison for a few days for legal matters. While he was there, he had a grand mal seizure and was admitted to the ICU. He demonstrates the lacerations produced by his teeth on the edge of his tongue. Mr. Benson informs me that he had been off his Dilantin some time during the month of August.

Mr. Benson reports that since he has been on Serzone, he has noticed no decrease in the intensity or frequency of his panic attacks and that he still has problems sleeping.

**O:** Mr. Benson is pleasant and cooperative throughout the interview process. He has a broad range of affect that is generally appropriate to context other than some nervous laughter when he is describing his seizures. He presents no suicidal or hostile ideation.

**A:** Panic attacks with agoraphobia (300.21), mixed personality disorder and seizure disorder.

**P:** We discussed the lowering of seizures produced by mini psychotropic medications and the habituating potential of Xanax and Ativan and the distinct fluctuations in there concentrations in his body particularly with any irregularity of usage.

I have written orders to discontinue Mr. Benson's Serzone and have written orders for Klonopin .5 mg in the morning and 1 mg in the evening hoping to enhance his protection against seizures and reduce his anxiety symptoms without taking inordinate risks of habituation. I would like to see him for a follow-up visit in one month.

                                          Eugene Polmueller, M.D.
                                          Psychiatrist

EP/mgr
D:9/1/99
T:9/2/99


SCI-SMITHFIELD
Medical Records Dept

# PROGRESS NOTES

[✓] Outpatient                                                                [ ] Inpatient

| Date/Time | Prob # | Discipline Abbreviation | Remarks<br>Subjective, Objective, Assessment, Plan |
|---|---|---|---|
| 9-23-99<br>1600 hrs | B | MD | <u>Psychiatry Clinic Note:</u> The patient was evaluated in F/U by Dr. Ellien. We discussed S+s and meds: |
| | | | S. Patient is sleeping poorly which, in turn, worsens anxiety. He denies full panic attacks and believes if sleep can be helped, anxiety will be back under control. We discussed TCA's: Pamelor (on-age 116) → Sinequan; + Neurontin. Patient pointed out he did well, in past, on Ambien 10 mg. |
| | | | O. affect + mood: anxious. No agitation. |
| | | | Dx: 300.21        GAF = 54 |
| | | | P. 1. Begin Ambien 10 mg PO hs, daily |
| | | | 2. Con't Klonopin 0.5mg q AM + 1mg hs |
| | | | 3. F/U - 2 weeks.        William H Ellien MD |

**Progress Notes**
**Commonwealth of Pennsylvania**
**Department of Corrections**
**DC-472**

Inmate Name: Jason Benson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: SCT - Smithfield

# PHYSICIAN'S ORDERS

Inmate Name: Jason Benson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: SCI- Smithfield.

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS | 1 |
|---|---|---|---|
| 9-23-99 1600 cont | B | ① Next appointment in 3 weeks | |
| | | ② Begin Ambien 10 mg PO HS daily, for 5 months. | |
| | | ③ Con't Klonopin 0.5 mg PO q AM and 1 mg PO HS, daily, for 5 months. | |
| | | William Olsen MD | |

**Jason Benson**
**19 Oct. 1999**
**1650 hours**
**Problem #B**

<u>**Smithfield – Progress Note for Psychiatry:**</u>
The patient was clinically evaluated, today, for psychiatric needs. Last appointment on 9-23-99.
S. The patient is currently in the infirmary due to intentional overdose with Dilantin. He reported that he has been trying to get help but can't get anyone to listen to him (please refer to my note of 9-23-99 when focus was on sleep problems. He had previously reported adjusting well at Smithfield. He currently states that since he survived his overdose, God must intend for him to live. He denies any current suicide thoughts. He also denies current depression or anxiety. After last appointment when Ambien was started, he initially felt it had helped him but then "I got used to it". We discussed medicine options I had previously proposed: Pamelor (prescribed for patient at age 16), Sinequan and Neurontin. We agreed to allow for clearing of overdose related sedation and physical effects and then to meet to discuss one of these options. He has never been psychotic.
O. <u>Current Medication</u>: Ambien 10mg hs; and
   Klonopin 0.5mg qAM (skips) and 1mg hs, daily.
<u>Lab</u>: Dilantin blood level reported to be = 37.5.
<u>Affect</u>: somnolent;     <u>mood</u>: "rough".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
<u>Diagnosis</u>: Panic Disorder without agoraphobia
   <u>ICD-9 CM</u>: 300.01
   <u>Axis 5: GAF</u> = 49
P. 1. Next appointment in 1 day.
   2. Cancel Ambien order.
   3. Continue Klonopin 0.5mg qAM and 1mg hs.

*William G. Ellien MD*
William G. Ellien, M.D.

**Progress Notes**
**Commonwealth of PA**
**Dept. of Corrections**
**DC-472**

Inmate Name: Jason Benson
Inmate Number: DS 6483
DOB: 9-27-76
Institution: Smithfield

## PHYSICIAN'S ORDERS

| | |
|---|---|
| Inmate Name: | Jason Benson |
| Inmate Number: | DS 6483 |
| DOB: | 9-27-76 |
| Institution: | SCI-Smithfield |

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☑ No

| Date/Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS | 1 |
|---|---|---|---|
| 10-19-99 1150hrs | B | ① Next appointment in 1 day or 7 days – when/after released from infirmary. ② Cancel Ambien order. William S Elsier MD | |

Jason Benson
8 Nov. 1999
1450 hours
Problem #B

**Smithfield – Progress Note for Psychiatry:**
The patient was clinically evaluated, today, for psychiatric needs. Last appointment on 10-19-99.
S. The patient has fully recovered from overdose. He later admitted that he took the Dilantin to get high – and has not been (and was not) suicidal. He is having problems getting to sleep that he did not have when he was still taking Ambien (which was D/C'd due to overdose). Although he had no withdrawal symptoms on lower dose of Klonopin (0.5mg qAM and 1mg hs), dose was increased 6 days ago to help with sleep.
O. <u>Current Medication</u>:  Klonopin 1mg qAM and
     2mg hs, daily.
<u>Affect</u>: even, appropriate;    <u>mood</u>: "OK".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
<u>Diagnosis</u>:  Panic Disorder without agoraphobia
     <u>ICD-9 CM</u>:  300.01
     <u>Axis 5</u>:  GAF = 65
P.  1.  Next appointment in 1 month.
    2.  Restart Ambien at 20mg hs, daily.
    3.  Continue Klonopin 1mg qAM and 2mg hs.
    4.  On 11-16-99, reduce Klonopin to 1mg qAM
        and 1mg hs, daily (will attempt further
        reductions due to substance abuse behavior
        and consider a TCA to treat anxiety disorder).

_William G. Ellien, M.D._
William G. Ellien, M.D.

Progress Notes
Commonwealth of PA
Dept. of Corrections
DC-472

Inmate Name:  Jason Benson
Inmate Number:  DS 6483
DOB:  9-27-76
Institution:  Smithfield

# PHYSICIAN'S ORDERS

Inmate Name: Jason Benson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: SCI-Smithfield.

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS                1 |
|---|---|---|
| 11-8-99 1440 hrs | B | ① Next appointment is 1 month. |
| | ③ | Begin Ambien 20mg P.O. hs, daily, for 6 weeks. |
| | ③ | Redette - on 16 NOV '99 - amend Klonopin order |
| | | to 1mg PO q AM and 1mg PO hs, daily, for 6 wks. |
| | | William ? Elias, MD |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**Jason Benson**
**8 Dec. 1999**
**1525 hours**
**Problem #B**

<u>Smithfield – Progress Note for Psychiatry</u>:
The patient was clinically evaluated, today, for
psychiatric needs.  Last appointment on 11-8-99.
S.  The patient is in the "hole" (RHU) since losing
control of his temper and punching a door.  He
injured his hand.  He attributed the loss of control to
an increase in panic attacks and anxiety.  He denied
irritability or depression.  Sleep onset is still delayed
by 2-3 hours, but he preferred to continue the
Ambien.  He denied any medicine side effects.  We
discussed TCA (tricyclic antidepressant) options:
report prior illicit use of Sinequan and having a
seizure.  Also discussed Tofranil, Pamelor and Elavil.
He stated that he preferred to not change any of his
medicines and stay with current regime.   He denied
feeling hopeless or suicidal and stated he was "stable"
today.
O.  <u>Current Medication</u>:  Klonopin 1mg qAM and
      1mg hs; and Ambien 20mg hs, daily.
<u>Affect</u>:  even, appropriate;      <u>mood</u>: "stable".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
<u>Diagnosis</u>:  Panic Disorder without agoraphobia
      <u>ICD-9 CM</u>:  300.01
      <u>Axis 5</u>:  GAF = 60
P.  1.  Next appointment in 4 weeks.
     2.  Continue Ambien 20mg hs, daily.
     3.  Continue Klonopin 1mg qAM and 1mg hs.
     4.  Will attempt further reductions in Klonopin,
         due to substance abuse behavior.  Continue to
         consider a TCA to treat anxiety disorder.


                                    William G. Ellien, M.D.


Progress Notes                    Inmate Name:  Jason Benson
Commonwealth of PA                Inmate Number:  DS 6483
Dept. of Corrections              DOB:  9-27-76
DC-472                            Institution:  Smithfield

## PHYSICIAN'S ORDERS

Inmate Name: Jason Benson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: SCI-Smithfield.

Drug Allergies: **NKA**

Self-Medication Program ☐ Yes  ☒ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS · 1 |
|---|---|---|
| 12-8-99 15:25 RN | B | ① Next appointment in 4 weeks. |
| | | ② Con't/renew Ambien 20mg PO hs, daily, for 6 months. |
| | | ③ Con't/renew Klonopin 1mg PO q AM, and 1mg PO hs, daily, for 6 months. |
| | | William S. Ellien MD. |

**CONFIDENTIAL**

**PSYCHIATRIC EVALUATION**

**INMATE NAME:** BENSON, JASON            **DOC NUMBER:** DS6453

**DATE OF EVALUATION:** 1/13/00           **TIME:** 1525 hours

**INSTITUTION:** SCI-Smithfield

The patient was evaluated today by Dr. Ellien in follow-up for his current mental health needs.

**S:  Problem #1**

The patient reported that he is still having break through anxiety.  He frequently does not take his morning Klonopin because he is over sleeping.  Ambien, at times, help him to sleep but other times he only ends up feeling sluggish and lethargic the next morning.  The patient denies depression but we continue to talk about antidepressant medications as an indication to treat panic disorder and his anxiety.  We reviewed various options, including previous tricyclic antidepressants, Tofranil, Pamelor and Elavil.  We also discussed Paxil.  The patient agreed that Paxil would be his choice.  I reviewed its indications, benefits, side and adverse effects and precautions and the patient gave consent.  The patient continues to dany any hopelessness or suicidal ideation.

**O:** Current medication:  Klonopin 1 mg b.i.d. although the patient frequently misses a.m. dose and Ambien 20 mg hs, daily.

**Affect:** Somewhat labile.  **Mood:** Anxious.  The patient denies any psychosis, hallucinations, agitation or suicidal thoughts.  The patient did not show any tremor or abnormal or involuntary movement.

**A:**  Panic disorder with agoraphobia, increased symptoms.
     <u>ICD-9 CM:</u>  300.01
     <u>GAF</u> = 55.

**P:**  1.   Cancel Ambien order since it does not appear to be helping but does
          leave patient feeling sedated the next morning.
     2.   Cancel current Klonopin order and continue with full 2 mg dose all at hs.
     3.   Begin Paxil 10 mg at 4:00 p.m., daily, for one week then increase to 20
          mg p.o. at 4:00 p.m., daily.
     4.   Next appointment in 2 weeks.

                                              William Ellien, M.D.
                                              Psychiatrist

09/27/00 WED 06:31 FAX 814 533 3110   RISK MANAGEMENT                    ☑007

Sep 26 00 02:39p                                                        p.20

01/28/2000  15:38                                          NO.136  023

**CONFIDENTIAL**

**PSYCHIATRIC EVALUATION**

**INMATE NAME:** BENSON, JASON          **DOC NUMBER:** DS6483

**DATE OF EVALUATION:** 1/27/00          **TIME:** 2000 hours

**INSTITUTION:** SCI-Smithfield

The patient is evaluated for current psychiatric needs in follow-up from last appointment with Dr. Ellen.

**S:  Problem B**

The patient reports that he is not sleeping at night. He continues to feel very anxious and attributes this to ongoing court cases and near notice that he was going to return to Adams County tomorrow. He reported feeling somewhat hyper with Paxil but that side effects is going away. We discussed adjunctive use of Sinequan to assist with sleep and anxiety. Depressive symptoms were reviewed along with indications, benefits, side and adverse effects and the patient indicated his understanding and gave consent.

**O:** Current medication:  Klonopin 2 mg at night, Paxil 20 mg at 4:00 p.m., daily.

**Affect:** Anxious and irritable. **Mood:** Upset and anxious. The patient denies any suicide thoughts. He denies hallucinations but does admit to sometimes seeing "shadows." He denied any other symptoms indicative of psychosis and there is no suicide thoughts or agitation.

**A:** Panic disorder with agraphia (300.01). GAF = 56.

**P:**  1.  Begin Sinequan concentrate 100 mg hs prn, daily, to help with sleep, depression and anxiety.
       2.  Continue Klonopin 2 mg each night.
       3.  Continue Ambien 20 mg each night.
       4.  Follow-up in telemedicine in 1 month.

William G. Ellen, M.D.
Psychiatrist

WGE/mgr
D:1/27/00
T:1/28/00

DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

**COMMONWEALTH OF PENNSYLVANIA**

**DEPARTMENT OF CORRECTIONS**

**INSTRUCTIONS**

Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.

| 1. TO: (NAME AND TITLE OF OFFICER) DR. Ellien - Psychiatry | | 2. DATE 02.12.00 |
| 3. BY: (INSTITUTIONAL NAME AND NUMBER) DS6483  Benson, JASON E. | | 4. COUNSELOR'S NAME ZIMMERMAN |
| 5. WORK ASSIGNMENT | 6. QUARTERS ASSIGNMENT CB04 | |

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE.  GIVE DETAILS.

Please read attached letter

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

☐ TO DC-14 CAR ONLY                              ☐ TO DC-14 CAR AND DC-15 IRS

| STAFF MEMBER | DATE |

09/27/00  WED 06:29 FAX 814 533 3110    RISK MANAGEMENT                    ☑003
Sep 26 00 02:41p                                                          P. 24
   02/17/2000    09:29                                           NO.319  D12

Jason E. Benson
DJ6483

Dr. Ellier,

About 4 or 5 days ago I sent a request to Mrs. Troutman in regards to a "condition" I've seemed to acquire. It is alarming in it's nature, and I wanted to consult with you before I consulted with a physician. I want to describe my problem to you directly, though I am *very* apprehensive.

I've begun to experience what I can only describe as "lucid petit-mal seizures." The first incident occured like a sudden drop of blood pressure, my head became very light, my body hummed, as if electrified. My vision became clouded, and my concious awareness went south - I then heard a voice saying "You are a data processing machine", in a very filtered, electronic voice. The voice repeated twice, and then I gradually regained my bearings. Though I couldn't really see, I was still concious, (at least in theory). As far as I could tell I did not lose conciousness, and I did not have a grand-mal seizure.

Since that incident I have not heard the "voice", but I have had similar fits.

I haven't been emotionally balanced as of late. I've told you the same story time and again, but these "fits" have caused several systemic abnormalities, at least at my concious level.

E  umm at times I feel as though I'm not safe

a sort of fleeting paranoia. At other times my senses seem to
excellerate, to come alive as if they were never in use. My
ability to conversate intellectually has demenissted... the worst
is that at times I cannot deferentiate between dreams
and reality — I lose my ability to recognize my conciousness,
and, for a minute or so, become completely lost in the sauce.
There seems to be a common link connecting these spells, but I
cannot say if it is a related factor or not. These things; these
symptoms I've told you of — they only occur when I am witnessing
some sort of conflict. For example, an arguement on the block, or
most recently, when an inmate cut his wrist.

I abhor violence, I absolutely hate it, The only thing I can
connect these symptoms with is violence. I am an extremely
empathetic person, sometimes I think overly so I hate to see any
one hurt, or miserable — in pain. However, it seems a bit
esoteric to link conflict with these fits. The thing is, is I just
don't know, and it's scaring the hell out of me. I wanted to write
it all down for you to see, I doubt I can vocalize any of this —
Listen, I've done an awful lot of LSD in my time, an awful lot
of mescaline and DMT — virtually every sort of hallucinogenic
I've done, in huge amounts. My last trip was 3 days before I was
busted, I took 22 hits of white blotter. The drug was extremely
potent, as I had initially bought a gram of crystalline LSD,
which when extenuated can dose about 3500 hits; we sprayed
only about 2000.

My point is that with such a massive quantity of LSD (well on

700 hits in my lifetime, that I've consumed) is it possible
that I've caused some sort of neurodegeneration? Am I
losing my damned mind?
Please Dee, get with me on this. Hearing voices, blacking out
man, this shit ain't my bag, you know?

Frank Benson

09/27/00  WED 08:28 FAX 814 553 3110    RISK MANAGEMENT                                    ☑001

Sep 26 00 02:42p                                                                           P.26

**Jason Benson**          <u>Smithfield – Progress Note for Psychiatry</u>:

**17 February 2000**     The patient was clinically evaluated, today, for

**1525 hours**           psychiatric needs.  Last appointment on 1-27-00.

**Problem #B**           S.  The patient provided a detailed, 3 page letter
describing periods of fearing something horrible was
going to happen associated with palpitations, tremor,
sweating, lightheadedness and feeling detached or
separated from his environment.  He describes
"triggers" of actual or threatened violence or injury
(see letter).  Sinequan has helped his sleep and he
denies problems with lightheadedness upon standing
from a lying position.  He expressed his worry that
past, severe abuse of hallucinogens may be causing
"petit mal seizures".  Dr. Long ruled this out,
yesterday and Dilantin blood level is therapeutic
(below).  I explained the likelihood that above
symptoms were worsening panic attacks.  I explained
the role of the antidepressant Sinequan in preventing
panic attacks if we optimize its dose.  He gave his
consent.  He denied any anger problems, aggressive
urges, suicide thoughts or psychotic symptoms.

O.  <u>Current Medication</u>:  Klonopin 2mg hs; Sinequan
   conc 100mg hs PRN; Paxil 20mg at 4pm, daily.

<u>Affect</u>:  even, appropriate;    <u>mood</u>:  "stable".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.

<u>Diagnosis</u>:  Panic Disorder without agoraphobia
   <u>ICD-9 CM</u>:  300.01  <u>Axis 5</u>:  GAF = 60

P.  1.  Next appointment in 4 weeks.
    2.  Increase Paxil to 30mg at 4pm, daily.
    3.  Continue Klonopin 2mg hs.
    4.  Increase Sinequan to 150mg hs, *daily* (not
        PRN) and check blood level on 3-2-00.

Lab: Dilantin level
on 2-3-00 = 14.8 une
                                    William G. Ellien, M.D.

**Progress Notes**              Inmate Name:  Jason Benson

**Commonwealth of PA**          Inmate Number:  DS 6483

**Dept. of Corrections**        DOB:  9-27-76

**DC-472**                      Institution:  Smithfield

09/27/00  WED 06:21 FAX 814 533 3110    RISK MANAGEMENT                    @002
Sep 26 00 02:42p                                                           P.25

# PHYSICIAN'S ORDERS

Inmate Name: Jason Benson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: SCI-Smithfield.

Drug Allergies:

NKA

Self-Medication Program ☐ Yes   ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS | | 1 |
|---|---|---|---|---|
| 2-17-00 1525 Um | B | ① Next appointment in 4 weeks. | | |
| | | ② Increase Sinequan to 150mg PO hs, every night (not PRN), for Comorbid: use concentrate. | | |
| | | ③ On/about 3-2-00, obtain Sinequan blood level | | |
| | | ④ Increase Paxil to 30mg PO at 4pm, daily, for 6 months.  R/ William L Ellen MD | | |

BENSON, JASON                    57139138/0          23 YEARS    MALE
Page   1  From Chantilly          FOR ECLTEN, MD (SS)      LAN:T30319
  COLLECTED:  200003020745     30312 SCI-SMITHFIELD
  RECEIVED:  03/03/2000        JERSEY SHORE HOSPITAL
  REPORTED:  0370572000        P.O. BOX 999
2000/  0/ 30312/  0/20001646    HUNTINGDON PA 16652
  HISTORY NO: DS6483           ROOM/BED:  S8

----------------TESTS----------------RESULTS-FLAG--REF. RANGE------UNITS

8741/Chantilly
Doxepin, Serum
  Doxepin                          None detected
                                   Detection limit 5 ng/mL
  Desmethyldoxepin                 None detected
                                   Detection limit 5 ng/mL
  Doxepin + Desmethyldoxepin       None detected
       Therapeutic range:           150-250 ng/mL
       (Doxepin plus Desmethyldoxepin)

       POTENTIALLY TOXIC VALUES:
       Doxepin:                    )= 450 ng/mL
       Desmethyldoxepin:           )= 450 ng/mL
       Doxepin + Desmethyldoxepin  )= 450 ng/mL

                    *** FINAL REPORT ***
CP 68948]-[S 2638]

                         Nathan Sherman, M.D.
                         Director of Laboratories

           N          NCS
   A  Requires a DC 472 SOAP Note

   Ronald Long, M.D.

                                              Received
                                              Mar 00 2000
                                              Sci Smithfield
                                              Medical Records Department

Sep 26 00 02:43p

03/23/2000   09:27

RISK MANAGEMENT

P.27

NO.525   D14

041

03.17.00

Dr. Ellien,

I would like to know if I could take an equal dose of Kolonopin in the mornings as well as the evenings. I have been under some very intense stress as of late, it often seems as though experientially my life has become one giant anxiety attack, and "normalist tids". I sunk into some unconcious current beneath the surface. I wish to God there were a more productive means of sorting through this ailement, but here in the system, it seems like the only hopeful solution is synthetic, dispite the reality of this disorders cause.

It has come to the points where depression is a good dream in comparison. What is frustrating is that all I want in life, all I seek, is emotional, spiritual and mental refinement. And the only means of attaining this very real nirvana are inaccessable to the unrefined. Life's irony is supposed to glorify man's intellectual wonder, but instead, for me, it has come to represent the inefficency of my greatest intentions.

There are no other options.

Please, double my dose to equal 2.0 in the a.m. and the p.m.

Jason E. Benson
DS 6483

Jason Benson
23 March 2000
1520 hours
Problem #B

**Smithfield – Progress Note for Psychiatry:**
The patient was clinically evaluated, today, for psychiatric needs.  Last appointment on 2-17-00.
S.  ITP was held today.  Patient talked at some length about his perception of how staff hold grudges against him.  He feels he has done all he can to accommodate and that, other than "isolating myself completely" he can do no more.  The patient provided another "letter" (one page, see note from 2-17-00) describing continued panic attach symptoms:  palpitations, tremor, sweating, lightheadedness and feeling detached or separated from his environment.  He also described these same symptoms, although not as severe, in relationship to taking Paxil, hence his refusal to take the medicine since late February 2000.  Sinequan has helped his sleep and he denies problems with lightheadedness upon standing from a lying position with it.  I described the "non detectable" blood level at the 150mg dose and recommended an increase in order to effectively prevent panic attacks.  He asked if Klonopin dose could be doubled, which I declined due to past history of drug abuse and high risk of tolerance, as well as the fact that an antidepressant is the "treatment of choice" for treating panic disorder.  We reviewed side effect and precaution issues with Sinequan and Klonopin and he noted his understanding and gave consent to the plan, below.  He denied any anger problems, aggressive urges, suicide thoughts or psychotic symptoms.
O.  Current Medication:  Klonopin 2mg hs; Sinequan concentrate 150mg hs PRN; and Paxil 30mg at 4pm, daily.

William G. Ellien, M.D.

**Progress Notes**
**Commonwealth of PA**
**Dept. of Corrections**
**DC-472**

**Inmate Name:  Jason Benson**
**Inmate Number:  DS 6483**
**DOB:  9-27-76**
**Institution:  Smithfield**

**Jason Benson – Progress Note of 3-23-00 continued:**

**Affect:** even, appropriate;   **mood:** "not great".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
**Diagnosis:** Panic Disorder without agoraphobia
   **ICD-9 CM:** 300.01
   **Axis 5:** GAF = 55
P.  1. Next appointment in 3 weeks.
    2. Cancel Paxil order due to side effects.
    3. Change Klonopin to 0.5mg at 11am and 1.5mg
       hs, daily.
    4. Increase Sinequan concentrate to 250mg hs,
       daily.
    5. Check Sinequan blood level on/about 4-6-00.

William G. Ellien, M.D.

**Progress Notes**
**Commonwealth of PA**
**Dept. of Corrections**
**DC-472**

**Inmate Name:** Jason Benson
**Inmate Number:** DS 6483
**DOB:** 9-27-76
**Institution:** Smithfield

## INDIVIDUAL TREATMENT PLAN

NAME _Benson, Juan_ DC# _D56483_ ASSIGNED PSS _S. Troutman_

ICD CODE _Mixed personality Disorder_ ASSIGNED PSYCHIATRIST _Dr. Ellies_

PREVIOUS ICD CODE _____ DATE OF LAST TREATMENT PLAN REVIEW _10/22/99_

TENTATIVE DATE OF NEXT REVIEW _7/2000_ DATE _3/23/00_

DETAINERS/OTHER _____ MINIMUM _5/22/2001_ MAXIMUM _5/22/2004_

| PROBLEMS & GOALS MINIMUM OF (2) | TREATMENT OBJECTIVES (OBSERVABLE & MEASURABLE) | OBJECTIVES TARGET DATE |
|---|---|---|
| ① To see MH, counselor & psychiatrist as scheduled. | | |
| ② To remain misconduct free | | |
| ③ To follow prescriptive program plan | | dropped out of stress & anger bk chose not to show up & has recently signed up again |
| ④ To remain medication compliant | | |
| ⑤ To obtain employment when available | | |

SUMMARY (UPDATED TREATMENT PLAN INFORMATION): Inmate has recently been on cell restriction & has received black cards. He is currently not taking his Paxil & took himself off medication. Dr. Ellies is working with him on the medication issues & adjusting it. He need to be more responsible for his behavior & prepare for parole & complete _____

Case 1:00-cv-01229-WWC   Document 131   Filed 01/16/2002   Page 56 of 126

Sep 26 00 02:45p

03/24/2000   11:27

RISK MANAGEMENT

NO.539   P03

p.32

| ALL THAT APPLY | TREATMENT | | | | LENGTH OF TREATMENT |
|---|---|---|---|---|---|
| | 1/wk | 2/wk | Every 2 wks | 1/mo | Up to 3 mos _____ Up to 6 mos _____ More than 1 year _____ |
| (11)INDIVIDUAL  *counselor*  *PSS*  *Psychiatrist* | | | | .5  .5  .5 | |
| (12)GROUP *Dropped out of Stress + Anger but signed back up* *—Hurd RAP group currently in* *—signed up for math classes + keyboarding* *—signed up to be a tutor* | | | | | |
| (13)COLLATERALS | | | | | |
| (14)EDUCATION | | | | | |
| (15)OTHER (SPECIFY) | | | | | |

**REVIEW/UPDATES**

Review and update treatment plan on a new form as follows:

1. Initial review (to be completed within 14 days of admission)
2. SNU reviews a minimum of one every 120 days.
3. At the request of Unit Manager.

(16)Client Signature _____  Date 03.23.00

(17)PSA Signature _____  Date 3/23/00

(18)Custody Staff Signature _____  Date

(19)Counselor Signature *Angela J. Zimmerman*  Date 3/23/00

(20)Psychiatrist Signature *W. Vernon Glover, MD*  Date 3-24-00

(21)Unit Manager Signature *J. R. Bush*  Date 3/23/00

# PHYSICIAN'S ORDERS

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: Smithfield

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS   1 |
|---|---|---|
| 3-23-00 1520 hrs | B | ① Next appointment in 3 weeks |
| | | ② On/about 4-6-00, obtain Sinequan blood level. |
| | | William R Edwards MD |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Jason Benson
11 April 2000
1615 hours
Problem #B

**Smithfield – Progress Note for Psychiatry:**
The patient was clinically evaluated, today, for psychiatric needs. Last appointment on 3-23-00.
S. The patient stated that Klonopin was helping him with anxiety during the day: having no further panic attacks. He denied having any anxiety problems at night (he also denied any anger problems, aggressive urges, suicide thoughts or psychotic symptoms) but stated: "I don't want the Sinequan. I want a sleeping medicine, only a sleeping medicine, not something that is used for something else." I confronted the patient with the several month pattern of rejecting the medicines which stand the best chance of helping him: antidepressant medicines, while seeking out addictive, antianxiety medicines. Patient attempted to turn this around by stating that he wanted to stop all medicines. I then attempted, repeatedly, to inform him of the risks for seizures if he abruptly stopped either or both Dilantin and Klonopin, which he was now threatening. I attempted to point out behavior patterns related to active drug addiction: taking back control, "people, places and things", and other issues but to no avail.    Previously, he had asked if Klonopin dose could be doubled, which I previously declined due to past history of drug abuse and high risk of tolerance, as well as the fact that an antidepressant is the "treatment of choice" for treating panic disorder. For related reasons of risk, I declined to "just stop" the Klonopin doses and told him he must be evaluated by Dr. Long re: question of

William G. Ellien, M.D.

Progress Notes
Commonwealth of PA
Dept. of Corrections
DC-472

Inmate Name:  Jason Benson
Inmate Number:  DS 6483
DOB:  9-27-76
Institution:  Smithfield

**Jason Benson – Progress Note of 4-11-00 continued:**

stopping Dilantin, although in light of seizure history, I strongly advised he not stop Dilantin. He continued to indicate he would refuse both medicines so I informed him that I would place him on the "must take" list for both medications due to high risk of life-threatening status epilepticus if he abruptly came off either or both medicines. He indicated his understanding of this plan, although he expressed his disagreement with it (see above). <u>Current Medication</u>: Klonopin 0.5mg at 11am and 1.5mg hs; Sinequan concentrate 250mg hs PRN; and Paxil 30mg at 4pm, daily.

<u>Affect</u>: even, appropriate;    <u>mood</u>: "OK".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
<u>Diagnosis</u>: Panic Disorder without agoraphobia
  <u>ICD-9 CM</u>: 300.01
  <u>Axis 5: GAF</u> = 68

P. 1. Next appointment in 6 weeks.
   2. Cancel Paxil order due to non-compliance.
   3. Taper Klonopin with plan to discontinue: reduce by 0.25mg per day, every week (see orders) and discontinue entirely by 5-31-00.
   4. Cancel Sinequan order due to refusal.
   5. Referral to be seen by Dr. Long to be counseled about decision to refuse to take Dilantin and risks related to status epilepticus.
   6. Place on "must take" list for Dilantin and Klonopin.

*William G. Ellien, MD*
**William G. Ellien, M.D.**

**Progress Notes**                    Inmate Name: Jason Benson
**Commonwealth of PA**                Inmate Number: DS 6483
**Dept. of Corrections**              DOB: 9-27-76
**DC-472**                            Institution: Smithfield

## PHYSICIAN'S ORDERS

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-27-76

Institution: Smithfield

Drug Allergies:  NKA

Self-Medication Program ☐ Yes  ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS                                                                                                  1 |
|---|---|---|
| 4-11-00 1615hrs | B | ① Next appointment in 6 weeks |
|  |  | ② Cancel current Klonopin order. |
|  |  | ③ Begin Klonopin 0.25mg PO at 11AM and 1.5mg PO hs, daily, through 4-18-00. |
|  |  | ④ On 4-19-00 reduce Klonopin to 1.5mg PO hs, daily, thro 4-25-00. |
|  |  | ⑤ On 4-26-00 reduce Klonopin to 1.25mg P.O. hs, daily, thro 5-2-00 |
|  |  | ⑥ On 5-3-00 reduce Klonopin to 1mg P.O. hs, daily, thru 5-9-00 |
|  |  | ⑦ On 5-10-00 reduce Klonopin to 0.75mg PO hs, daily, thru 5-16-00 |
|  |  | ⑧ On 5-17-00 reduce Klonopin to 0.50mg PO hs, daily, thru 5-23-00 |
|  |  | ⑨ On 5-24-00 reduce Klonopin to 0.25mg PO hs, daily, thru 5-30-00. |
|  |  | ⑩ On 5-31-00 cancel all further Klonopin. |
|  |  | ⑪ Cancel Paxil order: non-compliance |
|  |  | ⑫ Cancel Sinequan order: patient refusal. |
|  |  | ⑬ Refer to be seen by Dr. Long to be counseled about decision to refuse to take Dilantin and risks related to status epilepticus. |
|  |  | ⑭ Place on "must take" list for Dilantin and Klonopin |
|  |  | William H Emory [signature] |
|  |  | William Emory, M.D. Psychiatrist |
|  |  |  |
|  |  |  |

BENSON, JASON                   5736149770            23 YEARS   MALE
Page   1 From Chantilly         FOR ELLIEN, MD (SS)       LAN:T30319
COLLECTED:  200004060720        30312 SCI-SMITHFIELD
RECEIVED:   04/08/2000          JERSEY SHORE HOSPITAL
REPORTED:   04/09/2000          P.O. BOX 999
2000/  0/ 30312/  0/20002906    HUNTINGDON PA 16652
HISTORY NO: DS6483              ROOM/BED:  SS

--------------TESTS-------------RESULTS-FLAG--REF. RANGE------UNITS

8941/Chantilly
Doxepin, Serum
Doxepin                                 7                              ng/mL
Desmethyldoxepin                    None detected
                                    Detection limit 5 ng/mL
Doxepin + Desmethyldoxepin          7 L          150-250         ng/mL
      Therapeutic range:           150-250 ng/mL
      (Doxepin plus Desmethyldoxepin)

      POTENTIALLY TOXIC VALUES:
      Doxepin:                        >= 450 ng/mL
      Desmethyldoxepin:               >= 450 ng/mL
      Doxepin + Desmethyldoxepin:     >= 450 ng/mL

                  *** FINAL REPORT ***
[P 67867]-[S 2787]

                              Nathan Sherman, M.D.
                              Director of Laboratories

                                            (A)
                                         4-11-00
                                          6-0720


                                    Ronald Long, M.D.

Sep 26 00 02:48p

Jason Benson
17 May 2000
1740 hours
Problem #B

<u>Smithfield – Progress Note for Psychiatry:</u>
The patient was clinically evaluated, today, for psychiatric needs. Last appointment on 4-11-00.
S. I reflected with the patient how tense our last session was (refer to 4-11-00 note). The patient stated that his current concerns centered on going back to his county (Gettysburg) for trial. He shared that he was afraid his Dilantin would not be given to him. I shared that I would note, with emphasis, the importance of the Dilantin, in particular, being given as prescribed. Nurse also described the medical data which is placed on a transfer sheet as well as that inmate will have a 5-day supply of his meds sent with him. The patient noted that he has not been able to sleep. Otherwise, he appears to be tolerating taper of Klonopin. He continues to not want an antidepressant for treatment of anxiety disorder symptoms, however. He had been treated with Ambien last fall. It was generally helpful although eventually it was D/C'd due to mild side effects. In retrospect, this may have been due to concurrent Klonopin, which has been substantially reduced. After further discussion, we agreed to start PRN Ambien to get some help with sleep, and follow side effect issues. Klonopin taper and D/C orders will continue. Patient denied any fears or concerns about losing control. He denied anger problems or mood swings and he denied any suicide thoughts or assault or homicide urges.

William G. Ellien, M.D.

Progress Notes
Commonwealth of PA
Dept. of Corrections
DC-472

Inmate Name: Jason Benson
Inmate Number: DS 6483
DOB: 9-27-76
Institution: Smithfield

**Jason Benson – Progress Note of 5-17-00 continued:**

**Current Medication:** Klonopin 0.5mg hs.
**Affect:** even, appropriate;    **mood:** "worried".
Denies suicide thoughts; no psychosis or agitation.
No EPS or abnormal movements on examination.
**Diagnosis:** Panic Disorder without agoraphobia
    **ICD-9 CM:** 300.01
    **Axis 5: GAF = 60**
P.  1.  Next appointment in 1 month.
    2.  Begin Ambien 20mg hs PRN insomnia.
    3.  Emphasis on medicines being dispensed while
        in county prison during trial.

*William G. Ellien MD*
William G. Ellien, M.D.

**Progress Notes**                    **Inmate Name:  Jason Benson**
**Commonwealth of PA**                **Inmate Number:  DS 6483**
**Dept. of Corrections**              **DOB: 9-27-76**
**DC-472**                            **Institution:  Smithfield**

## PHYSICIAN'S ORDERS

Inmate Name: Jason Berson

Inmate Number: DS 6483

DOB: 9-22-76

Institution: Smithfield

Drug Allergies: NKA

Self-Medication Program ☐ Yes ☑ No

| Date/ Military Time | Prob # | DO NOT USE THIS SHEET UNLESS A RED NUMBER SHOWS — 1 |
|---|---|---|
| 5-17-00 174D | B | ① Next appointment in 1 month. |
| | | William H. Ellien, MD |
| | | **William Ellien, M.D.** |
| | | **Psychiatrist** |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JASON E. BENSON,               :        CIVIL ACTION
                                        NO. 1:CV-00-1229
          Plaintiff,           :

                                        (Judge Caldwell)
     vs.                       :        (Magistrate Judge Blewitt)

WILLIAM G. ELLIEN, M.D., et al., :

          Defendants           :

<u>VERIFICATION OF WILLIAM G. ELLIEN, M.D.</u>

I, William G. Ellien, M.D., being of full age, do depose and state as follows:

1.    I am a defendant in the above-captioned matter, and have knowledge relevant to

the issues in this case. If called to testify in this matter, I would testify under oath as herein.

2.    I am a psychiatrist, and at the time relevant to this matter, provided psychiatric

services to inmates at SCI-Smithfield.

3.    I provided treatment to Plaintiff Jason Benson ("Benson") solely for his

psychiatric problems. At no time was I responsible for the treatment of any medical condition of

Mr. Benson's.

4.    I first saw and treated Mr. Benson on July 27, 1999. Prior to that date I had no

professional contact with Benson whatsoever.

5.    At this time, July 27, 1999, Mr. Benson was not taking Dilantin for his epileptic

condition, and had, of his own volition ceased taking Dilantin at some time prior to June 4, 1999,

according to my review of his medical records. (Ex. "B", June 4, 1999) Mr. Benson had been

off of Dilantin for more than seven weeks prior to my first treating him.

6.    On July 27, 1999, I first treated Mr. Benson, and I clinically evaluated his



psychiatric needs, and Benson reported to me that he was experiencing periods of dizziness, confusion, sweating and tightness in his chest. He also appeared to be anxious and irritable. We discussed his fears about impending "Y2K" problems, the government, and what he believes will happen. I diagnosed him with panic disorder without agoraphobia. He was taking no medications at that time, and we discussed the use of Ativan and Tofranil (also known as Imipramine), with which he agreed and consented. I ordered Tofranil and Ativan for Mr. Benson. I also ordered a check of his Tofranil level in three weeks, and a follow-up evaluation in one month. (Ex. "B", July 27, 1999)

7.      Mr. Benson was next seen psychiatrically by Dr. Jin Ha Yun, on August 19, 1999. At that time, Dr. Yun noted that Benson had stopped taking the Tofranil after being on it for only three (3) days because, according to Benson, it made him nauseous and sick. At that time Dr. Yun discontinued the Tofranil and started Benson on Serzone. (Ex. "B", August 19, 1999)

8.      Benson was next psychiatrically seen on September 1, 1999, by Dr. Eugene Polmueller, after having returned from a several days stay in county prison. During that time, it was reported that Benson suffered a grand mal seizure, and had been admitted to the ICU at a local hospital. Dr. Polmueller noted that since starting on Serzone, Benson had experienced no decrease in panic attacks. At that time, Dr. Polmueller discontinued Serzone, and ordered Klonopin. (Ex. "B", September 1, 1999)

9.      I next treated Mr. Benson, for the second time, on September 23, 1999, at which time he reported that he was sleeping poorly and that his anxiety was worse. We discussed the use of Ambien, which he reported worked well for him in the past. With his agreement, I started Benson on a course of Ambien, and continued the Klonopin. (Ex. "B", September 23, 1999)

10.      On October 19, 1999, I next treated Mr. Benson, who was in the infirmary

following his intentional overdosing with Dilantin.  We discussed the effects of the overdose and

his recovery from it, and his current psychiatric medications.  Benson noted that the Ambien had

been initially helpful, but told me that he had gotten used to it.  We discussed a variety of other

medication options, including Pamelor, Sinequan and Neurontin.  I cancelled the order for

Ambien, and continued the Klonopin.  (Ex. "B", October 19, 1999)

      11.    On November 8, 1999, I treated Mr. Benson again, at which time he was fully

recovered from his intentional Dilantin overdose.  Mr. Benson later admitted that he had taken

the Dilantin overdose in an attempt to become high, and was not suicidal.  He reported sleeping

problems.  After discussing medication options, I restarted Mr. Benson on Ambien, and also

continued Klonopin.  (Ex. "B", November 8, 1999)

      12.    Mr. Benson was next evaluated on December 8, 1999, at which time he was being

housed in the RHU (Restrictive Housing Unit) for having lost his temper and punched a door.

We discussed his progress on his current medications, and the possibility of other medications,

including Pamelor, Tofranil and Elavil.  It was Mr. Benson's preference to continue with his

current medications, which we did.  (Ex. "B", December 8, 1999)

      13.    When I next evaluated Mr. Benson, on January 13, 2000, he was continuing to

experience anxiety, and we discussed other medication possibilities, including tricyclic

antidepressants, Tofranil, Pamelor, Elavil and Paxil.  We reviewed the indications, benefits, side

effects, and adverse effects and precautions, and Benson consented to the use of Paxil, which I

prescribed.  (Ex. "B", January 13, 2000)

      14.    I next evaluated Benson on January 27, 2000, at which time he reported that he

was not sleeping at night, and that he was very anxious about his ongoing court cases.  He

indicated that he was initially somewhat hyper with the Paxil, but that the symptoms were going

away. We discussed the use of Sinequan for sleep and anxiety, and its benefits, side effects and adverse effects. Benson gave his consent, and I began him on Sinequan. He was also continued on Klonopin and Ambien. (Ex. "B", January 27, 2000)

15.    I next evaluated Mr. Benson on February 17, 2000, at which time we discussed a letter he wrote to me on February 12, 2000. Benson was concerned that he might have been experiencing petit mal seizures, but this had been ruled out by Dr. Long. At this time, Benson's Dilantin levels were therapeutic. We discussed increasing Benson's Sinequan to treat his worsening panic attacks, and he consented to this. (Ex. "B", February 17, 2000)

16.    On March 23, 2000, I next evaluated Mr. Benson, at which time he expressed his belief that the staff held grudges against him, and described his continuing panic attack symptoms. Benson requested that I double his Klonopin dosage. Due to Benson's history of drug abuse, and the high risk of his developing a tolerance, I denied his request. We reviewed the precautions and side effects of Sinequan and Klonopin, and Benson indicated his understanding and consent for their continuance in his treatment. (Ex. "B", March 23, 2000)

17.    I next evaluated Benson on April 11, 2000, at which time he told me that the Klonopin was helping with his anxiety during the day. Benson told me that he did not want to take Sinequan to help with his sleeping, but that he wanted "a sleeping medication, not something that is used for something else." Mr. Benson had demonstrated a pattern over several months of rejecting medications that had the best chance of helping with his symptoms (antidepressants), while seeking out addictive, antianxiety medications. When I would not accede to these requests, Benson indicated that he wanted to just stop all medications. I informed him of the risks for seizures if he abruptly stopped taking his Dilantin and Klonopin, which he was then threatening to do. I referred him to Dr. Long about his desire to stop taking Dilantin,

and told Benson that he would be placed on a "must take" list for both the Dilantin and Klonopin because of the risks of abruptly stopping both medications. Benson indicated his understanding of this, although he stated that he did not agree. I wrote for the tapering of the Klonopin, with its eventual discontinuance by May 31, 2000. (Ex. "B", April 11, 2000)

18.    I last saw Mr. Benson on May 17, 2000, at which time he expressed his concerns about returning to Gettysburg for trial. He indicated that he was concerned that he would not be given his Dilantin when there. Benson also indicated that he was having trouble sleeping. Benson continued to reject the use of antidepressants for his anxiety disorder. The use of tricyclic antidepressants for the treatment of Benson's anxiety would have been appropriate. His prior treatment using Ambien had been discontinued because of mild side effects. We discussed its restart, and it was agreed. I restarted Mr. Benson an Ambien. His tapering off of Klonopin was being tolerated, and was almost complete by this time. (Ex. "B", May 17, 2000)

19.    Mr. Benson was prescribed Tofranil (Imipramine) on one occasion by myself, on July 27, 1999, at which time he was started on a dose of 50 mg per day, with orders to gradually increase the dose, and monitor his levels. The administration of Tofranil was discontinued by Mr. Benson after only three (3) days because, he indicated, it made him nauseated. His dosage during that time was 50 mg per day. The order for Tofranil was cancelled by Dr. Yun on August 19, 1999, when he evaluated Benson and learned that Benson had stopped taking the medication. The Tofranil was not restarted.

20.    Tofranil (or Imipramine) is a type of drug known as a tricyclic antidepressant. A dosage of 50 mg per day of Tofranil is a very small dosage. My intention prior to Mr. Benson's own stopping of the medication after only three (3) days was to gradually increase his dosage from 50 mg per day, to 75 mg per day, and ultimately to 100 mg per day, along with careful

monitoring of his blood levels. The choice of Tofranil in these dosages for Mr. Benson's psychiatric symptoms in July, 1999, was an appropriate choice of medication. I can state this to a high degree of medical certainty.

21.    The incidence of the adverse reaction of seizures among all types of antidepressants has been reported as being between one-half percent (1/2 %) and one-and-a-half percent (1-1/2 %). I am unaware of controlled medical research regarding the use of Tofranil (Imipramine) specifically being attributed as the cause of seizures. Certain other antidepressants, such as Wellbutrin, have been known to have been linked to seizures, but only in very large doses, generally exceeding 600 mg per day. I am unaware of any medical evidence that the use of low doses of Tofranil at 50 mg per day, has been linked to causing seizures in patients to whom it is prescribed.

22.    In my opinion, it is not possible that the grand mal seizure which Mr. Benson states he suffered while in the county prison some time in late-August, 1999, was in any way related to the low dose of Tofranil which I prescribed for him on July 27, 1999. The seizure which Mr. Benson states he suffered in late-August 1999 took place between three and four weeks after he stopped taking the Tofranil, and almost two weeks after Dr. Yun cancelled the order due to Mr. Benson's non-compliance. Even if Mr. Benson had been taking the very low dose of Tofranil that I had prescribed for him as of the date of the seizure, there is no medical evidence that would attribute such a low dose of this antidepressant to causing a seizure in an individual who had been seizure free, according to the notes of Dr. Long, since at least January, 1999. I can state, to a high degree of medical certainty, that the seizure which Mr. Benson states he suffered in late-August, 1999 while in the county prison, was in no way related to his having taken the Tofranil prescribed for him on July 27, 1999.

23.    All medications have the potential for both side effects and adverse effects, and the use of any medication, as with any medical treatment or procedure, carries with it risks as well as benefits.  These risks and benefits were at all time explained to Mr. Benson prior to the start of any new medication, and medications were prescribed only with Mr. Benson's understanding and consent to their use.

24.    All decisions regarding the selection, use and prescription of any psychiatric medications used in the psychiatric treatment of Mr. Benson, were made with the express knowledge, understanding and informed consent of Mr. Benson.  Before I or any other psychiatrist treating Mr. Benson at SCI-Smithfield prescribed any such medication for Mr. Benson, the uses, indications, contraindications, side effects and adverse effects of the medication were explained fully to Mr. Benson, and prior to any prescription, Benson was required to indicate that he understood the information provided, and that he consented to the use of the medication.  No medication used in Benson's psychiatric treatment was ever provided without having first obtained Benson's informed consent for its use.


I hereby certify that the above statements are true and correct to the best of my knowledge, information and belief.  I also understand that the statements contained herein are subject to the penalty of perjury pursuant to 28 U.S. §1746 relating to unsworn falsification to authorities.


1/11/02
_____
DATE

_William G. Ellien MD_
_____
WILLIAM G. ELLIEN, M.D.

BENSON, JASON                                     BENSON VS
08/30/01                                                              ELLIEN

```
 1                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2
        JASON E. BENSON,              :
 3           PLAINTIFF               :
                                     :
 4              VS                   :  NO. 1:CV-00-1229
                                     :
 5      WILLIAM G. ELLIEN, M.D.,     :
        et al.,                      :
 6           DEFENDANTS              :
 7
 8
                     DEPOSITION OF:  JASON E. BENSON
 9
                     TAKEN BY:       DEFENDANT - DR. ELLIEN
10
                     BEFORE:         TERESA K. BEAR, REPORTER
11                                   NOTARY PUBLIC
12                   DATE:           AUGUST 30, 2001, 12:22 P.M.
13                   PLACE:          SCI SMITHFIELD
                                     1220 PIKE STREET
14                                   HUNTINGDON, PENNSYLVANIA
15
16      APPEARANCES:
17          JASON E. BENSON, PRO SE
18          MONAGHAN & GOLD, P.C.
            BY:  ALAN L. BUTKOVITZ, ESQUIRE
19
                     FOR - DEFENDANT - DR. ELLIEN
20
            LAVERY, FAHERTY, YOUNG & PATTERSON
21          BY:  JAMES D. YOUNG, ESQUIRE
22                   FOR - DEFENDANT - DR. LONG
23          THOMAS, THOMAS & HAFER
            BY:  KEVIN C. MCNAMARA, ESQUIRE
24
                     FOR - ADAMS COUNTY DEFENDANTS
25
```

**GEIGER & LORIA ─── ─ ─ ─E - 1-800-222-4577**

BENSON, JASON 
08/30/01

BENSON VS
ELLIEN

---

2

TABLE OF CONTENTS
WITNESS

FOR DEFENDANT - DR. ELLIEN          DIRECT  CROSS
Jason E. Benson
    By Mr. Butkovitz          3    --
    By Mr. McNamara           --    58
    By Mr. Young              --    113

---

3

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that reading, signing, sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved to the time of the trial.

JASON E. BENSON, called as a witness, being sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BUTKOVITZ:

Q    Mr. Benson, my name is Alan Butkovitz. I'm the attorney for Dr. Ellien. I'm going to ask you some questions about the amended complaint you have filed against him and his codefendants in this case. If there is anything that I say that is not clear to you, would you please stop me and ask me to explain it?

A    Sure.

Q    You understand that this is a deposition, which means that it is a series of questions and answers under oath that is being written down by this court reporter?

A    Yes.

---

4

Q    And therefore all responses have to be verbal, that gestures, shakes of the head, nods, winks cannot be recorded. Do you understand that?

A    Yes, I do.

Q    And do you understand that we cannot both speak at the same time so that one of us will have to stop while the other is talking or otherwise it will be a jumble in the notes. You are Jason Benson?

A    I am.

Q    And what is your birth date?

A    9/27/76.

Q    And your social security number?

A    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.

Q    And your inmate number?

A    DS6483.

Q    How long have you been incarcerated?

A    A little over three years.

Q    So in 1998?

A    Since May 23rd of 1998.

Q    And where were you incarcerated?

A    I was incarcerated in Adams County.

Q    When were you transferred to this facility?

A    In February of 1999.

Q    In February of 1999?

A    Correct.

---

5

Q    And you've been here since then?

A    Yes.

Q    What sentence are you serving?

A    I'm serving three to six years.

Q    Three to six years?

A    Correct.

Q    And what is that for?

A    I'd have to object to that because I don't know how relevant that is.

MR. YOUNG:  Well, we're entitled to inquire into that because it may lead to the discovery of admissible evidence because certain crimes would be admissible at the time of trial and the only way we'll know that is if you answer the questions.

THE WITNESS:  Well, just so the objection is on the record and -- I'll tell you that I was here for conspiracy to robbery.

BY MR. BUTKOVITZ:

Q    Is that the only time you have ever been convicted of any crime?

A    No.

Q    What are your prior convictions?

A    I had a violation of the Uniform Firearm's Act as a juvenile.

Q    When was that?

---


---

6

| | | |
|---|---|---|
| 1 | A | 1992. I don't remember the date specifically. |
| 2 | Q | Anything else? |
| 3 | A | No. |
| 4 | Q | How far did you go in school? |
| 5 | A | Graduated. |
| 6 | Q | From high school? |
| 7 | A | Yes. |
| 8 | Q | What high school? |
| 9 | A | Central York. |
| 10 | Q | When was that? |
| 11 | A | 1994. |
| 12 | Q | Do you have any school beyond that? |
| 13 | A | Went to the Harrisburg Area Community College. |
| 14 | Q | How many years did you go there? |
| 15 | A | About one and a half. |
| 16 | Q | When did that start and end? |
| 17 | A | That started in the summer of '94 and ended in |
| 18 | the fall of '96 roughly. | |
| 19 | Q | Are you married? |
| 20 | A | No. |
| 21 | Q | Do you have any children? |
| 22 | A | No. |
| 23 | Q | Prior to your incarceration were you employed? |
| 24 | A | Yes. |
| 25 | Q | Where? |

7

| | | |
|---|---|---|
| 1 | A | I was employed by Luv Child Entertainment. |
| 2 | Q | L-o-v-e? |
| 3 | A | L-u-v, C-h-i-l-d. |
| 4 | Q | Where is that? |
| 5 | A | It's based out of York, Pennsylvania. |
| 6 | Q | And what did you do there? |
| 7 | A | I was event production, promotions. |
| 8 | Q | You were in promotions? |
| 9 | A | Yes. |
| 10 | Q | And production? |
| 11 | A | Yes. |
| 12 | Q | From when to when? |
| 13 | A | From I'd say September of 1995 until November |
| 14 | of 1997. | |
| 15 | Q | Between November of 1997 and the time that you |
| 16 | were arrested or -- this was a conviction, May 23rd, 1998; | |
| 17 | is that right? | |
| 18 | A | Correct. |
| 19 | Q | When were you arrested in that case? |
| 20 | A | I was arrested on the same day. |
| 21 | Q | You were arrested the same day you were |
| 22 | convicted? | |
| 23 | A | I was arrested the same day I was |
| 24 | incarcerated. | |
| 25 | Q | I'm sorry. This is the date your |

8

| | | |
|---|---|---|
| 1 | incarceration began? | |
| 2 | A | Yeah. |
| 3 | Q | Between November of 1997 and your |
| 4 | incarceration on May 23rd, 1998 were you employed? | |
| 5 | A | No. |
| 6 | Q | Had you been laid off? |
| 7 | A | No. |
| 8 | Q | Why did your employment come to an end in |
| 9 | November 1997? | |
| 10 | A | I moved. |
| 11 | Q | Where did you move to? |
| 12 | A | I moved to Orlando, Florida, Winter Park. |
| 13 | Q | But you were in Adams County in May of 1998? |
| 14 | A | Yes. |
| 15 | Q | Were you a resident of Orlando, Florida on |
| 16 | that date? | |
| 17 | A | No. |
| 18 | Q | Had you moved back to Pennsylvania? |
| 19 | A | Yes. |
| 20 | Q | When did you move to Pennsylvania again? |
| 21 | A | February of '98. |
| 22 | Q | What was your address in February 1998? |
| 23 | A | I believe it was 352 West Middle Street. I'm |
| 24 | not sure about the house. | |
| 25 | Q | What town? |

9

| | | |
|---|---|---|
| 1 | A | What? |
| 2 | Q | What town? |
| 3 | A | Oh, Gettysburg. |
| 4 | Q | Was that still your address on May 23rd, 1998? |
| 5 | A | Yeah. |
| 6 | Q | Did you live alone? |
| 7 | A | No. |
| 8 | Q | Who did you live with? |
| 9 | A | Several people. |
| 10 | Q | Who? |
| 11 | A | My codefendant in this case. |
| 12 | Q | Who is that? |
| 13 | A | Renee Rascoe, R-a-s-c-o-e. |
| 14 | Q | How is the first name spelled, R-e-n-e-e? |
| 15 | A | Correct. |
| 16 | Q | So that's a woman? |
| 17 | A | Correct. |
| 18 | Q | Anybody else? |
| 19 | A | Odds and ends really. I mean, just people |
| 20 | that came through. Honestly I don't know who a lot of them | |
| 21 | were. | |
| 22 | Q | How many other people shared that house with |
| 23 | you? | |
| 24 | A | Several. |
| 25 | Q | How many is several? |

BENSON, JASON                                     BENSON VS
08/30/01                                                          ELLIEN

---

10

1   A     At any given time four or five.
2   Q     Now, what chronic medical conditions had you
3   had as of the time you were incarcerated on May 23rd, 1998?
4   A     Epilepsy.
5   Q     When was your epilepsy first diagnosed?
6   A     When I was 12.
7   Q     So that would be in 1988?
8   A     Thereabouts.
9   Q     Who was your physician?
10  A     I really do not remember.  I remember that I
11  was diagnosed out of Hershey Medical Center.
12  Q     In the emergency room or part of a regular
13  office visit?
14  A     Part of a regular office.  I really don't
15  remember the exact details.
16  Q     Had you had seizures prior to the diagnosis?
17  A     One grand mal and one petit mal I think that
18  led up to it.
19  Q     Were you prescribed any medication?
20  A     Yeah, I was prescribed Tegretol at that time.
21  Q     How long were you on Tegretol?
22  A     Less than a year because I had seizures on it.
23  Q     Was the medication changed within a year?
24  A     Yeah, I was put on Dilantin.
25  Q     How long were you on Dilantin?

---

11

1   A     Probably another six months before I had
2   seizures on that as well.
3   Q     What happened then?
4   A     I was placed on a drug called Zarontin.
5   Q     How long were you on that?
6   A     Honestly I don't remember.
7   Q     Was there ever a time that you stopped taking
8   medications for the epilepsy?
9   A     No.
10  Q     Was there a time when Zarontin was replaced
11  with another drug?
12  A     Yes.
13  Q     What was that?
14  A     When I was in Florida I started taking
15  phenobarbital.
16  Q     Was that prescribed by a physician?
17  A     Yes, it was.
18  Q     Were all these drugs that we've discussed up
19  to now prescribed by physicians?
20  A     Yes, they were.
21  Q     How long were you on phenobarbital?
22  A     Until I was incarcerated.
23  Q     So that was about a year.  When did you move
24  to Orlando, Florida?  Was that in November of '97?
25  A     Yeah.

---

12

1   Q     So from November 1997 to May 1998 you were on
2   phenobarbital?
3   A     Correct.
4   Q     Did you have seizures while you were on
5   Zarontin?
6   A     Yes.
7   Q     Did that cause you to discontinue the
8   Zarontin?
9   A     Yes.
10  Q     What about the phenobarbital?
11  A     Not as much.
12  Q     But you did have seizures?
13  A     I had absent seizures, petit mal seizures, but
14  they kept the grand mal seizures under control.
15  Q     So you were not taken off phenobarbital?
16  A     No.
17  Q     Who was your doctor in Orlando, Florida?
18  A     It was an emergency room doctor.
19  Q     What hospital?
20  A     I couldn't tell you.  I really don't know.
21  Q     Did you treat at one particular emergency room
22  or did you treat at several emergency rooms?
23  A     Just one in Orlando.
24  Q     Was there somebody who accompanied you to the
25  emergency room?

---

13

1   A     Yes.
2   Q     Was that Renee?
3   A     No.
4   Q     Who accompanied you to the emergency room?
5   A     A girl by the name of Tina Wolf.
6   Q     W-o-l-f?
7   A     Correct.
8   Q     What is her address?
9   A     I have no idea now.
10  Q     What was your relationship with her?
11  A     Just a friend.
12  Q     Did she reside in Orlando, Florida?
13  A     No, she resided in Sebring.
14  Q     S-e-a --
15  A     S-e-b-r-i-n-g.
16  Q     Florida?
17  A     Correct.
18  Q     Do you know what town the emergency room was
19  in?
20  A     It was in Winter Park.
21  Q     Do you know the street?
22  A     No.
23  Q     Other than epilepsy, did you have any other
24  chronic health problem prior to your incarceration?
25  A     I had some anxiety problems.

---


---

14

1   Q    What were they?
2   A    I had anxiety attacks, panic attacks.
3   Q    When did they start?
4   A    Just prior to me getting incarcerated.
5   Q    Were you ever treated for that?
6   A    Yep.
7   Q    By who?
8   A    Self.
9   Q    Were you ever treated by a physician or health
10  care provider?
11  A    No.
12  Q    What was the treatment?
13  A    Marijuana.
14  Q    Have the anxiety attacks continued from the
15  time just prior to May 1998 up to the present?
16  A    Not so much when I was out there, but once I
17  was incarcerated, yeah, I had — they started to resurface
18  and I started to have those attacks again.
19  Q    How many attacks did you have prior to your
20  incarceration?
21  A    I don't know. I used to confuse them with
22  absent seizures because that's almost what it's like. It's
23  a bad situation. I don't know. I can't tell you.
24  Q    You're saying you hardly had any attacks
25  before you got into the prison?

---

15

1   A    No, I'm saying there were a few.
2   Q    What happened after you were incarcerated?
3   A    I wasn't medicated immediately for them so I
4   started to have a sort of resurgence of them.
5   Q    How many attacks did you have when you were
6   incarcerated?
7   A    Innumerable.
8   Q    Would that be every day?
9   A    Yes.
10  Q    For how long, from when to when?
11  A    From May I guess until August.
12  Q    And when you say you weren't medicated, that
13  means you were not given marijuana?
14  A    No, that doesn't mean that. That means I
15  wasn't given a prescription drug to treat it.
16  Q    Did you make a complaint about your anxiety
17  attacks?
18  A    Yes, I did.
19  Q    To who?
20  A    To the forensic psychologist, I believe his
21  name was, that was there. And he thought that I should see
22  a psychiatrist about it. Nothing ever materialized.
23  MR. YOUNG: Excuse me, are we in '98 right
24  now?
25  THE WITNESS: Correct.

---

16

1   BY MR. BUTKOVITZ:
2   Q    Do you know who the forensic psychologist was?
3   A    I don't remember his name.
4   Q    What about the — was there a specific
5   psychiatrist you were referred to?
6   A    He just stated blandly that I needed a
7   psychiatrist. He didn't get into the details.
8   Q    Other than these conditions, did you have any
9   other chronic health problem prior to your incarceration?
10  A    No.
11  Q    Had you ever been hospitalized prior to your
12  incarceration?
13  A    No.
14  Q    Did you ever have surgery before your
15  incarceration?
16  A    No.
17  Q    Who was your last family physician?
18  A    I couldn't tell you.
19  Q    So during your adulthood in your memory you
20  can't recall a private physician or a family physician?
21  A    No.
22  Q    In the present action you have brought a
23  complaint against Dr. Ronald Long because of an allegation
24  that he took you off of Dilantin; is that right?
25  A    Correct.

---

17

1   Q    When did you first see Dr. Long?
2   A    I believe it was June.
3   Q    What year?
4   A    Oh, when I first saw him in regards to the
5   complaint or just period?
6   Q    Period.
7   A    When I first got here, which was in August of
8   1999.
9   Q    You said you got here —
10  MR. YOUNG: He testified before he got here in
11  February of '99.
12  THE WITNESS: February, I'm sorry. August is
13  when I left Camp Hill.
14  BY MR. BUTKOVITZ:
15  Q    So you first saw Dr. Long in February 1999?
16  A    Correct.
17  Q    Now, Dr. Long is the doctor that treated you
18  for epilepsy; is that correct?
19  A    Himself and physician's assistants.
20  Q    Did Dr. Ellien treat you for epilepsy?
21  A    No.
22  Q    What did Dr. Ellien treat you for?
23  A    He was a psychiatrist.
24  Q    What conditions was he treating you for?
25  A    Anxiety attacks.

---


BENSON VS
ELLIEN

18

1  Q    When did you first start treating with Dr.
2  Ellien?
3    A    I want to say midway through 1999, April, May,
4  something like that. I'm not entirely positive if that's
5  correct.
6    Q    Had you ever been treated by a psychiatrist
7  prior to Dr. Ellien?
8    A    No.
9    Q    So you saw Dr. Long from February 1999 until
10 June 1999 before he discontinued the Dilantin; is that
11 correct?
12   A    Yes, that's correct.
13   Q    You were on Dilantin for those four months?
14   A    Actually I was on phenobarbital from Camp
15 Hill. And when I came here, I asked him if there would be a
16 suitable change because the phenobarbital really had me
17 dragging, you know what I mean, and I wanted to -- I wanted
18 to see if there would be a suitable change.
19        And he said, yeah, you know, he'd try to start
20 me on Dilantin. I expressed to him that that wasn't too
21 successful in the past, but he said that a suitable dosage
22 would prevent the seizures so I went along with that.
23   Q    You said it hadn't been suitable in the past
24 for what reason?
25   A    For whatever physiological reason drugs don't

19

1  work. It just didn't have an effect with me. I had
2  breakthrough seizures on it.
3    Q    So Long increased the dosage?
4    A    You have to understand I was a child when I
5  had taken it last so naturally he would have had to have
6  brought the dosage up a little bit higher. So, yeah, he --
7  he increased it from what it was before.
8    Q    Did you see a health care provider named
9  Troutman?
10   A    She's a psychologist.
11   Q    When did you first see her?
12   A    I have no idea.
13   Q    How often did you see her?
14   A    I didn't see her often at all.
15   Q    Did you see her more than once?
16   A    Yes.
17   Q    What was she treating you for?
18   A    She refers you to the psychiatrist. In order
19 to see a psychiatrist, you sort of had to go through her.
20   Q    You first saw Dr. Ellien on July 27th, 1999;
21 is that correct?
22   A    Say that again, please.
23   Q    You first saw Dr. Ellien on July 27th, 1999;
24 is that correct?
25   A    That may be correct. That may be correct. I

20

1  thought it was earlier but ...
2    Q    At that time -- by the way, are you on any
3  medications or drugs today?
4    A    Just my seizure medication.
5    Q    What medication is that?
6    A    Phenobarbital, a hundred milligrams.
7    Q    When you saw Dr. Ellien for the first time you
8  discussed with him that you were temporarily using Ativan
9  and Tofranil; is that right?
10   A    When I first saw him?
11   Q    July 27th, 1999.
12   A    No, those are drugs that he prescribed for me.
13   Q    When did you take Ativan?
14   A    When he prescribed it to me. As far as the
15 dates, I'd have to -- I'd have to look to be specific.
16   Q    How long were you on Ativan?
17   A    A few months.
18   Q    And what about Tofranil?
19   A    I want to say a month.
20   Q    What was Ativan, is that an antidepressant?
21   A    No, Ativan is a nerve medicine for the panic
22 attacks.
23   Q    What about Tofranil?
24   A    Tofranil was the antidepressant. I'd
25 explained to Dr. Ellien when he had first talked about

21

1  giving me Tofranil, I asked him wasn't that imipramine.
2    Q    What was that? I didn't hear you.
3    A    I asked him if that was imipramine. He said
4  it was imipramine, yes, it is. I said, well, that's not
5  going to go well with my seizures, is it? He had picked up
6  a -- it was over the screen. It was a TeleMed screen, you
7  know. He had picked up a -- one of his books. I believe it
8  was a PDR. He looks it up and he says, no, that's not going
9  to be a problem. So I -- I took it at face value.
10   Q    You also had a discussion with Dr. Ellien at
11 that time about Y2K; is that right?
12   A    I believe that was not a very serious
13 conversation. I wasn't experiencing any anxieties about
14 Y2K. That wasn't a concern of mine.
15   Q    Then you saw Dr. Jin Ha Yun on August 19th,
16 1999.
17   A    Refresh my memory.
18   Q    He was another psychiatrist. You stopped
19 taking Tofranil after three days saying it made you feel
20 nauseated and sick.
21   A    I never stopped taking Tofranil.
22   Q    You said nausea was a symptom of your panic
23 attacks, the first panic attack having occurred in 1996.
24 You told him that you had taken Xanax or Ativan and Ambien
25 most successfully in controlling your panic attacks. You

BENSON, JASON 
08/30/01

BENSON VS
ELLIEN

22

1  tried other medications without success. Previously on
2  Desyrel, up to 300 milligrams with no benefit, and you
3  agreed with Dr. Yun that you would try Serzone. You don't
4  recall any of that?
5      A    I don't recall anything about 1996. I don't
6  even recall the doctor, to be quite honest with you. I
7  mean, Ellien was my doctor. I saw Ellien.
8      Q    Do you recall Dr. Yun writing any order to
9  discontinue the Tofranil?
10     A    I never stopped taking the — the Desyrel, is
11 that what you said, discontinued Desyrel?
12     Q    Discontinue Tofranil.
13     A    No, I never discontinued Tofranil.
14     Q    It says in this note that he started you on
15 Serzone, a hundred milligrams for three days and then 200
16 milligrams for 30 days.
17     A    I remember being on Serzone, but I was also on
18 Tofranil.
19     Q    Do you remember who put you on the Serzone?
20     A    No. It's highly unlikely that I would have
21 seen a doctor outside of Ellien unless there was some sort
22 of psychiatric crisis going on. They seem very particular
23 about who you see and when you see them. I don't -- I
24 honestly don't recall seeing him. It sounds like an Asian
25 gentleman. I don't recall seeing him.

23

1      Q    What about this note that you had stopped
2  taking the Tofranil after three days because it made you
3  sick; is that true?
4      A    That's not true at all.
5      Q    Did you see a Dr. Eugene Polmueller on
6  September 1st, 1999?
7      A    No, I saw Polmueller one time for a
8  psychiatric review.
9      Q    And you're saying that is not on September
10 1st, 1999?
11     A    No, my review wasn't until 2000.
12     Q    The note says that you were in county prison
13 for a few days and you had a grand mal seizure and you were
14 admitted to ICU and that you had been off Dilantin sometime
15 during August. Since starting Serzone you hadn't had any
16 decrease in panic attacks and that he ordered you to
17 discontinue Serzone and put you on Klonopin; is that
18 accurate?
19     A    He had ordered me to be off the Serzone and on
20 the Klonopin?
21     Q    Yes.
22     A    Polmueller?
23     Q    Yes.
24     A    No, untrue.
25     Q    Did you see Dr. Ellien on September 23rd, 1999

24

1  for poor sleep and increased anxiety and tell him that you
2  had done well on Ambien, 10 milligrams in the past?
3      A    Maybe.
4      Q    And did Dr. Ellien put you on Ambien, 10
5  milligrams daily for five months and to continue the
6  Klonopin, half a milligram in the morning and a milligram in
7  the evening for five months?
8      A    I seem to remember being on those two drugs,
9  yeah.
10     Q    October 19th, 1999 you were seen by Dr.
11 Ellien. You were in the infirmary because of an intentional
12 Dilantin overdose; is that right?
13     A    It wasn't quite intentional, no.
14     Q    What happened in that case?
15     A    I had taken too many pills.
16     Q    Well, did you tell Ellien that you felt the
17 Ambien had initially helped you but you got used to it?
18     A    During that time -- I don't remember. I was
19 so whacked out because of the overdose so I don't really
20 remember a whole lot of what went on because I was on again,
21 off again.
22     Q    How many Dilantin pills were you supposed to
23 take?
24     A    I'd have to see the order to tell you.
25     Q    Did you have a discussion with Dr. Ellien

25

1  about Pamelor, Sinequan, Neurontin?
2      A    I discussed Neurontin before with him.
3      Q    What was the discussion with Neurontin?
4      A    It was in regards to seizures.
5      Q    What was the discussion?
6      A    Anti-epileptic pills as far as petit mal
7  seizures are concerned.
8      Q    What was said by him and by you about it?
9      A    He thought that, you know, it may help with
10 breakthrough seizures. I said, yeah, it may. He ended up
11 putting me on Dalmane.
12     Q    Did he cancel your Ambien?
13     A    I don't recall.
14     Q    And you continued on Klonopin?
15     A    I believe I asked him to take me off Klonopin.
16     Q    So do you know whether you continued on it,
17 whether you were taken off of it?
18     A    Well, if I asked him to take me off of it, he
19 took me off it.
20     Q    On November 8th, 1999 Dr. Ellien saw you and
21 you admitted to him that you took Dilantin to get high.
22     A    That's not possible.
23     Q    What do you mean it's not possible?
24     A    You can't get high off of Dilantin.
25     Q    Did you say that to him?

BENSON, JASON     BENSON VS
08/30/01    ELLIEN

26

1    A    No.
2    Q    And you complained that you were having
3    sleeping problems that you did not have while you were on
4    Ambien.
5    A    I really don't remember.
6    Q    And he increased -- he had increased your
7    Klonopin six days earlier to one milligram in the morning
8    and two milligrams in the evening to help you sleep.
9    A    I had asked him to take me off the Klonopin.
10    Q    Well, this indicates on November 8th, '99 that
11    you reduced your Klonopin to one milligram daily on November
12    16th.
13    A    Whether or not that was a response to my
14    request I couldn't tell you.
15    Q    You don't know the date of your request?
16    A    I don't know the date precisely.
17    Q    Did Dr. Ellien put you on the Ambien and
18    continue the Klonopin and reduce the Klonopin dosage?
19    A    I remember being off of Ambien. I asked him
20    to take me off Klonopin. As far as when, I don't remember.
21    What I was focused on when I wrote the complaint was the
22    administration of Tofranil.
23    Q    On December 8th, 1999 you were in the RHU for
24    losing your temper and punching a door in which you injured
25    your hand. Do you recall that?

27

1    A    No.
2    Q    Did that happen?
3    A    I'm not sure. It's a matter of
4    interpretation, I guess.
5    Q    And you discussed tricyclic antidepressants
6    with Dr. Ellien on that date.
7    A    I discussed tricyclic antidepressants with Dr.
8    Ellien way before that date.
9    Q    Did you discuss it with him on that date?
10    A    I don't recall that.
11    Q    Do you recall telling him on that date that
12    you took Sinequan without a prescription and had a seizure
13    while on it?
14    A    No.
15    Q    So that's not true?
16    A    I don't recall saying that.
17    Q    And you discussed Tofranil, Pamelor and Elavil
18    with Dr. Ellien?
19    A    I don't recall that.
20    Q    Did you tell Dr. Ellien you preferred not to
21    have any change in your medications?
22    A    In response to what? In response to what
23    medications? I don't know what you're talking about here.
24    Q    Well, you were on Serzone, Ambien -- you were
25    on Ambien and Klonopin at that time; is that right?

28

1    A    December -- you're saying as of December of
2    '99?
3    Q    Yes.
4    A    I truly don't know. I truly -- and I also
5    fail to see where, you know, it's going. I don't
6    understand.
7    Q    I'm entitled to take your deposition.
8    A    Sure. I'm not going to decline to answer. I
9    just -- you know, I --
10    Q    Do you remember any of these things or don't
11    you?
12    A    No.
13    Q    Okay. January 13th, 2000 you saw Dr. Ellien,
14    told him that you didn't take the Klonopin in the morning
15    because you overslept; is that right?
16    A    Couldn't tell you.
17    Q    You don't know if that's true or not?
18    A    I don't believe that it is. I told you I
19    asked him to take me off of the Klonopin. I asked him to
20    withdraw me from the Klonopin. Now, whether he did or he
21    did not, I don't recall a precise date.
22    Q    Dr. Ellien reviewed several options with you
23    at that time including the tricyclic antidepressants,
24    Tofranil, Pamelor, Elavil and Paxil; is that right?
25    A    I have no idea.

29

1    Q    And you told Dr. Ellien that Paxil would be
2    your choice; is that right?
3    A    I've never taken Paxil.
4    Q    Did you tell him that that would be your
5    choice out of those drugs?
6    A    Was I ever prescribed it?
7    Q    Right now we're talking about a discussion
8    that you had with him about four or five potential drugs.
9    A    I'm telling you that these are discussions
10    that could come up during any one of the visits that I've
11    ever had with Dr. Ellien. These conversations always came
12    up, always looking to see, well, what would be better than
13    this or what would be better than this, but as for changes
14    they were rarely made.
15         When I asked him to withdraw me from the
16    Klonopin, that's something I can recall, but you're talking
17    about him bringing up several different drugs at several
18    different times and -- this was the run of the mill sort of
19    conversation. He brought this up all the time.
20    Q    Did you say to him that out of the medications
21    that were just listed --
22    A    No.
23    Q    -- you would prefer Paxil?
24    A    No. I don't recall.
25    Q    Which is it, no, or you don't recall?


30

1    A    I don't recall.
2    Q    And at that time Dr. Ellien cancelled the
3    Ambien, changed Klonopin to full two milligram doses in the
4    evening and ordered you to begin Paxil, 10 milligrams at
5    4 p.m. for a week and then increase to 20 milligrams at
6    4 p.m. daily; is that correct?
7    A    That wouldn't make any sense.
8    Q    Do you know if that's accurate or not?
9    A    I wouldn't say that it is, no.
10   Q    Would you say that it isn't?
11   A    I would say that it isn't.
12   Q    On January 27th, 2000 Dr. Ellien saw you
13   again. You were complaining that you were not sleeping at
14   night and that you were very anxious because of your court
15   cases and that you were notified that you had to go to Adams
16   County the next day.
17   A    This is when?
18   Q    January 27th, 2000.
19   A    Yeah, probably.
20   Q    You said you were somewhat hyper on the Paxil
21   but that your symptoms were going away.
22   A    Whoa, whoa, I never took Paxil.
23   Q    Then you discussed the use of Sinequan for
24   sleep and anxiety.
25   A    Maybe that's correct, but the Paxil isn't

31

1    correct. I've never been on Paxil.
2    Q    And at that time Dr. Ellien started you on
3    Sinequan concentrate, a hundred milligrams as needed; is
4    that right --
5    A    I recall that.
6    Q    -- for sleep, depression, anxiety. That's
7    accurate. And you were continued on Klonopin, two
8    milligrams each night.
9    A    I don't know about that. Like I said, I asked
10   him -- why would I still be on a higher dosage than I was
11   when I first started out. That doesn't make sense. No,
12   that's not true.
13   Q    Then you were continued on Ambien, 20
14   milligrams for each night.
15   A    No, I doubt that. Why would I be on Sinequan
16   and Ambien at the same time. That wouldn't make sense.
17   Q    February 12th, 2000 you wrote a letter to Dr.
18   Ellien.
19   A    Um-hum.
20   Q    You said you were experiencing lucid petit mal
21   seizures and you heard voices telling you you were a data
22   processing machine.
23   A    Yeah.
24   Q    Do you recall that?
25   A    Yes, I do recall that.

32

1    Q    And that you had fleeting paranoia and trouble
2    at times differentiating between dreams and reality.
3    A    Not fleeting paranoia. What I was describing
4    to him was a petit mal seizure that I had had.
5    Q    You said in that letter that you had used a
6    lot of LSD, mescaline, DMT and every sort of hallucinogen --
7    A    Um-hum.
8    Q    -- before you were incarcerated; is that
9    right?
10   A    That's correct.
11   Q    You said that you have used LSD well over 700
12   times during your lifetime.
13   A    That's correct.
14   Q    And you raised in the letter the question is
15   it possible that I've caused some sort of neuro
16   degeneration, am I losing my damn mind; is that accurate?
17   A    Yeah. I recall writing that.
18   Q    What was the period of time that you were
19   using LSD?
20   A    From the time I was 18 until I was 21,
21   whenever I got locked up.
22   Q    You used it in prison?
23   A    No.
24   Q    What do you mean whenever you got locked up?
25   A    Whenever I was incarcerated that's when it

33

1    ended.
2    Q    How many times had you been incarcerated?
3    A    The time I was a juvenile.
4    Q    One time?
5    A    (Witness nods head affirmatively.)
6        MR. McNAMARA: You have to say yes or no.
7        THE WITNESS: Yes.
8    BY MR. BUTKOVITZ:
9    Q    When did you take 700 hits of LSD?
10   A    You have to understand I was taking large,
11   large quantities.
12   Q    How large?
13   A    Anywhere between 15 to 25 hits.
14   Q    How often?
15   A    It varied.
16   Q    Is that every day?
17   A    No, you would lose your mind.
18   Q    Every week?
19   A    Every week?
20   Q    Yes.
21   A    Probably for a while there, yeah.
22   Q    How long a while?
23   A    I seem to recall the summer of '95 having the
24   highest concentration of abuse. You know, after that it was
25   -- it sort of lost its novelty.


34

1   Q    Did you note any relationship between this and
2 your seizures?
3   A    I was asking, you know, because the petit mal
4 seizures, they're very surreal when you have them, you know,
5 and it's hard to differentiate sometimes depending on the
6 intensity of whether or not you're having some sort of
7 flashback or whether this is a seizure.
8     And I brought that up and he's the one that
9 suggested that it very well may be a petit mal seizure
10 because he -- in his career he's never heard of anybody that
11 doesn't have severe mental disorders having this -- this
12 kind of reaction. So at his suggestion ...
13   Q    February 17th, 2000 you met with Dr. Ellien.
14 Did you have a discussion with him about this letter at that
15 time?
16   A    I don't know. You'd have to refresh my memory
17 on that.
18   Q    What did he say to you about the LSD?
19   A    Well, what we were just talking about, that as
20 far as the LSD is concerned, yes, people have flashbacks but
21 they're usually not like what you're describing.
22 Considering your history with petit mal seizures, more
23 likely than not it is petit mal seizures. This is something
24 you'd have to discuss with Dr. Long. And I'm unsure about
25 the rest of that conversation.

35

1   Q    Did you tell him at that time that the
2 Sinequan was helping you sleep?
3   A    Probably, because it was.
4   Q    Did you also tell him that Dr. Long had ruled
5 out the possibility that you were having petit mal seizures?
6   A    No, I didn't see Long. Long had stopped
7 seeing me after I had gotten back.
8   Q    Did you agree to increase the Sinequan to help
9 prevent your panic attacks?
10   A    Maybe. It was a lot at the time.
11   Q    At that time Dr. Ellien increased your Paxil
12 to 30 milligrams at 4 p.m. daily.
13   A    How much?
14   Q    Thirty milligrams.
15   A    That's just not possible. I wasn't taking
16 Paxil.
17   Q    So you deny that -- you were never on Paxil?
18   A    No.
19   Q    And he continued you on Klonopin, two
20 milligrams in the evenings.
21   A    I can't say that I was on Klonopin either.
22   Q    Do you know if you were or you weren't?
23   A    I wasn't.
24   Q    And he increased your Sinequan to 150
25 milligrams daily.

36

1   A    I'll buy that.
2   Q    So are you saying that he made up these notes
3 about Paxil and Klonopin?
4   A    He had to have been.
5   Q    He just put them in the notes?
6   A    Or he was confused. It wasn't me. I wasn't
7 taking Paxil and I had asked him to stop the Klonopin a long
8 time ago.
9   Q    March 23rd, 2000 you saw Dr. Ellien and told
10 him that you felt that the staff was holding grudges against
11 you; is that right?
12   A    Maybe.
13   Q    And you described panic attack symptoms; is
14 that right?
15   A    Yes.
16   Q    Did you ask Dr. Ellien to double your Klonopin
17 dosage at that time?
18   A    No.
19   Q    Did he refuse that request due to a history of
20 drug abuse and high risk of tolerance, Klonopin?
21   A    I never had that kind of a conversation with
22 him.
23   Q    Did he discuss side effects of Sinequan and
24 Klonopin?
25   A    No. He had discussed the side effects of

37

1 Sinequan when he had first prescribed it to me.
2   Q    Did he cancel Paxil at that time due to side
3 effects?
4   A    No, because I wasn't on it.
5   Q    Did he raise your Klonopin -- or change the
6 Klonopin to a half a milligram at 11 in the morning and one
7 and a half milligrams in the evening?
8   A    I wasn't on it.
9   Q    And did he increase your Sinequan concentrate
10 to 250 milligrams in the evenings?
11   A    He may have at that point. I -- I -- or he
12 may have done that previously. You know, I really don't
13 recall with the Sinequan.
14   Q    March 23rd, 2000 your counselor noted that you
15 had stopped taking Paxil and you had taken yourself off
16 other medications.
17   A    Counselor being who?
18   Q    I don't know. Did you just stop taking any of
19 these medications?
20   A    I didn't stop taking Paxil. You keep bringing
21 that up. I was never on Paxil.
22   Q    With respect to Dilantin, Dr. Long noted that
23 you had on your own initiative stopped taking the Dilantin
24 between May 26 and June 4th, 1999; is that right?
25   A    No, that's not right.

BENSON, JASON     ● BENSON VS
08/30/01                                        ELLIEN

---

38

1    Q    Did the nurses have you see Dr. Long because
2    of a persistent noncompliance in his prescriptions?
3    A    That's not right at all. If I had stopped
4    taking the Dilantin, I would have been thrown back in the
5    infirmary. You don't play games with that.
6    Q    And on June 5th did Dr. Long accept the
7    decision to stop taking Dilantin?
8    A    No, he took me off it.
9    Q    April 11th, 2000 you saw Dr. Ellien again and
10   you told him that the Klonopin was helping with anxiety
11   during the day; is that not true?
12   A    No.
13   Q    You're saying that's not true?
14   A    I'm saying that's not true.
15   Q    Because you were not on Klonopin at that time?
16   A    I was not on Klonopin at that time.
17   Q    You told Dr. Ellien I don't want Sinequan, I
18   want a sleeping medication, not something that is used for
19   something else; is that right?
20   A    I may have. I seem to recall having those
21   sort of conversations with him considering he wanted to
22   always put me on something for --
23   Q    Dr. Ellien noted you had a pattern over the
24   preceding several months of rejecting antidepressants which
25   he described as those medications with the best chance of

---

39

1    helping you while seeking out addictive antianxiety
2    medications.
3    A    I asked to get off the Klonopin, for one. And
4    for two, when I rejected antidepressants, I rejected them on
5    the basis of I wanted something to sleep, not something to
6    treat a problem that I didn't have, a nonexistent problem.
7    I wasn't depressed. I needed to sleep. That's it.
8         I never volunteered names for him. I never
9    threw anything out there for him. I just simply told him I
10   don't want to be on antidepressants so I can sleep. I want
11   to be on sleeping pills so I can sleep. If that means
12   Tylenol PM, give me Tylenol PM if that's going to work.
13   Q    Did Dr. Ellien tell you at that time of the
14   risk of seizures if you abruptly stopped taking Dilantin?
15   A    No, he -- I had told him that I was not on
16   Dilantin when he had given me the Tofranil. When he was
17   about to prescribe the Tofranil, I said, listen, I can't
18   take Tofranil, I can't take that because it's not going to
19   work with my condition. It's been known to cause seizures.
20   That's when he looked it up in the book and said that it
21   wasn't, that it would be good for me.
22   Q    Dr. Ellien notes on April 11th, 2000 that he
23   refused to just stop Klonopin and referred you to Dr. Long
24   concerning your desire to stop Dilantin and that he strongly
25   advised you not to stop Dilantin and that you told Dr.

---

40

1    Ellien that you had refused to take both medications.
2    A    That's completely false.
3    Q    In what way is it completely false?
4    A    I never ever just stopped taking Dilantin. I
5    was discontinued from my Dilantin. I wanted him to change
6    it. I was having side effects from the Dilantin. I did not
7    want to be taking the Dilantin any longer.
8    Q    What were the side effects of Dilantin?
9    A    It was making me very jittery, very jittery,
10   like I had drank a gallon of coffee, only it was like that
11   all day. And subsequently it was causing problems with me
12   writing, problems concentrating. It wasn't worth the
13   hassle.
14        I wanted to get off the phenobarbital because
15   I was dragging around all the time, you know, not to be
16   switched onto something that had me a wreck. So I asked him
17   to change it and he refused. He would not change it. He
18   would not take me back.
19   Q    Dr. Ellien says in his note that he told you
20   that you -- he would place you on a must take list for
21   Klonopin and Dilantin due to high risk of life-threatening
22   status epilepticus if you abruptly stopped and that you
23   understood but did not agree with the plan.
24   A    That's completely false. If that were the
25   case, believe you me I would have been back in that

---

41

1    infirmary, locked in the catacombs until I agreed to start
2    taking that drug. That was not the case. That was never
3    ever the case, ever the case.
4         I -- I have to object to all of this
5    paperwork. I have never -- no one has ever given me a copy
6    of any of this. I don't even know where you're getting this
7    from. I have no idea of what its origin is. You're telling
8    me a lot of things that simply just are not true. Whether
9    they're written in there or not, it's never been introduced
10   to me. There are a lot of untruths in there.
11        MR. McNAMARA: He's only asking you
12   questions. He's not -- it's not necessarily gospel.
13        THE WITNESS: I'm speaking on behalf of
14   everybody in the room, to everybody that it concerns, that
15   it's -- there's a lot of things in that paperwork that
16   simply are not true and it's never been introduced to me.
17   It's never been given to me in any kind of discovery so --
18        MR. McNAMARA: All you have to say is what you
19   said. You don't have to take as gospel anything he says.
20   He's just asking questions. If you disagree, then that's
21   fine. He's working, I assume, from papers that he made or
22   that were created and he's able to do that without giving
23   them to you in advance.
24        THE WITNESS: Sure, I'm just curious as to the
25   origin of all of this stuff because it's ...

---

BENSON, JASON 
08/30/01

BENSON VS
ELLIEN

42

1      MR. McNAMARA: Sure.
2  BY MR. BUTKOVITZ:
3      Q    April 11, 2000 Dr. Ellien wrote that he
4  cancelled Paxil due to noncompliance and to taper Klonopin
5  with a plan to discontinue and that he was referring you to
6  Dr. Long to be counseled about your desire to stop Dilantin.
7      A    No.
8      Q    Are you saying all that is not so?
9      A    Yes, that's exactly what I'm saying.
10     Q    And he also said he was placing you on a must
11 take list for Dilantin and Klonopin.
12     A    If I was on a must take list and I didn't take
13 that medication, as I said, I would have been back in the
14 infirmary in a cell, not allowed to leave until my -- I
15 either took Dilantin or my level was back to where it should
16 be so I would be safe to enter back to the population. That
17 never happened.
18     Q    On May 17th, 2000 Dr. Ellien evaluated you.
19 You were concerned at that time about going back to
20 Gettysburg for trial.
21     A    Oh, yeah. I recall saying that. That much is
22 true. I was a little anxious considering, yeah.
23     Q    And you told him you were afraid Dilantin
24 would not be given to you; is that accurate?
25     A    I remember just saying blandly that an

43

1  anticonvulsive would not be given to me because I had not
2  been given any anticonvulsants here. I was concerned that I
3  wasn't going to have any to go down with me and then we'd
4  have this whole situation over again.
5      Q    You indicated you were tolerating the tapering
6  of the Klonopin at that time.
7      A    That's just not true.
8      Q    So you're saying you were not on Klonopin
9  throughout this entire period?
10     A    No.
11     Q    You said you were not able to sleep.
12     A    That very well could be true.
13     Q    And you continued not to want an
14 antidepressant for your anxiety disorder.
15     A    I agree with having that same conversation
16 with him as well, many times.
17     Q    Your prior treatment with Ambien had been
18 stopped because of mild side effects.
19     A    It had stopped because it didn't work anymore.
20     Q    But you agreed to restart it as you needed.
21     A    Um-hum.
22     Q    Can you give me a chronology of the drugs you
23 were on for epilepsy during the time you've been in
24 Smithfield?
25     A    When I first came here I was on phenobarbital.

44

1      Q    From when to when?
2      A    When I first got here. Like I said, February
3  of 1999 I was on phenobarbital. I want to say March, April
4  I asked Dr. Long to switch me to Dilantin.
5      Q    You asked who?
6      A    Dr. Long.
7      Q    Did you get it in April?
8      A    Yes.
9      Q    Right.
10     A    I was on it for -- self take for several
11 months, but I was having these effects with it. I had
12 complained about it before. He just said, well, stick with
13 it, see if you can ride through it, you know, see if you can
14 work through it.
15     Q    You complained about it to who?
16     A    Dr. Long.
17     Q    What were the complaints?
18     A    That it was making me jittery, anxious.
19     Q    When did you stop taking it?
20     A    I stopped taking it when he took me off of it.
21     Q    Which was about when?
22     A    That was in June.
23     Q    What was it replaced by?
24     A    Nothing. I had asked him to switch it with
25 phenobarbital.

45

1      Q    So you had no anticonvulsive medication?
2      A    None whatsoever.
3      Q    Until when?
4      A    Until I had gotten back from Gettysburg
5  Hospital.
6      Q    Which would be when?
7      A    Which would be August -- or September 1st of
8  2000 -- or '99.
9      Q    That's when it stopped. When did it start
10 that you didn't have an anticonvulsive?
11     A    It started in June.
12     Q    Did you have any seizures during the time that
13 you did not have the anticonvulsive medication?
14     A    When I went on writ. When I went down to
15 Adams County Prison.
16     Q    What happened?
17     A    You have to understand I'm relaying this to
18 you from what I've read about the situation because I don't
19 really recall any of it. What I recall is going to sleep
20 and waking up in the critical care unit.
21          What happened was around three o'clock in
22 the morning, 3:30 in the morning, one of the staff had came
23 in, saw me on the floor unresponsive, bleeding from my
24 mouth, unable to follow verbal commands. She contacted the
25 lieutenant of Adams County Prison. They left, didn't do

BENSON, JASON 
08/30/01

BENSON VS
ELLIEN

---

46

1  anything about it for about an hour and a half.
2      They came back and they saw me again in
3  seizures, this time actual physical convulsions. Again,
4  more bleeding from the mouth, just unresponsive, unable to
5  wake.
6      They called the Adams County sheriffs who then
7  took their time in coming to pick me up and took me to
8  Gettysburg Hospital where I had a seizure in the parking lot
9  which was saw by the doctors there at the Gettysburg
10 Hospital. And I had the seizure there in the parking lot
11 and they immediately took me into the emergency room and
12 then once they were able to stabilize me they took me up to
13 the critical care unit.
14 Q     Can you tell me all of the claims you have
15 against Dr. Ellien?
16 A     The claims?
17 Q     In this case.
18 A     My claim is that he was deliberately
19 indifferent to my medical needs because he had objective and
20 subjective knowledge that I was without anticonvulsives and
21 that the drug he was about to prescribe was a seizure
22 antagonist.
23 Q     What was the subjective knowledge?
24 A     The subjective knowledge was the fact that I
25 had told him that he knew I was an epileptic from my medical

---

47

1  records and from me telling him.
2  Q     What was the subjective knowledge that you
3  would be harmed?
4  A     When he picked up that book and looked it up.
5  Q     You're referring to the Tofranil?
6  A     Yes.
7  Q     So you're saying he had subjective knowledge
8  of prescribing Tofranil because there was a statement in the
9  PDR that there might be contraindications?
10 A     There would be.
11 Q     Do you have an expert who will testify that it
12 is a violation of any professional standard of care to
13 prescribe Tofranil to somebody who is an epileptic?
14 A     As of this point whoever the defendants choose
15 to put on the stand. I do have the doctor, Dr. Kamsler, who
16 put -- did the neurological consultation.
17 Q     Is it your position that a physician who
18 prescribes a medication for which there are possible
19 contraindications listed is thereby being deliberately ·
20 indifferent to conditions such as the epilepsy that you
21 have?
22 A     Say that again.
23 Q     The very fact that -- are you familiar with
24 the PDR?
25 A     Sure.

---

48

1  Q     For virtually every drug indicated there are
2  warnings and contraindications and risk factors; is that a
3  fact?
4  A     That's correct.
5  Q     And it's part of a physician's training and
6  experience to assess the benefits and the risks in arriving
7  at a decision to prescribe a particular drug in a particular
8  patient; isn't that true?
9  A     That's true.
10 Q     Isn't that why we have physicians prescribe
11 drugs rather than just go out and buy a book and self
12 medicate?
13 A     True enough.
14 Q     So are you saying that because there is a
15 statement in the PDR with respect to this specific drug that
16 indicates a risk in the case of epilepsy that in itself
17 establishes the deliberate indifference on the part of Dr.
18 Ellien to your condition?
19 A     No, what I'm saying is that Dr. Ellien was
20 aware that I was without seizure medication. I was abruptly
21 withdrawn from Dilantin which places me at risk for a status
22 epilepticus attack in and of itself. He was aware of that
23 because I told him and he was aware of that because it was
24 in my record. And as a psychiatrist, before he sees me he
25 reviews my record. That was revealed in the

---

49

1  interrogatories.
2      Now, because I was already at risk of a status
3  epilepticus attack, he placed me on a medication that lowers
4  the seizure threshold that is contraindicated to people with
5  seizure disorders. That is deliberate indifference because
6  he would know that at that point the chances of me having a
7  life-threatening seizure are within the 100 percentile
8  range. And there isn't an honest expert witness out there
9  that can testify otherwise.
10 Q     How frequently were you seeing Dr. Long during
11 the period that you were making these allegations about Dr.
12 Ellien?
13 A     During -- go back on that question for me.
14 Q     Well, you're saying Dr. Ellien was
15 subjectively aware or subjectively indifferent to you --
16 A     Um-hum.
17 Q     -- because he prescribed Tofranil at a time
18 that you were --
19 A     Without medication.
20 Q     -- without Dilantin. What time frame are we
21 talking about?
22 A     Figure that was in July when I was given the
23 Tofranil. It was June when I was discontinued from the
24 Dilantin. I hadn't seen Dr. Long from June until September.
25 Q     So you're saying as of July 1999 that would be

---


50

1  the beginning of Dr. Ellien's liability to you for
2  subjective indifference?
3      A      The beginning of July?
4      Q      No, you're saying July is when he prescribed
5  the Tofranil?
6      A      With Dr. Ellien?
7      Q      Yes.
8      A      Yes.
9      Q      And you're saying that is the triggering event
10 that is your claim against Dr. Ellien?
11     A      I would say that the triggering event was when
12 I informed him that I didn't think that was a good
13 medication, that he actually looked it up and still agreed
14 that it would be a good medication.
15     Q      When would that date be?
16     A      I don't have a precise date. I would need
17 that in front of me.
18     Q      So that would be July 27th, began Tofranil, 50
19 milligrams for one week?
20     A      I don't know that I would go by those notes
21 but perhaps.
22     Q      You're saying sometime in July of 1999?
23     A      It was sometime in July. I couldn't give you
24 a precise date right now.
25     Q      When do you say you stopped taking the

51

1  Tofranil?
2      A      When he stopped it.
3      Q      Which is when?
4      A      Which is when I got back from Gettysburg.
5      Q      September?
6      A      September.
7      Q      Again, you deny that Dr. Yun took you off the
8  Tofranil as of August 19th, 1999?
9      A      Yes, I do.
10     Q      And you indicated that all of Dr. Ellien's
11 notes after August of 1999 which do not indicate any
12 prescription for Tofranil are just inaccurate?
13     A      Basically, yes.
14     Q      If there's no prescription of Tofranil by Dr.
15 Ellien, do you have any other claim against him but for that
16 fact?
17     A      The fact that he knew and that he decided to
18 prescribe that drug anyway.
19     Q      Right, but if there was no prescription of
20 Tofranil, would there be any other claim against Dr.
21 Ellien? Is that your entire claim against him?
22     A      I would say that, you know, you have the
23 deliberate indifference thing going on there and as well you
24 have the fact that he -- he was deliberate to my serious
25 medical needs. He was deliberately indifferent to my

52

1  serious medical needs and I think that encapsulates -- I
2  think that's it in a nutshell.
3      Q      But I'm trying to find out what that means
4  factually.
5      A      Factually what that --
6      Q      You define that as relating to the Tofranil?
7      A      Sure.
8      Q      If you put the Tofranil to the side, okay,
9  aside from Tofranil, is there anything else factually that
10 you are claiming that indicates liability on the part of Dr.
11 Ellien?
12     A      What I believe is going on here is this, I was
13 on Ativan, I was on Tofranil, I was on Serzone, which is
14 Nefazodone.
15     Now, out of those drugs, every one of those
16 drugs contradicts the other. The biggest thing of it is,
17 though, the biggest thing is that the fact that he
18 prescribed Tofranil when he knew that I was abruptly
19 withdrawing from Dilantin and when he knew the effects that
20 the introduction of a seizure antagonist would have on
21 somebody that's been abruptly withdrawn from Dilantin.
22     Q      You testified at the beginning of this
23 deposition that Dr. Long was the physician who treated your
24 epilepsy; is that correct?
25     A      That's correct.

53

1      Q      So was he your -- is he the medical director
2  or is your regular physician --
3      A      General practitioner.
4      Q      You seem to have a lot of knowledge about the
5  indications and contraindications of these various drugs; is
6  that fair?
7      A      I've had to learn.
8      Q      And so as of this time in July of 1999 were
9  you alarmed that you had been prescribed Tofranil?
10     A      Yes.
11     Q      Why then didn't you see Dr. Long before
12 September of 1999 to discuss that issue?
13     A      Because he wouldn't see me.
14     Q      Did you put in requests to see him?
15     A      Yes, I put in a request to see him to ask him
16 to put me back on an anticonvulsive.
17     Q      Did you send him a note expressing alarm about
18 the prescription of Tofranil?
19     A      No.
20     Q      Why not?
21     A      Because I wasn't aware that it was going to
22 harm me the way it did. I had learned what I had learned.
23 I had asked the doctor and he said, no, that is not going to
24 be a concern here and so I took his word for it.
25     Q      When is it that you said that you became aware


54

1 of the contraindication for Tofranil?
2    A    September, late September.
3    Q    I thought you testified today that you sat
4 there with Dr. Ellien while you both looked at a computer
5 screen and discussed the very contraindications that you are
6 now citing --
7    A    Um-hum.
8    Q    -- as your claim against him.
9    A    Right.
10    Q    So wouldn't that be in July of 1999 when he
11 made the prescription?
12    A    I had known what I had read before, like from
13 Reader's Digest or one of those books, you know, they have
14 little prescription information, pills and whatnot. I had
15 read something along those lines.
16       And I recall that when he was bringing it up
17 and I said, well, you know, isn't that going to have an
18 effect? When he said no, I took it at that. That was my
19 testimony, that I just took his word for it because I wasn't
20 a hundred percent certain.
21       Now, when I went into this status epilepticus
22 fit, if you will, in Adams County Prison and I came back and
23 I had time to recuperate and figure out what the hell just
24 happened, then I went back through and I started looking
25 through things. I'm like, okay, this isn't right.

55

1    Q    What's the regular routine for you to be
2 evaluated as an epileptic in terms of time frame? How often
3 are you supposed to be evaluated by your doctor?
4    A    As far as here?
5    Q    Yes.
6    A    Whenever they feel like it.
7    Q    How long does your prescription last for the
8 various anticonvulsive medications and antianxiety
9 medications?
10    A    I do not know.
11    Q    Do they routinely last for more than 30 days?
12    A    Yes.
13    Q    Do you get your prescriptions renewed without
14 seeing a doctor?
15    A    Yes.
16    Q    Without seeing a nurse?
17    A    Well, the nurses just give out the drugs. You
18 see the doctor for seizure clinic and that's when they
19 discuss the dosages. That could be three months, that could
20 be two months, that could be six months. It's really
21 whenever they feel like it. If they don't feel like seeing
22 you -- you know, I just wrote the doctor today. I wrote
23 yesterday -- well, to the PA for a sick call. I asked if I
24 could see him because I had been having these problems with
25 these petit mal seizures. They have been recurring.

56

1       And basically what he did was he came to my
2 cell door today with a two-foot mag light and a pen to sign
3 a sick call slip. Sign the slip, you know what I mean, so I
4 can pay for it, shines a light in my eye and says I'm fine
5 and then shuts the door on my face and that was the extent
6 of it.
7       Now, did I get treated? No. When I got back
8 from Adams County Prison, I was taken to see a -- a
9 neurological consultation. The doctor recommended several
10 different tests that I should take. The doctor didn't do
11 -- I got back, they denied the tests. I couldn't get the
12 tests. So I'm working on their schedule here.
13    Q    Now, you said that you are personally familiar
14 with the Physician's Desk Reference insert on Tofranil; is
15 that right?
16    A    Yes, it's September.
17    Q    In fact, this is the amended complaint that
18 you have filed in this action to which you have attached a
19 copy of that drug insert; is that right?
20    A    That's correct.
21    Q    Could you point out to me or read to me the
22 section of that drug insert that you are asserting against
23 Dr. Ellien.
24    A    Sure. Extreme caution should be used when
25 this drug is given to patients with a history of seizure

57

1 disorder because this drug has been shown to lower the
2 seizure threshold.
3    Q    Can you point that out to me physically?
4    A    Extreme caution, you have the semicolon
5 there. It goes on to list a ...
6    Q    The quote that you're pointing out to me says
7 extreme caution should be used when this drug is given to
8 patients with cardiovascular disease because of the
9 possibility --
10    A    There's a semicolon and then there's an entire
11 list of different ailments that need to be used in caution
12 in a seizure.
13    Q    Where is the section that you're referring to?
14    A    (Pointing.)
15    Q    Patients with a history of seizure disorder
16 because this drug has been shown to lower the seizure
17 threshold. So because the drug -- because the insert says
18 extreme caution should be used, you're stating that that
19 establishes deliberate indifference?
20    A    That's one part of it. That's only one part
21 of it. That's one half of it.
22    Q    What's the other half of it?
23    A    I guess that would be a third. I don't know.
24 But the other part would be that he knew that I was abruptly
25 withdrawn from Dilantin and he knew the repercussions from



**BENSON, JASON**
08/30/01

**BENSON VS
ELLIEN**

---

58

1  that and he knew that by introducing a drug that can
2  actually lower the seizure threshold what the reaction would
3  be to that.
4        So there's three parts to it, pardon me.  With
5  having all that knowledge, that, okay, well, he was abruptly
6  discontinued from Dilantin, he's been off of it for about a
7  month now, now I'm going to give him a drug that's actually
8  going to lower the seizure threshold already when he's at
9  risk of having status epilepticus seizures.  That doesn't
10 seem to make a whole lot of sense.  It didn't make a whole
11 lot of sense to the neurologist at Gettysburg Hospital there
12 next to IMP.
13    Q     You said the Dilantin you were on from April
14 of '99.  When did you stop it?  September 1st, '99, okay.
15    MR. BUTKOVITZ: That's all I have.  I need a
16 minute.
17        (Break taken.)
18
19        CROSS-EXAMINATION
20
21 BY MR. McNAMARA:
22    Q     Jason, I'm going to go next.  I represent the
23 people from Adams County that you sued, all the COs, the
24 wardens, that whole group.  The first thing I want to do is
25 somewhere along the line I got messed up in my chronology.

---

59

1  I understood you got arrested and you got put in Adams
2  County Prison May 23rd, 1998.
3    A     That's correct.
4    Q     And the charges were conspiracy to commit
5  robbery?
6    A     Yes.
7    Q     Were you held there until you were tried on
8  those charges?
9    A     Yes, I was.
10   Q     And you were convicted after a trial?
11   A     Actually I took a plea bargain.
12   Q     And the only charge that you pled to was
13 conspiracy to commit robbery?
14   A     That's correct.
15   Q     And you got three to six years for that?
16   A     Yes.
17   Q     That's a long time for that particular
18 charge.  Are you sure there wasn't something else?
19   A     No.
20   Q     Do you know what the date was that you pleaded
21 to the conspiracy charge?
22   A     I believe it was in August.
23   Q     Of 1998?
24   A     Of '98, yeah.
25   Q     And then in August of '98 did you go to Camp

---

60

1  Hill Prison?
2    A     Yes.
3    Q     And then when were you transferred -- you were
4  transferred to Smithfield in February of '99?
5    A     That's correct.
6    Q     And then you came back to Adams County in
7  August of 1999 for a post conviction relief act petition?
8    A     That's correct.
9    Q     Now, other than being in Adams County Prison
10 from May 23rd, 1998 through August of 1998, were you ever in
11 Adams County Prison before that?
12   A     No.
13   Q     Now, how many times between May 23rd, 1998 and
14 August 23rd, 1998, when you were transferred to Camp Hill,
15 how many times had you been in and out of the prison?
16   A     Between when I first got there and when I left
17 for Camp Hill?
18   Q     Yes, to meet a lawyer, to have a court date.
19   A     Only once or twice for court.  You know, I had
20 the preliminary hearing and I had my -- my -- I forget what
21 you call it, the plea, the arraignment, where I did the
22 plea.
23   Q     So there were a couple of times between May
24 23rd, 1998 and August of 1998 when you were out of the
25 prison then you came back the same day?

---

61

1    A     That's right.
2    Q     Now, counting the first time you went into the
3  jail, were you strip searched every one of those times?
4    A     Yes.
5    Q     I've never been strip searched.  It sounds to
6  me like you take all your clothing off; is that right?
7    A     Indeed you do.
8    Q     And do they do a body cavity search as well?
9    A     My God, no.
10   Q     So they're not --
11   A     Hopefully.
12   Q     They're not looking in your rectum?
13   A     No.
14   Q     Do they look in your mouth?
15   A     Yeah, they make you run your fingers through
16 your mouth.
17   Q     Do they make you take every stitch of clothing
18 off?
19   A     Yes, they do.
20   Q     Now, in the two or three times between May
21 23rd, 1998 and August of 1998 that you were in and out of
22 the jail and strip searched every time --
23   A     Um-hum.
24   Q     -- what was the procedure that was followed
25 leading up to the strip search?

---


62

1     A     When I left and I would come back, they would
2  buzz you into the intake area and then you would sit on the
3  bench and they'd cuff you to the bench. Then when it was
4  your time to be stripped, they'd uncuff you and you'd go
5  into what they call the medical room and conduct a strip
6  search and you go back to your block.
7     Q     Now, each of the times between May 23rd, 1998
8  and August of 1998 when you had been in and out of the jail,
9  whenever you came in did they follow that same procedure?
10    A     Yes.
11    Q     And when you said they would cuff you to the
12 bench, that meant you would have one part of the cuff hooked
13 to the bench and the other one hooked to your hand?
14    A     Yeah, you would be like this. There's a ring
15 on the wall.
16    Q     So would you have cuffs on both wrists or
17 would you have a cuff --
18    A     Just on one wrist hanging to the wall.
19    Q     And then there's a pole there that they can
20 cuff you to?
21    A     Yes.
22    Q     Were you wearing shackles on your legs during
23 those two or three times that you'd been in and out?
24    A     No, they take those off. The sheriffs take
25 them with them. They're the sheriff's cuffs. They just

63

1  switch your handcuffs over.
2     Q     Whenever you needed to be moved from the jail,
3  from the Adams County Prison to court or wherever you had to
4  be outside, was it always the sheriff that did the
5  transporting?
6     A     Yes.
7     Q     Now, in these two or three times that you'd
8  been through a strip search prior to August 1998, when they
9  uncuffed you from the pole in the intake area and took you
10 into the medical area, did they recuff you after you were
11 unhooked from the pole?
12    A     No.
13    Q     Did they remove the cuffs entirely?
14    A     Yeah.
15    Q     So when you went in to be strip searched, you
16 would go into the nurse's area or the medical area with no
17 restraints on you at all?
18    A     That's right.
19    Q     And other than the very first time that you ·
20 came in, were you wearing the orange prison outfit that they
21 put on you there?
22    A     Yes.
23    Q     And when you did the strip search, did you
24 strip yourself or were you assisted?
25    A     I stripped myself.

64

1     Q     And then did a corrections officer examine you
2  at that time?
3     A     Yes.
4     Q     And do you understand why it is that they were
5  doing a strip search?
6     A     Sure I do.
7     Q     Why?
8     A     Well, they don't want you bringing back any
9  sort of contraband.
10    Q     And contraband could include weapons --
11    A     Weapons, drugs, cigarettes, whatever.
12    Q     And would you agree with me that the prison
13 has a -- there's a reasonable reason why they do that?
14    A     Yes.
15    Q     And had you ever refused to submit to a strip
16 search up until August of 1998?
17    A     Never.
18    Q     Now, when you were at Camp Hill, do they also
19 have a strip search procedure there?
20    A     Yes, they do.
21    Q     And without exception, every time you came
22 into the Camp Hill Prison from outside did you have to
23 submit to a strip search?
24    A     Yes, you did.
25    Q     They followed basically the same procedure

65

1  that they had had at Adams County Prison for strip searching
2  at Camp Hill?
3     A     Yes, they did.
4     Q     And there were absolutely no exceptions, every
5  time you came in you got strip searched?
6     A     That's correct.
7     Q     Now, at Smithfield, do they have a strip
8  search procedure here?
9     A     Yes, they do.
10    Q     And every single time you come into Smithfield
11 from the outside are you strip searched here?
12    A     Yes.
13    Q     And is the procedure basically the same as
14 what it was at Adams County?
15    A     Yes.
16    Q     And do you understand that at Camp Hill and
17 Smithfield they have the same interest in not wanting people
18 coming in from the outside to bring in contraband?
19    A     That's correct.
20    Q     Do you think that's a good reason for having a
21 strip search?
22    A     Yes, I do.
23    Q     Whatever number of times there were that you
24 came into Camp Hill and to Smithfield, did you ever refuse a
25 strip search?


66

1     A     No.
2     Q     Did anybody ever have to apply force to you up
3  until this incident in Adams County in August of 1999 to get
4  you to comply with the strip search?
5     A     No.
6     Q     You always did it voluntarily?
7     A     Yes.
8     Q     I think you mentioned somewhere during your
9  responses to Mr. Butkovitz's questions that you had kind of
10 an anxiety situation over returning to Adams County for
11 trial on something else.
12     A     It was a subsequent visit after the events
13 that took place on my complaint. I had to go down there to
14 answer to a charge.
15     Q     A charge that arose as a result of that
16 incident with the pepper spray?
17     A     That's correct.
18     Q     You were charged with a separate crime for
19 that incident?
20     A     Yes, I was.
21     Q     Were you convicted on that?
22     A     I pled on that. Nolo contendere.
23     Q     No contest to what charge?
24     A     To aggravated harassment by a prisoner.
25     Q     How much time did you get for that?

67

1     A     One to two years.
2     Q     Is that on top of your three to six?
3     A     Concurrent.
4     Q     Do you have any expectation of when you're
5  going to be released here?
6     A     I imagine I'll max out.
7     Q     Is that because you've been a discipline
8  problem while you've been in the system?
9     A     No, because of the charge that I've had I've
10 already gotten a two-year hit on a three to six and I really
11 don't want to give them a year on the street, understand.
12     Q     I don't understand what that means.
13     A     I got a two-year hit, meaning I can't see the
14 board again for two years.
15     Q     Is that because of the incident in Adams
16 County?
17     A     Yeah. So that's five years. I got three to
18 six. I really don't want to do a year on parole, you know,
19 because, I mean, the recidivism rate is so high. I have my
20 own anxieties as to, you know what I mean, how successful
21 I'll be. Not that I'm going to go out there with criminal
22 intent, but that I'll be able to get a job and do everything
23 as smoothly as perhaps the parole board would like me to.
24 So I just feel as though probably May 23rd, 2004 I'll be
25 walking out the gates.

68

1     Q     And other than those two charges, you don't
2  have anything else -- there's no other reason why you're in
3  prison?
4     A     No.
5     Q     There aren't additional charges, nothing in
6  other jurisdictions or other states?
7     A     That's everything.
8     Q     You mentioned that when you went into Adams
9  County Prison I believe in May of 1998 that your anxiety
10 feelings increased and that you had additional anxiety
11 attacks?
12     A     Not until later on during that day, you know,
13 that things happened. Not immediately when I first got
14 there. I adjusted well.
15     Q     I'm not talking about the day you went back
16 for your post conviction relief act hearing. I'm talking
17 about the original commitment. I understand --
18     A     Oh, my original commitment, I'm sorry.
19     Q     I understood you to answer Mr. Butkovitz's
20 questions that you -- that upon your initial arrest you had
21 some increased anxiety and problems with anxiety attacks.
22     A     Yes, but it really wasn't being addressed at
23 the time.
24     Q     That doesn't form the basis for any of the
25 claims you have in this case, does it?

69

1     A     No.
2     Q     So I'm not going to ask you questions about
3  that because it doesn't have anything to do with this
4  lawsuit.
5     A     Okay.
6     Q     I don't know much about seizure disorders.
7  You talked about grand mal seizures, petit mal seizures --
8     A     Um-hum.
9     Q     -- breakthrough seizures. Let's try and deal
10 with them one by one. A petit mal seizure, what is that for
11 you?
12     A     I'll lose my bearings. I almost -- I
13 literally lose vision. It's like I've fallen asleep and
14 I've gone into a dream for perhaps a few minutes, you know,
15 but in reality it's only been a few seconds. You just
16 completely lose your bearings. That's what a petit mal
17 seizure is.
18     Q     How long have you been having those kind of
19 seizures?
20     A     Since I was about 12, 13 years old.
21     Q     And all the medications that you've taken over
22 the years, none of them have done away completely with that
23 type of seizure?
24     A     No.
25     Q     Is it something that you still have once in a


---

**70**

1 while here?

2 A    Yeah, something I'm still complaining about.

3 Q    When you have a seizure like that -- for

4 instance, we've been going here for an hour and a half. If

5 you had had one during this deposition, would we have known

6 it?

7 A    Maybe, maybe not. I've had people notice and

8 I've had people not notice.

9 Q    So it's the kind of seizure that maybe can

10 slip by without somebody even knowing that it occurred?

11 A    Sure.

12 Q    And sometimes they only last for a few seconds

13 but to you it seems like a longer period of time?

14 A    Correct.

15 Q    Do you always know when you've had one?

16 A    Yes.

17 Q    Have you had any today so far?

18 A    Not today, no, just yesterday.

19 Q    But you haven't had any during this

20 deposition?

21 A    No.

22 Q    And with a petit mal seizure, do you have a

23 memory loss?

24 A    Sometimes.

25 Q    Other than spacing out for a few seconds, do

---

**71**

1 you have any kind of tremors or --

2 A    No.

3 Q    -- body movements? Nothing like that?

4 A    No, not with a petit mal seizure.

5 Q    It's a momentary loss of consciousness?

6 A    Correct.

7 Q    And you may have your eyes open while it

8 happens?

9 A    Sure. I could be talking to you.

10 Q    That was my next question. You can talk right

11 through them?

12 A    Sure.

13 Q    Now, distinguish that from a grand mal.

14 A    A grand mal seizure I lose control. I go into

15 convulsions, like I -- you can't really witness yourself

16 having a grand mal seizure. You have to rely on what other

17 people tell you, you know, and from the aftermath. I know

18 that I bite my tongue and my cheeks up really badly. I've

19 caused muscular injuries, you know, pulling muscles having

20 seizures because you twitch.

21 Q    And have you had grand mals since you were 12

22 as well?

23 A    Yes.

24 Q    Have any of the medicines that you've taken

25 over the years been effective in completely eliminating

---

**72**

1 grand mal seizures?

2 A    To date phenobarbital has for grand mal

3 seizures.

4 Q    But you still have petit mal seizures?

5 A    But I still have petit mal seizures.

6 Q    Now, when you have a grand mal seizure, do you

7 go to the ground typically?

8 A    Yeah, you're going down.

9 Q    And do you have -- you actually have

10 involuntary muscle movements when you're having a grand mal?

11 A    That's correct.

12 Q    And you bite your tongue?

13 A    Yes.

14 Q    Every time you have one?

15 A    Every single time.

16 Q    Are you able to talk through a grand mal?

17 A    No.

18 Q    Are you able to think rationally when you're

19 in the middle of one?

20 A    No, I'm not conscious.

21 Q    So you're not able to call for help or

22 anything like that?

23 A    No.

24 Q    And do you scratch yourself or --

25 A    Sometimes.

---

**73**

1 Q    -- strike yourself when you do that?

2 A    I don't know about strike myself. Scratch

3 myself or fall, hit my head.

4 Q    Do you know when one is coming?

5 A    No, not a grand mal seizure.

6 Q    Is there any particular time in the day when

7 grand mals typically hit you?

8 A    No.

9 Q    Is there any particular stimulus that triggers

10 grand mals?

11 A    For myself there doesn't seem to be one, but

12 for others there is.

13 Q    So for you a grand mal seizure, if it's going

14 to strike, comes on unexpectedly?

15 A    Yes.

16 Q    And there's no warning?

17 A    That's correct.

18 Q    And once it starts there's no way for you to

19 stop it?

20 A    No.

21 Q    How long do they last?

22 A    Well, the longest I had, which is the one that

23 occurred in Adams County Prison, was about two hours, which

24 is --

25 Q    A two-hour continuous seizure?

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**


74

1   A    Yes.
2   Q    Do you have any memory of anything that goes
3   on during seizure activity?
4   A    No.
5   Q    During a grand mal seizure?
6   A    No. And especially in this case, when I
7   looked through the hospital records, they say, well, he's
8   oriented, he's looking at me and he's following my commands,
9   my voice commands, following my fingers. I don't remember.
10  I truly don't recall doing any of that. The only thing I
11  recall is waking up -- literally waking up in the critical
12  care unit.
13  Q    Why don't we talk a little bit more about that
14  particular incident because I think you said in response to
15  Mr. Butkovitz's questions that you don't remember anything
16  about that incident other than waking up in the hospital?
17  A    That's correct.
18  Q    And do you remember what time of the day it
19  was when you woke up in the hospital?
20  A    I was really out of it.
21  Q    What was the last memory you had before waking
22  up in the hospital?
23  A    Going to sleep.
24  Q    So whatever the corrections officers did or
25  didn't do, you've drawn that out of the prison records that

75

1   have been prepared?
2   A    That's correct.
3   Q    And if one of the corrections officers
4   recalled talking to you or asking you if you were okay and
5   you said you were, you wouldn't be able to remember any of
6   that?
7   A    No.
8   Q    Has anybody told you in the past that while
9   you were in the middle of a seizure that you were speaking
10  to them --
11  A    No.
12  Q    -- as if you were making sense?
13  A    Unh-unh.
14  Q    The entire two hours that you were having this
15  seizure activity that evening at Adams County Prison, were
16  you continuously convulsing? Did the convulsions subside
17  and you go to sleep?
18  A    From what I've read, I was -- I was in and
19  out, but I never really was able to respond to verbal
20  commands or to -- to speak to anybody.
21  Q    Who was it that you recall reading reports or
22  records from that was involved with seeing you there in that
23  condition?
24  A    I want to say her name is Cher Sheather. Cher
25  Sheather, S-h-e-a-t-h-e-r.

76

1   Q    And she was the corrections officer that
2   actually saw you?
3   A    That found me in that state and she said that
4   I was unable to respond to verbal commands, that I was
5   unable to respond to her, that I was bleeding from the
6   mouth, that I was lying on the floor.
7        She went and contacted Lieutenant Orth.
8   Lieutenant Orth came up and the way that it reads in the --
9   in the extraordinary occurrence report was that they left,
10  came back and saw me in seizures again, more severe,
11  actually in convulsions, you know what I mean. They just
12  left me there. They figured, well, he's all right now.
13  Now, they came back a little bit later and I'm having grand
14  mal attacks again, you know, more bleeding and --
15  Q    And then they did --
16  A    The whole shebang. Then they called the
17  sheriff's department and they transported me and I had
18  another seizure. But when you look at the time account that
19  they keep, the in and out sheet or whatever it is that was
20  sent to me, you see that the seizure I think occurred around
21  3:58 in the morning and I didn't actually leave until 5:30.
22  Q    Now, do you know what happened during that
23  hour and a half?
24  A    No.
25  Q    Do you know why an hour and a half lapsed

77

1   until the sheriff got there to take you to the hospital?
2   A    No, I don't.
3   Q    Do you know if your condition got any worse or
4   if you got any sicker during that hour and a half?
5   A    I imagine I did, the way that it's described.
6   I can't -- I can say that, you know, I -- I went into more
7   seizures. So I can say, yeah, it got much worse.
8   Q    Do you know if there's anything that the Adams
9   County Prison people could have done to get the sheriff's
10  office there faster?
11  A    Most definitely.
12  Q    For instance?
13  A    First they need to be able to recognize a
14  seizure for a seizure, and I think that's -- that's
15  definitely part of the claim, in that they -- the inadequate
16  medical training and/or facilities and that they should be
17  able to recognize the fact that, well, wait a minute, he's
18  having a seizure.
19       Now, if they called the sheriff's department,
20  which -- as you know where the Adams County Prison is, the
21  sheriff's office is not even a mile. It's not even a mile
22  straight down the road, you know. At that time in the
23  morning they're not running warrants, they're not -- they're
24  not doing anything and --
25  Q    You just think they should have gotten there


78

1  faster?
2      A      Well, most definitely.  There is no doubt
3  about it.  And aside from that, if there was a situation, an
4  emergency where the sheriffs could not or were not
5  available, they should have called the hospital.
6      Q      When they did transport you to the hospital,
7  did you get appropriate care at the hospital?
8      A      Yes.
9      Q      And they stabilized your condition?
10     A      Yes.
11     Q      And how soon was it until you went back to the
12  prison?
13     A      A day or so.
14     Q      Do you remember spending a day in the
15  hospital?
16     A      No.
17     Q      What's a breakthrough seizure?
18     A      It's when you're on a medication and you have
19  a seizure anyway.
20     Q      For lack of a better term, it's a seizure that
21  breaks through the medication that's trying to control it?
22     A      That's correct.
23     Q      Now, you mentioned some rather extensive LSD
24  use prior to your imprisonment.
25     A      Yeah.

79

1      Q      And you said at one point during Mr.
2  Butkovitz's questioning that it's hard for you to tell the
3  difference between a flashback and a seizure and you
4  actually wrote a letter to him asking him if he could help
5  you distinguish.  Was I remembering your testimony
6  correctly?
7      A      I had asked him if there was a chance that
8  that could be a flashback rather than a petit mal seizure
9  because they had actually progressed, you know what I mean,
10  and they were never quite so vivid.
11     Q      Now, you were talking about flashbacks and
12  petit mal seizures, not flashbacks and grand mal seizures?
13     A      Correct.
14     Q      There was no mistaking the fact that you were
15  having a grand mal and you never thought grand mals were
16  related to LSD use?
17     A      No, never.
18     Q      And the evening that you had the seizures at
19  Adams County Prison you believe you were having a grand mal
20  that evening?
21     A      Yes.
22     Q      Now, the incident with the pepper spray
23  happened August 27th, 1999.
24     A      Um-hum.
25     Q      That's what all the reports say, that that is

80

1  the day --
2      A      That's correct.
3      Q      How long had you been in Adams County Prison
4  before that?
5      A      Two days.
6      Q      And you were there on this post conviction
7  relief act action?
8      A      Correct.
9      Q      Had you ever been hit with pepper spray before
10  that?
11     A      No.
12     Q      Did you know what pepper spray was?
13     A      No.
14     Q      Did you know that the officers were carrying
15  some type of mace or pepper spray on their belts as part of
16  their standard equipment?
17     A      No.
18     Q      Did you ever even hear of pepper spray before?
19     A      Sure.
20     Q      What did you know about it?
21     A      It hurt.
22     Q      How did you know that?
23     A      Just word of mouth.
24     Q      Before you got hit with pepper spray, did you
25  know anybody that --

81

1      A      I felt its full fury when I myself got hit
2  with it.
3      Q      Before that did you ever know anybody else
4  that had been hit with pepper spray?
5      A      Yeah, I believe so.  I believe so.  Accidently
6  or -- you know.
7      Q      Did you ever know anybody that carried it?
8  Some females carry it for protection against assailants.  Do
9  you know anybody that ever carried it?
10     A      No.
11     Q      Prior to August 27th, 1999 had you had any
12  incidents involving any of the corrections officers or the
13  warden that you brought suit against in any kind of clashes
14  or conflicts with them in the past?
15     A      In the past?
16     Q      Well, in the two days that you were there --
17     A      Oh, no.
18     Q      How about during the several months that you
19  were there back in 1998, did you have any problems?
20     A      I wasn't exactly well adjusted back then so I
21  was -- I was a bit of a behavior problem.
22     Q      And the behavior problem, was it directed to
23  Warden Duran?
24     A      No, not Warden Duran specifically, just
25  period.  More with other inmates than it was with, you know,

BENSON, JASON                               BENSON VS
08/30/01                                                        ELLIEN

---

82

1  the personnel or the staff.
2      Q      Did you find yourself spending some time
3  isolated as a result of disciplinary problems back then in
4  1998?
5      A      Yeah, I was sent up to the same block I was in
6  when I had these seizures, a little segregation unit they
7  have upstairs.
8      Q      Did you have any particular clashes that you
9  can recall with any of the corrections officers you've sued
10 in this case?
11     A      No.
12     Q      Any kind of a clash prior to August 27, 1999
13 where any one of those individuals had to use force on you?
14     A      No, never.
15     Q      And I mean even the lightest of force.
16     A      Never. I'd never given them a cause, you
17 know.
18     Q      What time of the day did you have to be in
19 court on August 27, 1999?
20     A      It was in the morning sometime. I believe it
21 was around nine o'clock, eight o'clock maybe.
22     Q      Did you have an attorney representing you?
23     A      Kristin Rice.
24     Q      Was she the one that represented you when you
25 got convicted?

---

83

1      A      No, she was a different -- she was another
2  court appointed.
3      Q      How did you get a hold of her?
4      A      Prior? I mean, how do you mean?
5      Q      I want to know how she got to be your lawyer
6  on --
7      A      She was court appointed because I had a claim
8  of ineffective counsel -- ineffective assistance of
9  counsel. And the court appointed was Kristin Rice and she
10 contacted me by mail here previous to that and by the phone
11 and then we met in Adams County Prison the evening of the
12 25th when I first got those.
13     Q      What judge did you appear in front of?
14     A      Oscar Spicer.
15     Q      Did the hearing go well for you?
16     A      No, it didn't.
17     Q      They almost never do. Was there any problem
18 in the courtroom that morning?
19     A      No. In fact, I remember being a little upset
20 for a guy. He just -- he had gotten double life. I don't
21 know, it just struck me as -- there was something vulgar
22 about the guy. I didn't really enjoy his company.
23     Q      So you were in court with another prisoner?
24     A      Yeah, yeah, with a bunch of other prisoners.
25 There was a lot of other fellows there with me, but this --

---

84

1  the only thing that strikes me, you know what I mean, as
2  being, you know, extraordinary was this --
3      Q      Did you get to address the court or did your
4  lawyer do all the talking?
5      A      My lawyer did all the talking.
6      Q      Were you happy with her performance?
7      A      In retrospect I guess not, you know what I
8  mean. At the time I'm just -- you know, like little dog and
9  big dog. I'm just yelping sure, yeah, you know what I mean,
10 go get them boss.
11     Q      Did you have high hopes for the post
12 conviction relief act petition?
13     A      I carry the -- the kind of a personal
14 philosophy, and this is just -- hope for the best and expect
15 the worst, you know. I came to terms with my time and my
16 sentence well before because I basically volunteered time
17 and sentence.
18         If I would have taken the case to trial, I
19 knew I could have beat it, but my codefendant being involved
20 I didn't -- I wasn't prepared to let her do all this time by
21 herself, you know. So, I mean, I was prepared for it.
22         It was just something basically to do. Well,
23 let's see how far you can go on your own as far as this PCRA
24 is concerned and actually got myself back into court and
25 allowed this attorney to take me immediately back out of

---

85

1  it. So it was all right. I mean ...
2      Q      Were you upset about the way things went in
3  court?
4      A      No, no.
5      Q      Did you know when you left the courthouse that
6  your petition was going to be denied?
7      A      Yeah, I expected it. I expected it from the
8  beginning.
9      Q      Did the judge say anything that led you to
10 believe that your petition was going to be denied?
11     A      No.
12     Q      Did your lawyer tell you anything that day
13 before you came back to prison?
14     A      In fact, I told her, you know, don't hold your
15 breath, you know what I mean. I wasn't expecting anything
16 and I really don't think -- I mean, she was trying to be the
17 optimist for me, but I pretty much told her, you know, it's
18 all right, you know, I know.
19     Q      You were consoling her?
20     A      I don't know if you would call it consoling
21 her. I was just telling her, you know, I know she did what
22 she could do with what she had, you know.
23     Q      Now, the Adams County Sheriff's Office
24 transported you from the courthouse to the prison?
25     A      Um-hum.

---


86

1  Q    You have to say yes or no.
2  A    Yes.
3  Q    And did they transport you in handcuffs and
4  leg irons?
5  A    Yes, they did.
6  Q    And when you got to the intake area, did they
7  take the cuffs and the leg irons off?
8  A    The sheriffs did, but I was cuffed up front
9  with one of the belts. I was cuffed in the front with the
10 belt and I was -- I had leg irons on. When I came in,
11 Briton Shelton took the cuffs off from the back, took the
12 belt off, put his own set of cuffs on and cuffed me from the
13 back and shackled me.
14 Q    Did you spend anytime cuffed to that pole that
15 we talked about before?
16 A    No, I actually was just sitting on it. I was
17 sitting on the bench at that point.
18 Q    And did Shelton put his own cuffs on you?
19 A    Yeah, as soon as the sheriffs took theirs off,
20 he had his on. It was immediately.
21 Q    Shelton is a large man?
22 A    I wouldn't call him a large man.
23 Q    Is he a big muscular guy?
24 A    He's an average build.
25 Q    Is he a big muscular guy?

87

1  A    I wouldn't say he was big and muscular
2  particularly.
3  Q    Is he physically intimidating?
4  A    He's an officer.
5  Q    Answer the question. Yes or no, is he
6  physically intimidating to you?
7  A    Yeah, I would say so.
8  Q    Now, was he the only one that met you in the
9  intake area?
10 A    Yes.
11 Q    And after the sheriff's department removed the
12 cuffs and the shackles from you, CO Shelton cuffed you with
13 his own cuffs?
14 A    Um-hum.
15 Q    Yes or no?
16 A    Yes, I'm sorry.
17 Q    And he cuffed you behind your back?
18 A    Yes, he did.
19 Q    Did he put you in leg irons too?
20 A    Yes, he did.
21 Q    Did you have the belt chain or --
22 A    No, I was -- it was behind my back.
23 Q    Now, this was something different than Adams
24 County had ever done any other time you had been into that
25 jail before.

88

1  A    Yes, it was.
2  Q    And did you ask why?
3  A    Yes.
4  Q    What did Shelton say to you?
5  A    Something along the lines of, you know, you
6  get what -- you sow what you reap or something along those
7  lines, you know.
8  Q    Did you indicate to you there was some
9  particular reason why he was cuffing you and shackling you
10 that particular day?
11 A    Very vague. I didn't know what he was talking
12 about.
13 Q    And there hadn't been any misconduct or
14 problems with you at the prison in the two days you'd been
15 there leading up to this?
16 A    No.
17 Q    Now, did Shelton then lead you into the
18 medical area that you talked about earlier?
19 A    Jennings came out. John Jennings came out and
20 said bring the shithead in here.
21 Q    Now, tell me about Jennings. Is he a big
22 physically imposing guy?
23 A    I wouldn't say he's big, but he is imposing,
24 yes.
25 Q    How so?

89

1  A    He's a very aggressive individual just in his
2  demeanor, the way he carries himself.
3  Q    Had you experienced that before coming to the
4  intake area on August 27, 1999?
5  A    When I was incarcerated before in Adams County
6  Prison prior to me coming upstate, yes.
7  Q    Had he ever hit you or physically applied any
8  force to you?
9  A    No.
10 Q    Now, did anybody have to apply force to you to
11 get you from the intake area into the medical area?
12 A    No.
13 Q    How long a walk is that?
14 A    Not but a second. It's right there in the
15 intake area, the door is.
16 Q    And then you went behind closed doors?
17 A    Yes.
18 Q    Is it the area where they always do strip
19 searches every time you'd been in in the past?
20 A    As far as I know.
21 Q    Is it the area you've always been strip
22 searched in in the past?
23 A    Yes.
24 Q    And did they ask you at that time to strip?
25 A    No.


90

1  Q    What was the next thing that happened after
2  you went into the nurse's area?
3  A    I sat down.  They had me sit next to the desk
4  and Shelton was over in the corner.
5  Q    You're indicating to your left?
6  A    To my right.
7  Q    I'm sorry, you're indicating to my left, to
8  your right.
9  A    Yeah, to my right.  He was over here on this
10  side of the room, to the right of me.  Officer Jennings
11  leaves the room.  I didn't say -- you know, I'm just sitting
12  there, I'm waiting to see what's going to happen here, you
13  know what I mean.  I don't understand.
14  Q    Up until this point in time had anybody asked
15  you to strip?
16  A    No, not up until this point.  Officer Jennings
17  comes back in with Duran, with Cluck, with Hankey, with
18  Heintzelman and I believe -- I believe that's it.
19  Q    Before all of these other people showed up,
20  there had never been any kind of a request of you to strip?
21  A    No.
22  Q    Had you been given an order to strip?
23  A    No.
24  Q    Had anybody said anything about stripping up
25  to this point?

91

1  A    No, they said sit down.  I sat down and they
2  left.
3  Q    And the next thing you know all these people
4  are marching into this room?
5  A    Yes.
6  Q    Did they have a video camera rolling at the
7  time?
8  A    Yes.
9  Q    Who was operating the camera?
10  A    I don't recall who that was at this point.
11  Q    Now, of all the people there, were any of them
12  females?
13  A    Yes.
14  Q    Who is that?
15  A    That was Debra Cluck.
16  Q    Debra --
17  A    Hankey, excuse me.
18  Q    And had you ever been strip searched before in
19  front of a woman, while a woman was in the room?
20  A    There was this one time in Camp Hill, but, you
21  know, that's really not a big deal.
22  Q    Now, when was the first time that somebody
23  asked you to strip?
24  A    It was Cluck.  I'm sure he had asked me to
25  strip.

92

1  Q    And that wasn't until the video camera was on
2  and everybody was assembled in the room?
3  A    That's correct.
4  Q    Did you have any idea why all these people had
5  all of a sudden taken an interest in your strip search?
6  A    No, I had no clue.
7  Q    And you hadn't refused up to that point to
8  strip?
9  A    No.  When he asked me to strip, I said I -- I
10  can't, you have to uncuff me.
11  Q    And did the video camera catch all that?
12  A    Not from what I saw in the courthouse.
13  Q    You've seen the videotape?
14  A    I've seen the -- I have the videotape.
15  Q    So you believe there was a request for you to
16  strip before the video camera was rolling?
17  A    Yeah.
18  Q    Let's take a step back then.  I thought you
19  told me that when all those people came in the video camera
20  was rolling then?
21  A    It was.
22  Q    Was the video camera shut off at any time that
23  you know of before the --
24  A    I imagine it would had to have been when they
25  initially asked me, or it wasn't rolling when they came in,

93

1  you know, maybe it wasn't rolling.  I don't know what the
2  deal was, but when you watch the video, it's only after the
3  second time that they asked me to strip.  It's the second
4  time.  When that video starts, it's the second time they ask
5  me to strip.
6  Q    How long was the camera in the room before
7  you're certain that it was rolling?
8  A    According to the video, if I could judge by
9  the video, I'd have to say about 30 seconds.
10  Q    Was it a camera that you can hold with a
11  single hand?
12  A    Yeah, with a screen.
13  Q    And when all these people came in the room,
14  were any of them displaying pepper spray?
15  A    No.
16  Q    Do you know if any of them had pepper spray in
17  their hand when they came in the room?
18  A    No.
19  Q    And when you were asked to strip, you --
20  initially asked, your response was that you couldn't do it
21  because you were in cuffs?
22  A    I was cuffed.
23  Q    And what was their response to that?
24  A    Cluck said, well, you know, that's -- I said
25  you have to uncuff me.  I can't do it with cuffs on.  He


94

1 said, that's not an option. I said, no, I -- you know, I
2 can't do it. He said, well, are you going to strip or not?
3 I said, no, this is bullshit, and that's -- he was talking
4 to me -- he was over here.
5    Q    To your right?
6    A    He was to my right, I'm sorry. He was to my
7 right. And Officer Jennings, from what I judge from the
8 video, was to my left towards the door. And when I said no,
9 this is bullshit and I turned around, that's when they
10 sprayed me in the face with this pepper spray.
11   Q    And we'll get to that. Do you recall what you
12 were wearing? Were you wearing the orange suit?
13   A    Yeah, I was wearing orange.
14   Q    Was it a jumpsuit, a one-piece?
15   A    It's two pieces.
16   Q    Pants and a shirt?
17   A    Um-hum.
18   Q    Yes or no?
19   A    Yes.
20   Q    Did it have a zipper or a button on the front
21 or was it a pullover shirt?
22   A    It was a pullover.
23   Q    So they asked you to remove your clothing and
24 there was no way you could comply because you were cuffed
25 and shackled?

95

1    A    That's correct.
2    Q    And then yet they told you that that was not
3 an option to uncuff and unshackle you?
4    A    Um-hum.
5    Q    Yes or no?
6    A    Correct. I'm sorry, yes.
7    Q    And then for reasons that you don't know you
8 were hit in the face with pepper spray?
9    A    That's correct.
10   Q    Before the pepper spray hit your face, did you
11 know anybody had it out?
12   A    No.
13   Q    Did you know anybody was carrying it?
14   A    No, it scared the hell out of me.
15   Q    Had anybody threatened to apply physical force
16 to you before you got the pepper spray in the face?
17   A    No.
18   Q    What was your reaction to getting hit with the
19 pepper spray?
20   A    I jumped back, you know. Consider I'm cuffed
21 behind my back, I'm like this, and I'm trying to get it
22 off. I remember saying something to the effect of, you
23 know, what the hell, you know, what are you guys doing,
24 something along those lines. It may have even been a little
25 more --

96

1    Q    Trust me, it was a lot more.
2    A    You know what I mean. I don't want to get
3 into like, you know, being all foul mouthed, but I'm sure it
4 was foul. And then -- I just remember -- I just remember
5 getting extremely worked up. It was in the midst of one of
6 these attacks. It just hit me. I mean, the whole thing
7 started when they first came in. You can start to feel your
8 heart.
9    Q    A panic attack?
10   A    Yeah, it's literally in your neck, you know,
11 and I'm feeling this thing come on and there's nothing I can
12 do about it, you know, and I'm trying my best to work with
13 these people and this is the response I got. And I was just
14 trying to equate everything in my head, trying to add
15 everything up to try to make sense of it.
16   Q    All you wanted to do was comply with their
17 directions, that was all you wanted to do, just have the
18 cuffs removed so you can strip?
19   A    Sure. I didn't want that, you know. I didn't
20 want to give any problems.
21   Q    So you get hit with the pepper spray, you get
22 worked up, what did you do next?
23   A    When I went to stand up, I started leaning
24 over towards the computer and went the rest of the way and
25 my head hit the computer and they took me down. I hit a

97

1 computer a couple times, twice.
2    Q    By accident or did you pound your head on the
3 computer on purpose?
4    A    The first time wasn't -- it wasn't on
5 purpose. The first time when I came down I -- I would say
6 that was a loss of balance.
7    Q    And the second time?
8    A    The second time I hit it again just to get it
9 the hell out of the way. Now, that does not seem rational
10 at all that, all right, well, you hit it and now you're
11 trying to hit it again to get it out of the way but ...
12   Q    Were you trying to provoke a confrontation
13 before this happened?
14   A    No.
15   Q    After you got hit with the pepper spray, were
16 you trying to injure yourself by striking your head on the
17 computer screen?
18   A    No. Once I had hit it the first time, I
19 wanted to hit it again so I didn't have to keep hitting it.
20   Q    And then someone gave an order to take you
21 down?
22   A    That's correct.
23   Q    And do you know who took you down?
24   A    Everybody, judging from the video.
25   Q    And did they come down on top of you?


98

1    A    Yes, they did.
2    Q    And were you still cuffed and shackled?
3    A    Yes.
4    Q    And what did they do next?
5    A    Well, I had told them I was cool, you know,
6    that I didn't want any problems because they were -- they
7    had me twisted up pretty badly, you know, and there was a
8    couple intentional knees in there, you know what I mean,
9    that hurt like hell. So I didn't want any more, you know
10   what I mean. Whatever it was they wanted me to do I was
11   going to do it regardless of how they wanted me to do it,
12   you know, at this point.
13        And so they let me up and they put me in the
14   shower and that was it. I blacked out. And when I came to,
15   I tried my best to kind of get up on one knee and I got a
16   mouthful of this foam. I mean, it's killing me. It's
17   foaming up in my mouth and it feels like I've got a stick of
18   dynamite that just went off in my mouth. I'm just spitting
19   all this stuff out, spitting all this stuff out. I'm saying
20   stuff to them at the same time, you know what I mean, like
21   you guys are F'ing animals, this, that and the other.
22        They were saying something. And in the
23   process of spitting, I don't stop spitting and I end up
24   getting spit on one of these cops. So they pick me up, they
25   walk me over, they take me to the floor and Duran puts his

99

1    foot on my neck, stomps his foot on my neck.
2    Q    At any point did you ever intentionally spit
3    at or on any of the corrections officers?
4    A    No, I didn't try that. I really didn't. The
5    only reason I pleaded guilty is because when I got in there
6    my attorneys told me you don't have a snowball's chance in
7    hell of making this.
8    Q    So they removed you from the shower?
9    A    (Witness nods head affirmatively.)
10   Q    You say you spit and it unintentionally got on
11   one of the corrections officers?
12   A    That's correct.
13   Q    And then they took you down again?
14   A    That's correct.
15   Q    And the warden put a foot on the back of your
16   neck?
17   A    He stomped on the back of my neck.
18   Q    Why did he do that?
19   A    (No response.)
20   Q    Did he tell you why he was doing that?
21   A    No.
22   Q    Did he do it to keep you from spitting
23   anymore?
24   A    I wasn't trying to spit on anyone to begin
25   with. I don't know why -- I didn't know that I'd even spit

100

1    on anyone. I couldn't see, you know. My mouth was on
2    fire. I was salivating just -- I was in the worst of ways,
3    you know, and I -- plus I had just come out of this. I had
4    lost consciousness and I was foggy and I -- you know, in
5    between all of that is when I got taken out of the shower,
6    taken to the floor and had this foot in my neck.
7    Q    You said you were foggy. Did you have a
8    seizure in the middle of all this?
9    A    My attorney says I did. She says a nurse that
10   she showed says that I could have, you know what I mean.
11   Other people say I didn't. The DA Mike George seems to
12   think I didn't. I don't know what it was. I know I lost
13   consciousness. I know that water hit me and that was it.
14   Q    How soon till you came back to consciousness?
15   A    According to the video, it wasn't very long at
16   all.
17   Q    Right about when you started bitching at them
18   again, would you say that's when you came back around and
19   you were conscious again?
20   A    Maybe in the midst thereof.
21   Q    How did it all end?
22   A    With them stomping my neck, that was it. That
23   hurt.
24   Q    Did they put a device on you to keep you from
25   spitting?

101

1    A    They put that Hannibal Lector looking thing on
2    my head, the spit guard.
3    Q    Was it your understanding that that was to
4    keep you from spitting anymore at people?
5    A    I wasn't sure what it was. I thought -- I
6    didn't know what that was, you know.
7    Q    Right around that time the video ends. Tell
8    me what happened after that.
9    A    They took me upstairs and I stripped and then
10   I asked them to take me to the hospital.
11   Q    What did you feel that you needed to go to the
12   hospital for?
13   A    I felt banged up. I felt real banged up. I
14   mean, not only was my face on fire, but my back was killing
15   me, the back of my neck, my head, my side. I had a
16   footprint on my side. That's what I'm saying, is that the
17   video didn't end there. They had the video on me the whole
18   time. I got naked and they videotaped me through the strip
19   search. They videotaped my request. That's when Jennings
20   said something like, well, no, you're not going to -- you
21   don't need any care. Duran said, you know, we'll talk
22   about it.
23        They came back and told me I was going. I
24   went. They had the camera on me the whole way to there
25   en route. They had the camera on me from the front of the


102

1  car. They had my -- the camera on me when I went to see
2  Steinour when I came back out.
3       Q       You say they had the camera on you. Do you
4  know the camera was rolling this whole time?
5       A       I assume so, given that they had it on me.
6       Q       The camera was there, but do you know if it
7  was turned on, if it was recording information?
8       A       No, I don't know if it was or if it wasn't.
9       Q       Do you believe there's additional videotape
10  above and beyond what you have in your possession?
11      A       Most definitely.
12      Q       Have you ever seen that videotape?
13      A       No.
14      Q       Do you know if somebody changed tapes at some
15  point in time, if they took the first tape out and put
16  another one in later?
17      A       I don't know what circumstances led to that
18  first 30 seconds or so being missing off the front of the
19  tape. To me it seems a little suspicious, but I don't know
20  what circumstances led to that. And I know that there is
21  more to that video than there is available.
22      Q       And you say they actually videotaped your
23  stripping and they videotaped you naked?
24      A       Um-hum.
25      Q       Yes or no?

103

1       A       Yes.
2       Q       And they got on the video your request for
3  transport to the hospital?
4       A       Yes.
5       Q       And Lieutenant Jennings saying that you didn't
6  need any?
7       A       Yes.
8       Q       How long after all this happened did you
9  actually go to the hospital?
10      A       Within the hour.
11      Q       At some point in time somebody decided to send
12  you. Who made the decision?
13      A       I don't know. It's not in any of the reports,
14  who made the decision.
15      Q       Who transported you to the hospital? Was it
16  the sheriff's office again?
17      A       It was the sheriff's office with Lieutenant
18  Jennings.
19      Q       And who was operating the video camera?
20      A       Lieutenant Jennings.
21      Q       Who was operating it during your strip search?
22      A       I really don't know who that was. The whole
23  -- they changed so many guards since I was there last.
24      Q       Lieutenant Jennings, when he was filming you,
25  was he using his right hand or his left hand?

104

1       A       I couldn't tell if he was using maybe both. I
2  really wasn't sure.
3       Q       Did he ride in the front or the back seat of
4  the car?
5       A       He was in the front, passenger seat.
6       Q       And this filming continued in the parking lot
7  of the hospital and --
8       A       Into the hospital.
9       Q       And into the hospital?
10      A       Um-hum.
11      Q       Did he videotape the doctor's examination at
12  the hospital?
13      A       Yes. Yes, he did.
14      Q       When did the videotape stop?
15      A       When we got back to the prison and I was
16  locked in the cell.
17      Q       How much time total would you say was captured
18  on videotape?
19      A       From beginning to end?
20      Q       Yes.
21      A       Probably about an hour and 45 minutes.
22      Q       Was there any other abuse that was captured on
23  the videotape?
24      A       Other than what -- not other than what's on
25  there.

105

1       Q       Abuse was the wrong term. Was there any other
2  application of physical force on the videotape?
3       A       No.
4       Q       Was there anything else other than Lieutenant
5  Jennings saying you didn't need medical care --
6       A       Um-hum.
7       Q       Was there anything else from your perspective
8  bad that happened in that period of time?
9       A       Not during that -- the day of the 27th, no.
10      Q       You believe there was additional videotaping
11  and in that additional videotaping, if we had it today, it
12  wouldn't show anybody hitting you or applying force to you?
13      A       Not in those missing moments, no.
14      Q       How long did the effects of the pepper spray
15  last on you?
16      A       Half an hour.
17      Q       And did they do anything at the hospital to
18  make it stop burning?
19      A       No.
20      Q       Did it stop burning before you left the
21  prison?
22      A       No.
23      Q       Did it stop burning before you got to the
24  hospital?
25      A       No. By the time I left, it felt like I just



106

1  had a lot of sand in my eyes.
2    Q    Did you get any treatment at the hospital for
3  the pepper spray?
4    A    No.
5    Q    Did you get any treatment for the -- you said
6  you got some knees and the boot on the back of your neck.
7  Did you get any treatment for that?
8    A    They gave me some pain medicine.
9    Q    And did any of the kneeing or the foot on the
10  back of the neck or -- did any of that leave a mark?
11    A    Yes.
12    Q    Where?
13    A    I had a very clear imprint of a boot here on
14  the side.
15    Q    You're indicating underneath your right arm
16  and your rib area?
17    A    Correct.
18    Q    You had a whole boot?
19    A    A whole boot.
20    Q    Impression on your side?
21    A    Yes.
22    Q    Do you know who left that?
23    A    No.
24    Q    Okay.
25    A    I had a bruise underneath -- I guess that

107

1  would be C-1, C-2.
2    Q    Don't get medical.
3    A    On my neck.
4    Q    High in the back of your neck?
5    A    Correct.
6    Q    And how did you see you had a bruise there?
7    A    The doctor.
8    Q    The doctor said you had a bruise there?
9    A    Yes. And I had bruises I think up here on my
10  temple.
11    Q    You're indicating your left temple area?
12    A    Correct.
13    Q    Was that from when your head hit the computer?
14    A    I would imagine.
15    Q    You say you would imagine. Did it happen from
16  anything else?
17    A    It could have been from me hitting the floor.
18    Q    Do you know?
19    A    No.
20    Q    The period of so called missing videotape,
21  would that have showed you were using additional foul
22  language to the corrections officers?
23    A    Yeah, I believe I was pretty explicative about
24  it during that.
25    Q    And that period of missing videotape, would

108

1  that also have shown your threatening to sue the corrections
2  officers and the staff there?
3    A    Well, I think I did that on camera.
4    Q    Well, I'm asking about the period of missing
5  videotape. I know you did it on the period that we have
6  it. I'm talking about the period when you think that there
7  was videotape being made.
8    A    The time that there wasn't, no. There wasn't
9  anything like that said.
10    Q    What other conversations would have occurred
11  in that period of missing video that you believe exists?
12    A    I recall when I was being -- when they were
13  actually searching me, you know, I said all you had to do
14  was uncuff me, but no one was responding. All you had to do
15  was uncuff me, you know, but nobody was really saying
16  anything so it didn't matter.
17    Q    Do you have any understanding of why the Adams
18  County Prison staff is -- has a heightened sensitivity to
19  prisoners who spit, especially prisoners who attempt to spit
20  on corrections officers, other than the fact that it's
21  disrespectful?
22    A    You mean if you have the spread of a disease.
23  I'm not sure.
24    Q    And they did put a special device on your face
25  at the end of this confrontation to prevent you from

109

1  spitting?
2    A    Yes, they did.
3    Q    Did you have any injuries in this incident
4  other than the superficial bruises that you mentioned?
5    A    With the seizure incident. That's not
6  counting the 30th.
7    Q    I'm talking only about the incident with the
8  pepper spray.
9    A    Only the incident -- no.
10    Q    Only the superficial bruises?
11    A    Just the bruises.
12    Q    And the temporary burning of your eyes and
13  your mouth?
14    A    Sure. That's an injury and a half.
15    Q    But their use of the paper spray on your face,
16  did it leave any marks?
17    A    Not that I'm aware of.
18    Q    Did it make your eyes red?
19    A    Yes.
20    Q    How long did that last?
21    A    When I got back from the hospital and was able
22  to look in the mirror, it was still there. So you figure an
23  hour and 45 minutes, two hours.
24    Q    Was it gone the same day?
25    A    Yes.

BENSON, JASON                                       BENSON VS
08/30/01                                                                ELLIEN

---

110

1    Q      Getting back to the incident on the 30th when
2  you had the seizure, do you have any reason to believe that
3  Lieutenant Orth would have deliberately permitted you to lay
4  there while you were in need of medical attention?
5      A      It didn't seem as though I was a priority.
6      Q      Well, you were out of it at the time. Do you
7  have any reason to believe that Lieutenant Orth was grinding
8  an ax?
9      A      I have no reason to believe otherwise.
10     Q      Well, did you have any kind of problem with
11 Lieutenant Orth before that night?
12     A      No.
13     Q      Is it possible Lieutenant Orth truly thought
14 that you were okay when he looked in on you at around three
15 o'clock?
16     A      It was obvious that I wasn't okay. I mean,
17 when they go to the extent of filing an extraordinary
18 occurrence report that says, well, this is seizures, he's
19 not responsive, he's got blood coming out of his mouth, he's
20 fine, that doesn't add up to me.
21     Q      I suggest you might have the chronology a
22 little wrong, but what I'm saying to you is it possible that
23 Lieutenant Orth subjective thought that there wasn't a
24 serious problem with you when he looked in on you?
25     A      I can't believe that.

---

111

1    Q      You generated an affidavit at one point in
2  time that might have been in response to a motion.
3      A      Um-hum.
4      Q      Do you remember doing that?
5      A      Sure.
6      Q      Did you type the affidavit yourself?
7      A      Yes, I did.
8      Q      And in the affidavit it says that you swear
9  under penalties of unsworn falsification that everything is
10 true and correct. Did you tell the truth in this?
11     A      Yes, I did.
12     Q      Absolute gospel truth, no misstatements or
13 anything false in it?
14     A      As far as I know, yes.
15     Q      How about mistakes? Are there any mistakes in
16 it that you know of?
17     A      I don't believe so.
18     Q      Let me just ask you about two parts of it. In
19 Paragraph 9 it says soon thereafter on August 30th, 1999 I
20 was witnessed by William Orth and David Vazquez to be in a
21 convulsive state.
22     A      I recanted that when I withdrew the charges on
23 Officer Vazquez. So, yes, as far as that's concerned, that
24 is correct, I did make a mistake there and I did withdraw
25 the -- my case against him. I'm not out to be malicious.

---

112

1    Q      In Paragraph 14 of the same affidavit it says
2  John Jennings sprayed me in the face and mouth with OC spray
3  and helped Thomas Duran, Bruce Cluck, Debra Hankey, William
4  Orth, Ray Heintzelman, David Vazquez and Briton Shelton
5  assault me.
6      A      That's got to be a typo.
7      Q      I assure you it says David Vazquez.
8      A      Oh, I'm sure, but what I'm saying is that's
9  got to be -- on my behalf that's got to be a typo. I
10 wouldn't have put Mr. Vazquez in there with those -- that
11 lot because it's not the same. That has to be a --
12     Q      But he was included in there by mistake?
13     A      Correct.
14     Q      Now, you say that after Jennings sprayed you
15 he helped these other listed individuals assault you. Do
16 you know if Debra Hankey ever laid a hand on you?
17     A      From what I can tell from the video -- I mean,
18 she was off to the side. When I say that she aided, she
19 didn't stop it either, by allowing it to go on, when she has
20 the authority to say, listen, this has gone far enough, you
21 can stop this. I include her as part of the scene, if you
22 will.
23     Q      Was she in charge there?
24     A      She was the deputy warden.
25     Q      Who was the senior person there?

---

113

1      A      Thomas Duran.
2      Q      He was the warden at the time?
3      A      Yes, he was.
4      Q      So Debra Hankey would not have been in charge
5  of the situation. Is it possible that Deputy Warden Hankey
6  was actually operating the videocamera? Do you have any
7  recollection of that?
8      A      I couldn't say that for sure. I saw her in
9  the video, though, so I can't say that because she was
10 actually in the video.
11     MR. McNAMARA: Those are all the questions I
12 have for you. Thanks for your patience.
13
14           CROSS-EXAMINATION
15
16 BY MR. YOUNG:
17     Q      I'm Jim Young. I represent Dr. Long. I'm not
18 going to go over everything that you've already testified
19 to, but there are some areas I just want to follow up on.
20 In February of '99 when you came to SCI Smithfield you were
21 on the phenobarbital, correct?
22     A      Correct.
23     Q      And was that 10 milligrams -- I'm sorry, 30
24 milligrams in the morning and 90 milligrams in the
25 afternoon?

---

BENSON, JASON                                     BENSON VS
08/30/01                                                              ELLIEN

---

114

1    A    That sounds right.
2    Q    And as I understand it, you complained about
3    the phenobarbital because it was making you -- I think what
4    you testified to was drag?
5    A    Lethargic.
6    Q    You felt lethargic, sluggish, things of that
7    nature.  Do you recall seeing Dr. Long on March 17th of
8    1999?
9    A    March 17th, 1999.  Perhaps.
10   Q    Do you recall him at that time prescribing for
11   180 days, which would be six months, Dilantin for you?
12   A    Yes.
13   Q    Was there any discussions with Dr. Long before
14   he prescribed the Dilantin for you?
15   A    This would be an introductory period at that
16   time.  And if there was any discussion, it was just about
17   general health questions, things of that nature.
18   Q    At that time did you discuss with him that you
19   had not had any seizures at all since at least December of
20   '98?
21   A    I believe that would be accurate, yes.
22   Q    When you were initially prescribed the
23   Dilantin, was it two 100 milligram capsules at 7 a.m.?
24   A    I really don't recall, to be honest with you,
25   what the exact dosage was at that time because I've taken

---

115

1    700 milligrams, 400 milligrams.  It's varied so often I
2    don't recall.
3    Q    If the prescription was for six months on
4    March 17th of '99, can we agree that that prescription would
5    be good through September 16th of '99?
6    A    Yes, it would.
7    Q    Your records indicate that in May you were
8    taking two capsules, a hundred milligrams each, in the
9    morning at 7 a.m. and at 10 p.m. of Dilantin.  Is that
10   consistent with your recollection?
11   A    It may be.
12   Q    You have no firm recollection as you sit here?
13   A    I have no firm recollection, no.
14   Q    Do you know a registered nurse by the last
15   name Griffith?
16   A    No.
17   Q    In May of '99 were you in lockup?
18   A    I'd have to consult my personal records on
19   that one.  I'm not sure.  I may have been.  May of 1999.
20   Q    Is H block a disciplinary block?
21   A    Yes, it is.  If it says I was there ...
22   Q    Do you recall saying to her after you were
23   placed in lockup, yes, I want to see a shrink?
24   A    She asked me if I was seeing a shrink.  I
25   said, yes, I was seeing Ellien at that time.  She asked me

---

116

1    did I want to see my psychiatrist and I said, yes, I do.
2    Q    Did you also say this is bullshit, look how
3    I'm treated.  I don't have a mattress, my jumpsuit doesn't
4    have buttons?
5    A    I was butt naked underneath, yes.
6    Q    At that point in time did she refer you for a
7    psychological evaluation the next day?
8    A    I don't know if she referred me to anything or
9    not.
10   Q    The Dilantin, do you recall if prior to being
11   transferred to H block whether you had taken the Dilantin
12   that day, May 25th of '99?
13   A    If it was prescribed, then yeah I did.
14   Q    But do you have a specific recollection as you
15   sit here that you were taking it up in H block in May of
16   '99?
17   A    Yeah.  While I was in H block?
18   Q    Yes.
19   A    Yes.
20   Q    Did there ever come a time between May 26 and
21   May 31st when you refused to take the Dilantin?
22   A    No, never.
23   Q    Are you familiar with a nurse, either Kristin
24   or Trish is the first name, providing treatment for you in
25   early June of '99?

---

117

1    A    No.
2    Q    Do you have any knowledge of a registered
3    nurse going to Dr. Long on June 3rd, '99 and reporting that
4    you had been noncompliant with your Dilantin for nine days?
5    A    I don't see why they would have.
6    Q    Do you have any information to the contrary,
7    that no nurse had in fact done that?
8    A    I was taking the meds in my cell at that
9    time.  So, I mean, they wouldn't have known whether or not I
10   was taking it or not.  I was taking it, though.
11   Q    But you'd have no knowledge one way or the
12   other whether that information was communicated to the
13   doctor on June 3rd?
14   A    No, I wouldn't know.
15   Q    You did see Dr. Long on June 4th of '99,
16   correct?
17   A    Yes.
18   Q    You hadn't signed up for sick call or for the
19   doctor line, correct?
20   A    June 4th, I believe that was seizure clinic.
21   Q    Well, you were seen June 8th, '99 by Physician
22   Assistant McMullen at the seizure clinic.  June 4th had you
23   signed up for medical treatment?
24   A    I don't recall.
25   Q    Do you recall a discussion with Dr. Long at

---



118

1  that point that at that point in time you hadn't taken
2  Dilantin for 10 days?
3      A      No, but I had told Dr. Long at that point -- I
4  believe I know what conversation you're referring to.  What
5  I told Dr. Long at that point was that the Dilantin -- and I
6  got into the side effects I was speaking about earlier, with
7  it making me jittery, shaky, things of that nature, and I
8  wanted to switch from Dilantin back to phenobarbital.  He
9  said, well, I just switched you, you know, you just made the
10  transition from Dilantin to phenobarbital.
11      Q      Two months after you had requested to be
12  switched from phenobarbital to the Dilantin --
13      A      Exactly.
14      Q      -- you're asking to switch back?
15      A      Yeah, because of the side effects of the
16  Dilantin.
17      Q      Did you indicate on June 4th, '99 to Dr. Long
18  that you feel jittery when you take the Dilantin?
19      A      You said June 4th?
20      Q      Yes.
21      A      Yeah.
22      Q      So that part of your progress note for June
23  4th, '99 is accurate, correct?
24      A      Yes.
25      Q      Did you also indicate to him that you wouldn't

119

1  take it, I won't take Dilantin anymore?
2      A      No, no.
3      Q      So that part --
4      A      I asked him to switch it and he said I'm not
5  going to switch it.  And I never got it ever again.  So that
6  was --
7      Q      Did you also have a discussion at that point
8  in time that the last seizure you had was prior to Christmas
9  of '98?
10      A      Yes.
11      Q      As I understand it, prior to being transferred
12  to Adams County for the PCRA hearing on August 25th, '99 you
13  had no further personal contact with Dr. Long, correct?
14      A      No.  I had sent him a request asking him to
15  reconsider the seizure medicines, to place me back on the
16  seizure medication, but I got no response from him.
17      Q      In your amended complaints you reference a
18  request -- on June 15th you indicate that -- it's attached
19  as Exhibit H to your amended complaint.  Through various
20  pleadings that have been filed, I have four different copies
21  of your amended complaint and I have no copy of that
22  request.  Do you still have that request?
23      A      Yes, I do.  I can send it to you if you don't
24  have it.  I can't believe that you don't.
25      Q      Well, listed as Exhibit H are two pages out of

120

1  the PDR.  That's the only thing --
2      A      Do any of you have that same problem because I
3  can make sure you all get copies of it if you need it?
4      MR. BUTKOVITZ: I don't have anything,
5  including the complaint.
6  BY MR. YOUNG:
7      Q      Provide me with a copy of it and I'll pass a
8  copy on to everybody else.
9      A      Most definitely.  I don't want there to be any
10  confusion.
11      Q      Between June 4th of '99 when the Dilantin was
12  discontinued and August 25th, 1999 when you were transferred
13  to Adams County Prison, you had not had any seizures,
14  correct?
15      A      Say this question again, please.
16      Q      Between June 4th, '99 and August 25th, '99,
17  which is the day you were transferred to Adams County
18  Prison --
19      A      Right.
20      Q      -- you had not reported --
21      A      Oh, no, no.
22      Q      -- any seizures, correct?
23      A      None.
24      Q      I want to make a very clear record so we
25  understand this here today.  Did you have any seizures

121

1  between June 4th, '99 and August 25th, '99?
2      A      No.
3      Q      So you had been off the Dilantin for almost
4  three months?
5      A      Correct.
6      Q      All of June, all of July and 5, 6 of August at
7  the time of your transfer?
8      A      Correct.
9      Q      And you had had no problems with seizures?
10      A      No.
11      Q      And you had no additional contact one on one
12  with Dr. Long?
13      A      Not one on one, no.
14      Q      Other than the one request that you sent to
15  him asking him to switch the medications back --
16      A      Correct.
17      Q      -- did you have any other contact with Dr.
18  Long?
19      A      No.
20      Q      What in your own words is the basis of your
21  claim against Dr. Long?
22      A      I had asked Dr. Long to take me off of the
23  Dilantin, discontinue Dilantin and place me on
24  phenobarbital, instead he discontinued the phenobarbital and
25  gave me no alternatives.


122

1    Now, I say that that is deliberately
2  indifferent to my serious medical needs because it is known
3  to medical professionals, people that deal with this sort of
4  pharmacology and things of that nature, it is known to
5  medical professionals, doctors, etcetera, that if you
6  abruptly discontinue the drug Dilantin that it will
7  precipitate into a status epilepticus attack.
8    Q    What's your definition of abrupt?
9    A    Abrupt meaning right away, without -- you
10  know, abrupt is abrupt, you know.
11    Q    Your Dilantin was discontinued on June 4th of
12  '99?
13    A    Um-hum.
14    Q    And you had no seizures until August 30th of
15  '99, correct?
16    A    Correct.
17    Q    Had any of your treating doctors ever
18  discussed with you any side effects or contraindications
19  from prolonged -- from taking on a prolonged basis a drug
20  such as phenobarbital?
21    A    No.
22    Q    When was the first time you had ever consulted
23  the Physician's Desk Reference with respect to Dilantin?
24    A    When I first saw Dr. Ellien using it and I had
25  seen one in the medical. And then when I got back from --

123

1  from Adams County Prison and out of Gettysburg Hospital, I
2  figured, well, that would be a good reference, a good place
3  to start, considering that's the -- their source of
4  information and given my limited knowledge, you know what I
5  mean. Maybe I can -- maybe I can learn and try to figure
6  out and try to understand what happened.
7    Q    In response to questions about an hour and a
8  half ago you indicated that Dr. Long wouldn't see you.
9  Wasn't your June 15th, '99 request simply can I have the
10  medication that I used to have?
11    A    I asked for a seizure medicine, period. I
12  told him that -- if you're not comfortable with giving me
13  the Dilantin -- or the phenobarbital, then just put me back
14  on the Dilantin but just don't leave me with nothing
15  because, you know, I'm going to be in serious jeopardy here.
16    Q    You didn't put in a request -- ever put in a
17  request to be examined by him or be treated by him and then
18  he refused to examine you, correct? I had that you had
19  testified previously that Dr. Long wouldn't see you.
20    A    I had asked -- I had asked the nurses, you
21  know, because if you have an issue such as this where they
22  consider Dilantin, phenobarbital, things like that life
23  sustaining medication and if you say I'm not taking it,
24  that's a big issue here and they're going to take you and
25  they're going to put you, like I said, back in what I call

124

1  the catacombs in the infirmary until you do take it, you
2  know.
3    Q    Do you have any personal knowledge that the
4  nurses communicated those comments to Dr. Long?
5    A    I don't have any personal knowledge that they
6  did or they didn't.
7    Q    As of June or July of '99 you had been in the
8  state correctional system for 10 or 11 months, correct?
9    A    Correct.
10    Q    Now, when you were committed to the state
11  correctional system, you were given an inmate handbook?
12    A    Um-hum.
13    Q    The inmate handbook explains to you the sick
14  line procedures?
15    A    Sure.
16    Q    It explains to you how to submit a request to
17  be seen on the medical line?
18    A    Yes.
19    Q    You didn't between June 4th of '99 and August
20  25th of '99 submit any request for sick line or to be seen
21  on Dr. Long's M.D. line, correct?
22    A    I had just been seen by the seizure clinic and
23  referred to -- I believe it was Hoffman for a PA.
24    Q    That's not my question. You had not submitted
25  any --

125

1    A    Oh, you're asking whether or not I had put in
2  a sick call slip?
3    Q    Yes.
4    A    No.
5    Q    And you had put in no written request to be
6  seen in Dr. Long's M.D. line?
7    A    No, I put in verbal requests and that one
8  written request for him to place me back on medication.
9    Q    Conspiracy for robbery, is that a felony?
10    A    Most definitely.
11    Q    Was there ever anytime while you were
12  incarcerated at SCI Smithfield when you refused to take
13  Dilantin?
14    A    No.
15    Q    You never once never signed any refusal slip
16  with respect to Dilantin?
17    A    Not with respect to Dilantin.
18    Q    How about with respect to any other
19  anti-seizure medication?
20    A    Phenobarbital.
21    Q    When did you refuse that?
22    A    Several months ago.
23    Q    In calendar year 2001?
24    A    Probably, yes.
25    Q    Have you been prescribed a medication

BENSON, JASON 
08/30/01

BENSON VS
ELLIEN

126

1    Depakene?
2    A    Yes, I was.
3    Q    What was that prescribed for?
4    A    Petit mal seizures.
5    Q    When were you prescribed that?
6    A    I don't recall the date exactly.
7    Q    Did you ever refuse to take the Depakene?
8    A    Oh, yeah.
9    Q    And why did you refuse that?
10   A    I had to see the doctor because they had a
11   younger doctor come in -- I wasn't seeing Long, understand,
12   after September -- or a little after September, maybe
13   October. I wasn't seeing him. And so they had other
14   doctors come in to see me every once in a while and it was
15   this other younger fellow who prescribed the Depakene. I
16   had a bad reaction to it. I was wobbly and nauseous and --
17   he said you've got to be taken off of it. So they took me
18   off of it.
19          And in respect to the phenobarbital, I had
20   asked to be seen about these petit mal seizures because they
21   had got worse once I got back from Adams County. I had
22   asked to be seen over and over again. The only reliable way
23   to actually get in here was to stop taking the med so I
24   stopped taking it.
25   Q    And that was in October of 2000?

127

1    A    Like I said, I think the refusal was in this
2    year, but I may be wrong. I may be wrong. I'm not entirely
3    sure, to be honest.
4          MR. YOUNG: That's all I have.
5          (The deposition was concluded at 2:58 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

128

1
2    COUNTY OF DAUPHIN          :
                                : SS
3    COMMONWEALTH OF PENNSYLVANIA  :
4          I, Teresa K. Bear, Reporter-Notary Public,
5    authorized to administer oaths within and for the
6    Commonwealth of Pennsylvania and take depositions in the
7    trial of causes, do hereby certify that the foregoing is the
8    testimony of JASON E. BENSON.
9          I further certify that before the taking of
10   said deposition, the witness was duly sworn; that the
11   questions and answers were taken down stenographically by
12   the said Teresa K. Bear, a Reporter-Notary Public, approved
13   and agreed to, and afterwards reduced to typewriting under
14   the direction of the said Reporter.
15         I further certify that the proceedings and
16   evidence are contained fully and accurately to the best of
17   my ability in the notes taken by me on the within
18   deposition, and that this copy is a correct transcript of
19   the same.
20         In testimony whereof, I have hereunto
21   subscribed my hand this 11th day of September,, 2001.
22
23
           _____
           Teresa K. Bear, Reporter
24         Notary Public
           My commission expires
25         on April 13, 2003



**POLICY STATEMENT**

**Commonwealth of Pennsylvania • Department of Corrections**

| Policy Subject: | | Policy Number: |
|---|---|---|
| **Consolidated Inmate Grievance Review System** | | **DC-ADM 804** |
| **Date of Issue:**<br>July 20, 1994 | **Authority:**<br>Joseph D. Lehman<br>Commissioner | **Effective Date:**<br>Oct. 20, 1994 |

## I. AUTHORITY

The Authority of the Commissioner of Corrections to direct the operation of the Department of Corrections is established by Sections 201, 206, 506, and 901-B of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, No. 175, as amended.

## II. PURPOSE

It is the purpose of this Administrative Directive to establish policy regarding the Consolidated Inmate Grievance Review System and to ensure that inmates have an avenue through which resolution of specific problems can be sought.

This directive sets forth procedures for the review of Inmate Grievances not already covered by other Administrative Directives and policies. It also provides the method through which review procedures established by other directives are to be integrated with the procedures outlined in this directive.

## III. APPLICABILITY

This policy is applicable to all employees of the Department of Corrections and all inmates under the jurisdiction of the Department of Corrections and to those individuals and groups who have business with or use the resources of the Department of Corrections.

## IV. DEFINITIONS

A. Grievance -

The formal written expression of a complaint submitted by an inmate related to a problem encountered during the course of his/her confinement.

B. Grievance Coordinator -

The Corrections Superintendent's Assistant in an institution or the Assistant to the Regional Director in Community Corrections who is responsible for the overall administration of the Inmate Grievance System in that facility\region. This includes all data collection, tracking and statistical reporting. At the direction of the Facility Mana▓▓▓▓▓▓▓▓▓▓ ▓▓▓tions Regional Director, the Grievance Coordinator may be called upon ▓▓▓▓▓▓▓▓▓▓▓▓▓ of certain grievances.

ADM 804

C. Grievance Officer -

An appropriate Department Head or Management Level staff person designated by the Facility Manager or CC Regional Director to provide Initial Review of an inmate grievance arising from his/her specific area of responsibility, e.g., a Unit Manager would be assigned to provide Initial Review of a grievance from the housing unit. If the grievance arises from the Food Services Area, the Grievance Officer designated by the Facility Manager shall be the Food Services Manager, likewise, the Corrections Health Care Administrator would be the Grievance Officer for a grievance related to a Health Care issue.

D. Central Office Review Committee (CORC) -

A committee of at least three (3) Central Office staff appointed by the Commissioner of Corrections to include the Commissioner, Executive Deputy Commissioner and Chief Counsel or their designees.

With the exception of appeals from disciplinary action under DC-ADM 801 and appeals arising from Health Care or medical treatment grievances, the CORC Shall have responsibility for direct review of all Inmate Appeals for Final Review.

E. Central Office Medical Review Committee (COMRC) -

A committee appointed by the Commissioner to include the Director of the Bureau of Health Services and relevant Bureau staff. The COMRC shall have responsibility for direct review of grievance appeals related to Health Care and medical treatment issues.

F. Initial Review -

The first step in the formal Inmate Grievance Process for all issues except those already governed by other specified procedures (see VI E). All reviews conducted below the level of Facility Manager or Regional Director are considered initial reviews.

G. Appeal from Initial Review -

The first level of appeal of a decision rendered at Initial Review. This appeal is directed to the Facility Manager or Community Corrections Regional Director.

**An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.**

**Only issues raised at Initial Review shall be appealed.**

H. Final Review -

Upon completion of Initial Review and appeal from Initial Review, an inmate may seek Final Review from the Central Office Review Committee (CORC), for any issue involving continued non-compliance with Department of Corrections directives or policy, the ICU Consent Decree or other law.

## V. POLICY

A. It is the policy of the Pennsylvania Department of Corrections that every individual committed to its custody shall have access to a formal procedure - the Consolidated Inmate Grievance Review System - through which the resolution of problems or other issues of concern arising during the course of confinement may be sought. For every such issue, there shall be a

C-ADM 804

B. Informal Resolution of Problems - All inmates are expected to attempt to resolve problems or differences with staff on an informal basis through direct contact or by sending a request slip to appropriate staff. Action taken by the inmate to resolve the situation must be indicated on the grievance form, Section B.

The Grievance Form, DC 804, Part I, is available in each Housing Unit or upon request from Unit staff. This is the proper form to be used for submission of a grievance and it should be completed according to the directions provided.

**It is required that a genuine effort be made to resolve the problem before the grievance system is used. The inmate must document these efforts in Section B of the Grievance Form. Failure to do so may result in the grievance being returned to the inmate without action. The inmate may then refile the grievance with Section B properly completed.**

C. Any inmate using the grievance system shall do so in good faith and for good cause.

No one shall be punished, retaliated against or otherwise harmed for good faith use of this grievance system.

Deliberate misuse of the grievance system may result in restricted access or disciplinary action, at the discretion of the Facility Manager.

D. It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review. See VI., C. 1.

E. The Inmate Grievance Review System is intended to deal with a wide range of issues, procedures or events which may be of concern to inmates. It is not meant to address incidents of an urgent or emergency nature. When faced with such an event, the inmate should contact the nearest staff member for immediate assistance.

## VI. PROCEDURES

A. A Grievance shall be submitted to the Grievance Coordinator in the following manner.

1. All grievances shall be in writing and in the format provided on the forms supplied by the institution (DC-804 Part 1). See Section V., B.

2. All grievances shall be presented individually. Any grievance submitted by a group of inmates will not be processed, however, if the Grievance Coordinator believes that the issue being grieved is legitimate, it will be referred to appropriate Management Staff for review.

3. Only an inmate who has been personally affected by a Department or institution action or policy shall be permitted to seek review of a grievance or appeal. The inmate grievant must sign the grievance or appeal.

4. All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text of the grievance must be legible and presented in a courteous manner. The inmate should identify any persons who may have information which could be helpful in resolving the grievance. The inmate may also specifically state any claims he/she wishes to make concerning violations of Department directives, regulations, the ICU Consent Decree or other law. The inmate may request to be personally interviewed prior to the decision on Initial Review. Any inmate who submits a grievance containing false and malicious information may be subject to

.DM 804

5. Grievances and appeals based on different events should be presented separately, unless it is necessary to combine the issues to support the claim. The Grievance Officer may combine multiple grievances which relate to the same subject.

**NOTE:**    At any point in the grievance process, the inmate has the right to withdraw the grievance.

B.  **Initial Review**

1. Initial Review Procedures must be completed before Appeal from Initial Review or Final Appeal may be sought. Any claims of violation of the ICU Consent Decree must be raised through this grievance procedure before they may be addressed by any court.

2. Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause.

3. The Grievance Coordinator will forward the grievance to the appropriate Grievance Officer for investigation and resolution. The inmate grievant and other persons having personal knowledge of the subject matter may be interviewed. A grievant who has requested a personal interview, shall be interviewed.

4. Within ten (10) working days of receipt of the grievance by the Grievance Officer, the grievant shall be provided a written response to the grievance to include a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance.

   The Grievance Coordinator may authorize an extension of up to an additional ten (10) working days if the investigation of the grievance is pending. If an extension is necessary, the grievant shall be so advised in writing.

C.  **Appeal from Initial Review**

1. An Initial Review Decision of a grievance on a Health Care or medical treatment issue may be appealed directly to the Central Office Medical Review Committee for Final Review within five (5) days of receipt by the inmate of the Initial Review decision. A grievance for which the Corrections Health Care Administrator conducted the Initial Review will usually be considered a Medical Grievance.

   All other appeals will be submitted as follows.

2. An inmate may appeal an initial review decision to the Facility Manager or Community Corrections Regional Director in writing, within five (5) days from the date of receipt by the inmate of the Initial Review decision. **The inmate must appeal in this manner prior to seeking Final Review. Only issues which were raised for initial review may be appealed.**

3. All appeals must conform to the requirements specified in Section VI A of this directive. The appeal must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any initial review decision will be permitted.

4. The Facility Manager or Regional Director must notify the inmate of his/her decision within ten (10) working days after receiving the appeal. This decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision.

C-ADM 804

D. Final Review

1. Any inmate who is dissatisfied with the disposition of an Appeal from Initial Review decision, may, within seven (7) days of receiving the decision, appeal any issue related to non-compliance with the ICU Consent Decree, other law, Department directive or policy, for final review. Only issues raised at the Initial Review and Appeal level may be referred for Final Review.

2. Final Review will not be permitted until the inmate has complied with all procedures established for Initial Review and Appeal from Initial Review. Exceptions may be made for good cause.

3. Final Review of all appeals will be sent directly to the CORC except the following:

    a. Medical Grievances which will be reviewed by COMRC.

    b. Requests for Final Review of appeals from disciplinary actions which were processed through DC-ADM 801. These will be reviewed by the Office of the Chief Counsel which may respond directly to the inmate or refer the appeal to the Central Office Review Committee (CORC) for further reviews.

The address of the CORC/COMRC is:

> **PA DEPARTMENT OF CORRECTIONS**
> **CENTRAL OFFICE REVIEW COMMITTEE**
> **PO BOX 598/2520 LISBURN ROAD**
> **CAMP HILL, PA 17001-0598**

4. Requests for Final Review must clearly identify the decision appealed from and all reasons for appeal. Only one appeal from any second level (Appeal from Initial Review) decision will be permitted.

5. The CORC\COMRC, or any member thereof, may require additional investigation to be made prior to a decision on a Final Review appeal.

6. The CORC\COMRC will review all issues properly raised according to the above procedures. It may also review and consider any other related matter.

7. For all Appeals receiving Final Review, the CORC/COMRC will issue its decision within twenty-one (21) days after receipt of an appeal. The decision may consist of approval, disapproval, modification, reversal, remand or reassignment for further fact finding, and must include a brief statement of the reasons for the decision. The committee shall notify the grievant and Facility Manager/Regional Director of its decision and rationale.

8. The Chief Counsel will notify counsel for the ICU class of disposition by the CORC/COMRC of any matter raised on Final Review alleging a violation of the ICU Consent Decree.

E. Exceptions

Initial Review and Appeal from Initial Review of issues related to the following Administrative Directives shall be in accordance with procedures outlined therein, and will not be reviewed by the Grievance Officer or Grievance Coordinator.

1. DC ADM 805 - Policy & Procedures for Obtaining Pre-Release Transfer.

2. DC ADM 801 - Inmate Disciplinary and Restricted Housing Unit Procedures. See DC-ADM 801 VI., G & I

DC-ADM 804

    4.  DC-ADM 814 - Incoming Publications

        See 814-IIIB. Appeal from Initial Review, see 814-IIID.

Additionally, there may be other kinds of issues for which Initial Review Procedures have been previously established by Administrative Memorandum or Policy Statement.

F.  Admissions and Review

    1.  All proceedings pursuant to this directive are in the nature of settlement negotiations and will, therefore, be inadmissible before any court or other tribunal in support of any claim made against the Commonwealth or any employee. No resolution of any grievance offered as a result of this procedure shall be admissible before any court or other tribunal as an admission of violation of the ICU Consent Decree or any State or federal law.

    2.  No decision rendered as a result of the processing of a grievance shall be reviewable by any court unless it establishes a system or institution-wide violation of the decree.

G.  Completion of Review After Transfer

Any inmate who is transferred after the filing of a grievance or appeal, but prior to the completion of the appeal process, may continue to pursue the grievance or appeal by notifying the Facility Manager or Regional Director of the facility in which confined when the grievance was filed. Adjustments in the various time limitations may be made to facilitate review.

## VII.  SUSPENSION DURING EMERGENCY

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Commissioner or his/her designee for a specific period of time.

## VIII.  RIGHTS UNDER THIS POLICY

This policy does not create rights in any person nor should it be interpreted or applied in such a manner as to abridge the rights of any individual. This policy should be interpreted to have sufficient flexibility so as to be consistent with law and to permit the accomplishment of the purpose of the policies of the Department of Corrections.

## IX.  SUPERSEDED POLICY AND CROSS-REFERENCE

This directive revises the Inmate Grievance System (DC-ADM 804, MAY 1, 1984), and supersedes the pilot grievance system in effect at selected DOC institutions. It does not supersede or repeal any portion of any other directive or policy statement. Where this directive is inconsistent with any other directive or policy, both shall be interpreted so as to provide full review of all issues raised, consistent with the scope and purpose of this directive. Conflicts will most frequently occur at the Initial Review level, where other directives establish committees to review specific issues.

Cross References:  DC-ADM 801, DC-ADM 802

ACA Cross-References: 3-4271

cc:  Executive Deputy Commissioner Reid
     Deputy Commissioner Clymer
     Deputy Commissioner Fulcomer
     Acting Deputy Commissioner Beard
     All Superintendents
     CCC Directors (4)
     File

Joseph D. Lehman,
Commissioner



**Bulletin**

**Commonwealth of Pennsylvania ● Department of Corrections**

| To: | Policy Subject: |
|---|---|
| **Superintendents** <br> **Boot Camp Commander** <br> **Regional Directors** <br> **Executive Staff** | **DC-ADM 804** <br> **CONSOLIDATED INMATE GRIEVANCE** <br> **REVIEW SYSTEM** |
| | **Policy Number:**   DC-ADM 804-1 |
| | **Policy Issue Date:**   **July 20, 1994** |

| Date of Issue: <br> April 2, 1996 | Authority: | Effective Date: <br> May 20, 1996 |
|---|---|---|

The purpose of this Bulletin is to include medical grievances in the regular grievance process and to **discontinue** the Central Office Medical Review Committee (COMRC). .

It is important that the Superintendent be aware of all functions within the institution. Similarly, it is essential that the Bureau of Health Care Services be included in the CORC process, to include review by the Chief Counsel's office with respect to medical grievances. Therefore, all grievances, including those relating to medical issues, are to be processed in the same manner. The grievance coordinator will continue to forward medical grievances to the CHCA for initial review. Then, the Superintendent will be responsible for the Appeal from Initial Review, as for all other grievances.

Final Appeal of medical grievances will no longer be forwarded to the COMRC. The Central Office Review Committee (CORC) will process the appeals. The Director of the Bureau of Health Care Services, or designee, will participate as a member of CORC for all medical grievance appeals.

The following sections of DC-ADM 804 are to be **discontinued:**

IV.E.:      Definition of COMRC

IV.G.:      "An appeal of the Initial Review decision on a grievance related to a Health Care or Medical issue shall be submitted directly to the COMRC at Central Office.

V.D.:      "It is the intent of the Department of Corrections to provide for an accelerated review of appeals of grievances related to medical issues. For this reason, the inmate is permitted to appeal a medical grievance to the Central Office Medical Review Committee for Final Review directly from Initial Review."



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors | Policy Subject: | Consolidated Inmate<br>Grievance Review System |
| --- | --- | --- | --- |

**Policy Number:** DC-ADM 804-2

**Policy Issue Date:** July 20, 1994

| Date of Issue:<br>October 1, 1997 | Authority:<br>*Martin F. H* | Effective Date:<br>November 1, 1997 |
| --- | --- | --- |

The procedures for appeal to final review under DC-ADM 804, VI, D, 5-7, are amended as follows:

(1)     The Chief Hearing Examiner will replace the Central Office Review Committee (CORC) at final review of all grievance appeals. The Chief Hearing Examiner will perform all functions previously performed by CORC.

(2)     In reviewing grievances submitted for final review, the Chief Hearing Examiner will review the initial grievance and response, any appeals therefrom and the responses thereto and the issues appealed to final review.

(3)     The Chief Hearing Examiner will review health care related grievances with the Bureau of Health Care. Appeals raising legitimate legal issues, including but not limited to access to courts and sentencing issues, will be reviewed with an attorney prior to response.

(4)     Upon completion of final review, the Chief Hearing Examiner will respond directly to the inmate in all cases where the position taken by the institution is upheld.

(5)     In all cases where the action of the Grievance Coordinator, PRC, Incoming Publication Review Committee, or Superintendent is reversed or amended, or where a matter is remanded, the Chief Hearing Examiner will prepare a letter to the inmate and a memorandum to the Superintendent. The Chief Hearing Examiner will forward the letter and memorandum to the appropriate Regional Deputy Commissioner for review and signature.

(6)     The Chief Hearing Examiner will be responsible for assuring that:

(a)     appeals to final review are responded to in a timely fashion;
(b)     records pertaining to such appeals are maintained properly; and
(c)     counsel for the ICU class is notified of the disposition at final review of any matter raised to final review alleging a violation of the <u>ICU vs Shapp</u> Consent Decree.

It is the intent of the Department of Corrections to provide inmates with a complete and timely review of



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Executive Staff<br>Superintendents<br>Regional Directors<br>Boot Camp Commander | Policy Subject: | Consolidated Inmate<br>Grievance Review System |
|-----|---|---|---|

**Policy Number:** DC-ADM 804-3

**Policy Issue Date:** July 20, 1994

| Date of Issue:<br>October 21, 1997 | Authority:<br>*Martin F. Horn* | Effective Date:<br>November 1, 1997 |
|---|---|---|

The purpose of this bulletin is to facilitate timely responses from the Chief Hearing Examiner's Office to all appeals to final review.

(1) All appeals to final review should be addressed to the Chief Hearing Examiner.

> Chief Hearing Examiner
> 1451 S. Market Street
> Elizabethtown, PA 17022

Appeals which are addressed to the Commissioner, Chief Counsel, to other Central Office staff, are of course, delivered to these individuals first, then have to be referred to the Chief Hearing Examiner. Improperly addressed appeals may cause a delay in the response to final appeal.

(2) Inmates appealing to final review are responsible for providing the reviewing body with any available paperwork relevant to the appeal. A proper appeal to final review should include photocopies of the initial grievance, initial grievance response, and the Superintendent's response. Appeals without proper records will be reviewed, but the review will be delayed until the appropriate paperwork can be obtained.



**Bulletin**

**Commonwealth of Pennsylvania • Department of Corrections**

| To: | Policy Subject: |
|---|---|
| Executive Staff<br>Superintendents<br>CCC Regional Directors<br>Boot Camp Commander | Consolidated Inmate Grievance Review System |
| | Policy Number: DC-ADM 804-4 |
| | Policy Issue Date: July 20, 1994 |

| Date of Issue: | Authority: | Effective Date: |
|---|---|---|
| April 29, 1998 | Martin F. Horn | May 1, 1998 |

The purpose of this bulletin is to amend the section VI. Procedures, A.4. to read,

"All grievances and appeals must be presented in good faith. They shall include a brief statement of the facts relevant to the claim. The text must be legible and presented in a courteous manner. The Grievant should identify any persons who may have information which could be helpful in resolving the grievance. The Grievant may specifically raise any claims concerning violations of Department of Corrections directives, regulations, court orders, or other law. The Grievant may also include a request for compensation or other legal relief normally available from a court. The inmate may request to be personally interviewed at initial review. Any inmate who submits a grievance containing false information may be subject to disciplinary action. Inmates who have not already completed final review may request compensation or legal relief on appeal to final review."

And to amend Section VI. Procedures, B. Initial Review, 2. to read:

"Grievances must be submitted for initial review to the Facility/Regional Grievance Coordinator within fifteen (15) days after the events upon which the claims are based. Extensions of this time period may be granted by the Facility Manager/Regional Director for good cause. Such extensions will normally be granted if the events complained of would state a claim of violation of federal right."

UNREPORTED/NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 99-1971

———————

LARRY GEISLER,
Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

———————

Argued:  September 12, 2000

———————

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed:  September 29, 2000 )

———————

MEMORANDUM OPINION OF THE COURT

———————

BARRY, <u>Circuit Judge</u>

Appellant Larry Geisler, a former prisoner at SCI-Graterford, appeals separate orders

of the District Court which granted motions to dismiss his civil rights action against appellees



Dr. Stanley Hoffman and Superintendent Donald T. Vaughn. The District Court dismissed Geisler's action against Dr. Hoffman for failure to exhaust administrative remedies and dismissed the action against Superintendent Vaughn on the merits.[1]  In this appeal, Geisler seeks reversal of the orders of dismissal and adds a constitutional challenge to 42 U.S.C. § 1997e(a), a challenge he did not raise before the District Court.[2]  For the reasons set forth below, we will affirm.

The facts underlying this case, as sympathetic as they are to Geisler, are well-known to the parties involved and will not be repeated here.  Despite that sympathetic story, however, we must follow the mandate of Congress in 42 U.S.C. § 1997e(a), as interpreted

---

[1]  Superintendent Vaughn argues that because Geisler's brief on appeal fails to address the merits of his claim against him, much less tell this Court why, in his opinion, the District Court erred in dismissing the action as to him, that order of dismissal is not properly before us for review.  We agree.  "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before t[he] court." Laborers' Int'l Union of No. Am. v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) (quoting Simmons v. City of Philadelphia, 947 F.2d 1042, 1066 (3d Cir. 1991), cert. denied, 503 U.S. 985 (1992)); see also Penn. Dept. of Public Welfare v. U.S. Dept. of Health and Human Services, 101 F.3d 939, 944 (3d Cir. 1996).  The remainder of this opinion will, therefore, address only Geisler's appeal from the dismissal of Dr. Hoffman and we will affirm as to Superintendent Vaughn without further discussion.

[2]  We have consistently refused to consider issues that are raised for the first time on appeal.  See Harris v. City of Philadelphia, 35 F.3d 840, 845 (3d Cir. 1994); Richerson v. Jones, 572 F.2d 89, 97 (3d Cir. 1978) (noting that "refusing to consider on appeal an issue or argument not raised below normally promotes the finality of judgments and conserves judicial resources").  While there is a "manifest injustice" exception to this Court's rule against consideration of new legal issues on appeal, this rarely-applied exception is not triggered here.  We, therefore, will not consider Geisler's challenge to § 1997e(a).

2

by this Court, and affirm the dismissal as to Dr. Hoffman because Geisler simply did not exhaust his administrative remedies as to the monetary relief he now seeks.

The plain language of 42 U.S.C. § 1997e(a), as amended by the Prison Litigation Reform Act ("PLRA"), makes clear that: "No action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted*." 42 U.S.C. § 1997(e)(a) (emphasis added). As we determined in <u>Nyhuis v. Reno,</u> 204 F.3d 65, 67 (3d Cir. 2000), Congress intended for the PLRA to amend "§ 1997e(a) in such a way as to make exhaustion of all administrative remedies mandatory–*whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action.*" The decision in <u>Nyhuis</u> – a Bivens action – to reject a "futility" exception to § 1997e(a) and to regard the exhaustion requirement as unqualified has been extended to § 1983 claims. <u>See Booth v. Churner,</u> 206 F.3d 289, 300 (3d Cir. 2000) ("[T]he rule we announced in <u>Nyhuis</u> has equal force in the § 1983 context . . . for § 1997e(a) treats Bivens actions and § 1983 actions as functional equivalents."), <u>petition for cert. filed,</u> 68 U.S.L.W. 3774 (U.S. June 05, 2000) (No. 99-1964).

As the record reveals and Geisler's counsel concedes, Geisler failed to utilize all three of the tiers of the administrative appeals process provided for by the Pennsylvania Department of Corrections via the Consolidated Inmate Grievance Review Procedure ("DC-ADM 804"). While Geisler claims to have filed a grievance to have his J tube reimplanted

3

and arranged to have an inmate file a second grievance on his behalf, he admittedly never went beyond that initial step within the formal appeals process outlined in DC-ADM 804. Moreover, the failure of the prison officials to formally respond in writing to these grievances did not, contrary to Geisler's argument, relieve him of the obligation of exhausting the requisite administrative remedies. DC-ADM 804 does not prohibit prisoners from appealing the failure of prison officials to act on initial grievances and, therefore, Geisler was statutorily constrained to bring his grievances to the next level within the prison grievance scheme before pursuing relief in the judicial forum. And, we note, Geisler's grievances sought relief wholly different from the monetary remedy that he subsequently sought from the District Court. To this end, even if Geisler had brought his grievances before the two appellate tiers provided for by DC-ADM 804, exhaustion in that setting clearly would not have exhausted his current claim for monetary relief, a claim which he never even began to pursue administratively.

In this connection, Geisler cannot be heard to argue that seeking monetary damages in the administrative setting would have been "futile." First of all, DC-ADM 804 made awards of monetary relief available to inmates as of May 1, 1998 – well before Geisler filed his federal complaint in July 26, 1999; if the very relief Geisler sought in the judicial forum was first available to him in the administrative forum, a grievance in that forum could not have been "futile." Second, even if administrative remedies had not been available to Geisler via DC-ADM 804, any attempt to invoke a "futility" exception would be denied in light of

4

Nyhuis and Booth.  See Nyhuis, 204 F.3d at 70-77 (explaining that Congress, via the PLRA, intended for exhaustion to be an unqualified requirement in prisoner civil rights litigation in an attempt to conserve judicial resources and to give deference to and promote the efficacy of administrative processes); Booth 206 F.3d at 300 (same).

In sum, Geisler's complaint fits squarely within the dictates of § 1997e(a), as interpreted by this court in Nyhuis and Booth, that a prisoner exhaust the administrative remedies available to him or her prior to initiating suit in federal court.  Because Geisler failed to exhaust the three-tiered administrative appeals process with respect to both (1) his request to have his J tube reimplanted and (2) his current request for monetary damages attributable to the time he was deprived of the J tube, the District Court properly granted Dr. Hoffman's motion to dismiss.

We make, however, one observation.  While Nyhuis and Booth compel us to uphold the dismissal of Geisler's complaint for failure to exhaust, we note that exhaustion is a two-way street with obligations on the part of prison officials as well as on the part of the prisoner.  In Nyhuis, this Court stated that "applying § 1997e(a) without exception promotes the efficacy of the administrative process itself . . ."  Nyhuis, 204 F.3d at 76.  We anticipated that under a strict exhaustion requirement "prison grievance procedures will receive enhanced attention and improved administration."  Id.  While the state's failure to formally respond to Geisler's grievances – and on a motion to dismiss both the filing of the grievances and the failure to respond must be accepted as true –  does not constitute a ground for

5

excusing Geisler from exhausting the administrative appeals process, such failure is wholly inconsistent with the "cooperative ethos . . . between inmate and jailer" which this Court envisioned a strict exhaustion requirement would promote. Id. at 77. In response to the inattention in this case, we issue a simple yet stern reminder: federal courts and prisoners alike depend upon prison officials to take seriously their roles within the relevant administrative grievance scheme. Only prompt attention and formal, guided response to timely prisoner grievances will facilitate the overarching policies of the PLRA.

TO THE CLERK OF THE COURT:

    Kindly file the foregoing Memorandum Opinion.

                          /s/ Maryanne Trump Barry
                                Circuit Judge

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

No. 99-1971

LARRY GEISLER,

Appellant

v.

STANLEY HOFFMAN, DR.;
DONALD T. VAUGHN

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civil No. 99-CV-3764
District Judge:  The Honorable John R. Padova

Argued: September 12, 2000

Before: NYGAARD, ROTH, and BARRY, Circuit Judges

(Opinion Filed: September 29, 2000 )

JUDGMENT

This cause came to be heard on the record from the United States District Court for

the Eastern District of Pennsylvania and was argued on September 12, 2000.

After consideration of all contentions raised by the appellant, it is

ADJUDGED and ORDERED that the judgments of the District Court be and are hereby affirmed.

Costs taxed against appellant.

*Marcia M. Waldron*

Marcia M. Waldron, Clerk

Dated: September 29, 2000

2



Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1997 WL 43015
(Cite as: 1997 WL 43015 (E.D.Pa.))
<KeyCite Citations>
Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.

Bilal A. MUHAMMAD, Plaintiff,
v.
Dr. Arnold SCHWARTZ, Dr. John Roeder and Dr. Josey
Malabranch, Defendants.

Civil Action No. 96-CV-6027.

Jan. 27, 1997.

Bilal A. Muhammad, Graterford, PA, Pro Se.

Alan S. Gold, Monaghan & Gold, P.C., Elkins Park, PA,
for Defendants.

*MEMORANDUM AND ORDER*

VAN ANTWERPEN, District Judge.

I. INTRODUCTION

*1 On August 29, 1996 Plaintiff Bilal A. Muhammad filed
a complaint against Dr. Arnold Schwartz, Dr. John Roeder,
and Dr. Josey Malabranch pursuant to 42 U.S.C. § 1983
alleging cruel and unusual punishment via deliberate
indifference to his medical needs in violation of the Eighth
and Fourteenth Amendments to the United States
Constitution. Mr. Muhammad also asserts a Pennsylvania
state law claim of medical malpractice. This court has
jurisdiction via § 1983, and through our assertion of
pendent jurisdiction over the state law claim per 28 U.S.C.
§ 1367.

In their instant motion, Dr. Schwartz and Dr. Roeder
request that the action against them be dismissed for failure
to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dr.
Malabranch was never properly served; the complaint
against her is therefore dismissed without prejudice. The
issue before us consists solely of whether Mr. Muhammad
alleged sufficient facts within his complaint to support his §
1983 action against Dr. Schwartz and Dr. Roeder.

II. DISCUSSION
*A. Failure to State a Claim*

Pursuant to Federal Rule of Civil Procedure 12(b)(6), this
court must dismiss a complaint if it fails to state a claim
upon which relief can be granted. A complaint should not
be dismissed for failure to state a claim unless the plaintiff
has alleged no set of facts in support of his claim which
would entitle him to relief. *Scheuer v. Rhodes,* 416 U.S.

232, 236 (1974); *Haines v. Kerner,* 404 U.S. 519, 520
(1972). This court's inquiry is essentially limited to the
content of the complaint. *Biesenbach v. Guenther,* 588
F.2d 400, 402 (3d Cir.1978). All allegations in the
complaint and all reasonable inferences that can be drawn
therefrom must be accepted as true and viewed in the light
most favorable to the non-moving party. *Nami v. Fauver,*
82 F.3d 63, 65 (3d Cir.1996); *Holder v. City of
Allentown,* 987 F.2d 188, 194 (3d Cir.1993). However,
"we are not required to accept legal conclusions either
alleged or inferred from the pleaded facts." *Kost v.
Kozakiewicz,* 1 F.3d 176, 183 (3d Cir.1993). Further, if
"the facts alleged in the complaint, even if true, fail to
support the ... claim," we must dismiss the complaint. *Id.*
(*citing Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d
Cir.1988). In a Section 1983 action, a motion to dismiss
will be granted if the plaintiff does not sufficiently allege in
his complaint the deprivation of any right secured in the
Constitution. *Nami,* 82 F.3d at 65.

*B. Factual Allegations*

We therefore review Mr. Muhammad's allegations as
contained solely within his complaint in the light most
favorable to him. Mr. Muhammad is currently incarcerated
at S.C.I. Graterford Prison in Graterford, Pennsylvania. He
states in his complaint that on December 19, 1994 at
approximately 5:00 p.m. he was rushed to the dispensary
with complaints of severe stomach and back pains.
*Complaint* at 2. Mr. Muhammad was seen by Defendant
Dr. Roeder, and complained to him that was vomiting and
thought he had food poisoning. Mr. Muhammad alleges
that Dr. Roeder then prescribed Donatol and Maalox to
him; however, Dr. Roeder did not take "blood pressure
readings and/or a finger stick for blood sugar reading along
with temperature readings to determine whether infection
was present." *Complaint* at 3. Mr. Muhammad alleges
that his medical records indicated a pre-existing problem
with diabetes, hypertension, and kidney stones. *Id.* In
addition, he states that a nurse at the infirmary "attempted
to convince defendant Dr. Roeder that [he] had problems in
the past dealing with kidney stones." *Id.* Mr. Muhammad
does not allege that he suggested any alternative diagnosis to
Dr. Roeder other than his initial complaint of food
poisoning.

*2 Later on December 19, 1994, at approximately 8:00
p.m., Mr. Muhammad alleges that he was brought back to
the dispensary to see Dr. Malabranch for vomiting and
pains. After a discussion about Mr. Muhammad's concerns
with his kidneys, Dr. Malabranch prescribed Demoral. Mr.
Muhammad alleges that "at no time [were his] procedural
vital signs taken by defendant Dr. Malabranch." *Complaint*
at 5. Mr. Muhammad then returned to his cell; he states

that he was in severe pain.    He alleges that a nurse requested that he be sent to a hospital, but this request was denied at that time. *Id.*

At approximately 6:00 a.m. on December 20, 1994 Mr. Muhammad states that he applied for sick call for treatment "relating to his stomach and back pains" and vomiting. *Complaint* at 7.   He was now seen by Dr. Schwartz, who prescribed Motrin for the pain and referred him to the Medical Director, Dr. Dennis Moyer. [FN1]   Dr. Moyer ordered that x-rays be taken and placed Mr. Muhammad on medical layin from work.   Mr. Muhammad returned to his cell and, being in pain, took the Motrin previously prescribed. *Id.*

> FN1. Dr. Moyer is not a defendant in this matter.

Two days later, on December 22, 1994, Mr. Muhammad signed up for "routine sick call" and was seen again by Dr. Schwartz.  He complained of "severe back pains associated with kidney stone presence and intense chills, along with vomiting." *Complaint* at 7.  Mr. Muhammad alleges that Dr. Schwartz did not take his blood pressure, but did prescribe Motrin.   He also alleges that approximately one half hour later he "fell to the floor" and was brought to the dispensary.   *Complaint* at 8.   There, he was seen by Dr. Moyer.       Mr. Muhammad's allegations are unclear subsequent to that, but it appears that he was admitted to Suburban General Hospital on December 24, 1994 with severe kidney problems.

### C. Deliberate Indifference

#### 1. Legal Standard

The gravamen of Mr. Muhammad's Section 1983 action is that Drs. Roeder and Schwartz subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the states by the Fourteenth Amendment. *See Robinson v. California,* 370 U.S. 660 (1962).  Because an inmate must rely on prison officials for their medical care, denial of same can result in pain and suffering that rises to the level of a constitutional violation. *See Estelle v. Gamble,* 429 U.S. 97, 103 (1976). However, the law is clear that failure to provide adequate medical treatment is a violation of the Eighth Amendment only when it results from "deliberate indifference to a prisoner's serious illness or injury." *Id.* at 105.

The Supreme Court clarified this standard in *Wilson v. Seiter,* 501 U.S. 294 (1991).  They held that "to establish an Eighth Amendment violation an inmate must allege both an objective element—that the deprivation was sufficiently serious—and a subjective element—that a prison official acted with a sufficiently culpable state of mind, i.e. deliberate indifference." *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996) (*citing Wilson* 501 U.S. at 304);  *Young v. Quinlan,* 960 F.2d 351, 359-60 (3d Cir.1992).  The first element requires that the doctor's act or omission "result in

the denial of the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981);  *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 1977 (1994) ("the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm").   To be sure, Mr. Muhammad has alleged a very serious injury: that he suffered bilateral kidney failure. For purposes of this discussion only, we will accept that this is sufficient to satisfy the first element.

\*3 However, it is not clear that he has alleged sufficient facts to show the second element:  that Drs. Schwartz and Roeder acted with a sufficiently culpable state of mind. The Supreme Court has held that when a prison official commits an act or omission that does not purport to be "punishment," there must be more than an ordinary lack of due care;  there must be deliberate indifference, or the "unnecessary and wanton infliction of pain." *Estelle,* 429 U.S. at 104;  *Whitley v. Albers,* 475 U.S. 312, 319 (1985); *Young v. Quinlan,* 960 F.2d 351, 359 (3d Cir.1992).   In *Farmer v. Brennan,* 114 S.Ct. 1970 (1994), the Supreme Court discussed "deliberate indifference" in more detail.  It is clear that the required state of mind is more than negligence in diagnosing or treating a medical condition, but less than acts or omissions committed for the very purpose of causing harm or with the knowledge that the specific harm will result. *Farmer,* 114 S.Ct. at 1978.   The *Farmer* court adopted subjective recklessness as the appropriate test, holding that a "prison official cannot be found liable under the Eighth Amendment ... unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Id.* at 1979;  *see also, Nami,* 82 F.3d at 67.   If the official should have perceived a risk, but did not, his acts or omissions cannot establish a constitutional violation. Alleging obviousness or constructive notice is insufficient to state a claim because liability may not be prefaced on these alone, and if a prison official was not aware of even an obvious risk there can be no constitutional violation. *Farmer,* 114 S.Ct. at 1980, 1982.

In this light, it is clear that to establish his claim, Mr. Muhammad must allege facts that at a minimum show recklessness on the part of Dr. Schwartz and Dr. Roeder. [FN2]   It is insufficient to allege that the doctors "misdiagnosed [his] condition, that [the doctors'] method of physical examination and treatment may not have followed community standards, or that [the doctors] disagreed with [his] suggested course of treatment." *Bellecourt v. United States,* 994 F.2d 427, 431 (8th Cir.1993), *cert. denied,* 510 U.S. 1109 (1994);  *see also Estelle,* 429 U.S. at 106. Malpractice, while not condoned by this court, is simply not actionable under Section 1983. *See Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d Cir.1993); *Sample v. Diecks,* 885 F.2d 1099, 1109 (3d Cir.1989). Malpractice indicates negligence on the part of the physician, and "negligence in the administration of medical

treatment is not itself actionable under the Constitution." *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.1979) (citing *Estelle*, 429 U.S. at 105); *see also Jordan v. Fox*, 20 F.3d 1250, 1277 (3d Cir.1994). Neither, certainly, is a disagreement between the plaintiff and the doctor on the medical diagnosis. *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir.1987), *cert. denied*, 486 U.S. 1006 (1988); *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir.1990). Because "there may, for example, be several ways to treat an illness," prison doctors have been accorded considerable latitude in the diagnosis and treatment of prisoners. *Durmer*, 991 F.2d at 67; *Inmates of Allegheny County Jail*, 612 F.2d at 762; *White*, 897 F.2d at 110.

> FN2. Some courts have held that because the element of deliberate indifference involves a discussion of intent, this sort of Eighth Amendment claim cannot be resolved at summary judgment; however, the complaint is certainly subject to dismissal for failure to state a claim if no such subjective intent is alleged in the first place. *See Young* 960 F.2d at 360.

*4 In finding deliberate indifference, courts have generally noted length of time without treatment, the types of complaints made by the prisoner, and the specific responses of the doctor. *See Durmer*, 991 F.2d at 67 (prisoner went over seven months without treatment, prisoner complained repeatedly of pain over that time, non-medical reasons given for denial); *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir.1990) (well over ten different instances with several prisoners over many months, repeated complaints, direct comments and actions by doctor which indicate no medical purpose); *Lanzaro*, 834 F.2d at 347 ("deliberate indifference is also evident where prison officials erect arbitrary and burdensome procedures that result in interminable delays and outright denials of medical care to suffering inmates"). The Third Circuit specifically found that allegations that a doctor "intended to inflict pain on prisoners without any medical justification," or a large number of "specific instances in which the doctor insisted on continuing courses of treatment that the doctor knew were painful, ineffective, or entailed substantial risk of serious harm to the prisoners" were distinguishing factors of a case that went beyond mere malpractice. *White*, 897 F.2d at 109.

2. Discussion

For Mr. Muhammad's claims of deliberate indifference, each doctor must be examined separately from the other. *See Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (holding that because respondeat superior is not a basis for liability under § 1983, one doctor at a prison cannot be held liable for actions of others); *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir.1993). We will therefore examine Mr. Muhammad's allegations with respect to Dr. Roeder first.

Dr. Roeder saw Mr. Muhammad once, when he was first brought to the dispensary on December 19, 1994. Mr. Muhammad complained of stomach and back pains and indicated that he thought it might be food poisoning. Based on this, Dr. Roeder prescribed Donatol and Maalox for treatment of the pain and possible food poisoning, and returned Mr. Muhammad to his cell. Mr. Muhammad does not allege that Dr. Roeder was involved subsequent to this. He does allege that a Nurse, Connie Chubb, told Dr. Roeder about his history of kidney stones.

These allegations are insufficient, even when taken in a light most favorable to Mr. Muhammad, to make out a § 1983 action. Mr. Muhammad does not allege that Dr. Roeder actually knew that the prescriptions issued to Mr. Muhammad would cause further harm. He merely disagrees with the diagnosis, with the ease of twenty-twenty hindsight. He does not allege that Dr. Roeder knew that Mr. Muhammad faced the serious risk of kidney failure, and issued a prescription for Donatol and Maalox in reckless disregard for that risk. He merely states that a history of kidney stones and diabetes was listed in his medical records. This is not deliberate indifference per *Farmer v. Brennan*. Without alleging actual knowledge, any reference to obviousness via the medical records available, or what the doctor "should have known" is unavailing.

*5 Dr. Schwartz saw Mr. Muhammad twice. The first time was on the morning of December 20, 1996 at a "sick call screening." Mr. Muhammad alleges in his complaint that he had continued stomach and back pains, and vomiting. Dr. Schwartz prescribed Motrin to alleviate his pain, and referred him to the Medical Director, Dr. Moyer. Mr. Muhammad does not allege any conversation or discussion of his case between Dr. Schwartz and his supervisor, only that the doctor screened him, prescribed him medication for his pain, and referred him to the director.

Dr. Schwartz did not see Mr. Muhammad again until two days later, on December 22, 1994, when Mr. Muhammad signed up for "routine sick call." Dr. Schwartz listened to Mr. Muhammad's complaints, and again prescribed Motrin for his pain. Mr. Muhammad does not state whether or not he took that medication, but it was soon thereafter that he was brought to the dispensary to again be examined by Dr. Moyer. Mr. Muhammad does not allege that Dr. Schwartz had any other contact with him. He does not allege that Dr. Schwartz did or said anything with the knowledge that his actions would cause Mr. Muhammad further harm. Rather, he disagrees with his method of diagnosis, and the diagnosis itself. He does not contest that at any time his complaints were ignored, or that prescriptions were not provided. Mr. Muhammad, simply, has alleged malpractice; in this case, his allegations do not rise to the level required by the deliberate indifferent indifference. *See Farmer* 114 S.Ct. at 1984; *Bellecourt*, 994 F.2d at 431.

For both Dr. Schwartz and Dr. Roeder, Mr. Muhammad asserts that their diagnosis was wrong, and that they therefore delayed his admittance at a local hospital. However, Mr. Muhammad first complained of pains in the afternoon of December 19, 1994, and was admitted to the hospital on December 24, 1994 after being in Dr. Moyer's care for two days.   While Mr. Muhammad undoubtedly suffered a severe injury, he has not--and, it seems, can not--alleged that Drs. Schwartz and Roeder were actually aware of the risks to his health caused by their actions, and that they recklessly disregarded those risks.   Mere mention of a medical record listing a history of kidney stones is insufficient to show that the risk to Mr. Muhammad was so obvious it had to have been known.  *Cf., Farmer,* 114 S.Ct. at 1981.    The facts reveal instead a pattern of Mr. Muhammad complaining of pain and receiving a responsive prescription, and then within five days of the onset of pain being sent to an outside hospital for further treatment. While the negligent malpractice of medicine upon prisoners is unfortunate and will certainly not be condoned by this court, the actions of Dr. Schwartz and Dr. Roeder do not rise to "cruel and unusual punishment" prohibited by the Eighth and Fourteenth Amendment.   The complaint must therefore be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim.

*D. State Malpractice Claim*

*6 We had originally exerted jurisdiction over the second count in Mr. Muhammad's complaint, a state malpractice claim, via pendant jurisdiction. However, because we have dismissed the federal Section 1983 claim above, we have no independent basis to hear the state law claim.   Ordinarily, when a court dismisses a federal claim early on in the case, it will not use its discretion to retain jurisdiction over any pendant claims, but rather will dismiss the state claims without prejudice to raise the matters in state court.  *Angst v. Mack Trucks,* 969 F.2d 1530, 1534-5 (3d Cir.1989); *Panis v. Mission Hills Bank,* 60 F.3d 1486 (10th Cir.1995), *cert. denied,* 116 S.Ct. 1045 (1996);  *See* 28 U.S.C. § 1367(c)(3).  We see no reason to do otherwise in this case.  We do not express any opinion on the outcome of the malpractice claim in the appropriate state court.

## III. CONCLUSION

Despite an examination of Mr. Muhammad's complaint in a light most favorable to him, we find that he has not alleged facts sufficient to make out a Section 1983 claim.

For the foregoing reasons, we will grant Defendants Dr. Schwartz and Dr. Roeder's motion to dismiss count one of Mr. Muhammad's complaint for failure to state a claim. We will dismiss Mr. Muhammad's pendant state malpractice claim without prejudice to bring the claim in the appropriate state court.    We also dismiss without prejudice the complaint against Dr. Malabranch for failure to provide service.

An appropriate order follows.

## ORDER

AND NOW, this 27th day of January, 1997, upon consideration of Defendants Dr. Arnold Schwartz and Dr. John Roeder's Motion to Dismiss filed on January 3, 1997 and Plaintiff Bilal A. Muhammad's response thereto filed on January 13, 1997, it is hereby ordered, consistent with the foregoing opinion as follows:

1. Defendants' Motion to Dismiss is GRANTED as to Count I of the complaint;

2. Plaintiff's Count II is DISMISSED for lack of jurisdiction without prejudice to bring the action in the appropriate state court;

3. Plaintiff's complaint against Defendant Dr. Josey Malabranch is DISMISSED without prejudice for failure to provide service;

4. This case is CLOSED.

END OF DOCUMENT